2017-1520, -1528

_____

IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

CLEARON CORP., OCCIDENTAL CHEMICAL CORPORATION,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellee,

HEBEI JIHENG CHEMICAL CO., LTD.,

Defendant,

JUANCHENG KANGTAI CHEMICAL CO., LTD., ARCH CHEMICALS, INC.,

Defendants-Appellees.

_____

Appeals from the United States Court of International Trade in
Nos. 13-0056, 13-0061, 13-0073 (consol. lead case), Judge R. Kenton Musgrave.

_____

BRIEF FOR DEFENDANT-APPELLEE

_____

CHAD A. READLER
Acting Assistant Attorney General

JEANNE E. DAVIDSON
OF COUNSEL                          Director

David Richardson                    PATRICIA M. MCCARTHY
Senior Attorney                     Assistant Director
Office of the Chief Counsel
  for Import Administration          EMMA E. BOND
Department of Commerce              Trial Attorney
                                    Civil Division
                                    Department of Justice
                                    PO Box 480, Ben Franklin Station
                                    Washington, DC 20044
                                    Tel: (202) 353-0521

June 22, 2017                       Attorneys for Respondent-Appellee

# TABLE OF CONTENTS

**Pages(s)**

STATEMENT OF THE ISSUES............................................................................2

STATEMENT OF THE CASE.............................................................................3

    I.      Nature Of The Case ...........................................................................3

    II.     Statement Of Facts And Course of Proceedings Below .......................4

          A.    Legal And Regulatory Framework ...............................................4

          B.    Decisions Under Review..............................................................5

SUMMARY OF THE ARGUMENT .......................................................................8

ARGUMENT .....................................................................................................10

    I.      Jurisdiction And Standard Of Review...................................................10

    II.     Surrogate Country Selection ...............................................................12

          A.    Legal Standards.......................................................................12

          B.    Background ..............................................................................14

          C.    Discussion ...............................................................................18

                1.     Kangtai's Challenges To The Surrogate Country Selection Process Are Unpersuasive And Contrary To Precedent ................................................................18

                2.     Commerce Adequately Considered India.....................24

                3.     Substantial Evidence Supports Commerce's Finding That Quality Data Exists From The Philippines ...........27

    III.    By-Product Offset................................................................................33

i

A.    Background ..................................................................33

B.    Commerce's Calculation Of The By-Product Offset Is
Supported By Substantial Evidence And In Accordance
With Law.......................................................................36

IV.   Urea Valuation ....................................................................45

A.    Background ..................................................................46

B.    Commerce's Valuation Of Urea Is Supported By
Substantial Evidence And In Accordance With Law ...............48

CONCLUSION .........................................................................55

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Boomerang Tube LLC v. United States,*
   856 F.3d 908 (Fed. Cir. 2017) ...............................................................45, 54

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984)...................................................................................31

*Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Tech. Salaried,*
   *& Mach. Workers,*
   6 F.3d 1511 (Fed. Cir. 1993) ................................................................ 49, 52

*Dorbest Ltd. v. United States,*
   604 F.3d 1363 (Fed. Cir. 2010) ...................................................................19

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009).....................................................................................37

*F.lli de Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
   216 F.3d 1027 (Fed. Cir. 2000) ...................................................................30

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) .....................................................................11

*Hebei Metals & Minerals Imp. & Exp.,*
   366 F. Supp. 2d 1264 (Ct. Int'l Trade 2005)................................................53

*JBF RAK LLC v. United States,*
   790 F.3d 1358 (Fed. Cir. 2015) ................................................................4, 19

*Jiaxing Bro. Fastener Co. v. United States,*
   822 F.3d 1289 (Fed. Cir. 2016) .......................................................... *passim*

*Jiaxing Bro. Fastener Co. v. United States,*
   961 F. Supp. 2d 1323 (Fed. Cir. 2014).......................................................20

*Juancheng Kangtai Chem. Co. v. United States,*
   2015 Ct. Intl. Trade LEXIS 94, 58 (Ct. Int'l Trade Aug. 21, 2015) .............53

*McKart v. United States*,
    395 U.S. 185 (1969)....................................................................54

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)......................................................................39

*Nan Ya Plastics Corp. v. United States*,
    810 F.3d 1333 (Fed. Cir. 2016) ............................................ *passim*

*Norsk Hydro Canada, Inc. v. United States*,
    472 F.3d 1347 (Fed. Cir. 2006) ..................................................10

*NTN Bearing Corp. of Am. v. United States*,
    186 F. Supp. 2d 1257 (Ct. Intl. Trade 2002) ................................42

*Qingdao Sea–Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) ............................................ *passim*

*SKF USA, Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011) ..................................................39

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ........................................... 30, 44

*Swiff-Train Co. v. United States*,
    793 F.3d 1355 (Fed. Cir. 2015) ..................................................52

*Taian Ziyang Food Co. v. United States*,
    637 F. Supp. 2d 1093 (Ct. Intl. Trade 2009) ...............................53

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ........................................... 10, 11

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009)............................................................ 11, 22

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007) ..................................................28

iv

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013) ....................................................52

*Zhejiang DunAn Hetian Metal Co. v. United States*,
   652 F.3d 1333 (Fed. Cir. 2011) ........................................... 11, 48

## STATUTES AND REGULATIONS

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................11

19 U.S.C. § 1673(1) .................................................................................4, 5

19 U.S.C. § 1673d(c)(1) ..............................................................................5

19 U.S.C. § 1677(5) ...................................................................................29

19 U.S.C. § 1677(5A) ................................................................................29

19 U.S.C. § 1677(5B) ................................................................................29

19 U.S.C. § 1677(35)(A)..............................................................................4

19 U.S.C. § 1677(35)(B)..............................................................................5

19 U.S.C. § 1677b(c) .................................................................................11

19 U.S.C. § 1677b(c)(1)..................................................................... *passim*

19 U.S.C. § 1677b(c)(4)................................................................. 5, 25, 31

19 U.S.C. § 1677b(c)(4)(A) ................................................................ 12, 19

19 U.S.C. § 1677b(c)(4)(A)-(B) ...............................................................12

19 U.S.C. § 1677b(c)(5)..............................................................................28

19 U.S.C.A. § 1677(5), (5A), (5B) ..........................................................29

19 C.F.R. § 351.401(b) ................................................................. 33, 34

19 C.F.R. § 351.408(c)(2) .................................................................12

## RULES

Fed. R. App. Procedure 32(a)(7)(B) ........................................................1

## FEDERAL REGISTER NOTICES

*Certain Corrosion-Resistant Steel Products From China*,
    81 Fed. Reg. 35,316 (Dep't of Commerce June 2, 2016) .............................44

*Chlorinated Isocyanurates from China*
    76 Fed. Reg. 70,957 (Dep't of Commerce Nov. 16, 2011).....................28, 29

*Chlorinated Isocyanurates from China*
    78 Fed. Reg. 4,386 (Dep't of Commerce Jan. 22, 2013) .................................3

*Chlorinated Isocyanurates from China*
    81 Fed. Reg. 1,167 (Dep't of Commerce Jan. 11, 2016) ...............................41

*Frontseating Service Valves From China*,
    76 Fed. Reg. 70,706 (Dep't of Commerce Nov. 15, 2011)...........................33

*Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles
From China*,
    60 Fed. Reg. 49251, 49252 (Dep't of Commerce Sept. 22, 1995) ..............53

*Multilayered Wood Flooring From China*,
    76 Fed. Reg. 64,318 (Dep't of Commerce Oct. 18, 2011) ...........................40

## LEGISLATIVE HISTORY

H.R. Rep. No. 576, 100th Cong., 2nd Sess., at 590-91 (1988)................................28

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5 of this Court's Rules, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title. Counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by this Court's decision in this appeal.

2017-1520, -1528

_____

IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
_____

CLEARON CORP., OCCIDENTAL CHEMICAL CORPORATION,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellee,

HEBEI JIHENG CHEMICAL CO., LTD.,

Defendant,

JUANCHENG KANGTAI CHEMICAL CO., LTD., ARCH CHEMICALS, INC.,

Defendants-Appellees.

_____

Appeals from the United States Court of International Trade in
Nos. 13-0056, 13-0061, 13-0073 (consol. lead case), Judge R. Kenton Musgrave.
_____

BRIEF FOR DEFENDANT-APPELLEE
_____

# STATEMENT OF THE ISSUES

When calculating the home-market price in a non-market economy country, the Department of Commerce (Commerce) uses surrogate values to value the inputs of the subject merchandise as if produced in a market economy.

1.    If possible, Commerce must select surrogate values from a country at a level of economic development comparable to the home country.  Did Commerce properly select the Philippines, instead of India, as the primary surrogate country, when only the former was on Commerce's list of countries at the same level of economic development as China?

2.    An offset may be awarded when a foreign producer receives commercial value from a by-product of producing the subject merchandise.  Did Commerce properly calculate the by-product offset by valuing the downstream product, ammonium sulfate, when sales of such ammonium sulfate provided commercial value, and the by-products used to make that ammonium sulfate had anomalously high surrogate values?

3.    The record does not conclusively show whether the Philippines domestically produced urea, an input for the subject merchandise.  Was

Commerce's inference that there was at least some domestic production of urea

supported by substantial evidence?

## STATEMENT OF THE CASE

### I.    Nature Of The Case

These appeals concern Commerce's antidumping duty administrative review

concerning the subject merchandise, chlorinated isocyanurates from the People's

Republic of China, for the period from June 1, 2010, through May 31, 2011.

*Chlorinated Isocyanurates from China*, 78 Fed. Reg. 4,386 (Dep't of Commerce

Jan. 22, 2013) (final results), and accompanying Issues & Decision Mem.,

Appx3291-3317.[1]  In the final results, Commerce determined that the subject

merchandise had been sold at less than fair value and assessed antidumping duty

margins for the exporters and producers subject to review.  *Chlorinated*

*Isocyanurates from China*, 78 Fed. Reg. at 4,388.

Numerous challenges were filed in the Court of International Trade by

(1) the United States producers of chlorinated isocyanurates, Clearon Corp., *et al.*

(Clearon); (2) exporters and producers of subject merchandise, Juancheng Kangtai

---

[1]  "Appx__" refers to pages in the Joint Appendix.  Confidential information
is contained in brackets "[ ]."  Modifications to quoted language are indicated by
curved brackets "{ }."

3

Chemical Co., Ltd. (Kangtai), and Hebei Jiheng Chemical Co., Ltd. (Jiheng); and

(3) Jiheng's importer of subject merchandise, Arch Chemicals, Inc. (also referred

to as Jiheng). *See, e.g.*, Appx141-147.

    After twice sending the case back to Commerce for further explanation and

other action, the Court of International Trade sustained Commerce's second

remand results in full. *See Clearon Corp. v. United States*, Slip Op. 14-88 (July

24, 2014), Appx105-140 (*Clearon I*); *Clearon Corp. v. United States*, Slip Op. 15-

91 (Aug. 20, 2015), Appx43-104 (*Clearon II*), *Clearon Corp. v. United States*, Slip

Op. 16-110 (Nov. 23, 2016), Appx1-40 (*Clearon III*). Kangtai and Jiheng filed

timely notices of appeal.

## II.    Statement Of Facts And Course Of Proceedings Below

### A.    Legal And Regulatory Framework

    The antidumping duty statute provides for the application of remedial duties

to foreign goods sold, or likely to be sold, in the United States at less than fair

value. 19 U.S.C. § 1673(1) (2012). Goods are sold at less than fair value when

the export price charged by a foreign producer in the United States is less than the

normal value charged by a foreign producer in its home market. *See JBF RAK*

*LLC v. United States*, 790 F.3d 1358, 1362 (Fed. Cir. 2015) (citing 19 U.S.C.

§ 1677(35)(A)).  In antidumping reviews involving non-market economy countries, such as China, Commerce "seeks to construct a hypothetical normal value for the merchandise that is uninfluenced by the nonmarket economy." *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1292 (Fed. Cir. 2016).  This is achieved by using surrogate values from a comparable market economy to value each of the factors of production used in producing the merchandise.  *Id.* (citing 19 U.S.C. § 1677b(c)(1), (4)).

Commerce then compares the export price (the price in the United States) with the normal value (the home market price based on surrogate values).  If the export price is less than the normal value, Commerce makes an affirmative determination that dumping has occurred.  *See* 19 U.S.C. §§ 1673(1), 1673d(c)(1).  In such cases, Commerce calculates a "dumping margin" for each entry of subject merchandise and assesses antidumping duties to reflect the difference.  *See* 19 U.S.C. § 1677(35)(B).

### B.    <u>Decisions Under Review</u>

In the final decision memorandum, Commerce explained its decisions on over a dozen issues that the parties disputed at the administrative level.  Appx3291-3292.  The parties challenged ten of those issues before the Court of

International Trade, including the selection of the primary surrogate country and the valuation of numerous factors of production.  Appx107.  The court ordered two remands for Commerce to provide further explanation, Appx105-140 (*Clearon I*), Appx43-104 (*Clearon II*), and, in *Clearon III*, ultimately sustained Commerce's second remand decision in full.  Appx1-40.

Only three issues remain: (1) surrogate country selection, (2) the by-product offset for ammonium sulfate, and (3) the surrogate value for urea.  Kangtai Br. at 17-53, Jiheng Br. at 16-36.  First, the Court of International Trade sustained the selection of the Philippines as the primary surrogate country.  Appx5-19.  The court held that Commerce reasonably declined to choose India because it was less economically comparable to China, and because data considerations did not overcome economic comparability.  *See, e.g.*, Appx17-18.

Second, the court sustained Commerce's calculation of the by-product offset by valuing the downstream product, ammonium sulfate.  Appx31-32, Appx37-39. The court held it was reasonable for Commerce to calculate the offset by valuing ammonium sulfate—which provided the commercial value that justified the offset. *Id.*  Contrary to Kangtai's and Jiheng's argument that Commerce should instead have valued the immediate by-products, ammonia gas and sulfuric acid, the court

6

held that it was "undisputed" that Jiheng and Kangtai "did not sell ammonia gas or sulfuric acid and did not record the actual amounts of their production" for those by-products. Appx37. Commerce had explained that ammonia gas and sulfuric acid had anomalously high surrogate values compared to the value for ammonium sulfate, and the court concluded that Commerce's concern was "legitimate." Appx31-32, Appx37 (citing Appx4008-4009).

Finally, the court sustained Commerce's selection of the surrogate value for urea, holding that Commerce had reasonably inferred that there was at least some domestic production of urea. Appx19-24. "Bearing in mind that 'the burden of creating an adequate record lies with interested parties and not with Commerce,'" the court held that "Commerce is permitted, and indeed is often required, to draw reasonable inferences from the record." Appx21-22 (quoting *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1338 (Fed. Cir. 2016)) (other citations omitted). The court held that Commerce's inference was adequately supported here, Appx20-22, and that Commerce reasonably exercised its discretion by following its traditional preference for domestic data, Appx21, Appx24.

Jiheng and Kangtai appeal.

7

## SUMMARY OF THE ARGUMENT

After ordering two remands for Commerce to provide further explanation, the Court of International Trade properly sustained Commerce's second remand results. On appeal, Kangtai and Jiheng challenge Commerce's decisions on three issues: (1) the selection of the Philippines as the primary surrogate country, (2) the calculation of the by-product offset, and (3) the use of domestic prices for the surrogate value for urea. However, Commerce's decision on each of these three issues was supported by substantial evidence and in accordance with law.

First, Commerce properly selected Philippines instead of India as the primary surrogate country. The statute provides that Commerce shall, if possible, select surrogate values from a country at a comparable level of economic development as the non-market economy—here, China. As Commerce explained, the Philippines was at the same level of economic development as China during the period of review, whereas India was not. In fact, the *per capita* gross national income (GNI) of India and China had been diverging for years, resulting in a significant disparity in this period of review. Despite that disparity, Kangtai argues that Commerce was required to compare data quality between India and the Philippines *separate from* economic comparability. That argument is wrong

8

because the statute expressly requires consideration of economic comparability, if possible. Commerce reasonably followed the economic-comparability requirement here.

Second, Commerce properly calculated the by-product offset. That offset is intended to reflect the commercial value that can be realized from by-products of producing the subject merchandise. Jiheng and Kangtai argue that Commerce should have valued the offset using the surrogate values of two by-products, ammonia gas and sulfuric acid. Instead, Commerce valued the offset by starting with the surrogate value for ammonium sulfate, the downstream product of combining ammonia gas and sulfuric acid. As Commerce explained, ammonium sulfate was the product actually sold to realize commercial value, and the surrogate values of ammonia gas and sulfuric acid were anomalously high in comparison with the value for ammonium sulfate. It would have been illogical for Jiheng and Kangtai to use highly-priced inputs (ammonia gas and sulfuric acid) to produce and sell a less-expensive downstream product (ammonium sulfate). Commerce properly declined to rely on those anomalously high prices.

Finally, Commerce reasonably selected domestic Philippine data, instead of import data, as the surrogate value for urea. Jiheng and Kangtai argue that

9

Commerce erred in using domestic data because the record shows there was no domestic production of urea. But Commerce explained that the record did not conclusively show whether or not there was domestic urea production. Commerce reasonably inferred that at least some of the domestically produced fertilizer was urea. Kangtai further argues that Commerce should not have used domestic prices because they were increased by duties and taxes. The Court of International Trade, however, held that plaintiffs had failed to exhaust their administrative remedies for this argument, and Kangtai does not even attempt to show that holding was an abuse of discretion.

## **ARGUMENT**

## I. **Jurisdiction And Standard Of Review**

This Court reviews the trial court's decision *de novo*, applying anew "the same standard of review the Court of International Trade used in reviewing the Commerce administrative record." *See Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1357 (Fed. Cir. 2006). Thus, the Court will uphold Commerce's determination unless it is "'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C.

§ 1516a(b)(1)(B)(i)).  "Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts."  *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (citing, *e.g.*, *United States v. Zenith Radio Corp.*, 562 F.2d 1209, 1216 (1977), *aff'd*, 437 U.S. 443 (1978)). Accordingly, Commerce receives "tremendous deference" in antidumping duty determinations.  *Id.* (citation omitted); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009).

When selecting surrogate values, the statute requires Commerce to choose data that constitutes the "best available information" on the record.  19 U.S.C. § 1677b(c)(1)(B).  Because the statute does not define the term, "Commerce is granted broad discretion to determine whether information is the best available." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citations omitted).  In reviewing such determinations, the question for this Court "is not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information."  *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1300-1301 (Fed. Cir. 2016) (citing *Zhejiang*, 652 F.3d at 1341).

11

## II.    <u>Surrogate Country Selection</u>

The Court of International Trade correctly sustained Commerce's selection of the Philippines as the primary surrogate country.  Kangtai argues that the Philippines lacks quality data and that Commerce failed to properly consider India as the primary surrogate country.  Kangtai Br. at 20-40.  As discussed below, each of these arguments is unpersuasive, and Commerce's selection of the Philippines is supported by substantial evidence and in accordance with the law.

### A.    <u>Legal Standards</u>

When selecting surrogate values, "Commerce selects a market economy country as the primary surrogate country."  *Jiaxing*, 822 F.3d at 1293 (citing 19 C.F.R. § 351.408(c)(2)).  To the extent possible, Commerce shall select surrogate values from "one or more market economy countries that are—(A) at a level of *economic development comparable* to that of the non-market economy country, and (B) *significant producers* of comparable merchandise." 19 U.S.C. § 1677b(c)(4)(A)–(B) (emphases added).  The statute also "directs Commerce to value the factors of production through 'the best available information' in the market economy." *Jiaxing*, 822 F.3d at 1293 (quoting 19 U.S.C. § 1677b(c)(1)).

12

"Commerce has discretion to determine what constitutes the best available information, as this term is not defined by statute." *Id.* (citation omitted).

Consistent with these statutory requirements, Commerce follows "a four-step process to select a surrogate country{.}" *Id.* First, "the Office of Policy . . . assembles a list of potential surrogate countries that are at a comparable level of economic development to the [non-market economy] country," based on *per capita* gross national income (GNI). *Id.* at 1293-94 (quoting, *inter alia*, Import Admin., U.S. Dep't of Commerce, No-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004) (Policy Bulletin 04.1), Appx265-269). Second, "Commerce identifies countries from the list with producers of comparable merchandise." *Id.* (internal quotation marks and citations omitted). Third, Commerce determines whether any of the countries that produce comparable merchandise "are significant producers of that comparable merchandise." *Id.* (internal quotation marks and citations omitted). Finally, "if more than one country satisfies" the first three steps, "Commerce will select the country with the best factors data." *Id.* (internal quotation marks and citations omitted).

13

**B.    Background**

In the final results, Commerce selected the Philippines as the primary surrogate country.  Appx3296.  In selecting the Philippines, Commerce acted consistently with the positions of Clearon, a domestic producer of chlorinated isocyanurates, and Jiheng, a Chinese producer and exporter of the subject merchandise.  *See* Appx3295-3296.  Only Kangtai argued that Commerce should have used India as the primary surrogate country.  Appx3296.  Commerce declined to use India because, unlike the Philippines, India was not on the list of countries that Commerce determined were at the same level of economic development as China.  Appx3296.

In *Clearon I*, the Court of International Trade remanded the primary-surrogate-country issue because Commerce had failed to provide India's *per capita* GNI or any analysis of why India's GNI was not economically comparable to China's.  Appx136-138.

In the first remand redetermination, Commerce provided further explanation for excluding India from the list of economically comparable countries.  As Commerce explained, it had begun the process of revising the list of comparable economies upon the annual release of the *World Bank Development Report*.

14

Appx3833.  After considering the increase in China's *per capital* GNI, Commerce

re-centered the GNI range to reflect that increase.  Appx3833-3834.  Based on the

new information, Commerce selected countries within the preliminary GNI range,

attempting to achieve "a degree of 'balance,'" with "the same number of surrogate

countries above and below {China}."  Appx3836.

Although India had been included on the list in prior years, the 2009 data

showed that India had diverged to "a level of economic development less

comparable" to China, with a *per capita* GNI outside of China's GNI band.

Appx3839.  "The growing distance between" the *per capita* GNIs of India and

China "was part of a long-term divergence," as reflected by the following table:

Table 2:  Comparison of the PRC and India's *per capita* GNIs (2001-2009)

|       | 2001 | 2002 | 2003  | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  |
|-------|------|------|-------|-------|-------|-------|-------|-------|-------|
| PRC   | 890  | 940  | 1,100 | 1,290 | 1,740 | 2,010 | 2,360 | 2,940 | 3,590 |
| India | 460  | 480  | 530   | 620   | 720   | 820   | 950   | 1,070 | 1,180 |

Appx3840; *see also* Appx3839 (discussing the "growing *per capita* GNI disparity"

between India and China).  By 2009, China had a *per capita* GNI in 2009 of

$3,590, with a GNI band ranging from $1,790 to $5,770, whereas India had a *per*

*capita* GNI of only $1,180.  Appx3840, Appx257.  In other words, India's GNI

was 67 percent lower than that of China, and 34 percent lower than even the lowest

15

end of the GNI band for China.  Accordingly, Commerce continued to select the Philippines as the primary surrogate country.

After considering the remand results, the Court of International Trade "conclude{d} that Commerce's selection of the Philippines as the primary surrogate country . . . has general support in the record."  Appx54 (*Clearon II*). Yet because the court found inadequate support for the Philippine surrogate values for chlorine and hydrogen gas, it remanded to give Commerce the opportunity to reconsider its selection.  Appx54.

On the second remand, Commerce continued to choose the Philippines as the primary surrogate country, even though it had to use Indian data for two inputs—chlorine and hydrogen gas.  Appx3988-3995.  As Commerce explained, chlorinated isocyanurates require "more than 40 {factors of production}, depending on the producer's level of integration."  Appx3989.  Accordingly, the two inputs of chlorine and hydrogen were "not so critical as to warrant switching to India as the primary surrogate country{.}"  Appx3989.

In *Clearon III*, the Court of International Trade sustained Commerce's selection of the Philippines as the primary surrogate country.  Appx5-19.  The court concluded that Commerce had complied with *Clearon II*'s remand order,

16

Appx8, and rejected each of Kangtai's challenges to Commerce's choice of the Philippines, Appx8-19.  With respect to Kangtai's argument that Commerce had failed to engage in any comparison between India and the Philippines, the court held that Commerce did explain "that it was simply not convinced that the merits of the Indian data outweighed the fact that India" was not on the list of economically comparable countries.  Appx14.  The court also sustained Commerce's interpretation of the "significant production" prong of the statute, stating that Kangtai had failed to "point to record evidence that . . . the Philippines production of the comparable merchandise . . . was so low that it completely failed to affect world trade."  Appx16.

## C.    <u>Discussion</u>

The Court of International Trade correctly sustained Commerce's selection of the Philippines as the primary surrogate country.  Kangtai levies numerous broad-brush challenges to Commerce's surrogate country selection process, but the crux of its argument is that Commerce failed to adequately consider using India as the primary surrogate country.  *See* Kangtai Br. at 17-41.  Contrary to Kangtai's arguments, Commerce's choice of the Philippines is supported by substantial evidence and in accordance with law.

17

### 1.    Kangtai's Challenges To The Surrogate Country Selection Process Are Unpersuasive And Contrary To Precedent

The root of Kangtai's argument is that Commerce "refused to weigh the full quality of the Indian data against the Philippine data *separate from its economic comparability concerns*."  Kangtai Br. at 6 (emphasis added).  In other words, Kangtai argues that Commerce must compare the quality of the Philippine data with the quality of the Indian data—disregarding that the Philippine economy is at the same level of economic development as China and the Indian economy is not. Yet nothing in the statute requires Commerce to undertake such an analysis "separate from" economic comparability.  *See id.*  To the contrary, this Court has "discern{ed} nothing in the statute that requires Commerce to consider any particular country as a surrogate country."  *Jiaxing*, 822 F.3d at 1298.  "When Congress does not mandate a procedure or methodology for applying a statutory test, 'Commerce may perform its duties in the way it believes most suitable.'"  *Id.* (quoting *JBF RAK LLC v. United States*, 790 F.3d 1358, 1364 (Fed. Cir. 2015)).

Kangtai's position mirrors one that has already been rejected by this Court. Kangtai Br. at 9, 18-19, 34.   In *Dorbest Ltd. v. United States*, the Court held that a regression line did not provide the "best available information" for selecting the surrogate value for labor, because it was divorced from any analysis regarding

18

economic comparability. *See* 604 F.3d 1363, 1369 (Fed. Cir. 2010). As the Court explained, Commerce had erroneously "decided to use data from many market-economy countries, *regardless of their economic comparability to China*, without any finding that data from economically comparable countries were unavailable or otherwise unusable." *Id.* at 1371-72 (emphasis added). This was error because the statute "requires Commerce to use data from economically comparable countries 'to the extent possible,'" and Commerce had "not shown that using only these data {was} impossible." *Id.* (quoting 19 U.S.C. § 1677b(c)(4)(A)).

Kangtai is wrong, therefore, in arguing that Commerce was required to consider data quality "irrespective of" economic comparability. *See, e.g.*, Kangtai Br. at 34-36. Instead, consistent with the Court's instruction in *Dorbest*, Commerce properly identified countries at the same level of economic development as China, including the Philippines, and concluded that it was not impossible to use data from those countries. *See* Appx4014-4016.

As further support for Commerce's position, this Court recently sustained Commerce's decision not to use India as the primary surrogate country when India was not on the list of countries at the same level of economic development as China. *Jiaxing*, 822 F.3d at 1298. In *Jiaxing*, the Court held that Commerce's

19

decision to exclude India was based on a permissible interpretation of the statute and supported by substantial evidence. *Id.* at 1298-1299. Citing the wide disparity between China's and India's *per capita* GNI and the availability of other economically comparable countries, the Court held that Commerce had properly considered and rejected the argument to use India. *Id.* at 1298-1299 (citing *Jiaxing Bro. Fastener Co. v. United States*, 961 F. Supp. 2d 1323, 1329, 1330-32 (Fed. Cir. 2014)). The same is true here. As in *Jiaxing*, there is a wide disparity between China's and India's *per capita* GNI during the relevant period—with China at $3,590, and India at only $1,180. Appx3840, Appx257. And, like *Jiaxing*, Commerce selected a primary surrogate country—the Philippines—that was on the list of economically comparable countries. *See* Appx257.

Kangtai raises several challenges to Commerce's surrogate-country selection process, Kangtai Br. at 21-30, but many of these arguments were already raised and rejected in *Jiaxing*. For example, Kangtai maintains that Commerce's selection of the GNI-range of economically comparable countries is not "predictable or consistent," and alleges that the economic-comparability prong is "practically an absolute threshold" in surrogate country selection. Kangtai Br. at

22, 29-31.[2]  The Chinese producer in *Jiaxing*, likewise, argued that excluding India resulted in a "complete lack of consistency and predictability," and challenged the use of a "threshold" for economic comparability.  Appellant Br. at *6, *45-*47, *Jiaxing Bro Fastener Co. v. United States*, Fed. Cir. No. 2015-1161, 2015 WL 514699 (Jan. 29, 2015).  And just as Kangtai argues that the surrogate country list is not transparent, the appellant in *Jiaxing* argued that the surrogate country selection was "nontransparent."  *Compare* Kangtai Br. at 22-23 (arguing that the relevant information "is *never* provided or explained" by Commerce) *with* Appellant Br. at *8, *25, 2015 WL 514699 (alleging "the process has not been transparent nor consistent").  Despite these arguments, the Court in *Jiaxing* sustained Commerce's interpretation of the statute with respect to surrogate-country selection.  *Jiaxing*, 822 F.3d at 1298.  Likewise here, Commerce properly followed the statute by selecting a surrogate country from the list of countries at the same level of economic development as China.  19 U.S.C. § 1677b(c)(4).

Kangtai also challenges Commerce's selection of the *per capita* GNI band, arguing that Commerce does not actually expand the GNI band "roughly on the

---

[2]  Kangtai clarifies that it is not "*per se* appealing the . . . formulation of the surrogate country list."  Kangtai Br. at 22.  If so, the Court need not consider the challenges in part II.B of Kangtai's brief.  *See id.* at 20-30.

same rate of China's GNI increase." Kangtai Br. at 21.[3]  As an initial matter, the

statute does not dictate how Commerce must decide which countries are

economically comparable, and Commerce's implementation of the statute is

entitled to deference.  *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333,

1341 (Fed. Cir. 2016) (citing, *e.g.*, *United States v. Eurodif S.A.*, 555 U.S. 305, 316

(2009)).  Moreover, to the extent Kangtai argues that Commerce's GNI band is not

supported by substantial evidence, the following chart shows otherwise.

Appx3842.  Chart I demonstrates that, over time, the GNI band has remained

---

[3] This argument was not resolved in *Jiaxing*, because the Court held that
Kangtai had waived it.  *Jiaxing*, 822 F.3d at 1298 n.17.

within a range that tracked China's progressive increase in *per capita* GNI.  *Id.*



**Chart 1**

**Range of *per capita* GNIs for the PRC on the Surrogate Country List Compared to the *per capita* GNI Range Suggested by the CAFC[38]**

Appx3842.  The GNI band is thus supported by substantial evidence.

Kangtai also argues that Commerce's stated goal—of including countries on the list that are "most likely to have good data availability and quality"—is impossible, given that Commerce "uses the same list for the entire year regardless of the product under review."  Kangtai Br. at 23.  But this argument

23

misunderstands the considerations relevant to creating the list of comparable economies. As Commerce explained, it listed countries within the GNI band that were "actively used . . . in on-going proceedings," rather than "smaller and less diversified economies." Appx3836-3837. That analysis is separate from the product-specific, best-available-information analysis that Commerce considers as the fourth step in surrogate-country selection. Appx268.

In any event, Kangtai's argument is irrelevant because it only implicates the specific countries on the list, not the GNI band. Commerce reasonably explained that it would consider any unlisted countries as being at the same level of economic development, so long as they are within the GNI band. Appx3837-3838. Kangtai's argument does not implicate consideration of India, because India is not within the GNI band.

### 2.   Commerce Adequately Considered India

Kangtai next argues that Commerce's selection of the Philippines instead of India is unsupported by substantial evidence. *See, e.g.*, Kangtai Br. at 33. Kangtai contends that Commerce erroneously "refus{ed} to evaluate the Indian data in this case," despite the absence of Philippine data for two (of forty) factors of production. *Id.* Each of these arguments is incorrect.

24

Importantly, Kangtai agrees that the statute supports Commerce's stated policy—of typically selecting a country within the GNI band unless none of the listed countries satisfies the significant-production prong or has quality data. Kangtai Br. at 28; Appx3830; Appx4014. When selecting the primary surrogate country, Commerce properly determined that there was no need to resort to countries outside of the GNI band in this case because the Philippines (1) was economically comparable to China, (2) was a significant producer of comparable merchandise, and (3) had quality data for almost all factors of production. *See, e.g.*, Appx4014; 19 U.S.C. §§ 1677b(c)(1), (4).

The fact that Commerce chose Indian data for two of the factors of production does not show otherwise. Commerce selected the factors of production from the primary surrogate country to the extent possible, and selected values from a less comparable economy when necessary. Appx4014. For the majority of factors with quality data from the Philippines, Commerce declined to "even consider" Indian data. Appx4014. And for the minority of factors—two out of forty—without Philippine data, Commerce used Indian data. Appx4014. That factor-specific analysis makes sense, and is consistent with the statute, which requires Commerce to select factors of production from "one *or more*" countries

25

that "to the extent possible" satisfy the economic comparability and significant

production prongs.  19 U.S.C. § 1677b(c)(4) (emphasis added).

Kangtai argues that, because Commerce used Indian data from chlorine and

hydrogen, it was required to consider India as the primary surrogate country.

Kangtai Br. at 33.  According to Kangtai, "{i}f missing critical raw material inputs

. . . does not meet an initial burden that the Philippines has a data quality issue . . .

then nothing will meet this burden."  *Id.*  What Kangtai fails to recognize is that

Commerce *did* use Indian data for the two factors without Philippine data.  Yet for

the many remaining factors (up to 38, depending on the producer's level of

integration), Commerce explained that quality data "exists from the Philippines."

Appx4016.  Given the availability of quality data for the vast majority of factors,

Commerce properly declined to consider a country outside of the GNI band when

selecting the primary surrogate country.  And, contrary to Kangtai's argument,

Commerce did not "effectively eliminate{} any reasonable scenario" where it

would consider an off-list country.  *See* Kangtai Br. at 33.

Kangtai also attempts to show that the Court of International Trade's

decision in *Clearon III* is inconsistent with its prior decision in *Clearon II*.

Kangtai Br. at 33-35.  As an initial matter, there was no inconsistency between

26

those decisions.  *Clearon II* recognized that Commerce's selection of the

Philippines enjoyed general support in the record, Appx54, and *Clearon III*

sustained Commerce's selection of the Philippines, Appx8, Appx19, Appx40.  In

any event, this argument does not satisfy Kangtai's burden on appeal—to show

that Commerce's final decision was unsupported by substantial evidence or

contrary to law.  *See, e.g.*, *Nan Ya*, 810 F.3d at 1341.

### 3.    Substantial Evidence Supports Commerce's Finding That Quality Data Exist from the Philippines

Kangtai argues that Commerce erred in finding that there are quality data

from the Philippines for the factors of production other than chlorine and

hydrogen.[4]  Kangtai Br. at 36-41.  The Court of International Trade, however,

correctly held that substantial evidence supports Commerce's finding that there

were quality data from the Philippines for these factors of production.

First, Kangtai argues that Commerce should not have used the financial

statement from the Philippine company, MVC, due to evidence of countervailable

---

[4]   In numerous places, Kangtai compares the Indian data with Philippine data, yet elsewhere states that "Kangtai *is not requesting*" this Court to evaluate Kangtai's claims that Indian data are superior.  Kangtai Br. at 36 (emphasis added). Accordingly, the only question on appeal is whether substantial evidence supports Commerce's finding that there were quality Philippine data for the vast majority of the factors of production.

subsidies.  Kangtai Br. at 37.  Kangtai fails to identify any statutory provision that supports its argument.  The only applicable statute requires Commerce to select the "best available information"—a standard that "is not defined" and that "Commerce has broad discretion" to apply.  *See Qingdao*, 766 F.3d at 1386 (citing 19 U.S.C. § 1677b(c)(1)).  To be sure, the legislative history states that "Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices."  *See* Omnibus Trade and Competitiveness Act of 1988, Conference Report to Accompany H.R.3, H.R. Rep. No. 576, 100th Cong., 2nd Sess., at 590–91 (1988).  Yet Commerce possesses discretion in how to interpret that legislative history when selecting the best-available information as required by statute.[5]  *See, e.g.*, *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1360-1363 (Fed. Cir. 2007) (considering legislative history in the course of determining that Commerce's interpretation was reasonable).

In exercising that discretion, Commerce adopted a practice of rejecting "financial statements that contain a subsidy that {Commerce} has found countervailable in the past."  Appx4017; *see also Chlorinated Isocyanurates from*

---

[5]   The current statute now provides a discretionary standard—that Commerce "*may* disregard price or cost values without further investigation if {Commerce} has determined that broadly available export subsidies existed."  19 U.S.C. § 1677b(c)(5) (2016) (emphasis added).

*China*, 76 Fed. Reg. 70,957 (Dep't of Commerce Nov. 16, 2011) and

accompanying IDM at cmt. 2, 76 ITADOC 70957 (Westlaw).  As Commerce

explained, the tax incentives alleged by Kangtai do not qualify because they had

not been "previously countervailed as a subsidy."  Appx4017. (citations omitted).

Kangtai nonetheless maintains that there was "as much evidence of

countervailable subsidies" in the MVC financial statement, as there was in the

financial statements from India that contained countervailable subsidies.  Kangtai

Br. at 37, 39.  Yet, unlike the MVC financial statement, the financial statements

from India contained subsidies that Commerce "has countervailed in the past,"

Appx1838, and thus qualified under Commerce's practice.  Appx4017.

Kangtai does not dispute that the alleged subsidies to MVC had not been

found countervailable in the past, arguing instead that "the same *types* of programs

have been found countervailable."  Kangtai Br. at 38 (emphasis added).  Yet the

applicable statute provides lengthy requirements and definitions for which

subsidies qualify as countervailable, and Kangtai fails to even mention these

standards—much less show that the relevant subsidies qualify as countervailable.

*See, e.g.*, 19 U.S.C. § 1677(5), (5A), (5B).  Kangtai agrees that Commerce is not

instructed to conduct a "formal investigation" into whether particular subsidies are

countervailable.  Kangtai Br. at 38.  Nor was Commerce required to accept

Kangtai's characterization of these particular subsidies as countervailable.

As the Court of International Trade held, moreover, Commerce properly

found that MVC did not actually receive the subsidies alleged by Kangtai.

Appx11-12.  Accordingly, Commerce properly relied on MVC's financial

statement as quality data, especially given the deferential standard for reviewing

whether Commerce has selected the "best available information," *Qingdao*, 766

F.3d at 1386.

Kangtai next argues that the Philippine chemical data were not quality data

because they were "lacking in specificity."  Kangtai Br. at 39.  Yet the Court of

International Trade held that Kangtai waived this argument by raising it only in a

"perfunctory manner."  Appx12-13 (*SmithKline Beecham Corp. v. Apotex Corp.*,

439 F.3d 1312, 1320 (Fed. Cir. 2006)).  Decisions regarding waiver are reviewed

under the deferential abuse-of-discretion standard.  *F.lli de Cecco Di Filippo Fara*

*S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000).  Kangtai

does not directly challenge the court's waiver decision, and that decision should be

affirmed.

Finally, Kangtai argues that the Philippines is not a significant producer of comparable merchandise. Kangtai Br. 40. The Court of International Trade correctly rejected this argument. Appx15-17. Although the statute requires Commerce (to the extent possible) to select surrogate values from one or more countries that are significant producers of comparable merchandise, it does not define how much production is "significant." *See* 19 U.S.C. § 1677b(c)(4). Commerce's interpretation of "significant" is thus entitled to deference. *See Nan Ya*, 810 F.3d at 1341 (citing, *e.g.*, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984)). As Commerce explained, the term "significant" does *not* require "a surrogate with an industry comparable in size to that of the country under investigation." Appx4019. Instead, Commerce explained, "there are not degrees of significant production. Either a potential surrogate country is a significant producer or not." Appx4018-4019.

Commerce reasonably found the Philippines was a significant producer of comparable merchandise. Appx4018. As support for that finding, Commerce relied "on information from a Philippines Securities and Exchange Commission Management Report" that MVC alone produces 30,000 metric tons of comparable

merchandise per year.  Appx4018.  That affirmative showing is substantial

evidence supporting Commerce's finding.  Appx4018.

Kangtai nevertheless argues that "the five Indian companies produced more

than the Philippines in total," and that Commerce should have compared the

"relative significant production" between India and the Philippines.  Kangtai Br. at

40.  That argument conflicts with Commerce's interpretation that the significant-

production prong does not require selecting the country with the "most" significant

production.  *See* Appx4018-4019.,  Kangtai offers no statutory basis for rejecting

Commerce's interpretation, Kangtai Br. at 40, which must, therefore, be sustained

as a reasonable interpretation of the statute.  *See Nan Ya*, 810 F.3d at 1341.

Finally, Kangtai notes that Commerce initially found, in the preliminary

results, that the Philippines was not a significant producer.  Kangtai Br. at 40.  But

the preliminary determination was based on export data of calcium hypochlorite as

comparable merchandise, which is not produced in the Philippines.  Appx1827,

Appx1839.  That was before Commerce determined in the final results that

sodium hypochlorite was also comparable to the subject merchandise.  Appx3293-

3295.  Kangtai does not dispute that sodium hypochlorite is comparable

merchandise.  Accordingly, the Court of International Trade properly sustained

32

Commerce's finding that the Philippines is a significant producer of comparable merchandise.

## III.   <u>By-Product Offset</u>

Commerce granted a by-product offset to Jiheng and Kangtai to reflect the commercial value of certain by-products—ammonia gas and sulfuric acid—that are secondary products of producing the subject merchandise.  Appx3981-3985, Appx4005-4011.  In valuing the offset, Commerce used the surrogate value for ammonium sulfate—the downstream product of ammonia gas and sulfuric acid— which is the product that Jiheng and Kangtai actually sell for commercial value. *Id.*  Appellants argue that Commerce was required to value the immediate by-products—ammonia gas and sulfuric acid.  Jiheng Br. at 16-30; Kangtai Br. at 46-53.  As discussed below, however, Commerce properly declined to value the immediate by-products because they had anomalously high prices compared to the value of the downstream product.  Appx30-32.

### A.    <u>Background</u>

Where appropriate, Commerce will decrease the normal value with a by-product offset when the respondent shows "that the byproduct has commercial value." *See, e.g.*, *Frontseating Service Valves From China*, 76 Fed. Reg. 70,706

(Dep't of Commerce Nov. 15, 2011) (final results), and accompanying IDM at cmt. 18, 76 ITADOC 70,706 (Westlaw). Respondents may demonstrate commercial value by showing the byproduct "was sold" or "re-introduced . . . into production." *Id.*; *see also* 19 C.F.R. § 351.401(b).

In the final results, Commerce valued the by-product offset using the value for ammonium sulfate. Appx121. After multiple parties challenged that decision in *Clearon I*, the Court of International Trade granted Commerce's request for a voluntary remand to provide further explanation. Appx120-124.

On remand, Commerce explained that, in prior reviews, it had valued the by-product offset using surrogate values for ammonia gas and sulfuric acid. Appx3852. In this review, however, Commerce valued ammonium sulfate, "the product actually sold by the companies." Appx3853. Commerce stated that, by doing so, it was granting "an offset equal to the amount of value a company actually receives, less any processing costs"—"not a hypothetical value that is unrelated to a company's financial books and records." Appx3852-3853; *see also* Appx3871. Commerce also explained that its valuation resolved the argument raised by the domestic industry: that the values of ammonia gas and sulfuric acid were anomalously high compared to the downstream salable product, ammonium

34

sulfate.  Appx3871 (citation omitted).  Finally, in response to Jiheng's and Kangtai's arguments that they had lacked the opportunity to submit relevant information, Commerce issued new questionnaires and revised the by-product calculation using Jiheng's and Kangtai's responses.  Appx3854.

In *Clearon II*, the Court of International Trade held that Commerce's focus on "whether a by-product has commercial value . . . accords with generally accepted cost accounting principles' income and inventory concerns."  Appx95. Yet the court remanded for a second time, holding that Commerce had failed, among other things, to explain how its "new methodology" was "an improvement over its previously applied methodology."  Appx99, Appx103-104.

On its second remand, Commerce described its "long standing practice" to value "the products as close to the split-off point as possible," but explained that, on this record, it would continue to value the downstream by-product that is actually sold.  Appx3982-3984; *see generally* Appx3981-3985, Appx4006-4011. It provided two reasons.  First, Commerce explained, the respondents did not keep actual production records for ammonia and sulfuric acid, instead estimating those quantities using records for ammonium sulfate and chemical formulae.  Appx3983. Second, the values for ammonia gas and sulfuric acid were anomalously higher

35

than the value for ammonium sulfate.  Appx3983-3984, Appx4009.  As Commerce

explained, it would be "illogical" for the inputs of the downstream product to be

worth more than the downstream product itself.  *Id*.

Accordingly, in the second remand, Commerce calculated the offset by

using the production quantity and price for ammonium sulfate, reduced by the

processing costs to convert ammonia gas and sulfuric acid to ammonium sulfate.

Appx3984.  The Court of International Trade sustained, holding that "Commerce

has expressed a legitimate concern (*i.e.*, reason) for" changing its methodology.

Appx31-32.  The court rejected appellants' argument that they detrimentally relied

on Commerce's prior calculation, finding that there was "no record evidence of

actual reliance."  Appx37; *see generally* Appx32-37.

### B.     Commerce's Calculation Of The By-Product Offset Is Supported By Substantial Evidence And In Accordance With Law

The Court of International Trade correctly sustained Commerce's second

remand results.  Appx27-40.  Jiheng and Kangtai challenge that decision, arguing

that (1) Commerce failed to recognize that it was changing its methodology,

(2) Commerce should be held to its calculation in prior reviews, and

(3) Commerce's rationales for valuing ammonium sulfate were unsupported by

substantial evidence and contrary to law.  Jiheng Br. at 16-30; Kangtai Br. at 46-53.  Each of these arguments is unpersuasive.

First, Jiheng argues, without citation, that Commerce's "methodology *was* changed," and argues that Commerce failed to "display awareness that it has changed position."  Jiheng Br. at 21 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).  Yet the case cited by Jiheng simply says that an agency may not "depart from a prior policy *sub silencio* or simply disregard rules that are still on the books."  *FCC*, 566 U.S. at 515-16.  Commerce was not silent on the topic of its by-product offset, nor did it disregard existing methodology.  Rather, over the course of the final results, the first remand results, and the second remand results, Commerce considered this topic at length—even reopening the record for Jiheng and Kangtai to submit additional factual information.  Appx3313-3314, Appx3852-3854, Appx3869-3875,  Appx3981-3985, Appx4005-4011.  Although Commerce ultimately adjusted the methodology to fit the particular facts of this case, it cannot be said that Commerce disregarded the prior methodology or failed to consider it.

Second, Kangtai argues that Commerce should be held to its calculation in prior reviews.  Kangtai Br. at 50-51.  But "{e}ach administrative review is a

37

separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1299-1300 (Fed. Cir. 2016).  And, as Commerce explained, the facts on this record showed that the surrogate values for ammonia gas and sulfuric acid were anomalously high.  Appx3983, 4008-4009.

Those values were so high, in fact, that they exceeded the value of the downstream product that they were combined to produce.  Appx3983-3984.  As Commerce explained, using those values "would result in an illogical outcome" of using two high-priced inputs to produce a lower-priced downstream product that is actually sold.  Appx3983.  By adjusting its normal methodology and starting with the value of the downstream product (ammonium sulfate), Commerce reasonably accounted for that factual anomaly on this record.  Appx3984.  The Court of International Trade correctly sustained Commerce's decision.  Appx30-31, Appx37.

Further, even assuming that Commerce had actually changed its methodology (instead of merely applying a record-based adjustment), Jiheng agrees that "Commerce is entitled to change its practice if the change is permitted by law and is accompanied by an adequate, reasoned analysis of the basis for

38

changing the practice." Jiheng Br. at 17 (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983); *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011)). Commerce was permitted "by law" to select the best available information on this record, *see Motor Vehicle*, 463 U.S. at 42, and receives substantial deference in doing so. *Qingdao*, 766 F.3d at 1386 (Fed. Cir. 2014) (citing 19 U.S.C. § 1677b(c)(1)). Neither Jiheng nor Kangtai has cited any statute or authority to the contrary. And with respect to the "adequate, reasoned analysis" for its methodology, *Motor Vehicles*, 463 U.S. at 42, Commerce adequately explained that it elected to value ammonium sulfate because: (1) it had actual production records for ammonium sulfate and (2) valuing ammonia gas and sulfuric acid would overstate the by-product offset because the surrogate values alone were higher than the value of the downstream by-product they were used to produce. Appx3983-3984.

Third, Jiheng and Kangtai raise numerous arguments challenging Commerce's rationale as unsupported by the record and contrary to law. Jiheng Br. at 20-29; Kangtai Br. at 46-53. Kangtai argues, for example, that Commerce should have valued ammonia gas and sulfuric acid because it obtained commercial value by reintroducing them into production, rather than by selling the downstream

39

product.  Kangtai Br. at 47-48.  Yet Kangtai's own questionnaire response stated that Kangtai had obtained commercial value by selling the downstream product—ammonium sulfate.  Appx4259.  Ammonia gas and sulfuric acid are not reintroduced into production of the subject merchandise, but instead are used to produce ammonium sulfate.  *Id.*  As Kangtai stated, "Kangtai claims that this by-product, i.e., ammonium sulfate, should be treated as an offset."  *Id.*  Kangtai's own questionnaire responses thus support Commerce's by-product offset.[6]

Jiheng, in turn, challenges Commerce's decision to cap the offset at the value of ammonium sulfate, the downstream product.  Jiheng Br. at 20, 22-29.  Importantly, however, Jiheng's capping argument *concedes* that the prices for ammonia gas and sulfuric acid were anomalously high, meriting some form of capping.  *Id.* at 22-29; *see also* Appx4146.  Jiheng nonetheless argues that Commerce's method of resolving that anomaly is contrary to a "regular" capping methodology in which Commerce caps the surrogate value at an average of inputs.  Jiheng Br. at 27-28 (citing, *e.g., Multilayered Wood Flooring From China*, 76 Fed. Reg. 64,318 (Dep't of Commerce Oct. 18, 2011) (final det.), and accompanying

---

[6]  Kangtai also argues that Commerce "frontloaded" labor and electricity costs to the production of ammonium sulfate.  Kangtai Br. at 49-50.  But Kangtai itself had presented that calculation to Commerce, and should not be permitted to challenge it now.  Appx3984-3985.

IDM at cmt. 23; *Chlorinated Isocyanurates From China*, 81 Fed. Reg. 1,167 (Jan. 11, 2016) (final results 2013-2014) and accompanying IDM at cmt. 3).  But the cited cases do not support a rigid capping method, and instead confirm that Commerce calculates the offset based on the record before it.  *See, e.g.*, *Chlorinated Isocyanurates From China*, 81 Fed. Reg. 1,167, accompanying IDM at cmt. 3 (citation omitted).

The case that Jiheng cites as providing a "capping practice," for example, merely states that Commerce "has a practice of capping by-product surrogate values in instances where {they are} of a higher price than the {surrogate value} for the input which created the scrap by-product in question." *Chlorinated Isocyanurates From China*, 81 Fed. Reg. 1,167, accompanying IDM at cmt. 3 (citation omitted).  In other words, that case presented an anomaly because the by-product was more costly than the inputs to produce the by-product.  This case, by contrast, involved an anomaly where the by-product is more costly than the downstream product that Jiheng and Kangtai actually sell.  *See, e.g.*, Appx3983, Appx3084.  Commerce exercised its expertise and broad discretion on this record, and properly determined to cap the offset using the commercial value of the downstream product.

41

Jiheng also argues that the record does not support Commerce's finding "that Jiheng did not keep records of the ammonia gas and sulfuric acid that were produced." Jiheng Br. at 22. Citing a verification report,[7] Jiheng argues that it "*does* maintain records of the actual production of the sulfuric acid{.}" *Id.* at 23 (citing Jiheng Verification Report at 33, Appx3085). But the cited language merely references certain records of "consumption" of sulfuric acid, and did not require Commerce to find that Jiheng measures actual quantities of sulfuric acid by-product *produced*. Appx3085.

Nor is there any dispute that Jiheng does not maintain actual records of production for ammonia gas. Jiheng Br. at 5. By contrast, both parties did maintain actual production records for ammonium sulfate, and it was those records that Commerce used to calculate the production quantities for the by-products of ammonia gas and sulfuric acid. *See, e.g.*, Appx589-590 (showing the formula for deriving quantities of ammonia gas and sulfuric acid), Appx609, Appx625 (showing records for production of ammonium sulfate).

---

[7]   Verification "is a spot check" of the respondent's business, "and is not intended to be an exhaustive examination." *NTN Bearing Corp. of Am. v. United States*, 186 F. Supp. 2d 1257, 1296 (Ct. Intl. Trade 2002) (internal citation omitted).

Contrary to Jiheng's argument, moreover, the verification report provides substantial evidence supporting Commerce's findings. *See* Appx3084-3085. According to the report, "Jiheng officials explained that to determine the amount of each by-product . . . , they started with the total production of ammonium sulfate . . . , and used molecular weights to determine the amount of sulfuric acid and ammonia gas{.}" Appx3084. In other words, Jiheng officials used the *actual* production records for ammonium sulfate to determine the *estimated* quantity of ammonia gas and sulfuric acid produced. Indeed, Jiheng concedes that "the ammonia gas does not show a metered 'actual' amount because it cannot be metered due to its corrosive nature." Jiheng Br. at 5 (citing, *e.g.*, Appx589-592, Appx596-597, Appx600-607, Appx638).[8]

Jiheng further argues that Commerce has acted inconsistently by (1) valuing other by-products, including hydrogen gas and discharged chlorine, whose production records are likewise based on chemical formulae, and (2) accepting estimated quantities of by-products in other cases. Jiheng Br. at 24-26 (citing, *e.g.*,

---

[8]   Jiheng criticizes the Government for referring to its records of ammonia gas as "hypothetical . . . without explaining how it reached" that conclusion. Jiheng Br. at 23 (internal quotation marks and citation omitted). Yet Jiheng itself characterized its records as reflecting "the quantity of by-product claimed when calculated by the formulae (the so-called '*hypothetical*' amounts)." Appx4047 (emphasis added).

*Certain Corrosion-Resistant Steel Products From China*, 81 Fed. Reg. 35,316 (Dep't of Commerce June 2, 2016) (final determination) and accompanying Issues and Decision Memorandum at cmt. 2). Yet even Jiheng concedes that, whereas it has metered readings for hydrogen gas and chlorine, it does not have such records for ammonia gas. *See* Jiheng Br. at 5. And Jiheng's inconsistency argument fails to account for the fact that Commerce had *two* reasons for capping the values of ammonia gas and sulfuric acid. Appx4008-4009. The second reason—the anomalously high values for ammonia gas and sulfuric acid—did not apply to the other by-products, such as hydrogen gas and chlorine, nor to the other by-product cases cited by Jiheng.

Relatedly, Jiheng suggests that Commerce acted inconsistently because past cases also presented "high" surrogate values for anhydrous ammonia. But Jiheng has waived this argument by raising it in a conclusory fashion, without citation and without any "developed argumentation." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006). Moreover, Jiheng provides no indication whether Commerce was previously presented with an *argument* that the ammonia gas price was too high and justified valuing ammonium sulfate. As a corollary of the requirement that parties must exhaust their administrative remedies

44

before the agency, *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017), Commerce cannot be presumed to have created a past practice without squarely deciding the issue in past proceedings.  Jiheng's argument must fail because it does not identify when, if ever, such anomalous pricing occurred, nor whether Commerce resolved any argument on that issue.

In sum, Commerce properly considered the argument that the ammonia gas and sulfuric acid prices were anomalously high, and decided to use a value for the downstream product, ammonium sulfate.  Appx3981-3985.  Even if this Court would not make the same decision in the first instance, Commerce reasonably exercised its broad discretion in choosing the best available information, and its findings are supported by substantial evidence.  *Qingdao*, 766 F.3d at 1386.

## IV.    <u>Urea Valuation</u>

In the second remand results, Commerce valued the urea factor of production using data from the Philippines' Bureau of Agricultural Statistics (BAS).  Appx3985, Appx3987.  Jiheng and Kangtai argue that Commerce should have used import data from the Global Trade Atlas (GTA).  Jiheng Br. at 31-36; Kangtai Br. at 41-46.  Under the deferential standard for reviewing Commerce's

45

best-available-information determinations, the Court of International Trade correctly sustained Commerce's decision.  Appx19-24.

### A.  <u>Background</u>

In the final results, Commerce used GTA data from the Philippines to value the urea factor of production.  Appx3985.  As Commerce explained, the record contained the Philippine BAS data "which allegedly reflects domestic prices of domestically produced urea," and "GTA data which contains imports of urea into the Philippines.  Appx3300.  Although Commerce found that both sources of data were "publicly available, contemporaneous with the {period of review}, and appear{ed} to be free of taxes," it also found that "there is record evidence that urea is not produced in the Philippines."  Appx3300.  Accordingly, Commerce selected the Philippine GTA import data as the best available information to value urea.  *Id.*

In *Clearon I*, the Court of International Trade remanded for Commerce to reconsider its surrogate country selection, and simultaneously remanded the factors of production, including urea, that hinged upon the primary surrogate country.  Appx139.  On remand, Commerce continued to use the GTA import data to value urea.  Appx3872.

46

In *Clearon II*, the court considered the argument by the domestic producer, Clearon, that Commerce's use of the GTA import data "'violated the well established preference for published domestic price data,' all other things being equal." Appx69 (citations omitted). According to Clearon, Commerce should have selected the "publicly available, {period-of-review} contemporaneous, and reliable domestic prices from the" BAS. Appx69 (citation omitted). Clearon also challenged Commerce's finding that there was no domestic urea production in the Philippines. Appx70 (citation omitted). The Court of International Trade remanded the urea surrogate value for additional consideration. Appx70. As the court explained "the record shows that urea is in fact produced domestically in the Philippines, as the defendant concedes, and . . this contrasts with the apparent reason Commerce gave for selecting the Philippines' GTA data{.}" *Id.*

On the second remand, Commerce elected to use the BAS domestic data because it inferred that those data were "representative of the domestic price of urea," and because, "all else being equal (public availability, contemporaneity, etc.)," Commerce typically prefers domestic dealer prices over GTA import data. Appx3986-3987.

47

The Court of International Trade sustained the use of BAS domestic data in *Clearon III*, holding that Commerce had reasonably exercised its discretion in using those data. Appx24. As the court explained, "{t}he BAS data contain a domestic price that is published by a government agency involved in domestic policy, and the record does not show that price 'was solely an import price.'" Appx24 (citation omitted).

### B. Commerce's Valuation Of Urea Is Supported By Substantial Evidence And In Accordance With Law

On appeal, Jiheng and Kangtai argue that Commerce's finding regarding domestic urea production is unsupported by substantial evidence, and that Commerce's use of the BAS data is unreasonable. Jiheng Br. at 30-36; Kangtai Br. at 42-45. Both arguments are unpersuasive.

As an initial matter, the selection of the BAS data is reviewed under the deferential standard of review applied to Commerce's best-available-information determinations. 19 U.S.C. Section 1677b(c)(1). As described above, the only question in such circumstances is whether Commerce reasonably selected the relevant data, not whether this Court would choose those data in the first instance. *See Zhejiang*, 652 F.3d at 1341. The Court of International Trade correctly applied this deferential standard to Commerce's inference that there was at least some

domestic production of urea.  *See* Appx20-23.  The court began by explaining that

"'the burden of creating an adequate record lies with interested parties and not with

Commerce,'" and that Commerce is thus "permitted, and indeed is often required,

to draw reasonable inferences from the record."  Appx21-22 (quoting *Nan Ya*, 810

F.3d at 1338; *Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Tech. Salaried,*

*& Mach. Workers*, 6 F.3d 1511, 1520 (Fed. Cir. 1993)).  "The question is whether

the record adequately supports the decision of [Commerce], not whether some

other inference could reasonably have been drawn."  Appx22 (quoting *Daewoo*, 6

F.3d at 1520).  "Stated differently," the court explained, "the possibility of a

different inference based on the same record does not mean that Commerce's

finding is unsupported by substantial evidence."  Appx22.

The court sustained Commerce's findings and analysis.  Appx21-22.  As

recounted by the court, Commerce found that none of the articles or sources cited

by Jiheng "state{d} that 100 percent of urea is imported," nor did they state "that

there is no domestic production."  Appx20 (quoting Remand 2 at 39).  Commerce

had further stated that it was faced with "an apparently domestic price . . .

published by a government agency involved in domestic policy."  *See* Appx21.  It

explained that it "does not as a matter of course conduct a query" into whether

apparently domestic prices are "in fact, based on domestic market sales." Appx21 (quoting Remand 2 at 39). Although Commerce would have considered evidence "that the price was solely an import price, (*e.g.*, a price published by a customs authority or a footnote indicating the price was based solely on imports)"—here, the record contained "no such evidence." Appx21 (quoting Remand 2 at 39). Accordingly, the court concluded that "the record evinces a 'domestic market' for urea, howsoever constituted," Appx22, and sustained Commerce's finding.

Jiheng argues that Commerce's finding is unsupported by substantial evidence, and that "{t}he record provided no indication of domestic production of urea during the period of review." Jiheng Br. at 32. But the BAS data are comprised of domestic dealer prices, and Commerce reasonably declined to presume that all of those domestic prices were based on imports. Appx3986-3987, Appx4013, Appx4322-4323. In any event, Commerce considered the record evidence, including the articles submitted by Jiheng, and found that "{t}he evidence implies that a large portion of urea is imported, but does not preclude the possibility that urea is also domestically produced, albeit in small quantities, just as similar fertilizers are." Appx4013. That finding properly considers all record

evidence, and draws a reasonable conclusion that is entitled to substantial

deference.

Jiheng argues that the only conclusion to be drawn from the articles is that

all urea sold in the Philippines is imported. Jiheng Br. at 32-34. Yet the articles

are not so clear. Jiheng relies, for example, on a Business Mirror article stating

that "92% of PHL fertilizer requirements are imported" in 2010. *Id.* at 32 (citing

Appx2231-2241). By inference, however, eight percent of fertilizer is not

imported, *i.e.*, is produced domestically, and urea is a type of fertilizer that may be

included in that figure. *See* Appx2231-2241.

Another article, titled "The Philippine Fertilizer Industry," notes that urea

comprises 32 percent of inorganic-fertilizer sales in the Philippines in 2004, that 60

percent of inorganic fertilizer was imported, and that urea accounts for 30 percent

of those imports. Appx2234-2235. Working through those percentages means that

18 percent (0.3 times 0.6) of inorganic fertilizer is imported urea, leaving 14

percent of urea sales that are presumably *not* imported. *Id.* And even though "the

domestic production of fertilizers continuously went down from 2006 to 2010,"

Appx2241, Commerce found that "there are no specific statistics about the

decrease of urea production itself, and there is no indication that the trend is

51

significant." Appx3987. Nothing in the BAS data or the articles of record state that there was no domestic production of urea. *See* Appx3987. Consistent with that understanding, even Kangtai does not argue that there is no domestic urea production in the Philippines, arguing instead that "almost none of the urea" was domestically sourced. Kangtai Br. at 9.

Jiheng further argues that Commerce's decision is based on an assumption rather than substantial evidence in the record. Jiheng Br. at 35 (citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)). But Commerce did not assume the existence of domestic production, and instead made an appropriate inference from the record evidence. To the extent that Jiheng would reach a different conclusion that may also be supported by the record, that does not alter the fact that Commerce's inference was also reasonable. *Daewoo*, 6 F.3d at 1520; *see also* Appx22. The possibility of "'a different conclusion based on the same record'" does not mean that Commerce's finding is unsupported by substantial evidence. *See Swiff-Train Co. v. United States*, 793 F.3d 1355, 1367 (Fed. Cir. 2015) (citation omitted).

Kangtai argues that Commerce erred by using the domestic BAS data because it "normally uses import data to value {factors of production.}" Kangtai

Br. at 42 (citing, *e.g.*, *Juancheng Kangtai Chem. Co. v. United States*, 2015 Ct.

Intl. Trade LEXIS 94, 58 (Ct. Int'l Trade Aug. 21, 2015); *Hand Final Results,*

*Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from*

*China*, 60 Fed. Reg. 49251, 49252 (Sept. 22, 1995) (final rev. results)).  Yet the

Commerce decision cited in support of Kangtai's rule merely states that Commerce

prefers import prices *over export prices*—saying nothing about domestic prices,

like the BAS data.  *See, e.g.*, *Heavy Forged Hand Tools*, 60 Fed. Reg. 49252

(stating that Commerce "prefers import data in the selected surrogate country over

export data").  In fact, Commerce has repeatedly stated that, when comparing two

data sets, one from domestic sources and the other from import sources, "{a}

domestic price is preferred for the calculation of surrogate values by prior practice,

policy, and logic."  *Hebei Metals & Minerals Imp. & Exp.*, 366 F. Supp. 2d 1264,

1273-74 (Ct. Int'l Trade 2005).  This "'conditional preference for domestic data is

a logical starting point for achieving the objective set by Congress,'" because,

among other reasons, "'it is reasonable to assume that a domestic price reflects the

value of a factor of production more accurately than an import price.'"  *Taian*

*Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093, 1148 n.61 (Ct. Intl. Trade

2009) (quoting *Hebei Metals*, 366 F. Supp. 2d at 1274-75).

53

Finally, Kangtai argues that the Philippines BAS price for urea "was inflated with all manner of markups, including taxes and profits at each level of trade that Kangtai would never have paid{.}  Kangtai Br. at 9-10, 41-45.  But the Court of International Trade properly found that plaintiffs had failed to exhaust administrative remedies with respect to this argument.  Appx22-23.  In response to Jiheng's argument that the BAS data were not tax-and-duty free, the court found that Jiheng did not "make that argument to Commerce ,and therefore the court must find that it failed to exhaust its administrative remedies in that regard."  Appx23 (citing, *e.g.*, *McKart v. United States*, 395 U.S. 185, 193-94 (1969)).  That determination is reviewed for an abuse of discretion, and Kangtai makes no effort to satisfy the significant hurdle of demonstrating such abuse of discretion.  *See Boomerang Tube*, 856 F.3d at 912.

Relatedly, Kangtai argues that a hypothetical producer of the subject merchandise in the Philippines would purchase imported urea rather than paying "retail prices."  Kangtai Br. at 44-45 (citation omitted).  Yet the Court of International Trade correctly rejected that argument because Kangtai failed to cite any record information to support it.  Appx23.  Again, Kangtai has not directly challenged the court's holding.

54

In any event, Commerce explained that it has "analyzed BAS data in the past and specifically found that the BAS data (i) represent broad market-average prices, (ii) are specific to the urea input, (iii) *are exclusive of value added taxes*, and (iv) are publicly available{.}" Appx3987 (internal quotation marks and citation omitted) (emphasis added). By failing to challenge that finding at the agency level, Kangtai gave Commerce no reason to question that the Philippine dealer prices in the BAS data were tax and duty free.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court affirm the decision of the Court of International Trade.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

<u>/s/ Patricia M. McCarthy</u>
PATRICIA M. MCCARTHY
Assistant Director

|  |  |
|---|---|
|  | /s/Emma E. Bond |
| OF COUNSEL | EMMA E. BOND |
|  | Trial Attorney |
| David Richardson | Commercial Litigation Branch |
| Senior Attorney | Civil Division; Department of Justice |
| Office of the Chief Counsel | P.O. Box 480; Ben Franklin Station |
| for Import Administration | Washington, D.C.  20044 |
| Department of Commerce | Tel:  (202) 353-0521 |
|  | Fax:  (202) 514-8624 |
|  |  |
| June 22, 2017 | Attorneys for Defendant-Appellee |

56

## **CERTIFICATE OF COMPLIANCE**

I certify that, pursuant to Fed. R. App. Procedure 32(a)(7)(B), this brief

complies with the type-volume limitation.  This brief was prepared using Microsoft

Word Times New Roman 14-point font.  In making this certification, I have relied

upon the word count function of the Microsoft Word processing system used to

prepare this brief.  According to the word count, this brief contains 10,402 words.


_____/s/Emma E. Bond_____
Emma E. Bond
Trial Attorney
June 22, 2017

## **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 22nd day of June, 2017, a copy of the foregoing "BRIEF FOR DEFENDANT-APPELLEE" was filed electronically.

**X** This filing was served electronically to all parties by operation of the Court's electronic filing system.

_____/s/Emma E. Bond_____

_____ A copy of this filing was served via:

_____ hand delivery

_____ mail

_____ third-party commercial carrier for delivery within 3 days

_____ electronic means, with the written consent of the party being served

To the following address: