2017-1520-1528                NON-CONFIDENTIAL

IN THE

# United States Court of Appeals for the Federal Circuit

CLEARON CORP., OCCIDENTAL CHEMICAL CORPORATION,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellee,

HEBEI JIHENG CHEMICAL CO., LTD.,

Defendant,

JUANCHENG KANGTAI CHEMICAL CO., LTD. ARCH CHEMICALS, INC.,

Defendants-Appellants.

Appeal from the United States Court of International Trade in
Nos. 13-0056, 13-0061, 13-0073 (consol.), Slip Op. 16-110 (November 23, 2016),
Judge R. Kenton Musgrave.

## NON-CONFIDENTIAL JOINT APPENDIX

Gregory S. Menegaz
Alexandra H. Salzman
J. Kevin Horgan
**DeKieffer & Horgan, PLLC**
1090 Vermont Avenue, NW
Suite 410
Washington, DC 20005
(202) 783-6900
*Counsel for Defendant-Appellant*

July 13, 2017

## NON-CONFIDENTIAL JOINT APPENDIX
## CAFC 17-1520-1528

| Date | Document | Appendix starting page | Designation |
|---|---|---|---|
| 2016-11-23 | *Clearon Corp. v. United States*, Slip Op 16-110 | Appx41 | Public |
| 2016-11-23 | *Clearon Corp. v. United States*, Judgment | Appx43 | Public |
| 2015-08-20 | *Clearon Corp. v. United States*, Slip Op 15-91 | Appx105 | Public |
| 2014-07-24 | *Clearon Corp. v. United States*, Slip Op 14-88 | Appx141 | Public |
| | Docket Sheet CIT 13-73 | Appx158 | |
| 2011-09-11 | Dep't Surrogate Country Letter | Appx158 | Public |
| 2011-10-28 | Dep't Surrogate Country Letter | Appx253 | Public |
| | Policy Bulletin 04.1 | Appx265 | Public |
| 2011-11-29 | Jiheng Section C&D Response | Appx271 | CONFIDENTIAL INFORMATION DELETED |
| 2012-01-09 | Jiheng Preliminary SV Submission | Appx893 | Public |
| 2012-01-09 | Clearon Preliminary SV Submission | Appx996 | Public |
| 2012-06-29 | Preliminary Results SV Memo | Appx1825 | Public |
| 2012-09-05 | Jiheng Resubmitted SV Submission | Appx2173 | Public |
| 2012-11-20 | Jiheng Verification Report | Appx3053 | Public |
| 2012-12-03 | Clearon Case Brief | Appx3146 | Public |
| 2012-12-10 | Jiheng Rebuttal Brief | Appx3213 | Public |
| 2012-12-10 | Kangtai Rebuttal Brief | Appx3246 | Public |
| 2013-01-14 | Final Results Issues & Decision Memorandum | Appx3291 | Public |

| 2013-01-14 | Final SV Memo | Appx3318 | Public |
|---|---|---|---|
| 2013-08-15 | Kangtai R.56.2 Brief | Appx3384 | Public |
| 2013-08-15 | Clearon R56.2 Brief | Appx3442 | Public |
| 2014-02-24 | US Response Brief | Appx3490 | Public |
| 2014-04-23 | Kangtai Reply Brief | Appx3556 | Public |
| 2014-08-13 | Dep't Placing Additional Information on Record | Appx3583 | Public |
| 2014-08-20 | Kangtai Rebuttal Information | Appx3635 | Public |
| 2014-12-11 | First Remand Results | Appx3825 | Public |
| 2015-01-28 | Kangtai Comments on Remand | Appx3876 | Public |
| 2015-05-22 | US Response to Court's Questions | Appx3948 | Public |
| 2016-03-22 | Second Remand Results | Appx3973 | Public |
| 2016-03-22 | Jiheng Analysis Memo 2nd Remand | Appx4023 | CONFIDENTIAL INFORMATION DELETED |
| 2016-04-22 | Jiheng Comments on Remand II | Appx4031 | Public |
| 2016-04-22 | Kangtai Comments on Remand II | Appx4068 | Public |
| 2016-06-20 | US Response Comments Remand II | Appx4102 | Public |
| 2016-07-05 | Jiheng Reply Comments Remand II | Appx4153 | Public |
| 2017-01-23 | Jiheng Notice of Appeal | Appx4203 | Public |
| 2011-11-30 | Kangtai Section C&D Response | Appx4205 | Public |
| 2012-01-17 | Clearon Rebuttal SV Submission | Appx4313 | Public |

## OMMISSION OF CONFIDENTIAL INFORMATION

The document information removed as indicated in the table of documents above contains business proprietary information released by the U.S. Department of Commerce to parties under administrative protective order ("APO"). The APO provides that such information cannot be shared with any party not approved under the APO.

A-570-898
Administrative Review
6/1/10-5/31/11
Public Document
APO: Donna Watkins

In the Matter of the Administrative Review of the
Antidumping Duty Order on Chlorinated Isocyanurates
from the People's Republic Of China (A-570-898)
(6/1/10-5/31/11)

## ADMINISTRATIVE PROTECTIVE ORDER

IT IS HEREBY ORDERED THAT:

All business proprietary information submitted in the above-referenced segment
of the proceeding, including new information submitted in a remand during
litigation on this segment of the proceeding, which the submitting party agrees to
release or the Department of Commerce ("the Department") determines to
release, will be released to the authorized applicants on the administrative
protective order ("APO") service list for this segment of the proceeding, except
the following:

• customer names in an investigation; and

• specific information of a type for which the Department determines there is a
clear and compelling need to withhold from disclosure.

### USE OF BUSINESS PROPRIETARY INFORMATION UNDER THIS APO

An authorized applicant may use business proprietary information submitted in
this segment of the proceeding in this segment. If business proprietary
information that is submitted in this segment of the proceeding is relevant to an
issue in two consecutive subsequent administrative reviews, an authorized
applicant may place such information on the record of those reviews. If business
proprietary information submitted in this segment of the proceeding is relevant to
an issue in other segments of this proceeding (such as scope, anticircumvention,

changed circumstances) that are initiated before publication of the final results in the second consecutive subsequent administrative review, an authorized applicant may place such information on the record of those
segments. At the conclusion of the second consecutive subsequent administrative review or at such earlier date as the Department may determine to be appropriate, the authorized applicant must certify to the destruction of business proprietary information within 30 days in accordance with item 6 of this APO. The existence of a judicial protective order in a subsequent administrative review does not extend the deadline for destruction of business proprietary information subject to this APO.

## REQUIREMENTS FOR AUTHORIZED APPLICANTS

All applicants authorized to have access to business proprietary information under this APO are subject to the following terms:

1. The authorized applicant must establish and follow procedures to ensure that no employee of the authorized applicant's firm releases business proprietary information to any person other than the submitting party, an authorized applicant, or the appropriate Department official identified in section 351.306(a) of the regulations. No person in the authorized applicant's firm may release business proprietary information received under this APO to any person other than those described in this paragraph.

2. The authorized applicant may allow APO access to one or more paralegals, law clerks, secretaries, or other support staff employed by or on behalf of the applicant's firm and operating within the confines of the firm. The authorized applicant also may use the services of subcontracted individuals to transport business proprietary information released by the Department and to deliver APO information to other parties. All support staff must sign and date an acknowledgment that they will abide by the terms and conditions of the APO at the time they are first permitted access to any information subject to APO.

3. The authorized applicant must ensure that business proprietary information in an electronic format will not be accessible to parties not authorized to receive business proprietary information.

A-570-898

4. The authorized applicant must pay all reasonable costs incurred by the submitter of the electronic business proprietary information for the copying of its electronic information released to the authorized applicant, if payment is requested. Reasonable costs include the cost of the electronic medium and the cost of copying the complete proprietary version of the electronic information/medium submitted to the Department in APO
releasable form, but not costs borne by the submitter of the electronic data in the

creation of the electronic data/medium submitted to the Department.

## NOTIFICATION REQUIREMENTS

5. If changed circumstances affect the authorized applicant's representation of an interested party at any time authorized under this APO (i.e., reassignment, departure from firm), the authorized applicant must notify the Department in accordance with section 351.305(a)(2) of the regulations.

6. At the expiration of the time specified in this APO, the authorized applicant must destroy all business proprietary information and notify the Department of the destruction in accordance with section 351.305(a)(3) of the regulations, or provide to the Department official responsible for the administration of the APO in this segment of the proceeding a protective order issued by a court or in a binational panel proceeding.

## SANCTIONS FOR BREACH OF THIS APO

7. The authorized applicant will be subject to any or all of the sanctions described in 19 C.F.R. Part 354 if there is a violation of this APO by the authorized applicant or any of the persons identified in item 8 of this APO.

8. The authorized applicant will accept full responsibility, individually and on behalf of the authorized applicant's firm or corporate office, for violation of this APO by any employee of the firm or corporate office, support staff retained by the firm or corporate office, or any other consultant, expert, or other outside staff retained for the subject proceeding, who is permitted access to APO information.

9. The authorized applicant will promptly report and confirm in writing any possible violation of this APO to the Department.

A-570-898
## DEFINITIONS

For purposes of this APO , the following definitions apply:

**"Representative"** is an individual, enterprise, or entity acting on behalf of an interested party.

**"Applicant"** is an individual representative of an interested party who has applied for access to business proprietary information under this APO.

**"Authorized Applicant"**is an applicant that the Secretary has authorized to receive business proprietary information under this APO.

**"Lead firm"** is the firm that will be the primary contact with the Department and that will accept service of all documents for the party it represents where two

firms independently have access under APO.

**"Support staff"** includes paralegals, law clerks, secretaries and other support staff that are employed by or on behalf of the applicant's firm, are operating within the premises of the firm, and work under the supervision of an authorized applicant, as well as subcontractors of the firm providing similar support staff functions.

**"Electronic data"** includes (1) data submitted by a party, generated by the Department, or entered by the recipient on computer tape, disk, diskette, or any other electronic computer medium; and (2) all electronic work products resulting from manipulation of this data, as transferred in any form onto any other electronic computer medium, such as tape, disk, diskette, Bernoulli cartridge, removable disk pack, etc.

*original on file*

_____

Evangeline D. Keenan
Director, APO/Dockets Unit
Import Administration

08/01/2011

_____

(date)

A-570-898

Slip Op. 16-110

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| CLEARON CORP., and OCCIDENTAL CHEMICAL CORP., | : | |
| Plaintiffs, | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| UNITED STATES, | : | Consol. Court No. 13-00073 |
| Defendant, | : | |
| and | : | |
| ARCH CHEMICALS, INC., and HEBEI JIHENG CHEMICAL CO., LTD., | : | |
| Defendant-Intervenors, | : | |
| and | : | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD., | : | |
| Defendant-Intervenor. | : | |

## OPINION

[Sustaining second results of remand of sixth (2010-2011) administrative review of antidumping duty order on chlorinated isocyanurates from the People's Republic of China.]

Decided: November 23, 2016

*James R. Cannon, Jr.* and *Ulrika K. Swanson*, Cassidy Levy Kent (USA) LLP, of Washington, DC, for the plaintiffs.

*Emma E. Bond*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. On the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M.*

*McCarthy*, Assistant Director. Of counsel on the brief was *David Richardson*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington DC.

*Gregory S. Menegaz*, *J. Kevin Horgan*, and *Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, DC, for the defendant-intervenor Juancheng Kangtai Chemical Co., Ltd.

*Peggy A. Clarke*, Law Offices of Peggy A. Clarke, of Washington, DC, for the defendant-intervenors Hebei Jiheng Chemical Co., Ltd. and Arch Chemical Co., Ltd.

Musgrave, Senior Judge: This opinion concerns the second redetermination ("*RR2*")[1] on the sixth (2010-2011) administrative review of chlorinated isocyanurates ("chlor-isos") from the People's Republic of China ("PRC") and will presume familiarity with the prior opinions on the matter.[2] The first opinion approved certain aspects of the methodology utilized by the defendant's International Trade Administration of the U.S. Department of Commerce ("Commerce" or "Department") but remanded for surrogate valuation of the normal value of subject merchandise, and the second remand was necessary for reconsideration, in relevant part, of Commerce's (1) selection of surrogate values for hydrogen gas and chlorine, (2) selection of the Philippines as the primary surrogate country; (3) selection of import data to value urea, (4) adjustment to the selling, general, and administrative (SG&A) expenses; and (5) methodology for calculating the by-product offset. *Clearon II*. On second remand, Commerce continues to find that the subject merchandise sales of Juangcheng Kangtai Chemical Co. Ltd. ("Kangtai"), and Hebei Jiheng Chemical Co., Ltd. ("Jiheng")

---

[1] *Final Results of Second Redetermination Pursuant to Court Remand*, ECF No. 106-1 (Mar. 22, 2016).

[2] *See Clearon Corp. v. United States*, 39 CIT ___, Slip Op. 15-91 (Aug. 20, 2015) ("*Clearon II*") (remanding first remand results); *Clearon Corp. v. United States*, 38 CIT ___, Slip Op. 14-88 (July 24, 2014) ("*Clearon I*") (remanding original "final" results). Herein, this court's preferred abbreviation of public and confidential documents in the administrative record (*i.e*, PDoc and CDoc), are preceded by "R-" whenever referring to documents in the remand administrative record.

were made for less than normal value ("NV") during the review period, *i.e.*, June 1, 2010 to May 31,

2011 ("POR"). *RR2* at 1. The defendant-intervenors, Arch Chemicals, Inc. and Jiheng (together

"Arch-Jiheng") and Kangtai, argue for further remand. The plaintiffs, Clearon Corp. and Occidental

Chemical Corp. (together, "Clearon"), argue for sustaining the remand results, as does the defendant.

For the following reasons, the second remand results will be sustained.

*Discussion*

I.  Surrogate Values for Hydrogen Gas and Chlorine

In the second remand results, Commerce continued to use the Philippines as the

primary surrogate country, but given (1) a record of a "relatively small quantity" of hydrogen gas

and chlorine imported into the Philippines during the POR, (2) prior reviews having found that those

chemicals in particular are costly to transport over long distances, thus "greatly" adding to the cost

of the inputs, and (3) no evidence on the record of this review to indicate that the nature of

transporting these two inputs had changed from the previous review, Commerce selected Indian

domestic data pertaining to Indian producers of hydrogen gas and chlorine as "[t]he only remaining

source of evidence available on the record" to value those inputs. *Id.* at 21-23; *see also* PDoc 104

at 4 & n.10. Clearon's comments support Commerce's redetermination on this issue.

Arch-Jiheng attempts a number of different avenues to argue that Commerce's

determination is not supported by substantial evidence on the record: (1) Commerce's general

preference for domestic prices applies only to pricing in the primary surrogate country, (2) there is

no record evidence showing that hydrogen import data is unreliable, (3) the petitioners never raised

the issue of hydrogen transportation costs in the instant review, (4), despite Commerce's exhaustion

argument, Arch-Jiheng argues it did not fail to raise the issue of Commerce's "hazardous nature" language with respect to both hydrogen gas and chlorine, (5) Commerce has used import values for hydrogen gas in all subsequent reviews[3], (6) Jiheng's proposal to use import values is consistent with Commerce's normal practice of not adjusting surrogate values for alleged differences in shipping costs, (7) there is no record evidence showing that hydrogen is not frequently traded on an international basis, (8) using Indian data was contrary to Commerce's preferences to use contemporaneous data from a single surrogate country, (9) and Commerce has not indicated what evidence on the record of this proceeding indicates that the import values of the primary surrogate country are not reliable. Arch-Jiheng *RR2* Cmts at 21-30.

        The court finds that these arguments either (1) overlook that Commerce's preference for domestic data from the primary surrogate country assumes *ceteris paribus* and is governed by whether those data are distorted, *see*, *e.g.*, *Rhodia, Inc. v. United States*, 25 CIT 1278, 185 F. Supp. 2d 1343 (2001), which would also logically inform the choice between import data for the primary surrogate country or domestic data from a secondary surrogate country, (2) disregard the law of the case on this matter and/or incorrectly attempt to shift the burden of proof, (3) ask the court to substitute judgment for that of Commerce without persuading that Commerce's choice was unreasonable, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("a court may [not] displace the [agency]'s choice between two fairly conflicting views, even though the court would

---

[3] Commerce responding to this point by stating that it expressly acknowledged that possibility in the second remand results, specifically that it would reconsider the issue "in future reviews, if relevant information is placed on the record indicating that [its] prior findings regarding hydrogen and import statistics are no longer valid", *RR2* at 47; and argument continuing over the fact that final results for such reviews were, in fact, issued at the time of issuance of *RR2*.

justifiably have made a different choice had the matter been before it *de novo*"), or (4) fail to acknowledge Commerce's explicit statements on particular subject(s). The cases to which Arch-Jiheng cites do not appear apposite to the propositions asserted, and substantial evidence of record supports Commerce's selection of surrogate values for hydrogen and chlorine gas.

## II. Primary Surrogate Country Selection

### A.

Kangtai continues to challenge Commerce's primary surrogate country selection of the Philippines over India. Kangtai *RR2* Cmts at 5-20. Commerce explains that the choice was based on the Philippines being on the list of economically comparable surrogate countries at the same level of economic development as the PRC (the "OP List") while India was not. *See generally id*. at 14-21. The main difference on second remand is the use of Indian domestic data to value hydrogen gas and chlorine, but Commerce diminished the use of those inputs as accounting for only two of over 40 factors necessary for the production ("FOPs") of chlor-isos, depending on the producer's level of integration. *RR2* at 15-16.

Kangtai here complains of what it considers an impossibly opaque task, of having to prove that the data for India outweigh the fact that India is not on the OP List. *See Clearon II*, Slip Op. 15-91 at 10-11. Specifically, Kangtai argues: (1) that the very fact that Commerce went outside the OP List for surrogate values for two important inputs shows that Kangtai met its initial burden of showing a lack of quality data for the Philippines and should have triggered a comparison of the quality of data for the Philippines against those of India on the record, and that it was improper for Commerce to avoid opining on the quality of the Indian data and instead place a greater, unspecified

burden on Kangtai as opposed to engaging in the analysis "directed by" the second remand order;

(2) that Commerce's articulated standard essentially equates "quality" as "quantity" or "availability,"

which is contrary to quality's plain meaning as "degree of excellence" or "superiority in kind", (3)

that Commerce's justification on remand is simply that as long as the Philippines has data for an

input, it is by definition of "higher quality" than the India data and Commerce need not even consider

relying on India as a surrogate source; (4) that such a standard cannot be squared with Commerce's

own policy statement discussing quantity and quality as two separate aspects of data consideration,

either of which could necessitate having to look at off-list country data;[4] (5) that Commerce

continues to conflate data quality and economic comparability notwithstanding the second remand

order's express rejection thereof and improperly burdens Kangtai with having to prove every one of

the Philippine data of less quality than the Indian data; (6) that Kangtai did address FOPs beyond

hydrogen and chlorine that were of lesser quality, including the reliability of the MVC financial

statement, concerning which Kangtai further argues Commerce misapplied the reason-to-believe-or-

suspect standard for finding distortion and that it, Kangtai, was not required to prove, nor was

Commerce required to formally investigate, the actual extent to which MVC benefitted from its

declared subsidy programs before concluding that the MVC data should be disregarded; (7) that the

very same reasons Commerce offered for choosing Indian chemical inputs over South African import

statistics in the *Preliminary Results* are true for the Philippines data as well, and with regard to the

---

[4]    *See* Policy Bulletin 04.1 ("it may happen that some countries meet both criteria, but sufficient data (with respect to quantity and quality) are not available to enable Commerce to use any of those countries as the primary surrogate."); *id*. ("a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable.").

defendant's criticism that Kangtai made no record citation to the Philippines import data to show it also does not have detailed concentration levels, Kangtai replies that "[a]ny cursory understanding of the import statistics or *Preliminary Results* or a mere glimpse of Commerce's surrogate value summary chart makes the same lack of concentration specificity abundantly clear" for the Philippine data, unlike the more specific Indian domestic data; and (8) that the defendant's claims on Kangtai's arguments (*i.e.*, on (a) conflation of the quality of data with economic comparability, (b) valuing economic comparability over significant production in violation of the statute, (c) error in determining the Philippines was a significant producer, and (d) refusal to acknowledge that India has better data than the Philippines and produces more comparable merchandise) as "beyond the scope of remand" or "previously resolved" are either incorrect, disingenuous, inconsistent, ignore *Clearon II*, or consist of a combination thereof. "Ultimately, the United States still fails to separately consider the totality of the data quality in India compared to the Philippines separate from its improper view that the data quality in India is *per se* lower because India is less economically comparable based on per capita" gross national income ("GNI"). Kangtai *RR2* Reply at 8.

## B.

The question here, as always, is whether the second remand results are supported by substantial evidence and in accordance with law. As previously discussed, the relevant statute, 19 U.S.C. §1677b(c)(4), at a minimum requires that the surrogate country be, to the extent possible: (A) "at a level of economic development comparable to that of the nonmarket economy country" ("NME"), and (B) a "significant producer[ ] of comparable merchandise."

Examining Commerce's primary country surrogate selection process as a general matter, *Clearon II* acknowledged that Commerce typically selects a country from the list of countries at the same level of economic development as the home country measured by per capita GNI, and it observed that Commerce will compare data from countries on the surrogate country list with data from a "less comparable country" when it becomes persuaded that none of the listed countries provide the requisite "scope of 'quality' data." *Clearon II*, Slip Op. 15-91 at 10-11. The opinion also observed "that Commerce's selection of the Philippines as the primary surrogate country has general support in the record", *id*. at 12, and therefore the question for remand as to whether the Indian data is in fact the "best" information available depended on "the quality of each challenged element of the Philippines data." *Id*. at 11. Commerce on second remand concluded from the foregoing that absent adequate showing that the Philippines lacks the quality of data necessary to complete the review, it was not required to conduct a comparison of those data with those of a country at a less comparable level of economic development. *See id.* at 10-12. The court is unable to conclude that that is an unreasonable interpretation of *Clearon II*, and the results of the second remand comply to that extent with what was ordered. *See RR2* at 14-21.

Adhering to its selection of the Philippines as the primary surrogate country, Commerce explained, again, that the Philippines was on the surrogate country list and that there were quality data available for the "vast majority" of the FOPs. As mentioned, Commerce further explained that producing chlor-isos requires over forty FOPs, depending on the level of integration, including "dozens of chemical inputs, packing materials, electricity, labor, overhead, selling, general, and administrative expenses, and profit." *Id*. at 15. Although Commerce had previously alluded

to the importance of hydrogen gas and chlorine, in considering the issue anew it downplayed their importance and considered that its determination to use Indian data for those inputs (hydrogen gas and chlorine) was now of lesser import when considered alongside the quality Philippine data for the remaining dozens of FOPs.[5]  *See id.* at 15.  As compelling as Kangtai's arguments may be, on Commerce's *volte-face* of the importance of those two chemicals to its choice of primary surrogate country, Commerce maintained that it preferred using the available quality of Philippine data for the remaining FOPs because the Philippines was an economically comparable country reflecting a similar "overall economic environment" as the NME, including "general labor and professional wages, interest rates, the availability of financing, [and] the sophistication of infrastructure." *Id.* at 15-16.  Here, the defendant contends that Commerce's declining to compare specific data from the Philippines with Indian data was consistent with *Clearon II* because Kangtai had failed to meet its burden of persuading that the Philippine data for the remaining FOPs were not "quality" data.  Def's Resp. to *RR2* Cmts at 11, referencing *RR2* at 15, 42.  The defendant maintains that since the Philippines provided the requisite quality data for all FOPs except hydrogen gas and chlorine, no comparison with Indian data was required. *Id.*, referencing *RR2* at 42.

Kangtai makes two arguments on Philippine data quality. First, it contends that the relevant Philippine financial statement for Mabuhay Vinyl Corporation ("MVC"), upon which Commerce relied, allegedly reflects receipt of countervailable subsidies, and it is Commerce's

---

[5] Commerce explained that "chlorine and hydrogen are not so critical as to warrant switching to India as the primary surrogate country, at the expense of quality data for all other [FOPs] chosen from a country at the same level of economic development." *Id.* at 15. That reasoning mirrors the preliminary results, in which Commerce used Indian data to value hydrogen and chlorine, but selected a primary surrogate country from the list of comparable countries. *See* PDoc 104 at 3-4.

practice "'to reject the financial statements of a company that [it has] reason to believe or suspect may have benefitted from countervailable subsidies[.]'" Kangtai *RR2* Cmts at 15, quoting *Golden Dragon Precise Copper Tube Grp. v. United States*, 39 CIT ___, ___, Slip Op. 15-89 at 10 (Aug. 19, 2015) (quoting *Chlorinated Isocyanurates From China*, 75 Fed. Reg. 70212 (Nov. 17, 2010), and accompanying issues and decision memorandum ("I&D Memo") at cmt. 3). Under this practice, Commerce excludes "financial statements that contain a subsidy that [Commerce] has found countervailable in the past." *RR2* at 43; *see also Chlorinated Isocyanurates from the PRC*, 76 Fed. Reg. 70957 (Nov. 16, 2011) and accompanying I&D Memo at cmt. 2. Kangtai argues the relevant tax incentives reflected in the MVC financial statement "very closely match" programs that Commerce found were countervailable in 1986. Kangtai *RR2* Cmts at 16-17 (citing *Canned Tuna From the Philippines*, 51 Fed. Reg. 43758 (Dec. 4, 1986) (final results). Kangtai points to Commerce's list of countervailable subsidy programs in the Philippines, albeit without precise argument on the potential relevancy of specific subsidy program(s). *Id.* (citation omitted).

Commerce rejected the argument that the MVC financial statements actually reflect "countervailable" subsidies, explaining that the tax incentives cited by Kangtai "are either too vague to tie to a previously countervailed subsidy," or have not been "previously countervailed as a subsidy." *RR2* at 23-24, 43 (citations omitted). The defendant adds that Kangtai's arguments do not show that the specific tax incentives at issue have been previously found to be countervailable and that Commerce was not required to treat them as countervailable or required to conduct a "formal" investigation into the matter. Def's Resp. to *RR2* Cmts at 11-12, referencing *Chlorinated Isocyanurates from the PRC*, 76 Fed. Reg. 70957, and accompanying I&D Memo at cmt. 2, and

Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. No. 100-576, at 590-91 (1988) (Conf.

Rep.) ("OTCA"), reprinted in 1988 U.S.C.C.A.N. 1547, 1623-24.

    Kangtai is correct, however, in arguing that there is only a "reason to believe or

suspect" standard that the merchandise is subsidized, Kangtai *RR2* Cmts at 15-16, and in

emphasizing that Commerce is not required to "conduct a formal investigation to ensure that . . .

prices are not dumped or subsidized". OTCA at 590-91. The defendant's response, above,

exaggerates the relatively low bar of the reason-to-believe-or-suspect standard in the sense that a

finding of distortion does not depend upon the existence of a finding or determination of

countervailability. On the other hand, Commerce must "base its decision on information generally

available to it at that time", *id.*, which appears to be what Commerce has done here, because

Commerce's additional finding that MVC may not have actually received these tax subsidies has

support in the record. *See RR2* at 43 ("Kangtai did not provide any indication from MVC's financial

statements that the company actually received any of these tax incentives"). Kangtai argues that

MVC actually received income tax holiday tax benefits of 6.95 million Philippine Pesos (PhP) in

2010 and 2.65 million PhP in 2009, Kangtai *RR2* Cmts at 16, citing PDoc 65, Exh. 4, p. 23 (MVC

Annual Report), but Commerce's position is that most of the listed subsidies are not income tax

holiday incentives, and the financial statement does not state that MVC actually received the listed

subsidies for, *e.g.*, duties on raw materials for an export product, or exemption from wharfage dues.

*See* PDoc 65, Exh. 4, p. 23. Commerce thus declined to find that MVC actually received the specific

subsidies, and it continued to rely on the MVC financial statements as "quality" data from the

Philippines. *See RR2* at 43. The court can not substitute its own view of the matter therefor. *See Universal Camera*, *supra*, 340 U.S. at 488.

   Continuing, Kangtai also argues that the Philippines data for four chemical inputs (calcium chloride, barium chloride, zinc sulfate, and sulfuric acid) "lack the specificity of the concentration levels." Kangtai *RR2* Cmts at 17-18. It cites the preliminary determination, in which Commerce rejected South African import values for four FOPs because it "did not have South African import statistics by the concentration level referenced in the GTA for those factors", and it argues that the Philippine import data suffer from the same flaw *Id*. at 17-18. The defendant's response is that Kangtai did not raise this argument in its first motion for judgment before this court, although it raised other arguments regarding concentration of chemical inputs.[6] *See* Kangtai Rule 56.2 Mot., ECF No. 30-1, at 27-31 (Aug. 15, 2013). The defendant thus argues it is too late at this state of the proceeding to insert new issues. Def's Resp. to *RR2* Cmts at 14, referencing *Dorbest Ltd. v. United States*, 35 CIT ___, ___, 755 F. Supp. 2d 1291, 1300 (2011) ("[r]emand proceedings do not grant the parties the right to a new antidumping investigation from the current date").

   The court considers Kangtai's argument as proper elaboration on its general argument for India as the primary surrogate country and motivated by the holding of *Clearon II*. On the other hand, Kangtai's assertion spans only two or three sentences, is without reference to the concentration levels of the specific inputs in the record, *see* Kangtai *RR2* Cmts at 17-18, and "[i]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at

---

 [6] Kangtai previously argued that Commerce had erred in using Philippine data to value sodium hydroxide because Kangtai used a lower concentration level than the commercial norm, which argument *Clearon II* concluded was unpersuasive. Slip Op. 15-91 at 28-31.

developed argumentation, are deemed waived." *SmithKline Beecham Corp. v. Apotex Corp.*, 439

F.3d 1312, 1320 (Fed. Cir. 2006), quoting *Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001).

*See also Home Prods. Int'l, Inc. v. United States*, 36 CIT ___, ___, 837 F. Supp. 2d 1294, 1301

(2012) (not the duty of a court to establish an argument's ossature).  Be that as it may, the defendant

points out that the four FOPs appear to be responsible for less than eight percent of the direct

materials, and the court agrees this is insufficient reason for holding unreasonable Commerce's

selection of the Philippines as the primary surrogate country.

## C.

With respect to Kangtai's remaining challenges to the Philippines' quality of data,

economic comparability, and the significant producer requirement, these have either been previously

resolved or they are insufficient to impact Commerce's surrogate country selection.  In brief, Kangtai

argues that Commerce "conflated quality of data with economic comparability," Kangtai 2nd

Remand Cmts at 2-3, that the statute does not value economic comparability over significant

production, *id*. at 3-5, that Commerce erred in its analysis regarding whether the Philippines is a

significant producer of comparable merchandise, *id*. at 5-13, and that India has better data than the

Philippines and produces more comparable merchandise, *id*. at 13-20.  These do not provide a basis

for holding the second remand results unsupported by substantial evidence on the record or otherwise

not in accordance with law, as, fundamentally, they argue for the court to substitute its own view of

the record, which is not appropriate where Commerce's interpretation of the record is not shown to

be unreasonable.  *See Universal Camera, supra*, 340 U.S. at 488.

Kangtai first challenges Commerce's preference for data from a country at the same level of economic development as the PRC. *See* Kangtai 2nd Remand Cmts at 2-3. Kangtai argues the second remand results' statement that "[d]ata from a less comparable country is automatically at a disadvantage to data from a country at the same level of economic development" means that Commerce "conflated quality of data with economic comparability." *Id*. at 3. Kangtai is correct (Commerce's statement does appear to conflate), but the ultimate problem was one of persuasion. *See Clearon II*, Slip Op. 15-91 at 10-11 (Commerce "acts not unreasonably in burdening the party proposing a non-listed country with demonstrating that no country on the surrogate country list provides the scope of 'quality' data that it requires in order to make a primary surrogate country selection"). In other words, Commerce expressed on second remand that it was simply not convinced that the merits of the Indian data outweighed the fact that India was not on the OP List.

Kangtai also argues Commerce improperly valued economic comparability over the separate factor requiring the surrogate country to be a significant producer of comparable merchandise. Kangtai *RR2* Cmts at 3-5. However, Commerce found that the Philippines satisfies both criteria: it is at the same level of economic development as the PRC, it is a significant producer of comparable merchandise, *e.g.*, *RR2* at 19-20, and the court previously observed that the selection of the Philippines has "general support in the record." *Clearon II*, Slip Op. 15-91 at 12. Kangtai again discusses the *Ad Hoc Shrimp Trade Action Comm'n v. United States*, 36 CIT ___, ___, 882 F. Supp. 2d 1366, 1375 (2012) and *Amanda Foods (Vietnam) Ltd. v. United States*, 33 CIT 1407, 647 F. Supp. 2d 1368 (2009) decisions to argue that neither statutory factor or the quality and availability of data discussed in Commerce's policy bulletin is preeminent, *see* Kangtai 2nd Remand Results

Cmts at 4-5, 11-13, but those (and other) cases have already been analyzed with respect to the points

the plaintiff would attempt to revive here. *See Clearon I*, Slip Op. 14-88 at 25-30 (explaining that

*Ad Hoc Shrimp* and *Amanda Foods* are distinguishable from this case because both involved

countries on the surrogate country list). Both cases, moreover, are consistent with Commerce's

approach here of "treating the per capita GNI ranking as a threshold statutory criterion that must be

met before the other criteria are considered." *Id*. Kangtai's reliance on *Amanda Foods* and *Ad Hoc*

*Shrimp* thus continues to be unpersuasive.

Additionally, Kangtai raises numerous additional arguments relating to the significant

producer criterion. Kangtai *RR2* Cmts at 5-13, 18-19. For example, Kangtai disagrees with

Commerce's explanation regarding the relationship between economic comparability and significant

production; to wit, that Commerce "considers these two statutory factors (economic comparability

and significant production) to be independent of each other" and that "both factors are threshold"

requirements. *RR2* at 20. Kangtai disagrees, arguing that Commerce "cannot lawfully make one

criterion a threshold requirement to the exclusion of the others." Kangtai *RR2* Cmts at 8-9. As these

are both *statutory* criteria, and the court has already considered and rejected similar argument, more

need not be said. *See*, *e.g.*, *Clearon I*, Slip Op. 14-88 at 24-25, *Clearon II*, Slip Op 15-91 at 8 & n.7.

Commerce requires both economic comparability and significant producer status, to the extent

possible, and does not elevate the former criterion "to the exclusion of the others." *See* Kangtai *RR2*

Cmts at 8-9; *RR2* at 20. Commerce's interpretation is thus consistent with the statute's plain

language. *See* 19 U.S.C. §1677b(c)(4).

Commerce further explained in the second remand results that the significant producer factor is based on "evidence of actual production of comparable merchandise, even though it may be on a much smaller scale than that of the respondents or the NME under investigation." *RR2* at 20.  Kangtai disagrees, relying on *Fresh Garlic Producers* to argue that significance is "a term of comparison" requiring reference to world trade.  Kangtai *RR2* Cmts 6, referencing *Fresh Garlic Producers Association v. United States*, 39 CIT ___, ___, 121 F. Supp. 3d 1313, 1338 (2015).  Nonetheless, Commerce's interpretation of "significant" is entitled to *Chevron* deference, and it also appears to be consistent with the court's analysis in *Fresh Garlic Producers* that production may be significant when it affects world trade in any event. *See Fresh Garlic Producers*, 121 F. Supp. 3d at 1337-38.  Kangtai does not point to record evidence that, or explain why, the Philippines' production of the comparable merchandise, sodium hypochlorite, was so low that it completely failed to affect world trade, and contrary to Kangtai's argument (*see* Kangtai *RR2* Cmts at 7), Commerce's interpretation does not equate significant production with "any" production.  *See* Import Administration Policy Bulletin 04.1 (the significant producer analysis strives for consistency with "the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics)" but "should not be judged against the NME country's production level").  Commerce's reasoning is consistent with the Policy Bulletin and is not synonymous with "any" production. *See RR2* at 19-20.

Kangtai also cites to Commerce's determination on a certain frozen fish fillets as precedent for comparing data from a country on the surrogate country list with data from an off-list country. Kangtai *RR2* Cmts at 11, referencing *Certain Frozen Fish Fillets From the Socialist*

*Republic of Vietnam,* 79 Fed. Reg. 19053 (Apr. 7, 2014) (final results). But that determination did

not state that Commerce was departing from its general policy of treating economic comparability

and significant producer as threshold requirements "to the extent possible" consistent with 19 U.S.C.

§1677b(c)(4). Rather, the determination involved a "unique industry" for producers of live

pangasius fish consisting of only a "limited number of significant producers" worldwide. *Certain*

*Frozen Fish Fillets from the Democratic Republic of Vietnam*, 78 Fed. Reg. 55676 (Sep. 11, 2013)

(preliminary results), and accompanying preliminary decision memorandum at 17. In other words,

the facts of *Frozen Fish Fillets* are not quite analogous to those considered in the second remand

results.

   Kangtai next argues that India has better data than the Philippines and produces more

comparable merchandise. Kangtai *RR2* Cmts at 13-20. These arguments either attempt re-litigation

of issues already decided, or they are immaterial to the remaining issues, or they essentially call for

supplanting Commerce's interpretation of the record and its statutory duties without persuading that

Commerce's interpretation was unreasonable. Of course in the case of the latter, for the court to so

order would run afoul of the standard of review. *See Universal Camera*, *supra*, 340 U.S. at 488.

   Kangtai also challenges Commerce's explanation that, all else being equal,

Commerce will consider data quality as a "'tie breaker'" in choosing between multiple countries on

the OP List that are significant producers of subject merchandise. *See* Kangtai *RR2* Cmts at 13,

quoting *RR2* at 41. Kangtai disagrees with Commerce's statement that data quality in such cases "is

more a matter of data 'quantity'" and argues that that is against Commerce policy. *See id*. Apart

from stating that this is a "new idea," Kangtai does not elaborate, nor does it explain why Commerce

should not receive deference on a matter that is within its expertise. *See Atar S.R.L. v. United States*, 730 F.3d 1320, 1325 (Fed. Cir. 2013). In any event, the meaning of data quality versus quantity is not material here, because the Philippines is on the OP List and India is not, so Commerce is not "choosing between multiple countries on the surrogate value list." *RR2* at 41.

Finally, Kangtai argues that Commerce should have used Indian data because the size of India's chemical industry is more comparable to the PRC's. Kangtai Brief, at 18-20. But that does not require a different outcome. As Commerce explained, "'economic comparability' is not an industry-focused analysis." *RR2* at 16. Consistent with this court's decision sustaining Commerce's focus on GNI, the economic comparability prong is focused on the "overall economic environment," not the status of a particular industry within the economy. *See RR2* at 16; *see also Clearon I*, Slip Op. 14-88 at 22-25. The PRC, India, and the United States all have "large-scale chemical industries," yet "[t]he United States could not be considered economically comparable" to the PRC. *RR2* at 16. Focusing on a single industry would incorrectly read the "economic comparability" criterion out of the statute. *See id.*

That the PRC is an NME, moreover, means that its prices are not determined by the market forces of supply and demand. *Id.* at 17. The size of a particular industry may result from distortions inherent in the PRC's NME, making it inappropriate to require a surrogate country with a similarly-sized industry. *Id.* Kangtai challenges this rationale, arguing that, if true, it would prevent Commerce from relying on GNI to determine economic comparability. Kangtai *RR2* Cmts at 20. But the argument misses the mark. When considering an NME country, "Commerce presumes all respondents are government-controlled". *Ad Hoc Shrimp Trade Action Comm. v.*

*United States*, 802 F.3d 1339, 1353 (Fed. Cir. 2015) (citing *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)). Under that presumption, an industry may increase in size because the NME government is directing resources to certain favored companies in specific industries. *Cf. RR2* at 16. But government control over a company or an industry is different from growth in the economy as a whole reflected by GNI. For the above reasons, Kangtai's objections to Commerce's selection of the Philippines as the primary surrogate country are therefore unpersuasive at this stage.

### III. Surrogate Valuation of Urea Using Indian Domestic Dealer Prices

To value the urea FOP, on remand Commerce opted for the Philippines' Bureau of Agricultural Statistics (BAS) data previously placed on the record by Clearon during the review. The initial *Final Results* had relied on data for Philippine imports of urea from the Global Trade Atlas, although Commerce prefers domestic data over import data when selecting surrogate values. The urea FOP was remanded due to expressed rationale that did not quite square with the record, and notwithstanding Commerce's further-expressed concern during litigation about the BAS data's market representativeness of domestic urea production in the Philippines.[7]

After further review, on second remand Commerce found the record inconclusive on the questions of whether all urea is imported or whether domestic fertilizer production includes production of urea. *See RR2* at 12, referencing Jiheng Sep. 5, 2012, SV Submission, at Attachment 2. On the other hand, Commerce acknowledged that in prior review(s) it had found the BAS data specific to urea, representative of a broad market-average, publically available, and tax and duty

---

[7] Commerce's final determinations must be sustained, if at all, on the basis articulated in the determination by Commerce itself. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156-168-69 (1962).

exclusive, making it reliable. *Id*. at 13. Commerce therefore relied on the BAS data for the present

review after noting that while the underlying data notes that fertilizer production had decreased in

the Philippines, there are no specific statistics about urea production itself or indication that the trend

is significant. Commerce also noted that the domestic price of urea had slightly decreased from the

previous year, which was the smallest decrease compared with other fertilizers, and that other data

indicated that the import price of fertilizers is sensitive to the price of oil. Commerce inferred from

this that changes in domestic price can be explained by changes in relevant market factors rather than

by aberrationally small domestic production and further explained that it does not take economies

of scale into consideration when choosing a surrogate value in any event. *Id*. at 13-14.

Challenging this reasoning, Kangtai and Arch-Jiheng stress that there is no evidence

on the record of any domestic production, and that the record only supports the reasonable inference

that all urea sold in the Philippines is imported. Arch-Jiheng, supported by Kangtai, argues that the

three quotes from the articles it provided for the record -- to wit, "92% of PHL fertilizer requirements

are imported", "In 2004, the Philippines bought an aggregate volume of 8.8M tons of various

fertilizer grades, with urea accounting for 30% and ammonium sulfate for 24%", and "Urea, potash,

and half of the ammonium sulfate are imported while all the phosphatic grades (NP/NPK) and the

rest of the ammonium sulfate are produced locally" -- only support the inference that all urea is

imported. *E.g.*, Arch-Jiheng *RR2* Reply at 15 (citation omitted). *See RR2* at 38-39. In response to

such arguments during the remand, Commerce disagreed, stating:

> While these articles support the contention that urea is imported (a fact the
> Department is not contesting), they offer a somewhat vague picture of the market and
> industry specific to urea and do not state that 100 percent of urea is imported, or that
> there is no domestic production. Without any such statements, we cannot conclude

the price represents 100 percent imports.  The Department does not as a matter of course conduct a query into whether an apparently domestic price (*e.g.*, a price published by a government agency involved in domestic policy, such as an agricultural agency) is, in fact, based on domestic market sales.  Clearly, if presented with evidence that the price was solely an import price (*e.g.*, a price published by a customs authority or a footnote indicating the price was based solely on imports), we would consider that evidence.  In this case, however, there is no such evidence.

> The evidence implies that a large portion of urea is imported, but it does not preclude the possibility that urea is also domestically produced, albeit in small quantities, just as similar fertilizers are.  Therefore we continue to rely on the BAS data as the SV for urea for this final remand redetermination.

*RR* at 39.  Commerce ultimately concluded it would use the BAS data because, *inter alia*, "all else being equal (public availability, contemporaneity, *etc.*), the BAS data, which represents dealer prices in the Philippines, is the preferred source over the GTA data used in the underlying review."[8]  *See RR2* at 12-13.

> The court cannot fault Commerce's analysis.  Bearing in mind that "the burden of creating an adequate record lies with interested parties and not with Commerce", *Nan Ya*, 810 F.3

---

[8] Clearon also adds that Jiheng's SPIK excerpt indicates that the fertilizer industry "has been liberalized in 1987 fostering free competition *particularly in the urea market.*" Clearon *RR2* Resp. to Cmts at 8, quoting PDoc 118 at Att. 2 (Clearon's emphasis).  The page goes on to state that (apparently in 1987) the government provided subsidies "[a]s further incentive for the local producers of fertilizers." *Id. quoting id.*  Clearon argues that "[t]his reference, therefore, does not establish that all of the urea sold in the Philippines is imported, but is reasonably understood to mean that *there is a competitive urea market in the Philippines* that includes local producers (albeit subsidized in 1987)." *Id.* (Clearon's emphasis). Clearon also notes that following the SPIK excerpt, the Attachment next includes a 2006 report by Florence Mojica-Sevilla, Senior Agribusiness Specialist, Center for Food and Agri Business, University of Asia and the Pacific, entitled "The Philippine Fertilizer Industry", and it calls attention to the report's statement that "local fertilizer plants depend partly upon the use of imported raw materials such as rock phosphate, anhydrous ammonia, and sulphuric acid." *Id.* at 9.  Clearon further argues that since ammonia is the principle raw material for the production of urea, it therefore appears from the context that urea is in fact produced by "local fertilizer plants" in the Philippines, and that this attachment thus contradicts the notion that urea is not produced in the Philippines.  *Id.*  Such points, however, go beyond what was expressed in the second remand results.

at 1338, Commerce is permitted, and indeed is often required, to draw reasonable inferences from the record. *See*, *e.g. Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Tech., Salaried, & Mach. Workers*, 6 F.3d 1511, 1520 (Fed. Cir. 1993). "The question is whether the record adequately supports the decision of [Commerce], not whether some other inference could reasonably have been drawn." *Daewoo*, 6 F.3d at 1520 (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)). Stated differently, the possibility of a different inference based on the same record does not mean that Commerce's finding is unsupported by substantial evidence. *See Swiff-Train Co. v. United States*, 793 F.3d 1355, 1367 (Fed. Cir. 2015) (citation omitted).

Kangtai, however, argues that even assuming that the 8 percent of Philippines fertilizer that is produced domestically includes urea, the domestic price is not a reliable source because a typical Philippines domestic producer of chlor-isos would actually source its urea by imports. Kangtai *RR2* Reply at 12, referencing *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 288, 300, 366 F. Supp. 2d 1264, 1274 (2005) ("the preference for domestic data is most appropriate where the circumstances indicate that a producer in the hypothetical market would be unlikely to use an imported factor in its production process."); *Yantai Oriental Juice Co. v United States*, 26 CIT 605, 617 (2002) (rejecting import data because Commerce failed to explain why the industry would purchase more expensive imported coal over domestic coal). Nonetheless, the record evinces a "domestic market" for urea, howsoever constituted. *Cf. Sulfanilic Acid From the PRC*, 65 Fed. Reg. 13366 (Mar. 13, 2000) (final results) and accompanying I&D Memo at cmt. 2 (the decline in the import tariff "effectively removed the distortions in the domestic price that we[re] previously attributed to th[e] 'abnormally high' rate" that had precluded selection of the

domestic price in a prior review). Kangtai's arguments appear to implicate the market channels for the distribution of inputs, concerning which the court is referred to no information of record. *See*, *e.g*, Kangtai *RR2* Reply at 12 ("[i]n the Philippines, a hypothetical [chlor-isos] producer would source its urea from the abundant more reasonably price imports").

Continuing on this point, however, Arch-Jiheng argues Commerce erred in finding that the BAS data are tax and duty exclusive. Arch-Jiheng *RR2* Cmts at 16. But Arch-Jiheng did not, make that argument to Commerce, and therefore the court must find that it failed to failed to exhaust its administrative remedies in that regard. *See McKart v. United States*, 395 U.S. 185, 193-94 (1969)*; see*, *e.g.*, *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1388 (Fed. Cir. 2014). In its comments to Commerce, Arch-Jiheng argued only that "there is no production of urea in the Philippines," and thus "there can be no domestic prices and [Commerce] must use the imported values." R-PDoc 82 at 1-5 (capitalization altered). It did not argue, as it does now, that even if there were domestic production, "the BAS data are not 'tax and duty free[.]'" Arch-Jiheng *RR2* Cmts at 17 (citing *RR2* at 13). Commerce provided the opportunity for comment on its draft remand results, noting its finding in a prior review that BAS data for urea was "exclusive of value added taxes." R-PDoc 74, Att. at 13, quoting *Final Results of Redetermination Pursuant to Court Remand*, CIT No. 08-00364, ECF No. 79, at 7-8 (Mar. 19, 2012), sustained by *Clearon Corp. v. United States*, 37 CIT ___, Slip Op. 13-22 (Feb. 20, 2013) ("alt-*Clearon*").[9] As the defendant

---

[9] The defendant notes that in alt-*Clearon*, although Commerce ultimately selected Indian data, it did so because of its preference to use a single surrogate country, 19 C.F.R. §351.408(c)(2), and despite finding that the Philippine data "fulfilled its selection criteria." *See* alt-*Clearon*, Slip Op. 13-22 at 8-9.

argues, Arch-Jiheng submitted comments regarding urea, but did not dispute that the BAS data for urea is tax and duty free. *See* Remand PDoc 82 at 1-5.

That does not, of course, address whether the BAS data are *actually* import duty exclusive, but when comparing two data sets, one from domestic sources and the other from import sources, "the conditional preference for domestic data is a logical starting point for achieving the objective set by Congress" because "it is reasonable to assume that a domestic price reflects the value of a factor of production more accurately than an import price." *Hebei Metals & Minerals Import & Export v United States*, 29 CIT 288, 300, 366 F. Supp. 2d 1264, 1274 (2005). *See also Taian Ziyang Food Co. v. United States*, 33 CIT 828, 890 n.61, 637 F. Supp. 2d 1093, 1148 n.61 (2009); *Home Meridian Int'l, Inc. v. United States*, 37 CIT ___, ___, 922 F. Supp. 2d 1366, 1376 (2013) ("[w]hen presented with conflicting evidence that provides substantial evidence to support opposite conclusions, the court will defer to Commerce's reasoned choice between the two"). The BAS data contain a domestic price that is published by a government agency involved in domestic policy, and the record does not show that price "was solely an import price." *RR2* at 39. Commerce retains discretion over its preferred data, and on the record here, the court cannot intrude upon Commerce's informed determination on this issue. *See Universal Camera*, *supra*, 340 U.S. at 488.

IV. "As-Adjusted" Financial Ratio Calculations

In the second remand results, Commerce adjusted the selling, general, and administrative (SG&A) ratio that it derived from the MVC financial statements in order to exclude the production labor items included in SG&A that were already included in the International Labor

Organization (ILO) Chapter 6A surrogate value for labor.[10]  Specifically, Commerce noted that the

financial statements used in this review are consistent with the distinction between production labor

and SG&A labor, listing  "direct labor" and "supervision and indirect labor" as part of the costs of

sales associated with the production of merchandise, but separately listing "salaries and wages"

under "operating expenses", which refers to salaries and wages of non-production employees such

as administrative and managerial employees and also refers to retirement benefits and employee

benefits.  *See* Def's Resp. to *RR2* Cmts at 31, referencing PDoc 65 at Att. 4, p. 34 (bracketing

omitted).  Commerce adjusted the operating expenses of the financial statement labeled "retirement

expenses", but only to the extent that they reflected production labor, and it declined to adjust

"employee benefits" since

> nowhere in the financial statements is there any definite indication that these benefits
> apply to 'regular' employees as there is in the notes for retirement benefits.  Because
> the record provides no further details on these employee benefits, and because these
> benefits are presented on the face of the financial statements as "Operating
> Expenses," we are continuing to treat this line item as part of SG&A expenses.

---

[10]   As previously discussed, the normal value of subject merchandise in a non-market
economy is determined in part based on "the value of the factors of production utilized in producing
the merchandise", 19 U.S.C. §1677b(c)(1), including "an amount for general expenses" and "other
expenses," *id*. §1677b(c)(1), which includes labor expenses that are not related to production of the
subject merchandise.  In changing its methodology, via notice and comment, for determining the
labor FOP in a given case, Commerce now employs a rebuttable presumption that ILO Chapter 6A
data "better accounts for all direct and indirect labor costs" than Chapter 5B data, which had only
"capture[d] the pre-tax monetary remuneration received by the employee."*Antidumping
Methodologies in Proceedings Involving Non  Market Economies: Valuing the Factor of Production:
Labor*, 76 Fed. Reg. 36092, 36094 (June 21, 2011) ("*Labor Methodology*"). *See also Antidumping
Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production:
Labor; Request for Comment*, 76 Fed. Reg. 9544 (June 21, 2011) ("Chapter 5B data includes two
types of compensation: (1) [d]irect wages and salaries ('wages'), as well as (2) earnings data, which
include wages plus bonuses and gratuities ('earnings'). The Department prefers 'earnings' data, when
available, since it more accurately reflects the full remuneration received by workers.") (citation
omitted).

*RR2* at 7.  *See also id*. at 28 ("a fully loaded ILO 6A SV does not account for all labor expenses; it

only accounts for all production labor expenses, because the SV is only being applied to a FOP that

accounts for production labor"); *id* at 30 ("Kangtai points to no record evidence indicating that

'regular' employees apply only to production labor").  The defendant elaborates that Commerce's

practice in such cases is to rely on the classification in the surrogate ratio financial statements rather

than "going behind" the financial statement to determine precisely what each item includes.  *Id*.,

referencing *Certain Steel Threaded Rod from the PRC*, 79 Fed. Reg. 71743 (Dec. 3, 2014) (final rev.

results) and accompanying I&D Memo at cmt. 3.

Challenging this determination, Kangtai argues Commerce is required, in accordance

with its *Labor Methodology*, to remove the employee benefits as well as the other item(s) removed

from SG&A labor, because those relate to production labor and are itemized among the SG&A of

the financial statement.  Kangtai *RR2* Cmts at 21-24.  Kangtai challenges the defense as overly

reliant upon *Elkay*,[11] as that case is now under appeal.  Kangtai argues it is not required to provide

*additional* record evidence to show that the SG&A labor cost is overstated beyond simply pointing

to the disaggregated SG&A expense items on the MVC financial statement that are already included

in the ILO Chapter 6A data, and it asks that Commerce simply follow its *Labor Methodology* as

published.

The court has considered the arguments on this issue and must conclude that

substantial evidence of record supports Commerce's determination.  Although it may *seem*

---

[11] *See Elkay Mfg. Co. v. United States*, 38 CIT ___, 34 F. Supp. 3d 1369 (2014), *appeal filed*,
*sub nom. Guangdong Dongyuan Kitchenware v. United States*, No. 16-2637 (Fed. Cir. Sep. 14,
2016).

unreasonable not to exclude the item self-described as *employee* benefits among the SG&A expenses

of the MVC financial statement in accordance with Commerce's own *Labor Methodology*, at this

point in time, the state of the law is such that it cannot be concluded unreasonable in fact. *Cf.*, *e.g.*,

*US Magnesium LLC v. United States*, No. 2015-1864, 2016 WL 5845735, at \*4 (Fed. Cir. Oct. 6,

2016) ("[g]iven that retorts are not listed as raw materials, and that retorts are grouped together with

other expenses that are plainly not direct materials, it was reasonable for Commerce to conclude that

the records do not show that TMI's supplier treated retorts as direct inputs"). Kangtai's argument,

rather, is for substitution of its own view of the record to support such exclusion, which would not

be appropriate. *See Universal Camera, supra*, 340 U.S. at 488.

## V. By-Product Offset Calculation Methodology

As previously discussed, Commerce's normal by-product offset practice values such

products as close to the split-off point as possible. *See*, *e.g.*, *Magnesium Metal from the Russian

Federation: Final Results of Antidumping Duty Administrative Review*, 76 Fed. Reg. 56396 (Sep.

13, 2011), and accompanying I&D Memo at comment 1a. On second remand, Commerce again

determined the by-product offset by reference to the value of the downstream by-product ammonium

sulfate, explaining that "[t]he net value of the ammonium sulfate reflects the product closest to the

split-off point that does not result in the illogical outcome when we value the ammonia gas and

sulfuric acid generated at the split-off point."[12] *RR2* at 10.

---

[12] Commerce also confirmed that it was relying on the full amount of ammonium sulfate
produced during the POR from those by products and not merely the amount of ammonium sulfate
sold during the POR. *RR* at 33.

A.

To get to that split-off point in the production of subject merchandise, Commerce deducted from the net value of the ammonium sulfate the further processing costs of the ammonia gas and sulfuric acid involved in its production.[13]  As its reasons for doing so, Commerce expressed two concerns.  The first was that "neither respondent during the [POR] could measure and keep records of the actual amount of waste ammonia gas and sulfuric acid which was being produced"[14] and that, "[a]s a result, we were forced to go to the downstream product production records to obtain the data to derive the amounts of ammonia gas and sulfuric acid." *RR2* at 9. "Therefore the first point at which the Department could determine the amount of by-product produced was from the companies' books and records on the downstream product production." *Id.*

Arch-Jiheng and Kangtai contend the foregoing is no reason for not relying on surrogate values of record to value the ammonia gas and sulphuric acid by-products in this instance because (1) the "concern" permeates the first through the fifth administrative reviews, during which time Commerce never expressed it to be problematic as such when determining the amounts of

---

[13]  In the final analysis, *per* Kangtai's previous suggestion, *see Clearon II*, Slip Op. 15-91 at 61, Commerce did not make any changes to Kangtai's by-product offset determined for the first remand results, *i.e.*, Commerce did not deduct the further processing costs from Kangtai's production of ammonium sulfate because Kangtai does not separately record the FOPS used to convert the ammonia gas and sulfuric acid into ammonium sulfate and it had allocated all the further processing costs to cyanuric acid.  *See RR2* at 10-11.

[14]  Arch-Jiheng points out that for the instant review this "finding" is factually incorrect on Jiheng's actual tracking of the actual amount of sulphuric acid it generated in the production of cyanuric acid. *See*, *e.g.*, Arch-Jiheng's Cmts on 2nd Remand Results at 11-12.

ammonia gas and sulphuric acid relevant to the by-product offset[15]; (2) Commerce routinely accepts

a by-product offset based on an estimation of the amount produced when the respondent (a) can

demonstrate that the by-product was produced in the course of producing the subject merchandise,

(b) does not maintain production records of the by-product, and (c) provides a reasonable calculation

tied to the company's production records[16]; (3) the concern is at odds with Commerce's treatment

in this same review of Jiheng's hydrogen gas and chlorine gas, because Commerce had verified

Jiheng's production records for those products and relied on Jiheng's formulas therefor in the

production of subject merchandise, and Commerce does not address why its methodological change

---

[15]   As in this instance, during those reviews the relevant offsets were made based upon chemical calculations of the amounts of ammonia gas and sulphuric acid that would have been required for the amounts of ammonium sulfate produced during the relevant review periods.

[16]   *See, e.g., Certain Corrosion-Resistant Steel Products From the PRC,* 81 Fed. Reg. 35316 (June 2, 2016) (*inter alia* final LTFV determ.) and accompanying I&D Memo at cmt 2 (although respondent did not track production of scrap, Commerce permitted an offset for scrap produced and sold, the amount of which was determined by calculating the difference between total input quantity of all major raw materials and subtracting the finished output);*Glycine from the PRC*, 80 Fed. Reg. 62027 (Oct. 15, 2015) (*inter alia* final rev. results) and accompanying I&D Memo at cmt 3 (accepting Baoding's records of sales of hydrochloric acid and ammonium chloride sales as sufficient support for production quantities for by-product offset purposes); *Drawn Stainless Steel Sinks From the PRC,* 78 Fed. Reg. 13019 (Feb. 26, 2013) (final LTFV determ.) and accompanying I&D Memo at cmt 9 (accepting calculation of scrap production for by-product offset purposes based on a ratio of total weight of stainless steel grades 301 and 304 scrap sold during the POI applied to production during the POI because the company did not track scrap production in its books); and *Steel Concrete Reinforcing Bars from Latvia,* 71 Fed. Reg. 74900 (Dec. 13, 2006) (final rev. results) (accepted respondent's claimed by-product offset calculation that was based on standards it used in the normal course of business rather than actual production).   Arch-Jiheng adds that contrary to the defendant's claim that Commerce requires respondents to provide sufficient documentation of the actual amount of by-product produced*, see* Def's Resp. to *RR2* Cmts at 36 (citing *Mid Continent Nail Corp. v. United States,* 34 CIT 498, 511 (2010)), the case cited does not reflect a position taken by the court but merely quotes Commerce's decision in *Wooden Bedroom Furniture* and does not otherwise discuss Commerce's practice as applied (the court having determined that the issue before it did not involve a by-product offset but, rather, a correction to the reported costs).

is necessary or more accurate for the valuation of the ammonia gas and sulfuric acid; and (4) arguing that *DuPont Teijin Films China Limited v. United States*, 38 CIT ___, ___, 7 F. Supp. 3d 1338, 1347-48 (2014), stands for the proposition that a change in methodology premised on supposedly greater accuracy must be rejected where there has been no change in relevant facts from the previous reviews compared to the present, Arch-Jiheng contends Commerce has not indicated what change in facts in the present case concerning the use of the formulae supported a finding that its change in methodology would lead to greater accuracy.

This court regards Commerce's first concern (that the record lacked "full" metered measurements and records of ammonia gas and sulfuric acid production) not as a stand-alone reason for surrogate valuation using the actual value of the downstream ammonium sulfate product but as a restatement of what has always been the problem since the original investigation, and it is, by now, well-established that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently. *E.g.*, *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). When an agency changes its existing "policy", *i.e.*, in the sense of a "course or principle of action previously adopted", then at a minimum the agency must "display awareness that it is changing position", "show that there are good reasons for the new policy", and be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016), quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (this court's alteration).

But, the presumption behind such concepts, of course, is *ceteris paribus*, and Commerce now takes the position that it has not "changed" its methodology, averring that it has

merely "adjusted" its policy into what it describes as a form of "capping" to suit the circumstances

at hand.  That position is obviously at odds with the analysis of *Clearon II*, and it is thus arguable

whether Commerce has, therefore, not in fact displayed "awareness" that for purposes of the review

at bar it has in fact "changed" its chosen course of action from its previous handling of the surrogate

valuation of the ammonia gas and sulfuric acid (because the way in which respondents produced

subject merchandise and handled the by-products thereof has not altered), or whether the only

apparent circumstance of relevance to this issue for the instant review that is "different" as compared

with prior reviews, as expressed as Commerce's second concern below, implies a difference of such

significance, *primae impressionis*, that the forgoing administrative principles are inapplicable, to wit:

> [I]f we valued the by-products as close to the split off point as possible in this
> proceeding, as we had done in all prior reviews and the investigation of this case,
> then the amount of the by-product offset would result in an illogical outcome because
> the value of the ammonia gas and sulfuric acid (the immediate by-products) would
> be higher than the value of the ammonium sulfate (the by-product that is actually
> sold).[ ] In reality, . . . no company would combine two inputs, and incur additional
> processing costs, in order to make a lower-valued ammonium sulfate by-product.
> This was a clear indication that applying our methodology in the normal manner was
> not appropriate.

*Id*. at 9 (footnote omitted); *see also id*. at 34.

        Commerce's solution has been perplexing to Arch-Jiheng and Kangtai, as this

litigation has shown, and as above indicated.  Nonetheless, in accordance with the foregoing

Commerce is permitted, generally speaking, to change its methodology at any time, so long as it

provides a reasonable explanation for the change.[17]  Commerce has expressed a legitimate concern (*i.e.*, reason) for doing so here.

B.

One exception changing a method or policy is when a party has relied upon a long standing methodology to its detriment.  *See Shikoku Chemicals Corp. v. United States*, 16 CIT 382, 388, 795 F. Supp. 417, 421-22 (1992) ("*Shikoku Chemicals*").  Arch-Jiheng and Kangtai maintain that Commerce's new method is impermissible, as it gave them no opportunity to "respond," and is unlawfully retroactive, as it gave them no opportunity to adjust their behavior from the existing methodology upon which they claim they had reasonably relied. Arch-Jiheng *RR2* Cmts at 4-5; Kangtai *RR2* Cmts at 26-28.

As to their first argument, the defendant contends Arch-Jiheng and Kangtai have had numerous opportunities to object to Commerce's calculation and they are not entitled to additional procedure on this issue,[18] and as to their second argument it argues "immediate application is the rule

---

[17] *E.g.*, *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 CIT 1150, 1169, 178 F. Supp. 2d 1305, 1327 (2001) (Commerce is generally "free to discard one methodology in favor of another, the better to calculate more accurate dumping margins") (citation omitted); *Cultivos Miramonte S.A. v. United States*, 21 CIT 1059, 1064, 980 F. Supp. 1268, 1274 (1997) ("Commerce has the flexibility to change its position providing that it explains the basis for its change and providing that the explanation is in accordance with law and supported by substantial evidence").

[18] Elaborating, the defendant points out that in the original proceeding the petitioners raised concerns with the inflated values for ammonia gas and sulfuric acid and proposed that Commerce use a different approach in the final results. *RR2* at 35, citing PDoc 155 at 40-41. Arch-Jiheng responded that the prior decisions cited by the petitioners were distinguishable, *see* PDoc 157 at 16-19, and Kangtai did not respond, *cf.* PDoc 159 at 35. Arch-Jiheng and Kangtai had additional opportunities to challenge Commerce's by-product offset in the first and second remands, and to the extent they raised specific arguments regarding the by-product methodology, Commerce responded to them in the second remand results. *See RR2* at 31-37.

where the new law affects only procedure or remedies." Def's Resp. to *RR2* Cmts at 40, quoting

*Brother Industries, Ltd. v. United States*, 15 CIT 332, 337, 771 F. Supp. 374, 380 (1991) (citations

omitted).[19] On this latter point, the defendant posits that *Shikoku Chemicals* basically relied on

typical retroactivity principles, which normally apply to "congressional enactments and

administrative rules", and it stresses that the respondents have not shown that Commerce's

methodology here had the effect of a regulation or statute or demonstrated retroactivity pursuant to

the applicable standards regarding (1) the "nature and extent of the change of the law," (2) "the

degree of connection between the operation of the new rule and a relevant past event," and (3)

"familiar considerations of fair notice, reasonable reliance, and settled expectations." Def's Resp.

to *RR2* Cmts at 40, quoting *Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1364 (Fed. Cir.

2005) (citing *Landgraf v. USI Film Prods*., 511 U.S. 244, 270 (1994)).

According to the defendant, *NTN Bearing Corp. of Am. v. United States*, 24 CIT 385,

400-01, 104 F. Supp. 2d 110, 124-25 (2000), *aff'd* 205 F.3d 1263 (Fed. Cir. 2002), is similar to this

case and limited *Shikoku* to its facts, holding *Shikoku* inapt when Commerce did not "switch to[ ]

any new methodology" when it abided an existing administrative preference as applied to the record.

*Id*., 24 CIT at 401, 104 F. Supp. 2d at 125. The defendant contends the *NTN* plaintiff also failed to

show actual reliance on the old methodology, because it did not establish that it "had actually

adjusted its prices and, except for the change in methodology, . . . would be entitled to a revocation

of the outstanding antidumping duty order." Def's Resp. to *RR2* Cmts at 41, quoting *id*. Likewise

here, the defendant continues, Arch-Jiheng and Kangtai have not provided evidence of actual

---

[19] *Cf. APEX Exp. v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015) (antidumping duty proceedings involve a "trade remedy" and their "antidumping duties are special remedial duties").

reliance but have only presented a general reliance interest argument, which is conclusory and unsupported by specific citations to the record. *Id*., referencing Kangtai *RR2* Cmts at 26-27 and Arch-Jiheng *RR2* Cmts 4-5. *See* R-PDoc 82 at 6; R-PDoc 83 at 19-20. Nor, the defendant emphasizes, have Arch-Jiheng and Kangtai shown that Commerce actually changed its methodology: "As Commerce explained, it did not alter its methodology in this review, but simply adjusted it given the specific facts in this review." *Id*., referencing *RR2* at 8-9.[20]

      Clearon supports these remand results, arguing that there is no evidence that any party relied on any particular by-product offset methodology when determining its pricing, and that the parties have commented exhaustively on this issue. Regarding Arch-Jiheng's argument that a third remand is necessary because Commerce "makes no reference to either the parties' reliance on the previous methodology or to Commerce's failure to provide notice and opportunity to comment during the underlying review", Arch-Jiheng *RR2* Cmts at 4, Clearon argues there was no reason for Commerce to discuss either allegation because no error occurred. Clearon *RR2* Resp. to Cmts at 2-3.

      Kangtai and Jihang, however, argue Commerce did in fact "change" its methodology and its "views" of their bookkeeping. However, this court need not resolve that question, because the record must encompass some form of evidence from which to conclude actual reliance upon the pre-altered methodology. *See*, *e.g.*, *Fischer S.A. Comercio, et al., v. United States*, 38 CIT ___, ___, Slip Op. 14-58 (May 27, 2014) at 13 (plaintiff "offers no evidence in support of its reliance argument

---

[20] The defendant also references *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1299-1300 (Fed. Cir. 2016), for the proposition that parties have no reliance interest in Commerce reaching the same results based on different records, however it is doubtful that the facts of that case are analogous to resolving the question of the degree to which the instant record "differs" from the prior administrative reviews with respect to the precise issue at bar.

other than its bare assertion that it relied on Commerce's past methodologies"); *Sanyo Elec. Co. v. United States*, 23 CIT 355, 366, 86 F. Supp. 2d 1232, 1243 (1999) (finding record evidence of actual reliance necessary to warrant remand under *Shikoku*'s reasoning); *Brother Industries, Ltd. v. United States*, 15 CIT 332, 339 (1991) ("in the absence of substantial evidence on the record, the Plaintiff's [had] failed to state a claim upon which relief [could] be granted"). It is not enough to simply assert reliance, but that, in essence, is what Kangtai and Jihang are arguing here.

Kangtai contends that "[t]his court is well aware, as explained in *Clearon II*, that respondents did rely on the former methodology", but that overstates the analysis of the prior decision, which only observed that Commerce had not addressed their reliance arguments. The court's examination of the record at this point does not independently reflect the type of reliance to which Kangtai alludes. Kangtai argues that it "kept its books and records in a particular way that Commerce accepted and found reliable to calculate a by-product offset", that it "did not make changes to its books and record", and further that it "actually relied on the fact that Commerce would continue to accept these records and grant the offset in the same manner in both POR 6 and POR 7", but the extent of that argument does not prove that such "reliance" was detrimental on this record.

Kangtai also argues that when Commerce "reversed course and determined to use a different methodology for the offset" it "determin[ed] Kangtai did not keep the appropriate books and records for the methodology it had consistently used prior." But Commerce did not determine that the respondents' books were not "appropriate" or insufficient for the purpose of determining whether a by-product offset could be granted, Commerce simply referred to the fact that "neither respondent during the [POR] could measure and keep records of the actual amount of waste

ammonia gas and sulfuric acid which was being produced" as the reason for having to rely on the

downstream ammonium sulfate product into which those by-products had been manufactured.

Kangtai further contends it "was unable to change its process to account for

Commerce's new decision" and that, "[i]f given the chance, Kangtai would have attempted to change

its books and records to account for Commerce's changed methodology", and that it "did change its

recordkeeping after this review to attempt to fit into Commerce's new requirements for the offset",

but again, such actions do not explain why Kangtai's prior recordkeeping (even assuming it had been

in reliance upon how Commerce had calculated the by-product offset from the first through the fifth

administrative reviews) was "detrimental." In other words, given Commerce's "second" concern

above, Kangtai does not explain how or why the result here would be any different even if it had had

the chance to alter its recordkeeping to "comport" with "Commerce's new requirements for the

offset".

Kangtai also emphasizes that due to the vagaries in the surrogate value methodology,

it is not possible to know whether the ammonia and sulfuric acid surrogate values are distortedly

high or the ammonium sulfate by-product surrogate value is distortedly low, as this is an issue in the

inconsistencies of the surrogate value methodology which can change from year to year and country

to country depending on the market. "Making the surrogate value price a factor in determining the

appropriate by-product methodology is fraught with potential inconsistencies and does not allow

parties to reasonably adjust their books and records and prices to account for which way Commerce

will retroactively account for its by-product offset." Kangtai *RR2* Reply at 17. Whether that is true

as a general matter, determinations on reliance must, of necessity, be made case by case, and the

argument is not, on this record, a reason for holding Commerce's methodological "alteration" unlawful in this instance.

Summarizing: neither Arch-Jiheng nor Kangtai point to anything of record beyond their statements of reliance on Commerce's by-product offset methodology. There appearing to be no record evidence of actual reliance as such, neither Kangtai nor Arch-Jiheng persuades that their circumstances fall with the exception to the general rule that Commerce may change its methodologies at any time as long as it provides a reasonable explanation. Here, it is undisputed that Jiheng and Kangtai did not sell ammonia gas or sulfuric acid[21] and did not record the actual amounts of their production but did provide for the record the actual amount of ammonium sulfate produced. *See RR2* at 9. Kangtai originally reported its by-product as ammonium sulfate. *See* Second Remand Results at 35, citing PDoc 51, Part D at 17. In explaining why it preferred using the downstream by-product on this record and why that preference was consistent with prior practice and did not disrupt any reliance interest by the respondents, *RR2* at 7-10, Commerce has at least expressed a reasonably legitimate concern and reasons for "altering" the way in which it valued the ammonia gas and sulfuric acid by-products on this record, whether or not that amounts to a "change" of methodology. *Cf. National Classification Committee v. United States*, 765 F.2d 1146, 1153 (D.C. Cir. 1985) ("an agency may adopt new rules *without* affirmatively proving that the status quo is wrong") (original italics); *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1349 (D.C. Cir. 1985) (it is enough for the agency to show that "there is no cause to believe that the status quo is right, so that the existing rule has no rational basis to support it").

---

[21]  *See* PDoc 49 at D-32 to D-33; PDoc 51, Sec. D, at 17.

## C.

Turning once again to Commerce's actual solution to valuing the ammonia gas and sulfuric acid, Commerce points out that its solution is in fact a form of capping. Arch-Jiheng argues Commerce's solution here is at odds with its "normal" capping practice, which is to cap the average of the surrogate values for the inputs as it did in cases such as *Multilayered Wood Flooring*[22] and Commere has stated that such behavior is its "practice."[23] The defendant responds that by advocating for Commerce to apply a capping methodology, Arch-Jiheng "concedes" that the values for ammonia gas and sulfuric acid were too high, and that Arch-Jiheng's cited cases "do not support a rigid capping method, but instead confirm that Commerce calculates the offset based on the record at hand." Def. 2nd Remand Response at 37. Arch-Jiheng replies that in none of the cases cited did Commerce deduct the FOPs from a downstream product to "cap" the value of the by-product offset. "[O]n the choice of 'capping methodology' as Commerce now calls its complete change in

---

[22] *Multilayered Wood Flooring From the PRC*, 76 Fed. Reg. 64318 (Oct. 18, 2011) (final LTFV det.) ("we have valued Layo Wood's byproducts using the simple average of the surrogate values for Layo Wood's wood veneer and wood core inputs").

[23] *See, e.g., Chlorinated Isocyanurates From the PRC,* 81 Fed. Reg. 1167 (Jan. 11, 2016) (final rev. results) and accompanying I&D Memo at cmt. 3 (capping the value of hydrogen by-product by the average of its input values and citing Commerce's "practice" to this effect); *Glycine from the PRC*, *supra*, 80 Fed. Reg. 62027 and accompanying I&D Memo at cmt 3 (did not cap hydrochloric acid because surrogate value was lower than the surrogate values for the inputs but capped the ammonium chloride surrogate value at the average of the inputs); *Certain Pneumatic Off-the-Road Tires from the PRC*, 80 Fed. Reg. 20917 (Apr. 15, 2015) (final rev. results) and accompanying I&D Memo at cmt. 21 (capping the value of coal by-products to the value of the coal input surrogate values). *See also Tapered Roller Bearings & Parts Thereof, Finished and Unfinished, From the PRC*, 74 Fed. Reg. 3987 ( Jan. 22, 2009) (final rev. results), and accompanying I&D Memo at cmt. 5 (did not use a surrogate value for the by-product that was higher than the cost of the finished good); *Certain Steel Nails from the PRC*, 73 Fed. Reg. 33977 (June 16, 2008) (final LTFV det.), and accompanying I&D Memo at cmt. 12 (did not use a surrogate value for the by-product that was higher than the cost of the finished good).

methodology, Commerce also has failed to provide a rational connection between the facts found and the choices made." Arch-Jiheng *RR2* Reply at 10. Kangtai raises similar argumentation.

Given surrogate values of record for ammonia gas and sulfuric acid that were higher than the downstream ammonium sulfate product into which those by-products were further-manufactured, however, for Commerce to theorize that the by-product offset for the ammonia gas and sulfuric acid by-products may be calculated based on the surrogate value of ammonium sulfate production less the further costs necessary for its manufacture is not an unreasonable solution to the problem Commerce identified. It is also, as Commerce explains, a form of "capping" in fact, albeit not the one pressed by the parties, and the defendant emphasizes that Commerce's solution is based on the actual, not hypothetical, record of production and sales. The court cannot substitute its own view of the record, *see Universal Camera*, *supra*, 340 U.S. at 488, but even if Commerce were to have considered using the surrogate values that directly pertain to ammonia gas and sulfuric acid on the record, it would still have been faced with having to consider "capping" or adjusting those values in a manner similar to the results reached here.

Substantial evidence of record supports Commerce's determination on this issue. In passing, briefly addressed here is Arch-Jiheng's argument that Commerce incorrectly calculated the FOPs for producing ammonium sulfate (*see* Arch-Jiheng *RR2* Cmts at 7-10): Apart from whether or not exhaustion is an issue, *see* Arch-Jiheng's Reply to 2nd Remand Cmts at 11-12, the court declines to order a third remand for correction of ministerial error for the reasons given in Commerce's Second Remand Results and as articulated in the defendant's brief. *See RR2* at 37; Def's Resp. to *RR2* Cmts at 38-39. *Cf.*, *e.g.*, *Dorbest Ltd. v. United States*, 32 CIT 185, 217 (2008)

Consol. Court No. 13-00073                                                    Page 40

("cases cited by [the plaintiff] do not go so far as to require that Commerce must correct late-raised

ministerial errors").

### *Conclusion*

For the above reasons, judgment will be entered sustaining Commerce's second

results of remand.


                                        /s/ R. Kenton Musgrave
Dated:  November 23, 2016               R. Kenton Musgrave, Senior Judge
        New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| CLEARON CORP., and | : | |
| OCCIDENTAL CHEMICAL CORP., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | |
| UNITED STATES, | : | Consol. Court No. 13-00073 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| ARCH CHEMICALS, INC., and | : | |
| HEBEI JIHENG CHEMICAL CO., LTD., | : | |
| | : | |
| Defendant-Intervenors, | : | |
| | : | |
| and | : | |
| | : | |
| JUANCHENG KANGTAI CHEMICAL | : | |
| CO., LTD., | : | |
| | : | |
| Defendant-Intervenor. | : | |

## JUDGMENT

This court's slip opinion 14-88 (July 24, 2014) having remanded to the International Trade Administration, U.S. Department of Commerce ("Commerce"), the final administrative determination *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 4386 (Jan. 22, 2013) for reconsideration and/or explanation in greater detail of several aspects of that determination; and slip opinion 15-91 (Aug. 20, 2015) having remanded Commerce's "Final Results of Second Redetermination Pursuant to Court Remand in *Clearon Corporation et al. v. United States*, Court

Consol. Court No. 13-00073                                             Page 2

No. 13-00073" dated December 22, 2014 (ECF No. 69) for further reconsideration and/or

explanation in greater detail of several aspects of that determination; and Commerce having filed

with the court its second "Final Results of Second Redetermination Pursuant to Court Remand in

*Clearon Corporation et al. v. United States*, Court No. 13-00073" dated March 22, 2016 (ECF No.

106) ("*Final Results of Redetermination*"); and the parties' comments thereon having been

considered and addressed in the court's final decision issued this date; and in consideration of all

papers and proceedings had herein; Now therefore, after due deliberation, it is

**ORDERED**, **ADJUDGED**, and **DECREED** that Commerce's *Final Results of*

*Redetermination*, dated March 22, 2016, be, and they hereby are, sustained.


                                             /s/  R. Kenton Musgrave
                                             R. Kenton Musgrave, Senior Judge

Dated:  November 23, 2016
        New York, New York

Slip Op. 15 - 91

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| CLEARON CORP., and OCCIDENTAL CHEMICAL CORP., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | |
| UNITED STATES, | : | Consol. Court No. 13-00073 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| ARCH CHEMICALS, INC., and HEBEI JIHENG CHEMICAL CO., LTD., | : | |
| | : | |
| Defendant-Intervenors, | : | |
| | : | |
| and | : | |
| | : | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD., | : | |
| | : | |
| Defendant-Intervenor. | : | |

## OPINION AND ORDER

[Remanding sixth (2010-2011) review of antidumping duty order on chlorinated isocyanurates from the People's Republic of China a second time.]

Dated: August 20, 2015

*James R. Cannon, Jr.* and *Thomas M. Beline* of Cassidy Levy Kent (USA) LLP, of Washington, DC, for the plaintiffs.

*Gregory S. Menegaz*, *J. Kevin Horgan*, *John J. Kenkel*, and *Alexandra H. Salzman*, DeKieffer & Horgan, of Washington, DC, for the consolidated-plaintiff and defendant-intervenor Juancheng Kangtai Chemical Co., Ltd.

*Peggy A. Clarke*, Law Offices of Peggy A. Clarke, of Washington, DC, for the consolidated-plaintiff Hebei Jiheng Chemical Co., Ltd. and the consolidated-plaintiff and defendant-intervenor Arch Chemical Co., Ltd.

*Jane C. Dempsey*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. On the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *David W. Richardson*, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington DC.

Musgrave, Senior Judge: Before the court are the *Final Results of Redetermination Pursuant to Court Remand*, *Clearon Corp. and Occidental Chemical Corp., et. al., v. United States* ("Remand" or "RR"), Court No. 13-0018, RR-PDoc 69 (Dec. 11, 2014) submitted from the defendant's International Trade Administration of the U.S. Department of Commerce ("Commerce" or "Department"). The matter covers the sixth (2010-2011) administrative review of the antidumping duty order on chlorinated isocyanurates ("chlor-isos") from the People's Republic of China ("PRC"). Familiarity with *Clearon Corp. v. United States*, 38 CIT ___, Slip Op. 14-88 (July 24, 2014) ("Opinion") and the basis of that remand is presumed.

The defendant-intervenors Arch Chemicals, Inc. and Hebei Jiheng Chemical Co., Ltd. ("Jiheng") (together "Arch") and Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") argue for further remand. Plaintiffs Clearon Corp. and Occidental Chemical Corp. (together, "Clearon") argue for sustaining the remand results. For the following reasons, remand is again necessary.

## I. *Background*

Briefly summarizing: after *Chlor-Isos from the PRC*, 78 Fed. Reg. 4386 (Jan. 22, 2013) (final 2010-2011 admin. review results), PDoc 169, and accompanying issues and decision memorandum ("*IDM*"), PDoc 164 (together, "*Final Results*") were summonsed here, the case was

voluntarily remanded on issues related to the determinations of surrogate factors of production

("FOPs"), namely: (1) whether certain identified labor, retirement, and employee benefit expense

items among the selling, general and administrative ("SG&A") items of a financial statement, upon

which Commerce relied for its financial ratios are inadvertently double-counted as a result of

Commerce's recent change in policy to rely upon International Labor Organization ("ILO") Chapter

6A data for valuing labor; (2) change in methodology for calculating intra-company transportation

costs; and (3) changes in the methodology employed for determining respondent's by-product

offsets. Because the selection of the surrogate country was also remanded due to certain flaws in that

process, consideration of the parties' further challenges to the surrogate valuation ("SV") of urea,

hydrogen gas, chlorine, sodium hydroxide, and electricity was therefore deferred.

Upon remand, Commerce placed additional information on the record for comment

and issued questionnaires to Arch and Kangtai requesting further information on intra-company

transport of goods and on the by-product offset claims for ammonium gas and sulfuric acid.[1] During

remand, Commerce again selected the Philippines as the primary surrogate country. RR at 31.

Commerce states that during remand it adjusted the normal value ("NV") calculation by recalculating

the transportation cost of intermediate goods between factories for Jiheng, and by recalculating the

by-product offset using company specific information for Jiheng and Kangtai. Commerce also states

it revised the by-product calculation made to the draft remand calculations and clarified certain

sentences in its explanation of its decision not to adjust financial ratios to account for benefits

---

[1] *See* RR at 3 (citations omitted).

included in the ILO surrogate value for labor.  RR at 3.  All other aspects of the Remand apparently remained unchanged.

   Regarding those remand results, Kangtai continues to contest Commerce's elimination of India in the surrogate country selection process.[2]  Kangtai and Arch both argue that the labor FOP continues to double count certain indirect labor costs, and that Commerce's by-product methodology is unsupported by record evidence and is contrary to law.[3]

   Clearon requests that the court accept the Remand "in its entirety."[4]  The court construes this to mean Clearon is satisfied with Commerce's reconsideration of Arch's and Kangtai's by-product offsets claims and that Clearon has therefore abandoned its own claims with respect thereto.  However, Clearon's other claims concerning the surrogate valuation of urea and hydrogen gas remain live, as do Arch's and Kangtai's claims regarding the surrogate valuation of chlorine, sodium hydroxide, and electricity.  As discussed herein, because the court must remand again concerning Commerce's selection of surrogate values for certain FOP's and its by-product offset methodology, the primary surrogate country selection remains an open question subject to reconsideration as may be appropriate.

---

 [2] Kangtai's Comments on Remand Results, RR-PDoc 76 (Jan. 28, 2015) at 1-23 ("Kangtai's Cmts.").

 [3] Kangtai's Cmts. at 23-37; *see also* Arch's Comments on Remand Results, RR-PDoc 75 (Jan. 28, 2015) at 3-17 ("Arch's Cmts.").

 [4] Clearon's Comments on Remand Results, RR-PDoc 82 (Feb. 26, 2015) at 22 ("Clearon's Cmts.").

## II. *Jurisdiction and Standard of Review*

The action was brought pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. §1516a(a)(2)(B)(iii). Clearon, Kangtai, and Arch have standing under 19 U.S.C. §1516a(d) and 28 U.S.C. §2631(c).

The party challenging a final administrative determination of the type at bar is burdened with showing how it is "unsupported by substantial evidence on the record" or is not "otherwise in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i). Substantial evidence means "more than a mere scintilla", it must be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), citing *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Commerce's statutory interpretations are considered pursuant to the familiar two-step analysis set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) (if "Congress has directly spoken to the precise question at issue . . ." *et cetera*).

## III. *Discussion*

### A. Process of Selecting the Primary Surrogate Country

The selection of a primary surrogate country was remanded because Commerce had not explained its GNI range selection process of country inclusion on its Surrogate Country List. Opinion at 34. The Remand details how Commerce arrives at its list of surrogate countries and provides historical context, particularly in the form of helpful charts and graphs showing the widening GNI gap between India and the PRC over time. Commerce's current practice involves seeking GNI ranges that are "evenly distributed around the PRC's GNI". *See* RR at 9, referencing

*Dongguan Sunrise Furniture Co. Ltd. v. United States*, 38 CIT ___,___, 865 F. Supp. 2d 1216, 1238 (2012).  From the annual release of the *World Bank Development Report,* Commerce looks beyond that report's "lower middle" income grouping of the PRC's GNI when considering which countries are economically comparable thereto.[5]  *See id*. at 9-14.  On remand, Commerce again selected the Philippines as its primary surrogate country and disregarded India not only for use as the primary surrogate country but also for valuing certain FOP's.  *Id*. at 2, 31-39.

Kangtai argues the very scope and length of Commerce's "first ever" explanation of its country selection process demonstrates that Kangtai was prejudiced by the lack of explanation while the segment was ongoing, and that had Kangtai been aware of the policy considerations it would have been in a better position to research surrogate countries.  It argues dropping India from the list was "sudden" because it had been the country of choice for 25 years, and that the "mere existence of a regulation, one that had not been used to change the primary surrogate in 25 years, cannot justify or render reasonable the Department's *implementation* of this regulation (GNI reliance for economic comparability) in this instance."  Kangtai's Cmts. at 2, referencing Opinion at 44-45 (Kangtai's italics).  Further emphasizing the point, Kangtai argues:

> The number and size of the companies offered in India versus the Philippines demonstrates this emphatically. The existence of a weekly chemical reporter in India and the non-existence, on this record, of a domestic chemicals trading market in the Philippines demonstrates this emphatically. Procedurally, the Department has dropped India after Kangtai's POR sales were made, based on GNI data that was not

---

[5]  In particular, Commerce states that it relies on its experience and professional judgment on a range of factors when considering to add or remove countries from the list, including the surrogate value requirements for the existing products under investigation, the data quality and availability of alternative surrogate countries, economic diversity of the manufacturing sector in the alternative countries, and the degree of specificity in the import data relied on to value the FOP's. RR at 13.

available when the sales were made. This totally frustrates the compliance purpose
of the statute and is not a problem that a market economy respondent would have to
encounter. Accordingly, the Department's procedure was arbitrary and unreasonable.

*Id*. at 3. Kangtai thus continues to argue that India's data quality outweigh those of countries on the

Surrogate Country List, and that Commerce has unreasonably refused to even consider India's data

quality when making its primary surrogate country selection.

Commerce's response is to explain that its general rule is to select a surrogate country

from its list of surrogate countries but that it also considers countries that other parties propose. It

generally selects a surrogate country that is "at the same level of economic development" as the

NME

unless it is determined that none of the countries are viable options because (a) they
either are not significant producers of comparable merchandise, (b) do not provide
sufficient reliable sources of publicly available surrogate value (SV) data, or (c) are
not suitable for use based on other reasons.

RR at 6 (internal citation omitted). Commerce only selects countries that are not at the "same level

of economic development as the NME country, but still at a level of economic development

comparable to the NME country" when data considerations outweigh the difference in levels of

economic development.[6] India's data are not "better," Commerce maintains, because they are not

from a country "at a level of economic comparability" to the PRC, noting that to be selected for the

list over the other countries which are at the same level of economic comparability to the PRC, "the

data quality and availability from India must outweigh its *per capita* GNI disparity with respect to

the PRC". RR at 15. Commerce maintains more importantly that because the Philippines has

---

[6] *Id.*; *see also* RR at 35 ("Countries outside the implied GNI range are also considered, [but]
are selected *only* to the extent that the data considerations outweigh the level of economic
development factor (as indicated by disparate GNIs).")(italics in original).

"reliable and useable" data (that Commerce also characterizes as "quality" data), Commerce did not

need to consider the Indian data's quality.  RR at 35-36, 38 (internal citations ommitted).

As discussed in the Opinion, Commerce's primary reliance on per capita GNI to

identify economically comparable countries was not unreasonable and was in accordance with law.

*See* Opinion at 25.[7]   In the Remand, Commerce provided a reasonable explanation of how it

generated the Surrogate Country List and selected the range of GNI's that qualify countries as

proximate and "economically comparable" to the PRC.  *See* RR at 4-19.  However, Commerce's

selection of the Philippines as the primary surrogate country relies heavily on its determination that

the Philippine data for valuing chlorine and hydrogen gas is the "best available information"[8] on the

record, and as discussed *infra*, that determination cannot be sustained at this time; therefore, the

primary surrogate country selection remains an open question, to be addressed on remand as

appropriate.

---

[7]    Kangtai re-argues several points in its motion for judgment regarding the methodology
Commerce applies when creating the surrogate country list  that the court addressed and rejected in
that opinion and which it will not again consider here. Specifically, that it was prejudiced by
Commerce's "dropping India from the Surrogate Country List", that Commerce's use of GNI in
determining economic comparability was unreasonable, and that the statute requires Commerce to
equally weigh economic comparability and significant production of comparable merchandise.
Kangtai's Cmts. at 1-23, and Kangtai's Motion for Judgment on the Agency Record, ECF No. 30
(Aug. 14, 2013) ("Kangtai's Br.") 6-11.  *See Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 697
(Fed. Cir. 2001) (noting that the law of the case doctrine "generally bars retrial of issues that were
previously resolved") (internal citations ommitted).

[8] *IDM* cmt. 2 at 7 ("the Department is selecting the Philippines as the surrogate country given
its superior data availability"), and at 8 ("[s]ince the Department has usable information from the
Philippines on the record to value all inputs, except for steam, the issues raised above [concerning
"Surrogate Values if the Philippines is Not Selected as the Surrogate Country"]  are moot"), and at
11 ("[t]herefore, we can find no basis to consider the Philippines GTA value for liquid chlorine to
be unreliable and find no reason to consider information from a non- Philippine source").

B. Consideration of India as Surrogate Country for Valuing FOP's

While in the Remand Commerce added India's per capita GNI to the record, provided a reasonable explanation of the methodology it applied when determining that India was "less economically comparable" than the PRC and that its GNI did not qualify it for the Surrogate Country List, Commerce did not provide the court with the data analysis it claims to undertake, or it did not adequately articulate the analysis if it did in fact undertake it, when considering India and the data therefrom should be used for valuing certain FOP's. RR at 4-17. Commerce's adherence to it's regulatory "preference" to value all FOP's from one surrogate country, in this instance the Philippines, and to completely disregard Indian data for consideration for certain FOP's was unreasonable.

It must first be pointed out that the statutory standard for Commerce valuing FOP's is not whether the surrogate data are merely "usable", as Commerce categorized the Philippine data, but whether they are the "best available". *Jiaxing Brother Fastener Co. v. United States*, 38 CIT ___, ___, 961 F. Supp. 2d 1323, 1333 (2014) ("*Jiaxing Brother*").[9]  While it is reasonable for Commerce to prefer to use data from a surrogate country that is at a comparable level of economic development over one that is at a less comparable level of development, when presented with a "less economically comparable" country off the list it must still provide an analysis of how the data from the less comparable country presented does not outweigh its economic disparity. RR at 36.

---

[9] Commerce declaring that the Philippine data are "quality" data, on the other hand, indicates that they satisfy Commerce's five-factor test of "period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and [are] publicly available". Import Policy Bulletin 04.1.

In the selection of primary surrogate country, Commerce found the fact that India may have a significant chemical industry comparable to the PRC was "irrelevant" to its analysis of India's level of economic development because the point only addresses whether the country is a "significant producer" of comparable merchandise.  RR at 38.[10]  On the one hand, it is unreasonable for Commerce to acknowledge that the level of economic comparability and the quality of a country's data are two separate considerations, and then refuse to undertake a comparative analysis, of the type Commerce here implies it must undertake, in order to determine whether data quality outweighs the fact that a country is not on the surrogate country list.  *See* RR at 6, 14-15, 35.  The fact that India's data originates from a country not inside the GNI band does not implicate those data's availability or quality.  On the other hand, requiring a full comparative evaluation of the data quality of a country not on the surrogate country list, as compared with the data of those that are, would be a pointless exercise if in the final analysis the non-listed country's data quality is in fact insufficient to overcome the fact that the country is not on the surrogate country list and substantial evidence of record can support the conclusion that data for another country thereon are the "best available information" for purposes of selecting surrogate values for FOP's. Commerce therefore acts not unreasonably in burdening the party proposing a non-listed country with demonstrating that no country on the

---

[10]  It also observed that "[i]f a country is a significant producer of comparable merchandise, then the economy of the surrogate country is developed enough to support an industry in the comparable merchandise." RR at 38. This is confusing.  Is the point here that because Commerce finds India's GNI "not comparable" to the PRC's, India cannot, therefore, be a "significant producer" of comparable merchandise or cannot have a significant chemical industry comparable to that of the PRC, in contradiction of the roughly 25 years of prior proceedings in which India has been relied upon as an appropriate primary surrogate country or even a *secondary* surrogate country, as the record of the preliminary determination of *this* proceeding shows?  Or is the point that India's economy *is* "developed enough" that its economy provides a fruitful comparison (*i.e.*, is "economically comparable") to the NME economy under consideration?

surrogate country list provides the scope of "quality" data that it requires in order to make a primary surrogate country selection.

However, if that threshold is met, then Commerce must consider the quality of the data on the country not on the list that a party proposes. Towards that end, determining the interstice of Commerce's five-factor data quality checkbox *vis-à-vis* particular datasets is a start, but the analysis does not end there if there are other relevant qualities of the datasets that require consideration. Commerce "must consider the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence", *Nucor Corp. v. United States*, 32 CIT 1380, 1384,594 F. Supp. 2d 1320, 1332 (2008) (internal quotation marks omitted), *aff'd*, 601 F.3d 1291 (Fed. Cir. 2010), as it is the facts that drive the law, not the other way around.

Commerce has steadfastly refused to address Kangtai's arguments concerning the quality of the data of record with respect to India's chemicals industry and Kangtai's conclusion that those data are far superior the Philippines' chemicals industry data, on the ground that the Philippine data satisfy Commerce's five-factor test. The court therefore deems this as an admission on Commerce's part as to the quality of the data covering India's chemicals industry. The validity of both parties' positions (Kangtai's as well as Commerce's) on the issue of resort to India as the primary or even secondary surrogate country for valuing FOP's is therefore dependant on the reasonableness of Commerce's conclusions as to the quality of each challenged element of the Philippines data. *Cf. Preliminary Results* (selecting South Africa's primary surrogate country but resorting to India as secondary surrogate for certain data).

At this point, after considering the Remand and the parties positions, the court must here conclude that Commerce's selection of the Philippines as the primary surrogate country from the Surrogate Country List has general support in the record.  However, as discussed below, because the choice of the Philippines was expressed in the Remand as largely dependant upon Philippine import data for chlorine and hydrogen gas, during which Commerce ignored a previously well-articulated preference for domestic data for these types of chemicals (even including reliance upon a domestic source from a non-surrogate-list country; *see*, *e.g.*, *Preliminary Results*), and because the latter determinations have not been reasonably explained, the choice of the Philippines as the primary surrogate country[11] remains an open question.  *See* RR at 36-39.[12]

### C.  Surrogate Valuation of Hydrogen Gas and Chlorine

For the *Preliminary Results*, Commerce looked to its second surrogate country, India, and used the values from three and four Indian producers, respectively, of hydrogen gas and chlorine producers to value those chemicals.  *See* Prelim. SV Memo, at 12-13 and Appx. III.39 & III.40, PDoc 104.  In doing so, Commerce explicitly recognized the previous reviews (as well as the *Preliminary*

---

[11]  Or "*countries*" -- as provided by 19 U.S.C. §1677b(c)(1)(B).

[12]  *Cf. also*, Kangtai's Surrogate Country Cmts., PDoc 58 (Dec. 19, 2011) (acknowledging that India is no longer on the Surrogate Country List but urging flexibility about what Commerce "will consider 'comparable' production in the countries it now does list as comparable"); Jiheng's Prelim. SV Submission, PDoc 65 (Jan. 9, 2012) (urging reliance upon data from India for valuation of steam and water consistent with *Multilayered Wood Flooring*, in which the Philippines was also selected as the primary surrogate country); Clearon's Prelim. SV Submission, PDoc 66 (Jan. 9, 2012) (arguing for use of Indian financial statements for calcium hypochlorite and stable bleaching powder values due to lack of publicly available financial statements for producers thereof in South Africa, the petitioners' preferred choice of primary surrogate country); Kangtai's Prelim. SV Submission, PDoc 70 (Jan. 9, 2012) (urging reliance upon Indian financial statements' value of chlorine notwithstanding argument that Commerce "should look to the Philippines and/or to Thailand for industries producing comparable product")

*Results*) in which it had found that both hydrogen and chlorine are not only infrequently traded on

an international basis, but that due to the very nature of those chemicals they face special concerns

both in transporting and in packaging, which are exacerbated over longer distances, greatly adding

to their costs.  *See id.*[13]; *see, e.g., Chlor-Isos from the PRC*, 76 Fed. Reg. 40689, 40695 (July 11,

2011) (prelim. admin. review), unchanged in *Chlor-Isos from the PRC*, 76 Fed. Reg. 70957 ( Nov.

16, 2011) (final admin. review).  For the *Final Results*, however. Commerce used GTA import data

from the Philippines to value chlorine and hydrogen gas.  *IDM* cmts 7 & 8, at 11-16.

Clearon and Kangtai both argue that the domestic Indian prices are better alternatives,

not only because the volumes of those chemicals in the Philippines import data are small, and the

prices contained therein unreliable, but because Commerce did not articulate what had changed about

those chemicals' "nature" since the *Preliminary Results* to suddenly render import data for them

reliable surrogate values.  Clearon's Motion for Judgment on the Agency Record, ECF No. 31 (Aug.

15, 2013) ("Clearon's Br.") at 17-21; Kangtai's Br. at 11-27.  Clearon and Kangtai also present

myriad other arguments for their respective positions,[14] which the court has considered, but it will

---

[13] The *Preliminary Results* specifically acknowledge that "chlorine gas and hydrogen gas are not frequently traded on an international basis," Prelim. SV Memo at 4, and that "due to the very nature of chlorine, it faces special concerns both in transporting and in packaging, which are exacerbated over longer distances, *greatly adding to the cost of chlorine*", *id*. at 12 (italics added); therefore, due to "these reasons, the Department continues to find that the GTA does not provide the best surrogate value for chlorine", *id*.  With respect to hydrogen gas, Commerce stated that it "has previously determined that the GTA does not provide the best representative surrogate value for hydrogen because hydrogen, like chlorine, is not frequently traded on an international basis, *and incurs special transport costs over long distances*."  *Id*. at 13 (italics added).

[14] Commerce raises a litany of points in response, *interalia* : (1) the court has recognized that a small volume of imports, by itself, does not establish that the import data are aberrational, *Trust Chem Co. v. United States*, 35 CIT ___, ___, 791 F. Supp. 2d 1257, 1265-66 (2011); (2) interested
(continued...)

follow the path of least resistance to focus only on those points pertinent to the ultimate conclusion,

to wit, that there are certain flaws in Commerce's determinations with respect to surrogate valuations

of chlorine and hydrogen gas, which must therefore be remanded for further analysis,

reconsideration, or explanation.

        As indicated, the *IDM* does not articulate direct responses to a number of Clearon's

and Kangtai's points, in particular those concerning the higher transportation and packaging costs

---

[14] (...continued)
parties bear the burden of creating an adequate record, *QVD Food Co. Ltd. v. United States*, 658 F.3d 1318, 1324-25 (Fed. Cir. 2011); (3) at the time of the *Preliminary Results* the record lacked Philippine production data, and Commerce accordingly could not determine whether the Philippines was a significant producer of comparable merchandise, *IDM* cmt. 7 at 11, 13; (4) after the *Preliminary Results* Commerce examined data availability for both South Africa and the Philippines to determine which country had superior data availability, *IDM* cmt. 2 at 7; (5) once it had selected the Philippines as the primary surrogate country, Commerce applied its regulatory preference to value all factors in a single country where possible and examined the record to identify Philippine data, 19 C.F.R. § 351.408(c)(2); (6) the only Philippine surrogate value on the record for chlorine was the Philippine GTA import data for chlorine, *IDM* cmt. 7 at 11-13; (7) there was no evidence on the record to value hydrogen using a source from one of the other economically comparable countries, *IDM* cmt. 8 at 14; (8) the Philippine GTA import data for hydrogen and chlorine satisfied its criteria of being product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and free of taxes and duties, *e.g., IDM* cmt. 7 at 12; (8) Commerce selects data from outside of the primary surrogate country only when data sources from the primary surrogate country cannot provide reliable surrogate values, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 Fed. Reg. 37116 (June 23, 2003) (final LTFV determin.), and accompanying I&D Memo at cmt. 14; (9) because India is not on the economically comparable Surrogate Country List "any comparison to data from India is inappropriate", Defendant's Response to Plaintiff's Motions for Judgment on the Agency Record, ECF No. 49 (Feb. 2, 2014) ("Def's Resp.") at 32 (citation omitted); (10) using data from a country that is not on the list of economically comparable countries could result in distortions in Commerce's calculations, *Clearon Corp. v. United States*, 37 CIT ___, ___, Slip Op. 13-22 (Feb. 20, 2013) at 12; (11) the record contained no data demonstrating that chlorine and hydrogen gas are rarely traded internationally because the parties failed to place price data on the record from either the domestic industries therefor or from other economically comparable countries, and "Commerce cannot make a finding that Philippine GTA import prices vary significantly when compared to other GTA import data without this information", *See* Def's Resp. at 33.

associated with movement of those chemicals and why Commerce's expressed preference for valuing all FOPs from a single country should trump its other (presumably co-equal) preference for using domestic prices over import prices especially where these chemicals are concerned. Commerce's articulation in the *IDM* is essentially that it finds that the Philippine GTA import data for those chemicals are reliable because they constitute "commercial quantities" and their prices have not been shown to be aberrant or distorted.[15]  Rather than abide by its previous statements concerning the "nature" of hydrogen gas and chlorine,  Commerce also shifts the burden onto Clearon and Kangtai to provide proof for the record thereof.  Hence, whether substantial evidence of record moots the points Clearon and Kangtai raise, thereby rendering Commerce's improper burden-shifting[16] harmless error, depends upon the validity of Commerce's ultimate conclusion.

As a "preliminary" matter, Kangtai disagrees with Commerce's implication that Commerce was unable to consider the Philippines import data for the *Preliminary Results* at the time thereof.  Kangtai contends that import data for chlorine pertaining to South Africa and the Philippines were on the record before the *Preliminary Results*, and that nothing in the record has

---

[15]  Commerce, supported by Clearon (thus undercutting its own argument with respect to hydrogen gas), makes the point that the record of this review does not indicate that the cost of shipping chlorine is so burdensome that it is not a "frequently" traded international good, and that Kangtai identifies no record evidence indicating that the containers used to store chlorine domestically could not be used to ship chlorine internationally, such that those "special . . . concerns" of transport and packaging exist regardless of whether those chemicals are moved domestically or internationally.  Whether that was rather Commerce's burden -- to explain in the *Final Results* why it was reversing its precedent on the "nature" of chlorine and hydrogen gas    this *post hoc* rationalization here will not carry the day.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (agency action is to be upheld, if at all, only on the grounds articulated by the agency itself).

[16]  Final findings in prior reviews become the law of the case and "agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently".  *See Dongbu Steel Co., Ltd. v. United States*, 635 F.3d 1363, 1371 (Fed. Cir. 2011).

changed since those results that would cause Commerce to select Philippine import data to value

chlorine. Kangtai's Br. at 15-16. The point is somewhat at odds with Kangtai's overall contention.

Commerce responds that Kangtai's point ignores the fact that at the time of the Preliminary Results,

the record lacked Philippine production data, and that Commerce accordingly could not determine

whether the Philippines was a significant producer of comparable merchandise, and therefore

whether it could use Philippine data for surrogate values. Def's Resp. at 23, referencing *IDM* cmt.

7 at 12-13. But that does not appear to be the case, as Clearon also makes the point that Mabhuay

Vinyl Corporation ("MVC"), upon whose financial statements Commerce determined to rely, "was

a major producer of chlorine in the Philippines", Clearon's 56.2 Response Brief, ECF No. 47 (Feb.

24, 2014)( "Clearon's Resp.") at 32, referencing Jiheng Final SV Submission , PDoc 122 (Sep. 5,

2012), Att. 1 at 14, and that MVC's 2010 financial statement was of record at the time of the

*Preliminary Results*. *See also* Jiheng's Prelim. SV Submission at Tab 4. Arguably, therefore, there

were at least sufficient data of record at the time of the preliminary determination to have determined

if the Philippines was a "significant producer" of comparable merchandise, just as Commerce did

when "conceding" (according to Kangtai) that India was a significant producer of comparable

merchandise and selecting the Indian data for chlorine at the time of the *Preliminary Results*.

Kangtai's Br. at 16. Be that as it may, "Preliminary Results are just that -- preliminary", and parties

may "not presume Commerce would not adopt a different approach in determining the Final

Results." *Changshan Peer Bearing Co., Ltd. v. United States*, 38 CIT ___, ___, 953 F. Supp. 2d

1354, 1363 (2014) (italics removed) ("*Changshan Peer*").

All parties acknowledge that there is some degree of international trade in chlorine and hydrogen gas. The issues appear to be (1) whether substantial evidence of record supports finding that the import data represent "commercial quantities" and (2) whether the import prices can be concluded non-aberrant. As to these questions, the court requested further briefing on what constitutes "commercial quantities" and the standard for establishing that an import statistic for a particular input represents or does not represent a "commercial quantity." *See* Supplemental Briefing Request, ECF No. 89 (May 8, 2015).

Clearon responded that whether a quantity is a "commercial quantity" depends upon the product itself and the manner in which it is traded in the market; thus a commercial quantity of a gas might be an ISO tank, a 100-kg pressurized cylinder, or a container holding a large number of smaller volume cylinders.[17] Kangtai responded similarly, stating that its understanding of the agency's practice is that the definition of a commercial quantity is "contextual and somewhat flexible." Kangtai also argued that at a minimum the term "must be understood and interpreted in the context of the quantities previously considered by the agency itself in the previous review segments of this very order."[18]

---

[17] Clearon's Resp. to Court Questions at 8-9, referencing *Ferrosilicon from Russia and Venezuela*, Inv. No. 731-TA-1224-1225 (Preliminary), USITC Pub. 4426 (Sep. 2003) (ferrosilicon shipped in super sacks, pallet boxes, drums, and 25 and 50 pound bags); *Certain Stilbenic Optical Brightening Agents from [the PRC] and Taiwan*, Inv. Nos. 731-TA-1186-1187 (Final), USITC Pub. 4322 (May 2012) (aqueous solutions shipped in bulk by tank truck or rail cars or in non-bulk by drums or intermediate bulk containers; powder shipped in bulk bags); *Certain Potassium Phosphate Salts from [the PRC]*, Inv. Nos. 701-TA-473 and 731-TA-1173 (Final), USITC Pub. 4171 (July 2010) (sales to distributors typically made in truckloads).

[18] Kangtai's Resp. to Court Questions at 5-6.

Commerce's response to the court's questions indicated that it "generally" compares the total quantity of the input imported by the primary surrogate country against the total quantities for the same input imported by other potential surrogate countries on the surrogate country list.[19] Arch, however, provided references to administrative comparisons of an imported quantity to the quantity of the domestically produced product in the surrogate country under consideration.[20]

As indicated below, it appears Commerce does both, which also appears to be appropriate.[21] On that note, however, Commerce here maintains that "[t]he appropriate comparison

---

[19] Def's Resp. to Court Questions at 8.

[20] Arch's Resp. to Court Questions at 11, referencing *Certain Seamless Carbon Alloy Steel Standard, Line, and Pressure Pipe From the PRC*, 75 Fed. Reg. 57449 (Sep. 9, 2010) (final LTFV determ., *inter alia*) and accompanying I&D Memo at cmt. 8 (comparing imported quantity to quantity of domestically produced product); *Certain Steel Threaded Rod From the PRC*, 74 Fed. Reg. 8907 (Feb. 27, 2009) (final LTFV determ.) and accompanying I&D Memo at cmt. 3 ("the Department finds that there is no record evidence to indicate that any of the reported values are aberrant or unrepresentative of commercial quantities"); *Lightweight Thermal Paper From the PRC*, 73 Fed. Reg. 57329 (Oct. 2, 2008) (final LTFV determ.) and accompanying I&D Memo at cmt. 10 (addressing a commercial quantity challenge by stating that the challenged surrogate value was not aberrational and represented the best information available).

[21] Full analysis of all data of record, *e.g.*, cross-country comparisons of import-with-import, import-with-domestic, domestic-with-domestic, is to be encouraged to the extent it paints the fullest picture of whether particular data are appropriate for purposes of surrogate valuation and produces the greatest accuracy in the attempt to reflect a surrogate's commercial appropriateness to a respondent's actual production experience. *Cf.*, *e.g.*, *Fuwei Films (Shandong) Co., Ltd. v. United States*, 36 CIT ___, ___, 837 F. Supp. 2d 1347, 1355 (2012) (noting Commerce's reason for rejecting import statistics in that case, to wit, that they "contained an insignificant quantity of imports not representative of the DuPont Group's PET chip purchase volume or consumption experience"); *Freshwater Crawfish Tail Meat From the PRC*, 75 Fed. Reg. 79337 (Dec. 20, 2010) (final rev. and new shipper results) and accompanying I&D Memo at cmt. 3 ("the Spanish import prices may or may not, arguably, constitute information that is directly representative of the production experience of the respondents in these reviews"); *Circular Welded Austenitic Stainless Pressure Pipe from the PRC*, 73 Fed. Reg. 51788 (Sep. 5, 2008) (prelim. LTFV determ.) and accompanying I&D Memo at "Selection of Surrogate Country" ("because India better represents the experience of producers of (continued...)

for the prices represented in the Philippine GTA import data are import prices from other countries

on the comparable countries list, or prices from Philippine domestic companies, none of which are

on the record".  Def's Resp. at 27.  At this point, the court fails to understand why that is

"appropriate" or why the prices represented in the Philippine GTA import data cannot be compared

with domestic price data from a country (or countries) not on the Surrogate Country List, when the

comparison would be at least for the purpose of showing those prices -- for that one FOP -- in relief,

*e.g.*, through a August 17, 2015comparison of import price data with Indian domestic price data.

*See, e.g., Jiaxing Brother, supra,* 38 CIT at ___, 961 F. Supp. 2d at 1332-35 (significantly lower

domestic Indian price as compared to import price and fluctuation in the Indian import volumes and

prices revealed comparable fluctuation in the Thai import volumes and prices, implying that the

"only reasonable inference one could draw from the administrative record is that the Thai import

values are similarly affected and thus do not reflect domestic Thai HCL prices").  *Cf. Blue Field*

*(Sichuan) Food Indus. Co., Ltd. v. United States*, 37 CIT ___, ___, 949 F. Supp. 2d 1311, 1317

(2013) (discussing use of benchmark data, which "need not come from an economy comparable to

the foreign producer's") (citation omitted) *with Hebei Metals & Minerals Imp. & Exp. Corp. v.*

*United States*, 29 CIT 288, 299-300, 366 F. Supp. 2d 1264, 1273-74 (2005) ("[D]omestic price is

preferred for the calculation of surrogate values by prior practice, policy, and logic. All else being

equal, tax-and duty-free domestic data is clearly preferable over imports data"); & *Yantai Oriental*

*Juice Co. v United States*, 26 CIT 605, 617 (2002) (rejecting more contemporaneous import data

---

[21] (...continued)

subject merchandise and provides better financial data[,] we have selected India as the surrogate country").

because the Department failed to explain why the industry would purchase more expensive imported

coal over domestic coal); & *Rhodia, Inc. v. United States*, 25 CIT 1278, 1287, 185 F. Supp. 2d 1343,

1352 (2001) ("*Rhodia*") ("Commerce has a stated preference for the use of the domestic price over

the import price, all else being equal").  Explanation from Commerce would therefore assist, in

accordance with the following.

        The entirety of Commerce's support for finding that the Philippines data represent

internationally traded commercial quantities for hydrogen and chlorine rests on its decision in

*Glycine from the PRC,* 77 Fed. Reg. 64100 (Oct. 18, 2012) (final rev. results) ("*Glycine from PRC*").

*IDM* cmt. 7 at 10-12, cmt. 8 at 13-14.  *See Glycine from PRC*, I&D Memo cmt. 1 at 3-9.   Issued

subsequent to the *Preliminary Results*, in *Glycine from PRC* Commerce selected Indonesian GTA

import data for chlorine, claiming that they represent commercially significant quantities.[22]

Commerce emphasizes here that the Philippine GTA import data show over 1,000 metric tons of

chlorine imported into the Philippines, that the quantity of imports in this review is higher than

imports in the previous reviews, *see* Kangtai's Admin. Rebuttal Br., PDoc 159 (Dec. 10, 2012) at

16, and that since *Glycine from the PRC* determined 2,000 MT of chlorine to be a commercially

---

    [22]  *See Glycine from PRC*, accompanying I&D Memo cmt. 1 at 6-9.  Specifically therein, Commerce determined that Indonesian GTA import prices for chlorine were not aberrational because Indonesia's average unit value was within the range of values of imports from countries on the economically comparable list and because Indonesia had the highest volume of chlorine among the countries on the list.  *Id.* at 6-7. Commerce therein stated that in previous reviews for glycine it had rejected import prices because the import volume of chlorine was just one metric ton, and because the import volume for Indonesia during the relevant review period exceeded 2,000 metric tons, Commerce determined that the Indonesian GTA import data "show[ed] that liquid chlorine is shipped frequently on an international basis and in substantial commercial quantities, thus undermining the notion that high transportation costs are prohibitive of a robust international trade in chlorine."  *Id*. at 9.

representative quantity, the 1,000-plus MTs of chlorine imports into the Philippines cannot be dismissed as "commercially insignificant."  Def. Resp. at 26.

On the issue of the surrogate valuation of chlorine, *Glycine from the PRC* is essentially *ipse dixit*, and Commerce here neglects to mention that the issue is among those of that determination that are under appeal.  *See generally*, *Baoding Mantong Fine Chemistry Co., Ltd. v. United States*, Court No. 12-00362; *see also id*., ECF No. 30, Motion for Judgment (July 22, 2013) at 20-23.  The court will therefore accord *Glycine from the PRC* only a *Skidmore* level of deference at this time.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("power to persuade, if lacking power to control").

Kangtai also stresses that Commerce "had consistently rejected the use of imported chlorine values for two reasons[ ], one of [which] was that 'chlorine is not frequently traded on an international basis'", a finding on a record that contained imports into a potential surrogate country that exceeded 2,000 MT, in stark contrast to this record of only 1,000 MT of chlorine imported into the Philippines being found commercially significant.  Kangtai's Resp. to Court Questions at 5-6, referencing *AR09-10 Chlor-Isos* Prelim. SV Memo at 12 & *id*. at Att. XXXII(a).  Kangtai argues that the frequency[23] of imports into the Philippines does not equate to commercial amounts thereof, because Commerce had to aggregate an entire year's volume to reach 1,000 MT and the actual volumes underlying the transactions are far smaller.

---

[23]  The court understands "frequent" "frequently" and "frequency", in the sense used by the parties, to refer to the number of transactions in a given period.  In that sense, "frequent" produces a greater number of data points during a specific period, thus imparting breadth to the average, but that does not, in itself, indicate anything with respect to the prices underlying the transactions.  On the other hand, given a total known volume, then the higher the frequency (*i.e.*, number of transactions), the lower the average volume.

Commerce, however, points out that the record at bar contains comparable GTA import data, albeit pointing to the only other country on the list of economically-comparable countries with GTA import data for chlorine -- South Africa (*see* Clearon's Prelim. SV Submission at Ex. 23), and when Commerce compared the 4.6 MT import volume for South Africa against the 1,062.3 MT import volume for the Philippines, Commerce found that the import volume for the Philippines exceeded those of the other import data on the record pertaining to a country on the Surrogate Country List (*i.e.*, "economically comparable"), and therefore, as in *Glycine from the PRC*, Commerce determined that the Philippine imports represented a significant commercial quantity during the period of review.[24]  *See* Def's Resp. at 25, referencing *IDM* cmt. 7 at 14; Final SV Memo, PDoc 167 (Jan. 18, 2013) at Appx. III.39.

In other words, as Kangtai argues, Commerce is simply saying that because a particular quantity of chlorine was imported into the Philippines, the import data therefor was *per se* superior, *See* Kangtai's Br. at 16.  Such a response, of course, ignores the data for India of record. Kangtai also emphasizes that in contrast to *Glycine from the PRC*, in the prior  2009-2010 review of chlor-isos ("*AR09-10 Chlor-Isos*"), Commerce rejected GTA import data for chlorine representing approximately 2,000 MT, finding that chlorine was not only not frequently traded into India, but not frequently traded into *any country* on an international basis.  Kangtai's Reply at 15 (Kangtai's italics), referencing *AR09-10 Chlor-Isos* Prelim. SV Memo at 12 & at Att. XXXII(a).

Responding, Commerce implies that it "only" rejected Indian GTA import data in *AR09-10 Chlor-Isos* because of the "wide range of import volumes" reported in the Indian GTA

---

[24]  This also appears to have largely informed Commerce's decision to no longer rely on South Africa as the primary surrogate country.

import data compared to other economically comparable countries. Def's Resp. at 26-27 (citation omitted). That is inaccurate.[25] The response leads to discussion of the second issue noted above.

As to that issue, Commerce states that it found nothing of record concerning the domestic prices in the Philippines that could be compared to the Philippine GTA data. The only substantive consideration of price in the *IDM* is the statement where Commerce found "that record evidence does not support a finding that the average unit value from any of the other countries, when compared with that of the Philippines, either is more specific to the input or demonstrates that the value from the Philippines is aberrational." *IDM* cmt. 7 at 12. This is a weak comparison for that inference. As Commerce itself points out, there was only *one* other country for that comparison -- South Africa -- which had relatively minuscule imports of chlorine that Commerce *itself* rejected as appropriate for surrogate valuation purposes in the *Preliminary Results*, and there is no indication in the *IDM* of what South Africa's average import unit value for chlorine is for the purpose of that comparison. Commerce's statement, in other words, exists in a vacuum as far as the reader is concerned.

In any event, averages mask variance, and Kangtai pointed out that the average unit value of chlorine imports into the Philippines for the review at bar ranged from 3.4 Philippine pesos ("PhP") to 134 PhP -- an extraordinarily wide range for a purported chemical commodity. The court agrees that the *IDM*'s reasoning for finding the average unit value of the Philippines GTA data

---

[25] The *IDM* itself explains that the decision "was *partly* based on the wide range of import volumes reported in the Indian GTA data as compared to other potential surrogate countries, and *partly* attributed to the various means and costs associated with transporting chlorine over long distances", *IDM* cmt. 7 at 13 -- but, as above mentioned, if in fact the amount imported into the Philippines during the POR at bar can be concluded representative of a price that a producer would pay for the inputs, then that fact would moot those special cost concerns associated with those inputs.

reliable as a surrogate for the chlorine input is undercut by a lack of consideration of the apparent

extraordinarily wide range of Philippine import values in light of the fact that Commerce used such

a variation to explain why, in part, it was opting for Indian domestic data in the prior review,

therefore requiring remand. *Cf. Trust Chem*, *supra*, 35 CIT at ___, 791 F. Supp. 2d at 1264-65

(aberrancy is demonstrated through juxtaposition, *i.e.*, "*relative*", of data) (italics in original).

        Commerce's ultimate conclusion, essentially, is that there were in fact sufficient

commercial quantities of chlorine and hydrogen gas imported into the Philippines that enabled it to

adhere to its "preference" for valuing from a single surrogate country "where possible." All things

are "possible," but that does not make their realization reasonable. Commerce argues its preference

does not "require [it] to use domestic price in all circumstances," Def's Resp. at 23, quoting *Rhodia*,

*supra*, 25 CIT at 1287, 185 F. Supp. 2d at 1352 (this court's bracketing; italics omitted), and that

Clearon and Kangtai did not urge Commerce to use domestic data instead of import data from

countries on the economically comparable list, but rather urged Commerce to use domestic data from

a country no longer on the Surrogate Country List, rather than import prices from the primary

surrogate country. That in no way imparts anything of relevance to the reader concerning the quality

of the Indian domestic data versus the quality of the GTA import data of record, and Commerce's

only apparent redoubt, once again, is that Clearon's and Kangtai's argument is "contrary" to its

regulatory preference. *Id*. at 23 and 49, referencing Kangtai's Br. at 12-13; and *cf.* Clearon's Br. at

13 (domestic prices are preferred "all else being equal").

        Commerce is required to use the best information available in choosing surrogate

values. *E.g.*, *Blue Field*, *supra*, 37 CIT at ___, 949 F. Supp. 2d at 1317, 1326, citing 19 U.S.C.

§1677b(c)(1).  The relevant regulation, 19 C.F.R. §351.408(c)(2), expresses leeway in providing that Commerce "*normally* will value all factors in a single surrogate country" (italics added). Commerce's response contradicts its own position in the *Preliminary Results*, where it relied on data from India -- a country not on the Surrogate Country List -- as its "second" surrogate country to value chlorine.  Prelim. SV Memo at 4.  For that reason, Commerce's stance in the *Final Results* -- that not only is reliance upon Indian data improper but even reference thereto (let alone comparison therewith) improper, even for the purpose of enlightening as to what is the best surrogate value for a specific individual FOP (*i.e.*, because "India is not on the Surrogate Country List") -- rings hollow, even if it is the case that "Preliminary Results are just that -- preliminary".  *Changshan Peer*, *supra*.

Clearon and Kangtai maintain it is unreasonable for Commerce to consider import data for hydrogen gas and chlorine as "reasonable" surrogate values in part due to the "very small" quantities represented by the import data.  Kangtai in particular argues that the import quantities represented by the Philippine GTA import data were small as compared to MVC's production, the only apparent domestic producer of chlorine in the Philippines. Kangtai's Br. at 20.  For this comparison, Kangtai relies on the fact that MVC reported that the company produced 5,000 MT of chlorine in 2010, representing approximately 60% of the purported 8,000 MT chlorine market in the Philippines.  Kangtai's Admin. Rebuttal Br. at 19.

Commerce, however, here points out that the stockholder's meeting minutes from MVC's financial statement indicate that import prices for chlorine are "competitive" with prices for domestically produced chlorine, albeit at the time of the international financial crisis,[26]  to wit:

---

[26]  Kangtai also interprets a statement from MVC's financial statements as indicating that it
(continued...)

> MVC remains to be a regular supplier of Manila Water and Maynilad, which are the main market[s] for chlorine in the Philippines. However, both companies had signified their preference to use imported material for economic reasons. Apparently, they are able to procure the imported material at prices lower than what MVC can offer.

*See* Clearon's Final SV Submission, PDoc 128 (Sep. 5, 2012), Ex. 15 at Annex C at 3 of 9. In other words, Commerce argues, the cost of importing chlorine at the time was not so high as to not allow importers of chlorine to compete with domestic production; therefore, Commerce argues, Kangtai's argument that the price of chlorine reflected in the Philippine GTA import data are significantly higher than domestic prices because of transportation concerns is unsupported by the record.

The *IDM* did not, however, advance the foregoing heresay as a reasoned part of the analysis. If such statements were to be used, then in any event they need to be considered in the context of any record evidence addressing and MVC management's explanation of the state of the Philippines economy as a whole, including the impact of the international financial crisis and Thai plant disruptions, whether there were other producers of chlorine in the Philippines or whether MVC was able to command monopolistic pricing, whether MVC is an efficient producer of chlorine, *et cetera*, because the meaning of "economic reasons" and "imported material" are not immediately apparent, nor is it entirely clear whether Manila Water and Maynilad's "imported material" source(s), assuming for the sake of argument the truth of MVC management's statement, is or are from a market economy source or privately transacted.

---

[26] (...continued)
does not export chlorine because the export of chlorine is cost prohibitive. *See* Kangtai's Br. at 19. Commerce points out that the precise statement therefrom is that MVC "is not engaged in export sales," but MVC does not indicate that this is due to the expense of exporting chlorine. *See* Jiheng Resubmission of SV for FOP, PDoc 118 (Sep. 5, 2012), at Att. 1, MVC SEC Form 20-IS at 14. The record thus does not support the extent of Kangtai's construal.

All in all, the issue of selecting the best surrogate value for chlorine requires remand and reconsideration, as the *IDM*'s rationale does not reflect a full consideration of the parties' arguments, it instead reflects inconsistent logic as compared with Commerce's treatment of the chlorine surrogate value in the *Preliminary Results* and prior reviews, and it does not approximate a surrogate country with comparable production or Kangtai's actual production experience. *Cf.* note 21, *supra*. Whether other data of record might be more suitable for that purpose, no opinion is here offered.[27]

*D.*  Surrogate Valuation of Urea

Clearon argues the value selected for the urea FOP for the *Final Results*, based on GTA import data under the relevant Harmonized Tariff Schedule ("HTS") heading, also "violated the well established preference for published domestic price data", all other things being equal,[28] and that publicly available, POR-contemporaneous, and reliable domestic prices from the Philippines' Bureau of Agricultural Statistics were available on the record.  Clearon's Br. at 11-16; Clearon's Reply at 2-6.

---

[27]  The court notes in passing that Kangtai also claims that the GTA import price for chlorine makes no commercial sense because it is valued at approximately six times the value of the sodium salt, the input consumed to produce chlorine. *See* Kangtai's Br. at 25-27.  The court finds little merit in the argument, but notes that Commerce's apparent nominalization of all off-shoots of production as "by-products" (or so it would seem) is unnecessarily obfuscating. *See infra.* Commerce succinctly stated that the value of a "by-product is the value it can obtain in the market", *IDM* cmt. 7 at 14, which is true, but it is unclear whether the price therefor is skewed by the above concerns. At any rate, insofar as Kangtai's arguments are concerned, the surrogate value for chlorine includes values of the additional inputs and processing costs and is not analogous to the products in  *Paslode Division* or *Wood Flooring from PRC*, and Kangtai cites to no evidence of record showing that chlorine is not a value-added product as a result of the processes that produce it.

[28]  *See, e.g.*, *Ferrovanadium and Nitrided Vanadium from the Russian Federation*, 62 Fed. Reg. 65656, 65661 (Dec. 15, 1997) (final rev. results) (Commerce has "articulated a preference for a *surrogate country's* domestic prices over import values") (italics added).

Commerce stated in the *Final Results* that it was unsure what the BAS data actually represent. Citing to a submission to the record from Arch, the *Final Results* state "there is record evidence that urea is not produced in the Philippines." *IDM* cmt. 5 at 10 (citation omitted). Commerce therefore opted for the Philippines' GTA data as the best available data. However, since the record shows that urea is in fact produced domestically in the Philippines, as the defendant concedes,[29] and since this contrasts with the apparent reason Commerce gave for selecting the Philippines' GTA data, the selection of the surrogate value for this FOP must be remanded for reconsideration notwithstanding the defendant's characterization that "the underlying concern of the data is that the price of urea in domestic Philippine market is not really representative of the domestic price of urea because domestic production had dropped significantly over time and imports comprised 92 percent of Philippine demand." Def's Resp. at 49. *See Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 50 (1983) ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself").

### E. Surrogate Valuation of Sodium Hydroxide

For the *Final Results*, Commerce selected Philippine import data collected by the GTA for the HTS number for sodium hydroxide to value "sodium hydroxide."[30] Final SV Memo at 6. Kangtai argues that the record reflects that it consumed sodium hydroxide at a concentration of 32 percent, which is lower than the 50 percent concentration produced commercially and reflected

---

[29]    *See* Def's Br. at 49 ("the evidence cited shows there is production [of urea] in the Philippines").

[30]    The parties sometimes refer to sodium hydroxide (NaOH) as lye or caustic soda. The court notes that the common names would also cover potassium hydroxide (KOH).

in the GTA Harmonized Tariff Schedule ("HTS") data and thus, Commerce should have made a downward adjustment to the surrogate value for sodium hydroxide in accordance with *Synthetic Indigo*.[31] *See* Kangtai's Br. at 27-31.

Commerce declined, explaining that the record contains information that sodium hydroxide is commercially traded at different levels of concentration, not just 50 percent as asserted by Kangtai, and there is no information on the record regarding the concentration level reflected in the Philippine GTA import data for sodium hydroxide. *IDM* cmt. 18 at 26-27. Clearon adds that the evidence submitted by it established that there was no correlation between prices for 100% sodium hydroxide flakes (HTS 2815.11) and liquid sodium hydroxide (HTS 2815.12). Clearon's Resp. at 37 (citation omitted).

Kangtai submitted Philippine GTA import data before the *Preliminary Results* and there was apparently only one source of Philippine surrogate value data on the record for sodium hydroxide. *See* Kangtai's Prelim. SV Submission at Ex. SV-13. In the *Final Results*, Commerce selected contemporaneous Philippines' GTA import data under the HTS number for sodium hydroxide to value sodium hydroxide. Final SV Memo at 6.

Kangtai argues that it presented in full that as a general matter of international commerce sodium hydroxide is normally traded at a 50% concentration, and that, based on the typical concentration level for sodium hydroxide, "it is unreasonable to speculate that imports are made at concentrations other than the standard commercial concentration." Kangtai's Br. at 29.

---

[31] *See Synthetic Indigo from the PRC*, 68 Fed. Reg. 53711 (Sep. 12, 2003) (final rev. results) ("*Synthetic Indigo*") and accompanying I&D Memo at cmt. 5, referencing *Saccharin from the PRC*, 68 Fed. Reg. 27530 (May 20, 2003) (final LTFV determination) ("*Saccharin*") and accompanying I&D Memo at 2.

Based on this assumption, Kangtai argues that the surrogate value for sodium hydroxide should be adjusted downward from 50 percent concentration to 32 percent concentration to account for Kangtai's consumption of sodium hydroxide at the 32 percent concentration.  *Id*. at 29-30.

Commerce responds that although the record indeed contains evidence that sodium hydroxide is sold at a 32 percent concentration level,[32] Kangtai cites to no evidence that the Philippines' GTA import data in fact reflect prices for sodium hydroxide at only the 50 percent concentration level.  Kangtai's claim that Commerce unreasonably speculated that imports are made at concentrations other than the standard commercial concentration is undermined by Kangtai's concession that it "purchases and consumes [sodium hydroxide] at a lower 32% concentration." Kangtai's Br. at 27-28.  More importantly, regardless of whether 50 percent concentration is the typical concentration level for commercially-traded sodium hydroxide, Kangtai presented no evidence demonstrating that the Philippines' GTA import data actually reflect prices for sodium hydroxide at 50 percent.[33]  *See IDM* cmt. 18 at 26-27.  Absent any positive evidence on the record establishing the concentration level of the Philippines' GTA import data, any adjustment made by Commerce to the surrogate value would have been arbitrary.  And regarding *Synthetic Indigo*, Commerce contends Kangtai's argument ignores the fact that therein Commerce had been able to determine that the surrogate value data source in question (the "Monthly Statistics of the Foreign

---

[32]  *See* Kangtai's Section D Questionnaire Resp., Nov. 30, 2011, at Ex. D-2.

[33]  Commerce further argues that in a marketplace where sodium hydroxide is sold at various concentration levels, Kangtai is requesting a downward adjustment from 50 percent to 32 percent when the record simply does not establish that the starting point of the downward adjustment is 50 percent, and the public materials that Kangtai placed on the record do not suggest that the Philippines' GTA import data actually reflect prices for sodium hydroxide at 50 percent. Def's Resp. at 35, referencing Kangtai's Br. at 27-28.

Trade of India") represented prices for chemicals at commercially traded concentration levels, whereas there is no such information regarding the Philippines' GTA import data on this record.

Kangtai does not persuade that Commerce's surrogate valuation of sodium hydroxide was unsupported by substantial evidence or not in accordance with law, although judgment thereon will need to abide reconsideration of the selection of primary surrogate country, which may necessarily result in altering the surrogate valuation of this chemical.

*F.* Surrogate Valuation of Electricity

For the *Final Determination*'s surrogate valuation of electricity in the Philippines, Commerce analyzed *Camarines Sur* rate data and Manila Electric Company ("Meralco") rate data pursuant to the usual factors of public availability, broad market average, product specificity, contemporaneity, and freedom from taxes and duties.[34]  Commerce selected the *Camarines Sur* electricity rate data as the surrogate value for the electricity FOP because the "electricity rate matches the factor rate in kilowatt hours for industrial users, is publicly available from the primary surrogate country, represents electricity rates from two cities in the Philippines, does not appear to include taxes or duties, and does not suffer from the unknown variability factors of the MERALCO rate". *IDM* cmt. 10 at 18-19.

Kangtai and Arch argue that the Meralco data set is better than the *Camarines Sur* data. Kangtai's Br. at 40-42; Arch's Motion for Judgment on the Agency Record, ECF No. 27 (Aug. 15, 2013) ("Arch Br") at 15-21. Commerce responds that all the plaintiffs are asking this court to do

---

[34] *See, e.g.*, *See Certain Polyester Staple Fiber From the PRC*, 75 Fed. Reg. 1336 (Jan. 11. 2010) (final rev. results), and accompanying I&D Memo at cmt. 1 ("*Certain Polyester Staple Fiber*").

is re-weigh evidence, while referring to non-record material and administrative determinations that

do not support their arguments.  Def's Resp. at 36-46.

    1. Relevant Facts

        There are only two Philippine surrogate values on the record. One is the *Camarines*

*Sur* electricity rates in kilowatts hours from the "2009 Doing Business in Camarines a Sur" report

submitted by Kangtai.  Kangtai's Prelim. SV Submission at Exs. SV-15 & SV-16b.  The *Camarines*

*Sur* data lists industrial electricity rates (with demand) for two cities in the Philippines, Naga and

Iriga.  *Id*. at SV-16b.

        The other Philippine electricity rate data, the Meralco data, were submitted by Jiheng.

Jiheng's Prelim. SV Submission at Tab 5.  The Meralco data consist of a single page chart for the

month of December 2010.  *Id*.  In the left hand column of the chart there are eight different main

categories of users each with several subparts, 39 in all.  *Id*.  The remaining 21 columns list various

charges, adjustments, discounts, and subsidies some in kilowatt hours others in kilowatts.  *Id*.  The

notes to the chart indicate that certain charges vary on a monthly basis.  *Id*.  Commerce contends that

neither Arch nor Kangtai provided any additional argument, explanation, or evidence as to within

which of the 39 categories of users their production would fall into or how to use 21 columns of

charges, adjustments, discounts, and subsidies to derive an industrial kilowatt hour electricity rate.

Def's Resp. at 42-43.

        To evaluate the quality of the two data sets to value electricity, Commerce applied

its standard surrogate value analysis, which is its five-factor test of public availability, product

specificity, whether they represented a broad market average, the contemporaneity of the data, and

whether the data were free of taxes and duties. *See*, *e.g.*, *Certain Polyester Staple Fiber* at cmt. 1.

For the *Final Results*, Commerce found that both data sets were publicly available,

*IDM* cmt. 10 at 18-19, but that the *Camarines Sur* data were more specific to the kilowatt hour factor

than the Meralco data. *Id*. at 18-19. Commerce explained that the Meralco data contained some data

in kilowatts, not kilowatt hours, and that the record lacked sufficient information to make the

conversion. *Id*. at 18. Commerce determined that Arch's suggested conversion methodology made

assumptions that were not supported by the record. *Id*. Commerce also determined that the Meralco

data indicated that several of the 21 different components of the electricity charge were variable on

a monthly basis, and there was only one month of Meralco data on the record. *Id*. at 18-19.

Commerce found that both data sets represented a broad market average but that

neither data set represented the entire Philippine market. *Id*. at 19. It noted that, although Arch

argued that the Meralco data represented a broader section of the Philippine market, the *Camarines*

*Sur* data represented industrial rates for two cities in the Philippines. *Id*. Commerce found that the

2009 *Camarines Sur* industrial electricity rates were sufficiently contemporaneous to the 2010-2011

period of review because utility rates apply forward and there was no record evidence that they had

changed since 2009. *Id*. at 19. Finally, Commerce found that the Meralco data specifically excluded

taxes and duties, and that there was no evidence that the *Camarines Sur* data included taxes and

duties. *Id*. After weighing all of these factors, Commerce determined that the *Camarines Sur* data

were the best available information on the record with which to value the electricity factor for both

Kangtai and Arch. *Id*.

As an initial matter, the court notes that no party challenges the public availability of the *Carmines Sur* and the Meralco data sets. Kangtai and Arch express three shared contentions with regards to flaws they perceive in the *Camarines Sur* data and Commerce's analysis thereof. First, Arch and Kangtai argue the *Camarines Sur* data is not broadly based, a fact Kangtai claims the defendant concedes.[35]  Second, both parties claim that the *Camarines Sur* data is not contemporaneous. *See* Kangtai's Reply at 19; *see also* Arch's Br. at 19-20. Third, Kangtai claims that the data is not more specific than the Meralco data and Arch adds that the variability of the *Camarines Sur* was unknown and unknowable. *See* Kangtai's Reply at 19; *see also* Arch's Br. at 19. Arch also claims that the absence of any evidence of the *Camarines Sur* data being tax exclusive does not mean that the data actually were as Commerce claims. Arch's Br. at 18.

With respect to Arch's and Kangtai's challenges to Commerce's selection of the *Camarines Sur* data, Commerce contends the parties impermissibly refer to non-record information and misunderstand Commerce's administrative determinations, and that the court's role is not to re-weigh the evidence but to determine whether Commerce's weighing of the evidence is supported by substantial evidence and is otherwise in accordance with law. Def's Resp. at 39, referencing *Metallverken Nederland B.V. v. United States*, 13 CIT 1013, 1017, 728 F. Supp. 730, 734 (1989).

2. Representative of a Broad Market

Commerce's specific findings were that neither the Meralco data nor the *Camarines Sur* covered the entire Philippine market and that the *Camarines Sur* data covered two cities. *IDM* cmt. 10 at 19. Commerce made these findings by weighing the results of its analysis of the factors

---

[35]  *See* Kangtai's Reply at 18, referencing Def's Resp. at 44; *see also* Arch's Br. at 18.

against each other. In the same paragraph, Commerce also discussed the specificity and the tax-and-duties factors. *Id*. Kangtai avers that Meralco data is more representative of a broad market as it is the largest electrical supplier in the Philippines and is one that covers all of the country's "major industrial zones", while the *Camarines Sur* data covers only "two tiny cities in one non-industrial province." *See* Kangtai's Reply Br. at 41-43. The choice Commerce made, it claims, does not take into account a respondent's production experience and is between "one source which is broadly based and representative of the industrial experience in the Philippines and one source which is neither." *Id.* at 18. Arch echos Kangtai's contentions stating that the record indicates that "the Meralco rate applied to 60% of the industrial base of the country, including one of the facilities making the comparable product", and that "none of the surrogate product was manufactured within the coverage of the *Camarines Sur* data, because the company had no facilities located in that Province". Arch's Br. at 18.

Although the Meralco data may have broader market coverage than the *Camarines Sur* data, when weighed with other factors, which Commerce concluded detract from the Meralco data, Commerce concluded the *Camarines Sur* data have sufficiently broad coverage (two cities) to be a reliable surrogate value of the Philippine market. Arch's and Kangtai's assertions that the Meralco data cover a broader portion of the Philippines' electricity market do not overcome or render unreasonable that analysis, and the court cannot engage in re-weighing of this evidence of record.

3. Specificity

The production factor that Commerce valued was the kilowatt hours of electricity used to make the subject merchandise (chlor-isos). Commerce observed that the *Camarines Sur* data

represent a single average industrial electricity rate in kilowatt hours.  *See* Kangtai's Prelim. SV Submission at Ex. SV-15 & SV-16b.  Also, that the Meralco data do not provide an industrial electricity rate in kilowatt hours, but consist of a chart representing one month of 21 components of an electricity rate, some of which are not in kilowatt hours, some of which are identified as varying by month, with no explanation or evidence as to what should be included in an electricity rate and no explanation of how to convert the components that are in kilowatts to kilowatt hours. *See* Jiheng's Prelim. SV Submission at Tab 5.  Based on this, Commerce found that the record did not contain the information to make the conversion.  *IDM* cmt. 10 at 18.

     Commerce's decision that the *Camarines Sur* data were more specific to the electricity factor, which was in kilowatt hours, therefore has support in the record.  *See id.* at 18-19. Arch and Kangtai argue that Commerce calculated kilowatt hour rates from one month of the Meralco data in other cases and should have done so here.  Arch's Br. at 16-17; Kangtai's Br. at 40. However, the cases on which they rely point more towards the principle that the record facts in each administrative review determine the analysis that Commerce will perform to determine the best available information on the record.

     The determinations in those cases provide no information other than that Commerce used the Meralco data to value electricity. In the *Steel Wire Hangers* case,[36] there is no discussion of any alternative electricity rate data sources, nor is there any "best available information" analysis using the five factors. The most that can be inferred from this determination is that there was only

---

[36] *Steel Wire Garment Hangers from the PRC, accompanying Steel Wire Garment Hangers From the PRC*, 77 Fed. Reg. 66952 (Nov. 8, 2012) (prelim. rev. results) and accompanying I&D Memo, unchanged in the final results, 78 Fed. Reg. 25946 (May 16, 2013) (final rev. results) ("*Steel Wire Hangers*").

one electricity data source on the record and that Commerce used the Meralco data as the "best available information." Arch's reliance on the *Hardwood Plywood* decision is similarly unavailing. See Arch's Br. at 17 (citing *Hardwood and Decorative Plywood from the PRC*, 78 Fed. Reg. 25946 (May 3, 2013) (final LTFV investigation) ("*Hardwood Plywood*"). There is no indication that Commerce had any other alternatives from which to choose. *See generally id.*

Arch attempts to support its challenge here by referring to a document from the *Steel Wire Hangers* record. Arch's Br. at 17, n.2. As it is not in the record of this case, it will be disregarded. *See* 28 U.S.C. §1516a(b)(2)(A). Even assuming it can be considered, it does not establish that Commerce had any alternative electricity rates from which to choose. *See* Arch's Br. at 17, n.2. As a result, Arch's reliance on the *Steel Wire Hangers* and *Hardwood Plywood* cases do not demonstrate that Commerce's determination here should be set aside.

Next, as explained above, there is no evidence on the record of this proceeding with which to make the conversions from kilowatts to kilowatt hours and Arch and Kangtai have not cited any. Furthermore, there is no information or argumentation on the record which indicates how the 21 components for the electricity rate should be combined to form an actual electricity rate. Finally, there is no information on the record to indicate in which of the 13 industrial user categories out of 39 categories, Kangtai and Arch fall. Because the record contains an average industrial rate in kilowatt hours from *Camarines Sur* there was no reason to go through the speculative process of converting and constructing an average industrial electricity rate from the Meralco data, even if the components of that rate in kilowatts represent "a minuscule part of the overall Meralco rate" as Kangtai claims. Kangtai's Reply at 19.

To defend the record deficiencies in the Meralco data, Arch contends that, because the website for the Meralco data is on the record, Commerce should have gone to the website and allayed any concerns concerning the Meralco data and its variability. Arch's Br. at 19. Kangtai similarly argues that the website for the *Camarines Sur* data is on the record and argues that the data on the website do not support Commerce's determination. Kangtai's Br. at 42. That the website addresses are on the record does not mean that all of the data on the websites are on the record. If a party wants evidence from a website on the record of a Commerce proceeding, it must submit the appropriate pages from the website; otherwise, the information is not on the record of the proceeding. Both Kangtai and Arch had the opportunity to put whatever aspects of these websites on the record they chose. Kangtai put on selected portions of the *Camarines Sur* data. Kangtai's Prelim. SV Submission, at Ex. SV-15, SV-16b. Jiheng placed on the record a single chart from the Meralco site but without explanation. Jiheng's Prelim. SV Submission at Tab 5. Arch and Kangtai cannot now rely on data that they never placed on the record.

Finally, Arch and Kangtai speculate that the *Camarines Sur* data lack detail to determine whether they suffer from an unknown variability. *See* Arch's Br. at 19; *see also* Kangtai's Reply at 19. Kangtai claims that half of the rate from the *Camarines Sur* is based off "completely unknown" variables from an "on demand" electricity based system.[37] The record shows that the *Camarines Sur* data are an average industrial electricity rate from two cities in the Philippines. Kangtai's Prelim. SV Submission, at Ex. SV-15, SV-16b. There is no record evidence that the average rates suffer from unknown monthly variability. In contrast, even if there were data to convert

---

[37] Kangtai's Reply at 19 (referring to the Naga City industrial rate which it claims depends on the individual customers daily demand or maximum usage).

the Meralco rate components from kilowatts to kilowatt hours, the Meralco chart itself indicates that some of the Meralco components are subject to monthly variation. Jiheng's Prelim. SV Submission at Tab 5. To construct an annual average rate from the one month of data would require Commerce to assume numerous variables did not vary during the year, which would have been an unreasonable assumption given that the chart itself identifies monthly variation.

Kangtai also argues that the *Camarines Sur* data are listed as industrial "with demand" which it contests Commerce "is certainly aware" means that the *Camarines Sur* data are also variable. Kangtai's Br. at 42. However, neither Kangtai nor Arch made this argument to the agency. As a result, they failed to exhaust their administrative remedies and accordingly the issue was not discussed in Commerce's Final Results. *See*, *e.g.*, *Shandong Huarong Machinery Co., Ltd. v. United States*, 30 CIT 1269, 1305, 435 F. Supp. 2d 1261, 1292 (2006). In any event, Kangtai's statement that Commerce "is certainly aware" is not record evidence and thus the argument is not supported by record evidence. In short, the *Camarines Sur* data are more specific to the factor of production being valued, electricity usage in kilowatt hours, and Arch's and Kangtai's argumentation on the record does not persuade that Commerce's specificity determination is unsupported by substantial evidence or not in accordance with law.

4. Exclusion of Taxes And Duties

The record demonstrates that the Meralco data do not include taxes and duties while there is no record evidence that the *Camarines Sur* data do include taxes and duties, as Arch points out and as Commerce specifically found in its Final Results. *See IDM* cmt. 10 at 19; *see also* Arch's Reply at 18-19. Given this identified and acknowledged difference in the record evidence on the exclusion of taxes and duties, based on a weighing of all of the factors which includes the serious

problems with the specificity of the Meralco data, as discussed above, Commerce preferred to use

the more specific *Camarines Sur* data over the less specific Meralco data. This is not an

unreasonable decision. In Commerce's view, the difference in the record data on taxes and duties

is not enough to justify rejecting the *Camarines Sur* data.

     5. Contemporaneity

        In the *Final Results*, Commerce found that the *Camarines Sur* data were from 2009

based on the copyright date on the publication "Doing Business in Camarines a Sur". *IDM* at 19.

In addition, Commerce found that utility rates generally, "represent a current rate as indicated by the

effective date for each of the rates provided." *Id*. It found further that the *Camarines Sur* rate was

sufficiently close to the period of review of 2010-2011 that it was likely to still be in effect. *Id*.

        Arch distinguishes this review from the prior review. Arch's Br. at 19-20. It claims

that Commerce used a "non-sequitur" concerning the effective dates of electricity rates because, in

the prior review, the surrogate country was India and not the Philippines. *Id*. at 19. There is no non-

sequitur. That the surrogate country in the last review was India and in this review the surrogate

country is the Philippines is irrelevant to a finding that generally utility rates represent a current rate

by the effective date, the proposition for which the case was cited.

        Arch and Kangtai also both attempt to distinguish this case from the prior review by

arguing that the fact that the *Camarines Sur* data have a copyright date of 2009 does not mean that

their electricity rates are from 2009, whereas the India electricity rates in the last review have a

specific effective date, a date type which the *Camarines Sur* data do not contain. Arch's Br. at 20-

21; *see also* Kangtai's Reply at 18. This is again a distinction without a difference. The "Doing

Business in Camarines a Sur" publication is published to attract business to Camarines a Sur. The

section of the publication from which the electricity rates are derived contains, in relevant part, the

following description, "[t]his section provides investors with a clear perspective of what to consider

like fees and licenses and what to expect such as attractive incentive packages available before taking

a business venture of a lifetime [in Camarines a Sur]." Kangtai's Prelim. SV Submission at Ex.

SV-16b. Based on the express purpose of the "Doing Business in Camarines a Sur" publication, it

is illogical to assume, as Arch does, that the 2009 publication would not contain electricity rates

effective in 2009. As a result, Arch and Kangtai fail to distinguish this case from the decisions in

the prior review.

   Finally, once again, the discussion of the contemporaneity of the two sets of data in

Commerce's Final Results is in the context of weighing the various factors against one another. *IDM*

at 19. Even assuming that the *Camarines Sur* data were 2009 data and not effective during the

2010-2011 period of review, this factor would not be enough to reject using the *Camarines Sur* data.

Commerce regularly indexes data to make it contemporaneous with the period of review.

   In short, based on Commerce's analysis and weight of the data factors, Commerce's

selection of the *Camarines Sur* data was reasonable.

   *G.* Accounting for Labor in the SG&A Financial Ratio

   In the *Final Results*, Commerce relied on Philippine labor statistics as reported in the

International Labour Organization's statistics for category 6A. As alluded in the prior opinion,

Commerce now employs a rebuttable presumption that this category 6A "better accounts for *all*

direct *and indirect* labor costs." *Antidumping Methodologies in Proceedings Involving Non-Market*

*Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36092, 36093 (June 21, 2011)

("*Labor Methodology*") (italics added).[38]  Because ILO Chapter 6A data are intended to be all-inclusive of labor costs, Commerce further explained in *Labor Methodology*, that

> [i]f there is evidence submitted on the record by interested parties demonstrating that the NME respondent's cost of labor is overstated, the Department will make the appropriate adjustments to the surrogate financial statements subject to the available information on the record.  Specifically, when the surrogate financial statements include disaggregated overhead and selling, general and administrative expense items that are already included in the ILO's definition of Chapter 6A data, the Department will remove these identifiable costs items.

*Id.*

For the *Final Results*, Commerce relied upon the 2010 financial statement for Mabuhay Vinyl Corporation ("Financial Statement") for surrogate selling, general and administrative ("SG&A") expenses in the calculation of a surrogate SG&A financial ratio for the respondents. The prior opinion remanded the issue of whether employee retirement and other benefits had been double counted in that calculation, due to an indication in the Financial Statement of certain retirement and employee benefits included among the SG&A portion of that statement.

On remand, Commerce concluded that since these itemized amounts relating to labor had been included in the Financial Statement as operating costs rather than cost of sale, they were

---

[38] *Labor Methodology* was the consequence of the Federal Circuit's invalidation of Commerce's prior regression-based analysis as provided in 19 C.F.R. §351.408(c)(3).  *See Dorbest Ltd. v. United States*, 604 F.3d 1363, 1372 (Fed. Cir. 2010).  As explained in *Labor Methodology*, Commerce first resorted to reliance upon ILO Chapter 5B labor cost data, but because those data only cover direct labor compensation and bonuses, Commerce became concerned that such data were underinclusive.  Thus, going forward, Commerce announced in *Labor Methodology* that it would rely on ILO Chapter 6A instead, and whereas in the past Commerce distinguished between direct labor cost and indirect labor cost that was accounted either as a part of the surrogate value for factory overhead or as part of labor, in accordance with *Labor Methodology* it now appears the cost of "labor" as a whole is to be calculated simply by multiplying the labor hour input by the relevant ILO-based unit labor cost figure.

properly included in its surrogate SG&A calculation.  Kangtai had argued that the Philippines ILO

data of record for labor costs include those for all paid employees, including managers, executives

and supervisors, but Commerce responded that it had only relied on the "Industrial/commercial

survey", which made no such mention.  RR at 39-40. Restating Arch's argument, Commerce

interpreted it as claiming that the Financial Statement had "incorrectly accounted for" or

"misallocated" production-labor employee benefits in the administrative labor accounts,[39] but

Commerce found that record evidence does not support such a finding.  *Id*. at 40-41.  The Financial

Statement indicated that employee and retirement benefits were provided to all "regular employees"

and Commerce stated that its conclusion on what "regular employee" means is based on its

understanding of the Philippines' generally accepted accounting principles.  Quoting Clearon,

Commerce stated that "there is no basis to assume that the ILO labor cost data would include

employee and retirement benefits associated with direct production workers, but that the same

employee benefits would be reported as operating expenses rather than costs of sales."[40]

Actually, there is.  Although the Philippine generally accepted accounting principle

upon which Commerce claims to have relied has not been made a part of the record (at least insofar

---

[39] Arch had argued that, "[i]n its filing with the Philippine SEC authorities, MVC stated 'The company has a registered, non-contributory retirement plan. *All regular employees are covered from the President down to the rank and file*.'"  As quoted in RR at 41, referencing Arch's Draft Remand Cmts. (Arch's italics).

[40] RR at 41-42, quoting Letter from Petitioner, "Remand of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlo-Isos from the PRC: Comments Regarding New Data Placed on the Record" (August 20, 2014).

as the court can discern from the papers submitted here[41]), the Financial Statement's independent auditors' opinion letter of record asserts that the Financial Statement is in accordance with Philippine Financial Reporting Standards. And insofar as the court could discern, by its own examination of Philippine and international generally accepted accounting standards in existence in 2010-11, the "proper" accounting treatment of employee retirement and other benefits, as those relate to accounting for cost of goods sold, is not as clear-cut as Commerce assumes, except to the extent that they must be accounted for and reported.

Be that as it may, Kangtai appears correct in arguing that Commerce's assumption, as to how labor is distinguished among the operating and period costs of the Financial Statement, is all beside the point. Commerce faults Arch for "claiming that the ILO data includes SG&A type labor for which an adjustment to the financial data is necessary" and that "like Kangtai's argument, [Arch] has also failed to demonstrate that such labor is included in the ILO data", but Commerce's own *Labor Methodology* policy presumptively and apparently includes *all* costs relating to labor via category 6A data. That policy pronouncement specifically stated that any labor item identified among the SG&A (or "period") items must be excluded from the surrogate SG&A ratio in order to avoid overstatement, and it is not reasonably disputed that the employee and retirement benefits described in the Financial Statement are a type of labor item that the *Labor Methodology* policy was meant to address. If the determination in this matter implies that Commerce has discovered a

---

[41] Therefore, Commerce's assumption or projection of what is the "proper" way to account for these employee retirement and other benefits has no support in the record, unless that be by way of official notice.

problem with its policy, then it should address that by way of further notice and comment, rather than attempting the type of tortured analysis in which it has engaged in here.

As Arch argues, the record shows that MVC has treated its employee and retirement expenses as a coherent whole, as indicated in its Notes to the Financial Statement. Were Philippines' Accounting Standards ("PAS") a part of the record, in particular PAS 19, they would likely inform that the Financial Statement has been prepared in accordance therewith and does not, as intimated by Commerce, involve a "misallocation" of labor amounts. Note 19 of the Financial Statement provides detail, including the exact calculation of year 2010's retirement benefit costs. Note 17 also itemizes "employee benefits," although it does not provide as much information on these expenses as for the retirement benefits. Note 24 breaks out the amounts of compensation of "key management personnel" into "short-term employee benefits" and "retirement benefits", which establishes that these benefits, too, apply beyond administrative expenses. Thus, the Financial Statement has itemized costs that would be included in the Chapter 6A labor rates, that are individually itemized, and are not included in the labor costs in the financial statements. This appears to be precisely the situation Commerce contemplated when stating that it would make adjustments in order to avoid overstating labor costs, and the court must therefore conclude that Commerce has apparently failed to interpret the record correctly, thereby inadvertently violating its *Labor Methodology* policy without adequate justification.

On remand, in order to address the foregoing, Commerce should either remove the labor items identified among MVC's SG&A expenses or explain why adhering to its *Labor Methodology* policy is inappropriate in this instance.

*H.*  By-Product Offset Methodology

If a by-product resulting from production of subject merchandise has commercial value, then the costs associated with its production must be allocated from the costs associated with production of the subject merchandise.  To date, apparently, Commerce has recognized by-products' commercial value either by sales thereof or by reintroduction into the production of the subject or non-subject merchandise.[42]  Arch and Kangtai challenge Commerce's explanation of its by-product offset determination.

1.  Further Background on the *Final Results*

Commerce accepts that ammonia gas and sulfuric acid are the relevant by-products cast out of the respondents' production of subject merchandise at a certain "split off" point from the production of chlor-isos.  Kangtai avers that these by-products are then further processed into ammonium sulfate, first into liquid form, and then into a powder, for sale primarily as fertilizer. *See* Kangtai's Resp. to Court's Letter of May 8, 2015, ECF No. 98 (May 22, 2015).

In the original investigation, Commerce found that its "downstream by-products practice" for determining by-product credits did not apply to the process of subject merchandise

---

[42] *See, e.g.*, *DuPont Teijin Films China Ltd. v. United States*, Consol. Court No. 13-00229, ECF No. 86 (Jan. 9, 2015) ("*DuPont Teijin Films Redetermination*") at 5-6; *Frontseating Service Valves From the PRC*, 78 Fed. Reg. 35245 (June 12, 2013) (final 2010-2011 rev. results), and accompanying I&D Memo at cmt. 10; *Frontseating Service Valves From the PRC*, 76 Fed. Reg. 70706 (Nov. 15, 2011)  (final 2008-2010 rev. results), and accompanying I&D Memo at cmt. 18; *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam*, 74 Fed. Reg. 47191 (Sep. 15, 2009) (*inter alia*, final rev. results), and accompanying I&D Memo at cmt. 7.A ("because by reintroducing the by-product into production, the material costs of the subject merchandise are directly reduced").  Complexities can arise depending upon whether the by-product is re-introduced into production of the subject merchandise or non-subject merchandise, and whether the by-product requires inventorying (different PORs) or is reintroduced immediately into a continuous production process.  *See, e.g.*, *DuPont Teijin Films Redetermination* at 5-8.

production.  *See*, *e.g.*, Arch's Br. at 25.  Therefore, in previous reviews of the Order as well as for the *Preliminary Results*, Commerce had calculated the volume of the ammonia gas and sulfuric acid by-products based upon the amounts of those products that are chemically (*i.e.*, formulaically) required to produce the amounts of ammonium sulfate reported by Arch and Kangtai as having been actually produced (as opposed to the amount actually sold).  Commerce would then calculate the total of each respondent's by-product offset based upon selected surrogate values for the ammonia gas and sulfuric acid from among those the parties had submitted.[43]  *See* RR at 28.

After the *Preliminary Results*, in their administrative case brief the petitioners argued that if Commerce continues to rely upon the Philippine import data, it should consider the fact that the surrogate values for ammonia gas and sulfuric acid of record exceed that of ammonium sulfate, leading to a "counterintuitive conclusion that respondents are combining two high-value by-products . . . in order to produce a significantly lower value by-product in ammonium sulfate", which is not realistic.  *See* RR at 47, quoting Clearon's Admin. Case Br., PDoc 255 (Dec. 3, 2012) at 38.  Restating this argument, for the *Final Results* Commerce changed its methodology for determining the by-product offsets, characterizing the change as necessary "to conform to the Department's recent practice," and because the new methodology is both "more reasonable" than that employed in the *Preliminary Results* and

> is consistent with the information the Department requests in our questionnaire, which asks respondents: "[i]f the byproduct for which you are claiming an offset is

---

[43] Neither respondent actually sold ammonia gas or sulfuric acid, and thus the calculations were based upon hypothetical "sales" derived from actual sales of ammonium sulfate.  *See* Jiheng Resp. to Questionnaire Section D, PDoc 49 (Nov. 28, 2011), at D-32-33; Kangtai's Resp. to Questionnaire Section D , PDoc 51 (Nov. 28, 2011) at 17.

a downstream by-product, in addition to responding to the items above,[44] please also: (i) Provide the per-unit usage rate of each input used to produce the downstream by-product."

Consistent with this practice, the Department first starts with the value of the downstream product actually sold by the respondents, ammonium sulfate, produced during the POR. From this amount, the Department would normally deduct the costs associated with converting the by-products into the downstream product, such as labor and electricity. Since this information is not on the record of this review, the Department is not able to deduct such costs for these final results. In the future, the Department will require such information in order to grant this offset. But in this instance, we are using the full value of the ammonium sulfate as the by-product offset. We calculated this amount by multiplying the quantities of ammonium sulfate produced *and sold* by respondents during the POR by the surrogate value (Philippine GTA data) for ammonium sulfate.

*IDM* cmt. 14 at 23-24 (footnotes omitted; italics added).

The respondents challenged this change here, arguing, *inter alia*, that they had been prejudiced by lack of notice concerning the new methodology and that they had relied upon the old methodology in their pricing of subject merchandise. Agreeing with the parties that it had not explained its new by-product methodology,[45] Commerce voluntarily requested remand in order to

---

[44] Earlier in precedence was this questionnaire request, which has been omitted from Commerce's discussion in the *IDM*: "Please note: By-product/co-product offsets are only granted for merchandise that is either sold or reintroduced into production during the POR, up to the amount of that by-product/co-product actually produced during the POR. If you are claiming a by-product or co-product offset in your FOP database, please report each by-product or co-product in a separate field. Further, in your narrative response please: i. Provide a description of the by-product/co-product; ii. Provide an explanation why you have defined the products as by-products or co-products, as applicable; . . ." Questionnaire, Section D (Oct. 6, 2011) at D-9.

[45] To the court, Clearon had argued that the value of the downstream by-product (ammonium sulfate) overstates the value of the input by-products (ammonia gas and sulfuric acid) and that Commerce should find that the respondents had "withheld" relevant information and that the matter should at least be remanded for its collection. *See* Clearon's Br. at 21-25. Clearon had also argued for application of "adverse inferences" pursuant to 19 U.S.C. §1677e(b), which Commerce declined to apply. In addition to arguing that the change in methodology was unlawful, Kangtai and Arch had
(continued...)

consider those arguments, provide explanation, and collect additional relevant information if necessary.  *See* Opinion at 18, referencing Def's Resp. at 54.

    2.  Results of Remand

        The Remand explains that in order to approximate a "market value" for the ammonium gas and sulfuric acid by-products, RR at 29, Commerce is now determining a "net realizable value"[46] for the ammonium gas and sulfuric acid by-products.  Commerce states that this is "consistent with its practice" of "start[ing] with the value of a downstream product, in this case ammonium sulfate that was *actually sold* by the respondents *and produced* during the POR", which leads to "an offset equal to the amount of value a company *actually receives*, less any processing costs, and not a hypothetical value that is unrelated to a company's financial books and records"[47]. Commerce determines these values by deducting the costs of further processing the ammonium gas and sulfuric acid by-products (*e.g.*, labor and electricity) that are incurred from the split-off point in the production of subject merchandise when transforming those by-products into the downstream product ammonium sulfate.  Commerce reasoned that

---

[45] (...continued)
argued and that the value of the ammonia gas and sulfuric acid by-products should be individually and directly determined by reference to surrogate values therefor, as Commerce had done in prior reviews.  On remand, however, Commerce pursued applying  its new methodology by issuing a questionnaire to Arch and Kangtai, obtaining data from the parties, and incorporating the data in its recalculation of the offset based on the new methodology.  *See* RR at 30.

[46] *Id*. at 29 (italics added), quoting *Citric Acid and Certain Citrate Salts From the PRC*, 79 Fed. Reg. 101 (Jan. 2, 2014) (final 2011-2012 rev. results) ("*Citric Acid and Certain Citrate Salts*"), and accompanying I&D Memo at 12.

[47] *Id*. at 28-29 (italics added), referencing *Magnesium Metal from the Russian Federation*, 73 Fed. Reg. 52642 (Sep. 10, 2008) (final rev. results), and accompanying I&D Memo at cmt 1.B & 1.C.

> [t]he value of ammonium sulfate reflects the actual economic value of the byproducts generated through the respondents' cyanuric acid production process and is accordingly an appropriate source to value the byproducts that are combined to produce ammonium sulfate. Thus [Commerce's] methodology reflects the actual value that the company receives for the byproducts [that] are contained in the downstream product which Kangtai and [Arch] actually sell.

RR at 47. Commerce again noted that although it did not elaborate on its change in methodology in the *Final Results*, the "policy is evident from our boilerplate questionnaire, used in the underlying review, which asks parties to report the FOPs required to process the by-product into saleable downstream product."[48] Commerce also noted again that this methodological "change" is in order to comport with recent "agency-wide" policy and avoids overstating the value of the by-product offsets. *Id*. at 28. As applied in the instant review, Commerce found that it "did not have the FOPs to deduct, so we used the full value of the ammonium sulfate as the full value of the two by-products combined as the by-product offset." *Id.* at 28.

    3. Arguments

        Supporting Commerce's determination, Clearon claims that the by-product offset determinations for each respondent were appropriately limited to the downstream product actually sold. Clearon's Cmts. at 9-16. The respondents oppose, arguing that even on remand Commerce has failed to provide a reasoned explanation for departing from its established methodology or demonstrated why the new methodology is better, that the change was unsupported by substantial evidence and was arbitrary, and they ask the court to remand the issue with instruction to apply the original methodology. Arch's Cmts. at 2-3, 17; Kangtai's Cmts. at 33-34, 38.

---

[48] *Id*. at 29, referencing Letter to Jiheng, "2010-2011 Administrative Review of the Antidumping Duty Order on Clor-Isos the PRC" (Oct. 6, 2011) at D-9.

Arch continues to argue that Commerce has not provided a reasoned explanation, and without one they are not able to "respond to, or address, whatever concerns Commerce may have had with the previous methodology" or comment substantively on the change. Arch's Cmts. at 10, 13. Arch argues that although the Draft Remand results stated that the change in practice was necessary "to bring the calculation into conformity with agency-wide policy",[49] and that "this policy is evident from [Commerce's] boilerplate questionnaire used in the underlying review, which asks parties to report the FOPs required to process the byproduct into saleable downstream product", this is not, in fact, what the underlying questionnaire asked, *see supra*, and that the Draft Remand was the first time Commerce used the term "saleable product" in the proceeding.[50]

Because the foregoing was the only explanation provided in the draft remand results, Arch argued to Commerce that beginning with "saleable product" was not an "agency-wide" practice at the time of the underlying review, which was instead to require that a by-product have commercial value.[51] Pointing to the second administrative review of the Order, Arch notes that Commerce defended its practice before the court and that the court upheld Commerce's findings that ammonia gas and sulfuric acid had commercial value and were the appropriate by-products for offset purposes.

---

[49]  Draft Remand Results, RR-PDoc 64.

[50]  Arch's Cmts. at 10, referencing Questionnaire, Section D (Oct. 6, 2011) at D-9; *see supra*, note 44.  Arch also argues that because Commerce had previously stated that the downstream by-product methodology did not apply to its ammonia gas and sulfuric acid by-products, Arch had no reason to think the boilerplate language in the questionnaire referred to its downstream by-product, a point bolstered by the fact that Commerce had accepted Arch's response that it had no downstream by-products in the *Preliminary Results* of the review.  Re-opening the record on remand and Arch's responses to Commerce's requests for additional information, however, moots the point.

[51]  Arch's Cmts. at 11, citing the 2008-2010 and the 2010-2011 *Frontseating Valves* reviews, *see supra* note 42.

Arch's Cmts. at 11-12, referencing their Cmts. on Draft Remand Results at 11-12, RR-PDoc 67. *See*

*Clearon Corp.*, *supra*, 37 CIT at ___, Slip Op. 13-22 at 27-31. Arch avers that Commerce did not

explain why products that it had previously stated were not downstream by-products, and which over

the course of the investigation and previous reviews it did not treat as downstream by-products, were

now suddenly being treated as downstream by-products. Arch's Cmts. at 10.

   Kangtai avers that in making the change Commerce devalued its by-product offset

to production costs and created conditions where NV is determined by the manufacture of the non-

subject downstream ammonium sulfate, not by the manufacture of the subject merchandise itself,

while the original methodology captures the full costs and full measurable offsets most accurately

Kangtai's Cmts. at 36. It avers that recent administrative decisions are evidence that its new

methodology is "no policy at all" but that it was instead applied arbitrarily in the review to increase

antidumping duty margins. *Id.* at 33-34. Kangtai also claims that because the argument for the new

methodology was only raised at the briefing stage by petitioners in their case brief they were not

provided sufficient opportunity to argue if the surrogate value for ammonium sulfate was artificially

low. Kangtai also supports Arch in arguing that the record demonstrates there are two methods

under which Commerce determines "commercial value" and the right to a by-product offset, that

Commerce has unreasonably ignored the latter method, and that Kangtai's by-products are

reintroduced into production because they are piped "directly from where they are generated into a

centrifuge tank to make ammonium sulfate."[52]

---

[52] Kangtai's Cmts. at 34-35, referencing *DuPont Teijin Films Redetermination*; *see also* Kangtai's Br. at 39-40; Kangtai's Reply at 9-11; Arch's Br. at 24-30; Kangtai's Cmts. on Draft Remand, RR-PDoc 68, at 20-22; Arch's Cmts. on Draft Remand, RR-PDoc 67, at10-13.

4. Analysis

Because of uncertainty over how prices are determined in non-market economies, 19 U.S.C. §1677b(c) requires the calculation of "normal value" in these sorts of proceedings to be achieved through FOP methodology. Although not directly addressed in the statute, Commerce's treatment of co-products and by-products apparently derives from the consideration that is required of it (Commerce) with regard to generally accepted accounting principles pursuant to 19 U.S.C. §1677b(f)(1)(A). Among those, accounting's matching principle[53] requires proper allocation to co- and by-products of the costs of their production (*i.e.*, all relevant FOPs). Since the accounting objective therefor is to determine the impact of such products on *income* and *inventory* carrying values for financial reporting purposes,[54] Commerce's apparently current by-product offset practice, which focuses upon whether a by-product has commercial value (demonstrated either by the respondent's sales of the by-product or by re-introduction into production), accords with generally accepted cost accounting principles' income and inventory concerns.

---

[53] *I.e.*, matching expenses with the benefits derived therefrom. *See*, *e.g.*, *Live Swine From Canada*, 70 Fed. Reg. 12181 (Mar. 11, 2005) (final LTFV determ.), and accompanying I&D Memo, at cmt. 57.

[54] *See*, *e.g.*, Steven M. Bragg, *Wiley GAAP 2011*, pp. 329-31 (2010) (discussing cost flow assumptions for determining inventory carrying cost); *see also* 26 U.S.C. §472. For financial and cost accounting purposes, the "split-off" point is the point at which co- and by-products become separate and identifiable and at which the joint costs of production to that point must be allocated based upon suitable methodology. *See*, *e.g.*, Wayne J. Morse and Harold P. Roth, *Cost Accounting*, p. 147 (3rd ed. 1986) ("*CA*"). *See generally id.*, pp. 147-62, and Charles T. Horngren, *Cost Accounting: A Managerial Emphasis*, 531-534 (5th ed. 1982). *Cf. Ipsco, Inc. v. United States*, 13 CIT 402, 405-06, 714 F. Supp. 1211, 1214-15 (1989) (discussing need for cost allocation but variable cost allocation methodologies), referencing *id.*

Commerce also has the discretion in antidumping and countervailing duty proceedings to modify a given methodology in order to calculate a more accurate dumping margin or for ease of use.[55] Commerce may not, however, apply a new methodology if a respondent has an expectation right in the application of existing methodology, *e.g.*, demonstrated reliance upon the methodology, in effect at the time of action taken, to avoid dumping.[56] Commerce must also provide a reasoned explanation for the change, and it must demonstrate that its explanation is in accordance with law and supported by substantial evidence.[57] In changing methodology, Commerce must also provide parties with timely notice and sufficient opportunity to provide the information required by the revised methodology.[58]

---

[55] *See, e.g., NSK Ltd. v. United States,* 19 CIT 1013, 1027, 896 F. Supp. 1263, 1275 (1995) (noting that Commerce need not "adhere to its prior . . . methodology, especially where Commerce is striving for more accuracy"), *aff'd in part and rev'd in part on other grounds*, 115 F.3d 965 (1997); *SeAH Steel Corp. v. United States*, 34 CIT 605, 615, 704 F. Supp.2d 1353, 1361-62 (2010); *Arch Chemicals, Inc. v. United States*, 33 CIT 954, 963-64 (2009), referencing *Fujian Machinery and Equipment Import & Export Corp. v. United States*, 25 CIT 1150, 1169, 178 F. Supp. 2d 1305, 1327 (2001) ("*Fujian Machinery*"); *SKF USA Inc. v. United States*, 31 CIT 951, 958, 491 F. Supp. 2d 1354, 1362 (2007).

[56] *See, e.g.*, *Shikoku Chemicals Corp. v. United States*, 16 CIT 382, 386-89, 795 F. Supp. 417, 420-22 (1992) ("*Shikoku Chemicals*").

[57] *Arch Chemicals, Inc. v. United States*, 33 CIT 954, ___ (2009) ("*Arch Chemicals*"), referencing *Fujian Machinery*, 25 CIT at 1169-70, 178 F. Supp. 2d at 1327 (citation omitted); *see also Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 n. 5 (Fed. Cir. 2007) ("[w]hen an agency decides to change course . . . it must adequately explain the reason for a reversal of policy") (citation omitted).

[58] *See, e.g., Arch Chemicals, supra*, 33 CIT at 963-64; *Anshan Iron & Steel Co., Ltd. v. United States*, 27 CIT 1234, 1241-42 (2003); *Fujian Machinery, supra*, 25 CIT at 1169-70, 178 F. Supp. 2d at 1326-27; *Hussey Copper, Ltd. v. United States*, 17 CIT 993, 998, 834 F. Supp. 413, 419 (1993); *Shikoku Chemicals, supra*, 16 CIT at 388, 795 F. Supp. 2d at 421.

Commerce explains in the remand results that between the preliminary and final results of the matter at bar it modified its methodology to "net realizable value" in order to conform with "agency wide policy" and "to avoid overstating the value of the by-product". RR at 28. Net realizable value, sometimes called "net sales value," is common to both co- and by-product cost accounting and is a recognized method for assigning income or inventory value to a co- or by-product. *See CA* at 151. And yet, regarding Commerce's attempted articulation of its new methodology,[59] it is the function of the court to sustain only on the basis of that articulation, and not to impute reasoning that the agency itself did not raise. On that basis, the court has concerns over Commerce's reasoning and cannot sustain its change of by-product offset methodology.

As an initial matter, the first portion of Commerce's explanation, that it modified its methodology to conform with "agency wide policy", is not supported by substantial evidence. In supplemental briefing requested by the court, Commerce explains that it did not intend "agency wide" as a term of art but only used it to signal both a departure from its past practice and an attempt to conform with its then-recent practice.[60] However, the Remand points to only one case, *Citric Acid and Certain Citrate Salts,* to support the claim that the new methodology is an "agency wide" practice, and as Arch rightly points out, one case does not qualify this methodology as "agency wide" or even a "practice".[61] Moreover, the proceeding in question was published in 2014, a year after the

---

[59] The court will uphold "a decision of less than ideal clarity" *et cetera. See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

[60] Def's Resp. to Court Questions (May 29, 2015) at 7-8.

[61] *See* RR at 29, referencing *Citric Acid and Certain Citrate Salts*, *supra*, 79 Fed. Reg. 101, and accompanying I&D Memo at 12; *see also* Arch's Cmts. at 12.

results of the review at issue, and thus does not speak to what practice was in place or altered at the time of the review.

The remainder of Commerce's explanation for its change in methodology (to "avoid overstating the value of the by-product") also contains several deficiencies. First, the remand results are unclear on whether Commerce in this matter is granting an offset to each respondent for the full amount of the ammonia gas and sulfuric acid claimed as *produced* during the POR, in accordance with Commerce's general by-products practice, as opposed to limiting the offset to the value of the amount of those by-products as embodied in the amount of ammonium sulfate actually *sold* during the POR. *Cf.* RR at 28 ("it [i]s still the Department's practice to first start with the value of the downstream product (*i.e.*, ammonium sulfate) that was *actually sold* by the respondents *and produced* during the POR") (italics added). At a minimum, the matter requires remand for clarification thereof.

Second, if Commerce is only granting an offset based on the amount of ammonium sulfate that was actually sold during the POR, *cf. id* ("we must grant an offset equal to the amount of value a company actually receives, less any processing costs, and not a hypothetical value"), then the new methodology is actually a "net realized value" standard (based upon the values of the ammonium gas and sulfuric acid by-products in actual sales of the downstream product that occur during a period of review), not a "net realizable value" standard, which would therefore be at odds both with the generally accepted accounting principles' cost accounting concerns for income and inventory valuations as well as at odds with Commerce's allegedly still-existing policy of determining whether or not the by-product has commercial value by proof of sales or reintroduction

into production.  Arch raised this last point in its comments on the Draft Remand, and it is an

argument of cogent materiality that Commerce failed to address, requiring remand for that reason

as well.  *See Altx, Inc. v. United States*, 25 CIT 1100, 1103, 167 F. Supp. 2d 1353, 1359 (2001),

quoting *United States v. Nova Scotia Food Products Corp*., 568 F.2d 240, 252 (2d Cir.1977) ("[i]t

is not in keeping with the rational [agency] process to leave vital questions, raised by comments

which are of cogent materiality, completely unanswered"); *see also* Arch's Cmts. at 12.[62]

       Third, it is unclear how Commerce's new methodology is an improvement over its

previously applied methodology and is a reasonable change.  Although it is apparent that Commerce

perceived a need to adjust how it calculates the by-product offset in this proceeding due to concern

over the irrationality of record evidence of higher surrogate values for the by-products than for the

downstream product into which they were further processed, Kangtai correctly points out that "this

is an accident of the surrogate values in a particular surrogate country at a particular time period and

has nothing to do with the legitimacy of the methodology"[63], and that Commerce's concern is really

a "capping" argument.  *See, e.g.*, *Multilayered Wood Flooring from the PRC*, 76 Fed. Reg. 64318

(Oct. 18, 2011) (final LTFV determ), and *IDM* at cmt. 23.  Further, it is difficult to fathom why

---

[62]  Citing *DuPont Teijin Films China Limited, et al. v. United States*, 38 CIT ___, Slip Op.
14-106 (Sep. 11, 2014), and final results of redetermination pursuant thereto (dated Jan. 9, 2015).
"The Department grants an offset for by-products generated during the production of subject
merchandise if evidence is provided that such by-product has commercial value. The Department
considers that a byproduct has commercial value if it is sold, or if, as in this instance, it is
reintroduced into production. Thus, the Department's practice is to attribute the commercial value
to a by-product by virtue of its reintroduction. Given that DuPont Group ultimately reintroduces the
PETWASTEOUT into production, this demonstrates that this byproduct has commercial value."
Arch's Cmts. on Remand at 12.

[63]  Kangtai's Resp. to Court Questions at 4.

Commerce would opt for a more complex methodology over the simplicity of the earlier one in order to address the problem identified by the petitioners. The former methodology simply determined the volume of the ammonia gas and sulfuric acid by-products that must have been produced at the split-off point and calculated their values based upon the per-unit surrogate values of record that were deemed appropriate. Some form of "cap" to address the petitioners' (and Commerce's) concern regarding overstatement would be appropriate, and would certainly comport with Occam's Razor, but simplicity itself, of course, does not render a more complex method unreasonable. Rather, the reasonableness of increased complexity must be assessed on the basis of the increased accuracy it purports to achieve.

From the first through the fifth administrative reviews Commerce determined that the allowable by-product offset is for those by-products that are generated at the split-off point in the production of subject merchandise. For those reviews, Commerce adhered to a methodology that simply assigned a surrogate value to those by-products. For the matter at bar, the further-manufacturing FOPs (labor and electricity) that Commerce states "must" be deducted appear to be relevant only for purposes of determining income or inventory values. Yet in focusing on sales of ammonium sulfate during the POR, both the new methodology and the previous one ignore the under- or over-statements of ammonia gas and sulfuric acid production during the POR that occur due to changes between beginning and ending inventories of ammonium sulfate[64] at the close of the POR.

---

[64] Kangtai avers that it has a "continuous production" operation. Kangtai's Resp. to Clearon's Br. at 8 (Feb. 24, 2015).

Certainly the new methodology does not result in improved accuracy to that extent, and if the concern is simply over a proper per-unit valuation, one is left wondering: what, exactly, is the improvement of the new methodology over the old one? After all, by-product valuation is not an exact science but is largely arbitrary, albeit with defined rules of varying complexity. *See*, *e.g.*, *Cost Accounting* at 149; *Wiley GAAP 2011*, ch. 9. Further, the new methodology appears to be an attempt to determine what the "actual" (*i.e.*, "saleable") value of the ammonia gas and sulfuric acid is to the respondents, but the "reality" of those values are apparently tethered to the *surrogate* value for the downstream by-product, based upon a Philippine value, and not what the "reality" of what the respondents "actually" received as compensation for sales of ammonium sulfate. Commerce does not, on that further basis, demonstrate or persuade that its new methodology actually produces a more accurate result than the old methodology, even if it is an attempt to comport with accepted cost-accounting methodology.

Fourth, in voluntarily requesting remand, Commerce has side-stepped the parties' arguments concerning lack of notice and comment. Commerce claims to have modified its methodology in order "to avoid overstating the value of the by-product", but Kangtai points out that in the petitioners' administrative case brief following the *Preliminary Results* they only expressed concern over the surrogate values used to value ammonia gas and sulfuric acid and did not voice concern over the existing methodology, and no party otherwise expressed concerns over the existing methodology. Where there is no reliance interest in a particular methodology, Commerce has the discretion to reconsider the methodology on its own, *sua sponte*, but in this matter, in announcing after the *Preliminary Results* that it would base the by-product offset on actual sales of the

downstream product during the POR, not only has Commerce not adequately explained what was wrong with the old methodology (except to state a desire to avoid "overstating", which can be addressed via, *e.g.*, capping, as argued by Kangtai), it has not addressed or apparently considered Kangtai's and Arch's arguments that they relied on the old methodology for their pricing of subject merchandise, and that applying the new methodology *ex post facto* is fundamentally unfair. *See*, *e.g.*, Kangtai's Reply to Court Questions, ECF No. 98 (May 29, 2015) at 8-9. The issue therefore requires reconsideration via remand.

In passing, the court considers Kangtai's argument regarding Commerce's apparent agreement with the petitioners that based on Kangtai's record keeping in the normal course of business there was no verifiable way to allocate to the downstream ammonium sulfate product certain labor and electricity associated with its production as a basis for rejecting Kangtai's proposed method of allocating labor and electricity incurred after the split-off point, and allocating such FOPs to the production of subject merchandise. On the one hand, the court agrees the record does not demonstrate that any labor was involved in the respondents further processing of ammonium gas and sulfuric acid into ammonium sulfate, and Commerce's point is not in accordance with its own acknowledgment that production of "[a]mmonium sulfate . . . involves a large amount of electricity". *See* RR at 50. Furthermore, Commerce's point is not in accordance with the "net realizable value" methodology that it claims it had to utilize.[65] On the other hand, to the extent Kangtai argues that this amounts, in effect, to an *ex post facto* adverse inference against Kangtai for not keeping the

---

[65] *See*, *e.g.*, *CA* at 151 ("[S]eparate production costs incurred after the split-off point are easier to identity with individual products . . .. When separate production costs exist, joint costs are allocated on the basis of relative net realizable values.").

records that Commerce's new methodology would require, the remand results state that Commerce relied on Kangtai's own contention that if "the Department does not agree with Kangtai's allocation methodology . . ., the Department should simply award the by-product offset with no additional by-product FOPs and with the Direct Material FOPs as previously reported at Exhibit D-7 of Section D response dated November 28, 2011, where Kangtai attributed all and total consumption to the CYA production." RR at 50, quoting Letter from Kangtai, "Certain Chlor-Isos from the PRC -- Remand Questionnaire Response," August 18, 2014, at 3-4. In other words, since the remand results are apparently in accordance with what Kangtai itself argues, they are therefore not unreasonable to that extent.

Commerce has the discretion to adopt a new by-product valuation methodology with prospective effect, so long as it provides the respondents time to adapt and comply. On remand of this matter, Commerce might be able to offer a valid explanation of why the respondents had no reliance interest in the then-existing methodology and why the new methodology results in greater accuracy and "avoid[s] overstating the value of the by-product" as well as address the parties' arguments concerning lack of notice and comment and the remainder of the foregoing. If on remand it again determines to calculate Kangtai's by-product offsets based on net realizable value methodology, then Commerce is requested to consider using the facts available, notwithstanding Kangtai's apparent concession, above, in order to properly allocate and attribute all FOPs incurred in the production of ammonium sulfate. Further, Commerce must either supply valid reasons to support changing its methodology in this proceeding which amounts to a "sufficient, reasoned

Consol. Court No. 13-00073                                              Page 62

analysis",[66] supported by substantial evidence, or it should revert to its "former" (apparently still-existing) methodology, albeit with any appropriate modification (*e.g.* capping) to avoid the "illogical conclusions that do not match the real world experience of [Arch] and Kangtai," that Commerce explained was its true concern.  *See* RR at 47.

IV.  <em>Conclusion</em>

For the above reasons, the matter must be remanded for further proceedings not inconsistent with this opinion.  The results of remand shall be due December 18, 2015, whereupon by the fifth business day thereafter the parties shall file a joint status report as to a proposed scheduling of comments, if any, on the remand results, as well as a proposed page limitation(s) thereof.

**So ordered.**

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: August 20, 2015
        New York, New York

---

[66]  *See NMB Singapore Ltd., v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009); *see also Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009).

Slip Op. 14-88

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CLEARON CORP., | : |
| and OCCIDENTAL CHEMICAL CORP., | : |
| | : |
| Plaintiffs, | : |
| | : |
| and | : Before: R. Kenton Musgrave, Senior Judge |
| | : |
| JUANCHENG KANGTAI CHEMICAL CO. | : Consol. Court No. 13-00073 |
| LTD., HEBEI JIHENG CHEMICAL CO., LTD., | : |
| and ARCH CHEMICALS, INC., | : |
| | : |
| Consolidated-Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| ARCH CHEMICALS, INC., and JUANCHENG | : |
| KANGTAI CHEMICAL CO., LTD., | : |
| | : |
| Defendant-Intervenors. | : |
| | : |

## OPINION AND ORDER

[On sixth administrative review of antidumping duty order on chlorinated isocyanurates, requests for voluntary remand granted, and motions for judgment on the agency record granted in part.]

Dated: July 24, 2014

*James R. Cannon, Jr.* and *Thomas M. Beline*, Cassidy Levy Kent (USA) LLP, of Washington, DC, for the plaintiffs.

*James K. Horgan*, *John J. Kenkel*, and *Gregory S. Menegaz*, DeKieffer & Horgan, of Washington, DC, for the consolidated-plaintiff and defendant-intervenor Juancheng Kangtai Chemical Co., Ltd.

*Peggy A. Clarke*, Law Offices of Peggy A. Clarke, of Washington, DC, for the consolidated-plaintiff Hebei Jiheng Chemical Co., Ltd. and the consolidated-plaintiff and defendant-intervenor Arch Chemical Co., Ltd.

*Jane C. Dempsey*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. On the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *David W. Richardson*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington DC.

Musgrave, Senior Judge: This opinion addresses challenges to *Chlorinated Isocyanurates From the People's Republic of China*, July 18, 2014. Reg. 4386 (Jan. 22, 2013), PDoc 169 ("*Final Results*"), the sixth administrative review of an antidumping duty ("AD") order on chlorinated isocyanurates[1] from the People's Republic of China ("PRC") conducted by the International Trade Administration of the U.S. Department of Commerce ("Commerce"). Before the court in this consolidated action[2] are three motions for summary judgment on the agency record brought under USCIT Rule 56.2. One motion is brought by the consolidated-plaintiff and

---

[1]  The "subject merchandise" are all chlorinated isocyanurates. These are derivatives of cyanuric acid and consist of three primary compositions, trichloroisocyanuric acid, sodium dichloroisocyanurate, and sodium dichloroisocyanurate. Subject merchandise are available in powder, granular, and tableted forms and are created in three steps, first making the intermediate inputs cyanuric acid, caustic soda and chlorine gas, second combining these inputs, and third "shaping the finished products." Issues and Decision Memorandum for the *Final Results* (Jan. 14, 2013), PDoc 164 ("I&D Memo") at cmt. 1.

[2]  *Juancheng Kangtai Chemical Co., Ltd. v. United States*, Court No. 13-00056 and *Arch Chemicals, Inc. et al v. United States*, Court No. 13-00061, have been consolidated into this action, now styled *Clearon Corporation et al v. United States,* Consol. Court No. 13-00075. *See* Order (Apr. 22, 2013), ECF No. 20.

defendant-intervenor Arch Chemicals Inc. ("Arch"), an importer of the subject merchandise, and by the consolidated-plaintiff Hebei Jiheng Chemical Co., Ltd. ("Jiheng"), a producer and exporter of the subject merchandise from the PRC.[3]  A second motion is brought by the consolidated-plaintiff and defendant-intervenor Juancheng Kangtai Chemical Co., Ltd. ("Kangtai"), a producer and exporter of the subject merchandise from the PRC.[4]  The third motion is brought by the plaintiffs Clearon Corp. and Occidental Chemical Corp., U.S. producers of domestic like product (together "Clearon").[5]  Collectively, the motions contest ten aspects of the *Final Results*: Commerce's (1) calculation of the selling, general, and administrative expense financial ratio ("SG&A ratio") using data pertinent to the Philippines, (2) alleged use of a 2011 financial statement not on the record, (3) treatment and calculation of intra-company transportation of intermediate products, (4) application of new methodology for valuing ammonia gas and sulfuric acid by-products, (5) selection of the Philippines as the primary surrogate country, and the surrogate value selection for (6) chlorine, (7) hydrogen gas, (8) sodium hydroxide, (9) electricity, and (10) urea.

Commerce asks the court to grant voluntary remand for three of its determinations, namely (1) its calculation of the SG&A ratios using Philippine data, (2) its calculation of

---

[3]  Mot. for Judgment on the Agency R. pursuant to Rule 56.2 by Consol. Plaintiffs Arch Chemicals, Inc. and Hebei Jiheng Chemical Co., Ltd. (Aug. 15, 2013), ECF No. 27 ("Arch & Jiheng Rule 56.2 Mot."). Arch had also intervened herein on the side of the defendant. *See* Arch's Mot. to Int. as a Matter of Right, Court No. 13-00073 (Apr. 16, 2013), ECF No. 12.

[4]  Mot. for Judgment on the Agency R. pursuant to Rule 56.2 by Consol. Pl.'s Juancheng Kangtai Chemical Co., Ltd. (Aug. 15, 2013), ECF No. 30 ("Kangtai Rule 56.2 Mot."). Kangtai had also intervened herein on the side of the defendant. Kangtai's Mot. to Int. as a Matter of Right, Court No. 13-00073 (Apr. 24, 2013), ECF No. 21.

[5]  Mot. for Judgment on the Agency R. pursuant to Rule 56.2 by Pl.'s Clearon Corp. and Occidental Chemical Corp. (Aug. 15, 2013), ECF No. 31 ("Clearon Rule 56.2 Mot.").

intra-company transportation of intermediate products, and (3) its by-product valuation

methodology, and it opposes the remaining issues of the three Rule 56.2 motions.[6] Arch and Kangtai

contest three aspects of Clearon's Rule 56.2 motion, and in doing so argue that Commerce's

surrogate value selection for urea and hydrogen gas was the best available information on the record

and that Clearon failed to exhaust administrative remedies concerning its by-product claims.[7]

For the reasons below, the court grants the three voluntary remand requests and also

orders remand on the issue of surrogate country selection from the *Final Results*.

### I. *Jurisdiction and Standard of Review*

Final administrative AD review determinations are evaluated under 19 U.S.C.

§1516a(b)(1)(B)(i). Commerce's determinations, findings, or conclusions are sustained unless they

are found to be "unsupported by substantial evidence on the record, or otherwise not in accordance

with law." *NSK Ltd. v. United States*, 481 F.3d 1355, 1359 (Fed. Cir. 2007), citing 19 U.S.C.

§1516a(b)(1)(B)(i)); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

Substantial evidence is "more than a mere scintilla", it is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Universal Camera Corp. V. NLRB*, 340

U.S. 474, 477 (1951), citing *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

---

[6] Def's Resp. to Pl.'s and Consol. Pl.'s Rule 56.2 Mot.'s for Judgment on the Agency R. (Feb. 24, 2014), ECF No. 49 ("Def's Resp.").

[7] *See* Def. Int. Arch Chemicals, Inc. Resp. to Pl.'s Clearon and Occidental's Rule 56.2 Mot. For Judgment on the Agency R. (Feb. 24, 2014), EFC No. 46 ("Arch Resp."); *see also* Def. Int. Kangtai Chemicals, Co., Ltd. Resp. to Pl.'s Clearon and Occidental's Mot. For Judgment on the Agency R. (Feb. 24, 2014), EFC No. 50 ("Kangtai Resp.").

In determining if Commerce's interpretation of a statute is in accordance with law, the court applies a two-step analysis set forth by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). First, the court examines whether "Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress." *Id.* Second, if the statute is silent to the specific issue or the legislative intent is not clear, the court must determine "whether the agency's answer is based upon a permissible construction of the statute." *Id.* at 843-44. *See also*, *e.g.*, *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359-60 (Fed. Cir. 2007). The court provides the agency deference on interpreting the statutes the agency administers and has found that "[a]ny reasonable construction of the statute is a permissible construction." *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004), citing *Torrington v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

## II. *Background*

Commerce initiated the review covering four producers/exporters of the subject merchandise from the PRC and selected Jiheng and Kangtai as the two mandatory respondents in the review.[8] Commerce's Office of Policy issued a Surrogate Country Memorandum as part of the review which included the following "non-exhaustive" list of six potential surrogate countries that it determined were "most likely to have good data availability and quality" and were "at a level of

---

[8]  *See Initiation of Antidumping Administrative Reviews*, 76 Fed. Reg. 45227, 45229 (July 28, 2011). The review covered Jiheng, Kangtai, Nanning Chemical Industry Co., Ltd., and Zhucheng Taisheng Chemical Co., Ltd. for the period of June 1, 2010 through May 31, 2011.

economic development comparable to [the PRC] in terms of *per capita* gross national income" for

the review based on figures from the World Bank's 2011 World Development Report:

| Country | *Per Capita* GNI, 2009 ($USD) |
|---|---|
| PRC | 3,590 |
| Philippines | 1,790 |
| Indonesia | 2,230 |
| Ukraine | 2,800 |
| Thailand | 3,760 |
| Columbia | 4,930 |
| South Africa | 5,770 |

*See Memorandum to Mark Hoadley, Request for a List of Surrogate Countries for an Administrative*

*Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic*

*of China* (Sep. 9, 2011), PDoc 37 ("Surrogate Country Memorandum"), referencing World

Development Report 2011, World Bank.  Commerce asked the parties to comment on the surrogate

country selection and provide it with information for valuing factors of production.  In response, the

parties submitted surrogate country comments and surrogate value data from India, Thailand, the

Philippines, and South Africa.[9]

       Commerce published its preliminary results and selected South Africa as the primary

surrogate country for valuing factors of production, finding it was the largest exporter of comparable

---

[9] In its comments Kangtai offered Thailand and the Philippines as potential surrogate countries and noted that India had been the surrogate country for the first five reviews, that Commerce had removed India from the potential surrogate list, and that Commerce rarely selects a surrogate country that is not included in the list. *See* Kangtai's Sur. Country Cmts. (Dec. 19, 2011), PDoc 58 at 2-3.  Arch commented that Thailand and the Philippines were the best surrogate countries options.  *See* Arch Sur. Country Cmts. (Jan. 9, 2012), PDoc 55 at 2.  Clearon commented that South Africa was the best surrogate choice. *See* Clearon Sur. Country Cmts. (Dec. 19, 2011), PDoc 57 at 3.  *See also,* Jiheng Sur. Value Sub. (Jan. 9, 2012),  PDoc 65; Clearon Sur. Value Sub. (Jan. 9, 2012),  PDoc 66; Kangtai Sur. Value Sub. (Jan. 9, 2012), PDocs 69, 70; Kangtai Sur. Value Sub. for Final Results, (Sept. 5, 2012), PDocs 116, 117.

merchandise among the countries on the potential surrogate list. For factors of production ("FOPs")

where data was not placed on the record from South Africa or other countries on the list, Commerce

relied on India data stating that it was the only alterative on the record, and that "even though India

is not on the list of possible surrogate countries in the Surrogate Country Memorandum, India is a

significant producer of comparable merchandise that has the data needed to calculate certain

surrogate values." *See Chlorinated Isocyanurates From the People's Republic of China: Preliminary*

*Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 41746, 41479 (July 16, 2012)

("*Preliminary Results*") (citation omitted).

       Commerce received comment and rebuttal briefs from the parties including a brief

from Kangtai claiming India should be selected as the primary surrogate country or in the alternative

South Africa should be selected. *See* Kangtai Rebuttal Brief at 1-2 (Dec. 10, 2011), PDoc 159.

Commerce then issued its *Final Results* and choose the Philippines as the primary surrogate country,

finding that it is economically comparable to the PRC, that it is a significant producer of comparable

merchandise, and that the record now contained Philippine surrogate value data for all but one factor

of production (steam). I&D Memo at cmt. 2. Responding to Kangtai's argument that India was the

appropriate surrogate country, Commerce stated that when selecting a primary surrogate country it

will normally first look to the potential surrogate list in the Surrogate Country Memorandum, and

that "the list did not include India because India's *per capita* GNI did not fall within the range of

countries proximate to the PRC." *Id.*

### III. *Claims*

The first claim of Arch, Jiheng and Kangtai challenges Commerce's decision to treat employment and retirement benefits as SG&A instead of labor expenses when calculating the financial ratios. The parties aver that Commerce's determination is not supported by substantial evidence, that Commerce failed to provide an adequate explanation for its determination, and that its decision resulted in the double-counting of certain labor costs contrary to Commerce's stated policy. *See* Arch & Jiheng Rule 56.2 Mot. at 21-24; *see also* Kangtai Rule 56.2 Mot. at 31-38. Second, Kangtai argues Commerce erred in calculating the financial ratio by relying a 2011 financial statement not on the record. Kangtai Rule 56.2 Mot. at 38-39.

In the third claim, Arch and Jiheng argue Commerce acted contrary to law by applying a new methodology for valuing intra-company transportation when calculating normal value in the *Final Results* without providing notice, or giving the parties an opportunity to comment, or providing the parties an opportunity to place requisite information on the record. The parties further claim Commerce failed to provide a reasoned explanation for the change in methodology. Arch & Jiheng Rule 56.2 Mot. at 31-35.

Fourth, Clearon, Kangtai, Arch and Jiheng challenge Commerce's valuation of the subject merchandise's by-product offsets, ammonia gas and recovered sulfuric acid, which are converted to produce ammonium sulfate. All parties claim Commerce changed its methodology for by-product valuation from the *Preliminary Results* to the *Final Results* without providing a reasoned explanation or support for its change in practice. Clearon contends that Commerce failed to account for the costs associated with converting ammonium gas to ammonium sulfate, that it ignored the language of its own questionnaire, that it disregarded its regulations, and that it permitted Jiheng and

Kangtai to reduce their antidumping duty margins by withholding data. Clearon Rule 56.2 Mot. at

20-25. Arch and Jiheng claim Commerce made the change without providing the parties notice and

an opportunity to comment and place requisite information on the record. Arch & Jiheng Rule 56.2

Mot. at 8-12, 24. Kangtai alleges that the determination was unlawful and unreasonable, that no

party argued for the change in methodology, and that Commerce should apply the methodology it

used in the *Preliminary Results*. *See* Kangtai Rule 56.2 Mot. at 38-40; Kangtai Resp. at 6-8; Cons.

Pl. Kangtai Chemicals, Inc. Reply Br. in Support of its Mot. for Judgment on the Agency R. (April

23, 2014), EFC No. 59 ("Kangtai Reply") at 9-11.

       In the fifth claim, Kangtai challenges Commerce's surrogate country selection

methodology and contends that India is economically comparable to the PRC. Kangtai argues that

Commerce's reliance on *per capita* GNI to determine economic comparability is unreasonable, and

that the methodology it applied to select economially comparable countries, as well as its decision

to eliminate India from the list of economically comparable countries, is not supported by substantial

evidence and is not in accordance with law. Kangtai Rule 56.2 Mot. at 6-11; Kangtai Reply at 1-9.

       The final five claims challenge Commerce's surrogate value selections for various

factors of production. In the sixth claim, Clearon avers Commerce's surrogate value selection for

hydrogen gas is unsupported by substantial evidence and contrary to law. Clearon argues that the

Philippine GTA import data Commerce used to value Jiheng's hydrogen gas by-product is

aberrational and unreliable, and that Commerce should have instead relied on domestic data from

India. Clearon Rule 56.2 Mot. at 16-20. Seventh, Kangtai claims that Commerce's surrogate value

selection for chlorine was not the best available information on the record and that it was not

supported by substantial evidence. Kangtai avers that selected surrogate value was based on a small

quantity of imports into the Philippines and that Commerce should have instead used Indian chlorine

and caustic soda data to value chlorine. Kangtai Rule 56.2 Mot. at 11-27.  In the eighth claim

Clearon alleges that Commerce erroneously determined urea was not produced in the Philippines,

and that instead of relying upon Philippine GTA import statistics to value urea Commerce should

have used Philippine Bureau of Agricultural Statistics data.  Clearon contends Commerce's rejection

of the Philippine Bureau of Agricultural Statistics domestic prices for urea is not supported by

substantial evidence and is contrary to law.  Clearon Rule 56.2 Mot. at 11-16.  Ninth, Jiheng and

Kangtai claim that Commerce's reliance on the Philippine *Doing Business in the Camarines Sur*

rates to value electricity is not supported by substantial evidence on the record, and that the

Philippine *Meraloc* data is the best available information on the record to value electricity. Kangtai

Rule 56.2 Mot. at 40-42; Arch & Jiheng Rule 56.2 Mot. at 15-21.  In the tenth claim Kangtai

challenges Commerce's surrogate value selection for sodium hydroxide.   Kangtai argues that

Commerce should have made a downward adjustment to reflect Kangtai's lower consumption of

sodium hydroxide, and that Commerce's decision not to adjust the value is unsupported by

substantial evidence.  Kangtai's Rule 56.2 Mot. at 27-31.

        Defendant intervenors Arch and Kangtai support Commerce's determination in

opposing three aspects of Clearon's Rule 56.2 Motion. Arch and Kangtai both oppose Clearon's

contention that Commerce's did not use the best available information for its surrogate value

selection for urea and argue that Commerce's determination is supported by substantial evidence.

Kangtai Resp. at 2-6; Arch Resp. at 3-5.  The two parties also argue Clearon failed to exhaust

administrative remedies concerning its claim that the two parties responses were insufficient for the

proper by-product valuation of ammonium sulfate.  Kangtai Resp. at 7-8; Arch Resp. at 8-10.  Arch

further opposes Clearon's claim that the selected surrogate value for hydrogen gas was not the best available information on the record and argues Commerce's determination was supported by substantial evidence.  Arch Resp. at 5-8.

IV.  <em>Statutory and Regulatory Framework</em>

In an AD administrative review Commerce determines if the subject goods will likely be sold at a less than fair value in the United States.  In making this determination, Commerce calculates the "dumping margin" by subtracting the foreign product's price in the United States, the "export price", from the price in the producer's home country, the "normal value".  *See* 19. U.S.C. §1675(a)(2)(A); 19 U.S.C. §1673; 19 U.S.C. §1677(35)(A).  When determining the normal value of subject goods from a nonmarket economy ("NME") such as the PRC, Commerce makes its calculation based on "surrogate values" which are the "value of the factors of production" from surrogate market economy country data.  *See* 19 U.S.C. §1677b(c)(1).

To value factors of production Commerce must use the "best available information" from the production and sales data it obtains from the parties in the administrative review on the record. 19 U.S.C. §1677b(c)(1).  Commerce uses "to the extent possible" data from "one or more" surrogate market economy countries that are (1) "at a level of economic development comparable to that of the nonmarket economy country" and (2) "significant producers of comparable merchandise."  19 U.S.C. §1677b(c)(4).  Commerce has a regulatory preference for valuing all factors of production, with the exception of labor, from one surrogate country. 19 C.F.R. §351.408(c)(2).

V.  *Discussion*

A.  Commerce's Requests for Voluntary Remand

The first three issues before the court concern Commerce's requests for voluntary remand for three of its determinations in the *Final Results*.  First, Commerce requests voluntary remand to address party comments in the first instance concerning its financial ratio calculation using Philippine data.  Second, it seeks remand to explain its changed methodology for determining the by-product valuation of ammonia gas and sulfuric acid.  In its third request Commerce seeks remand to explain its change in methodology for its treatment and calculation of intra-company transportation of intermediate products.

The court has discretion over whether to grant remand when, as in the instance case, an agency requests the remand without confessing error to reconsider its position, and such requests are generally granted if the agency's concerns are found to be substantial and legitimate.  *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028-29 (Fed. Cir. 2001) ("*SKF I*"); *see also Nucor Corp. v. United States*, 33 CIT 207, 292, 612 F. Supp. 2d 1264, 1336 (2009).  Concerns have been found to be substantial and legitimate when (1) the agency has a compelling justification for the remand, (2) the justification for the remand is not outweighed by the need for finality, and (3) the scope of the remand is appropriate.  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 37 CIT___, 882 F. Supp. 2d 1377, 1381 (2013), referencing *Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 29 CIT 1516, 1522-26, 412 F. Supp. 2d 1330, 1336-39 (2005).  Requests that are frivolous or made in bad faith, including those that compromise legitimate concerns for finality,

are based on non-binding policy statements, or are merely legal tactics applied to avoid judicial review, may be denied.[10]

    1.  Calculation of Financial Ratio

        Kangtai, Arch, and Jiheng contend Commerce failed to follow its stated practice for adjusting financial statements and this resulted in the improper calculation of the financial ratio in the *Final Results*. The parties argue that the ILO wage rate Commerce used to value the labor FOP includes labor, retirement, and employee benefit expenses, and that these expenses will be double counted if Commerce does not adjust the financial ratio to correctly reflect the financial statements. Kangtai Rule 56.2 Mot. at 31-38; Arch & Jiheng Rule 56.2 Mot. at 21-24.  In its first remand request, Commerce does not admit that it erred in its calculation of the SG&A financial ratio, but contends that as a result of the number of possible surrogate countries that existed after the *Preliminary Results*, Kangtai, Arch, and Jiheng did not get the opportunity to comment on the calculation and Commerce did not have the opportunity to respond to comments.  Commerce asks to address these comments in the first instance and accordingly "respectfully request[s] the Court remand the financial ratio calculation issue for Commerce to reconsider the SG&A financial ratio calculation in light of the comments concerning the alleged overstatement of labor in the normal value calculation".  It claims that the court would not "be able review Commerce's determination,

---

[10]  *See Gleason Indus. Products, Inc. v. United States*, 31 CIT 393, 396 (2007), referencing *Corus Staal, BV v. U.S. Dep't of Commerce*, 27 CIT 388, 391, 259 F. Supp. 2d 1253, 1257 (2003) (suggesting "merely a change in policy" will not justify a voluntary remand over an interested party's objection), and *Lutheran Church--Missouri Synod v. Fed. Communications Comm'n*, 141 F.3d 344, 349 (D.C. Cir. 1998) (refusing to grant a "novel, last second motion to remand" which was based on a prospective policy statement that did not bind the FCC and stating that "the Commission has on occasion employed some rather unusual legal tactics when it wished to avoid judicial review, but this ploy may well take the prize").

if the interested parties and Commerce have not in the first instance raised, considered and addressed the arguments." Def's Resp. at 51-52.

Commerce has a substantial and legitimate concern for requesting remand. Correcting a possibly inaccurate determination of normal value is a compelling reason for a remand request.[11] The need for finality in this instance is also not outweighed by the concern of protecting the administrate review from material inaccuracy. Further, Commerce has limited its request to the financial ratio calculation and this scope is appropriate. It does not appear Commerce's substantial and legitimate concern is frivolous or in bad faith, and Commerce's request for remand to reconsider the SG&A financial ratio calculation is granted. On remand, Commerce is requested to address the arguments as raised in the parties' briefs before the court.

Kangtai alleges that Commerce further erred in its financial ratio calculation by relying on a 2011 financial statement for Mabuhay Vinyl Corporation ("MVC"), a Philippine producer of sodium hypochlorite, that is not on the record. Kangtai Rule 56.2 Mot. 38-39, referencing App'x III.45, Surrogate Value Memorandum ("surrogate value chart"). Although Commerce references MVC's "2011" financial statement in the surrogate value chart, this reference

---

[11] Kangtai argues the court should not grant remand for Commerce to "consider these comments" on the "alleged overstatement of labor", but instead asks for remand to Commerce "to make the adjustments it said it would make but failed to execute" in the review which are consistent with its *Labor Methodologies* and its final determinations in *Stainless Steel Sinks* and *Certain Steel Nails*. Kangtai Reply at 20-21, referencing *Drawn Stainless Steel Sinks From the People's Republic of China: Investigation, Final Determination*, 78 Fed. Reg. 13019 (Feb. 26, 2013) and accompanying issues and decision memorandum at cmt. 4, and *Certain Steel Nails From the People's Republic of China: Final Results of the Fourth Antidumping Duty Administrative Review*, 79 Fed. Reg. 19316 (Apr. 8, 2014) and accompanying issues and decision memorandum at cmt. 2. In response, Commerce asks in its remand request to address the comments made by both Jiheng and Kangtai concerning the SG&A financial ratio. The language of the request is appropriate and encompasses the concerns Kangtai raise in its comments on this issue.

is merely a typographical error. The record supports Commerce's claimed reliance on the 2010

MVC financial statement[12] in its calculation of the financial ratio.

The court recognizes a presumption of administrative legality and regularity in AD

cases, and presumes that if the 2011 MVC had been submitted to Commerce it would have been

included on the record.[13] There is no indication in the papers before the court that a 2011 MVC

financial statement was ever submitted to Commerce, nor do any of the parties argue that it ever was

part of the administrative record. Commerce cites to its reliance on the 2010 MVC financial

statement in its *Final Results*,[14] and the numbers stated by Commerce in the surrogate value chart

correspond to the numbers in the 2010 MVC financial statement.[15] The record accordingly does not

support Kangtai's assertions that Commerce used a 2011 MVC financial statement, and Commerce's

explanation with respect to the financial statement that it did rely upon is reasonable.

---

[12]   Jiheng Sur. Value Sub. (Jan. 9, 2012), PDoc 65 at Tab 4 ("2010 MVC Financial
Statement").

[13]   *See* 19 U.S.C. §1516a(b)(2)(A) (documents presented or obtained by Commerce are
included as part of the administrative record); *see also Bohler-Uddeholm Corp. v. United States*, 20
CIT 1336, 1343, 946 F. Supp. 1003, 1009 n.18 (1996) (citations omitted).

[14]   I&D Memo at cmt. 13, referencing 2010 MVC Financial Statement.

[15]   *See, e.g.*, the identical figures in: the 2010 MVC Financial Statement "Consolidated
Statements of Income -- Net Sales" section and the "Sales" line of the surrogate value chart
(1,217,602,316 PHPs); the 2010 MVC Financial Statement "Consolidated Statements of Income --
Cost of Sales" section and the "Cost of Sales" line in the surrogate value chart (863,303,184 PHPs);
the 2010 MVC Financial Statement "Consolidated Statements of Income -- Direct Labor" section
and the "Direct Labor" line on the surrogate value chart (26,437,846 PHPs).

2.  Change in Methodologies

In its second and third requests Commerce seeks voluntary remand to explain its change in methodology, consider comments by the parties, and collect additional relevant information if necessary, for its valuation of the by-products ammonia gas and sulfuric acid and its calculation of intra-company transportation.  Def's Resp. at 53-54.  Although adherence to previous methodology may be required in some instances, a change in Commerce's practice or methodology may be permitted in an administrative review if the change is for an adequate cause, if Commerce provides a reasoned explanation, and in making this change Commerce provides parties with timely notice and sufficient opportunity to provide the information required by the revised methodology.[16]

a.  Calculation of Intra-Company Transportation of Intermediate Products

Commerce requests remand "to reconsider and explain its treatment and calculation of intra-company transportation" of intermediate products in response to Arch and Jiheng's challenge of its methodology, and its concern is both substantial and legitimate.  *See* Def's Resp. at 54, referencing I&D Memo at cmt. 16.  In the *Final Results*, Commerce changed the methodology it applied for valuing the intra-company transportation of intermediate products, treating it as a separate factor of production rather than considering it to be included in overhead as it did in its *Preliminary Results*, without justifying this change.  *Id.*  The need for an agency to adequately

---

[16]  *See, e.g.*, *Arch Chemicals, Inc. v. United States*, 33 CIT 954, 963-64 (2009); *Anshan Iron & Steel Co., Ltd. v. United States*, 27 CIT 1234, 1241-42 (2003); *Fujian Mach. and Equip. Imp. & Exp. Corp. v. United States*, 25 CIT 1150, 1169-70, 178 F. Supp. 2d 1305, 1326-27 (2001); *Hussey Copper, Ltd. v. United States*, 17 CIT 993, 998, 834 F. Supp. 413, 419 (1993); *Shikoku Chemicals Corporation v. United States*, 16 CIT 382, 388, 795 F. Supp. 2d 417, 421 (1991).

address a departure from past practice is a compelling justification for a remand request.[17]  The

concern addressed by Commerce in its request, ensuring consistency in AD proceedings, is not

outweighed by the need for finality.[18]  Explaining a change in methodology for the calculation of

one FOP is an appropriate scope for a remand request.  There is no indication Commerce's

substantial and legitimate concern is frivolous or in bad faith. Commerce's remand request is

granted.  On remand, Commerce is requested to collect additional relevant information if necessary,

provide the parties an opportunity to comment on any new additional information, and provide an

explanation that addresses the parties comments either in their briefings if no additional information

is collected or as may be submitted to Commerce.

    b.  By-Product Valuation Methodology

         Commerce claims that it changed its by-product valuation methodology for ammonia

gas and sulfuric acid from the *Preliminary Results* to the *Final Results* without providing an

explanation for the change.[19]  Clearon, Kangtai, and Arch all challenged the determination in their

---

[17]  *See SKF USA Inc. v. United States*, 31 CIT 951, 959, 491 F. Supp. 2d 1354, 1362 (2007) ("it is within Commerce's expertise and discretion to update its methodology for both increased accuracy and ease of use") (citation omitted); *see also Shakeproof Assembly*, *supra*, 29 CIT at 1522, 412 F. Supp. 2d at 1336, referencing *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. Of Trade*, 412 U.S. 800, 808 (1973) ("it is an established principle of administrative law that an agency has a 'duty to explain its departure from prior norms').

[18]  *See Allied Tube & Conduit Corp. v. United States*, 29 CIT 502, 508, 374 F. Supp. 2d 1257, 1262 (2005) ("Commerce must explain why it chose to change its methodology and demonstrate that such change is in accordance with law and supported by substantial evidence") (citation omitted); *see also Hussey Copper, Ltd.*, 17 CIT at 998, 834 F. Supp. at 419 (requiring remand on the ground that Commerce "failed to adequately articulate the reasons for its departure from its normal practice").

[19]  Commerce claims it valued ammonia gas and sulfuric acid with individual surrogate values for each by-product in the *Preliminary Results*, and in the *Final Results* valued the two by-
(continued...)

motions,[20] and Commerce "respectfully requests a voluntary remand . . . to consider these comments,

provide an explanation and collect additional relevant information if necessary." Def's Resp. at 53-

54, referencing *SKF I*, *supra*, 254 F.3d at 1029. Kangtai, however, opposes its request for remand

arguing that contrary to Commerce's claims the record contains the information necessary for

valuing the two by-products, as evidenced by Commerce's calculation of the surrogate value costs

in the *Preliminary Results*. It asks the court to restore the *Preliminary Results'* treatment of

Kangtai's by-product on remand. Kangtai Reply at 9-10, referencing Def's Resp. at 53-54.[21]

Kangtai also opposes remand on the grounds that Commerce excessively delayed briefing on the

issue and that it did not properly brief the merits of its request. *Id.* at 10-11.

---

[19] (...continued)
products by using the value of the down-stream product ammonium sulfate. *See* Def's Resp. at 53-
54, referencing *Preliminary Results*; *see also* I&D Memo at cmt. 14 (stating "[w]e are adjusting the
manner in which we calculate the by-product offsets for both Jiheng and Kangtai to conform to the
Department's recent practice. [Commerce] considers this by-product methodology more reasonable
than the by-product methodology employed for the *Preliminary Results* because it is consistent with
the information [Commerce] requests in our questionnaire . . ." and acknowledging it did not have
information necessary on the record to calculate the by-product offsets).

[20] Clearon claimed that by using the value of the downstream product ammonia sulfate in
its calculation Commerce overstated the value of the by-products, ammonia gas and sulfuric acid.
It requests remand so that Commerce may collect appropriate information and adjust the value to
include only the by-products. Clearon Rule 56.2 Mot. at 20-25. Arch, Jiheng, and Kangtai argued
that Commerce changed its methodology without providing an explanation and that it should value
the by-products individually as it had done in previous review. Kangtai Rule 56.2 Mot. at 39-40;
Arch & Jiheng Rule 56.2 Mot. at 24-31.

[21] Kangtai argued in its Motion for Judgment on the Agency Record that by valuing the
offset based on the surrogate value for inputs, Commerce did not select the "best available
information" for the by-product offset and that its determination was unlawful and unsupported by
substantial evidence. It also claimed that no party asked for the change and that Commerce
conceded it was missing the information to effect its change. Kangtai Rule 56.2 Mot. at 39-40.

Kangtai's contention that Commerce did not properly brief the merits of its request

lacks merit. In its remand request Commerce explained its change in methodology from the

*Preliminary Results* to the *Final Results*. The court may reasonably deduce from the request that

Commerce desires to reconsider its by-product methodology determination in light of the comments

made Kangtai, Arch and Clearon, obtain additional information if necessary, and permit the parties

to comment if additional information is collected.[22]

Commerce's concern is substantial and legitimate. Commerce provides evidence that

it changed its methodology, and, as discussed above, addressing a change in methodology is a

compelling justification for requesting a remand. The need for finality is not outweighed by the

need for Commerce to ensure an accurate and consistent review result.[23] Here, Commerce is not

attempting to "delay the day of reckoning" or asking for a "do-over anytime it wishes"[24] instead, its

request to address a seeming departure from its past practice is consistent with the applicable

statutory objective of "[securing] the just, speedy and inexpensive determination of every action and

proceeding". *See* USCIT Rule 1. Commerce further appropriately limited the scope of its request

to address a change in one methodology, the valuation of by-products, and it does not appear its

---

[22] Def's Rep. at 53-54. *See, e.g., Albemarle Corp. v. United States,* 37 CIT ___, Slip Op. 13-106 (Aug. 15, 2013).

[23] *Cf. Civil Aeronautics Board v. Delta Air Lines, Inc.*, 367 U.S. 316, 321 (1961) (noting the significance of the public interest in reaching what, ultimately, appears to be the right result in weighing a reconsideration request) (citation omitted); *see also SKF USA Inc. v. United States*, 630 F.3d 1365, 1373-74 (Fed. Cir. 2011) (Commerce has an obligation to provide an explanation and address important factors raised by comments from petitioners and respondents), referencing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1358 (Fed. Cir. 2005), and *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997).

[24] *Corus Staal BV v. United States*, 29 CIT 777, 783, 387 F. Supp. 2d 1291, 1297 (2005) *aff'd*, 186 F. App'x 997 (Fed. Cir. 2006).

substantial and legitimate concern is frivolous or made in bad faith.  The court grants Commerce's

remand request.[25]  On remand, Commerce is requested to collect additional relevant information if

necessary, provide the parties an opportunity to comment on any new additional information, and

provide an explanation that addresses the parties comments either in their briefings if no additional

information is collected or as may be submitted to Commerce.

### B.  Primary Surrogate Country Selection

Kangtai requests remand concerning Commerce's choice of the Philippines as the

primary surrogate country.  It argues that contrary to Commerce's findings, India is an economically

comparable country to the PRC and that India should have been selected as the surrogate country

for the review.  Supporting its claim Kangtai avers that Commerce's sole reliance on *per capita* GNI

to determine economic comparability is unreasonable, that Commerce misapplied its surrogate

country selection methodology, and that the range of *per capita* GNIs Commerce determined to be

proximate and economically comparable to the PRC is not supported by substantial evidence.

Kangtai Rule 56.2 Memo at 6-11(citations omitted).

---

[25]  Kangtai states the court must deny remand "to consider the issues anew and gather new information because [Commerce] . . . ultimately never answered the question of why [Commerce's] longstanding practice to value the immediate by-products generated in production of the subject merchandise should be abandoned" and because Commerce "unilaterally decided not to provide any reason whatsoever supported by the record that would have justified change in its practice." Kangtai Reply at 10.  The language of the remand request is appropriate.  Commerce requests remand to address the shortcomings in the *Final Results* that Kangtai points out: a lack of explanation for a change in by-product methodology.   In passing, this court notes Kangtai and Arch allege that the issue is not properly raised here, as Clearon failed to exhaust administrative remedies concerning its contention that the respondents responses were insufficient for the proper by-product valuation of ammonium sulfate. For this court to comment on these allegations at this point would be premature.

As discussed above, when valuing factors in AD reviews for NMEs Commerce must select data that are the "best available information" on the record. Commerce is also required under 19 U.S.C. §1677b(c)(4) to use "to the extent possible" surrogate country data that comes from one or more market economy countries that are (1) at "a level of economic development comparable to that of the nonmarket economy country" and (2) "significant producers of comparable merchandise". In making its surrogate country selection Commerce as a matter of policy applies a four-step procedural approach that is a "*sequential* consideration of the statutory elements". *See Import Administration Policy Bulletin 04.1: Nonmarket Economy Surrogate Country Selection Process* (Mar. 1, 2004) (italics added), *available at* http://ia.ita.doc.gov/policy/bull04-1.html (last visited July 10, 2014) ("Policy Bulletin 4.1"). First, Commerce's Office of Policy creates a list of potential surrogate countries that are at a "comparable level of economic development" to the NME country at issue ("potential surrogate country list"). Second, Commerce determines which countries on the potential surrogate country list are also producers of "comparable merchandise" to the merchandise subject to the AD order. Third, Commerce determines if any of the countries that satisfy steps one and two are also "significant" producers of the merchandise**.** Fourth, if more than one country exists in the selection process, Commerce chooses the country with the "best factors data" quality by evaluating the data's availability, reliability, and adequacy. Commerce generally selects a country from the potential surrogate country list, but will "go off" list if it determines all of the final listed countries lack sufficient data. Commerce also has a regulatory preference for valuing all surrogate values from one surrogate country. *See* 19 C.F.R. §351.408(c)(2).

Following this sequential approach Commerce listed the Philippines, Indonesia, Ukraine, Thailand, Columbia, and South Africa in its Surrogate Country Memorandum as those

countries it considered to be "economically comparable to [the PRC] and most likely to have good

data availability and quality" based on the 2011 World Development Report from the World Bank.

*See* Surrogate Country Memorandum, referencing World Development Report 2011, World Bank.

    1.  *Per Capita* GNI as Indicator of Economic Comparability

      Kangtai first challenges Commerce's sole reliance on *per capita* GNI to identify

economically comparable countries to the PRC, arguing Commerce's reliance on the measure is

unreasonable and contrary to law.[26]  Kangtai contends that Commerce has used India as the primary

surrogate country in the past 20 reviews, and that although it is aware that Commerce "always

included its form language about economic comparability and GNI even when consistently selecting

India as the primary surrogate country", *per capita* GNI is a crude benchmark for determining

economic comparability that does not consider all factors that contribute to determining if a country

has a comparable significant industry.  Kangtai Reply at 1; Kangtai Rule 56.2 Mot. 7-8.  To support

its claims Kangtai argues, without citation to the record, that "in modern times, [the PRC], India and

the United States are compared frequently and generally as leading world economies", that India is

"one of the world's largest countries with one of the largest economies", and that "it is self-evident

that India is more economically developed than the Philippines but only due to its large population

its *per capita* GNI ranking falls below the Philippines."  Kangtai Rule 56.2 Mot. at 7-8**.**

      The court finds Kangtai's arguments unpersuasive, and Commerce's reliance on *per*

*capita* GNI reasonable and in accordance with law.  In the *Final Results* Commerce explained that

its selection of economically comparable countries for the review was consistent with its "long-

---

[26]  Kangtai Rule 56.2 Mot. at 7, referencing 19 U.S.C. §1516a(b)(1)(B)(I) and *Chevron U.S.A., Inc.*, *supra*, 467 U.S. 837 (1984).

standing and predictable practice of selecting economically comparable countries on the basis of

GNI".[27]  Commerce is provided substantial deference in both the interpretations of its AD statutes

and the methodology it applies to fulfill its statutory mandate, and under the second prong of

*Chevron* its interpretation will be sustained if it is found to be reasonable.[28]  Commerce is not

required by statute or regulation to select the same surrogate country it did in previous reviews, or

the country with largest economy, or the most populated country, as Kangtai suggests.  Rather, in

*each* segment of the proceeding Commerce must value the factors of production from a surrogate

country that is *at a level of economic development comparable to that of the NME* and a *significant*

*producer of comparable merchandise*.  *See* 19 U.S.C. §1677b(c)(4); *see also* 19 C.F.R. §351.408(b)

(italics added).  The applicable statute does not expressly define the phrase "level of economic

development comparable " or what methodology Commerce must use in evaluating the criterion.

19 U.S.C. §1677b(c)(4).  19 C.F.R. §351.408(b) states that although other information may be

considered when Commerce determines if a country is at a level of economic development

comparable to the NME under 19 U.S.C. §1677b(c)(2)(B) or 19 U.S.C. §1677b(c)(4)(A), primary

emphasis will be placed on *per capita* GDP as the measure of economic comparability.  Commerce

later amended its methodology and explained that it now "uses *per capita* GNI, rather than *per*

*capita* GDP, because while the two measures are very similar, *per capita* GNI is reported across

---

[27]  I&D Memo at cmt. 2, referencing *Magnesium Metal From the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 65450 (Oct. 25, 2010), and accompanying issues and decision memorandum at cmt. 4.

[28]  *United States v. Eurodif S.A.*, *supra*, 555 U.S. at 316; *accord Timken Co.*, *supra*, 354 F.3d at 1342 ("any reasonable construction of the statute is a permissible construction"), citing *Torrington*, *supra*, 82 F.3d at 1044, and *SKF I*, *supra*, 254 F.3d at 1027.

almost all countries by an authoritative source (the World Bank), and because the Department believes that the *per capita* GNI represents the single best measure of a country's level of total income and thus level of economic development." *Antidumping Methodologies in Proceedings Involving NonMarket Economy Countries: Surrogate Country Selection and Separate Rates*, 72 Fed. Reg. 13246, 13246 n.2 (Mar. 21, 2007) (req. for cmts.).

Kangtai suggests that instead of using GNI to measure economic comparability, Commerce should have considered the chemical industry under review. Pointing to Indian data available for the subject merchandise Kangtai argues that India "has, and has had, a large and established chemicals industry from which to draw surrogate values - far more established than the other countries under consideration" and that "[N]o other country comes close to this amount of quality data."[29] The metric proffered by Kangtai, however, only addresses the second prong of the surrogate country criteria which requires a country be a "significant producer of comparable merchandise" without addressing economic comparability.[30]

The court in *Jiaxing Brother* recently addressed arguments similar to those raised by Kangtai. There the plaintiff claimed India's steel industry was more comparable to the PRC's than it was to the selected surrogate country, Thailand, regardless of the *per capita* GNI of each of the countries. It averred that Commerce's use of GNI as a measure of economic comparability was

[29] Kangtai claims that there is no good substitute for India that complies with Commerce's policy of selecting a country that provides both "good data availability and quality", and that both Commerce and the interested parties have voiced difficulties about finding surrogate values for the subject merchandise beyond those which come from the India data. Kangtai 56.2 Mot. at 7-9 (citations omitted).

[30] *See Jiaxing Brother Fastener Co. v. United States*, 38 CIT___, Slip Op. 14-12 (Feb. 6, 2014) (hereinafter "*Jiaxing Brother*") at 10, referencing 19 U.S.C. §1677b(c)(4)(B).

unreasonable and that it should have instead applied an industry-sensitive approach to determine economic comparability. *See Jiaxing Brother*, *supra*, Slip Op. 14-12 at 9-10. The court questioned how the industry-sensitive approach offered by the plaintiff would be administrable across all NME cases, noting the approach both "leaves open to debate which metrics Commerce should utilize to identify economically comparable countries" and makes identifying a surrogate country early in the proceedings "difficult if not impossible." *See id.* at 11. Determining that Commerce's use of *per capita* GNI was a reasonable interpretation of its statutory mandate to identify and select a surrogate country at a "level of economic development comparable" to the NME, the court found that *per capita* GNI is a "consistent, transparent, and objective metric to identify and compare a country's level of economic development." *Id.* at 10. The *Jiaxing Brother* decision is persuasive on this issue and Commerce's use of GNI as a measure of economic comparability in the instant review is reasonable interpretation of the statute and is in accordance with law.

2.   Application of Methodology for Selecting a Primary Surrogate Country

Kangtai claims Commerce erred in applying its surrogate country selection methodology resulting in the improper elimination of India as a surrogate country. Kangtai unconvincingly argues the court is split on this issue. It contends that the *Amanda Foods*[31] and *Ad Hoc Shrimp*[32] decisions correctly interpreted the statue by requiring a "weighing" of the three criteria - economic comparability, significant producer of comparable merchandise, and data availability –

---

[31] *Amanda Foods (Vietnam) Ltd. v. United States*, 33 CIT 1407, 647 F. Supp. 2d 1368 (2009) (hereinafter "*Amanda Foods*").

[32] *Ad Hoc Shrimp Trade Action Comm. v. United States*, 36 CIT ___, 882 F. Supp. 2d 1366, 1375 (2012) (hereinafter "*Ad Hoc Shrimp*").

while the *Jiaxing Brother* and *Foshan Shunde*[33] decisions, which Commerce followed in the instant review, misconstrued the statute by approaching *per capita* GNI ranking as threshold statutory criterion. Kangtai Reply at 3-9.

The court is not split on the application of the surrogate country eligibility criteria as Kangtai suggests. All four cases approach the selection process by treating the *per capita* GNI ranking as a threshold statutory criterion that must be met before the other criteria are considered. The cases are, however, distinguishable as they address issues in two different stages of the surrogate country selection process. In *Foshan Shunde* and *Jiaxing Brother*, as in this matter, the court addressed the argument that a country which did not meet the threshold *per capita* GNI ranking criterion and was not on the potential surrogate country list in the Surrogate Country Memorandum, should still be considered economically comparable to the NME.[34] In *Amanda Foods* and *Ad Hoc Shrimp,* the court addressed challenges to Commerce's surrogate country selection between two countries listed on the Surrogate Country Memorandum which had met the threshold *per capita* GNI ranking criterion.

The plaintiff in *Amanda Foods* challenged Commerce's selection of Bangladesh as the primary surrogate country for Vietnam, and contended Commerce erred in applying Policy

---

[33] *Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States*, 37 CIT ___, 896 F. Supp. 2d 1313 (2013) (hereinafter "*Foshan Shunde*").

[34] *See id.* at 1318-25 (plaintiffs unsuccessfully argued that Commerce's selection of a country listed on the potential surrogate country list in the Surrogate Country Memorandum, Indonesia, was unreasonable and accordingly unsupported by substantial evidence and that Commerce should have instead selected India, a country not on the list); *see also Jiaxing Brother*, *supra*, Slip Op. 14-12 at 4-14 (plaintiffs unsuccessfully argued that Commerce's selection of a country listed on the potential surrogate country list in the Surrogate Country Memorandum, Thailand, was unreasonable and accordingly unsupported by substantial evidence and that Commerce should have instead selected India, a country not on the list).

Bulletin 4.1 in its surrogate country selection by not addressing the GNI differential between

Vietnam and Bangladesh as compared to the differential between Vietnam and another country on

the potential surrogate country list, India.  The court ordered remand, finding that Commerce did

not provide more than conclusory reasoning of why the GNI discrepancy between two countries on

the potential surrogate list did not affect Commerce's final surrogate country selection:

> Nor has Commerce explained why the difference between Bangladesh and Vietnam,
> in *per capita* GDP, is not relevant in this case or why the difference in economic
> similarity to Vietnam is outweighed by the differences in quality data between
> Bangladesh and India.  Rather, without explanation, Commerce has adopted a policy
> of treating all countries *on the surrogate country list* as being equally comparable to
> Vietnam.  As Commerce's chosen designation has not been supported by any
> justification or evidence at all, it is not supported by substantial evidence.
>
> Significantly, [Commerce's] Policy Bulletin states that each Surrogate Country
> Memorandum must explain how the chosen country satisfies each element of the
> statutory criteria.  In accordance with [Commerce's] own policy, therefore, the
> Surrogate Country Memorandum must explain why its chosen surrogate country is
> at a level of economic development comparable to Vietnam.  The memorandum in
> this case does not do so.  Accordingly, the court cannot find on this record that
> Commerce's surrogate country selection is supported by substantial evidence.

*Amanda Foods, supra*, 33 CIT at 1413, 1415, 647 F. Supp. 2d at 1376-78 (citations omitted; italics

added).

In *Ad Hoc Shrimp* the plaintiff argued Commerce should choose Thailand rather than

India from the potential surrogate country list as the primary surrogate country for the PRC. The

court evaluated Commerce's policy of treating all countries on the potential surrogate list as

equivalent in terms of economic comparability and ordered remand after finding Commerce's

selection of India was not supported by a reasonable reading of the record:

> Commerce's policy of disregarding relative GNI differences *among potential
> surrogates* for whom quality data is available and who are significant producers of
> comparable merchandise is not reasonable, because it arbitrarily discounts the value

of economic comparability relative to the remaining eligibility criteria (*i.e.*, significant production of comparable merchandise and quality of data). While it is true, as Commerce emphasizes, that the most economically comparable country would not be a reasonable surrogate choice if the dataset from that country was inadequate, this is equally true of the remaining criteria. Thus, for example, the most economically comparable country would be an unreasonable surrogate choice if it were not a significant producer of comparable merchandise, and the country with the absolute best dataset would similarly be an unreasonable surrogate choice if it were not economically comparable to the NME in question. Indeed, Commerce's own policy suggests that none of the three surrogate country eligibility criteria -- economic comparability, significant production of comparable merchandise, and quality data -- is preeminent.

Because none of Commerce's three surrogate country eligibility criteria is preeminent, it follows that relative strengths and weaknesses among *potential surrogates* must be weighed by evaluating the extent to which the *potential surrogates* satisfy each of the three criteria. If, for example, one *potential surrogate* has superior data quality and another is closer in GNI to the NME in question, Commerce must weigh these differences when selecting the appropriate surrogate. An unexplained and conclusory blanket policy of simply ignoring *relative GNI comparability within a particular range of GNI values* does not amount to a reasonable reading of the evidence in support of a surrogate selection *where more than one potential surrogate within that GNI range* is a substantial producer of comparable merchandise for which adequate data is publicly available. Rather, in such situations, Commerce must explain why its chosen surrogate's superiority in one of the three eligibility criteria *outweighs another potential surrogate's superiority* in one or more of the remaining criteria.

*Ad Hoc Shrimp*, *supra*, 36 CIT at ___, 882 F. Supp. 2d at 1374-75 (citations omitted; italics added).

Kangtai's attempt to demonstrate a split in the court's jurisprudence is misplaced.

The issue before the court in *Amanda Foods* and *Ad Hoc Shrimp* was not the initial placement of a

country on the potential surrogates list as it was in *Foshan Shunde* and *Jiaxing Brother*, but rather

the merits of each of the potential surrogates on the list relative to each other.[35] Commerce complied

---

[35] *See* Commerce Policy Bulletin 4.1; *see also, e.g., Ad Hoc Shrimp Action Committee v. United States,* Slip Op. 14-59, 38 CIT ___ (May 29, 2014) at 11 n.17 (discussing the application of the *per capita* GNI threshold statutory criterion versus a later weighing of the three criteria):

[I]mportantly, Bangladesh's relatively less similar GNI to that of [the NME] (when

(continued...)

with the applicable statute and regulation in applying the surrogate country methodology in the review.

Kangtai also unconvincingly argues that the surrogate country selection methodology Commerce applies results in "a surrogate country list that changes from review to review" and that it contravenes the importance of the AD law which is selecting a "reliable, consistent surrogate for [the PRC]". It claims that it was prevented from receiving notice of Commerce's change in surrogate country and that parties have no way of predicting what the normal value of their products will be in each segment of the review. Kangtai Rule 56.2 Mot. at 10-11; Kangtai Reply at 2-3.

As discussed above, Commerce is not required by statute or regulation to select the same potential surrogate countries or final surrogate country in each review, nor is it required to select the same surrogate country from the *Preliminary Results* to the *Final Results*. In each review, parties are given opportunities to present and comment on surrogate country selection and are presumed aware of the possible countries that may be selected as well as of the possibility that the selected surrogate country may change from review to review. This is true for the present review where Kangtai commented on the surrogate country selection after being informed early in the proceedings of the potential countries that may be selected. *See* Surrogate Country Memorandum at 5; *see* Request for Surrogate Country Cmts. (Oct. 28, 2011), PDoc 37; *see generally* Kangtai Sur.

---

[35] (...continued)
compared with India's GNI) does not affect Commerce's determination that all three potential surrogate countries independently fell within the range of economic comparability to [the NME], and therefore that data from all three countries would satisfy that threshold statutory requirement. The appropriateness of placing Bangladesh on the initial potential surrogates list (based on Commerce's finding that Bangladesh's GNI fell within the range of economic comparability to [the NME]) is uncontested . . . [and] Commerce's initial placement of Bangladesh on the potential surrogates list is not the issue before the court.

Country Cmts. (Dec. 19, 2011), PDoc 58; Kangtai Sur. Value Sub. (Jan. 9, 2012), PDocs 69, 70;

Kangtai Sur. Value Sub. for Final Results (Sept. 5, 2012), PDocs 116, 117.[36]  Although, Kangtai

may not be completely certain of the country Commerce will choose as a surrogate, as a participant

in previous administrative reviews it is aware of the process and methodology Commerce follows,

and that the surrogate country selection occurs as part of a retroactive process where Commerce

applies duties to entries after they have been sold.

    3.  Range of GNI Used by Commerce to Determine Economically Comparable Countries

        Kangtai next challenges the range of GNI Commerce used to make its surrogate

country selection and to determine that India was not a level of economic development comparable

to the PRC.  Arguing Commerce's decision to eliminate India was not supported by substantial

evidence, Kangtai claims that Commerce has failed to provide any analysis explaining why countries

are economially comparable to the PRC "if they are within a particular range of GNI, as opposed

to a larger or smaller range" or why the range "changed from year to year".[37]

---

[36]  Kangtai argues The Omnibus Trade Act Report is evidence that Congress voiced similar
fairness concerns about the retroactive application of factors of production in the surrogate country
selection methodology.  *See* Kangtai Rule 56.2 Mot. at 10-11, citing Omnibus Trade Act Report S.
Rep. No. 100-71 at 106 (1987).  However; Kangtai's argument is based on a selective reading of the
report, which addresses concerns that imports from the PRC not be unfairly disadvantaged by the
methodology when "price differences can be accounted for in whole or in part by quality differences
in the imported merchandise":

    The Committee is particularly concerned that the imports from certain nonmarket
    economy countries, such as the People['] s Republic of China, not be unfairly
    disadvantaged by the use of the new methodology [the factors of production
    methodology] where price difference can be accounted for in whole or in part by
    quality differences in the imported merchandise.  [Commerce] should ensure that, in
    computing the trade-weighted average price, it only uses prices that are in fact from
    arms-length sales to unrelated parties.

[37]  Kangtai Reply at 1, referencing *Consol. Edison Co.*, *supra*, 305 U.S. at 229.  *See* Kangtai
(continued...)

Commerce is granted broad discretion in its selection of surrogate countries for AD proceedings, and the court "will not impose its choice of which economy is more comparable . . . provided the choice made by Commerce is sufficiently reasonable and supported by evidence." *See* 19 U.S.C. §1516a(b)(1)(B); *see also Technoimportertexport and Peer Bearing Co. v. United States*, 15 CIT 250, 255, 766 F. Supp. 1169, 1175 (1991) (citation omitted).  Commerce is not required to set a fixed range of GNIs into which potential surrogate countries must fall, but it must provide a reasoned explanation which permits the court to determine the process by which it reached its result was logical and rational, and this explanation must be supported by the administrative record.[38]

Commerce created the potential surrogate country list for the segment of the review at issue without explanation.  The Surrogate Country Memorandum which contains the potential surrogate country list states:

> With regard to the first statutory requirement, the six countries on the non-exhaustive list below are at a level of economic development comparable to [the PRC] in terms of *per capita* gross national income (GNI).  *Per capita* is the primary basis for determining economic comparability.
>
> This list provides you the countries that are economically comparable to [the PRC] and the most likely to have good data availability and quality.  You may also

---

[37] (...continued)

Compl. ¶ 14 ("[t]he Department's conclusion that India was not at a level of economic development comparable to [the PRC] was not supported by substantial evidence"), referencing 19 U.S.C. §1677b(c)(1) and 19 U.S.C. §1677b(c)(2)(B) (requiring that the Department select surrogate values from "one or more market economy countries that are at a level of economic development comparable to that of" the PRC).

[38] *See, e.g.*, *Dorbest Ltd. v. United States*, 30 CIT 1671, 1677, 462 F. Supp. 2d 1262, 1269-70 (2006); *see also Ad Hoc Shrimp*, *supra*, 36 CIT at ___, 882 F. Supp. 2d. at 1374, citing *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational").

consider other countries on the case record if the record provides you adequate information to evaluate them.

Surrogate Country Memorandum.  While dismissing Kangtai's argument that India is economically comparable to the PRC in its *Final Results,* Commerce again made its determination without explanation:

> In the *Preliminary Results* [Commerce] stated that, for the purpose of selecting a surrogate country, Colombia, Indonesia, the Philippines, South Africa, Thailand and Ukraine were equally comparable to the PRC in terms of economic development. The list is comprised of countries that are proximate to the PRC in terms of GNI . . .. [T]he list did not include India because India's *per capita* GNI did not fall within the range of countries proximate to the PRC.

> [Commerce] finds that the selection of the range of economically comparable countries base on GNI, included in the Surrogate Country Memorandum, is reasonable and consistent with the Tariff Act of 1930, as amended.

I&D Memo at cmt. 2.

Even assuming, *arguendo*, the court could accept the *post hoc* rationalization Commerce provides in its Rule 56.2 response,[39] Commerce fails to provide India or the PRC's GNI ranking, India's GNI, or analysis, beyond conclusory statements, explaining why the GNIs of the countries on the potential surrogate list qualify as economically comparable and proximate to the PRC's GNI while India's GNI does not.[40]  Commerce instead has advanced an explanation that

---

[39]  *See* Def's Resp. at 8 ("Although Commerce had selected India as the primary surrogate country in all of the earlier administrative reviews of this order, India became less economically comparable to [the PRC] over time.  Indeed, given the *per capita* GNI data in the World Bank Report, India's and [the PRC]'s *per capita* GNI rankings had moved so far apart that Commerce dropped India from its surrogate country list, substituting other, more comparable countries.") & 11 (the PRC "has a large population and a GNI that is much higher than that of India").

[40]  *Atcor, Inc. v. United States*, 11 CIT 148, 154, 658 F. Supp. 295, 300 (1987) ("[I]n reviewing agency action, the Court must base its decision upon the administrative record.  New evidence may not be received.  The Court must rely upon the rationale articulated by the agency.
(continued...)

amounts to "we did it because it is our policy to do it". This explanation is not reasonably adequate

to support a conclusion and cannot serve as a basis for Commerce's reasoned decision-making. *See*

*Ad Hoc Shrimp*, *supra*, 36 CIT at ___, 882 F. Supp. 2d at 1374, referencing *Consol. Edison Co.*,

*supra*, 305 U.S. at 229 (1938).

   After reviewing the record, the court also fails to find evidence on the record that

could reasonably support Commerce's conclusion.[41] The administrative record consists of "a copy

of all information presented to or obtained by [Commerce] during the course of the administrative

proceeding". 19 U.S.C. §1516a(b)(2)(A)(i). Although Commerce can and does take into

consideration its policies and methodologies as expressed in different administrative case precedent

when making its determination, it cannot take the factual information underlying those decisions into

consideration unless those facts are properly on the record of the proceeding before it.[42] Commerce

has relied upon the World Development Report to determine those countries whose GNIs it views

to be "proximate" and economically comparable to the PRC. It is therefore a part of the record. The

record, however, does to reflect its inclusion. If Commerce is in possession of such evidence then

---

[40] (...continued)
It may not rely upon *post hoc* rationalizations."), referencing *Abbott v. Secretary of Labor*, 3 CIT 54, 55 (1982), and *ILWU Local 142 v. Donovan*, 10 CIT 161 (1986).

[41] *PPG Indus. v. United States*, 978 F.2d. 1232, 1237 (Fed. Circ. 1992) (the court evaluates if the evidence on the record "could reasonably lead to [Commerce's] conclusion") (citations omitted).

[42] *Gourmet Equip. Taiwan Corp. v. United States*, 24 CIT 572, 577-78 (2000) ("Commerce's longstanding practice, upheld by this court, is to treat each segment of an antidumping proceeding, including the antidumping investigation and the administrative reviews that may follow, as independent proceedings with separate records and which lead to independent determinations").

it needs to incorporate it into the record so that the court may determine if that evidence could

reasonably lead to Commere's conclusion.[43]

Commerce's selection of the GNI range for economically comparable countries on

the potential surrogate country list and its determination that India does not qualify as a

economically comparable country is not supported by a reasonable analysis and record evidence.

For these reasons the court remands this issue to Commerce to (1) provide a reasonable explanation

why the range of the GNIs listed on the Surrogate Country Memorandum qualify the countries as

proximate and "economically comparable" to the PRC, including a discussion of why it believes

India's GNI does not, if that continues to be Commerce's determination, qualify it as an

economically comparable country, and (2) place the data on the record that it relied upon to make

its determination.

## C. Surrogate Value Selections

The parties also contest Commerce's surrogate value selection of the FOPs chlorine,

hydrogen gas, sodium hydroxide, electricity, and urea. As noted above, when valuing FOPs

Commerce must select the "best available information regarding the values of such factors in a

market economy or countries", 19 U.S.C. §1677b(c)(1)(B), and it has regulatory preference for

valuing all FOPs from a single surrogate country. 19 C.F.R. §351.408(c)(2) (Commerce will

"normally value all factors in a single surrogate country"). Commerce is provided substantial

---

[43] *See, e.g., Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377, 1379 (Fed. Cir. 2012) (stating that "[t]he grounds upon which an [agency action] must be judged are those upon which the record discloses that [the] action was based" and "review of an administrative decision must be made on the grounds relied on by the agency" such that "[i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis") (citations omitted).

discretion in its choice, but the court must be satisfied that when viewing the record as a whole a

reasonable mind could conclude the best available information was selected, and Commerce's

selection must be supported by substantial evidence and in accordance with law.  *See Dorbest Ltd.*,

*supra*, 30 CIT at 1676-77, 462 F. Supp. 2d at 1269.

    For the court to determine that a reasonable mind could conclude that the surrogate

value selections for chlorine, hydrogen gas, sodium hydroxide, electricity, and urea were the best

available information Commerce must justify its selections by conducting a "fair comparison of the

data sets on the record".[44]  This court is unable to make this determination considering that

Commerce has a preference for valuing all FOPs from a single country, and an evaluation of this

preference is part of Commerce's process of comparing and selecting potential surrogate values.

Commerce may decide to select a different surrogate country on remand and in doing so will need

to analyze its surrogate value selections for the FOP anew.  The court accordingly defers its

determination on these issues pending the completion of the redetermination.

## IV.  *Conclusion*

    For the reasons set forth above, this matter must be, and hereby is, remanded to

Commerce for further consideration of the surrogate financial ratios, by-product valuation

methodology, intra-company transport methodology, and the surrogate country selection in light of

Clearon, Kangtai, Arch and Jehing's arguments and all relevant intervening legal developments.

The results of remand shall be due October 21st, 2014, comments on the remand results shall be due

---

[44]  *See Amanda Foods*, *supra*, 33 CIT at 1417, 647 F. Supp. 2d at 1378-79, referencing *Olympia Indus., Inc. v. United States*, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998), and *Allied Pac. (Dalian) Co. v. United States*, 30 CIT 736, 757, 435 F. Supp. 2d 1295, 1313-14 (2006).

30 days from the date the remand results are filed with the court, and rebuttal commentary shall be

due 15 days thereafter.

**So ordered.**


                                                        /s/  R. Kenton Musgrave
                                                        R. Kenton Musgrave, Senior Judge

Dated: July 24, 2014
        New York, New York

U.S. Court of International Trade
LIVE Database (New York)
CIT DOCKET FOR CASE #: 1:13-cv-00073-RKM

Clearon Corporation et al v. United States
Assigned to: R. Kenton Musgrave
Lead Docket:

| | |
|---|---|
| Jurisdiction: | Date Filed: 02/21/2013 |
| 28USC § 1581(c) Antidumping or Countervailing Duty Determination(s) | Jury Demand: No |
| | Date Terminated: 11/23/2016 |
| Category: | Date Reopened: |
| Final Determination: 751 Periodic Review 19USC § 1516a(a)(2)(B)(iii) | |
| | Does this action raise an issue of constitutionality?: N |
| Agency: | |
| U.S. Department of Commerce | |

Product Description:
Chlorinated Isocyanurates

Export Country:
China

Plaintiff

Clearon Corporation              represented by    James R. Cannon , Jr.
                                                   Cassidy Levy Kent (USA) LLP
                                                   2000 Pennsylvania Avenue, NW.
                                                   Suite 3000
                                                   Washington, DC 20006
                                                   (202) 567-2318
                                                   Fax: (202) 567-2301
                                                   Email: jcannon@cassidylevy.com
                                                   LEAD ATTORNEY
                                                   ATTORNEY TO BE NOTICED
                                                   ATTORNEY IN SEALED GROUP
                                                   Bar Status: ACTIVE

                                                   Thomas Martin Beline
                                                   Cassidy Levy Kent (USA) LLP
                                                   2000 Pennsylvania Avenue, NW.
                                                   Suite 4500
                                                   Washington, DC 20006
                                                   (202) 567-2316
                                                   Fax: (202) 567-2301

Email: tbeline@cassidylevy.com
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

Ulrika Kristin Skitarelic Swanson
Cassidy Levy Kent (USA) LLP
2000 Pennsylvania Avenue, NW.
Suite 3000
Washington, DC 20006-1812
(202) 787-5505
Fax: (202) 567-2301
Email: uswanson@cassidylevy.com
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

Plaintiff

Occidental Chemical Corporation          represented by  James R. Cannon , Jr.
                                                          (See above for address)
                                                          LEAD ATTORNEY
                                                          ATTORNEY TO BE NOTICED
                                                          ATTORNEY IN SEALED GROUP
                                                          Bar Status: ACTIVE

                                                          Thomas Martin Beline
                                                          (See above for address)
                                                          ATTORNEY TO BE NOTICED
                                                          ATTORNEY IN SEALED GROUP
                                                          Bar Status: ACTIVE

                                                          Ulrika Kristin Skitarelic Swanson
                                                          (See above for address)
                                                          ATTORNEY TO BE NOTICED
                                                          ATTORNEY IN SEALED GROUP
                                                          Bar Status: ACTIVE

Consolidated Plaintiff

Juancheng Kangtai Chemical Co. Ltd.       represented by  Gregory Stephen Menegaz
                                                          deKieffer & Horgan PLLC
                                                          1455 Pennsylvania Avenue, NW.
                                                          Suite 900B
                                                          Washington, DC 20004
                                                          (202) 783-6904
                                                          Fax: (202) 783-6909
                                                          Email: gmenegaz@dhlaw.com
                                                          LEAD ATTORNEY
                                                          ATTORNEY TO BE NOTICED
                                                          ATTORNEY IN SEALED GROUP
                                                          Bar Status: ACTIVE

                                                          Alexandra H. Salzman
                                                          deKieffer & Horgan PLLC

1455 Pennsylvania Avenue, NW.
Suite 900B
Washington, DC 20004
(202) 783-6900
Fax: (202) 783-6909
Email: asalzman@dhlaw.com
ATTORNEY TO BE NOTICED
Bar Status: ACTIVE

James Kevin Horgan
deKieffer & Horgan PLLC
1455 Pennsylvania Avenue, NW.
Suite 900B
Washington, DC 20004
(202) 783-6902
Fax: (202) 783-6909
Email: khorgan@dhlaw.com
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

John Joseph Kenkel
deKieffer & Horgan PLLC
1455 Pennsylvania Avenue, NW.
Suite 900B
Washington, DC 20004
(202) 783-6900
Fax: (202) 783-6909
Email: jkenkel@dhlaw.com
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

<u>Consolidated Plaintiff</u>

Hebei Jiheng Chemical Co., Ltd.             represented by    Peggy Ann Clarke
                                                              Law Offices of Peggy A. Clarke
                                                              1325 G Street, NW.
                                                              Suite 500
                                                              Washington, DC 20005
                                                              (202) 552-7407
                                                              Fax: (202) 449-7701
                                                              Email: peggy@peggyclarkelaw.com
                                                              ATTORNEY TO BE NOTICED
                                                              ATTORNEY IN SEALED GROUP
                                                              Bar Status: ACTIVE

<u>Consolidated Plaintiff</u>

Arch Chemicals, Inc.                        represented by    Peggy Ann Clarke
                                                              (See above for address)
                                                              LEAD ATTORNEY
                                                              ATTORNEY TO BE NOTICED
                                                              ATTORNEY IN SEALED GROUP
                                                              Bar Status: ACTIVE

<u>Defendant</u>

United States               represented by   David F. D'Alessandris
U.S. Department of Justice
Commercial Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-0139
Fax: (202) 514-7969
Email: david.d'alessandris@usdoj.gov
LEAD ATTORNEY
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

Emma Eaton Bond
U.S. Department of Justice
Commerical Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353-0521
Fax: (202) 514-8624
Email: emma.e.bond@usdoj.gov
LEAD ATTORNEY
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

David W. Richardson
Of Counsel
U.S. Department of Commerce
Office of Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW.
Room 3614
Washington, DC 20230
(202) 482-3155
Fax: (202) 482-4912
Email: david.richardson@trade.gov
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

James Henry Ahrens , II
Of Counsel
U.S. Department of Commerce
Office of Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

(202) 482-3558
Fax: (202) 482-4912
Email: james.ahrens@trade.gov
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

Jane Chang Dempsey
U.S. Department of Justice
Commerical Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353-0897
Fax: (202) 305-7644
Email: jane.dempsey@usdoj.gov
TERMINATED: 07/14/2015
Bar Status: ACTIVE

Patricia Mary McCarthy
U.S. Department of Justice
Commercial Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-0164
Fax: (202) 514-7969
Email: patricia.mccarthy@usdoj.gov
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

Intervenor Defendant

Arch Chemicals, Inc.                    represented by  Peggy Ann Clarke
                                                        (See above for address)
                                                        LEAD ATTORNEY
                                                        ATTORNEY TO BE NOTICED
                                                        ATTORNEY IN SEALED GROUP
                                                        Bar Status: ACTIVE

Intervenor Defendant

Juancheng Kangtai Chemical Co. Ltd.     represented by  Gregory Stephen Menegaz
                                                        (See above for address)
                                                        LEAD ATTORNEY
                                                        ATTORNEY TO BE NOTICED
                                                        ATTORNEY IN SEALED GROUP
                                                        Bar Status: ACTIVE

                                                        Alexandra H. Salzman
                                                        (See above for address)
                                                        ATTORNEY TO BE NOTICED

Bar Status: ACTIVE

James Kevin Horgan
(See above for address)
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

John Joseph Kenkel
(See above for address)
ATTORNEY TO BE NOTICED
ATTORNEY IN SEALED GROUP
Bar Status: ACTIVE

| Date Filed | # | Docket Text |
|---|---|---|
| 02/21/2013 | 1 | Summons . Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Beline, Thomas) Modified on 2/22/2013 (Goell, Geoffrey). (Entered: 02/21/2013) |
| 02/21/2013 | 2 | Form 5 Information Statement . Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Beline, Thomas) (Entered: 02/21/2013) |
| 02/21/2013 | 3 | Form 13 Corporate Disclosure Statement of Clearon Corp.. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation. (Beline, Thomas) (Entered: 02/21/2013) |
| 02/21/2013 | 4 | Form 13 Corporate Disclosure Statement of Occidental Chem. Corp.. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Occidental Chemical Corporation. (Beline, Thomas) (Entered: 02/21/2013) |
| 02/21/2013 | 5 | Form 17 Business Proprietary Information Certification filed on behalf of James R. Cannon Jr. and Thomas M. Beline. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Beline, Thomas) (Entered: 02/21/2013) |
| 02/21/2013 | 6 | Form 11 Notice of Appearance of James R. Cannon Jr. and Thomas M. Beline. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation.(Beline, Thomas) (Entered: 02/21/2013) |
| 02/21/2013 | 7 | Certificate of service (related document(s) 2 , 3 , 1 , 5 , 4 , 6 ). Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Beline, Thomas) (Entered: 02/21/2013) |
| 02/22/2013 | 8 | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Goell, Geoffrey) (Entered: 02/22/2013) |
| 03/11/2013 | 9 | Form 11 Notice of Appearance . Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States.(Dempsey, Jane) (Entered: 03/11/2013) |
| 03/25/2013 | 10 | Complaint against United States. Administrative Record due by 5/13/2013. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Attachments: # 1 Certificate of Service) (Beline, Thomas) (Entered: 03/25/2013) |
| 04/08/2013 | 11 | Order entered on 4/8/2013, assigning action to Judge R. Kenton Musgrave. (Taronji, |

| | | Steve) (Entered: 04/08/2013) |
|---|---|---|
| 04/16/2013 | 12 | Motion to Intervene as defendant intervenor . Responses due by 5/6/2013. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc.. (Clarke, Peggy) (Entered: 04/16/2013) |
| 04/16/2013 | 13 | Form 11 Notice of Appearance . Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc..(Clarke, Peggy) (Entered: 04/16/2013) |
| 04/16/2013 | 14 | Form 13 Corporate Disclosure Statement . Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc.. (Clarke, Peggy) (Entered: 04/16/2013) |
| 04/16/2013 | 15 | Form 17 Business Proprietary Information Certification filed on behalf of . Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc.. (Clarke, Peggy) (Entered: 04/16/2013) |
| 04/16/2013 | 16 | Certificate of service (related document(s) 12 ). Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc.. (Clarke, Peggy) (Entered: 04/16/2013) |
| 04/16/2013 | 17 | Proposed Order For Intervention. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc.. (Clarke, Peggy) (Entered: 04/16/2013) |
| 04/16/2013 | 18 | Order entered on 4/16/2013 granting Motion to intervene by Arch(Related Doc # 12 ).. (Demb, Rebecca) (Entered: 04/16/2013) |
| 04/18/2013 | 19 | Consent Motion to consolidate case(s) 13-00056; 13-00061; 13-00073 with lead case 13-00073. Responses due by 5/7/2013. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Attachments: # 1 Proposed Order) (Beline, Thomas) (Entered: 04/18/2013) |
| 04/22/2013 | 20 | Order entered on 4/22/2013 granting Motion to consolidate cases. Ordered that Court Nos. 13-00056; Juancheng Kangtai Chemical Co., Ltd. v. United States and 13-00061, Arch Chemicals, Inc., et al v. United States, are consolidated into designated Consolidated Court No. 13-00073. (Related Doc # 19 ). (Love, Cynthia) (Entered: 04/22/2013) |
| 04/24/2013 | 21 | Motion to Intervene as defendant intervenor (to participate as defendant-intervenor). Responses due by 5/13/2013. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Juancheng Kangtai Chemical Co. Ltd..(Menegaz, Gregory) (Entered: 04/24/2013) |
| 04/25/2013 | 22 | Order entered on 4/25/2013 granting Motion to intervene by Juancheng (Related Doc # 21 ).. (Demb, Rebecca) (Entered: 04/25/2013) |
| 04/26/2013 | 23 | Joint status report and proposed briefing schedule. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Attachments: # 1 Certificate of Service, # 2 Proposed Order)(Beline, Thomas) (Entered: 04/26/2013) |
| 04/29/2013 | 24 | Order entered on 4/29/2013 Scheduling Order: Dispositive motions, if any, due by 8/7/2013. Response to Dispositive Motion due by 10/9/2013. Replies due by 11/6/2013. Any motion for oral argument due by 11/20/2013..(Demb, Rebecca) (Entered: 04/29/2013) |
| 08/05/2013 | 25 | Consent Motion for extension of time until 8/15/2013 to file R. 56.2 Motions & Briefs (related document(s) 24 ). Responses due by 8/26/2013. Filed by Gregory Stephen |

| | | Menegaz of DeKieffer & Horgan on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Attachments: # 1 Proposed Order)(Menegaz, Gregory) (Entered: 08/05/2013) |
|---|---|---|
| 08/06/2013 | 26 | Order entered on 8/6/2013, Granting consent motion for extension of time (Related Doc # 25 ). Plaintiff's shall file their motion for judgment upon the agency record on or before 8/15/2013. Deft & Deft-Intervenors shall file their response briefs no later than 10/17/2013. Plaintiff's shall file their reply briefs no later than 11/14/2013. Any motion for oral argument due by 11/29/2013. (Taronji, Steve) (Entered: 08/06/2013) |
| 08/15/2013 | 27 | Motion for judgment on agency record 56.2 and memorandum in support of motion. Response to 56.2 Motion due by 10/17/2013. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) Modified on 8/15/2013 (Love, Cynthia). (Entered: 08/15/2013) |
| 08/15/2013 | 28 | Public Appendix to motion for judgment on the agency record (related document(s) 27 ). Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 08/15/2013) |
| 08/15/2013 | 29 | Confidential Appendix to motion for judgment on the agency record (related document(s) 27 ). Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 08/15/2013) |
| 08/15/2013 | 30 | Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 10/17/2013. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Attachments: # 1 Brief Memorandum in Support of R.56.2 Motion for Judgment on the Agency Record, # 2 Proposed Order Granting Motion for Judgment Upon the Agency Record)(Menegaz, Gregory) Modified on 8/16/2013 (Love, Cynthia). (Entered: 08/15/2013) |
| 08/15/2013 | 31 | Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 10/17/2013. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Attachments: # 1 Brief Memorandum of Points and Authorities in Support of Plaintiffs' Rule 56.2 Motion, # 2 Proposed Order Remanding Certain Aspects of the Final Results to the Department of Commerce)(Beline, Thomas) Modified on 8/16/2013 (Love, Cynthia). (Entered: 08/15/2013) |
| 08/21/2013 | 32 | Public Appendix Part I (related document(s) 30 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Attachments: # 1 Appendix Part II)(Menegaz, Gregory) (Entered: 08/21/2013) |
| 08/21/2013 | 33 | Confidential Appendix Part I (related document(s) 30 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Attachments: # 1 Appendix Part II)(Menegaz, Gregory) (Entered: 08/21/2013) |
| 08/22/2013 | 34 | Consent Errata Memorandum to Correct Citations to the Administrative Record in Plaintiffs' Rule 56.2 Brief. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation.(Beline, Thomas) (Entered: 08/22/2013) |
| 08/22/2013 | 35 | Appendix accompanying Plaintiffs' Memorandum of Points and Authorities (related document(s) 31 ). Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Beline, Thomas) (Entered: 08/22/2013) |
| 09/27/2013 | 36 | Consent Motion for extension of time until 12/2/2013 to file brief . Responses due by 10/16/2013. Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States.(Dempsey, Jane) (Entered: 09/27/2013) |

| | | |
|---|---|---|
| 10/01/2013 | 37 | Order entered on 10/1/2013 granting Motion for extension of time. Ordered that defendant and defendant-intervenors shall file their responses no later than December 2, 2013; that the consolidated plaintiffs shall file their replies no later than December 30, 2013;that any motion for oral argument shall be filed no later than January 13, 2014. (Related Doc # 36 ). (Love, Cynthia) (Entered: 10/01/2013) |
| 11/08/2013 | 38 | Consent Motion for extension of time until 1/13/2014 to file brief . Responses due by 11/27/2013. Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States.(Dempsey, Jane) (Entered: 11/08/2013) |
| 11/12/2013 | 39 | Order entered on 11/12/2013, Granting defendant's consent motion for extension of time to file brief. ORDERED that defendant & defendant-intervenors shall file their responses no later than January 13, 2014. ORDERED that the consolidated plaintiff's shall file their replies no later than February 10, 2014. ORDERED that any motion for oral argument shall be filed no later than February 24, 2014. (Related Doc # 38 ). (Taronji, Steve) (Entered: 11/12/2013) |
| 12/30/2013 | 40 | Form 11 Notice of Appearance . Filed by Patricia Mary McCarthy of U.S. Department of Justice on behalf of United States.(McCarthy, Patricia) (Entered: 12/30/2013) |
| 01/03/2014 | 41 | Third Motion for extension of time until 2/24/2014 to file brief in opposition to Rule 56.2 motions (related document(s) 27 , 30 , 31 ). Responses due by 1/22/2014. Filed by Patricia Mary McCarthy of U.S. Department of Justice on behalf of United States. (McCarthy, Patricia) (Entered: 01/03/2014) |
| 01/06/2014 | 42 | Response in opposition to motion for third extension of time (related document(s) 41 ). Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Hebei Jiheng Chemical Co., Ltd..(Clarke, Peggy) (Entered: 01/06/2014) |
| 01/07/2014 | 43 | Amended Proposed Order for Motion for Enlargement of Time. Filed by Patricia Mary McCarthy of U.S. Department of Justice on behalf of United States. (McCarthy, Patricia) (Entered: 01/07/2014) |
| 01/07/2014 | 44 | Response of Kangtai in Opposition to motion for extension of time to respond (related document(s) 41 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Juancheng Kangtai Chemical Co. Ltd..(Menegaz, Gregory) (Entered: 01/07/2014) |
| 01/10/2014 | 45 | Order entered on 1/10/2014 granting Motion for extension of time to file brief (Related Doc # 41 ). ORDERED that defendant and defendant-intervenors shall file their responses no later than February 24, 2014;ORDERED that the consolidated plaintiffs shall file their replies no later than March 26, 2014; and it is further,ORDERED that any motion for oral argument shall be filed no later than April 7,2014.(Love, Cynthia) (Entered: 01/10/2014) |
| 02/24/2014 | 46 | Response to motion for judgement on the agency record (related document(s) 31 ). Reply due by 3/26/2014. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc..(Clarke, Peggy) Modified on 2/24/2014 (Love, Cynthia). (Entered: 02/24/2014) |
| 02/24/2014 | 47 | Response in opposition to motion for judgment on the agency record filed by Arch Chemicals Inc. and Hebei Jiheng Chemical Co., Ltd. and Juancheng Kangtai Chemical Co., Ltd. (related document(s) 27 , 30 ). Reply due by 3/26/2014. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation.(Beline, Thomas) Modified on 2/25/2014 (Love, Cynthia). (Entered: 02/24/2014) |
| 02/24/2014 | 48 | Motion for excess pages in response to three motions for judgment on the administrative record. Responses due by 3/17/2014. Filed by Patricia Mary McCarthy of U.S. |

| | | |
|---|---|---|
| | | Department of Justice on behalf of United States.(McCarthy, Patricia) (Entered: 02/24/2014) |
| 02/24/2014 | 49 | Response of the United States to motion s for judgment on the administrative record (related document(s) 27 , 30 , 31 ). Reply due by 3/26/2014. Filed by Patricia Mary McCarthy of U.S. Department of Justice on behalf of United States.(McCarthy, Patricia) Modified on 2/25/2014 (Love, Cynthia). (Entered: 02/24/2014) |
| 02/24/2014 | 50 | Response to motion for judgment on the agency record (related document(s) 31 ). Reply due by 3/26/2014. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Juancheng Kangtai Chemical Co. Ltd..(Menegaz, Gregory) Modified on 2/25/2014 (Love, Cynthia). (Entered: 02/24/2014) |
| 02/25/2014 | 51 | Certificate of Compliance . Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Menegaz, Gregory) Modified on 2/25/2014 (Love, Cynthia). (Entered: 02/25/2014) |
| 03/03/2014 | 52 | Appendix accompanying the Response Brief filed by Clearon Corp. and Occidental Chemical Corporation (related document(s) 47 ). Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Beline, Thomas) (Entered: 03/03/2014) |
| 03/03/2014 | 53 | Appendix to Defendant's Response to Plaintiffs' Rule 56.2 Motions (related document(s) 49 ). Filed by Patricia Mary McCarthy of U.S. Department of Justice on behalf of United States. (Attachments: # 1 Appendix Tab 1, # 2 Appendix Tab 2, # 3 Appendix Tab 3, # 4 Appendix Tab 4, # 5 Appendix Tab 5, # 6 Appendix Tab 6, # 7 Appendix Tab 7, # 8 Appendix Tab 8, # 9 Appendix Tab 9, # 10 Appendix Tab 10, # 11 Appendix Tab 11, # 12 Appendix Tab 12, # 13 Appendix Tab 13, # 14 Appendix Tab 14, # 15 Appendix Tab 15, # 16 Appendix Tab 16, # 17 Appendix Tab 17, # 18 Appendix Tab 18, # 19 Appendix Tab 19, # 20 Appendix Tab 20, # 21 Appendix Tab 21)(McCarthy, Patricia) (Entered: 03/03/2014) |
| 03/20/2014 | 54 | Consent Motion for extension of time until 4/23/2014 to file reply brief . Responses due by 4/8/2014. Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Attachments: # 1 Proposed Order)(Beline, Thomas) (Entered: 03/20/2014) |
| 03/21/2014 | 55 | Order entered on 3/21/2014 granting Motion for extension of time to file reply brief. Consolidated Plaintiffs Replies due by 4/23/2014. Any motion for oral argument due by 4/30/14 (Related Doc # 54 ). (Love, Cynthia) (Entered: 03/21/2014) |
| 03/26/2014 | 56 | Order entered on 3/26/2014 granting Motion for excess pages. ORDERED that defendant's combined response to three motions for judgment on the administrative record shall be accepted for filing. (Related Doc # 48 ). (Love, Cynthia) (Entered: 03/26/2014) |
| 04/23/2014 | 57 | Reply (related document(s) 49 ). Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Hebei Jiheng Chemical Co., Ltd..(Clarke, Peggy) (Entered: 04/23/2014) |
| 04/23/2014 | 58 | Reply of Plaintiffs, Clearon Corp. and Occidental Chemical Corporation (related document(s) 50 , 49 , 46 ). Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation.(Beline, Thomas) (Entered: 04/23/2014) |
| 04/23/2014 | 59 | Public Reply In Support Of Its Motion For Judgment Upon the Agency Record (related document(s) 49 , 47 ). Filed by Gregory Stephen Menegaz of DeKieffer & Horgan on behalf of Juancheng Kangtai Chemical Co. Ltd..(Menegaz, Gregory) (Entered: 04/23/2014) |

| | | |
|---|---|---|
| 04/30/2014 | 60 | Appendix accompanying Plaintiffs' Reply Brief (related document(s) 58 ). Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Beline, Thomas) (Entered: 04/30/2014) |
| 07/24/2014 | 61 | Order entered on 7/24/2014, Slip opinion: 14-88. this matter must be, and hereby is, remanded to Commerce for further consideration of the surrogate financial ratios, by-product valuation methodology, intra-company transport methodology, and the surrogate country selection in light of Clearon, Kangtai, Arch and Jehings arguments and all relevant intervening legal developments. The results of remand shall be due October 21st, 2014, comments on the remand results shall be due 30 days from the date the remand results are filed with the court, and rebuttal commentary shall be due 15 days thereafter. (related document(s) 27 , 30 , 31 ) (Love, Cynthia) (Additional attachment(s) added on 7/24/2014: # 1 Cited Web Pages) (Love, Cynthia). (Entered: 07/24/2014) |
| 10/14/2014 | 62 | Partial Consent Motion for extension of time until 12/22/2014 to File Remand Redetermination. Responses due by 11/3/2014. Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States.(Dempsey, Jane) (Entered: 10/14/2014) |
| 10/17/2014 | 63 | Order entered on 10/17/2014 granting Motion for extension of time for the Department of Commerce to file its remand redetermination. ORDERED: that the Department of Commerce shall file its remand redetermination no later than December 5, 2014. (Related Doc # 62 ). (Goell, Geoffrey) (Entered: 10/17/2014) |
| 12/08/2014 | 64 | Motion for Relief. Responses due by 12/29/2014. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke, Gregory Stephen Menegaz of DeKieffer & Horgan, John Joseph Kenkel of DeKieffer & Horgan, James Kevin Horgan of DeKieffer & Horgan on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd., Juancheng Kangtai Chemical Co. Ltd.. (Clarke, Peggy) Modified on 12/8/2014 (Goell, Geoffrey) (Entered: 12/08/2014) |
| 12/09/2014 | 65 | Consolidated Response to motion for relief and motion for leave to permit the Department of Commerce to file the remand redetermination out of time (related document(s) 64 ). Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States.(Dempsey, Jane)Response to Motion for Leave to File Out of Time due 12/29/2014. Modified on 12/10/2014 (Goell, Geoffrey). (Entered: 12/09/2014) |
| 12/09/2014 | 66 | Response of Plaintiffs, Clearon Corp. and Occidental Corporation, to motion for relief filed by defendant-intervenors (related document(s) 64 ). Filed by Thomas Martin Beline of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation.(Beline, Thomas) (Entered: 12/09/2014) |
| 12/10/2014 | 67 | Response to motion for leave to permit filing out of time (related document(s) 65 ). Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd., Juancheng Kangtai Chemical Co. Ltd.. (Clarke, Peggy) (Entered: 12/10/2014) |
| 12/11/2014 | 68 | Order entered on 12/11/2014 denying Motion for relief and granting motion for leave to file remand redetermination out-of-time. ORDERED: that the motion for relief filed by Consolidated-Plaintiffs is denied. ORDERED: that Defendant's motion for leave to file the remand redetermination is granted. ORDERED: that Commerce shall file its remand redetermination on December 11, 2014. ORDERED: that Consolidated-Plaintiffs shall file a proposed scheduling order for comments on the redetermination, superseding the deadlines set in the July 23, 2014 court-ordered remand, on or by December 15, 2014. ORDERED: that Defendant shall file a brief report with the court by January 10, 2015 outlining the checks and mechanisms Commerce has in place or will instill to prevent a similar such occurrence in the future. (Related Doc # 64 ). (Goell, Geoffrey) (Entered: 12/11/2014) |

| 12/11/2014 | 69 | Remand results filed by U.S. Department of Commerce . Filed by David W. Richardson of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Remand Results)(Richardson, David) (Entered: 12/11/2014) |
|---|---|---|
| 12/15/2014 | 70 | Consent Motion for entry of scheduling order for comments on First Remand Results. Responses due by 1/5/2015. Filed by Gregory Stephen Menegaz of DeKieffer & Horgan PLLC on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Attachments: # 1 Proposed Order)(Menegaz, Gregory) (Entered: 12/15/2014) |
| 12/15/2014 | 71 | Order entered on 12/15/2014 granting Motion for Entry of Scheduling order: (Related Doc # 70 ). Comments on First Remand due by 1/27/2015. Response comments must be filed by 2/26/2015. Parties' replies to response comments must be filed by 3/13/2015. (Goell, Geoffrey) (Entered: 12/15/2014) |
| 12/16/2014 | 72 | Letter Caption Correction. Filed by David W. Richardson of U.S. Department of Commerce on behalf of United States. (Richardson, David) (Entered: 12/16/2014) |
| 12/16/2014 | 73 | Administrative record for U.S. Department of Commerce filed . Filed by David W. Richardson of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Record Declaration, # 2 Index)(Richardson, David) (Entered: 12/16/2014) |
| 01/09/2015 | 74 | Response to Court's Request/Order For Report Regarding The Department of Commerce's Process To Ensure Compliance With Court Ordered Deadlines. Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States. (Dempsey, Jane) (Entered: 01/09/2015) |
| 01/28/2015 | 75 | Comments on remand results . Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 01/28/2015) |
| 01/28/2015 | 76 | Comments on remand results . Filed by Gregory Stephen Menegaz of DeKieffer & Horgan PLLC on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Menegaz, Gregory) (Entered: 01/28/2015) |
| 02/02/2015 | 77 | Errata Memorandum regarding comments on final results of redetermination pursuant to remand. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd..(Clarke, Peggy) (Entered: 02/02/2015) |
| 02/02/2015 | 78 | Appendix to comments on final results of redetermination pursuant to remand. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 02/02/2015) |
| 02/04/2015 | 79 | Form 11 Notice of Appearance . Filed by Gregory Stephen Menegaz of DeKieffer & Horgan PLLC on behalf of Juancheng Kangtai Chemical Co. Ltd..(Menegaz, Gregory) (Entered: 02/04/2015) |
| 02/26/2015 | 80 | Revised Administrative record for U.S. Department of Commerce filed . Filed by David W. Richardson of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Analyst Declaration, # 2 Amended Public Remand Record Index) (Richardson, David) (Entered: 02/26/2015) |
| 02/26/2015 | 81 | Reply to comments on remand results (related document(s) 75 , 76 ). Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States. (Dempsey, Jane) (Entered: 02/26/2015) |
| 02/26/2015 | 82 | Comments on remand results . Filed by James R. Cannon, Jr of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Cannon, James) (Entered: 02/26/2015) |

| 03/05/2015 | 83 | Confidential Appendix to Comments on Remand Results (related document(s) 82 ). Filed by James R. Cannon, Jr of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Cannon, James) (Entered: 03/05/2015) |
| --- | --- | --- |
| 03/05/2015 | 84 | Public Appendix to Comments on Remand Results (related document(s) 82 ). Filed by James R. Cannon, Jr of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Cannon, James) (Entered: 03/05/2015) |
| 03/13/2015 | 85 | Reply to comments on remand results (related document(s) 81 , 82 ). Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 03/13/2015) |
| 03/13/2015 | 86 | Confidential Appendix To Reply to Remand Comments. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 03/13/2015) |
| 03/13/2015 | 87 | Public Appendix To Reply to Remand Comments. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 03/13/2015) |
| 03/13/2015 | 88 | Reply to comments on remand results (related document(s) 81 , 82 ). Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Menegaz, Gregory) (Entered: 03/13/2015) |
| 05/08/2015 | 89 | Letter issued by The Honorable R. Kenton Musgrave concerning Supplemental Briefing Requested W/ Questions for Supplemental Briefing. Supplemental Briefs due by May 22, 2015 and any rebuttal by May 29, 2015. (Goell, Geoffrey.) (Entered: 05/08/2015) |
| 05/22/2015 | 90 | Form 17 Business Proprietary Information Certification filed on behalf of Ulrika Swanson. Filed by James R. Cannon, Jr of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Cannon, James) (Entered: 05/22/2015) |
| 05/22/2015 | 91 | Response to Court's Request/Order of May 8, 2015. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 05/22/2015) |
| 05/22/2015 | 92 | Response to Court's Request/Order . Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States. (Dempsey, Jane) (Entered: 05/22/2015) |
| 05/22/2015 | 93 | Response to Court's Request/Order . Filed by James R. Cannon, Jr of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Cannon, James) (Entered: 05/22/2015) |
| 05/22/2015 | 94 | Response to Court's Request/Order . Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Menegaz, Gregory) (Entered: 05/22/2015) |
| 05/29/2015 | 95 | Letter Reply to May 22, 2015 Responses to Court's Request. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 05/29/2015) |
| 05/29/2015 | 96 | Response to Court's Request/Order Rebutting Responses to Court Questions. Filed by Jane Chang Dempsey of U.S. Department of Justice on behalf of United States. (Dempsey, Jane) (Entered: 05/29/2015) |
| 05/29/2015 | 97 | Response to Court's Request/Order . Filed by James R. Cannon, Jr of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Cannon, James) (Entered: 05/29/2015) |

| 05/29/2015 | 98 | Response to Court's Request/Order Re Parties' Cmts to Court's Questions. Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Menegaz, Gregory) (Entered: 05/29/2015) |
| --- | --- | --- |
| 06/03/2015 | 99 | Form 11 Notice of Appearance . Filed by Ulrika Kristin Skitarelic Swanson of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation.(Swanson, Ulrika Kristin) (Entered: 06/03/2015) |
| 07/14/2015 | 100 | Form 11 Notice of Appearance . Filed by David F. D'Alessandris of U.S. Department of Justice on behalf of United States.(D'Alessandris, David) (Entered: 07/14/2015) |
| 08/20/2015 | 101 | Order entered on 8/20/2015 Slip opinion: 15-91 Remanding sixth (2010-2011) review of antidumping duty order on chlorinated isocyanurates from the People's Republic of China a second time. (related document(s) 69 ) Results of remand shall be due December 18, 2015, whereupon by the fifth business day thereafter the parties shall file a joint status report as to a proposed scheduling of comments, if any, on the remand results, as well as a proposed page limitation(s) thereof..(Demb, Rebecca) (Entered: 08/20/2015) |
| 12/17/2015 | 102 | Consent Motion for extension of time until 3/8/2016 to permit Commerce to file remand results (related document(s) 101 ). Responses due by 1/5/2016. Filed by David F. D'Alessandris of U.S. Department of Justice on behalf of United States.(D'Alessandris, David) (Entered: 12/17/2015) |
| 12/18/2015 | 103 | Order entered on 12/18/2015 granting Motion for extension of time to file remand redetermination. Remand redetermination due by 3/8/2016 (Related Doc # 102 ). (Goell, Geoffrey). (Entered: 12/18/2015) |
| 03/02/2016 | 104 | Consent Motion for extension of time until 3/22/2016 to permit Commerce to file its remand results (related document(s) 103 ). Responses due by 3/21/2016. Filed by David F. D'Alessandris of U.S. Department of Justice on behalf of United States.(D'Alessandris, David) (Entered: 03/02/2016) |
| 03/03/2016 | 105 | Order entered on 3/3/2016 granting Consent Motion for extension of time to file remand results. Commerce shall file its remand redetermination by 3/22/2016 (Related Doc # 104 ). Remand Results due by 3/22/2016. (Goell, Geoffrey) (Entered: 03/03/2016) |
| 03/22/2016 | 106 | Second Remand results filed by Department of Commerce . Filed by David W. Richardson of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Second Remand Results)(Richardson, David) (Entered: 03/22/2016) |
| 03/25/2016 | 107 | Form 11 Notice of Appearance . Filed by Emma Eaton Bond of U.S. Department of Justice on behalf of United States.(Bond, Emma) (Entered: 03/25/2016) |
| 03/28/2016 | 108 | Form 11 Notice of Appearance . Filed by James Henry Ahrens, II of U.S. Department of Commerce on behalf of United States.(Ahrens, James) (Entered: 03/28/2016) |
| 03/28/2016 | 109 | Administrative record for Department of Commerce filed . Filed by James Henry Ahrens, II of U.S. Department of Commerce on behalf of United States. (Attachments: # 1 Declaration, # 2 Record Index (Public), # 3 Record Index (BPI))(Ahrens, James) (Entered: 03/28/2016) |
| 03/28/2016 | 110 | Consent Motion for entry of scheduling order . Responses due by 4/18/2016. Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Attachments: # 1 Proposed Order)(Menegaz, Gregory) (Entered: 03/28/2016) |
| 03/29/2016 | 111 | Order entered on 3/29/2016 granting Motion for Entry of Scheduling order: Scheduling Order issued. Parties opposing the Second Remand Results may file comments by 4/22/2016. Parties supporting the Second Remand Results may file responsive comments |

| | | by 5/22/2016. Parties opposing the Second Remand Results may file reply comments by June 6, 2016. (Related Doc # 110 ). (Goell, Geoffrey). (Entered: 03/29/2016) |
|---|---|---|
| 04/22/2016 | 112 | Comments on remand results of March 22, 2016. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 04/22/2016) |
| 04/22/2016 | 113 | Comments on remand results (related document(s) 106 ). Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Menegaz, Gregory) (Entered: 04/22/2016) |
| 04/29/2016 | 114 | Public Appendix to 2nd Remand Comments. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 04/29/2016) |
| 04/29/2016 | 115 | Confidential Appendix to 2nd Remand Comments. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 04/29/2016) |
| 05/10/2016 | 116 | Consent Motion for extension of time until 6/6/2016 to file brief responding to comments on Second Remand Redetermination (related document(s) 112 , 113 ). Responses due by 5/31/2016. Filed by Emma Eaton Bond of U.S. Department of Justice on behalf of United States.(Bond, Emma) (Entered: 05/10/2016) |
| 05/11/2016 | 117 | Order entered on 5/11/2016 granting Consent Motion for extension of time to file brief. ORDERED: that parties supporting the Second Remand Results may file responsive comments by June 6, 2016; and parties opposing the Second Remand Results may file reply comments by June 21,2016 (Related Doc # 116 ). (Goell, Geoffrey) (Entered: 05/11/2016) |
| 06/01/2016 | 118 | Consent Motion for extension of time until 6/20/2016 to file response brief in support of Commerce's second remand results (related document(s) 111 , 117 ). Responses due by 6/20/2016. Filed by Emma Eaton Bond of U.S. Department of Justice on behalf of United States.(Bond, Emma) (Entered: 06/01/2016) |
| 06/02/2016 | 119 | Order entered on 6/2/2016 granting Consent Motion for extension of time to file response comments. ORDERED: that parties supporting the second remand results may file response comments by 6/20/2016 and parties opposing the second remand results may file reply comments by 7/5/2016. (Related Doc # 118 ). (Goell, Geoffrey) (Entered: 06/02/2016) |
| 06/15/2016 | 120 | Consent Motion for excess pages/words . Responses due by 7/5/2016. Filed by Emma Eaton Bond of U.S. Department of Justice on behalf of United States.(Bond, Emma) (Entered: 06/15/2016) |
| 06/15/2016 | 121 | Order entered on 6/15/2016 granting Consent Motion for excess pages/words (Related Doc # 120 ). (Goell, Geoffrey) (Entered: 06/15/2016) |
| 06/20/2016 | 122 | Public Reply to comments on Commerce's second remand results. Filed by Emma Eaton Bond of U.S. Department of Justice on behalf of United States.(Bond, Emma) (Entered: 06/20/2016) |
| 06/20/2016 | 123 | Comments on remand results . Filed by Ulrika Kristin Skitarelic Swanson of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Swanson, Ulrika Kristin) (Entered: 06/20/2016) |
| 06/22/2016 | 124 | Public Appendix in support of the second remand results (related document(s) 122 ). Filed by Emma Eaton Bond of U.S. Department of Justice on behalf of United States. (Bond, Emma) (Entered: 06/22/2016) |

| 06/27/2016 | 125 | Public Appendix to Response Comments in Support of Second Remand Results (related document(s) 123 ). Filed by Ulrika Kristin Skitarelic Swanson of Cassidy Levy Kent (USA) LLP on behalf of Clearon Corporation, Occidental Chemical Corporation. (Swanson, Ulrika Kristin) (Entered: 06/27/2016) |
| --- | --- | --- |
| 07/05/2016 | 126 | Reply to comments on remand results of the Defendant (related document(s) 123 ). Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 07/05/2016) |
| 07/05/2016 | 127 | Reply to comments on remand results (related document(s) 123 ). Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of Juancheng Kangtai Chemical Co. Ltd.. (Menegaz, Gregory) (Entered: 07/05/2016) |
| 07/12/2016 | 128 | Consent Errata Memorandum with respect to Reply to Defendant's Response to Comments upon the 2nd Remand Results. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd (Clarke, Peggy). (PER COURT ORDER (ECF #131), THIS CONSENT ERRATA MEMORANDUM IS DEEMED A CONSENT MOTION FOR ERRATA SUBSTANTIALLY COMPLIANT WITH ADMIN. ORDER 02-01 4(d). (Modified on 7/13/2016) (Love, Cynthia). (Entered: 07/12/2016) |
| 07/12/2016 | 129 | Confidential Appendix to Plaintiffs Reply to Defendant's Response to Comments on 2nd Remand Results. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 07/12/2016) |
| 07/12/2016 | 130 | Public Appendix to Plaintiffs Reply to Defendant's Response to Comments on 2nd Remand Results. Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Hebei Jiheng Chemical Co., Ltd.. (Clarke, Peggy) (Entered: 07/12/2016) |
| 07/13/2016 | 131 | Order entered on 7/13/2016. ORDERED that the notice of errata be, and hereby is, deemed a motion for errata in compliance with Administrative Order 02-01 4.(d), and it is further ORDERED that said motion for errata be, and hereby is, GRANTED.(Love, Cynthia) (Entered: 07/13/2016) |
| 11/23/2016 | 132 | Order entered on 11/23/2016 Slip opinion: 16-110, Sustaining second results of remand of sixth (2010-2011) administrative review of antidumping duty order on chlorinated isocyanurates from the Peoples Republic of China. Judgment will be entered sustaining Commerce's second results of remand. (related document(s) 106 ).(Love, Cynthia) (Entered: 11/23/2016) |
| 11/23/2016 | 133 | Judgment Order entered on 11/23/2016. ORDERED, ADJUDGED, and DECREED that Commerces Final Results of Redetermination, dated March 22, 2016, be, and they hereby are, sustained. (related document(s) 132 ).(Love, Cynthia) (Entered: 11/23/2016) |
| 01/23/2017 | 134 | Notice of Appeal of 16-110 filed. (related document(s) 133 , 132 ). Filed by Peggy Ann Clarke of Law Offices of Peggy A. Clarke on behalf of Arch Chemicals, Inc., Arch Chemicals, Inc..(Clarke, Peggy) (Entered: 01/23/2017) |
| 01/23/2017 | 135 | Notice of Appeal of 11/23/2016 filed. (related document(s) 133 , 132 ). Filed by Gregory Stephen Menegaz of deKieffer & Horgan PLLC on behalf of Juancheng Kangtai Chemical Co. Ltd..(Menegaz, Gregory) (Entered: 01/23/2017) |
| 01/25/2017 | 136 | Appeal of Slip Op. 16-110 docketed on 1/25/2017 by the CAFC as appeal no. 17-1520 (related document(s) 134 ). (Goell, Geoffrey) (Entered: 01/25/2017) |
| 01/26/2017 | 137 | Appeal of Slip Op. 16-110 docketed on 1/26/2017 by the CAFC as appeal no. 17-1528 |

(related document(s) 135 ). (Goell, Geoffrey) (Entered: 01/26/2017)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 03/15/2017 12:11:47 | | | |
| PACER Login: | dh0429:2536371:0 | Client Code: | kangtai |
| Description: | Docket Report | Search Criteria: | 1:13-cv-00073-RKM |
| Billable Pages: | 14 | Cost: | 1.40 |

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-898
POR: 06/01/2010-05/31/2011
Public Document

**MEMORANDUM TO:**     Mark Hoadley
Program Manager, Office 6
AD/CVD Operations

**FROM:**     Carole Showers
Director, Office of Policy

**DATE:**     September 9, 2011

**SUBJECT:**  Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates ("CLI") from the People's Republic of China ("China").

If you base normal value in this review on surrogate country factor prices, then section 773(c)(4) of the statute requires, to the extent possible, that you use a surrogate country that (1) is at a level of economic development comparable to that of China and (2) is a significant producer of merchandise comparable to CLI.

With regard to the first statutory requirement, the six countries on the non-exhaustive list below are at a level of economic development comparable to China in terms of per capita gross national income (GNI).  Per capita is the primary basis for determining economic comparability.

For purposes of selecting a surrogate country, you should, following <u>Magnesium from China</u> (59 FR 55424) and <u>Saccharin from China</u> (59 FR 58818), treat the six countries listed below as being equally comparable in terms of economic development and determine which, if any, is a significant producer of merchandise comparable to CLI.  The statute does not define "significant" or "comparable," although "comparable" encompasses a larger set of products than "like product."  We have in past cases identified comparable merchandise on the basis of similarities in production factors (physical and non-physical) and factor intensities (see, for example, <u>Magnesium</u>).  See Import Administration Policy Bulletin 04.1 for further guidance.

If you find that more than one of the six countries satisfies both statutory requirements then you should, if possible, narrow the field to a single country on the basis of data availability and quality.  See <u>Pencils from China</u> (59 FR 55625).  Following the practice specified in <u>Certain Butt-Weld Carbon Steel Pipe Fittings from China</u> (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures.



Appx158

You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

This list provides you the countries that are economically comparable to China and most likely to have good data availability and quality. You may also consider other countries on the case record if the record provides you adequate information to evaluate them. You may be unable to obtain the necessary factor price information in a suitable surrogate country. If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

| Country | Per Capita GNI, 2009 ($USD) |
| --- | --- |
| China | 3,590 |
| Philippines | 1,790 |
| Indonesia | 2,230 |
| Ukraine | 2,800 |
| Thailand | 3,760 |
| Colombia | 4,930 |
| South Africa | 5,770 |

* World Development Report 2011, World Bank.

Appx159

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-898
POR: 06/01/2010-5/31/2011
**Public Document**
IA/O6: EH

October 28, 2011

TO ALL INTERESTED PARTIES:

Re:     **2010-2011 Antidumping Duty Administrative Review of Chlorinated Isocyanurates from the People's Republic of China**

The Department of Commerce (Department) is providing all interested parties the opportunity to comment on the selection of a surrogate country for this administrative review of chlorinated isocyanurates from the People's Republic of China (PRC). Because the Department is considering the PRC a non-market economy country in this review, it is necessary for the Department to select an appropriate surrogate market economy country as provided by section 773(c)(4) of the Tariff Act of 1930, as amended.

Attached is a memorandum outlining a non-exhaustive list of six countries (i.e., Indonesia, Philippines, Ukraine, Thailand, Colombia and South Africa) determined to be at a level of economic development comparable to the PRC in terms of per capita gross national income (GNI) for this review. See Attachment I. In addition, Policy Bulletin 04.1, entitled "Non-Market Economy Surrogate Country Selection Process," further outlines the Department's policy that the surrogate country should also be a significant producer of merchandise comparable to the merchandise under investigation. See Attachment II. The Policy Bulletin 04.1 is also available on the Department's website at http://ia.ita.doc.gov.

While the Department determines the countries provided in the attached list to be economically comparable to the PRC in terms of per capita GNI, and most likely to have good quality data available, you may also comment on other countries not listed, provided that you submit sufficient information on the criteria listed below with respect to that country. Specifically, parties are requested to submit information regarding the selection of a single surrogate country by providing the following information regarding that country:

(1) Information on whether the country is a significant producer of merchandise comparable to the merchandise subject to this administrative review;[1]

(2) Information regarding data availability and quality of the data available within that single country for the major factors of production used to produce the merchandise subject to this

---

[1] The statute does not define "significant" or "comparable," although comparable encompasses a larger set of products than "like product." We have in past cases identified comparable merchandise on the basis of similarities in production factors (physical and non-physical) and factor intensities.



administrative review.[2]  The major factors include, but are not limited to urea, sodium chloride, sodium carbonate, hydrochloric acid, copper sulfate, hydrogen gas, ammonia gas, electricity, truck freight, brokerage and handling, and financial ratios; and

(3)  Information regarding data availability and quality of financial statements available within that single country for producers of merchandise identical or comparable to the merchandise subject to this administrative review.

The Department intends to issue its surrogate country selection prior to or in its preliminary results.  Therefore, comments, if any, regarding surrogate country selection must be submitted to the Department **no later than December 19, 2011**.  Furthermore, pursuant to 19 CFR 351.301(c)(3)(ii), interested parties may submit publicly available information to value factors of production from the surrogate country selected by the Department within 20 days after the date of publication of the preliminary results of review.  Notwithstanding this deadline, if you wish to submit publicly available information to value factors of production for consideration for purposes of the Department's preliminary results, you must submit comments and relevant information to the Department **no later than January 9, 2012**.  Rebuttal comments, limited to information submitted by parties on surrogate country selection and surrogate values, are due **no later than January 16, 2012.**

If you have any questions, please contact Emily Halle at (202) 482-0176.

Sincerely,

Mark Hoadley
Program Manager
Ad/CVD Operations, Office 6
Import Administration

Attachments

---

[2] All else being equal and to the extent possible, the Department will select broad, publicly available prices, on a duty- and tax-exclusive basis, giving due consideration to aggregation, small quantities, contemporaneity, and data-source concerns.

Filed By: Emily Halle, Filed Date: 10/28/11 10:51 AM, Submission Status: Approved

**Attachment I**

Filed By: Emily Halle, Filed Date: 10/28/11 10:51 AM, Submission Status: Approved

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-898
POR: 06/01/2010-05/31/2011
Public Document

**MEMORANDUM TO:**      Mark Hoadley
Program Manager, Office 6
AD/CVD Operations

**FROM:**      Carole Showers
Director, Office of Policy

**DATE:**      September 9, 2011

**SUBJECT:** Request for a List of Surrogate Countries for an Administrative Review of the
Antidumping Duty Order on Chlorinated Isocyanurates ("CLI") from the People's Republic of
China ("China").

If you base normal value in this review on surrogate country factor prices, then section
773(c)(4) of the statute requires, to the extent possible, that you use a surrogate country that (1) is
at a level of economic development comparable to that of China and (2) is a significant producer
of merchandise comparable to CLI.

With regard to the first statutory requirement, the six countries on the non-exhaustive list
below are at a level of economic development comparable to China in terms of per capita gross
national income (GNI). Per capita is the primary basis for determining economic comparability.

For purposes of selecting a surrogate country, you should, following Magnesium from
China (59 FR 55424) and Saccharin from China (59 FR 58818), treat the six countries listed
below as being equally comparable in terms of economic development and determine which, if
any, is a significant producer of merchandise comparable to CLI. The statute does not define
"significant" or "comparable," although "comparable" encompasses a larger set of products than
"like product." We have in past cases identified comparable merchandise on the basis of
similarities in production factors (physical and non-physical) and factor intensities (see, for
example, Magnesium). See Import Administration Policy Bulletin 04.1 for further guidance.

If you find that more than one of the six countries satisfies both statutory requirements
then you should, if possible, narrow the field to a single country on the basis of data availability
and quality. See Pencils from China (59 FR 55625). Following the practice specified in Certain
Butt-Weld Carbon Steel Pipe Fittings from China (57 FR 21062), all else being equal and to the
extent possible, you should use broad, publicly available price measures.



You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

This list provides you the countries that are economically comparable to China and most likely to have good data availability and quality. You may also consider other countries on the case record if the record provides you adequate information to evaluate them. You may be unable to obtain the necessary factor price information in a suitable surrogate country. If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

| Country | Per Capita GNI, 2009 ($USD) |
|---|---|
| China | 3,590 |
| | |
| Philippines | 1,790 |
| Indonesia | 2,230 |
| Ukraine | 2,800 |
| Thailand | 3,760 |
| Colombia | 4,930 |
| South Africa | 5,770 |

* World Development Report 2011, World Bank.

Appx257

# Attachment II

Filed By: Emily Halle, Filed Date: 10/28/11 10:51 AM, Submission Status: Approved

Case: 17-1520    Document: 47    Page: 174    Filed: 07/13/2017

Import Administration Policy Bulletin

Number: 04.1
Topic: Non-Market Economy Surrogate Country Selection Process

Approved: _____

      James Jochum
      Assistant Secretary
        for Import Administration


_____

Date

Statement of Issue

This policy bulletin provides guidance regarding the Department's selection of surrogate market economy countries in non-market economy ("NME") cases.

Background

The statute provides broad discretion in the selection of surrogate market economy countries to value NME factors of production. In particular, section 773(c)(1)(B) of the Act reads:

> ...the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

Section 773(c)(4) of the Act adds:

The administering authority shall utilize *to the extent possible* ... prices ... in one or more market economy countries that are -

> 1. at a level of economic development comparable to that of the nonmarket economy country, and

> 2. a significant producer of comparable merchandise.

The terms "comparable level of economic development," "comparable merchandise," and "significant producer" are not defined in the statute. However, the Department's regulations attempt to clarify the statute's general guidance regarding surrogate country selection. In determining economic comparability, section 351.408 of the regulations places primary emphasis on per capita income, although other information can be considered. Some clarification is also provided in the Conference Report to the 1988 Omnibus Trade and Competitiveness Act, which added to the statute the current NME provisions and states that "significant producer" includes any country that is a "significant net exporter."[(1)] Section 351.408 of the regulations also makes clear that the relative weight attached to each of the two selection criteria, described above, is unspecified because the relative importance that the Department attaches to each will necessarily vary depending on the specific facts in each case.

Appx259

Date: 10/28/11 10:51 AM, Submission Status: Approved

The Conference Report also states that the Department should seek to use, if possible, data (in the surrogate market economy country) that reflect levels of technology and production volumes that are similar to the producers under investigation.

Statement of Policy

In each NME investigation and review, the team considers potential surrogate countries in terms of their economic comparability to the NME country, and whether they are significant producers of comparable merchandise. The team then designates one country as the primary surrogate in a memo to the file, which explains how that country satisfies the statutory selection criteria. The memo must give substantive reasons on the record for why it deems the country selected to be a "significant producer" of comparable merchandise. It must include more than mere assertions, and must separately address the significant producer and comparable merchandise requirements. If one or both of the statutory criteria cannot be met, the memo should explain why this is the case, and why the particular country was selected as the primary surrogate.

The statute does not require that the Department use a surrogate country that is at a level of economic development *most* comparable to the NME country and that is the *most* significant producer of comparable merchandise. The statute requires only that the Department use a surrogate market economy country that is at a level of economic development comparable to that of the NME country and that is a significant producer of comparable merchandise. Even these requirements are not binding, as the statute requires that they be met *only to the extent possible*. Accordingly, the Department has adopted the following approach of sequential consideration of the statutory elements.[2]

*Economic Comparability*

First, early in a proceeding, the operations team sends the Office of Policy ("OP") a written request for a list of potential surrogate countries. In response, OP provides a list of potential surrogate countries that are at a comparable level of economic development to the NME country.[3] OP determines economic comparability on the basis of per capita gross national income, as reported in the most current annual issue of the World Development Report (The World Bank).[4] The surrogate countries on the list are not ranked and should be considered equivalent in terms of economic comparability.[5] Both the team's written request and OP's response should be made available to interested parties by being placed on the record of the proceeding.

*Comparable Merchandise*

Second, the operations team identifies those countries with producers of comparable merchandise among the potential surrogates on OP's list. As noted above, "comparable merchandise" is not defined in the statute or the regulations, since it is best determined on a case-by-case basis. Even so, there are some basic rules that every team should follow. In all cases, if identical merchandise is produced,[6] the country qualifies as a producer of comparable merchandise. In cases where identical merchandise is not produced, the team must determine if other merchandise that is comparable is produced. How the team does this depends on the subject merchandise. For example, in some cases, *e.g.*, steel and textiles, physical form and the extent of processing/finishing essentially distinguish different

Appx260

Case: 17-1520    Document: 47    Page: 176    Filed: 07/13/2017

products. In such cases, consideration of major inputs often is not required, as it is normally sufficient for the team to identify comparable merchandise on the basis of physical differences in the merchandise and whether the product is one of low or high value-added. Thus, if circular steel pipe and tube were the subject merchandise, rectangular steel pipe and tube, hot-rolled steel sheet and plate, steel wire rod, steel wire rope, steel bar, and structurals, all of which are low value-added products of roughly similar form (made by combining iron, energy, and further processing), would constitute comparable merchandise.

A similar approach can also be used in the case of industrial commodity chemicals and when the subject merchandise is part of a spectrum of light manufactured products, *e.g.*, paper clips, fireworks, wax candles, cased pencils, toys, shoes, gift boxes, folding metal tables and chairs. In these cases, the large number, and generic nature, of the inputs makes input matching very complicated. Therefore, it may make more sense for the operations team to consider the physical characteristics of the merchandise, and the extent of further value-added process in identifying comparable merchandise.

In other cases, however, where there are major inputs, *i.e.*, inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, *e.g.*, processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.

*Significant Producer*

Third, the operations team determines whether any of the countries which produce comparable merchandise are "significant" producers of that comparable merchandise. The extent to which a country is a *significant* producer should not be judged against the NME country's production level or the comparative production of the five or six countries on OP's surrogate country list. Instead, a judgement should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics). Since these characteristics are specific to the merchandise in question, the standard for "significant producer" will vary from case to case. For example, if there are just three producers of comparable merchandise in the world, then arguably any commercially meaningful production is significant. Intermittent production, however, would not be significant. If there are ten large producers and a variety of small producers, "significant producer" could be interpreted to mean one of the top ten. If, in the example above, there is also a middle-size group of producers, then "significant producer" could be interpreted as one of the top ten or middle group. In another case, there may not be adequate data available from major producing countries. In such a case, "significant producer" could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers. Because the meaning of "significant producer" can differ significantly from case to case, fixed standards such as "one of the top five producers" have not been adopted. For example, South Korea is, by almost any measure, a significant producer of steel, even though in 2001 it was not one of the top five producers overall.

Given that the decision as to what constitutes "significant production" in a particular case depends on available (often scarce) data, the specific criteria and supporting factual information used to determine whether a potential surrogate country is a significant producer is left to the discretion of the operations team. The operations team may consult with U.S. Government experts who have made their own assessments of the world's producers of

comparable merchandise or who can supply the team with country production or trade data. Other possible sources of data supporting the "significant production" decision may include non-governmental organizations or international trade/industry association publications and similar sources.

Sometimes, none of the countries identified as being economically comparable are a significant producer of comparable merchandise, as defined above. Or, it may happen that some countries meet both criteria, but sufficient data (with respect to quantity and quality) are not available to enable the Department to use any of those countries as the primary surrogate. In such cases, the team should request a second list of potential surrogate countries from OP, and then follow the country selection procedure described above.

*Data Considerations*

Fourth, if more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country.[7] Even if no issues arise regarding economic comparability and significant production, data quality is a critical consideration affecting surrogate country selection. After all, a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable. Limited data availability sometimes is the reason why the team will "go off" the OP list in search of a viable primary surrogate country.

In assessing data and data sources, it is the Department's stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data.

*Exceptions to the Sequencing Procedure*

Occasionally, there are also cases in which it is more appropriate for the team to address economic comparability only *after* the significant producer of comparable merchandise requirement is met. Cases where particular emphasis on "significant producer of comparable merchandise" is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), *e.g.*, crawfish, which is produced by only a few countries. See *Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 67 FR 63877 (October 16, 2002). Particular emphasis on "significant producer of comparable merchandise" is also generally warranted where major inputs are not widely traded internationally, *e.g.*, electricity, which is used intensively in the production of magnesium. See *Notice of Preliminary Results of Antidumping Duty Administrative Review: Pure Magnesium from the Russian Federation*, 59 FR 55427 (November 7, 1994).[8]

The significant producer requirement is particularly important in these cases because the Department wants to avoid selecting a surrogate country in which the relative scarcity (either through domestic sources or through imports) of a major non- or little-traded input precludes the country from being a competitive producer of comparable merchandise. For example, in the *Notice of Preliminary Determination of Sales at Less Than Fair Value: Urea Ammonium Nitrate Solutions From the Russian Federation*, 67 FR 62008 (October 3, 2002), the

 Retrieved from: www.fws.gov Date: 10/28/11 10:51 AM, Submission Status: Approved

Department placed particular emphasis on the significant producer requirement in light of the gas-intensive nature of urea ammonium nitrate production, and the fact that natural gas is not commonly imported into the countries being considered as surrogate countries.

In cases in which the significant producer of comparable merchandise criterion is particularly important, the team should first ensure, on the basis of in-house research (including possible communications with other U.S. Government experts) and any interested party comments, that the significant producer of comparable merchandise requirement is met. Only after this requirement is met should the team consider economic comparability. If the competing significant producer countries are at disparate levels of economic development, and the necessary factors data is available in these countries, then the team should use the country closest to the NME country in terms of per capita GNI. On the other hand, if the significant producer countries are at closely similar levels of economic development, as are the countries on a surrogate country selection list, the team should use the country with the best factor price data. Where only one country satisfies the significant producer and data requirements, that country will normally be used.

---

1. A net exporter is defined as a country whose exports exceed its imports.

2. An alternative approach that the Department has considered, but rejected as administratively unfeasible would be to assess the extent to which each country "grades out" *overall* with respect to the two statutory criteria. For example, each country would be assessed with respect to economic comparability and the extent to which it was a significant producer of comparable merchandise. These two grades would then be weighted together to arrive at a composite grade for each country. Teams would then have to combine with this composite grade an assessment or grading of factors data quality and completeness in the country. The best surrogate would then be selected on the basis of this overall grade.

3. OP excludes non-market economy countries from the list of potential surrogate countries, and also excludes countries that technically are presumed to be market economies, but which in OP's judgement are unsuitable sources for factor values (*e.g.*, Cuba).

4. In the past, the OP memos also referenced growth rates and the national distribution of labor between the agriculture and non-agriculture sectors. However, since these factors are not determinative in the selection of an economically comparable surrogate country, they will no longer be included in future OP memos.

5. IA's current practice reflects in large part the fact that the statute does not require the Department to use a surrogate country that is at a level of economic development *most* comparable to the NME country.

6. If considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise.

7. An additional surrogate is sometimes used to fill factor price "holes" in the primary

doc.gov/policy/bull04- l.html Date: 10/28/11 10:51 AM, Submission Status: Approved

surrogate.

8. For example, concerns were raised in *Pure Magnesium from the Russian Federation* about the electricity-intensive nature of magnesium production and the fact that electricity, as a general rule, is not significantly traded into potential surrogate countries. These concerns made clear the importance, from an electricity valuation standpoint, of selecting a surrogate that was a significant producer of magnesium or some other comparable electricity-intensive product. However, none of the countries on OP's initial surrogate country list produced "comparable merchandise," even after that had been more broadly defined. (After consulting with experts at the U.S. Bureau of Mines and the DOC Trade Development Metals Division, the Department concluded in that case that "comparable merchandise" comprised magnesium and aluminum because both are "light metals" in terms of weight, are electricity-intensive products, are produced using an electrolytic process, and share some common end-uses. The Department, with the help of the U.S. Bureau of Mines, identified four significant producers of such "comparable merchandise," defining significant production as production exceeding 100,000 metric tons per year. Venezuela, Argentina, Brazil and South Africa were found to be "significant producers" of either magnesium or aluminum. Because only Brazil produced magnesium, the Department selected Brazil as the primary surrogate country.

Import Administration Policy Bulletin

Number: 04.1
Topic: Non-Market Economy Surrogate Country Selection Process

Approved: _____

       James Jochum
       Assistant Secretary
        for Import Administration


_____

Date

<u>Statement of Issue</u>

This policy bulletin provides guidance regarding the Department's selection of surrogate market economy countries in non-market economy ("NME") cases.

<u>Background</u>

The statute provides broad discretion in the selection of surrogate market economy countries to value NME factors of production. In particular, section 773(c)(1)(B) of the Act reads:

> ...the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

Section 773(c)(4) of the Act adds:

The administering authority shall utilize to the extent possible ... prices ... in one or more market economy countries that are -

> 1. at a level of economic development comparable to that of the nonmarket economy country, and

> 2. a significant producer of comparable merchandise.

The terms "comparable level of economic development," "comparable merchandise," and "significant producer" are not defined in the statute. However, the Department's regulations attempt to clarify the statute's general guidance regarding surrogate country selection. In determining economic comparability, section 351.408 of the regulations places primary emphasis on per capita income, although other information can be considered. Some clarification is also provided in the Conference Report to the 1988 Omnibus Trade and Competitiveness Act, which added to the statute the current NME provisions and states that "significant producer" includes any country that is a "significant net exporter."[1] Section 351.408 of the regulations also makes clear that the relative weight attached to each of the two selection criteria, described above, is unspecified because the relative importance that the Department attaches to each will necessarily vary depending on the specific facts in each case.

The Conference Report also states that the Department should seek to use, if possible, data (in the surrogate market economy country) that reflect levels of technology and production volumes that are similar to the producers under investigation.

<u>Statement of Policy</u>

In each NME investigation and review, the team considers potential surrogate countries in terms of their economic comparability to the NME country, and whether they are significant producers of comparable merchandise. The team then designates one country as the primary surrogate in a memo to the file, which explains how that country satisfies the statutory selection criteria. The memo must give substantive reasons on the record for why it deems the country selected to be a "significant producer" of comparable merchandise. It must include more than mere assertions, and must separately address the significant producer and comparable merchandise requirements. If one or both of the statutory criteria cannot be met, the memo should explain why this is the case, and why the particular country was selected as the primary surrogate.

The statute does not require that the Department use a surrogate country that is at a level of economic development most comparable to the NME country and that is the most significant producer of comparable merchandise. The statute requires only that the Department use a surrogate market economy country that is at a level of economic development comparable to that of the NME country and that is a significant producer of comparable merchandise. Even these requirements are not binding, as the statute requires that they be met only to the extent possible. Accordingly, the Department has adopted the following approach of sequential consideration of the statutory elements.[2]

Economic Comparability

First, early in a proceeding, the operations team sends the Office of Policy ("OP") a written request for a list of potential surrogate countries. In response, OP provides a list of potential surrogate countries that are at a comparable level of economic development to the NME country.[3] OP determines economic comparability on the basis of per capita gross national income, as reported in the most current annual issue of the <u>World Development Report</u> (The World Bank).[4] The surrogate countries on the list are not ranked and should be considered equivalent in terms of economic comparability.[5] Both the team's written request and OP's response should be made available to interested parties by being placed on the record of the proceeding.

Comparable Merchandise

Second, the operations team identifies those countries with producers of comparable merchandise among the potential surrogates on OP's list. As noted above, "comparable merchandise" is not defined in the statute or the regulations, since it is best determined on a case-by-case basis. Even so, there are some basic rules that every team should follow. In all cases, if identical merchandise is produced,[6] the country qualifies as a producer of comparable merchandise. In cases where identical merchandise is not produced, the team must determine if other merchandise that is comparable is produced. How the team does this depends on the subject merchandise. For example, in some cases, e.g., steel and textiles, physical form and the extent of processing/finishing essentially distinguish different products. In such cases, consideration of major inputs often is not required, as it is normally sufficient for the team to identify comparable merchandise on the basis of physical differences in the merchandise and whether the product is one of low or high value-added. Thus, if circular steel pipe and tube were the subject merchandise, rectangular steel pipe and tube, hot-rolled steel sheet and plate, steel wire rod, steel wire rope, steel bar, and structurals, all of which are low value-added products of roughly similar form (made by combining iron, energy, and further processing), would constitute comparable merchandise.

A similar approach can also be used in the case of industrial commodity chemicals and when the subject merchandise is part of a spectrum of light manufactured products, e.g., paper

clips, fireworks, wax candles, cased pencils, toys, shoes, gift boxes, folding metal tables and chairs. In these cases, the large number, and generic nature, of the inputs makes input matching very complicated. Therefore, it may make more sense for the operations team to consider the physical characteristics of the merchandise, and the extent of further value-added process in identifying comparable merchandise.

In other cases, however, where there are major inputs, i.e., inputs that are specialized or dedicated or used intensively, in the production of the subject merchandise, e.g., processed agricultural, aquatic and mineral products, comparable merchandise should be identified narrowly, on the basis of a comparison of the major inputs, including energy, where appropriate.

Significant Producer

Third, the operations team determines whether any of the countries which produce comparable merchandise are "significant" producers of that comparable merchandise. The extent to which a country is a significant producer should not be judged against the NME country's production level or the comparative production of the five or six countries on OP's surrogate country list. Instead, a judgement should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics). Since these characteristics are specific to the merchandise in question, the standard for "significant producer" will vary from case to case. For example, if there are just three producers of comparable merchandise in the world, then arguably any commercially meaningful production is significant. Intermittent production, however, would not be significant. If there are ten large producers and a variety of small producers, "significant producer" could be interpreted to mean one of the top ten. If, in the example above, there is also a middle-size group of producers, then "significant producer" could be interpreted as one of the top ten or middle group. In another case, there may not be adequate data available from major producing countries. In such a case, "significant producer" could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers. Because the meaning of "significant producer" can differ significantly from case to case, fixed standards such as "one of the top five producers" have not been adopted. For example, South Korea is, by almost any measure, a significant producer of steel, even though in 2001 it was not one of the top five producers overall.

Given that the decision as to what constitutes "significant production" in a particular case depends on available (often scarce) data, the specific criteria and supporting factual information used to determine whether a potential surrogate country is a significant producer is left to the discretion of the operations team. The operations team may consult with U.S. Government experts who have made their own assessments of the world's producers of comparable merchandise or who can supply the team with country production or trade data. Other possible sources of data supporting the "significant production" decision may include non-governmental organizations or international trade/industry association publications and similar sources.

Sometimes, none of the countries identified as being economically comparable are a significant producer of comparable merchandise, as defined above. Or, it may happen that some countries meet both criteria, but sufficient data (with respect to quantity and quality) are not available to enable the Department to use any of those countries as the primary surrogate. In such cases, the team should request a second list of potential surrogate countries from OP, and then follow the country selection procedure described above.

Data Considerations

Fourth, if more than one country has survived the selection process to this point, the country with the best factors data is selected as the primary surrogate country.[7] Even if no issues arise regarding economic comparability and significant production, data quality is a critical consideration affecting surrogate country selection. After all, a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable. Limited data availability sometimes is the reason why the team will "go off" the OP list in search of a viable primary surrogate country.

In assessing data and data sources, it is the Department's stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data.

Exceptions to the Sequencing Procedure

Occasionally, there are also cases in which it is more appropriate for the team to address economic comparability only after the significant producer of comparable merchandise requirement is met. Cases where particular emphasis on "significant producer of comparable merchandise" is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), e.g., crawfish, which is produced by only a few countries. See Freshwater Crawfish Tail Meat from the People's Republic of China: Notice of Preliminary Results of Antidumping Duty Administrative Review, 67 FR 63877 (October 16, 2002). Particular emphasis on "significant producer of comparable merchandise" is also generally warranted where major inputs are not widely traded internationally, e.g., electricity, which is used intensively in the production of magnesium. See Notice of Preliminary Results of Antidumping Duty Administrative Review: Pure Magnesium from the Russian Federation, 59 FR 55427 (November 7, 1994).[8]

The significant producer requirement is particularly important in these cases because the Department wants to avoid selecting a surrogate country in which the relative scarcity (either through domestic sources or through imports) of a major non- or little-traded input precludes the country from being a competitive producer of comparable merchandise. For example, in the Notice of Preliminary Determination of Sales at Less Than Fair Value: Urea Ammonium Nitrate Solutions From the Russian Federation, 67 FR 62008 (October 3, 2002), the Department placed particular emphasis on the significant producer requirement in light of the gas-intensive nature of urea ammonium nitrate production, and the fact that natural gas is not commonly imported into the countries being considered as surrogate countries.

In cases in which the significant producer of comparable merchandise criterion is particularly important, the team should first ensure, on the basis of in-house research (including possible communications with other U.S. Government experts) and any interested party comments, that the significant producer of comparable merchandise requirement is met. Only after this requirement is met should the team consider economic comparability. If the competing significant producer countries are at disparate levels of economic development, and the necessary factors data is available in these countries, then the team should use the country closest to the NME country in terms of per capita GNI. On the other hand, if the significant producer countries are at closely similar levels of economic development, as are the countries on a surrogate country selection list, the team should use the country with the best factor price data. Where only one country satisfies the significant producer and data requirements, that country will normally be used.

1. A net exporter is defined as a country whose exports exceed its imports.

2. An alternative approach that the Department has considered, but rejected as administratively unfeasible would be to assess the extent to which each country "grades out" overall with respect to the two statutory criteria. For example, each country would be assessed with respect to economic comparability and the extent to which it was a significant producer of comparable merchandise. These two grades would then be weighted together to arrive at a composite grade for each country. Teams would then have to combine with this composite grade an assessment or grading of factors data quality and completeness in the country. The best surrogate would then be selected on the basis of this overall grade.

3. OP excludes non-market economy countries from the list of potential surrogate countries, and also excludes countries that technically are presumed to be market economies, but which in OP's judgement are unsuitable sources for factor values (e.g., Cuba).

4. In the past, the OP memos also referenced growth rates and the national distribution of labor between the agriculture and non-agriculture sectors. However, since these factors are not determinative in the selection of an economically comparable surrogate country, they will no longer be included in future OP memos.

5. IA's current practice reflects in large part the fact that the statute does not require the Department to use a surrogate country that is at a level of economic development most comparable to the NME country.

6. If considering a producer of identical merchandise leads to data difficulties, the operations team may consider countries that produce a broader category of reasonably comparable merchandise.

7. An additional surrogate is sometimes used to fill factor price "holes" in the primary surrogate.

8. For example, concerns were raised in Pure Magnesium from the Russian Federation about the electricity-intensive nature of magnesium production and the fact that electricity, as a general rule, is not significantly traded into potential surrogate countries. These concerns made clear the importance, from an electricity valuation standpoint, of selecting a surrogate that was a significant producer of magnesium or some other comparable electricity-intensive product. However, none of the countries on OP's initial surrogate country list produced "comparable merchandise," even after that had been more broadly defined. (After consulting with experts at the U.S. Bureau of Mines and the DOC Trade Development Metals Division, the Department concluded in that case that "comparable merchandise" comprised magnesium and aluminum because both are "light metals" in terms of weight, are electricity-intensive products, are produced using an electrolytic process, and share some common end-uses. The Department, with the help of the U.S. Bureau of Mines, identified four significant producers of such "comparable merchandise," defining significant production as production exceeding 100,000 metric tons per year. Venezuela, Argentina, Brazil and South Africa were found to be "significant producers" of either magnesium or aluminum. Because only Brazil produced magnesium, the Department selected Brazil as the primary surrogate country.



BLANK ROME LLP
COUNSELORS AT LAW

Phone:     (202) 772-5922
Fax:       (202) 772-8382
Email:     Clarke-p@blankrome.com

November 29, 2011

Case Number: A-570-898
Total Pages: 480
6th Administrative Review:
6/1/2010 – 5/31/2011
1A/China/NME/Office 8
**Business Proprietary Information is Deleted On Pages
C-11, 15-21, 25-29, 33, 45, and 46 and in Exhibits A.1; C-1, C-2, and
CV-1-8, And On Pages D-9, 11, 18-19, 25, and 36, and DV-9-10 and
in Exhibits D 1-4, 5.2-12.4, and 12.6-15, and DV 2, 4, and 5.1-17.3**

**PUBLIC VERSION**

**BY ELECTRONIC FILING**

The Honorable John Bryson
Secretary of Commerce
U.S. Department of Commerce
Central Records, Room 1870
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

Re:    *Chlorinated Isocyanurates from China (Sixth Administrative Review) –
Jiheng Chemical Response to Sections C and D*

Dear Secretary Bryson:

On behalf of Hebei Jiheng Chemical Company, Ltd. ("Jiheng Chemical"), a respondent

in the above-captioned review, we hereby submit the response to Sections C and D of the

Watergate 600 New Hampshire Avenue NW Washington, DC 20037
www.BlankRome.com

California  •  Delaware  •  Florida  •  New Jersey  •  New York  •  Appx271  •  Pennsylvania  •  Texas  •  Washington, DC  •  Hong Kong

PUBLIC VERSION

## SECTION D

### Factors of Production

All of the subject merchandise sold by Hebei Jiheng Chemical Co., Ltd. ("Jiheng Chemical") to the United States during the POR was produced by Jiheng Chemical and its affiliated company, Hebei Jiheng Baikang Chemical Industry Co., Ltd. (hereinafter referred to as "Baikang"). Therefore, this response is submitted in reply to the Department's Section D Questionnaire regarding the antidumping duty annual administrative review of Chlorinated Isocyanurates ("subject merchandise") from the People's Republic of China ("PRC"), on behalf of Jiheng Chemical and Baikang (hereinafter collectively referred to as "HJC Group").

## I.  General Explanation of Section D

This section of the antidumping questionnaire instructs you on how to report the factors of production of the merchandise under consideration. Please refer to the cover letter to determine your reporting requirements.

### A. Factors of Production

Factors of production (FOP) are used to construct the value of the product sold by your company in the United States. The Department will use the input amounts you report, along with the appropriate price from the chosen surrogate country, to construct the normal value of the merchandise under consideration sold by your company to the U.S. market. Surrogate values for overhead, selling, general and administrative (SG&A) expenses and profit will also be added. Unless otherwise instructed by the Department, you should report FOP information for **all** models or product types in the U.S. market sales listing submitted by you (or the exporter) in response to Section C of the questionnaire, including that portion of the production that was not destined for the United States. The reported amounts should reflect the FOPs used to produce one unit of the merchandise under consideration.

If you believe that your company uses any raw materials that should be classified as factory overhead expenses rather than valued as a FOP and

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

PUBLIC VERSION

Jiheng Chemical does not assign costs to the by-products in its normal records and it records the income from the sale of hydrogen (the only by-product it sells as is) separately from the sales of the products or co-products.   In contrast to the by-products, Jiheng Chemical treats the intermediate products as co-products to the extent that they are not used to produce chlor isos.   In other words, Jiheng Chemical sells the cyanuric acid, caustic soda, and chlorine gas that Jiheng Chemical does not use for its own production.   Jiheng Chemical assigns costs to these products and treats the sales revenue as business income.   Therefore, Jiheng Chemical considers these products to be co-products rather than by-products.

> iii. **Complete the Excel chart at Appendix VIII, identifying, by month, the quantity produced, sold, reintroduced into production, or otherwise disposed of (*e.g.*, sold, returned to production of the merchandise under consideration, discarded).   You should complete a separate chart for each by-product or co-product.**

Response:

> Exhibit-12.1 contains the by-product disposition chart as requested.

> iv. **Provide production records demonstrating production of each by-product/co-product during one month of the POR. (Where possible, provide records for the same month for each by-product/co-product for which an offset is claimed);**

Response:

> Exhibit-12.2 contains the production records for each by-product as requested.

> v. **Provide    evidence    of    the    disposition    of    the by-products/co-products:**

129331.06504/36144449v.2

D-29

Appx434

1. **If sold, provide evidence of the sales (*e.g.*, invoices or internal records demonstrating the sale), as well as evidence of receipt of payment for the sale of the item for the largest month of sales for each by-product/co-product;**

Response:

Exhibit-12.3 contains the sales invoice and the evidence of receipt of payment as requested.

2. **If reintroduced into production, provide production records demonstrating this for the largest month of consumption for each by-product/co-product;**

Response:

Exhibit-12.4 contains the production records as requested.

vi. **Provide a detailed explanation of how you derived the claimed offset amount for each claim; and**

Response:

Jiheng Chemical provides the following exhibits to demonstrate the calculation of recovered volume for each by-product:

- Exhibit D-12.5 contains the conversion chart explaining the by-products conversion rate.

- Exhibit D-12.6 contains the worksheets to support the claimed offset of four by products.

Hydrogen gas: During the POR, hydrogen gas was generated in the electrolysis process and was recovered for two purposes: 1) to sell to unaffiliated customers; and 2) mixed with chlorine gas to produce hydrochloric acid. The hydrochloric acid produced from hydrogen gas and chlorine gas were used in the production process, and also sold to unaffiliated

129331.06504/36144449v.2

Appx435

PUBLIC VERSION

customers.   Jiheng Chemical claimed an offset only for hydrogen gas sold to unaffiliated customers directly, and the gas used to produce hydrochloric acid, which was sold on the market.   Jiheng Chemical did not claim an offset for the portion of hydrogen gas which was used to produce hydrochloric acid that was cycled into production.

Discharged chlorine gas.   Discharged chlorine gas is the chlorine gas left in the pipes when chlorine gas is transported.   The gas that is being discharged at these points was produced at the same time as the chlorine gas intermediate product.   As shown in Jiheng Chemical's production flow chart, provided at Exhibit D-5.1, chlorine gas is discharged in three production processes:

(1) Purification process in the Chlor-alkali Plant—chlorine gas from electrolysis is purified and then either piped back into the production process to become an input for TCCA products or sold.   Some chlorine gas is unavoidably discharged in this process;

(2) Liquefaction process in the Chlor-Alkali Plant—In the liquefaction process, some chlorine gas is unavoidably discharged; and

(3) TCCA production process in the Disinfector Plant—chlorine gas is required to produce the TCCA products and SDIC, but the chemical reaction cannot be 100%, therefore, some chlorine gas is unavoidably discharged.

During the POR, discharged chlorine gas was recovered for the production of hydrochloric acid and sodium hypochlorite.   Both the Disinfector Plant and the

PUBLIC VERSION

Chlor-alkali Plant have sodium hypochlorite production lines. Jiheng Chemical claimed an offset for the portion of discharged chlorine gas used to produce hydrochloric acid and sodium hypochlorite sold to the market. Jiheng Chemical did not claim an offset for the portion of discharged chlorine gas that was used to produce hydrochloric acid recycled into production.

> Recovered sulfuric acid. Sulfuric acid was used as an input to refine cyanuric acid at the Cyanuric Acid Plant, and the discharged sulfuric acid was generated after refining process. During the POR, sulfuric acid was mixed with ammonia gas to produce ammonium sulfate. Jiheng Chemical claims an offset for the sulfuric acid used to produce ammonium sulfate, which was sold on the market.

> Ammonium gas. Ammonia gas was generated in the pyrolysis process at the Cyanuric Acid Plant. During the POR, ammonia gas was mixed with sulfuric acid to produce ammonium sulfate. Jiheng Chemical claims an offset for the ammonia gas used to produce ammonium sulfate, which was sold on the market.

In the Department's supplemental questionnaire issued to Jiheng Chemical in January, 2008 during the second review, the Department instructed Jiheng Chemical to also provide the calculations based on the quantity of downstream product produced. Thus, Jiheng Chemical has also calculated the claimed offset of the four by-products based on their production quantity during the instant POR.

PUBLIC VERSION

Exhibits D-12.7 contains the worksheets to support the claimed offset of ammonia gas, sulfuric acid, chlorine gas and hydrogen gas based on the quantity of by-products claimed based on the amount of downstream product produced during the POR.

Jiheng Chemical has reported the by-product offset based on the sales quantity of downstream products in Field Number 6.1 – 6.4 in its consolidated and factory-specific FOP charts.

Jiheng Chemical has also reported the by-product-offset based on the production quantity of downstream products in Field Number 6.5 – 6.8 in its consolidated and factory-specific FOP charts.

Exhibit D-12.8 and Exhibit D-12.9 contains the by-product calculation worksheets which are offset based on the sales quantity and production quantity of downstream products respectively.

> **vii. Provide the calculations used to derive each claimed amount.**
>
> **If the by-product for which you are claiming an offset is a downstream by-product, in addition to responding to the items above, please also:**
>
> i. **Provide the per-unit usage rate of each input used to produce the downstream by-product; and**
> ii. **Provide a detailed narrative description of the production process used to generate the downstream by-product.**

Response:

Calculations are provided in Exhibit D-12.7.

129331.06504/36144449v.2

# EXHIBIT LIST

| Exhibit No. | Description | Tab No. |
|---|---|---|
| Exhibit D-1 | Headquarters FOP Database | 1 |
| Exhibit D-2 | Wuyi Branch FOP Database | 2 |
| Exhibit D-3 | Baikang FOP Database | 3 |
| Exhibit D-4 | Consolidated FOP Database | 4 |
| Exhibit D-5.1 | Production Process Diagram | 5 |
| Exhibit D-5.2 | Production Process Technical Description | 5 |
| Exhibit D-6 | List of Documents | 6 |
| Exhibit D-7 | Raw Material Inputs Calculation Worksheets | 7 |
| Exhibit D-8 | Transportation Distance Worksheet | 8 |
| Exhibit D-9 | Direct Labor Hour Calculation Worksheet | 9 |
| Exhibit D-10 | Indirect Labor Hour Calculation Worksheet | 10 |
| Exhibit D-11 | Energy Inputs Calculation Worksheets | 11 |
| Exhibit D-12.1 | By-Product Disposition Chart | 12 |
| Exhibit D-12.2 | Production Records for Each By-Product | 12 |
| Exhibit D-12.3 | Sales Invoice and Payment Evidence | 12 |
| Exhibit D-12.4 | Supporting Documents for Quantity Reintroduced into Production | 12 |
| Exhibit D-12.5 | By-Product Conversion Rates | 12 |
| Exhibit D-12.6 | By-Products Offset (by Sales Quantity) | 12 |
| Exhibit D-12.7 | By-Products Offset (by Production Quantity) | 12 |
| Exhibit D-12.8 | By-Product Calculation Worksheet (by Sales Quantity) | 12 |
| Exhibit D-12.9 | By-Product Calculation Worksheet (by Production Quantity) | 12 |
| Exhibit D-13 | Packing Material Calculation Worksheet | 13 |

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

| Exhibit D-14 | Packing Labor Hours Calculation Worksheet | 14 |
| Exhibit D-15 | FOP Spreadsheets | 15 |

| Exhibit No. | Description | Tab No. |
|---|---|---|
| Exhibit DV-1 | Cost Flow Chart | 16 |
| Exhibit DV-2 | 2010 Consolidated Financial Statements | 17 |
| Exhibit DV-3 | Master Chart | 18 |
| Exhibit DV-4 | Cost of Inventory Goods | 19 |
| Exhibit DV-5.1 | Breakdown of December 2010 Net Inventory | 20 |
| Exhibit DV-5.2 | Headquarters 2010 Balance Sheet | 20 |
| Exhibit DV-5.3 | Wuyi 2010 Balance Sheet | 20 |
| Exhibit DV-6.1 | Movement of Inventory Cost to COM | 21 |
| Exhibit DV-6.2 | Supporting Ledger | 21 |
| Exhibit DV-7 | Cost of Main Raw Material Inventory to COM | 22 |
| Exhibit DV-8 | December 2010 COM Statement | 23 |
| Exhibit DV-9 | COM to Cost of Finished Goods | 24 |
| Exhibit DV-10 | Overlapping Cost Demonstration | 25 |
| Exhibit DV-11.1 | "Work-in-Progress" Goods Chart | 26 |
| Exhibit DV-11.2 | Supporting Ledger | 26 |
| Exhibit DV-12.1 | Cost of Finished Goods Inventory | 27 |
| Exhibit DV-12.2 | Ledger of Finished Goods | 27 |
| Exhibit DV-13.1 | Cost of Finished Goods Inventory to Cost of Goods Sold | 28 |
| Exhibit DV-13.2 | Ledger Supporting the Consumption for Production | 28 |
| Exhibit DV-13.3 | Ledger Supporting the Consumption of Some Free of Charge | 28 |
| Exhibit DV-13.4 | Ledger Supporting the Quantity Transferred to the Detergent Plant | 28 |

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

| | | |
|---|---|---|
| Exhibit DV-13.5 | Ledger Supporting the Cost of Non-Refundable Value-Added Tax | 28 |
| Exhibit DV-13.6 | Ledger of Other Business Cost | 28 |
| Exhibit DV-14.1 | Cost of Goods Sold Reconciliation | 29 |
| Exhibit DV-14.2 | Wuyi December 2010 Income Statement | 29 |
| Exhibit DV-14.3 | Headquarters December 2010 Income Statement | 29 |
| Exhibit DV-15.1 | Salt Reconciliation Chart | 30 |
| Exhibit DV-15.2 | Sub-Ledger for Salt | 30 |
| Exhibit DV-16.1 | Urea Reconciliation Chart | 31 |
| Exhibit DV-16.2 | Sub-Ledger for Urea | 31 |
| Exhibit DV-17.1 | Electricity Reconciliation Chart | 32 |
| Exhibit DV-17.2 | Ledgers for Electricity | 32 |
| Exhibit DV-17.3 | Sample Electricity Invoice | 32 |

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

# Exhibit D-5.1

129331.06504/36144461v.1

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

Official Document: A-570-898 Barcode:3043529-02 REV - Admin Review 6/1/10 - 5/31/11

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

*Cyanuric acid stage*



Official Document: A-570-898 Barcode:3043529-02 REV - Admin Review 6/1/10 - 5/31/11

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved



Official Document: A-570-898 Barcode:3043529-02 REV - Admin Review 6/1/10 - 5/31/11

*TCCA stage*



Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

Official Document: A-570-898 Barcode:3043529-02 REV - Admin Review 6/1/10 - 5/31/11

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

**SDIC stage**
*(Unit: Metric Ton)*



# Exhibit D-12.1

129331.06504/36144461v.1

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:47 PM, Submission Status: Approved

By-Product: Ammonia gas

Company-wide (Headquarters and Wuyi Branch combined)                                                                Unit: MT



| | Quantity Produced | Quantity directly sold | Quantity sold based on the sales quantity of Ammonium sulfate | Quantity Reintroduced into Production of Ammonium sulfate | Quantity Discarded | Quantity lost |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F=A-B-D |
| Jun-10 | | | | | | |
| Jul-10 | | | | | | |
| Aug-10 | | | | | | |
| Sep-10 | | | | | | |
| Oct-10 | | | | | | |
| Nov-10 | | | | | | |
| Dec-10 | | 1100 | 400 | 1200 | | -16 |
| Jan-11 | | | | | | |
| Feb-11 | | | | | | |
| Mar-11 | | | | | | |
| Apr-11 | | | | | | |
| May-11 | | | | | | |
| Subtotal | | | | | | |

\* Jiheng Chemical provides the ledger of urea in August, 2010.
\* Jiheng Chemical provides the sales invoice stamped with chop of cash received evidencing the payment of ammonium sulfate in March, 2011.
\* Jiheng Chemical provides the consumption quantity for reintroducing into the production of ammonium sulfate in Feb., 2011.

I. Quantity produced
Month: August, 2010
Headquarters          300 (MT)
Wuyi Branch           (MT)
Company-wide          1200 (MT)

*Chemical reaction of cyanuric acid stage:*
3CO(NH2)2 → C3O3H3N3 + 3NH3

Molecular weight of urea (3CO(NH2)2): (A)                     180
Consumption of urea (3CO(NH2)2) reported in August,          900 MT
2010: (B)

Molecular weight of ammonium gas (3NH3): (C)

Theoretical output of ammonium gas (3NH3) based on           300 MT
chemical equation: (D=C/A*B)

Please see the supporting documents contained in Ex D-12.2.

II. Quantity sold based on the sales quantity of Ammonium sulfate.
Month: March, 2011
Headquarters          2200 (MT)
Wuyi Branch           (MT)
*Less: Internal transaction*
Company-wide          2400 (MT)

*chemical reaction for producing ammonia sulfate:*
2NH3 + H2SO4 → (NH4)2SO4

Sales quantity of ammonium sulfate in March, 2011 (E)        7000 MT

Please see the supporting documents contained in Ex D-12.3.

Molecular weight of ammonium gas: (F)                        34
Molecular weight of ammonium sulfide: (G)                    132
Absorption rate of ammonium gas: (H)                         95%
Concentration of ammonium sulfate: (I)                       90%
Total amount of ammonium gas needed to produce the           2000 MT
ammonium sulfate manufactured during the POR:
(J=E*F/G/H*I)

III. Quantity Reintroduced into Production of Ammonium sulfate
Month: Feb., 2011
Headquarters          2500 (MT)
Wuyi Branch           2000 (MT)
Company-wide

*chemical reaction for producing ammonia sulfate:*
2NH3 + H2SO4 → (NH4)2SO4

Production quantity of ammonium sulfate in Feb., 2011 (E)    7000 MT

Please see the supporting documents contained in Ex D-12.4.

Molecular weight of ammonium gas: (F)                        34
Molecular weight of ammonium sulfide: (G)                    132
Absorption rate of ammonium gas: (H)                         95%
Concentration of ammonium sulfate: (I)                       85%
Total amount of ammonium gas needed to produce the           2200 MT
ammonium sulfate manufactured during the POR:

Contains Ranged Data
Public Version

Appx589

By-Product: Recovered sulfuric acid

Company-wide (Headquarters and Wuyi Branch combined)

| | Quantity Produced | Quantity directly sold | Quantity sold based on the sales quantity of Ammonium sulfate | Quantity Reintroduced into Production of Ammonium sulfate | Quantity Reintroduced into Production of Cyanuric acid | Quantity lost |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F=A-D-E |
| Jun-10 | | | | | | |
| Jul-10 | | | | | | |
| Aug-10 | | | | | | |
| Sep-10 | | | | | | |
| Oct-10 | | | | | | |
| Nov-10 | | | | | | |
| Dec-10 | 1100 | | 1300 | 800 | 400 | |
| Jan-11 | | | | | | |
| Feb-11 | | | | | | |
| Mar-11 | | | | | | |
| Apr-11 | | | | | | |
| May-11 | | | | | | |
| Subtotal | 14,000 | | 10,000 | 9,000 | 5,000 | |

* Jiheng Chemical provides the production record of recovered sulfuric acid in August, 2010.
* Jiheng Chemical provides the sales invoice stamped with chop of cash received evidencing the payment of ammonium sulfate in March, 2011.
* Jiheng Chemical provides the consumption quantity for reintroducing into the production of ammonium sulfate in Feb., 2011

**I. Quantity produced**
Month: August, 2010
Headquarters  (MT)
Wuyi Branch (MT)
Company-wide (MT)

*Please see the supporting documents contained in Ex D-12.2.*

**II. Quantity sold based on the sales quantity of Ammonium sulfate**
Month: March, 2011
Headquarters  (MT)
Wuyi Branch (MT)
*Less: Internal transaction* (MT)
Company-wide (MT)

Sales quantity of ammonium sulfate in March, 2011  A

Concentration of ammonium sulfate — B
*Conversion Rate 14.24% C
Total sulfuric acid required to produce the ammonium sulfate D=A*B*C
* Input of other purchased sulfuric acid into production of ammonium sulfate E
Sulfuric acid recovered F=D-E

*Please see the supporting documents contained in Ex D-12.3.*

**III. Quantity Reintroduced into Production of Ammonium sulfate**
Month: Feb., 2011
Headquarters  (MT)
Wuyi Branch (MT)
Company-wide (MT)

Production quantity of Ammonium Sulfate in Feb., 2011  A

Concentration of ammonium sulfate B
*Conversion Rate 14.24% C
Total sulfuric acid required to produce the D=A*B*C
* Input of other purchased sulfuric acid into production of ammonium sulfate E
Sulfuric acid recovered F=D-E

*Please see the supporting documents contained in Ex D-12.4.*

Public Version

Contains Ranged Data

Appx590

By-Product: Discharged chlorine gas

Chart 1. Discharged chlorine gas generated at chlor-alkali Plant
Company-wide (Headquarters and Wuyi Branch combined)



Unit: MT

| | Quantity Produced | Quantity directly sold | Quantity sold based on the sales quantity of hydrochloric acid | Quantity sold based on the sales quantity of sodium hypochlorite | Quantity Reintroduced into Production of hydrochloric acid (EXCLUDING the hydrochloric acid re-entered into electrolysis stage) | Quantity Reintroduced into Production of sodium hypochlorite | Quantity Discarded | Quantity lost |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H=A-B-E-F |
| Jun-10 | 100 | | 225 | | 210 | 20 | | |
| Jul-10 | | | | | | | | |
| Aug-10 | | | | | | | | |
| Sep-10 | | | | | | | | |
| Oct-10 | | | | | | | | |
| Nov-10 | | | | | | | | |
| Dec-10 | | | | | | | | |
| Jan-11 | | | | | | | | |
| Feb-11 | | | | | | | | |
| Mar-11 | | | | | | | | |
| Apr-11 | | | | | | | | |
| May-11 | | | | | | | | |
| Subtotal | 2000 | | 1500 | | 1800 | 220 | | |

Chart II. Discharged chlorine gas generated at disinfectant plant
Company-wide (Headquarters and Wuyi Branch combined)

Unit: MT

| | Quantity Produced | Quantity directly sold | Quantity sold based on the sales quantity of sodium hypochlorite | Quantity Reintroduced into Production of sodium hypochlorite | Quantity Discarded | Quantity lost |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F=A-B-D |
| Jun-10 | 150 | | | 150 | | |
| Jul-10 | | | | | | |
| Aug-10 | | | | | | |
| Sep-10 | | | | | | |
| Oct-10 | | | | | | |
| Nov-10 | | | | | | |
| Dec-10 | | | | | | |
| Jan-10 | | | | | | |
| Feb-10 | | | | | | |
| Mar-10 | | | | | | |
| Apr-10 | | | | | | |
| May-10 | | | | | | |
| Subtotal | 1300 | | | 1250 | | |

* Jiheng Chemical picks the discharged chlorine gas generated at chlor-alkali stage to provide supporting documents.
* Jiheng Chemical provides the production record of chlorine gas in August, 2010
* Jiheng Chemical provides the sales invoice stamped with chop of cash received evidencing the payment of hychloric acid in August, 2010.
* Jiheng Chemical provides the supporting docs demonstrating the quantity reintroducing into the production of hydrochloric acid and that into the production of sodium hypochlorite in August, 2010 respectively.

* The totalities of "Quantity Produced" at two plants reported above are different from the claimed discharged chlorine gas calculated at Exhibit D-12.15. This is because the totalities of "Quantity Reintroduced into Production of sodium hypochlorite" herein are reported based on the meter reading, what Jiheng calculated the discharged chlorine gas at Exhibit D-12.15, Jiheng derived the discharged Chlorine gas (the part used to produce sodium hypochlorite) only based on the actual production quantity of sodium hypochlorite. Therefore, there are sligh differences among these numbers.

I. Quantity produced
Month: August, 2010
Headquarters   [300] (MT)
Wuyi Branch    [100] (MT)
Company-wide   [400] (MT)

**Contains Ranged Data**

**Public Version**

Production of hydrochloric acid in August, 2010   A1   [800] Please see the supporting documents contained in Ex D-12.2.
Quantity re-entered into electrolysis stage   A2   [20]
* Conversion Rate   B   30.15%
Chlorine gas recovered   C=(A1-A2)*B   [300]
Quantity Reintroduced into Production of sodium hypochlorite   D   [20] Please see the supporting documents contained in Ex D-12.2.
Quantity produced   E=C+D   [50]

II.Quantity sold based on the sales quantity of hydrochloric acid
Month: August, 2010
Headquarters   [250] (MT)
Wuyi Branch    [50] (MT)
Company-wide   [300] (MT)

Sales quantity of hydrochloric acid in August, 2010   [900] A   Please see the supporting documents contained in Ex D-12.3.
* Conversion Rate   30.15% B
Chlorine gas recovered   [300] C=A*B

III. (1) Quantity Reintroduced into Production of hydrochloric acid  (EXCLUDING the hydrochloric acid re-entered into electrolysis stage)
Month: August, 2010
Headquarters   [300] (MT)
Wuyi Branch    [50] (MT)
Company-wide   [350] (MT)

Production of hydrochloric acid in August, 2010   A1   [1000] Please see the supporting documents contained in Ex D-12.4.
Quantity re-entered into electrolysis stage   A2   [50]
* Conversion Rate   B   30.15%
Chlorine gas recovered   C=(A1-A2)*B   [300]

III. (2) Quantity Reintroduced into Production of sodium hypochlorite
Month: August, 2010
Headquarters   [20] (MT)   Please see the supporting documents contained in Ex D-12.4.
Wuyi Branch    (MT)
Company-wide   [30] (MT)

Appx591



By-Product: Hydrogen gas

Company-wide (Headquarters and Wuyi Branch combined)        Unit: MT

| | Quantity Produced | Quantity directly sold | Quantity sold based on the sales quantity of hydrochloric acid | Quantity Reintroduced into Production of hydrochloric acid | Quantity Discarded |
|---|---|---|---|---|---|
| | A | B | C | D | E=A-B-D |
| Jun-10 | | | | | |
| Jul-10 | | | | | |
| Aug-10 | | | | | |
| Sep-10 | 400 | 70 | | 20 | 300 |
| Oct-10 | | | | | |
| Nov-10 | | | | | |
| Dec-10 | | | | | |
| Jan-11 | | | | | |
| Feb-11 | | | | | |
| Mar-11 | | | | | |
| Apr-11 | | | | | |
| May-11 | | | | | |
| Subtotal | 3400 | 2200 | 35 | 200 | 1100 |

* Jiheng Chemical provides the production record of hydrogen gas in August, 2010.
* Jiheng Chemical provides the sales invoice stamped with chop of cash received evidencing the payment of hydrogen gas in Oct., 2010
* Jiheng Chemical provides the sales invoice stamped with chop of cash received evidencing the payment of hychloric acid in August., 2010.
* Jiheng Chemical provides the consumption quantity for reintroducing into the production of hydrochloric acid in Sept, 2010.

I. Quantity produced
Month: August, 2010
Headquarters      120 (MT)            Please see the supporting documents contained in Ex D-12.2.
Wuyi Branch          (MT)
Company-wide     275 (MT)

II. Quantity directly sold
Month: Oct., 2010
Headquarters      950000 (M3)        Please see the supporting documents contained in Ex D-12.3.
Wuyi Branch       3200000 (M3)
Subtotal          4200000 (M3)
    Density                 MT/M3
    Purity
Company-wide      350 (MT)

III. Quantity sold based on the sales quantity of hydrochloric acid
Month: August, 2010
Headquarters      (MT)
Wuyi Branch       (MT)
Company-wide      (MT)

Sales quantity of hydrochloric acid in August, 2010        Please see the supporting documents contained in Ex D-12.3.
                                              700 A
* Conversion Rate                             0.85% B
Chlorine gas recovered                        C=A*B

IV. Quantity Reintroduced into Production of hydrochloric acid
Month:Sept., 2010
Headquarters      12 (MT)            Please see the supporting documents contained in Ex D-12.4.
Wuyi Branch          (MT)
Company-wide      25 (MT)

Contains Ranged Data

Public Version

Appx592

# Exhibit D-12.2

129331.06504/36144461v.1

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

NOT SUSCEPTIBLE TO
PUBLIC SUMMARY

Testing Report of Hebei Jiheng

河北冀衡化学股份有限公司 Chemical Co. Ltd

检 验 报 告

Plant: Cyanuric acid plant

分厂: 氰尿酸厂

Sampling date, August, 2010

抽样时间: 2010年8月

| Product name 产品名称 | Density (kg/L) 稀硫酸 密度(千克/升) | Recovered sulphuric acid Density 浓度 |
|---|---|---|
| Item 表号 | | |
| | ( | 12%. ) |
| | | |
| | | |
| | | |
| | **Public Version** | |
| | | |
| | **Contains Ranged Data** | |
| | | |
| Remarks 备注 | | |
| Tester 检验人 王春荣 | Reviewer 复核人 | Person in charge 负责人 |

300 MT

Cyanuric acid

氢尿酸厂

August 14, 2010

读表日期 2010年8月14日

Product name                    Recovered

| 产品名称 | | 稀硫酸 |
| 本月打酸 | (2000) | |
| Sulfuric acid | | |
| | | |
| Remarks 备注 | | |

Prepared by                    Reviewer

Contains Ranged Data
Public Version

NOT SUSCEPTIBLE TO
PUBLIC SUMMARY

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

Meter-reading record of chlorine gas



| Products and meters | Item | | Meter reading (M3) | | Qty of chlorine gas (MT) |
|---|---|---|---|---|---|
| | Density (g/L) | Purity (%) | Last month | Current month | |
| Meter (no.1) Discharged chlorine gas generated from purification process | | 75 | 15000 | 15000 | 300 |
| Meter (no.2) Discharged chlorine gas generated from liquefaction process | | | | | |
| Meter (no.3) Chlorine used to produce hypochloric acid | | | | | |
| Meter (no.4) Chlorine gas used to produce SDIC | | | | | |
| Meter (no.5) Chlorine gas used to produce TCCA | | | | | |
| Meter (no.7) Discharged chlorine gas generated from TCCA production | | | | | |
| Meter (no.8) Discharged chlorine gas generated from SDIC production | | | 17000 | 17000 | 20 |

Prepared by [        ]

Date: 2010-8-31

300     300   20MT

Public Version

Contains Ranged Data

Appx600

Testing report of chlorine gas (Headquarters)

| Products and meters | Item | |
|---|---|---|
| | Density (g/L) | Purity (%) |
| Meter (no.1) Discharged chlorine gas generated from purification process | | 75 |
| Meter (no.2) Discharged chlorine gas generated from liquefaction process | | 70 |
| Meter (no.3) Chlorine used to produce hypochloric acid | | 80 |
| Meter (no.4) Chlorine gas used to produce SDIC | | 100 |
| Meter (no.5) Chlorine gas used to produce TCCA | | 95 |
| Meter (no.7) Discharged chlorine gas generated from TCCA production | | |
| Meter (no.8) Discharged chlorine gas generated from SDIC production | | |
| | | |
| Date: 2010-8-31 | Date: 2010-8-31 | Date: 2010-8-31 |

Contains Ranged Data

Public Version

Appx601

## 硕康氯气查表记录



| 名称及表号 | 项目 | | 表字（m³） | | 氯气数量 |
|---|---|---|---|---|---|
| | 密度（g/L） | 纯度% | 上月 | 本月 | （吨） |
| 和氯气产生尾氯表1 | | | | | |
| 液化产生的尾氯表2 | | | | | |
| 盐酸耗氯表3 | | | | | |
| 二氯耗氯表4 | | | | | |
| 三氯耗氯表5 | | | | | |
| 三氯产生的尾氯表7 | | | | | |
| 二氯产生的尾氯表8 | | | | | |

查表：

日期： 20/0. 8. 31

Public Version

## 硕康氯气检验报告



| 样品名称及表号 | 项目 | |
|---|---|---|
| | 密度（g/L） | 纯度% |
| 粗氯气产生尾氯 表1 | | |
| 液化产生的尾氯表2 | | |
| 盐酸耗氯表3 | | |
| 二氯耗氯表4 | | |
| 三氯耗氯表5 | | |
| 三氯产生的尾氯表7 | | |
| 二氯产生的尾氯表8 | | |
| 日期：20/0.8.3/ | 日期：20/0.8.3/ | 日期：20/0.8.3/ |

Public Version

**Meter-reading record of hydrogen gas**

| Products and meters | Meter reading (M3) | |
|---|---|---|
| | Last month | Current month |
| Meter (no.1) Hydrogen gas generated from electrolysis process | | 1,500,000 |
| Meter (no.2) Hydrogen gas piped to hydrochloric acid production | 9,000,000 | 10,000,000 |
| Meter (no.3) Hydrogen gas sold | 33,000,000 | 33,000,000 |
| | | |
| | | |
| | | |

Prepared by:
Date: 2010-8-31

Meter (no.1) Hydrogen gas generated from electrolysis process          1,500,000        98    130 MT

Contains Ranged Data

Public Version

Appx604

**Testing report of hydrogen gas (Headquarters)**



| Products and meters | Item | |
|---|---|---|
| | Density (g/L) | Concentration (%) |
| Meter (no.1) Hydrogen gas generated from electrolysis process | | 95 |
| Meter (no.2) Hydrogen gas piped to hydrochloric acid | | 95 |
| Meter (no.3) Hydrogen gas sold | | 95 |
| | | |
| | | |
| Date: 2010-8-31 | Date: 2010-8-31 | Date: 2010-8-31 |

Contains Ranged Data

Public Version

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

Public Version

## 硕康氢气查表记录



| 名称及表号 | 表字（m³） | |
| --- | --- | --- |
| | 上月 | 本月 |
| 电解生产氢气表1 | | |
| 盐酸耗氢气表2 | | |
| 销售氢气表3 | | |
| | | |
| | | |

抄表：[        ]

日期： 20/0.8.3 |

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

Public Version

## 硕康氢气检验报告



| 样品名称及表号 | 项目 | |
|---|---|---|
| | 密度（g/L） | 纯度% |
| 电解生产氢气 表1 | | |
| 盐酸耗氢气表2 | | |
| 销售氢气表3 | | |
| | | |
| | | |
| | | |
| | | |
| 日期：2010.8.31 | 日期：2010.8.31 | 日期：2010.8.31 |

Appx607

# Exhibit D-12.3

129331.06504/36144461v.1

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

NOT SUSCEPTIBLE TO
PUBLIC SUMMARY

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

# Exhibit D-12.4

129331.06504/36144461v.1

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

# NOT SUSCEPTIBLE TO PUBLIC SUMMARY

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

# Exhibit D-12.5

129331.06504/36144461v.1

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved

## By-Products Conversion Rate

**Ammonium Gas Conversion Rate**

$2NH_3$ (Ammonium Gas) $\longrightarrow$ $(NH_4)_2SO_4$ (Ammonium Sulfate)

Molecular Weight of $NH_3$: 17.

Molecular Weight of $(NH_4)_2SO_4$: 132

Conversion Rate= 17×2/132

$\qquad$ =25.76%

In the above formula, the weight of N account for 25.76% of $(NH_4)_2SO_4$, it means, to produce one metric ton ammonium sulfate, it requires 0.2576 metric ton of ammonium gas.

**Sulfuric acid conversion rate**

$H_2SO_4$ (sulfuric acid) $\longrightarrow$ $(NH_4)_2SO_4$ (Ammonium Sulfate)

Molecular Weight of $H_2SO_4$: 98.

Molecular Weight of $(NH_4)_2SO_4$: 132

Conversion Rate= 98/132

$\qquad$ =74.24%

In the above formula, the weight of $H_2SO_4$ account for 74.24% of $(NH_4)_2SO_4$, it means, to produce one metric ton ammonium sulfate, it requires 0.7424 metric ton of sulfuric acid.

**Chlorine gas conversion rate**

$H_2$ (hydrogen gas) + $CL_2$ (chlorine gas) $\longrightarrow$ 2 HCL (hydrochloric acid)

Molecular Weight of $CL_2$: 71

Molecular Weight of 2 HCL: 73

The concentration of HCL: 31%

Conversion Rate= 71×31%/73

$\qquad$ = 30.15%

In the above formula, the weight of $CL_2$ account for 30.15% of hydrochloric acid, it means, to produce one metric ton hydrochloric acid, it requires 0.3015 metric ton of chlorine gas.

**Hydrogen gas conversion rate**

$H_2$ (hydrogen gas) + $CL_2$ (chlorine gas) $\longrightarrow$ 2 HCL (hydrochloric acid)

Molecular Weight of $H_2$: 2

Molecular Weight of 2 HCL: 73

The concentration of HCL: 31%

Conversion Rate= 2×31%/73

$\qquad$ = 0.85%

In the above formula, the weight of $H_2$ account for 0.85% of hydrochloric acid, it means, to produce one metric ton hydrochloric acid, it requires 0.0085 metric ton of hydrogen gas.

Filed By: clarke-p@blankrome.com, Filed Date: 11/29/11 3:51 PM, Submission Status: Approved



Phone:      (202) 772-5922
Fax:        (202) 572-8382
Email:      Clarke-p@blankrome.com

January 9, 2012

Case Number:  A-570-898
Total Pages: 103
6th Administrative Review:
06/01/2010 – 05/31/2011
IA/China/NME/Office 6

**PUBLIC DOCUMENT**

**BY ELECTRONIC FILING**

The Honorable John Bryson
Secretary of Commerce
U.S. Department of Commerce
Central Records, Room 1870
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

> Re:    *Chlorinated Isocyanurates from China (Sixth Administrative Review) – Pre-
> Preliminary Surrogate Value Information*

Dear Secretary Bryson:

On behalf of Hebei Jiheng Chemical Company, Ltd. ("Jiheng Chemical"), a respondent

in the above-captioned review, we are providing the attached information to assist the

Department in valuing the factors of production. Consonant with the comments of Arch

Chemicals, Inc., dated December 19, 2011, addressing surrogate country selection, Jiheng

129331.06504/36155660v.1

Watergate 600 New Hampshire Avenue NW Washington, DC 20037
www.BlankRome.com

California  •  Delaware  •  Florida  •  New Jersey  •  New York  •  Ohio  •  Pennsylvania  •  Texas  •  Washington, DC  •  Hong Kong

# Tab 4

Filed By: clarke-p@blankrome.com, Filed Date: 1/9/12 1:35 PM, Submission Status: Approved



# MABUHAY VINYL CORPORATION 2010 ANNUAL REPORT



CHANGE   INTEGRATION   COMMITMENT

Filed By: clarke-p@blankrome.com, Filed Date: 1/9/12 1:35 PM, Submission Status: Approved

Official Document: A-570-898 Barcode:3050135-01 REV - Admin Review 6/1/10 - 5/31/11

## 1.   Corporate Information

Mabuhay Vinyl Corporation (the Company) and MVC Properties, Inc. (MPI), collectively referred to as the "Group", were incorporated in the Philippines. The Group's primary purpose is to engage in the business of manufacturing and distributing basic and intermediate chemicals with a wide range of household and industrial applications, including caustic soda, hydrochloric acid, liquid chlorine and sodium hypochlorite (chlor-alkali).

As at December 31, 2010, the Company is 45.93% owned by Tosoh Corporation (Tosoh) and Mitsubishi Corporation (Mitsubishi), foreign corporations (39.53% as of December 31, 2009). The remaining equity is held by various other stockholders.

The Company operates manufacturing plants in Assumption Heights, Iligan City and Laguna Technopark, Biñan, Laguna. The Group's main office address is 3rd Floor, Philamlife Salcedo Center, 126 L. P. Leviste Street, Salcedo Village, Makati City.

The consolidated financial statements were approved for issue by the Board of Directors (BOD) on March 17, 2011.

### Registration with the Board of Investments (BOI)

On July 2, 2007, the BOI approved the registration of the Company as New Producer of Caustic Soda, Hydrochloric Acid, and Liquid Chlorine on a Pioneer Status under Executive Order (E.O.) 226. Under the terms of its registration, the Company is required to achieve certain production and sales volume from the new Ion Exchange Membrane (ILM) Bi-polar Chlor-Alkali plant. As a registered enterprise, the Company is entitled to certain tax incentives which include, among others: (a) income tax holiday (ITH) for six (6) years from June 2008 or actual start of commercial operations, whichever is earlier; (b) extension of the ITH for a maximum of two years (bonus years), subject to certain conditions; (c) for the first five (5) years from the date of registration, additional deduction from taxable income of 50% of the wages arising from additional workers hired, provided that it is not simultaneously availed with the ITH; (d) tax credit for taxes and duties on raw materials for its export product; (e) exemption from wharfage dues, any export tax, duty, imposts and fees for ten (10) years from the date of registration; and, (f) may qualify for zero-duty import of capital equipment, spare parts and accessories from the date of registration up to June 16, 2011, pursuant to E.O. 528 and its Implementing Rules and Regulations. Tax benefits from this ITH in 2010 and 2009 amounted to ₱6.95 million and ₱2.65 million, respectively (see Note 26).

## 2.   Summary of Significant Accounting and Financial Reporting Policies

### Basis of Preparation
The consolidated financial statements of the Group have been prepared using the historical cost convention, except for land and available-for-sale (AFS) financial assets that have been measured at fair value.

The consolidated financial statements are presented in Philippine peso (Peso), which is the Group's functional and presentation currency. Amounts are rounded to the last Peso, unless otherwise indicated.

### Statement of Compliance
The consolidated financial statements of the Group have been prepared in compliance with Philippine Financial Reporting Standards (PFRS).

### Basis of Consolidation
The consolidated financial statements comprise the financial statements of the Company, and its subsidiary, MVC Properties, Inc. (MPI), a 40%-owned special purpose entity (SPE) over which the Company has the ability to govern the financial and operating policies to obtain benefits from its activities.

A subsidiary is consolidated from the date on which control is transferred to the Company and cease to be consolidated from the date on which control is transferred out of the Company. An SPE is consolidated from the date on which the substance of the relationship between the Company and the SPE indicates that the SPE is controlled by the Company.

The financial statements of the subsidiary are prepared for the same reporting period as the Company using uniform accounting policies for like transactions and other events in similar circumstances. All intercompany transactions and balances, including intercompany profits and unrealized profits and losses, are eliminated in full in the consolidated financial statements.

### Noncontrolling Interest
Noncontrolling interest represents the portion of income and expense and net assets in MPI not held by the Company and are presented separately in the consolidated statement of income, consolidated statement of comprehensive income and within equity in the consolidated balance sheet, separate from the equity attributable to the equity holders of the Company.

### Changes in Accounting Policies and Disclosures
The accounting policies adopted are consistent with those of the previous financial years except that the Group has adopted the following new relevant PFRS and amended/revised Philippine Accounting Standard (PAS) and Philippine Interpretation based on International Financial Reporting Interpretation Committee (IFRIC) in 2010. The adoption of these new and revised standards did not have significant effect on the Group.

- Revised PFRS 3, *Business Combinations* and PAS 27, *Consolidated and Separate Financial Statements*. PFRS 3 introduces a number of changes in the accounting for business combinations that will impact the amount of goodwill recognized, the reported results in the period that an acquisition occurs, and future reported results. The revised PAS 27 requires, among others, that a change in ownership interests of a subsidiary (that does not result in loss of control) will be accounted for as an equity transaction and will have no impact on goodwill nor will it give rise to a gain or loss. The amendment also changes the accounting for losses incurred by the subsidiary and loss of control of a subsidiary.

*Improvements to PFRS (2009)*
The omnibus amendments to the following PFRSs issued in 2009, and which became effective in 2010, were issued primarily with a view to remove inconsistencies and clarify wordings. These amendments are either not relevant to or have no significant impact on the Group's consolidated financial statements.

- PFRS 2, *Share-based Payment*
- PFRS 5, *Noncurrent Assets Held for Sale and Discontinued Operations*
- PFRS 8, *Operating Segments*
- PAS 1, *Presentation of Financial Statements*
- PAS 7, *Statement of Cash Flows*
- PAS 17, *Leases*
- PAS 36, *Impairment of Assets*
- PAS 38, *Intangible Assets*
- PAS 39, *Financial Instruments: Recognition and Measurement*
- Philippine Interpretation IFRIC 9, *Reassessment of Embedded Derivatives*
- Philippine Interpretation IFRIC 16, *Hedge of a Net Investment in a Foreign Operation*

Filed By: clarke-p@blankrome.com, Filed Date: 1/9/12 1:35 PM, Submission Status: Approved

## 24  NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Future Changes in Accounting Policies**

The following standards, interpretations and amendments to existing standards will become effective subsequent to 2010 and have not been early adopted. Listed and described below are the new and amended PFRS and Philippine Interpretations that the Group reasonably expects to be applicable in the future. The Group, however, does not expect the adoption to have a significant impact on the consolidated financial statements.

*Effective in 2011*

- PAS 24 (Amended), *Related Party Disclosures*, provides a partial exemption for government-related entities and by simplifying the definition of a related party and removing inconsistencies.

- PAS 32, *Financial Instruments: Presentation (Amendment), Classification of Rights Issue*; amended the definition of a financial liability in order to clarify rights issues (and certain option warrants) as equity instruments in cases where such rights are given pro-rata to all of the existing owners of the same class of an equity's non-derivative equity instruments or to acquire a fixed number of the entity's own equity instruments for a fixed amount in any currency.

- Amendment to Philippine Interpretation IFRIC 14, *Prepayments of a Minimum Funding Requirement*, applies in the limited circumstances when an entity is subject to minimum funding requirements and makes an early payment of contributions to cover those requirements. The amendment permits such an entity to treat the benefit of such an early payment as an asset.

- Philippine Interpretation IFRIC 19, *Extinguishing Financial Liabilities with Equity Instruments*, clarifies that equity instruments issued to a creditor to extinguish a financial liability qualify as consideration paid. The equity instruments issued are measured at their fair value. In case that this cannot be reliably measured, the instruments are measured at the fair value of the liability extinguished. Any gain or loss is recognized immediately in profit or loss.

*Improvements to PFRS 2010*

Improvements to PFRSs is an omnibus of amendments to PFRSs. The amendments have not been adopted as they will become effective for annual periods on or after either July 1, 2010 or January 1, 2011. The amendments to the following standards and interpretations are not expected to have a significant impact on the consolidated financial statements:

- PFRS 3, *Business Combinations*
- PFRS 7, *Financial Instruments: Disclosures*
- PAS 1, *Presentation of Financial Statements*
- PAS 27, *Consolidated and Separate Financial Statements*
- Philippine Interpretation IFRIC - 13, *Customer Loyalty Programmes*

*Effective in 2012*

- PFRS 7, Financial Instruments: Disclosures (Amendments), *Disclosure-Transfers of Financial Assets* will allow users of financial statements to improve their understanding of transfer transactions of financial assets (for example, securitizations), including understanding the possible effects of any risks that may remain with the entity that transferred the assets. The amendments also require additional disclosures if a disproportionate amount of transfer transactions are undertaken around the end of a reporting period.

- PAS 12, Income Taxes (Amendment), *Deferred Tax: Recovery of Underlying Assets*, provides a practical solution to the problem of assessing whether recovery of an asset will be through use or sale. It introduces a presumption that recovery of the carrying amount of an asset will normally be through sale.

- Philippine Interpretation IFRIC 15, *Agreement for Construction of Real Estate*, covers accounting for revenue and associated expenses by entities that undertake the construction of real estate directly or through subcontractors. This interpretation requires that revenue on construction of real estate be recognized only upon completion, except when such contract qualifies as construction contract to be accounted for under PAS 11, *Construction Contracts*, or involves rendering of services in which case revenue is recognized based on stage of completion.

*Effective in 2013*

- PFRS 9, *Financial Instruments: Classification and Measurement*, introduces new requirements on the classification and measurement of financial assets. It uses a single approach to determine whether a financial asset is measured at amortized cost or fair value, replacing the many different rules in PAS 39. The approach in the new standard is based on how an entity manages its financial instruments (its business model) and the contractual cash flow characteristics of the financial assets. The new standard also requires a single impairment method to be used, replacing the many different impairment methods in PAS 39.

  The new standard represents the completion of the first part of a three-part project of the IASB to replace PAS 39 with a new standard - PFRS 9, *Financial Instruments*. The second part of the project will address proposals on the impairment methodology for financial assets and the third part, on hedge accounting.

**Cash and Cash Equivalents**

Cash includes cash on hand and in banks. Cash equivalents are short-term, highly liquid investments that are readily convertible to known amounts of cash with original maturities of three months or less and that are subject to an insignificant risk of change in value.

**Financial Assets and Financial Liabilities**

The Group recognizes a financial asset or financial liability in the balance sheet when it becomes a party to the contractual provision of the instrument.

Financial assets within the scope of PAS 39 are classified as either financial assets at fair value through profit or loss (FVPL), loans and receivables, held-to-maturity (HTM) investments, or AFS financial assets, as appropriate. Financial liabilities, on the other hand, are classified as either financial liabilities at FVPL or other financial liabilities, as appropriate. The Group determines the classification of its financial assets and financial liabilities at initial recognition and, where allowed and appropriate, reevaluates this designation at each financial year-end.

Financial assets and financial liabilities are recognized initially at fair value. Directly attributable transaction costs, if any, are included in the initial measurement of financial assets and financial liabilities, except for financial instruments measured at FVPL.

The fair value of investments that are actively traded in organized financial markets is determined by reference to quoted market prices or dealer price quotation (bid price for long positions and ask price for short positions), at the close of business on the balance sheet date. When current bid and asking prices are not available, the price of the most recent transaction provides evidence of the current fair value as long as there has not been a significant change in economic circumstances since the time of the transaction. For investments where there is no active market, fair value is determined using generally accepted valuation techniques using inputs and assumptions based on observable market data and conditions and reflect appropriate adjustments that market participants would make for credit and liquidity risks existing as at each of the periods indicated.

All regular way purchases and sales of financial assets are recognized on the trade date, i.e., the date that the Group commits to purchase the asset. Regular way purchases or sales are purchases or sales of financial assets that require delivery of assets within the period generally established by regulation or convention in the marketplace.

Appx964

36   NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Changes in the fair value of plan assets are as follows:

| | 2010 | 2009 |
|---|---|---|
| Fair value of plan assets at beginning of year | ₱98,790,193 | ₱93,356,246 |
| Expected return on plan assets | 7,903,215 | 6,534,937 |
| Contributions | 7,417,169 | 2,760,280 |
| Benefits paid | (20,229,253) | (5,899,573) |
| Actuarial gain (loss) on plan assets | 4,040,426 | 2,038,343 |
| Fair value of plan assets at end of year | ₱97,921,750 | ₱98,790,193 |

Actual return on plan assets is as follows:

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| Expected return on plan assets | ₱7,903,215 | ₱6,534,937 | ₱6,269,822 |
| Actuarial gain (loss) on plan assets | 4,040,426 | 2,038,343 | (3,982,609) |
| | ₱11,943,641 | ₱8,573,280 | ₱2,287,213 |

The major categories of the net plan assets are as follows:

| | 2010 | 2009 |
|---|---|---|
| Cash | 0.03% | 1.63% |
| Fixed income securities | 87.17% | 86.09% |
| Equities | 10.86% | 10.15% |
| Others | 1.94% | 2.12% |
| | 100.00% | 100.00% |

The Company expects to contribute ₱5.00 million in 2011.

The assumptions used to determine retirement benefits obligation for the Company's retirement plan for the year ended December 31 are as follows:

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| Discount rate at end of year | 7.00% | 8.70% | 9.05% |
| Salary increase rate | 7.00% | 7.00% | 7.00% |
| Expected rate of return on plan assets | 8.00% | 7.00% | 6.00% |

The expected rates of return on plan assets were based on a reputable fund trustee's indicative yield rate for a risk portfolio similar to that of the fund with consideration of the fund's past performance.

Relevant amounts for the current and previous periods are as follows:

| | 2010 | 2009 | 2008 | 2007 | 2006 |
|---|---|---|---|---|---|
| Present value of obligation | ₱122,878,611 | ₱118,705,174 | ₱109,086,144 | ₱132,669,032 | ₱113,300,972 |
| Fair value of plan assets | 97,921,750 | 98,790,193 | 93,356,246 | 104,497,025 | 92,140,693 |
| Deficit | 24,956,861 | 19,914,981 | 15,729,898 | 28,172,007 | 21,160,279 |
| Experience adjustments | 512,999 | (9,937,375) | (3,953,303) | (4,873,697) | 4,014,000 |

## 50.   Income Taxes

a.   The current provision for income tax consist of the following:

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| Regular corporate income tax | ₱12,821,656 | ₱21,575,788 | ₱– |
| Minimum corporate income tax | – | – | 6,603,683 |
| Final tax | 361,624 | 573,714 | 857,137 |
| | ₱13,183,280 | ₱22,149,502 | ₱6,560,820 |

b.   The components of the net deferred income tax assets are as follows:

| | 2010 | 2009 |
|---|---|---|
| Deferred income tax assets on: | | |
| Allowance for doubtful accounts | ₱11,003,158 | ₱10,722,358 |
| Retirement benefits payable and unamortized past service cost | 7,353,194 | 6,874,002 |
| Allowance for inventory obsolescence | 1,502,579 | 792,611 |
| Accrued leases | 813,724 | 1,093,320 |
| Asset retirement obligation | 290,470 | 260,288 |
| Unrealized foreign exchange loss | 76,461 | 91,289 |
| | 21,039,586 | 19,833,870 |

[Forward]

Filed By: clarke-p@blankrome.com, Filed Date: 1/9/12 1:35 PM, Submission Status: Approved

**Official Document: A-570-898 Barcode:3050135-01 REV - Admin Review 6/1/10 - 5/31/11**

Case: 17-1520    Document: 47    Page: 230    Filed: 07/13/2017

| | 2010 | 2009 |
|---|---|---|
| Deferred income tax liabilities on: | | |
| Revaluation increment | ₱14,038,927 | ₱14,038,927 |
| Capitalized asset retirement costs | 65,797 | 65,797 |
| | 14,104,724 | 14,104,724 |
| Net deferred income tax assets | ₱6,934,862 | ₱5,729,146 |

c. The excess MCIT of ₱1.81 million incurred in 2008 was used as a deduction against the RCIT payable in 2009.

d. A reconciliation of income tax computed at the statutory income tax rate to the provision for income tax reflected in the consolidated statements of income is as follows:

| | 2010 | 2009 | 2008 |
|---|---|---|---|
| Income tax at statutory rate | ₱19,088,868 | ₱16,658,793 | ₱17,997,121 |
| Increase (decrease) in provision for income tax resulting from: | | | |
| Income tax holiday (Note 1) | (6,947,961) | (2,647,024) | (6,562,360) |
| Movement in deferred income tax asset not recognized | (369,213) | 369,213 | – |
| Unallowable portion of interest expense and other nondeductible expenses | 433,510 | 322,564 | 1,237,935 |
| Interest income subjected to final tax | (226,702) | (316,933) | (643,852) |
| Dividend income | (938) | (899) | (2,092) |
| | ₱11,977,564 | ₱14,385,714 | ₱13,390,133 |

e. MPI did not recognize deferred income tax asset from NOLCO amounting to ₱1,230,710 as of December 31, 2009 as it expects that it may not have sufficient taxable income within the future against which the NOLCO can be utilized before it expires in 2012. In 2010, the NOLCO was fully applied against the taxable income.

f. Under Republic Act (RA) No. 9337 or the Expanded Value-Added Tax Act of 2005 which took effect on November 1, 2005, RCIT rate was reduced from 35% to 30% and nondeductible interest expense rate was reduced from 42% to 33% of interest income subjected to final tax beginning January 1, 2009.

21. **Financial Risk Management Objectives and Policies**

The Group's principal financial instruments comprise cash and cash equivalents, AFS financial assets, other receivables, trust receipts payable and bank loans. The main purpose of these financial instruments is to finance the Group's operating requirements. The other financial assets and financial liabilities arising directly from its operations are trade receivables and payables. The Group does not engage in any trading of financial instruments.

The main risks arising from the Group's financial instruments are foreign currency risk, credit risk and liquidity risk. The BOD reviews and approves the policies for managing each of these risks and they are summarized below.

*Foreign currency risk*

Foreign currency risk is the risk that the fair value or future cash flows from the Group's foreign-currency denominated assets or liabilities may fluctuate due to changes in foreign exchange rates.

The Group's exposure to foreign currency risk primarily arises from deposits and placements in foreign currency and importation of finished goods and raw materials and equipment. Purchases of finished goods and raw materials are subject to an open account from foreign suppliers and is settled immediately through a peso trust receipt financing from a local bank once all the documentation requirements are complete. The Group may also enter into currency forward contracts to manage the currency risks.

The foreign currency-denominated (all in US$) financial assets of the Group are as follows:

| | 2010 | | 2009 | |
|---|---|---|---|---|
| Cash and trade receivables | US$849,785 | ₱37,254,579 | US$277,151 | ₱12,803,452 |

The following table shows the effect on income before income tax for the year ended due to a reasonably possible change in foreign currency rates. There is no other impact on the Group's equity other than those affecting net income.

| | Increase (decrease) in rate | Effect on income before income tax |
|---|---|---|
| 2010 | +4.5% | 1,676,456 |
| | -4.5% | (1,676,456) |
| 2009 | +4.5% | 576,155 |
| | -4.5% | (576,155) |

The sensitivity analysis takes into account historical movements of Peso at every US$1 foreign exchange rates. As of December 31, 2010 and 2009, the foreign exchange rate amounted to ₱43.84 and ₱46.20 per US$, respectively. The Group assumes parallel upward and downward effect on income due to a reasonably possible change in these foreign exchange rates.

*Credit risk*

Credit risk arises because the Group's counterparty may fail to perform its obligations.

The Group is not exposed to concentrations of credit risk. The Group does not have any customer that accounts for more than 10% of its total revenue. It is the Group's policy to require all customers, who wish to trade on credit terms, to comply with and undergo the credit verification process. This process emphasizes on the customer's capacity and willingness to pay. In addition, receivables are closely monitored so that exposure to bad debts is minimized.

Appx977

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

J. Christopher Wood
Direct: +1 202.955.8595
Fax: +1 202.530.9698
CWood@gibsondunn.com

January 9, 2011

**VIA IA ACCESS**

| | |
|---|---|
| The Honorable John Bryson | Case No. A-570-898 |
| Secretary of Commerce | Total Pages: 618 |
| U.S. Department of Commerce | 6th AD Admin. Review: 6/01/10 – 5/31/11 |
| Central Records Unit, Room 1870 | IA/China/NME/Office 8 |
| 14th Street and Constitution Avenue, N.W. | **Public Document** |
| Washington, D.C.  20230 | |

Re:     *Chlorinated Isocyanurates from the People's Republic of China (6th Antidumping Administrative Review):  Petitioners' Submission of Information Regarding Surrogate Values for Factors of Production*

Dear Secretary Bryson:

On behalf of Petitioners Clearon Corp. and Occidental Chemical Corporation, this letter responds to the Department's October 28, 2011 request for publicly available information to value factors of production in this review.[1]

For certain direct materials, packing materials and by-products connected to the production of subject merchandise, Petitioners have supplied South Africa import data published by the World Trade Atlas for the POR, using South Africa HS codes to collect the appropriate data.  The POR exchange rate, calculated using Federal Reserve data, available at http://www.federalreserve.gov/releases/h10/hist/dat00_sf.htm, is 0.140896 South African rand per dollar.  Included in **Exhibit 1** for each input is an excerpt from the South African

---

[1]  *See* Letter to All Interested Parties re 2010-2011 Antidumping Administrative Review of Chlorinated Isocyanurates from the People's Republic of China (Oct. 28, 2011).

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

Filed By: cwood@gibsondunn.com, Filed Date: 1/9/12 3:02 PM, Submission Status: Approved

# EXHIBIT 41

Filed By: cwood@gibsondunn.com, Filed Date: 1/9/12 3:02 PM, Submission Status: Approved

Barcode:3050182-01 A-570-898 REV - Admin Review 6/1/10 - 5/31/11



# 6th
# ANNUAL REPORT
# 2010-11

# SREE RAYALASEEMA
# HI-STRENGTH HYPO LIMITED

led By: cwood@gibsondunn.com, Filed Date: 1/9/12 3:02 PM, Submission Status: Approv

Barcode:3050182-02 A-570-898 REV - Admin Review 6/1/10 - 5/31/11

**SREE RAYALASEEMA HI-STRENGTH HYPO LIMITED** 

iii) **Defined Benefit plan :**

The company provides for gratuity as defined benefit plan. There are no other post retirement benefits. The defined benefit gratuity obligation on annual basis is determined by actuarial valuation using the projected unit credit method on renewal date.

The annual contribution paid during the year towards gratuity liability is recognised as funded expenses and unfunded part of the gratuity liability determined on acturial basis is provided as unfunded gratuity liability.

Disclosures for defined contribution plan and defined benefit plan as required under AS 15(Revised),Employee Benefits,are submitted in Notes to accounts.

h) **Sales**

Gross Sales include excise duty amount and net of sales returns. In order to comply with ASI-14 issued by ICAI,the gross sales and net sales(deducting excise duty)are disclosed in Profit and Loss Account.

i) **Foreign exchange transactions**

(i) **Intial recognision**

Transactions in foreign currencies are recorded at the exchange rate prevailing on the date of transaction.

(ii) **Conversion**

The outstanding transactions other than those covered by forward contracts at the end of the year are accounted at the rates prevailing as on Balace sheet date.

(iii) **Forward Exchange Contracts**

In respect of transactions covered by foreign exchange contracts,the difference between forward trade and exchange rate and the exchange rate on the date of transaction is recognized over the period of contract.

(iv) **Exchange differences**

All exchange differences arising on settlement/conversion/payment of foreign currency transactions are recognized as Income or Expenses in Profit and Loss Account.

j) **Revenue Recognition :**

i) **Sales**

Revenue is recognized from sales when the property in the goods is transferred and significant risks and rewards associated with the ownership of the goods are passed to the buyer.

ii) **Insurance Claims**

Insurance claims are accounted on the basis of claims lodged.

iii) **Dividends**

Dividends on investments are recognized when the right to receive it is established.

42

Appx1268

Barcode:3050182-02 A-570-898 REV - Admin Review 6/1/10 - 5/31/11

**SREE RAYALASEEMA HI-STRENGTH HYPO LIMITED** 

iv) **Export incentives** :

Export incentives such as DEPB (Duty Entitlement Pass Book), Focus Market Scheme. Licenses are calculated based on exports made during the year.

k) **Impairment**

The carrying amounts of assets are reviewed at each Balance Sheet date whether there is any indications of impairment of asset based on internal/ *external factors. If any such indication exist,an impairment loss will be* recognized whether the carrying amount exceeds its estimated recoverable amount (greater of the assets net selling price and value in use) the carrying amounts is reduced to recoverable amount. Such reduction is treated as impairment loss and recognized in the Profit and Loss Account.

Previously recognized impairment loss is further increased or partly /fully reversed depending on changes in circumstances.

l) **Borrowing costs**

Borrowing costs relating to acquisition of fixed assets which takes substantial period of time to get ready for its intended use are included to the extent they relate to the period till such assets are ready to be put to use. All other borrowing cost are charged to revenue.

m) **Accounting for taxes on income** :

The Company has accounted for deferred tax in accordance with Accounting standard 22 ''Accounting for taxes on Income ''issued by the Institute of Chartered Accountants of India. Accordingly,timing difference resulting in deferred tax liabilities are recognized.

n) **Provisions and contingent liabilities**

The Company recognizes a proyisions when there is a present obligation as a result of a post event that probably requires an outflow of resources and a reliable estimate can be made of the amount of the obligation. A disclosure for a contingent liability is made when there is a possible obligation or a present obligation that may,but probably will not,require an outflow of resources or there is present obligation,reliable estimate of the amount of which cannot be made. Where there is a possible obligations or a present obligation and the likelihood of outflow of resources is remote,no provision or disclosure for contingent liability is made.

o) Prior period and extraordinary items and changes in accounting policies having material impact on the financial affairs of the Company are disclosed.

p) Material events occurring after the Balance Sheet date are taken into recognizance.

q) **Leases:**

Leases rentals payments under operating leases are recognized as expense and Leases rentals received under operating leases are recognized as income in Profit and Loss Account on a straight line basis over the lease term.

43

Appx1269

Barcode:3050182-03 A-570-898 REV - Admin Review 6/1/10 - 5/31/11

# EXHIBIT 43

Filed By: cwood@gibsondunn.com, Filed Date: 1/9/12 3:02 PM, Submission Status: Approved

ADITYA BIRLA CHEMICALS (INDIA) LIMITED

**DIRECTORS**

Shri A. K. Agarwala
Shri Biswajit Choudhuri
Shri J. C. Chopra
Shri P. P. Sharma
Shri G. M. Dave
Shri K. K. Maheshwari
Shri Lalitkumar S. Naik
Shri K. C. Jhanwar

**MANAGING DIRECTOR**

Shri S. S. Gupta

**COMPANY SECRETARY**

Shri Akash Mishra

**BANKERS**

HDFC Bank Limited
State Bank of India
Axis Bank Limited
IDBI Bank Limited

**STATUTORY AUDITORS**

M/s. Khimji Kunverji & Co.
Chartered Accountants
Mumbai

**COST AUDITORS**

M/s. S. Gupta & Co.
Cost Accountants
Kolkata

**REGISTERED OFFICE**

"Ghanshyam Kunj"
Garhwa Road, P.O. Rehla-822 124
Distt. Palamau (Jharkhand)
Phone :  (06584)  262 211
              262 221, 262 488
Fax No : (06584) 262 205

| CONTENTS | PAGE NO. |
| --- | --- |
| Directors' Report | 3 |
| Corporate Governance Report | 10 |
| Management Discussion and Analysis Report | 21 |
| Auditors' Report | 23 |
| Balance Sheet | 26 |
| Profit and Loss Account | 27 |
| Schedules to Accounts | 28 |

Appx1392

## ADITYA BIRLA CHEMICALS (INDIA) LIMITED

## PROFIT & LOSS ACCOUNT FOR THE YEAR ENDED MARCH 31, 2011

(Rs. in lacs)

| | Schedule | For the year ended March 31, 2011 | For the year ended March 31, 2010 |
|---|---|---|---|
| **INCOME:** | | | |
| Income from Operation | ' 14A ' | **26,265.21** | 24,354.56 |
| Less : Excise duty | | **2,482.08** | 1,922.05 |
| Net Income from Operation | | **23,783.13** | 22,432.51 |
| Other Income | ' 14B ' | **1,519.59** | 1,915.91 |
| | | **25,302.72** | 24,348.42 |
| **EXPENDITURE:** | | | |
| (Increase)/Decrease in stocks | ' 15 ' | **(10.93)** | 75.21 |
| Raw Materials consumed | ' 16 ' | **9,934.58** | 9,084.48 |
| Manufacturing and other expenses | ' 17 ' | **3,766.56** | 3,517.49 |
| Payment to and provisions for employees | ' 18 ' | **1,322.14** | 1,268.78 |
| Selling, Distribution, Administration and other expenses | ' 19 ' | **845.78** | 919.40 |
| | | **15,858.13** | 14,865.36 |
| **Profit before Interest, Depreciation & Tax** | | **9,444.59** | 9,483.06 |
| Interest and Financial Charges | ' 20 ' | **264.00** | 357.15 |
| **Profit before Depreciation & Tax** | | **9,180.59** | 9,125.91 |
| Depreciation | | **2,036.26** | 2,003.57 |
| **Profit before Tax** | | **7,144.33** | 7,122.34 |
| Provision for Taxation (including Wealth Tax - Rs. 0.88 lac) Previous year Rs. 1.03 lacs) | | **1,429.36** | 1,234.34 |
| MAT Credit Entitlement | | **(588.08)** | (316.53) |
| Provision for Deferred Tax (Net) | | **32.24** | 130.26 |
| Profit after Tax | | **6,270.81** | 6,074.27 |
| Adjustment of Taxation for earlier years | | **(40.85)** | (724.81) |
| Balance Brought forward from previous year | | **21,517.26** | 16,880.56 |
| Less: Transferred to State Capital Subsidy | | | – |
| Balance available for Appropriation | | **27,747.22** | 22,230.02 |
| **APPROPRIATIONS:** | | | |
| Proposed Dividend on Equity Shares | | **116.93** | 350.80 |
| Tax on Proposed Dividend | | **18.97** | 58.26 |
| Transferred to General Reserve | | **–** | 303.71 |
| Balance Carried over to Balance Sheet | | **27,611.32** | 21,517.25 |
| | | **27,747.22** | 22,230.02 |
| Basic and diluted earning per Share (in Rupees) | | **26.81** | 25.97 |
| Significant Accounting Policies and Notes on Accounts | ' 21 ' | | |

As per our attached report of even date

For Khimji Kunverji & Co
Chartered Accountants
F.R.N. : 105146W

| | | | |
|---|---|---|---|
| | | A. K. Agarwala | Director |
| | | Biswajit Choudhuri | Director |
| Hasmukh B. Dedhia | Akash Mishra | J. C. Chopra | Director |
| Partner (F-033494) | Company Secretary | G. M. Dave | Director |
| | | L. S. Naik | Director |
| Place : Mumbai | | K. C. Jhanwar | Director |
| Dated : April 26 2011 | | S.S. Gupta | Managing Director |

Filed By: cwood@gibsondunn.com, Filed Date: 1/9/12 3:02 PM, Submission Status: Approved

# ADITYA BIRLA CHEMICALS (INDIA) LIMITED

## SCHEDULES FORMING PART OF THE BALANCE SHEET AS AT MARCH 31, 2011

(Rs. in lacs)

|  |  | As at March 31, 2011 | As at March 31, 2010 |
|---|---|---|---|
| **SCHEDULE '1'** | | | |
| **SHARE CAPITAL :** | | | |
| **Authorised** | | | |
| 24,500,000 | Equity Shares of Rs. 10/- each | **2,450.00** | 2,450.00 |
| 50,000 | 11% Redeemable Cumulative Preference Shares of Rs. 100/- each (Free of Company's Tax but subject to deduction of tax at source at the prescribed rates and redeemable at par between 7 to 10 years from the date of allotment by giving three months notice in writing). | **50.00** | 50.00 |
| | | **2,500.00** | 2,500.00 |
| **Issued, Subscribed and Paid-up** | | | |
| 23,386,500 | Equity Shares of Rs. 10/- each fully paid up in cash (12004987 shares are held by Hindalco Industries Limited (Holding Compay), 775000 shares are held by Renuka Investment & Finance Limited (Subsidiary of Hindalco Industries Limited). | **2,338.65** | 2,338.65 |
| | | **2,338.65** | 2,338.65 |
| **SCHEDULE '2'** | | | |
| **RESERVES & SURPLUS :** | | | |
| Capital Reserve | | **1,000.00** | 1,000.00 |
| Add : Subsidy received during the year | | **175.00** | – |
| | | **1,175.00** | 1,000.00 |
| Securities Premium Account | | **1.75** | 1.75 |
| General Reserve : | | | |
| As per last Balance Sheet | | **4,078.04** | 3,774.33 |
| Add : Transferred from Profit & Loss Account | | **–** | 303.71 |
| | | **4,078.04** | 4,078.04 |
| Balance as per Profit & Loss Account | | **27,611.32** | 21,517.25 |
| | | **32,866.11** | 26,597.04 |

28

Appx1419

**ADITYA BIRLA CHEMICALS (INDIA) LIMITED**

## SCHEDULES FORMING PART OF THE BALANCE SHEET AS AT MARCH 31, 2011

of the Government bonds are consistent with the currency and estimated tenure of the defined benefit obligation.

**(x)  RECOGNITION OF INCOME & EXPENDITURE**

Sales are recorded net of trade discounts, Sales Tax, VAT, and include excise duty. Revenue from sale of products is recognised when the significant risks and rewards of ownership of the goods have passed to the buyer.

Income and Expenditure are recognised on accrual basis but Sales claims under escalation clause, insurance and other claims are accounted on acceptance basis.

**(xi)  BORROWING COST**

Borrowing Costs, attributable to acquisition and construction of qualifying assets, are capitalised as a part of the cost of such asset up to the date when such assets are ready for its intended use. Other borrowing costs are charged to the Profit and Loss Account.

**(xii)  TAXATION**

a)  Tax expense comprises of current and deferred tax.

b)  Provision for current tax is made on the basis of estimated taxable income for the current accounting year in accordance with the provisions of Income Tax Act, 1961.

c)  The deferred tax for timing differences is accounted for, using the tax rates and laws that have been substantively enacted as of the Balance Sheet date. Deferred tax assets arising from timing differences are recognised to the extent there is reasonable certainty that these would be realised in future.

d)  Deferred tax assets in case of unabsorbed losses and unabsorbed depreciation are recognised only if there is virtual certainty that such deferred tax asset can be realised against future taxable profits.

e)  Credit for entitlement of Minimum Alternate Tax (MAT) is recognized only if the same can be utilized within statutorily permissible time.

**(xiii)  INTANGIBLE ASSETS**

Intangible Assets are recognized by the Company only if it is probable that the future economic benefits that are attributable to the assets will flow to the enterprise and the cost of the same can be measured reliably.

Intangible Assets are amortized on a systematic basis over its useful life and the amortization for each period will be recognized as an expense.

**(xiv)  GOVERNMENT GRANTS/ CAPITAL SUBSIDY**

a)  Capital subsidy/ Government grants are recognised when there is reasonable assurance that the same will be received. Revenue grants are recognised in the Profit & Loss Account.

b)  Capital subsidy/ Government grants relating to specific non depreciable fixed assets and in the nature of Promoter's Contribution are credited to capital reserve account.

c)  Capital subsidy/ Government grants related to specific depreciable assets are credited to capital reserve account and are recognized as income in profit and loss statement on a systematic and rational basis over the useful life of assets.

**(xv)  CONTINGENT LIABILITIES AND PROVISIONS**

Contingent Liabilities are possible but not probable obligations as on Balance Sheet date, based on the available evidence. Contingent Liabilities are not provided for in the accounts. These are disclosed by way of Notes to the Accounts.

Provisions are recognised when there is a present obligation as a result of past event, and it is probable that an outflow of resources will be required to settle the obligation, in respect of which a reliable estimate can be made. Provisions are determined based on best estimate required to settle the obligation at the Balance Sheet date.

37

Appx1428

**UNITED STATES DEPARTMENT OF COMMERCE**
**International Trade Administration**
Washington, D.C. 20230

A-570-898
POR: 06/01/2010 - 05/31/2011
IA/O6: EH
~~Proprietary Document~~
**PUBLIC VERSION**

June 29, 2012

| | |
|---|---|
| **MEMORANDUM TO**: | The File |
| **THROUGH**: | Mark Hoadley GHC<br>Program Manager, Office 6<br>AD/CVD Operations |
| **FROM**: | Emily Halle *EH*<br>International Trade Analyst, Office 6<br>AD/CVD Operations<br><br>Andrew Huston<br>International Trade Analyst, Office 6<br>AD/CVD Operations |
| **CASE**: | 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China |
| **SUBJECT**: | Preliminary Results Surrogate Value Memorandum |

## I.    Background

The Department of Commerce (Department) calculated normal value (NV) based on factors of production (FOP) data reported by Hebei Jiheng Chemical Company Ltd. (Jiheng) and Juancheng Kangtai Chemical Co., Ltd. (Kangtai) (respondents), producers and exporters of the subject merchandise, in accordance with section 773(c) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.408. A summary of surrogate value selections is provided at Appendix I.

Section 773(c)(1) of the Act provides that, in the case of a non-market economy (NME), the Department shall determine NV using an FOP methodology if the merchandise is exported from an NME and the information does not permit the calculation of NV using home-market prices, third-country prices, or constructed value under section 773(a) of the Act. The Department will base NV on FOPs because the presence of government controls on various aspects of these economies renders price comparisons and the calculation of production costs invalid under normal methodologies. Therefore, NV was calculated using FOPs, which is in accordance with sections 773(c)(3) and (4) of the Act and 19 CFR 351.408(c).



Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

The FOPs include:  (1) hours of labor required; (2) quantities of raw materials employed; (3) amounts of energy and other utilities consumed; and (4) representative capital costs.  The FOPs were used for materials, packing, by-products, energy, labor, financial ratios and transportation.  On January 9, 2012, Petitioners,[1] Jiheng, and Kangtai each submitted publicly available surrogate value information with which to value the FOPs for these preliminary results.  On January 17, 2012, Jiheng and Petitioners submitted rebuttal surrogate value comments.

## II.     Surrogate Country Selection

As explained in the Preliminary Results, the Department considers Colombia, Indonesia, the Philippines, South Africa, Thailand and Ukraine equally comparable to the People's Republic of China in terms of economic development.  The Department reviewed the record, and found that it does not contain information with respect to production volumes of identical or comparable merchandise in any of the potential surrogate countries.  Indeed, one of the interested parties stated that, "we have found it exceedingly difficult to find production of those products {subject or comparable merchandise} in any of these countries."[2]  Petitioners also reached a similar conclusion, stating that, "Petitioners are not aware of the production of identical merchandise in any of the six countries identified as economically comparable to China."[3]  Jiheng submitted a financial statement from a Philippines company that produced several inputs of subject merchandise, as well as sodium hypochlorite, a chemical that Jiheng claimed the Department could find to be comparable to subject merchandise.  However, after reviewing the financial statements, the Department could not determine the percentage of the company's sales that were sodium hypochlorite.  We then checked export data over the period of review (POR),[4] and found that the Philippines had no exports of sodium hypochlorite.  Therefore, for these preliminary results, the Department determines that the Philippines do not produce identical or comparable merchandise.  Kangtai submitted a financial statement from a company from Thailand, but based on the record evidence, this company does not appear to produce identical or comparable merchandise, but only inputs for the production of subject merchandise.  Finally, Petitioners submitted financial statements from several Indian companies, but as India is not listed as a potential surrogate country, the Department did not review any production data that may be included in the Indian financial statements.  The Department also conducted independent internet searches, but did not find any information demonstrating production of identical or comparable merchandise in the potential surrogate countries.[5]

Since neither the information on the record nor our own research provided sufficient information to determine domestic production of subject or comparable merchandise in any of the potential surrogate countries, we evaluated the Global Trade Atlas (GTA) data, published by Global Trade Information Services, Inc.[6]  We reviewed the GTA data to see if there were exports of identical merchandise during the POR, from each potential surrogate county, using the primary

---

[1] Petitioners are Clearon Corporation, and Occidental Chemical Corporation.

[2] See Letter from Arch Chemicals, Inc., "Chlorinated Isocyanurates from China (Sixth Administrative Review) – Comments on Surrogate Country Selection," dated December 19, 2011, at page 2.

[3] See Letter from Petitioners, "Chlorinated Isocyanurates from the People's Republic of China (6th Antidumping Administrative Review):  Petitioners' Comments on Surrogate Country Selection," dated December 19, 2011 (Petitioners Surrogate Country Letter), at page 3.

[4] The POR is June 1, 2010, through May 31, 2011.

[5] See Appendix IV.

[6] See GTA, available at http://www.gtis.com/gta/.

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

Harmonized Tariff Schedule (HTS) number listed in the scope of the order (i.e. 2933.69). The HTS number examined includes data for non-subject merchandise. While several of the countries on the surrogate country list have exports, we were concerned that this was a basket category and that we had no other information indicating domestic production of subject merchandise in these countries. Petitioners also provided the GTA data under this HTS number (for a period including, but also beyond the POR), and also concluded that it "does not appear that any of the six countries export significant quantities" under this HTS number.[7]

The Department next reviewed the GTA data for comparable merchandise, calcium hypochlorite. The Department has previously determined that calcium hypochlorite was comparable to the subject merchandise because it has "similar physical characteristics, end uses, and production processes."[8] Furthermore, the HTS number for calcium hypochlorite does not appear to be a basket category. We examined the GTA data for HTS number 2828.10 (calcium hypochlorite) for all the possible surrogate countries. Petitioners stated that "production data for all of the countries listed by the Department are not reasonably available, but export data are available. These data…show that South Africa is a significant exporter of merchandise under tariff code 2828.10, calcium hypochlorite."[9] South Africa is by far the largest exporter of calcium hypochlorite among the six surrogate countries. As such, the Department finds that South Africa is the appropriate choice for surrogate country for purposes of these preliminary results. Jiheng argues that South Africa is a poor choice to use as a surrogate country because there are no South African financial statements on the record, and the data placed on the record is inferior (i.e., for certain inputs, the HTS number at the six digit level, which is as specific an HTS number available from South Africa for several inputs, is too generic to represent the input). The Department is aware of these data concerns, and will continue to evaluate its selection of surrogate country to best address these concerns for the final results.

However, as discussed below in more detail, there are several FOPs for which there is no appropriate data from South Africa. As such, the Department is preliminarily using India as the surrogate country for these other factors because India has been found in the past to be a significant producer of comparable merchandise and continues to be a significant producer of comparable merchandise during the POR. We will continue to evaluate the choice of surrogate country and to search for usable surrogate value information from the countries on the surrogate country list.

## III.   Data Sources

### South African Import Statistics Published by Global Trade Atlas

Unless indicated otherwise, the Department valued FOPs of direct materials, packing materials, energy, and by-products using publicly available import prices reported in the GTA.

---

[7] See Petitioners Surrogate Country Letter at page 3.
[8] See Notice of Final Determination of Sales at Less Than Fair Value:  Chlorinated Isocyanurates From the People's Republic of China, 70 FR 24502 (May 10, 2005) and accompanying Issues and Decision Memorandum at Comment 2.
[9] See Petitioners Surrogate Country Letter at page 4.

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

In accordance with 19 CFR 351.408(c)(1), publicly available information was used to value the FOPs for the respondents purchases of raw materials, denominated in Chinese Renminbi (RMB), from NME suppliers. The Department applied a surrogate value using South African import prices, except as noted below, as reported by the South African Revenue Service and published by the GTA during the POR. Further, surrogate values were adjusted for inflation, deflation, exchange rates, taxes, and unit conversions, where applicable. Imports from NME countries, from unspecified countries, and from countries that the Department has determined maintain non-specific export subsidies (i.e., Indonesia, India, South Korea, and Thailand) were excluded from these calculations.

**Indian Sources**

Because chlorine gas and hydrogen gas are not frequently traded on an international basis, the Department has previously determined that the GTA data is not the best surrogate value source for these FOPs.[10] Instead, the Department took the average unit values obtained from financial statements of Indian producers of chemicals used in the previous POR, and inflated these data to make them contemporaneous with the POR. Chemical Weekly was used to value calcium chloride, barium chloride, zinc sulfate, and sulfuric acid because we did not have South African import statistics by the concentration level referenced in the GTA for these factors. The values we used were adjusted to account for taxes and for freight costs incurred between the supplier and respondents factories, and inflated for the POR.

**Exchange Rates**

All surrogate values denominated in Indian rupees (Rs) or South African rand were converted to U.S. dollars using the daily exchange rate based on the date of sale. The source of the exchange rates is the official daily exchange rates from the Department's website.[11] The surrogate value for labor, however, was adjusted using the "National Currency per U.S. Dollar" as published in the International Financial Statistics (IFS) of the International Monetary Fund (IMF) from India, as discussed below. In accordance with current Department practice, South African import statistics retrieved from the GTA to calculate surrogate values were retrieved in their original reported currency.

**Price Index Adjustor**

Jiheng and Kangtai provided FOP data for producing trichloroisocyanuric acid (TCCA) and sodium dichloroisocyanurate (SDIC) products for the POR. When the Department could not obtain publicly available information contemporaneous with the POR with which to value FOPs, we adjusted the surrogate values using, where appropriate, the Indian monthly Wholesale Price Index (WPI) as published by the Office of the Economic Adviser to the Government of India. See Appendix II. The surrogate value for labor, however, was adjusted using the Indian annual Consumer Price Index (CPI) as published in the IFS of the IMF, as discussed below.

---

[10] See Memorandum "Preliminary Results of the 2009-2010 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Surrogate Value Memorandum," June 30, 2011, (2009-2010 Surrogate Value Memorandum) at page 12-13.
[11] See http://ia.ita.doc.gov/exchange.

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

## IV.    Factors of Production

We valued the FOPs used to produce subject merchandise using surrogate values, pursuant to section 773(c)(1) of the Act.  When selecting surrogate values, the Department's practice is to select, to the extent practicable, surrogate values which are publicly available, product-specific, representative of a broad market average, tax-exclusive, and contemporaneous with the POR.[12] In this case, except where noted, we selected South African values as surrogates.  Additionally, since the Department was able to find usable data from either South Africa or India (the primary and secondary surrogate countries, respectively), there is no need for the Department to evaluate data from other countries placed on the record by the parties.

## A.    Raw Materials and Packing Materials

**Aluminum Sulfate** (Jiheng)

Petitioners suggested using South African HTS number 2833.22.00 to value aluminum sulfate. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2833.22 to value aluminum sulfate in the preliminary results of review.  We calculated an average unit value (AUV) of 1.99 rand per kg using contemporaneous data under this HTS heading.  See Appendix III.1.

**Ammonium Chloride** (Kangtai)

Petitioners suggested using South African HTS number 2827.10 to value ammonium chloride. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2827.10 to value ammonium chloride for these preliminary results.  We calculated an AUV of 5.37 rand per kg using contemporaneous data under this HTS heading.  See Appendix III.2.

**Barium Chloride** (Jiheng)

Petitioners suggested using South African HTS number 2827.39 to value barium chloride. However, the Department has previously determined that barium chloride needs to be valued at a certain concentration level, which cannot be found in the GTA data.  Therefore, the Department used data from Chemical Weekly, placed on the record of the previous review, to value barium chloride for these preliminary results.  Based on this data, the surrogate value for barium chloride is 31.72 Rs per kg.  Because this value is not contemporaneous with the POR, the Department inflated this value using an Indian WPI inflator (1.09) to calculate a contemporaneous surrogate value of 34.71 Rs per kg.  See Appendix III.3.

**Boric Acid** (Jiheng)

Petitioners suggested using South African HTS number 2810.00 to value boric acid.  The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South

---

[12] See Final Determination of Sales at Less Than Fair Value: Certain Artist Canvas from the People's Republic of China, 71 FR 16116 (March 30, 2006) and accompanying Issues and Decision Memorandum at Comment 2.

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

African import data collected by the GTA for HTS category 2810.00.00 to value boric acid in the preliminary results of review. We calculated an AUV of 5.30 rand per kg using contemporaneous data under this HTS heading. See Appendix III.4.

**Calcium Carbonate** (Kangtai)

Petitioners suggested using South African HTS number 2836.50 to value calcium carbonate. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2836.50 to value calcium carbonate in the preliminary results of review. We calculated an AUV of 4.47 rand per kg using contemporaneous data under this HTS heading. See Appendix III.5.

**Calcium Chloride** (Jiheng and Kangtai)

Petitioners suggested using HTS category 2827.20 to value calcium chloride, but the GTA data submitted by Petitioners was not broken down by concentration level. In previous reviews of Jiheng, the Department determined that concentration level of calcium chloride needed to be considered when calculating its surrogate value.[13] Kangtai has also informed the Department that its calcium chloride input has a concentration level of 68 percent.[14] The record indicates that both Jiheng and Kangtai use this input at a specific concentration level. Therefore, we conclude that the GTA data is not the best source to value this input. The Department used data from Chemical Weekly, placed on the record from the previous review, to value calcium chloride in the preliminary results of this review, with a concentration level of 70 percent. Based on this data, the surrogate value for calcium chloride is 9.79 Rs per kg. Because this value is not contemporaneous with the POR, the Department inflated it using an Indian WPI inflator (1.09) to calculate a contemporaneous surrogate value of 10.71 Rs per kg. See Appendix III.6.

**Chlorine** (Kangtai)

See "Chlorine" under the by-products section below.

**Citric Acid** (Kangtai)

Petitioners suggested using South African HTS number 2918.14 to value citric acid. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2918.14 to value citric acid for these preliminary results. We calculated an AUV of 15.10 rand per kg using contemporaneous data under this HTS heading. See Appendix III.7.

**Copper Sulfate** (Jiheng)

Petitioners suggested using South African HTS number 2833.25.00 to value copper sulfate. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2833.25.00 to value copper sulfate

---

[13] See 2009-2010 Surrogate Value Memorandum.
[14] See Kangtai's November 28, 2011 questionnaire response, Exhibit D-8.

Appx1830

for these preliminary results.  We calculated an AUV of 20.45 rand per kg using contemporaneous data under this HTS heading.  See Appendix III.8.

**Disodium Carbonate** (Jiheng and Kangtai)

Petitioners suggested using South African HTS number 2836.20 to value disodium carbonate. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2836.20.00 to value disodium carbonate for these preliminary results.  We calculated an AUV of 0.90 rand per kg using contemporaneous data under this HTS heading.  See Appendix III.9.  The Department notes that Jiheng reported using sodium carbonate, but according to the Material Safety Data Sheet website, disodium carbonate is listed as a synonym.[15]

**Ferric Trichloride** (Jiheng)

Petitioners suggested using South African HTS number 2827.39.10 to value ferric trichloride. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2827.39.90 to value ferric trichloride for these preliminary results.  We calculated an AUV of 16.48 rand per kg using contemporaneous data under this HTS heading.  See Appendix III.10.

**Filter Aid** (Jiheng)

Petitioners suggested using South African HTS number 2811.22.00 to value filter aid (silicon dioxide).  The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2811.22 to value filter aid (silicon dioxide) for these preliminary results.  We calculated an AUV of 13.55 rand per kg using contemporaneous data under this HTS heading.  See Appendix III.11.

**Liquid Ammonia** (Jiheng)

Petitioners suggested using South African HTS number 2814.10.00 to value liquid ammonia. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2814.10 to value liquid ammonia for these preliminary results.  We calculated an AUV of 2.70 rand per kg using contemporaneous data under this HTS heading.  See Appendix III.12.

**Magnesium Stearate** (Jiheng)

Petitioners suggested using South African HTS number 2915.70 to value magnesium stearate. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2915.70 to value magnesium stearate for these preliminary results.  We calculated an AUV of 9.71 rand per kg using contemporaneous data under this HTS heading.  See Appendix III.13.

---

[15] Available by searching for "sodium carbonate" at http://www.msds.com.

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

**Polyacrylate Sodium** (Jiheng)

Petitioners suggested using South African HTS number 3906.90.90 to value polyacrylate sodium. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 3906.90.90 to value polyacrylate sodium for these preliminary results. We calculated an AUV of 17.99 rand per kg using contemporaneous data under this HTS heading. See Appendix III.14.

**Sodium Bicarbonate** (Kangtai)

Petitioners suggested using South African HTS number 2836.30 to value sodium bicarbonate. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2836.30 to value sodium bicarbonate for these preliminary results. We calculated an AUV of 2.34 rand per kg using contemporaneous data under this HTS heading. See Appendix III.15.

**Sodium Chloride (Salt)** (Jiheng)

Petitioners suggested using South African HTS number 2501.00 to value sodium chloride. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2501.00 to value sodium chloride for these preliminary results. We calculated an AUV of 4.87 rand per kg using contemporaneous data under this HTS heading. See Appendix III.16.

**Sodium Hydroxide** (Kangtai)

Petitioners suggested using South African HTS number 2815.12 to value sodium hydroxide. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2815.12.00 to value sodium hydroxide for these preliminary results. We calculated an AUV of 1.01 rand per kg using contemporaneous data under this HTS heading. See Appendix III.17.

**Sodium Sulfate** (Jiheng)

Petitioners suggested using South African HTS number 2833.11.00 to value sodium sulfate. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2833.11.00 to value sodium sulfate for these preliminary results. We calculated an AUV of 4.50 rand per kg using contemporaneous data under this HTS heading. See Appendix III.18.

**Sodium Sulfite** (Jiheng)

Petitioners suggested using South African HTS number 2832.10.00 to value sodium sulfite. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2832.10.00 to value sodium sulfite for these preliminary results. We calculated an AUV of 2.77 rand per kg using contemporaneous data under this HTS heading. See Appendix III.19.

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

**Sulfuric Acid** (Jiheng and Kangtai)

Petitioners suggested using GTA data to value sulfuric acid using HTS category 2807.00. The data from the GTA was not sorted by concentration level. Both Jiheng and Kangtai have reported using sulfuric acid input at a specific concentration level, and in previous reviews, the Department has determined that using data that values the inputs by concentration level is better than data containing a wide range of concentrated chemicals.[16] Petitioners also submitted a contemporaneous price list from a chemical producer located in South Africa called "Norceline Chemicals Suppliers." The Department reviewed this price list and found that it did include a price for sulfuric acid at a specific concentration level, 98 percent. The price list contained two unit prices for sulfuric acid, both at the same concentration level, but packaged differently. The Department averaged these two prices to calculate a surrogate value of 2.73 rand per KG. In past reviews, Jiheng reported its sulfuric acid input as [   ] to [   ] percent pure, so for this instant review, we calculated Jiheng's average sulfuric acid input as [   ] percent pure and adjusted the calculated sulfuric acid value to account for this purity level, i.e., [   ] rand per kg. Kangtai reported its sulfuric acid input as 93 percent pure, so we adjusted the calculated sulfuric acid value to account for this purity level, i.e., 2.59 rand per kg. See Appendix III.20.

**Urea** (Jiheng and Kangtai)

Petitioners suggested using South African HTS number 3102.10.00 to value urea. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 3102.10.00 to value urea for these preliminary results. We calculated an AUV of 2.45 rand per kg using contemporaneous data under this HTS heading. See Appendix III.21.

**Water** (Jiheng and Kangtai)

Petitioners submitted an "Amendment of Tariff of Charges for Water" from the city of Johannesburg, with tariffs effective July 1, 2010. The Department reviewed the rates for a commercial user, and calculated an average rate of 14.72 rand per MT. See Appendix III.22.

**Zinc Oxide** (Jiheng)

Petitioners suggested using South African HTS number 2817.00 to value zinc oxide. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2817.00.00 to value zinc oxide for these preliminary results. We calculated an AUV of 18.36 rand per kg using contemporaneous data under this HTS heading. See Appendix III.23.

**Zinc Sulfate** (Jiheng)

Petitioners suggested using South African HTS number 2833.29.10 to value zinc sulfate. As noted above, zinc sulfate, like several other inputs, needs to be valued at specific concentration levels that are not available in the GTA data. The Department used data from Chemical Weekly,

---

[16] See 2009-2010 Surrogate Value Memorandum.

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

placed on the record of the previous review, to value zinc sulfate for these preliminary results. Based on this data, the surrogate value for zinc sulfate is 28.02 Rs per kg. Because this value is not contemporaneous with the POR, the Department inflated it using an Indian WPI inflator (1.09) to calculate a contemporaneous surrogate value of 30.65 Rs per kg. See Appendix III.24.

**Cartons and Gaylords** (Jiheng)

Petitioners suggested using South African HTS number 4819.10.00 to value cartons. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 4819.10.00 to value cartons for these preliminary results. We calculated an AUV of 23.81 rand per kg using contemporaneous data under this HTS heading. See Appendix III.25.

**Desiccant** (Jiheng)

The Department selected South African import data collected by the GTA for HTS category 2811.22.00 to value desiccant for these preliminary results. We calculated an AUV of 13.55 rand per kg using contemporaneous data under this HTS heading. See Appendix III.26.

**Labels (Including Batch Label and EPA Label)** (Jiheng and Kangtai)

Petitioners suggested using South African HTS number 4821.10.00 to value labels. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 4821.10.00 to value labels for these preliminary results. We calculated an AUV of 139.49 rand per kg using contemporaneous data under this HTS heading. See Appendix III.27.

**Palm Rope** (Jiheng)

The Department selected South African import data collected by the GTA for HTS category 5607.49 to value palm rope for these preliminary results. We calculated an AUV of 29.40 rand per kg using contemporaneous data under this HTS heading. See Appendix III.28.

**Plastic Bags (Polyethylene Bags)** (Jiheng and Kangtai)

Petitioners suggested using South African HTS number 3923.21.90 to value plastic bags. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 3923.21.90 to value plastic bags for these preliminary results. We calculated an AUV of 35.93 rand per kg using contemporaneous data under this HTS heading. See Appendix III.29.

**Plastic Film** (Jiheng and Kangtai)

Petitioners suggested using South African HTS number 3920.69 to value plastic film. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 3920.69.00 to value plastic film for

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

these preliminary results. We calculated an AUV of 70.51 rand per kg using contemporaneous data under this HTS heading. See Appendix III.30.

**Plastic Pails** (Jiheng and Kangtai)

Petitioners suggested using South African HTS number 3923.90.90 to value plastic pails. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 3923.90.90 to value plastic pails for these preliminary results. We calculated an AUV of 31.59 rand per kg using contemporaneous data under this HTS heading. See Appendix III.31.

**Plastic Lids** (Jiheng)

Petitioners suggested using South African HTS number 3923.50.90 to value plastic pail lid. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by GTA for HTS category 3923.50.90 to value plastic pail lids for these preliminary results. We calculated an AUV of 36.77 rand per kg using contemporaneous data under this HTS heading. See Appendix III.32.

**Plywood** (Jiheng)

The Department selected South African import data collected by the GTA for HTS category 4412.99.00 to value plywood for these preliminary results. We calculated an AUV of 6.37 rand per kg using contemporaneous data under this HTS heading. See Appendix III.33.

**Rope** (Jiheng)

Petitioners suggested using South African HTS number 5607.49.00 to value rope. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 5607.49.00 to value rope for these preliminary results. We calculated an AUV of 52.41 rand per kg using contemporaneous data under this HTS heading. See Appendix III.34.

**Supersacks (Woven Bags)** (Jiheng and Kangtai)

Petitioners suggested using South African HTS number 6305.33.90 to value supersacks. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 6305.33.90 to value supersacks for these preliminary results. We calculated an AUV of 1.22 rand per kg using contemporaneous data under this HTS heading. See Appendix III.35.

**Wooden Pallets** (Jiheng and Kangtai)

Petitioners suggested using South African HTS number 4415.20.10 to value wooden pallets. The Department reviewed the HTS and the GTA data provided by Kangtai, and selected South African import data collected by the GTA for HTS category 4415.20.10 to value wooden pallets

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

for these preliminary results.  We calculated an AUV of 33.22 rand per piece using contemporaneous data under this HTS heading.  See Appendix III.36.

**Wooden Rods** (Jiheng)

The Department selected South African import data collected by the GTA for HTS category 4409.29.00 to value wooden rods for these preliminary results.  We calculated an AUV of 12.99 rand per kg using contemporaneous data under this HTS heading.  See Appendix III.37.

## B.     By-Products

**Ammonia Gas** (Jiheng)

The Department selected South African import data collected by GTA for HTS category 2814.10.00 to value ammonia gas for these preliminary results.  We calculated an AUV of 2.70 rand per kg using contemporaneous data under this HTS heading.  See Appendix III.38.

**Ammonium Sulfate** (Kangtai)

Kangtai reported ammonium sulfate as a by-product.  However, the Department has previously determined that ammonium sulfate is not a by-product, but is instead produced from two by-products of the chlorinated isocyanurates production process, i.e., ammonia gas and sulfuric acid.  The Department calculated FOP values for these by-products for Kangtai, and used the surrogate values for ammonia gas and sulfuric acid.[17]

**Chlorine**

Petitioners suggested valuing chlorine using HTS 2801.10.  However, in previous reviews, the Department found that chlorine is not frequently traded on an international basis and, due to the very nature of chlorine, it faces special concerns both in transporting and in packaging, which are exacerbated over longer distances, greatly adding to the cost of chlorine.[18]  For these reasons, the Department continues to find that the GTA does not provide the best surrogate value for chlorine.

Kangtai suggested using the financial statements from Kanoria Chemicals & Industries Limited (Kanoria) 2010 annual report to value chlorine.  Additionally, Petitioners have placed Kanoria's 2011annual report on the record which could be used as a more contemporaneous source to value chlorine.  When selecting surrogate values, the Department prefers to obtain a value that is "representative of a broad market average" and "contemporaneous with the POR."  Therefore, the Department is using the value calculated in the previous review (2,799.85 Rs per MT).  This value was obtained by averaging the purchases of chlorine from four Indian chemical producers (including Kanoria), as listed in their 2010 annual reports, thereby representing a broad market average.  While Petitioners' submission is contemporaneous with the POR, because the

---

[17] For an explanation of how the Department calculated Kangtai's by-products, see "Analysis for the Preliminary Results of the 2010-2011 Administrative Review of Chlorinated Isocyanurates from the People's Republic of China: Juancheng Kangtai Chemical Co., Ltd.," dated June 29, 2012.

[18] See 2009-2010 Surrogate Value Memorandum at page 12-13.

-12-

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

Department is able to calculate a broad market average of chlorine using the previous review's data, which is only two months outside the POR, we conclude that Petitioners' submission is not the best source to value chlorine. To obtain a contemporaneous rate, the Department inflated the value using an Indian WPI inflator (1.11), to calculate a value of 3,115.37 Rs per MT. See Appendix III.39.

**Hydrogen Gas**

The Department has previously determined that the GTA does not provide the best representative surrogate value for hydrogen because hydrogen, like chlorine, is not frequently traded on an international basis, and incurs special transport costs over long distances. There are no usable South African financial statements on the record to value hydrogen. As a result, the Department looked to its secondary surrogate country, India, to determine if there are any usable financial statements on the record. While Petitioners submitted Kanoria's 2011 annual report, this annual report does not include any purchases of hydrogen during the POR. Petitioners also submitted the 2010-2011 annual report from Sree Rayalaseema Hi-Strength Hypo Limited, which does contain purchases of hydrogen. However, for the reasons explained in the section "Chlorine," above, after reviewing the potential surrogate values for hydrogen, we find that using the value calculated for hydrogen gas in the previous review, based on the 2010 annual reports of three Indian chemical producers, is the best source to value hydrogen in the instant review. We calculated an AUV of 150,297.73 Rs per MT. We then inflated this value using an Indian WPI (1.11), to calculate a contemporaneous value of 167,234.71 Rs per MT. See Appendix III.40.

**Sulfuric Acid** (Jiheng)

The Department used contemporaneous data from a South African chemical producer, Norceline Chemicals Suppliers, placed on the record by Petitioners, to value sulfuric acid for these preliminary results. Based on these data, the surrogate value for sulfuric acid (98 percent) is 2.73 rand per kg. Because Jiheng's reported sulfuric acid by-product is [    ] percent pure, we adjusted the calculated sulfuric acid value to account for this purity level, i.e., [    ] rand per kg. See Appendix III.20.

**C.     Energy and Utilities**

**Steam Coal** (Jiheng and Kangtai)

Petitioners suggested using South African HTS number 2701.19 to value coal. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2701.19.00 to value steam coal for these preliminary results. We calculated an AUV of 1.51 rand per kg using contemporaneous data under this HTS heading. See Appendix III.41.

**Electricity** (Jiheng and Kangtai)

Petitioners placed on the record a report called "Tariff and Charges 2010/11" as published by Eskom, the South African electric public utility. We calculated an average rate using "MegaFlex" non-local authority rates for a transmission zone of ≤300km. We averaged the rate

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

category (i.e., peak, standard, or off peak) across seasons, and then averaged these values by rate category. Finally, we took the average of these rate categories to reach an average contemporaneous AUV of 0.48 rand per kWh. See Appendix III.42.

**Steam** (Jiheng)

Petitioners suggested using South African HTS number 2701.11 to value steam. The Department reviewed the HTS and the GTA data provided by Petitioners, and selected South African import data collected by the GTA for HTS category 2701.11.00 to value steam for these preliminary results. We calculated an AUV of 0.57 rand per kg using contemporaneous data under this HTS heading. See Appendix III.43.

## D.     Direct, Indirect, and Packing Labor

For this review, Petitioners provided labor data from Chapter 5A of the ILO's Yearbook. However, because the Department has determined Chapter 6A to be the best source to value labor, the Department calculated the wage rate using data provided to the ILO's Yearbook in Chapter 6A under Sub-Classification 24 of the ISIC-Revision 3 standard from India. The Department finds that the two-digit description under this sub-classification of ISIC-Revision 3 (Manufacture of Chemicals and Chemical Products) provides the best available wage rate surrogate value because it is specific and derived from industries that produce merchandise comparable to the subject merchandise. ISIC-Revision 3 is the most current version available from India. This is the same classification used in the prior review of this case.

Because data were not available on a per-hour basis, we converted these data to an hourly basis using the premise that there are 8 working hours per day, 5.5 working days a week and 24 working days per month, consistent with the Department's methodology. Because these rates were in effect before the POR, we inflated the labor rate using the Indian CPI as published in the IMF's IFS. The inflated rate is 1.83.U.S. dollars per hour. See Appendix III.44.

The ILO data from Chapter 6A of the Yearbook, which was used to value labor, reflects all costs related to labor, including wages, and indirect labor costs such as benefits, housing, and training. The financial statements used to calculate the surrogate financial ratios were adjusted to avoid any double counting.

## E.     Factory Overhead, Selling General & Administrative Expenses, and Profit

No party submitted a financial statement from South Africa to value financial ratios. Parties did submit financial statements from other potential surrogate countries. Kangtai submitted the December 31, 2010 financial statements of Vinythai Public Company Limited (Vinythai) in exhibit SV-9 of its January 9, 2012 submission. As Petitioners argued, Vinythai's financial statements are not appropriate to use when valuing financial ratios because they contain subsidies that the Department has countervailed in the past. Specifically, page 17 of Vinythai's financial statements, under "special privileges," references "Exemption from corporate income tax for net income from the promoted operations and exemption from income tax on dividends paid from the income of the operations throughout the period in which the corporate income tax is exempted," and "Permission to deduct twice the amount expended on transportation,

-14-

electricity and water, for a period of ten years from the date of first earning revenue from the operations." The Department has previously countervailed both of these subsidies.[19] Jiheng submitted a financial statement from a sodium hypochlorite producer from the Philippines, but because the Department has not found sodium hypochlorite to be comparable merchandise, and because the Philippines is not a significant producer of comparable merchandise, the Department is not using financial statements from companies located in the Philippines. Petitioners identified one company, Arch Water Products South Africa (Pty) Ltd., a subsidiary of Arch Lonza, that produces calcium hypochlorite in South Africa, but Petitioners did not provide a financial statement for the South African company. Furthermore, Jiheng noted that "Arch Chemicals (PTY) Ltd. is the main producer of calcium hypochlorite in South Africa. However, it is a privately-owned company, and its financial statements are not publicly available. Arch's filings with the U.S. Securities and Exchange Commission may be publicly available, but this does not address the availability of financial statements for Arch Chemicals (PTY) Ltd."[20] The Department could not find a publicly available financial statement from this South African company. Since there are no usable financial statements on the record for South Africa, the Department examined other suitable South African financial statements, but was not able to find any from South Africa, or from any other potential surrogate country. See Appendix IV. Therefore, the Department looked to India, the secondary surrogate country.

Petitioners submitted the 2011 financial statements from three Indian companies: Sree Rayalaseema Hi-Strength Hypo (HSH), Kanoria, and Aditya Birla Chemicals (India) Ltd. (Aditya). We did not use Aditya's financial report as it appears Aditya continues to receive a subsidy the Department has countervailed in the past. Regarding HSH, the Department has previously determined that while HSH produces comparable merchandise, "HSH's production processes are not at a comparable level of integration as the respondents" (one of the respondents was Jiheng). The 2011 financial statements of HSH continue to show that it purchased two major inputs, chlorine and caustic soda, and, therefore, HSH "did not incur capital expenditures that are required to self-produce caustic soda and chlorine gas." This would lead the Department to calculate a lower manufacturing overhead, as well as cause all the financial ratios to reflect the higher purchase value of these inputs, all else being equal. On the other hand, the Department has found, and continues to find, that Kanoria has a production experience that is representative of Jiheng. Therefore, in the instant review, the Department is using Kanoria's 2011 financial statements to value the financial ratios for Jiheng. Additionally, while HSH may have production processes similar to Kangtai, page 43 of HSH's financial statements include a subsidy that the Department has previously countervailed (i.e., Export incentives such as DEPB (Duty Entitlement Pass Book).[21] Because HSH receives a countervailed subsidy, we cannot use it to value financial ratios. Kangtai's financial ratios are therefore calculated using Kanoria's 2011 financial statements.

---

[19] See Ball Bearings and Parts Thereof from Thailand: Preliminary Results of Countervailing Duty Administrative Review, 61 FR 34794 (July 3, 1996) (unchanged in final), and Preliminary Negative Countervailing Duty Determination and Alignment with Final Antidumping Duty Determination: Bottle-Grade Polyethylene Terephthalate (PET) Resin from Thailand, 69 FR 52862 (Aug. 30, 2004).

[20] See Jiheng's January 17, 2012 submission at page 2.

[21] See Polyethylene Terephthalate Film, Sheet, and Strip From India: Final Results of Expedited Five-Year (Sunset) Review of the Countervailing Duty Order, 72 FR 57300 (October 9, 2007) and Issues and Decision Memorandum.

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

In order to avoid any double-counting that could arise from the Department's use of Chapter 6A to calculate labor, we made adjustments for several items included by Kanoria in its financial statements as overhead, because the ILO's description of the Chapter 6A data included those same items as part of compensation. These adjustments included moving the line items "Contribution to Provident Fund" and "Welfare Expenses" from overhead to direct labor. To ensure that "Depreciation & Amoritisation" excluded any factors covered by Chapter 6A, we examined the auditor's notes in Kanoria's financial statements to ensure that none of the subcategories of "Depreciation & Amoritisation" are covered by Chapter 6A (e.g., buildings did not include worker housing). We then sorted each of the subcategories under either SG&A or manufacturing overhead, as appropriate.

After incorporating these adjustments, we calculated (1) fixed overhead (FOH) as a percentage of the total raw materials, labor, and energy (ML&E) costs; (2) SG&A as a percentage of ML&E plus overhead (i.e., cost of manufacture); and (3) the profit ratio as a percentage of the cost of manufacture plus SG&A. Therefore, to calculate our surrogate financial ratios, we calculated an FOH ratio (23.97 percent), SG&A ratio (9.27 percent), and profit ratio (4.79 percent). See Appendix III.45.

## F.     Freight

**Inland Truck Freight** (Jiheng and Kangtai)

Petitioners submitted a working paper titled "Transport Prices and Costs in Africa: A Review of the Main International Corridors," published by the International Bank for Reconstruction and Development/World Bank (July 2008), and a short-haul freight contract for transportation services in South Africa from October 2011 to value truck freight. To obtain an average truck freight using these sources, we first converted the World Bank data from U.S. dollars to Rand. Both sources were dated outside the POR, so we inflated the World Bank data and deflated the short-haul freight contract to reach contemporaneous values. Then, we averaged these two values to obtain a contemporaneous truck freight rate of 0.08 U.S. dollars per MT per kilometer. See Appendix III.46.

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

### List of Appendices

| | |
|---|---|
| Appendix I | Summary of Surrogate Values |
| Appendix II | Inflation Index |
| Appendix III.1 | Aluminum Sulfate |
| Appendix III.2 | Ammonium Chloride |
| Appendix III.3 | Barium Chloride |
| Appendix III.4 | Boric Acid |
| Appendix III.5 | Calcium Carbonate |
| Appendix III.6 | Calcium Chloride |
| Appendix III.7 | Citric Acid |
| Appendix III.8 | Copper Sulfate |
| Appendix III.9 | Disodium Carbonate |
| Appendix III.10 | Ferric Trichloride (Chlorides of Iron) |
| Appendix III.11 | Filter Aid (silicon dioxide) |
| Appendix III.12 | Liquid Ammonia |
| Appendix III.13 | Magnesium Stearate |
| Appendix III.14 | Polyacrylate Sodium |
| Appendix III.15 | Sodium Bicarbonate |
| Appendix III.16 | Sodium Chloride |
| Appendix III.17 | Sodium Hydroxide |
| Appendix III.18 | Sodium Sulfate |
| Appendix III.19 | Sodium Sulfite |
| Appendix III.20 | Sulfuric Acid |
| Appendix III.21 | Urea |
| Appendix III.22 | Water |
| Appendix III.23 | Zinc Oxide |
| Appendix III.24 | Zinc Sulfate |
| Appendix III.25 | Cartons |
| Appendix III.26 | Desiccant (Silicon Dioxide) |
| Appendix III.27 | Labels |
| Appendix III.28 | Palm Rope |
| Appendix III.29 | Plastic Bag |
| Appendix III.30 | Plastic Film |
| Appendix III.31 | Plastic Pail |
| Appendix III.32 | Plastic Pail Lid |
| Appendix III.33 | Plywood |
| Appendix III.34 | Rope |
| Appendix III.35 | Supersacks |
| Appendix III.36 | Wooden Pallet |
| Appendix III.37 | Wooden Rods |
| Appendix III.38 | Ammonium sulfate |
| Appendix III.39 | Chlorine |
| Appendix III.40 | Hydrogen Gas |
| Appendix III.41 | Coal (Steam Coal) |

Appendix III.42     Electricity

Appendix III.43     Steam

Appendix III.44     Labor/ Skilled and Unskilled

Appendix III.45     Financial Ratios

Appendix III.46     Truck Freight

Appendix IV        Searches for Financial Statements

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

**APPENDIX I**

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

## Summary of Surrogate Values

Official Document: A-570-898  Barcode:3084877-01 REV - Admin Review 6/1/10 - 5/31/11

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

| Category | Appendix | Factor | HTS Number | Source of Data | Period of Data | Source Value | Source Unit | Jiheng Reported Unit* | Kangtai Reported Unit* | Inflator/Deflator | Variable Name | Surrogate Value | SV Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Materials | 1 | Aluminum Sulfate | 2833.22 | GTA - South Africa | 06/2010-05/201 | 1.9886 | rand/KG | M/MT | M/MT | | Aluminum_Sulfate_SV | 1.99 | rand/KG |
| | 2 | Ammonium Chloride | 2827.10 | GTA - South Africa | 06/2010-05/201 | 5.3741 | rand/KG | M/MT | M/MT | | Ammonium_Chloride_SV | 5.37 | Rs/KG |
| | 3 | Barium Chloride | -- | Chemical Weekly | 06/2009/05/2010 | 31.7241 | Rs/Kg | M/MT | | | Barium_Chloride_SV | 34.71 | Rs/KG |
| | 4 | Boric Acid | -- | GTA - South Africa | 06/2010-05/201 | 5.3012 | rand/KG | M/MT | | | Boric_Acid_SV | 5.30 | rand/KG |
| | 5 | Calcium carbonate | 2810.00.0000 | Chemical Weekly | 06/2009/05/2010 | 4.6724 | Rs/Kg | | kg/MT | 1.09401228 | Calcium_Carbonate_SV | 30.67 | Rs/KG |
| | 6 | Calcium Chloride | -- | Chemical Weekly | 06/2009/05/2010 | 9.7888 | Rs/Kg | | kg/MT | 1.09401228 | Calcium_Chloride_SV | 10.71 | Rs/KG |
| | 39 | Chlorine | -- | Annual Reports from Kanoria Chemicals & Industries Ltd, DCM Shriram Cons LTD, Punjab Alkalies & Chemicals Limited and Sree Rayalaseema Alkalies and Allied Chemicals Limited | 2009-2010 | 2799.8536 | RS/MT | M/MT | kg/MT | 1.11268851 | Chlorine_SV | 3,115.37 | RS/MT |
| | 7 | Citric Acid | 2918.14 | GTA - South Africa | 06/2010-05/201 | 15.1028 | rand/KG | M/MT | | 1 | Citric_Acid_SV | 15.10 | rand/KG |
| | 8 | Copper Sulfate | 2833.25.00 | GTA - South Africa | 06/2010-05/201 | 20.4524 | rand/KG | M/MT | | 1 | Copper_Sulfate_SV | 20.45 | rand/KG |
| | 9 | Disodium Carbonate | 2836.40.00 | GTA - South Africa | 06/2010-05/201 | 0.8953 | rand/KG | M/MT | | 1 | Dissodium_Carbonate_SV | 0.90 | rand/KG |
| | 10 | Ferric Trichloride Chloride of Iron | 2827.39.90 | GTA - South Africa | 06/2010-05/201 | 16.4778 | rand/KG | M/MT | | 1 | Ferric_Trichloride_SV | 16.48 | rand/KG |
| | 11 | Filter Aid (silicon dioxide) | 2811.22 | GTA - South Africa | 06/2010-05/201 | 13.5353 | rand/KG | M/MT | | 1 | Filter_Aid_SV | 13.53 | rand/KG |
| | 12 | Liquid Ammonia | 2814.10 | GTA - South Africa | 06/2010-05/201 | 2.6983 | rand/KG | kg/MT | | 1 | Liquid_Ammonia_SV | 2.70 | rand/KG |
| | 13 | Magnesium Stearate | 2915.70 | GTA - South Africa | 06/2010-05/201 | 9.3950 | rand/KG | M/MT | | 1 | Magnesium_Stearate_SV | 9.71 | rand/KG |
| | 14 | Polyacrylic Sodium | 3906.90.90 | GTA - South Africa | 06/2010-05/201 | 17.9390 | rand/KG | M/MT | | 1 | Polyacrylic_Sodium_SV | 17.99 | rand/KG |
| | 15 | Sodium Bicarbonate | 2836.30 | GTA - South Africa | 06/2010-05/201 | 2.3387 | rand/KG | M/MT | kg/MT | 1 | Sodium_Carbonate_SV | 2.34 | rand/KG |
| | 16 | Sodium Chloride Rock Salt | 2501.00 | GTA - South Africa | 06/2010-05/201 | 4.8655 | rand/KG | M/MT | | 1 | Sodium_Chloride_SV | 4.87 | rand/KG |
| | 17 | Sodium Hydroxide | 2815.12.00 | GTA - South Africa | 06/2010-05/201 | 1.0126 | rand/KG | M/MT | kg/MT | 1 | Sodium_Hydroxide_SV | 1.01 | rand/KG |
| | 18 | Sodium Sulfate | 2833.11.00 | GTA - South Africa | 06/2010-05/201 | 4.5010 | rand/KG | M/MT | | 1 | Sodium_Sulfate_SV | 4.50 | rand/KG |
| | 19 | Sodium Sulfite | 2832.10.000 | GTA - South Africa | 06/2010-05/201 | 2.7669 | rand/KG | M/MT | | 1 | Sodium_Sulfite_SV | 2.77 | rand/KG |
| | 20 | Sulfuric Acid | -- | Norcrine Chemicals Suppliers | 1/8/2012 | 2.5987 | Rand/KG | M/MT | | 1 | Sulfuric_Acid_SV | 2.59 | Rand/KG |
| | 20 | Sulfuric Acid 93% | 3102.10.000 | Norcrine Chemicals Suppliers | 1/8/2012 | 2.4482 | Rand/KG | M/MT | | 1 | Sulfuric_Acid_93_SV | 2.45 | rand/KG |
| | 21 | Water | -- | Johannesburg Water Tariffs | 7/1/2010 | 14.7290 | rand/KG | M/MT | | 1 | Water_SV | 14.72 | rand/KG |
| | 22 | Zinc Oxide | 2817.00.00 | GTA - South Africa | 06/2010-05/201 | 18.3648 | rand/KG | M/MT | | 1 | Zinc_Oxide_SV | 18.36 | rand/KG |
| | 23 | Zinc Sulfate | 2833.29.00 | GTA - South Africa | 06/2010-05/201 | 28.0172 | rand/KG | M/MT | | 1.09401228 | Zinc_Sulfate_SV | 30.65 | rand/KG |
| Packing | 25 | Carton | 4819.10.00 | GTA - South Africa | 06/2010-05/201 | 23.8095 | rand/KG | M/MT | | | Carton_SV | 23.81 | rand/KG |
| | 26 | Desiccant | 2811.22.00 | GTA - South Africa | 06/2010-05/201 | 13.5493 | rand/KG | M/MT | | | Desiccant_SV | 13.55 | rand/KG |
| | 27 | Labels | 4821.10.00 | GTA - South Africa | 06/2010-05/201 | 139.4914 | rand/KG | M/MT | | | Label_SV | 139.49 | rand/KG |
| | 28 | Palm Rope | 5607.90.90 | GTA - South Africa | 06/2010-05/201 | 29.3975 | rand/KG | M/MT | | | Palm_Rope_SV | 29.40 | rand/KG |
| | 29 | Plastic Bag | 3923.21.90 | GTA - South Africa | 06/2010-05/201 | 35.9280 | rand/KG | M/MT | | | Inner_Plastic_Bag_SV | 35.93 | rand/KG |
| | 30 | Plastic Film | 3920.00.00 | GTA - South Africa | 06/2010-05/201 | 70.5143 | rand/KG | M/MT | | | Plastic_Film_SV | 70.51 | rand/KG |
| | 31 | Plastic Pail | 3923.90.90 | GTA - South Africa | 06/2010-05/201 | 31.5592 | rand/KG | M/MT | | | Plastic_Pail_SV | 31.59 | rand/KG |
| | 32 | Plastic Pail Lid | 3923.50.90 | GTA - South Africa | 06/2010-05/201 | 36.7741 | rand/KG | M/MT | | | Plastic_Pail_Lid_SV | 36.77 | rand/KG |
| | 33 | Plywood | 4412.99.00 | GTA - South Africa | 06/2010-05/201 | 6.2749 | rand/KG | M/MT | | | Plywood_SV | 6.27 | rand/KG |
| | 34 | Rope | 5607.49.00 | GTA - South Africa | 06/2010-05/201 | 52.4102 | rand/KG | M/MT | | | Rope_SV | 52.41 | rand/KG |
| | 35 | Supersacks | 6305.33/90 | GTA - South Africa | 06/2010-05/201 | 1.2151 | rand/KG | M/MT | | | Supersacks_SV | 1.22 | rand/KG |
| | 36 | Wooden Pallet | 4821.10.00 | GTA - South Africa | 06/2010-05/201 | 33.2169 | rand/piece | pieces/MT | pieces/MT | | Wooden_Pallet_SV | 33.22 | rand/piece |
| | 37 | Wooden Skids | 4415.20.10 | GTA - South Africa | 06/2010-05/201 | 12.2990 | rand/KG | M/MT | | | Wooden_Skids_SV | 12.29 | rand/KG |
| | 38 | Ammonia Gas | 2814.10.00 | GTA - South Africa | 06/2010-05/201 | 2.6983 | rand/KG | M/MT | | | Ammonia_Gas_SV | 2.70 | rand/KG |
| By-Products | 39 | Chlorine | -- | Annual Reports from Kanoria Chemicals & Industries Ltd, DCM Shriram Cons LTD, Punjab Alkalies & Chemicals Limited and Sree Rayalaseema Alkalies and Allied Chemicals Limited | 2009-2010 | 2799.8536 | RS/MT | M/MT | | 1.11268851 | Chlorine_BY_SV | 3,115.37 | RS/MT |
| | 40 | Hydrogen Gas | -- | Annual Report from: DCM Shriram Cons LTD, Punjab Alkalies & Chemicals Limited and Sree Rayalaseema Alkalies and Allied Chemicals Limited | 2009-2010 | 150297.7271 | RS/MT | M/MT | | 1.11268851 | Hydrogen_Gas_SV | 167224.71 | RS/MT |
| | 20 | Sulfuric Acid | -- | Norcrine Chemicals Suppliers | 1/8/2012 | 1.5065 | Rand/KG | M/MT | kg/MT | | Sulfuric_Acid_BY_SV | 1.51 | Rand/KG |
| Utilities | 41 | Coal (Steam Coal) | 2701.19.00 | GTA - South Africa | 06/2010-05/201 | | rand/KG | M/MT | kg/MT | | Steam_Coal_SV | | Rand/KG |
| | 42 | Electricity | -- | Eskom | 04/01/2010-03/31/2011 | 0.48 | rand/KWh | KWH/MW | kwh/MW | | Electricity_SV | 0.48 | rand/KWh |
| | 43 | Steam | 2711.11.00 | GTA - South Africa | 06/2010-05/201 | 0.5748 | rand/KG | M/MT | | | Steam_SV | 0.57 | rand/KG |
| Labor | 44 | Labor/ Skilled and Unskilled | -- | India ILO Chapter 6A | 2003-2008 | 1.83 | USD/hour | hour/MT | hour/MT | | Labor_SV | 1.83 | USD/hour |
| Financial Ratios | 45 | Overhead | -- | Annual Report from Kanoria Chemicals & Industries Ltd. | 2010-2011 | 23.97% | percent | | | | OVHHDSV | 0.2397 | % as a decimal |
| | | SG&A | | | | 9.27% | percent | | | | SGASV | 0.0927 | |
| | | Profit | | | | 4.79% | percent | | | | PROFITSV | 0.0479 | |
| Transportation | 46 | Truck Freight | -- | AICD Report and AFRICATRANSIT Contract | July 2008 & October 2011 | 0.0810 | USD/MT/KM | km | km | | Truck_SV | 0.08 | USD/MT/KM |

* Where reported unit and source unit differ, the source unit has been converted in the margin calculation program to match the reported unit.

Appendix III.3

| Chemical Weekly |
| Barium Chloride |

| | June 2009 - May 2010 | | |
|---|---|---|---|
| Price: Rs/Kg | | Barium Chloride | |
| Price Date | Mumbai | Chennai | Delhi |
| 2-Jun-09 | | 38.00 | |
| 9-Jun-09 | | 38.00 | |
| 16-Jun-09 | | 38.00 | |
| 30-Jun-09 | | 38.00 | |
| 7-Jul-09 | | 38.00 | |
| 14-Jul-09 | | 38.00 | |
| 21-Jul-09 | | 38.00 | |
| 28-Jul-09 | | 38.00 | |
| 4-Aug-09 | | 38.00 | |
| 11-Aug-09 | | 38.00 | |
| 18-Aug-09 | | 38.00 | |
| 25-Aug-09 | | 38.00 | |
| 1-Sep-09 | | 38.00 | |
| 8-Sep-09 | | 38.00 | |
| 15-Sep-09 | | 38.00 | |
| 22-Sep-09 | | 38.00 | |
| 29-Sep-09 | | 38.00 | |
| 6-Oct-09 | | 38.00 | |
| 13-Oct-09 | | 38.00 | |
| 20-Oct-09 | | 38.00 | |
| 27-Oct-09 | | 36.00 | |
| 3-Nov-09 | | 36.00 | |
| 10-Nov-09 | | 36.00 | |
| 17-Nov-09 | | 36.00 | |
| 24-Nov-09 | | 36.00 | |
| 1-Dec-09 | | 36.00 | |
| 8-Dec-09 | | 36.00 | |
| 15-Dec-09 | | 36.00 | |
| 22-Dec-09 | | 36.00 | |
| 29-Dec-09 | | 36.00 | |
| 5-Jan-10 | | 36.00 | |
| 12-Jan-10 | | 36.00 | |
| 19-Jan-10 | | 36.00 | |
| 26-Jan-10 | | 36.00 | |
| 2-Feb-10 | | 36.00 | |
| 9-Feb-10 | | 36.00 | |
| 16-Feb-10 | | 36.00 | |
| 23-Feb-10 | | 36.00 | |
| 2-Mar-10 | | 36.00 | |
| 9-Mar-10 | | 36.00 | |
| 16-Mar-10 | | 36.00 | |
| 23-Mar-10 | | 36.00 | |
| 30-Mar-10 | | 36.00 | |
| 6-Apr-10 | | 36.00 | |
| 13-Apr-10 | | 36.00 | |
| 20-Apr-10 | | 36.00 | |
| 27-Apr-10 | | 36.00 | |
| 4-May-10 | | 36.00 | |
| 11-May-10 | | 36.00 | |
| 18-May-10 | | 36.00 | |

| Averages (Jun-09 -- May-10):* | 36.80 |
|---|---|
| *Chennai prices include Excise Duty (16%). | |
| Average Prices excluding Excise (16%) | 31.72413793 |
| **Country-wide Average Price, excl. taxes:** | **31.7241** |

Appx1848

**Chemical Weekly**
**Calcium Chloride**

| Price: Rs/Kg | June 2009 - May 2010 | | |
| --- | --- | --- | --- |
| | Calcium Chloride 70% solid | | |
| Price Date | Mumbai | Chennai | Delhi |
| 2-Jun-09 | 10 | 9.5 | |
| 9-Jun-09 | 10 | 9.5 | |
| 16-Jun-09 | 10 | 9.5 | |
| 30-Jun-09 | 10.00 | 9.00 | |
| 7-Jul-09 | 14.00 | 9.00 | |
| 14-Jul-09 | 14.00 | 9.00 | |
| 21-Jul-09 | 14.00 | 9.00 | |
| 28-Jul-09 | 14.00 | 9.00 | |
| 4-Aug-09 | 14.00 | 9.00 | |
| 11-Aug-09 | 14.00 | 9.00 | |
| 18-Aug-09 | 14.00 | 9.00 | |
| 25-Aug-09 | 14.00 | 9.00 | |
| 1-Sep-09 | 14.00 | 9.00 | |
| 8-Sep-09 | 14.00 | 9.00 | |
| 15-Sep-09 | 14.00 | 9.00 | |
| 22-Sep-09 | 14.00 | 9.00 | |
| 29-Sep-09 | 14.00 | 9.00 | |
| 6-Oct-09 | 14.00 | 9.00 | |
| 13-Oct-09 | 14.00 | 9.00 | |
| 20-Oct-09 | 14.00 | 9.00 | |
| 27-Oct-09 | 14.00 | 9.00 | |
| 3-Nov-09 | 14.00 | 9.00 | |
| 10-Nov-09 | 14.00 | 9.00 | |
| 17-Nov-09 | 14.00 | 9.00 | |
| 24-Nov-09 | 14.00 | 9.00 | |
| 1-Dec-09 | 14.00 | 9.00 | |
| 8-Dec-09 | 14.00 | 9.00 | |
| 15-Dec-09 | 14.00 | 9.00 | |
| 22-Dec-09 | 14.00 | 9.00 | |
| 29-Dec-09 | 14.00 | 9.00 | |
| 5-Jan-10 | 14.00 | 9.00 | |
| 12-Jan-10 | 14.00 | 9.00 | |
| 19-Jan-10 | 14.00 | 9.00 | |
| 26-Jan-10 | 14.00 | 9.00 | |
| 2-Feb-10 | 14.00 | 9.00 | |
| 9-Feb-10 | 14.00 | 9.00 | |
| 16-Feb-10 | 14.00 | 9.00 | |
| 23-Feb-10 | 14.00 | 9.00 | |
| 2-Mar-10 | 14.00 | 9.00 | |
| 9-Mar-10 | 14.00 | 9.00 | |
| 16-Mar-10 | 14.00 | 9.00 | |
| 23-Mar-10 | 14.00 | 9.00 | |
| 30-Mar-10 | 14.00 | 9.00 | |
| 6-Apr-10 | 14.00 | 9.00 | |
| 13-Apr-10 | 14.00 | 9.00 | |
| 20-Apr-10 | 14.00 | 9.00 | |
| 27-Apr-10 | 14.00 | 9.00 | |
| 4-May-10 | 14.00 | 9.00 | |
| 11-May-10 | 14.00 | 9.00 | |
| 18-May-10 | 14.00 | 9.00 | |

| | | | |
| --- | --- | --- | --- |
| Averages (Jun-09 -- May-10):* | 13.680000 | 9.030000 | |
| *Mumbai and Chennai prices include Excise Duty (16%). | | | |
| Average Prices excluding Excise (16%) | 11.793103 | 7.784483 | |
| **Country-wide Average Price, excl. taxes:** | **9.7888** | | |

Appx1851

Appendix III.20

| Norceline Chemicals Suppliers |
| Sulfuric Acid |

| Product Description | Rand/kg |
|---|---|
| Sulphuric Acid Bulk 98% | 2.56 |
| Sulphuric Acid 98% | 2.9 |
| **Average Price** | **2.73** |

| Adjust for (98%) Concentration level* | | | |
|---|---|---|---|
| Average Price | Sulfuric Acid  Jiheng INPUT [(      )] | Sulfuric Acid BYPRODUCT [                ] | Sulfuric Acid Kangtai INPUT (93%) |
| (A) | (B) = (A)*([     ]) | (C) = (A)*(    ) | (C) = (A)*(93/70) |
| 2.7300 | [                          ] | [                          ] | **2.5907** |
| *All units are Rand/KG | | | |

Filed By: Emily Halle, Filed Date: 7/5/12 5:09 PM, Submission Status: Approved

**Chemical Weekly**
**Zinc Sulfate**

| Price: Rs/Kg | June 2009 - May 2010 | | |
|---|---|---|---|
| | | Zinc Sulfate | |
| Price Date | Mumbai | Chennai | Delhi |
| 2-Jun-09 | 35.00 | 30.00 | |
| 9-Jun-09 | 35.00 | 30.00 | |
| 16-Jun-09 | 35.00 | 30.00 | |
| 30-Jun-09 | 35.00 | 30.00 | |
| 7-Jul-09 | 35.00 | 30.00 | |
| 14-Jul-09 | 35.00 | 30.00 | |
| 21-Jul-09 | 35.00 | 30.00 | |
| 28-Jul-09 | 35.00 | 30.00 | |
| 4-Aug-09 | 35.00 | 30.00 | |
| 11-Aug-09 | 35.00 | 30.00 | |
| 18-Aug-09 | 35.00 | 30.00 | |
| 25-Aug-09 | 35.00 | 30.00 | |
| 1-Sep-09 | 35.00 | 30.00 | |
| 8-Sep-09 | 35.00 | 30.00 | |
| 15-Sep-09 | 35.00 | 30.00 | |
| 22-Sep-09 | 35.00 | 30.00 | |
| 29-Sep-09 | 35.00 | 30.00 | |
| 6-Oct-09 | 35.00 | 30.00 | |
| 13-Oct-09 | 35.00 | 30.00 | |
| 20-Oct-09 | 35.00 | 30.00 | |
| 27-Oct-09 | 35.00 | 30.00 | |
| 3-Nov-09 | 35.00 | 30.00 | |
| 10-Nov-09 | 35.00 | 30.00 | |
| 17-Nov-09 | 35.00 | 30.00 | |
| 24-Nov-09 | 35.00 | 30.00 | |
| 1-Dec-09 | 35.00 | 30.00 | |
| 8-Dec-09 | 35.00 | 30.00 | |
| 15-Dec-09 | 35.00 | 30.00 | |
| 22-Dec-09 | 35.00 | 30.00 | |
| 29-Dec-09 | 35.00 | 30.00 | |
| 5-Jan-10 | 35.00 | 30.00 | |
| 12-Jan-10 | 35.00 | 30.00 | |
| 19-Jan-10 | 35.00 | 30.00 | |
| 26-Jan-10 | 35.00 | 30.00 | |
| 2-Feb-10 | 35.00 | 30.00 | |
| 9-Feb-10 | 35.00 | 30.00 | |
| 16-Feb-10 | 35.00 | 30.00 | |
| 23-Feb-10 | 35.00 | 30.00 | |
| 2-Mar-10 | 35.00 | 30.00 | |
| 9-Mar-10 | 35.00 | 30.00 | |
| 16-Mar-10 | 35.00 | 30.00 | |
| 23-Mar-10 | 35.00 | 30.00 | |
| 30-Mar-10 | 35.00 | 30.00 | |
| 6-Apr-10 | 35.00 | 30.00 | |
| 13-Apr-10 | 35.00 | 30.00 | |
| 20-Apr-10 | 35.00 | 30.00 | |
| 27-Apr-10 | 35.00 | 30.00 | |
| 4-May-10 | 35.00 | 30.00 | |
| 11-May-10 | 35.00 | 30.00 | |
| 18-May-10 | 35.00 | 30.00 | |
| Averages (Jun-09 -- May-10):* | 35.000000 | 30.000000 | |
| *Mumbai and Chennai prices include Excise Duty (16%). | | | |
| Average Prices excluding Excise (16%) | 30.172414 | 25.862069 | |
| **Country-wide Average Price, excl. taxes:** | **28.0172** | | |

Appx1869

*Law Offices of Peggy A. Clarke*
1325 G Street, NW
Suite 500
Washington, D.C. 20005
Phone: (202) 552-7407
Fax: (202) 449-7701
E-mail: peggy@peggyclarkelaw.com

September 5, 2012

Case Number: A-570-898
Total Pages: 363
6th Administrative Review
06/01/2010 – 05/31/2011

**PUBLIC DOCUMENT**

**BY ELECTRONIC FILING**

The Honorable Rebecca Blank
Acting Secretary of Commerce
U.S. Department of Commerce
Central Records, Room 1870
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

      Re:    *Chlorinated Isocyanurates from China (Sixth Administrative Review) – Hebei
              Jiheng Chemical Company, Ltd. Resubmission of Surrogate Value Information for
              Factors of Production*

Dear Acting Secretary Blank:

      On behalf of Hebei Jiheng Chemical Company, Ltd. ("Jiheng"), a respondent in the

above-captioned review, we are resubmitting information relevant to the determination of

appropriate surrogate values to apply to the factors of production or Jiheng. This information

was originally filed, as required by the Department, on August 6, 2012, then withdrawn upon the

Department's unwarranted grant of a 30-day extension of time.

# Attachment 1

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

SEC Number :  216

File Number :

# MABUHAY VINYL CORPORATION

(Company's Full Name)

3rd Floor Philamlife Salcedo Center
126 L.P. Leviste Street, Salcedo Village, Makati City

(Company's Address)

000-164-0009-000 VAT

(TIN Number)

8178971

(Telephone Number)

8164785

(Fax Number)

# SEC FORM 20-IS

## AMENDED PRELIMINARY INFORMATION STATEMENT

Form Type

Each Active Secondary License Type and File Name:  NONE

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

## MABUHAY VINYL CORPORATION
## MANAGEMENT REPORT

### PART I - BUSINESS

**A.  Description of Business**

(1) Business Development

(a) Mabuhay Vinyl Corporation (MVC) is the only Chlor-Alkali producer in the Philippines.  It was incorporated and duly registered with the Philippine Securities and Exchange Commission as a rubber shoe manufacturer on July 20, 1934 under the name Mabuhay Rubber Corporation, and subsequently reorganized in 1960 to engage in chemical and resin manufacturing.  In October 10, 1966, the corporate name of Mabuhay Vinyl Corporation was adopted.

In 2001, the company underwent a major business realignment when it decided to exit from the PVC business and focus on the chlor-alkali business.  The company closed down its PVC Plant operations and sold the related marketing operations to PRII in March 2001.  With the stockholders' approval, the company also divested its 49% shareholdings in Philippine Resins Industries, Inc. in the same month.

Sale of the PVC business and divestment of PRII shareholdings enabled the company to invest in a major expansion of its chlor-alkali business.  The project was registered under the Omnibus Investment Code of 1987.  As such, it is entitled to a 3-year income tax holiday.  The plant started its commercial operation in October of 2003.

(b) MVC is not involved in any bankruptcy, receivership or similar proceeding; and

(c) There is no material reclassification, merger, consolidation, or purchase or sale of a significant amount of assets not in the ordinary course of business.

(2) Business of MVC

(a) Description of Registrant

( i ) The Company produces four (4) basic and intermediate chemicals with a wide range of industrial and household applications. Included within the chlor-alkali group of products are the following:

• **Caustic Soda (NaOH)**

This is the common name for sodium hydroxide, a clear, colorless, slippery and highly corrosive liquid compound that is used as a raw material in the manufacture of soaps, detergents, textiles, and paper.  Produced commercially at a concentration of fifty percent (50%), Caustic Soda is also used for water treatment, washing of soft drink and beer bottles, and petroleum refining.  MVC ranks as the country's largest manufacturer and distributor of Caustic Soda.  With the commissioning of Ion-Exchange Membrane plant, Caustic Soda production capacity was increased to about 1,900 metric tons per month or 22,800 MTPY (previously 15,000 MTPY).  This is manufactured at the company's Iligan plant.  Additionally, MVC imports Caustic Soda in bulk in order to supply the requirements of the domestic market.  Contribution to revenue is 58%.

• **Hydrochloric Acid (HCl)**

This chemical is an aqueous solution of hydrogen chloride gas, a colorless, pungent, and poisonous gas at ordinary room temperature and pressure.  Commercially known as "muriatic acid", this compound is a clear, slightly yellow fuming liquid, which has thirty percent (30%) to thirty

13

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

two percent (32%) concentration. It is commonly used in the pre-treatment of metals in steel manufacturing, activation of geothermal oil wells, food processing, production of zinc chloride for batteries, and steel pickling in electronics assembly. Homemakers also buy muriatic acid for various household applications such as the removal of stains in floor tiles and kitchen sinks. MVC is the biggest producer of Hydrochloric Acid in the country with a production capacity of about 5,150 metric tons per month or 61,800 MTPY. This is manufactured in the company's Iligan plant. Its revenue contribution is 19%.

- **Liquid Chlorine (Cl2)**

  A co-product of Caustic Soda when salt is dissolved in water and electrolyzed, Chlorine is a clear, amber-colored liquefied gas, which is kept under high pressure in steel cylinders. It is a highly reactive gas with a pungent and irritating odor and is primarily used for drinking water purification, water treatment, as a bleaching agent for paper and textile manufacturing, and for producing insecticides, refrigerants and chlorine-synthetic chemicals (such as vinyl chloride, ethylene dichloride ("EDC"), etc.). Presently, MVC is the only chemical company in the country which produces Cl2 in commercial quantities. It supplies Chlorine to Manila Water Co. and Maynilad Water Services, Inc., private concessionaires that took over the responsibility from MWSS for the generation, treatment and distribution of potable water to Metro Manila. MVC also supplies Liquid Chlorine to other municipal/city water districts and power plants in the country. This is manufactured at Iligan plant. Production capacity is approximately 400 metric tons per month or 4,800 MTPY. Share of revenue is 8%.

- **Sodium Hypochlorite (NaOCl)**

  This compound is a light-yellow solution produced through the mixing of Caustic Soda, Liquid Chlorine and water. It is used as a bleaching material for clothes, and as disinfectant and deodorant in dairies, sewage disposals, hospitals, school canteens, bathrooms and kitchens. Industrially, it is also used as a bleaching agent by textile and paper manufacturing companies. MVC has a production capacity of about 2,500 metric tons per month or 30,000 MTPY. This is manufactured in the company's Laguna plant and Iligan plant. Revenue contribution is 14%.

(ii) The company is not engaged in export sales.

(iii) Distribution Methods of the Products

The Company leases warehouse and depot facilities in strategic areas of the country. Bulk terminals are located in major ports of entry such as: Bauan in Batangas, Mandaue in Cebu, Lanang in Davao City and Pulupandan in Negros Occidental. From the chlor-alkali plant in Iligan City, liquid products (Caustic Soda and Hydrochloric Acid) are transported to the depots via specialized shipping vessels in rubber-lined or epoxy-coated tanks. Caustic Soda and Hydrochloric Acid from the depots, and Sodium Hypochlorite from the Laguna plant, are then delivered to industrial users by specialized 10 to 20-ton class contracted tank trucks with special handling facilities for corrosive and toxic chemicals.

MVC owns the 450-tonner M/T Snoopy 1 vessel, which is dedicated for the inter-island shipment of Hydrochloric Acid within the Visayas-Mindanao area. A new vessel, M/T Snoopy 2, with a capacity of 850 MT of Hcl is serving Iligan and Batangas depot. The Company has also commissioned William Michael Shipping, Inc. to provide, on a year-round basis, a chemical tanker M/T W. Michael 1, exclusively for the Company's bulk shipment of Caustic Soda from the Iligan plant to MVC depots and other destinations.

Liquid Chlorine, contained in steel cylinders, are loaded in container vans for shipment to Manila and Cebu. MVC has signed contracts with several trucking companies to provide exclusive flatbed trucks to transport Chlorine directly from the pier to customers' warehouses.

Appx2199

(iv) The company has no publicly-announced new product or service.

(v) Competition

Because of the basic nature of the company's products, almost all industries from various sectors are being served by MVC. From soap and detergents to steel manufacturing, to beverage (beer and soft drinks) manufacturer to power plants, to construction, to municipal water disinfecting, to telecommunications, food processing, textile, energy development, etc.

Competition basically comes from imported materials brought in by traders/indentors particularly in Metro Manila and neighboring industrial provinces. MVC can effectively compete due to the strength present in each of the following products:

- **Liquid Caustic Soda** – Because of the commodity-like nature of the product, other parties use pricing as the main competing factor. The competitive advantages of MVC are its logistical network of depots/warehouses, its market leadership (67% market share) and its dual role of being the country's only manufacturer and biggest importer of this product.

- **Hydrochloric Acid and Liquid Chlorine** – MVC has a dominant position in the industry, being the biggest producer of HCl using the electrolysis process and the only merchant-producer of Chlorine. The quality of Hcl produced by electrolysis is considered superior when compared to the other processes. Furthermore, the contributing difficulty in importing and handling these highly corrosive and toxic materials has continued to favor the operations of MVC. Hcl shares 53% of the market while chlorine claims 64% share.

- **Sodium Hypochlorite** – Competition comes from only one other merchant-manufacturer. MVC has gained fifty five percent (55%) market share after twelve(12) years of operation mainly brought about by its consistent product quality, utilizing a state-of-the-art manufacturing facility, and its wider coverage of the market.

(vi) Sources And Availability Of Raw Materials And Principal Supplier

| SUPPLIER | RAW MATERIAL | EST. ANNUAL VOLUME |
|---|---|---|
| Dampier Salt Ltd. | Industrial Salt | 36,000 to 45,000 MT |

The agreement with Dampier Salt Limited of Australia provides that it will supply the salt requirements of MVC as follows: (a) 2006 – 45,000 MT (b) 2007 – 36,000 to 45,000 MT (c) 2008 – 36,000 to 45,000 MT delivered at Iligan pier. The supplier will provide the vessel while all insurance from the time of loading and taxes in the Philippines shall be for the account of MVC. The contract will expire in December 2008.

(vii) Dependence On One Or Few Major Customers

The company is not dependent on any one industry, company or customer. Likewise, no single customer accounts for 20% or more of total sales.

(viii) Transactions With Related Parties

Please see notes on page 28 under 'Certain Relationships and Related Transactions'.

(ix) The company is not covered with any patent, trademark, copyright, franchise, concession or royalty agreement.

(x) There is no need for any government approval on its principal products.

15

Appx2200

# Attachment 2

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved



Submit

**SP**❇**K**  Samahan sa Pilipinas ng mga Industriyang Kimika



## AGRICHEMICALS INDUSTRY

Based on the most recent data gathered, utilization of crop protection chemical products continues to become more prevalent among Filipinos. The most extensively used pesticides in the Philippines now include insecticides, which account for 51% of the total market, 21% herbicide, 14% fungicide, and the remaining 14% are others.

These agricultural chemicals are used in crops such as rice, which constitutes 3.3 million hectares plantation area, corn that constitutes 3.2 million hectares, pineapple that constitutes 67,000 hectares of plantation area, and banana which constitutes 25,000 hectares of plantation area.

*Crop Protection Association of the Philippines (CPAP)*

At the mainstream of this industry sub-sector is the Crop Protection Association of the Philippines (CPAP), the leading trade association of agricultural chemical businesses in the country. CPAP spearheads the efforts of making available the different types of crop protection products. Its primary mandate includes the manufacture, importation and sales to distributors or end-users of these products. Composed of 15 members, CPAP's vision is to ensure better harvest, health and environment through the proper use of agricultural chemicals.

CPAP works together with the Fertilizer and Pesticides Authority (FPA), a government regulatory and licensing body that oversees the distribution of crop protection products.

## FERTILIZERS INDUSTRY

The fertilizer industry in the Philippines has shown a modest growth of about 8 percent per year during the last ten years. The annual consumption of fertilizers consists of 55% urea and ammonium sulfate, 40% phosphatic fertilizers and 5% potash, amounting to more than 1.5 million metric tons per year. Urea, potash and half of the ammonium sulfate are imported while all the phosphatic grades (NP/NPK) and the rest of the ammonium sulfate are produced locally.

The industry has been liberalized in 1987, fostering free competition particularly in the urea market. The tariff on imported finished fertilizers, which was fully subsidized by the government through the Fertilizer and Pesticide Authority was restored at 3% for urea, ammonium sulfate and potash, and 5% for the phosphatic grades. As further incentive for the local producers of fertilizers, the government continues to provide subsidy for the tariff on raw materials.

*Producers of Compound Fertilizers*

There are presently four producers of compound phosphatic fertilizers in the country with a combined capacity of 1.52 million metric tons per year.

PHILPHOS currently exports 70 percent of its output into South East Asia. The balances, together with the output of the other producers are consumed locally.

Share this:

**LIVESTOCKS => AGRI-NEWS => Topic started by: mikey on January 11, 2009, 06:50:20 AM**

Title: **The Philippine Fertilizer Industry**
Post by: **mikey** on **January 11, 2009, 06:50:20 AM**

Agri-Food Trade Service
The Philippine Fertilizer Industry*

Florence Mojica-Sevilla
Senior Agribusiness Specialist
Center for Food and Agri Business
University of Asia and the Pacific 2006

Agriculture faces the challenge of increasing production to provide food for the growing population. Increasing population puts pressure on the cultivation of marginal land areas and results to land degradation and decline in soil production potential. To maintain soil fertility and productivity and to prevent land degradation and erosion, nutrients taken by crops must be replenished through the application of fertilizers.

Fertilizers are a major cost item in Philippine agriculture. They increase yield and enable the country to attain sufficiency in food and agro-industrial crops. Fertilizers have also made crop production possible in unproductive soils. Fertilizer is believed to contribute 30% to 50% of the increase in yield in crops. However, high fertilizer prices have become a cause for concern since they squeeze farm incomes.

Status of the Philippine Fertilizer Industry
Fertilizer plays a crucial role in improving crop production. A total of 1.7 million (M) tons of inorganic fertilizers were sold locally in 2004, with four fertilizer products representing 91% of the sales (Table 1). These include: urea (32%), complete or 14-14-14 (21%), ammonium sulfate or 21-0-0 (20%), and mono-ammonium phosphate or 16-20-0 (18%).

Table 1. SUPPLY-DEMAND OF FERTILIZER, CY 1995-2005 (Volume in Thousand Tons)

| YEAR | SUPPLY Production | Imports | Sales | Export |
|------|------------|---------|-------|--------|
| 1995 | 1,390 | 1,237 | 1,475 | 718 |
| 1996 | 1,613 | 1,202 | 1,637 | 528 |
| 1997 | 1,322 | 1,246 | 2,038 | 457 |
| 1998 | 1,181 | 787 | 1,545 | 439 |
| 1999 | 1,168 | 1,222 | 1,864 | 200 |
| 2000 | 1,069 | 1,260 | 1,840 | 233 |
| 2001 | 1,202 | 1,030 | 1,945 | 231 |
| 2002 | 1,340 | 910 | 1,805 | 362 |
| 2003 | 1,059 | 1,640 | 1,540 | 335 |
| 2004 | 1,073 | 8,872 | 1,671 | 364 |
| 2005 | 307 | 2,140 | 978 | 126 |

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

Source: Fertilizer and Pesticides Authority (FPA)

Based on preliminary reports submitted by fertilizer companies, sales in 2005 reached 978,000 tons. Luzon accounted for 50-60% of the inorganic fertilizer market, Visayas 17-20%, and Mindanao 20-28%. Regions II (Cagayan), III (Central Luzon), and IV (Southern Tagalog - Calabarzon and Mimaropa) are the biggest fertilizer markets representing nearly half of the total fertilizer consumption in the country.

An estimated 60% of fertilizer sales are used for food crops, principally rice and corn, with the remainder mainly applied to plantation crops such as banana, sugarcane, and pineapple.

Supply

Imports. Bulk (60%) of the inorganic fertilizer supply is imported. In 2004, the Philippines bought an aggregate volume of 8.8M tons of various fertilizer grades, with urea accounting for 30% and ammonium sulfate for 24%. Ammonium sulfate is imported when the international market price is lower than that of domestic production. The majority of the finished fertilizer grades are sourced from Saudi Arabia, Japan, Ukraine, China and Indonesia. Other important suppliers include Qatar, Malaysia, Singapore, Russia, Korea and Taiwan (Figure 1).

Figure 1. Urea Imports by Country of Origin, 2005 (Total: 570,286 tons)

Source of basic data: National Statistics Office (NSO)

As of 2005, there are 119 registered importers licensed by the FPA. Importers generally source directly from foreign suppliers or through indentors/traders. Among major importers are: AFC Fertilizer and Chemicals, Inc., Farmix Fertilizer, Soiltech Agricultural Products Corporation, La Filipina Uy Gongco, Modern Time Enterprises, and Norsk Hydro (Phil.).

Production. Domestic fertilizer production in 2004 totaled 1.1 M tons, largely in the form of 14-14-14 (33%), 16-20-0 (23%), 21-0-0 (15%) and 16-16-8 (12%) (Figure 2).

Figure 2. Inorganic Fertilizer Production by Grade, Philippines, 2004 (Total: 1,072,835 tons)

Source of basic data: FPA

The Philippines currently has three fertilizer manufacturing plants that produce various fertilizer grades for local use and for export; one is located in Luzon and the other two in the Visayas. These plants are into fertilizer blending, granulation and compaction. The fertilizers manufactured locally include 21-0-0, 16-20-0, 18-46-0, 0-18-0 (single superphosphate), 15-15-15, 14-14-14, 12-12-12, 16-16-8, 6-9-15, and 0-0-52 (sulfate of potash).

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

Three other chemical fertilizer plants ceased operation between the late 1970s and early 1980s due to uncompetitive production costs: Maria Cristina, Chemical Industries of the Philippines, and Planters Products.

## Demand

Almost all (99%) of the 14-14-14 produced in 2004 were utilized locally. On the other hand, a total of 364,000 tons of fertilizers were exported primarily 16-16-8 (45%), 18-46-0 (18%), 16-8-8 (11%) and 16-20-0 (11%). Some amount of ammonium sulfate is also exported to Malaysia, Thailand, Vietnam, Pakistan, and Palau (Figure 3). For the manufacturer of these various nutrient grades, local fertilizer plants depend partly upon the use of imported raw materials such as rock phosphate, anhydrous ammonia, and sulphuric acid.

Figure 3. Ammonium Sulfate Export by Country of Destination, 2005 (Total: 72,154 tons)

Source of basic data: NSO

The most widely used fertilizer grades are urea, 21-0-0 and 16-20-0. Urea is mainly used as a nitrogen source while 16-20-0 is applied as a source of both nitrogen and phosphorus. In some areas 18-46-0, and to some extent, 14-14-14, are used instead of 16-20-0.

## Organic Fertilizer

The government and some private enthusiasts and environmentalists are now into the re-introduction of organic faming. Organic farming is a farming system that promotes, among other practices, the use of organic fertilizers. Organic matter is an essential component of healthy soils, and all sound farming practices integrate and allocate available organic materials to maintain or improve soil fertility. The Philippines, with its agricultural based economy, has a plentiful supply of organic wastes. A wide variety of organic materials can be used as fertilizers, such as animal manures (e.g. livestock dung, liquid manure from livestock holding facilities), agricultural by-products and processing wastes (e.g. mudpress), green manures (e.g. grass, leaves), domestic wastes (e.g. sewage), and industrial wastes (e.g. wastes from distilleries, sugar refineries, fish canning plants). Chicken manure is the standard organic fertilizer used locally, although cattle and carabao manures, mudpress, and rice bran are also used at a lesser extent. Unlike inorganic fertilizers, animal manures not only provide nutrients but also organic substrate vital for enhancing primary productivity within aquatic environments. Chicken manure is the most valuable because of its effectiveness in promoting natural food growth, its availability, and its ease in handling and application.

## Processed organic fertilizers

Processed organic fertilizers are composed of a mixture of animal manures, agricultural wastes (e.g. mudpress), and limestone, composted for at least a

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

week through biological, chemical, and mechanical action. These are usually enriched with primary and secondary nutrients, and in some cases, also with trace elements. The product appears like soil or peat and normally contains two to six times more nitrogen, phosphorus, and potassium than fresh manures.

Because animal manures are a major ingredient in processed organic fertilizers, it should not come as a surprise that many of the manufacturers are located near poultry and livestock farming centers. Some of the manufacturers of organic fertilizers include Absolute Chemicals, Inc, (Abono), Alcolex Corporation (Ferti King), FEACO (Feaco), Greenbelt Manufacturing Corp. (Greenbelt) and Proganic International, Inc.

Domestic organic fertilizer production in 2005 totaled 25,465 tons (Table 2). Sales during the period amounted to 20,650 tons.

Table 2. Organic Fertilizer Supply-Demand, 1995-2005 (Volume in Tons)

| Year | Production | Sales |
|---|---|---|
| 1995 | 21,769 | 28,090 |
| 1996 | 14,754 | 12,734 |
| 1997 | 11,651 | 12,102 |
| 1998 | 16,893 | 15,684 |
| 1999 | 8,951 | 9,764 |
| 2000 | 12,108 | 11,961 |
| 2001 | 6,969 | 6,770 |
| 2002 | 21,160 | 1,914 |
| 2003 | 2,758 | 3,523 |
| 2004 | 19,389 | 16,235 |
| 2005 | 25,465 | 20,650 |

Source: FPA

Marketing and Distribution
The Philippine fertilizer industry operates largely under a free market system. Production, importation, marketing, and distribution of fertilizers are being handled by the private sector. Following the trade liberalization policy and the removal of levy and other restrictions, smaller companies engaged in agricultural trading were able to enter into the fertilizer market, once controlled only by a few private and government-assisted firms.

The marketing of fertilizers passes through three main levels, namely: (1) importers/ manufacturers; (2) distributors; and (3) dealers. All importations can only be made by FPA licensed importers and cover only products registered at the FPA.

As of 2005, there are about 369 fertilizer handlers (manufacturers, importers, repackers, exporters, distributors) licensed by FPA. The fertilizer distributors or wholesalers constitute the second level of fertilizer marketing, and usually cover several provinces or an entire region. They sell to dealers or outlets. A few importers are also distributors themselves and this provides them with the advantage of direct market access.

The dealers constitute the last step of the marketing channel and are the ones in direct contact with the farmers. Because of the free market system,

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

most distributors also hold a dealer's license, and sell directly in areas where there are no dealers or in conditions where local dealers are weak, or selling to plantation accounts which do not require the networking advantage offered by the dealers. In many cases, it is therefore difficult to draw the line between distributors and dealers.

Imported fertilizers, as finished products in bulk or in bags, are discharged in major ports such as Manila and Poro Point in Luzon; Iloilo, Bacolod, and Cebu in the Visayas; and Cagayan de Oro, Davao, and General Santos in Mindanao.

### Pricing

The selling price of inorganic fertilizers is generally affected by the prevailing international market price, foreign exchange rate, and the local supply and demand situation as influenced by factors such as changes in rainfall pattern, type of crop planted, calamities, and importer speculation.

Retail prices of six major fertilizer grades are presented in Table 3. Prices of fertilizers have been increasing for the past eleven years due to rising world prices and foreign exchange. Prices of urea had tripled from a low of P314/bag in 1999 to P950/bag in 2005 (Figure 4). Retail prices of all other grades had been increasing. The highest jump was recorded for 18-46-0 with the highest price of P1,400/bag in 2005 compared to P396/bag in 1995.

Table 3. Average Retail Prices of Fertilizers, CY 1995-2005 (6 Major Imported Fertilizer Grades) - In Pesos per 50-kilogram bag

| Year | Urea | 21-0-0 | 16-20-0 | 18-46-0 | 14-14-14 | 0-0-60 |
|------|------|--------|---------|---------|----------|--------|
| 1995 | 368.93 | 212.93 | 316.54 | 396.40 | 322.61 | 259.32 |
| 1996 | 378.05 | 217.16 | 325.97 | 409.21 | 332.78 | 279.83 |
| 1997 | 345.54 | 224.82 | 334.46 | 424.26 | 348.31 | 245.40 |
| 1998 | 365.64 | 239.03 | 285.89 | 468.13 | 390.59 | 340.72 |
| 1999 | 313.65 | 227.41 | 398.00 | 507.27 | 403.97 | 357.68 |
| 2000 | 365.43 | 231.87 | 398.87 | 515.57 | 402.72 | 379.23 |
| 2001 | 439.98 | 272.24 | 413.89 | 552.08 | 426.87 | 434.70 |
| 2002 | 424.44 | 269.81 | 422.71 | 564.71 | 435.82 | 460.44 |
| 2003 | 550.96 | 316.05 | 466.22 | 673.90 | 476.66 | 495.49 |
| 2004 | 741.75 | 489.91 | 634.65 | 863.46 | 659.83 | 663.08 |
| 2005 | 950.50 | 538.16 | 779.00 | 1,400.32 | 797.96 | 782.76 |

Source: FPA

Figure 4. Average Retail Prices of Urea and 18-46-0, CY 1995-2005

Source: FPA

### Conclusion

Fertilizers are said to impact positively on crop production. They help in minimizing soil degradation, particularly soil erosion while maintaining and enhancing soil fertility as a whole. Studies show that combining inorganic

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

and organic sources of plant nutrients is a beneficial option for the crop and soil system and hence can be of great benefit to both farmers and the environment.

The increasing cost of fertilizer, however, continues to be a major problem by farmers. Today, producers complain that fertilizer costs in the Philippines are far higher than those in Malaysia and Thailand. High fertilizer prices translate to higher production cost. Further because of high prices, fertilizer use is usually below the recommended levels.

The production and supply of fertilizers are of vital importance to food security. A prerequisite for producing the quantity and quality of affordable food is that the farming community has adequate access to fertilizers, i.e. proximity to markets on equitable terms. This requires that farmers are able to choose between various sources of supply of fertilizer grades, at prices they can afford and in the quantity, quality and at the time they are required. It is also necessary to provide an environment in which those involved in fertilizer production and supply can enter freely.

-----------------------------------------------------------------------------------

* Published in the May 2006 issue of the Food and Agri Business Monitor, a monthly magazine of the Center for Food and Agri Business, University of Asia and the Pacific, Pasig City, Philippines.

How hard would it be to make your own organic fertilizer,"animal wastes,some plant material and agri. lime"???let it ferment for some time first,then apply.

Title: **Re: The Philippine Fertilizer Industry**
Post by: **mikey** on **February 02, 2009, 08:27:35 AM**

Prices of fertilizers going down in the Philippines
[02 February 2009] The Philippine Department of Agriculture said that prices of fertilizers have fallen more than 50% since September 2008 when prices went as high as PHP 1940 (USD 40.84)/bag. The decrease in prices is due to the continuing decline in prices of crude oil in the world market. In November 2008, Agriculture Secretary Arthur Yap had ordered the Fertilizer and Pesticide Authority (FPA) monitor prices of fertilizers and check against activities of some dealers and retailers who refuse to slash their retail prices. Last year, Philippine crop producers have warned of lower productivity due to the rising prices of fertilizers

Powered by SMF 1.1.3 | SMF © 2006-2008, Simple Machines LLC

APPX 2239
Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

A broader look at today's business

# BusinessMirror

www.businessmirror.com.ph

HOME    ADVERTISING    ARCHIVE    ABOUT US    BM FLIP PAGES    CONTACT US

Appx2240
Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

Barcode:3095487-01 A-570-898 REV - Admin Review 6/1/10 - 5/31/11 Chlorinated Isos

92% of PHL fertilizer requirements are imported - Case 1:17-cv-01520 Document 47   Page: 281   Filed: 07/13/2017   Page 2 of 3

BusinessMirror.com.ph

# 92% of PHL fertilizer requirements are imported

THE Philippines is increasingly relying on imported fertilizer, with imports accounting for around 92 percent of total supply in 2010, according to a study released by the Bureau of Agricultural Statistics (BAS).

In its Agricultural Indicators System series, BAS noted that the domestic production of fertilizers continuously went down from 2006 to 2010.

In 2010, fertilizer production was 182,549 metric tons [MT] and it posted a 6.91-percent drop from the 2009 record. Meanwhile, importation of fertilizers increased to 1.97 million metric tons [MMT] or by 13.60 percent from [2009], the report read.

Last year, the BAS report pointed out that the share of local production to total supply of fertilizers declined to 8.48 percent while that of imports rose to 91.52 percent.

Among the fertilizer grades, the retail prices of di-ammophos were consistently highest for the years 2006 to 2010. In 2010, di-ammophos was priced P1,767.94 per bag. The prices of muriate of potash and complete fertilizer were P1,648.88 and P1,068.46 per bag, respectively.

For 2010, the BAS report noted that the retail prices of major fertilizer grades posted year-on-year declines. The average price of urea was down by 2.81 percent, ammosul by 10.27 percent, ammophos by 17.16 percent, di-ammophos by 21.09 percent, complete fertilizer by 10.45 percent, and muriate of potash by 15.53 percent.

The increasing reliance of local farmers on imported fertilizer could make them vulnerable to price spikes in oil prices since the Department of Agriculture (DA) earlier said that some fertilizer grades are petroleum-based.

High oil prices in the international market would cause fertilizer prices to spike. Urea, a fertilizer grade used in palay production, is a by-product of oil.

In 2008, high oil prices and high fertilizer prices in the world market were cited by the DA as the major factors that drove up the price of food in the local market.

The Philippines was one of those that bore the brunt of the volatility of commodity prices in 2008 when it paid for more than $1,000 per metric ton for imported rice.



Latest

Partners

          

Graphic          Cook          Health & Fitness          View

# Attachment 14

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

India Import Statistics

Commodity: 31021000, Urea Whether Or Not In Aqueous Solution

Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 8995419470 | 4565584172 | 62180322253 | 5275311843 | 6117686313 | 4664788284 | 61,176,686,313 | 4,664,788,284 |
| Australia | KG | 0 | 0 | 0 | 0 | 442351706 | 27499000 | | |
| Bahrain | KG | 1248899670 | 89646311 | 3084816649 | 225861923 | 590432165 | 42000000 | | |
| Bangladesh | KG | 1717441043 | 66898866 | 353649904 | 25909000 | 0 | 0 | | |
| Belarus | KG | 88833784 | 4873000 | 0 | 0 | 0 | 0 | 0 | 0 |
| China | KG | 6911013946 | 199225757 | 7339447172 | 532374360 | 26302714388 | 1714340000 | 26,302,714,388 | 1,714,340,000 |
| Egypt | KG | 3851817524 | 153631774 | 618018380 | 45000000 | 0 | 0 | | |
| France | KG | 0 | 0 | 0 | 0 | 2359492 | 110000 | | |
| Germany | KG | 0 | 0 | 45292 | 1000 | 333617 | 9800 | | |
| Indonesia | KG | 2874090408 | 78350451 | 771057994 | 56750170 | 667821673 | 39237017 | 667,821,673 | 39,237,017 |
| Iran | KG | 612412392 | 49916000 | 5819537401 | 424512702 | 1463595 0068 | 968606700 | | |
| Israel | KG | 0 | 0 | 0 | 0 | 260560726 | 39904703 | | |
| Japan | KG | 0 | 0 | 0 | 0 | 421758 | 20000 | | |
| Korea South | KG | 0 | 0 | 0 | 0 | 2373800 | 108000 | 2,373,800 | 108,000 |
| Kuwait | KG | 1686980352 | 81541080 | 1469367360 | 111241000 | 0 | 0 | | |
| Latvia | KG | 2772117456 | 72600000 | 0 | 0 | 0 | 0 | | |
| Lithuania | KG | 3423144448 | 116349510 | 601898048 | 46086000 | 0 | 0 | | |
| Malaysia | KG | 417310048 | 22800000 | 737519055 | 55005000 | 0 | 0 | | |
| Netherlands | KG | 0 | 0 | 1387019 | 121800 | 0 | 0 | | |
| Oman | KG | 17749566512 | 1750583163 | 18625198615 | 2053414585 | 14662623851 | 1586299177 | | |
| Portugal | KG | 0 | 0 | 663667200 | 50816000 | 0 | 0 | | |
| Qatar | KG | 5374867564 | 260069137 | 4026894482 | 299029937 | 807179620 | 57165000 | | |
| Romania | KG | 1353594496 | 47221000 | 0 | 0 | 0 | 0 | | |
| Russia | KG | 6096127800 | 234787000 | 717416247 | 53985900 | 101106326 | 5241916 | | |
| Saudi Arabia | KG | 3021094839 | 215473300 | 3666377634 | 270004000 | 0 | 0 | | |
| Switzerland | KG | 0 | 0 | 0 | 0 | 4448125 | 220000 | | |
| Taiwan | KG | 0 | 0 | 223736 | 9920 | 336257 | 16000 | | |

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

| Country | Unit | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Thailand | KG | 0 | 0 | 0 | 0 | 2334038 | 110000 | 2,334,038 | 110,000 |
| Turkey | KG | 984938880 | 27001000 | 0 | 0 | 0 | 0 | | |
| Ukraine | KG | 26641989232 | 943963020 | 12617819798 | 952489800 | 1243234436 | 80752000 | | 63,502,000 |
| Unidentified Country | KG | 0 | 0 | 1023917 | 63600 | 776269269 | 63502000 | 776,269,269 | 63,502,000 |
| United Arab Emirates | KG | 2689172171 | 138778603 | 802229031 | 57501146 | 432371245 | 26150972 | | |
| United Kingdom | KG | 0 | 0 | 0 | 0 | 2359492 | 110000 | | |
| United States | KG | 3247139 | 85200 | 0 | 0 | 0 | 0 | | |
| Uzbekistan | KG | 0 | 0 | 202595093 | 15114000 | 2386825 03 | 13365999 | 238,682,503 | 13,365,999 |
| Vietnam | KG | 43553016 | 11790000 | 132226 | 20000 | 0 | 0 | | |
| Yemen | KG | 0 | 0 | 0 | 0 | 421758 | 20000 | 0 | 0 |

World, Less NMEs, Subsidy Countries, and Unknowns    33,186,490,642  2,834,125,268

11.7096 Rs/KG

Source of Data: Ministry of Commerce

Appx2373

India Import Statistics
Commodity: 25010020, Rock Salt

Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 61345875 | 31929429 | 58763663 | 30405957 | 67972138 | 32347338 | 67,972,138 | 32,347,338 |
| Afghanistan | KG | 0 | 0 | 0 | 0 | 4597709 | 2927769 | | |
| China | KG | 0 | 0 | 46162 | 18000 | 0 | 0 | 0 | 0 |
| Germany | KG | 0 | 0 | 0 | 0 | 195030 | 22000 | | |
| Iran | KG | 0 | 0 | 577019 | 259947 | 0 | 0 | | |
| Pakistan | KG | 61345875 | 31929429 | 58140482 | 30128010 | 63179399 | 29397569 | | |
| Source of Data: Ministry of Commerce| | | | World, Less NMEs, Subsidy Countries, and Unknowns | | | | 67,972,138 | 32,347,338 |

2.1013 Rs/KG

Appx2374

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

India Import Statistics

Commodity: 28362020, Disodium Carbonate Light

Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 2163305559 | 196219557 | 2783848861 | 283647329 | 2461824013 | 221384648 | 2,461,824,013 | 221,384,648 |
| Afghanistan | KG | 0 | 0 | 0 | 0 | 18891182 | 1530000 | | |
| Bosnia & Herzegovina | KG | 0 | 0 | 0 | 0 | 11108290 | 1000000 | | |
| Bulgaria | KG | 15489865 | 1082250 | 345433229 | 33154513 | 296684589 | 28001040 | | |
| China | KG | 1740400502 | 161986740 | 914057083 | 102872881 | 338408887 | 30903277 | 338,408,887 | 30,903,277 |
| Croatia | KG | 0 | 0 | 213672 | 15000 | 0 | 0 | | |
| France | KG | 0 | 0 | 0 | 0 | 2182490 | 102500 | | |
| Germany | KG | 3207 | 300 | 965680 | 103000 | 3154955 | 326100 | | |
| Hong Kong | KG | 2240826 | 205230 | 0 | 0 | 0 | 0 | | |
| Indonesia | KG | 0 | 0 | 0 | 0 | 762280 | 61000 | 762,280 | 61,000 |
| Iran | KG | 55064773 | 5420366 | 170136463 | 17511531 | 12507126 | 1254230 | | |
| Italy | KG | 0 | 0 | 0 | 0 | 2704676 | 215000 | | |
| Japan | KG | 0 | 0 | 0 | 0 | 5852768 | 522330 | | |
| Kenya | KG | 44737577 | 3593000 | 65826897 | 6428110 | 27070096 | 2619750 | | |
| Korea South | KG | 0 | 0 | 10919259 | 1280000 | 3336078 | 253000 | 3,336,078 | 253,000 |
| Malaysia | KG | 385911 | 18000 | 0 | 0 | 2378668 | 220000 | | |
| Netherlands | KG | 0 | 0 | 0 | 0 | 11314911 | 910504 | | |
| Pakistan | KG | 24671324 | 2101300 | 484576537 | 44162875 | 263786151 | 23090600 | | |
| Poland | KG | 326586 | 20160 | 6062720 | 604000 | 43211227 | 3929999 | | |
| Romania | KG | 132748249 | 9507000 | 318913282 | 31300017 | 284089472 | 25015207 | | |
| Russia | KG | 26260440 | 1455749 | 13997497 | 1508000 | 1787895339 | 14658892 | | |
| Spain | KG | 0 | 0 | 0 | 0 | 10115789 | 817990 | | |
| Switzerland | KG | 0 | 0 | 0 | 0 | 2970674 | 252395 | | |
| Taiwan | KG | 0 | 0 | 1076594 | 20000 | 0 | 0 | | |
| Turkey | KG | 20785800 | 2000000 | 78038411 | 8256428 | 53524740 | 5349635 | | |
| Ukraine | KG | 79164532 | 6646462 | 363482001 | 35452725 | 878729711 | 79476198 | | |
| Unidentified Country | KG | 8903541 | 960000 | 0 | 0 | 0 | 0 | 0 | 0 |
| United Arab Emirates | KG | 4118802 | 395000 | 10049536 | 978249 | 4428330 | 380000 | | |
| United States | KG | 7003624 | 828000 | 0 | 0 | 5821384 | 495000 | | |

World, Less NMEs, Subsidy Countries, and Unknowns   2,119,316,768   190,167,371

11.1445 Rs/KG

Source of Data: Ministry of Commerce

Appx2375

India Import Statistics
Commodity: 28141000, Anhydrous Ammonia
Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 30788822298 | 1504595918 | 28912539197 | 1990958098 | 26529994558 | 1499406347 | 26,529,994,558 | 1,499,406,347 |
| Australia | KG | 0 | 0 | 212198585 | 14789725 | 0 | 0 | | |
| Bahrain | KG | 382255117 | 26960700 | 703462078 | 558854613 | 130384490 | 7850000 | | |
| Bangladesh | KG | 1522981071 | 87157020 | 278550246 | 22877060 | 66598052 | 4000000 | | |
| Belgium | KG | 0 | 0 | 0 | 0 | 1327 | 100 | | |
| Canada | KG | 1916360 | 27336 | 0 | 0 | 0 | 0 | | |
| China | KG | 836687 | 40000 | 277198060 | 20017669 | 0 | 0 | 0 | 0 |
| Egypt | KG | 0 | 0 | 1104916763 | 69746236 | 0 | 0 | | |
| France | KG | 0 | 0 | 0 | 0 | 98784570 | 4500000 | | |
| Germany | KG | 257333392 | 16768000 | 0 | 0 | 48844 | 380 | | |
| Indonesia | KG | 219012688 | 4998000 | 439652919 | 29896020 | 162243282 | 9781421 | 162,423,282 | 9,781,421 |
| Iran | KG | 7897353638 | 326467219 | 5314859184 | 342613554 | 11181297606 | 591134225 | | |
| Japan | KG | 0 | 0 | 15190 | 1500 | 0 | 0 | | |
| Korea South | KG | 576953 | 40000 | 606423 | 59000 | 407169422 | 22498081 | 0 | 0 |
| Kuwait | KG | 139814740 | 7014436 | 5109441180 | 36701413 | 2114001445 | 116046329 | | |
| Malaysia | KG | 3391762971 | 164376055 | 1758664721 | 118500564 | | | | |
| Morocco | KG | 0 | 0 | 88618448 | 3555268 | 0 | 0 | | |
| Oman | KG | 814066241 | 116444845 | 641516233 | 98212000 | 798992175 | 128714048 | | |
| Qatar | KG | 4211211666 | 198811033 | 5066885126 | 338771281 | 3281776305 | 166159777 | | |
| Saudi Arabia | KG | 9835107357 | 444884082 | 9579893834 | 640393148 | 7474039162 | 401378352 | | |
| Singapore | KG | 0 | 0 | 40343 | 1000 | 0 | 0 | | |
| South Africa | KG | 158126701 | 10548000 | 0 | 0 | 0 | 0 | | |
| Trinidad & Tobago | KG | 0 | 0 | 354603573 | 25003762 | 0 | 0 | | |
| Tunisia | KG | 168082879 | 11900000 | 0 | 0 | 0 | 0 | | |
| Ukraine | KG | 682141664 | 22326000 | 1095744217 | 76286000 | 0 | 0 | | |
| Unidentified Country | KG | 178795978 | 8250000 | 635576670 | 4999000 | 217409996 | 11760634 | 217,409,996 | 11,760,634 |
| United Arab Emirates | KG | 927339697 | 57612433 | 1420592404 | 92679285 | 597067882 | 35383000 | | |
| United Kingdom | KG | 106498 | 10759 | 0 | 0 | 0 | 0 | | |

World, Less NMEs, Subsidy Countries, and Unknowns    26,150,161,280   1,477,864,292

Source of Data: Ministry of Commerce

17.6946 Rs/KG

Appx2376

India Import Statistics

Commodity: 28332500, Copper Sulphate

Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 130237707 | 1429470 | 137221386 | 1956473 | 383158969 | 3902473 | 383,158,969 | 3,902,473 |
| Australia | KG | 0 | 0 | 4720 | 5 | 0 | 0 | | |
| Austria | KG | 0 | 0 | 16025 | 25 | 1300 | 10 | | |
| Belgium | KG | 890 | 1 | 79552 | 1940 | 15877058 | 190900 | | |
| Canada | KG | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Chile | KG | 0 | 0 | 20043551 | 320000 | 0 | 0 | | |
| China | KG | 4273534 | 34925 | 5374980 | 49678 | 35381309 | 399032 | 35,381,309 | 399,032 |
| Finland | KG | 0 | 0 | 923593 | 5500 | 0 | 0 | | |
| France | KG | 0 | 0 | 56342 | 700 | 36476 | 90 | | |
| Germany | KG | 156725 | 1267 | 509450 | 11122 | 378688 | 2218 | | |
| Indonesia | KG | 0 | 0 | 2260 | 8 | 0 | 0 | 0 | 0 |
| Japan | KG | 51701 | 260 | 107713 | 800 | 28741 | 140 | | |
| Korea South | KG | 0 | 0 | 0 | 0 | 7518 | 56 | 7,518 | 56 |
| Netherlands | KG | 0 | 0 | 0 | 0 | 6014268 | 72000 | | |
| Russia | KG | 75288429 | 700000 | 0 | 0 | 0 | 0 | | |
| Singapore | KG | 6586 | 40 | 627106 | 3398 | 3593 | 25 | | |
| Spain | KG | 0 | 0 | 0 | 0 | 5222 | 12 | | |
| Switzerland | KG | 549761 | 1900 | 0 | 0 | 145314 | 250 | | |
| Taiwan | KG | 20097946 | 353000 | 109459099 | 1562842 | 325213971 | 3237270 | | |
| Thailand | KG | 64337 | 1000 | 0 | 0 | 38099 | 310 | 38,099 | 310 |
| Unidentified Country | KG | 4268240 | 80000 | 0 | 0 | 0 | 0 | 0 | 0 |
| United Kingdom | KG | 6285 | 61 | 1450 | 2 | 2260 | 11 | | |
| United States | KG | 20813219 | 200016 | 15545 | 453 | 25152 | 149 | | |
| Uzbekistan | KG | 4660054 | 57000 | 0 | 0 | 0 | 0 | 0 | 0 |
| Source of Data: Ministry of Commerce | | | World, Less NMEs, Subsidy Countries, and Unknowns | | | | | 347,732,043 | 3,503,075 |

99.2648 Rs/KG

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

India Import Statistics
Commodity: 283322, Aluminum Sulfate

Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 37198243 | 865507 | 19542420 | 613157 | 26260055 | 923197 | 26,260,055 | 923,197 |
| China | KG | 21058145 | 534008 | 10607528 | 281999 | 8085102 | 405199 | 8,085,102 | 405,199 |
| Germany | KG | 2032 | 30 | 5559 | 58 | 0 | 0 | | |
| Indonesia | KG | 1156417 | 96000 | 1094319 | 125000 | 833262 | 100000 | 833,262 | 100,000 |
| Iran | KG | 1694416 | 42000 | 173739 | 3000 | 0 | 0 | | |
| Italy | KG | 0 | 0 | 0 | 0 | 1225019 | 72000 | | |
| Japan | KG | 0 | 0 | 0 | 0 | 114215 | 1025 | | |
| Korea South | KG | 0 | 0 | 0 | 0 | 434931 | 1000 | 434,931 | 1,000 |
| Mexico | KG | 3362669 | 60000 | 0 | 0 | 0 | 0 | | |
| Netherlands | KG | 0 | 0 | 287846 | 1050 | 149247 | 394 | | |
| Singapore | KG | 0 | 0 | 0 | 0 | 1367548 | 23500 | | |
| Spain | KG | 288780 | 3780 | 0 | 0 | 0 | 0 | | |
| Turkey | KG | 8503241 | 121999 | 7217976 | 180000 | 13880500 | 319000 | | |
| Unidentified Country | KG | 0 | 0 | 111960 | 20000 | 0 | 0 | 0 | 0 |
| United Kingdom | KG | 0 | 0 | 27333 | 1850 | 130251 | 650 | | |
| United States | KG | 1132543 | 7690 | 16160 | 200 | 39980 | 429 | | |

Source of Data: Ministry of Commerce — World, Less NMEs, Subsidy Countries, and Unknowns    16,906,760    416,998

40.5440 Rs/KG

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

Barcode:3095487-04 A-570-898 REV - Admin Review 6/1/10 - 5/31/11 Chlorinated Isos

India Import Statistics

Commodity: 28100020, Boric Acid

Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 309738787 | 9814295 | 306447186 | 8751497 | 314578525 | 9257280 | 314,578,525 | 9,257,280 |
| Argentina | KG | 8888376 | 193000 | 11109112 | 324000 | 10796100 | 325000 | | |
| Belgium | KG | 14578 | 492 | 0 | 0 | 0 | 0 | | |
| Chile | KG | 42227549 | 1134000 | 0 | 0 | 0 | 0 | | |
| China | KG | 0 | 0 | 595925 | 11000 | 3486730 | 103400 | 3,486,730 | 103,400 |
| Finland | KG | 0 | 0 | 386589 | 4000 | 0 | 0 | | |
| Germany | KG | 99819 | 1129 | 60895 | 1504 | 815063 | 23608 | | |
| Korea South | KG | 0 | 0 | 1677784 | 40000 | 2883314 | 80200 | 2,883,314 | 80,200 |
| Malaysia | KG | 8339765 | 199556 | 0 | 0 | 3327581 | 105000 | | |
| Netherlands | KG | 0 | 0 | 1498644 | 42095 | 67498 | 1050 | | |
| Peru | KG | 14582471 | 339000 | 14224855 | 258196 | 14293221 | 443000 | | |
| Spain | KG | 0 | 0 | 25443 | 488 | 0 | 0 | | |
| Sweden | KG | 624094 | 21000 | 0 | 0 | 0 | 0 | | |
| Switzerland | KG | 0 | 0 | 5712 | 69 | 2638 | 80 | | |
| Tunisia | KG | 0 | 0 | 116085 | 3075 | 0 | 0 | | |
| Turkey | KG | 182433944 | 6233248 | 203468607 | 6014619 | 154446288 | 4542583 | | |
| United Kingdom | KG | 0 | 0 | 1387680 | 39116 | 1703 | 51 | | |
| United States | KG | 52528191 | 1692870 | 71889855 | 2013335 | 124458389 | 3633308 | | |
| Source of Data: Ministry of Commerce | World, Less NMEs, Subsidy Countries, and Unknowns | | | | | | | 308,208,481 | 9,073,680 |

33.9673 Rs/KG

Appx2379

**India Import Statistics**
Commodity: 39069090, Others
Year Ending: May

| Partner Country | Unit | 2009 IND | 2009 Quantity | 2010 IND | 2010 Quantity | 2011 IND | 2011 Quantity | 2011 IND | 2011 Quantity |
|---|---|---|---|---|---|---|---|---|---|
| World | KG | 3582257339 | 29447676 | 5293192563 | 39708118 | 6271944011 | 43359304 | 6271944015 | 431399304 |
| Afghanistan | KG | 0 | 0 | 0 | 0 | 45136 | 360 | | |
| Argentina | KG | 0 | 0 | 0 | 0 | 357390 | 3800 | | |
| Australia | KG | 14528180 | 105121 | 18336453 | 142790 | 35851677 | 284032 | | |
| Austria | KG | 143873 | 359 | 948268 | 5028 | 10839750 | 74967 | 157869 | 636 |
| Azerbaijan | KG | 0 | 0 | 0 | 0 | 506027 | 6300 | | |
| Bahrain | KG | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Belgium | KG | 146729518 | 517594 | 204737132 | 656475 | 237999173 | 785344 | | |
| Brazil | KG | 0 | 0 | 38116 | 500 | 6266874 | 35415 | | |
| Cameroon | KG | 0 | 0 | 0 | 0 | 527428 | 9400 | | |
| Canada | KG | 14302499 | 46186 | 11931886 | 35229 | 20184451 | 98293 | | |
| Chile | KG | 0 | 0 | 0 | 0 | 127503 | 3000 | | |
| China | KG | 307049745 | 2761259 | 409096820 | 4328434 | 722258770 | 6450859 | 722588770 | 6450659 |
| Czech Republic | KG | 1300865 | 10925 | 1820631 | 49000 | 618700 | 5000 | | |
| Denmark | KG | 560631 | 1145 | 80795 | 230 | 77457 | 267 | | |
| Egypt | KG | 1310640 | 16670 | 0 | 0 | 2308 | 15 | | |
| Finland | KG | 1109267 | 16001 | 174489 | 2270 | 0 | 0 | | |
| France | KG | 338145645 | 2710544 | 497522075 | 3881105 | 399094617 | 3820304 | | |
| Germany | KG | 713799568 | 2728793 | 1035414122 | 4144532 | 1016632139 | 4405957 | | |
| Guadeloupe | KG | 738892 | 1860 | 0 | 0 | 0 | 0 | | |
| Guinea | KG | 0 | 0 | 0 | 0 | 1412500 | 16600 | | |
| Hong Kong | KG | 3123985 | 26113 | 2872644 | 9807 | 1411579 | 28299 | | |
| Hungary | KG | 0 | 0 | 0 | 0 | 119069 | 415 | | |
| Indonesia | KG | 3615748 | 31825 | 1435097 | 22323 | 13744081 | 208640 | 13744081 | 208640 |
| Ireland | KG | 560631 | 1145 | 513716 | 6000 | 886341 | 1400 | | |
| Israel | KG | 1310640 | 16670 | 0 | 0 | 332908 | 3150 | | |
| Italy | KG | 58410326 | 399969 | 72246625 | 386726 | 56778160 | 357279 | | |
| Japan | KG | 277813427 | 1472693 | 459670070 | 2743530 | 817503464 | 4728724 | | |
| Jordan | KG | 1472693 | 0 | 0 | 0 | 951065 | 8500 | | |
| Kenya | KG | 0 | 0 | 0 | 0 | 4550515 | 4928 | | |
| Korea North | KG | 2702404 | 6400 | 2111227 | 22805 | 4820852 | 34000 | | |
| Korea South | KG | 343196000 | 253352 | 475985855 | 3685223 | 511566510 | 3585886 | 511566510 | 3585886 |
| Kuwait | KG | 0 | 0 | 1492 | 70 | 4549 | 6 | | |
| Latvia | KG | 0 | 0 | 0 | 0 | 483605 | 2320 | | |
| Malaysia | KG | 38892646 | 354490 | 96774894 | 823477 | 69241820 | 378233 | | |
| Mexico | KG | 1092279 | 3899 | 3466708 | 10902 | 20652640 | 106559 | | |
| Nepal | KG | 0 | 0 | 846000 | 64 | 0 | 0 | | |
| Netherlands | KG | 120252911 | 823380 | 172885703 | 1103149 | 130902759 | 1188417 | | |
| New Zealand | KG | 0 | 0 | 0 | 0 | 2605531 | 27170 | | |
| Norway | KG | 495835 | 1900 | 5189255 | 25330 | 1160003 | 5454 | | |
| Pakistan | KG | 87056529 | 99980 | 0 | 0 | 3592143 | 4440 | | |
| Philippines | KG | 1684684 | 4936 | 2778997 | 13780 | 7737334 | 10555 | | |
| Poland | KG | 390494 | 21090 | 1730725 | 74100 | 2542025 | 4511 | | |
| Portugal | KG | 0 | 0 | 0 | 0 | 360079 | 8070 | | |
| Puerto Rico (U.S.) | KG | 0 | 0 | 0 | 0 | 12 | 12 | | |
| Reunion | KG | 0 | 0 | 0 | 0 | 7869408 | 55000 | | |
| Russia | KG | 0 | 0 | 7406096 | 20000 | 33514320 | 57720 | | |

Appx2380

| Country | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Saudi Arabia | KG | 0 | 0 | 5566246 | 52000 | 1753776 | 16950 | | |
| Singapore | KG | 109760731 | 803377 | 249841650 | 1996769 | 262242957 | 1787350 | | |
| Slovenia | KG | 0 | 0 | 131205 | 500 | 267514 | 13000 | | |
| South Africa | KG | 3420850 | 20000 | 236457 | 770 | 1411276 | 47100 | | |
| Spain | KG | 10939475 | 65440 | 31317129 | 222778 | 46898068 | 312823 | | |
| Sudan | KG | 0 | 0 | 0 | 0 | 1909248 | 12800 | | |
| Swaziland | KG | 187012 | 1235 | 87254 | 250 | 3102372 | 30000 | | |
| Sweden | KG | 1947777 | 6245 | 26332564 | 42574 | 22270369 | 40049 | | |
| Switzerland | KG | 24857972 | 98310 | 35785434 | 127826 | 22872516 | 100700 | | |
| Taiwan | KG | 329762075 | 5350671 | 374191420 | 5698740 | 448628467 | 6886738 | | |
| Thailand | KG | 470582269 | 5673916 | 73853602 | 1092348 | 162382174 | 1545408 | 162,382,174 | 1,545,408 |
| Turkey | KG | 8285207 | 113950 | 10930928 | 341604 | 7140607 | 83960 | | |
| Unidentified Country | KG | 3369155 | 54440 | 6707727 | 45649 | 6921062 | 38369 | 6,921,062 | 38,369 |
| United Arab Emirates | KG | 5335687 | 85287 | 10766467 | 83878 | 4495080 | 46905 | | |
| United Kingdom | KG | 261838805 | 1747207 | 297996120 | 1876556 | 335218342 | 2101294 | | |
| United States | KG | 364410719 | 2248052 | 623950727 | 2862218 | 747240259 | 3790351 | | |
| Uruguay | KG | 10859464 | 144000 | 4992558 | 71060 | 2985382 | 35000 | | |
| World, Less NAFTA, Subsidy Countries, and Unknowns | | | | | | | | 4,854,583,549 | 31,369,506 |

154.7549 Rs/KG

Source of Data: Ministry of Commerce

Appx2381

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

| India Import Statistics | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Commodity: 28273990, Other Chloride;Nes | | | | | | | | |
| Year Ending: May | | | | | | | | |
| **Partner Country** | **Unit** | **2009** | | **2010** | | **2011** | | **2011** | |
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 192509028 | 2382473 | 395254212 | 7000264 | 485246760 | 8627692 | 485,246,760 | 8,627,692 |
| Austria | KG | 856833 | 239 | 0 | 0 | 13728 | 500 | | |
| Belgium | KG | 2247805 | 19468 | 2175575 | 19077 | 6323350 | 62590 | | |
| Canada | KG | 0 | 0 | 0 | 0 | 13474 | 200 | | |
| China | KG | 53613273 | 640564 | 158046409 | 3468038 | 165518467 | 2893696 | 165,518,467 | 2,893,696 |
| Denmark | KG | 33026 | 18 | 231780 | 195 | 0 | 0 | | |
| Egypt | KG | 0 | 0 | 164489 | 100 | 0 | 0 | | |
| Finland | KG | 0 | 0 | 0 | 0 | 180221 | 1055 | | |
| France | KG | 72951828 | 1061723 | 144952825 | 2191478 | 148977660 | 2074492 | | |
| Germany | KG | 17944562 | 62771 | 19350519 | 95259 | 53656244 | 1494445 | | |
| Hong Kong | KG | 0 | 0 | 112113 | 50 | 21629 | 112 | | |
| Hungary | KG | 0 | 0 | 0 | 0 | 2950 | 25 | | |
| Israel | KG | 446356 | 1080 | 1227154 | 2760 | 990000 | 635 | | |
| Italy | KG | 106050 | 100 | 0 | 0 | 147997 | 345 | | |
| Japan | KG | 7798559 | 105000 | 183773 | 30 | 1045990 | 1754 | | |
| Jordan | KG | 4969200 | 100000 | 13821142 | 311500 | 16963526 | 753000 | | |
| Korea South | KG | 1520509 | 18230 | 4726727 | 42480 | 16239012 | 173410 | 16,239,012 | 173,410 |
| Malaysia | KG | 348509 | 19600 | 1762231 | 99000 | 240180 | 400 | | |
| Netherlands | KG | 31255 | 300 | 493228 | 1520 | 1751179 | 4845 | | |
| Russia | KG | 0 | 0 | 3301760 | 128000 | 1515888 | 65000 | | |
| Singapore | KG | 654516 | 3495 | 32346 | 302 | 222225 | 890 | | |
| South Africa | KG | 0 | 0 | 0 | 0 | 17063 | 25 | | |
| Spain | KG | 3426447 | 40000 | 11794628 | 120000 | 9913525 | 122535 | | |
| Sweden | KG | 0 | 0 | 0 | 0 | 13953 | 5 | | |
| Switzerland | KG | 68182 | 265 | 322578 | 2501 | 4210096 | 15200 | | |
| Taiwan | KG | 12062450 | 220500 | 22971250 | 488206 | 35391172 | 854530 | | |
| Thailand | KG | 0 | 0 | 2069 | 10 | 29293 | 79 | 29,293 | 79 |
| Unidentified Country | KG | 38810 | 112 | 0 | 0 | 1451726 | 5158 | 1,451,726 | 5,158 |
| United Arab Emirates | KG | 0 | 0 | 0 | 0 | 39729 | 151 | | |
| United Kingdom | KG | 623471 | 2553 | 859455 | 1401 | 1334773 | 5087 | | |
| United States | KG | 12767387 | 86455 | 8722161 | 28357 | 17516828 | 77346 | | |
| Vietnam | KG | 0 | 0 | 0 | 0 | 58668 | 182 | 58,668 | 182 |
| Yemen | KG | 0 | 0 | 0 | 0 | 1446214 | 20000 | | |

Source of Data: Ministry of Commerce   World, Less NMEs, Subsidy Countries, and Unknowns   301,949,594   5,555,167

54.3547 Rs/KG

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

| | | 2009 | | 2010 | | 2011 | | 2011 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Partner Country | Unit | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 229354073 | 6646899 | 349637295 | 12352421 | 254452863 | 10582117 | 254,452,863 | 10,582,117 |
| Belgium | KG | 7084 | 140 | 5733202 | 54625 | 0 | 0 | | |
| China | KG | 112390175 | 2821497 | 197216681 | 6221646 | 117370710 | 4657965 | 117,370,710 | 4,657,965 |
| Germany | KG | 47523563 | 1247284 | 56638081 | 1590767 | 51092504 | 1376414 | | |
| Hong Kong | KG | 745877 | 19000 | 0 | 0 | 0 | 0 | | |
| Israel | KG | 1633582 | 64000 | 0 | 0 | 0 | 0 | | |
| Italy | KG | 1422228 | 66747 | 53845 | 80 | 628931 | 35405 | | |
| Japan | KG | 0 | 0 | 0 | 0 | 409232 | 20825 | | |
| Kazakhstan | KG | 0 | 0 | 0 | 0 | 354710 | 25000 | | |
| Netherlands | KG | 0 | 0 | 1004231 | 9500 | 450173 | 19600 | | |
| Philippines | KG | 25347 | 450 | 0 | 0 | 0 | 0 | | |
| Poland | KG | 0 | 0 | 841259 | 1530 | 0 | 0 | | |
| Russia | KG | 7610258 | 181802 | 942480 | 48000 | 0 | 0 | | |
| Singapore | KG | 0 | 0 | 2630672 | 119008 | 1526153 | 44685 | | |
| South Africa | KG | 605 | 12 | 0 | 0 | 0 | 0 | | |
| Taiwan | KG | 0 | 0 | 0 | 0 | 484390 | 22000 | | |
| Tanzania | KG | 0 | 0 | 0 | 0 | 946235 | 46825 | | |
| Thailand | KG | 46037503 | 1773636 | 82363854 | 4193552 | 81175429 | 4332584 | 81,175,429 | 4,332,584 |
| Turkey | KG | 11077931 | 448009 | 2148633 | 108189 | 0 | 0 | | |
| Unidentified Country | KG | 536719 | 21000 | 0 | 0 | 3130 | 100 | 3,130 | 100 |
| United Kingdom | KG | 7455 | 128 | 1070 | 39 | 5869 | 330 | | |
| United States | KG | 335746 | 3194 | 63287 | 5485 | 5397 | 384 | | |

Commodity: 283210, Sodium Sulfites

Year Ending: May

Source of Data: Ministry of Commerce       World, Less NMEs, Subsidy Countries, and Unknowns       55,903,594   1,591,468

35.1271 Rs/KG

Appx2383

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

| | | India Import Statistics | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Commodity: 29157090, Other Palmitic Acid, Stearic Acid & Their Salts & Estrs | | | | | | | |
| | | Year Ending: May | | | | | | | |
| **Partner Country** | **Unit** | **2009** | | **2010** | | **2011** | | **2011** | |
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 613731485 | 7087053 | 822964555 | 10854799 | 1835433983 | 19979250 | 1,835,433,983 | 19,979,250 |
| Australia | KG | 293503 | 300 | 0 | 0 | 0 | 0 | | |
| Austria | KG | 17962 | 264 | 0 | 0 | 0 | 0 | | |
| Belgium | KG | 1815904 | 16930 | 0 | 0 | 581501 | 3001 | | |
| Canada | KG | 0 | 0 | 48233 | 226 | 288392 | 2700 | | |
| China | KG | 54422479 | 219181 | 60682799 | 625103 | 192944963 | 2490381 | 192,944,963 | 2,490,381 |
| Denmark | KG | 0 | 0 | 700849 | 5000 | 1231200 | 6200 | | |
| Egypt | KG | 223265 | 1075 | 0 | 0 | 0 | 0 | | |
| France | KG | 14534872 | 47399 | 9575790 | 18571 | 9023355 | 11363 | | |
| Germany | KG | 21724347 | 133486 | 28901727 | 156426 | 32882782 | 199032 | | |
| Indonesia | KG | 69478734 | 1403055 | 72395000 | 1500381 | 281187553 | 3273138 | 281,187,553 | 3,273,138 |
| Ireland | KG | 0 | 0 | 0 | 0 | 2281611 | 19750 | | |
| Israel | KG | 0 | 0 | 0 | 0 | 175586 | 65 | | |
| Italy | KG | 5494568 | 41243 | 14011266 | 174644 | 16276892 | 28243 | | |
| Japan | KG | 871994 | 3586 | 2920219 | 14979 | 1775973 | 2506 | | |
| Korea South | KG | 7020902 | 45699 | 2328334 | 26035 | 3778387 | 26787 | 3,778,387 | 26,787 |
| Malaysia | KG | 219117883 | 3938049 | 279275772 | 5259172 | 892996791 | 10631366 | | |
| Netherlands | KG | 7513262 | 61560 | 65082426 | 696480 | 117546356 | 1324207 | | |
| Saudi Arabia | KG | 0 | 0 | 0 | 0 | 2903120 | 26000 | | |
| Singapore | KG | 53052053 | 708991 | 66465074 | 1099716 | 59978119 | 722782 | | |
| Spain | KG | 1256056 | 2000 | 7679038 | 630 | 22921 | 26 | | |
| Sweden | KG | 0 | 0 | 116802 | 800 | 0 | 0 | | |
| Switzerland | KG | 13756 | 25 | 17740007 | 160522 | 50680 | 20 | | |
| Taiwan | KG | 0 | 0 | 2252 | 20 | 3051882 | 26100 | | |
| Thailand | KG | 0 | 0 | 2453669 | 27700 | 4656937 | 33059 | 4,656,937 | 33,059 |
| Turkey | KG | 0 | 0 | 0 | 0 | 8850 | 8 | | |
| Unidentified Country | KG | 1920780 | 22200 | 0 | 0 | 0 | 0 | 0 | 0 |
| United Arab Emirates | KG | 1067676 | 7600 | 2189748 | 25850 | 7214553 | 50250 | | |
| United Kingdom | KG | 3035371 | 7074 | 6579335 | 27316 | 12424814 | 18709 | | |
| United States | KG | 150856118 | 427336 | 183816215 | 1035228 | 192150765 | 1083557 | | |

Source of Data: Ministry of Commerce        World, Less NMEs, Subsidy Countries, and Unknowns        1,352,866,143  14,155,885

95.5692 Rs/KG

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

| | | India Import Statistics | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Commodity: 28170010, Zinc Oxide | | | | | | | |
| | | Year Ending: May | | | | | | | |
| **Partner Country** | **Unit** | **2009** | | **2010** | | **2011** | | **2011** | |
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 248896450 | 2189824 | 295061933 | 3105866 | 321911633 | 3279114 | 321,911,633 | 3,279,114 |
| Australia | KG | 0 | 0 | 4373594 | 29094 | 3720949 | 3295 | | |
| Belgium | KG | 14709 | 74 | 2905212 | 47020 | 766743 | 944 | | |
| Canada | KG | 36930803 | 319770 | 17394818 | 160020 | 18100639 | 162995 | | |
| China | KG | 6656836 | 56925 | 2626912 | 57850 | 3013903 | 33571 | 3,013,903 | 33,571 |
| Congo | KG | 0 | 0 | 0 | 0 | 8733901 | 166000 | | |
| Czech Republic | KG | 0 | 0 | 233388 | 1594 | 303011 | 3313 | | |
| Denmark | KG | 245383 | 1000 | 0 | 0 | 0 | 0 | | |
| France | KG | 1178079 | 3909 | 2542297 | 9529 | 0 | 0 | | |
| Germany | KG | 17927250 | 62474 | 24576098 | 103430 | 18320056 | 96879 | | |
| Greece | KG | 0 | 0 | 0 | 0 | 4547369 | 93000 | | |
| Indonesia | KG | 1933897 | 20000 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ireland | KG | 255805 | 250 | 0 | 0 | 0 | 0 | | |
| Israel | KG | 10786217 | 111068 | 6424253 | 59000 | 0 | 0 | | |
| Italy | KG | 948619 | 3620 | 440896 | 1490 | 214995 | 1250 | | |
| Japan | KG | 26874757 | 104760 | 3528298 | 8200 | 6704950 | 20651 | | |
| Korea South | KG | 1703911 | 20651 | 14492358 | 139462 | 10893093 | 103204 | 10,893,093 | 103,204 |
| Lebanon | KG | 0 | 0 | 258515 | 3000 | 0 | 0 | | |
| Malaysia | KG | 16502920 | 230003 | 23071017 | 248033 | 8070350 | 80000 | | |
| Morocco | KG | 0 | 0 | 1511528 | 21000 | 10595775 | 125000 | | |
| Netherlands | KG | 102019 | 557 | 246053 | 1203 | 208135 | 800 | | |
| Norway | KG | 490952 | 4800 | 0 | 0 | 0 | 0 | | |
| Pakistan | KG | 388756 | 5000 | 0 | 0 | 0 | 0 | | |
| Peru | KG | 4825011 | 47000 | 12378134 | 133979 | 16164799 | 147911 | | |
| Portugal | KG | 0 | 0 | 0 | 0 | 27275 | 350 | | |
| Saudi Arabia | KG | 12904149 | 125290 | 42157543 | 393017 | 46293817 | 385651 | | |
| Singapore | KG | 178025 | 1809 | 17794 | 125 | 1731315 | 2349 | | |
| Slovakia | KG | 0 | 0 | 35988 | 5 | 0 | 0 | | |
| Somalia | KG | 0 | 0 | 0 | 0 | 141476 | 1000 | | |
| Spain | KG | 289590 | 250 | 0 | 0 | 5175 | 31 | | |
| Sri Lanka | KG | 50152427 | 563900 | 59559563 | 697048 | 56549093 | 640041 | | |
| Sweden | KG | 0 | 0 | 75698 | 500 | 0 | 0 | | |
| Taiwan | KG | 46587641 | 466100 | 58061402 | 769917 | 83839136 | 927200 | | |
| Thailand | KG | 732808 | 5120 | 2353537 | 24544 | 11518 | 100 | 11,518 | 100 |
| Turkey | KG | 0 | 0 | 1469475 | 17000 | 4060653 | 52000 | | |
| Unidentified Country | KG | 116454 | 44 | 6419717 | 113000 | 61336 | 20 | 61,336 | 20 |
| United Arab Emirates | KG | 171801 | 2446 | 0 | 0 | 6389377 | 148000 | | |
| United Kingdom | KG | 1105948 | 1317 | 209157 | 679 | 3124553 | 23923 | | |
| United States | KG | 8891683 | 31687 | 7698688 | 66127 | 9318241 | 59636 | | |

| Source of Data: Ministry of Commerce | World, Less NMEs, Subsidy Countries, and Unknowns | 307,931,783 | 3,142,219 |
|---|---|---|---|

97.9982 Rs/KG

Appx2385

| | | India Import Statistics | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Commodity: 28331100, Disodium Sulphate | | | | | | | |
| | | Year Ending: May | | | | | | | |
| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 128182628 | 16148249 | 94383870 | 15003359 | 93469170 | 13000373 | 93,469,170 | 13,000,373 |
| Austria | KG | 0 | 0 | 730 | 23 | 0 | 0 | | |
| Belarus | KG | 0 | 0 | 1852426 | 21000 | 0 | 0 | 0 | 0 |
| Chile | KG | 0 | 0 | 0 | 0 | 2250320 | 324000 | | |
| China | KG | 126036357 | 16005828 | 81140415 | 13970254 | 60622721 | 8971580 | 60,622,721 | 8,971,580 |
| France | KG | 0 | 0 | 0 | 0 | 2707980 | 43000 | | |
| Germany | KG | 906220 | 25994 | 4259443 | 55523 | 195154 | 3533 | | |
| Hong Kong | KG | 0 | 0 | 22408 | 5000 | 839526 | 135000 | | |
| Indonesia | KG | 289304 | 50000 | 2334456 | 383000 | 12353209 | 1825200 | 12,353,209 | 1,825,200 |
| Japan | KG | 0 | 0 | 1677784 | 20000 | 0 | 0 | | |
| Korea South | KG | 0 | 0 | 13068 | 30 | 1782087 | 250060 | 1,782,087 | 250,060 |
| Malaysia | KG | 0 | 0 | 0 | 0 | 8082356 | 818000 | | |
| Russia | KG | 626793 | 26000 | 0 | 0 | 0 | 0 | | |
| Singapore | KG | 311164 | 40225 | 426390 | 75000 | 0 | 0 | | |
| Spain | KG | 0 | 0 | 221404 | 23000 | 0 | 0 | | |
| Thailand | KG | 0 | 0 | 2428159 | 450000 | 2892486 | 400000 | 2,892,486 | 400,000 |
| Unidentified Country | KG | 0 | 0 | 0 | 0 | 1550799 | 210000 | 1,550,799 | 210,000 |
| United Kingdom | KG | 10009 | 200 | 1358 | 20 | 0 | 0 | | |
| United States | KG | 2781 | 2 | 5829 | 509 | 192532 | 20000 | | |

Source of Data: Ministry of Commerce     World, Less NMEs, Subsidy Countries, and Unknowns     14,267,868     1,343,533

10.6197 Rs/KG

Appx2386

| India Import Statistics | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Commodity: 28112200, Silicon Dioxide | | | | | | | | |
| Year Ending: May | | | | | | | | |
| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 929984629 | 15181409 | 846175731 | 9369580 | 936773315 | 13780646 | 936,773,315 | 13,780,646 |
| Australia | KG | 37766 | 1000 | 327172 | 6380 | 636426 | 34380 | | |
| Austria | KG | 74730 | 1500 | 0 | 0 | 0 | 0 | | |
| Belgium | KG | 102210743 | 1253639 | 104668624 | 478352 | 106080367 | 426236 | | |
| Brazil | KG | 6962194 | 290215 | 11350536 | 374040 | 5892311 | 51495 | | |
| Canada | KG | 669388 | 10128 | 130918 | 226 | 2245841 | 15122 | | |
| China | KG | 81345679 | 4235390 | 49385136 | 1301731 | 105384869 | 3041202 | 105,384,869 | 3,041,202 |
| Czech Republic | KG | 0 | 0 | 0 | 0 | 1246595 | 1600 | | |
| Egypt | KG | 6436874 | 385303 | 8139114 | 455999 | 5877388 | 355000 | | |
| Finland | KG | 682041 | 2634 | 741237 | 946 | 305636 | 2005 | | |
| France | KG | 5755405 | 103175 | 5111586 | 19824 | 11342542 | 135329 | | |
| Germany | KG | 191922360 | 728913 | 275104440 | 1191455 | 272976304 | 1168063 | | |
| Greece | KG | 0 | 0 | 0 | 0 | 678774 | 2939 | | |
| Hong Kong | KG | 17557 | 65 | 49021 | 600 | 1002779 | 15040 | | |
| Iceland | KG | 0 | 0 | 0 | 0 | 11802648 | 866600 | | |
| Indonesia | KG | 774138 | 6160 | 3097119 | 35929 | 8634617 | 134400 | 8,634,617 | 134,400 |
| Iran | KG | 7000571 | 404582 | 0 | 0 | 0 | 0 | | |
| Ireland | KG | 0 | 0 | 15968 | 9 | 91993 | 436 | | |
| Italy | KG | 187630 | 1008 | 2048010 | 5070 | 3696140 | 15870 | | |
| Japan | KG | 31508477 | 128029 | 60080922 | 167234 | 52812357 | 163764 | | |
| Kenya | KG | 0 | 0 | 0 | 0 | 683424 | 4200 | | |
| Korea South | KG | 36304795 | 183810 | 4991501 | 27849 | 31139566 | 274765 | 31,139,566 | 274,765 |
| Liechtenstein | KG | 0 | 0 | 13085 | 15 | 0 | 0 | | |
| Malaysia | KG | 45948910 | 280035 | 50020143 | 288530 | 47389260 | 292190 | | |
| Mali | KG | 0 | 0 | 0 | 0 | 1175024 | 8000 | | |
| Netherlands | KG | 190426 | 247 | 2283617 | 8989 | 2213358 | 6790 | | |
| Norway | KG | 127446701 | 5111469 | 84453858 | 3493180 | 97422650 | 4887329 | | |
| Philippines | KG | 2011073 | 177000 | 251114 | 1000 | 1116260 | 3600 | | |
| Russia | KG | 0 | 0 | 685844 | 24150 | 0 | 0 | | |
| Singapore | KG | 1157880 | 5255 | 1604029 | 7229 | 1192858 | 7200 | | |
| South Africa | KG | 2858339 | 117000 | 2304087 | 65920 | 1139296 | 52520 | | |
| Spain | KG | 445297 | 22500 | 0 | 0 | 0 | 0 | | |
| Sweden | KG | 5483023 | 180000 | 595804 | 4800 | 2876071 | 22500 | | |
| Switzerland | KG | 152920 | 654 | 935957 | 1910 | 265015 | 261 | | |
| Taiwan | KG | 7458547 | 114850 | 1939533 | 28010 | 8765616 | 133446 | | |
| Thailand | KG | 649541 | 4777 | 432104 | 3162 | 5469332 | 304838 | 5,469,332 | 304,838 |
| Ukraine | KG | 336925 | 400 | 0 | 0 | 708736 | 3200 | | |
| Unidentified Country | KG | 108294903 | 311769 | 2756122 | 112005 | 11318894 | 176011 | 11,318,894 | 176,011 |
| United Arab Emirates | KG | 21831 | 7 | 15491 | 20 | 1266765 | 21895 | | |
| United Kingdom | KG | 15591041 | 222626 | 25721036 | 160671 | 15275856 | 98715 | | |
| United States | KG | 140046924 | 897269 | 146922603 | 1104345 | 116647747 | 1053705 | | |

Source of Data: Ministry of Commerce    World, Less NMEs, Subsidy Countries, and Unknowns    774,826,037    9,849,430

78.6671 Rs/KG

Appx2387

India Import Statistics

Commodity: 44152000, Palets,Palets(Box,Colrs) & Othr Load Bordsof Wood

Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | NO | 154252827 | 1412206 | 145638675 | 754714 | 250829866 | 863019 | 250,829,866 | 863,019 |
| Australia | NO | 275057 | 2919 | 653042 | 948 | 89027 | 48 | | |
| Austria | NO | 1745415 | 272 | 478924 | 7922 | 106565 | 42 | | |
| Belgium | NO | 765954 | 5422 | 228110 | 460 | 954460 | 5608 | | |
| Brazil | NO | 115463 | 2 | 406833 | 180 | 0 | 0 | | |
| Canada | NO | 200185 | 10 | 898953 | 1337 | 10032 | 10 | | |
| China | NO | 57200488 | 244150 | 44827053 | 103934 | 93707892 | 208659 | 93,707,892 | 208,659 |
| Czech Republic | NO | 18550 | 30 | 0 | 0 | 1750 | 2 | | |
| Denmark | NO | 0 | 0 | 6865 | 1 | 337096 | 61 | | |
| Egypt | NO | 2307 | 5 | 0 | 0 | 0 | 0 | | |
| Finland | NO | 3713 | 9 | 3918 | 9 | 143419 | 102 | | |
| France | NO | 715324 | 3148 | 1272773 | 22880 | 295553 | 334 | | |
| Germany | NO | 20327772 | 44717 | 28450636 | 62452 | 56571290 | 321639 | | |
| Ghana | NO | 0 | 0 | 114349 | 242 | 0 | 0 | | |
| Hong Kong | NO | 2020312 | 255 | 0 | 0 | 77388 | 14 | | |
| Hungary | NO | 0 | 0 | 0 | 0 | 101269 | 26 | | |
| Indonesia | NO | 67381 | 83 | 0 | 0 | 490073 | 225 | 490,073 | 225 |
| Iran | NO | 0 | 0 | 7570 | 13 | 0 | 0 | | |
| Ireland | NO | 0 | 0 | 0 | 0 | 10346 | 10 | | |
| Italy | NO | 1757285 | 2945 | 145593 | 263 | 653763 | 881 | | |
| Japan | NO | 0 | 0 | 0 | 0 | 7938994 | 5649 | | |
| Korea South | NO | 2563693 | 2841 | 4761471 | 4210 | 7926152 | 9264 | 7,926,152 | 9,264 |
| Latvia | NO | 0 | 0 | 0 | 0 | 303845 | 422 | | |
| Luxembourg | NO | 0 | 0 | 18161 | 4 | 0 | 0 | | |
| Malaysia | NO | 33383 | 132 | 4276578 | 10783 | 8200324 | 19448 | | |
| Mexico | NO | 16691 | 2 | 0 | 0 | 1136 | 2 | | |
| Netherlands | NO | 1789823 | 22758 | 556081 | 1719 | 369597 | 3746 | | |
| New Zealand | NO | 268183 | 543 | 1551879 | 2415 | 9264067 | 13201 | | |
| Norway | NO | 118015 | 1400 | 21288 | 11 | 109249 | 612 | | |
| Oman | NO | 0 | 0 | 0 | 0 | 448503 | 1719 | | |
| Philippines | NO | 0 | 0 | 0 | 0 | 33576 | 20 | | |
| Poland | NO | 5918 | 10 | 40656 | 1354 | 6786 | 10 | | |
| Qatar | NO | 0 | 0 | 0 | 0 | 243621 | 1500 | | |
| Saudi Arabia | NO | 0 | 0 | 0 | 0 | 10583 | 20 | | |
| Singapore | NO | 26015912 | 1011659 | 15187819 | 425888 | 13295788 | 147293 | | |
| Spain | NO | 3007852 | 1699 | 357493 | 299 | 1129335 | 638 | | |
| Sri Lanka | NO | 0 | 0 | 95719 | 130 | 0 | 0 | | |
| Sweden | NO | 12913344 | 33296 | 26156268 | 91916 | 32740820 | 105462 | | |
| Switzerland | NO | 2357851 | 2729 | 3076312 | 2724 | 277577 | 75 | | |
| Taiwan | NO | 22741 | 31 | 1271769 | 1217 | 6083188 | 2465 | | |
| Thailand | NO | 224225 | 386 | 6959245 | 9922 | 2062781 | 3530 | 2,062,781 | 3,530 |
| Turkey | NO | 351005 | 1625 | 0 | 0 | 0 | 0 | | |
| Ukraine | NO | 0 | 0 | 0 | 0 | 310730 | 35 | | |
| Unidentified Country | NO | 87179 | 878 | 240062 | 393 | 3268194 | 5349 | 3,268,194 | 5,349 |
| United Arab Emirates | NO | 1560868 | 19329 | 50547 | 112 | 13835 | 42 | | |
| United Kingdom | NO | 9601810 | 550 | 61083 | 9 | 58637 | 49 | | |
| United States | NO | 4469410 | 1221 | 3461625 | 967 | 3182625 | 4807 | | |
| Vanuatu | NO | 83709 | 100 | 0 | 0 | 0 | 0 | | |
| Vietnam | NO | 3546009 | 7050 | 0 | 0 | 0 | 0 | 0 | 0 |

| Source of Data: Ministry of Commerce | World, Less NMEs, Subsidy Countries, and Unknowns | 143,374,774 | 635,992 |
|---|---|---|---|

225.4349 Rs/NO

Barcode:3095487-04 A-570-898 REV - Admin Review 6/1/10 - 5/31/11 Chlorinated Isos

India Import Statistics
Commodity: 48211020, Labels
Year Ending: May

| Partner Country | Unit | 2009 IND | 2009 Quantity | 2010 IND | 2010 Quantity | 2011 IND | 2011 Quantity | 2011 IND | 2011 Quantity |
|---|---|---|---|---|---|---|---|---|---|
| World | KG | 364339550 | 2609666 | 260954885 | 1087495 | 440538784 | 1165187 | 440,538,784 | 1,165,187 |
| Afghanistan | KG | 0 | 0 | 180403 | 80 | 0 | 0 | | |
| Argentina | KG | 0 | 0 | 0 | 0 | 2927 | 13 | | |
| Australia | KG | 100582 | 434 | 444001 | 354 | 46841 | 119 | | |
| Austria | KG | 1017175 | 4043 | 580580 | 1660 | 2445639 | 5942 | | |
| Bahrain | KG | 14214 | 40 | 3088 | 10 | 31879 | 229 | | |
| Bangladesh | KG | 352757 | 994 | 622969 | 1547 | 86986 | 121 | | |
| Belarus | KG | 0 | 0 | 154183 | 260 | 0 | 0 | 0 | 0 |
| Belgium | KG | 698811 | 2403 | 635836 | 1310 | 302497 | 729 | | |
| Brazil | KG | 225892 | 390 | 0 | 0 | 849 | 5 | | |
| Bulgaria | KG | 0 | 0 | 0 | 0 | 123996 | 1280 | | |
| Cambodia | KG | 0 | 0 | 47790 | 104 | 0 | 0 | | |
| Canada | KG | 1711882 | 6770 | 506481 | 3684 | 192541 | 519 | 58,288,804 | 166,892 |
| China | KG | 43710129 | 177716 | 20624188 | 475163 | 58288804 | 166892 | | |
| Colombia | KG | 0 | 0 | 0 | 0 | 160513 | 120 | | |
| Czech Republic | KG | 0 | 0 | 81421 | 160 | 564149 | 999 | | |
| Denmark | KG | 201757 | 683 | 101175 | 171 | 1967027 | 1030 | | |
| Dominican Republic | KG | 50174 | 160 | 0 | 0 | 0 | 0 | | |
| Egypt | KG | 16631 | 20 | 0 | 0 | 0 | 0 | | |
| Estonia | KG | 0 | 0 | 0 | 0 | 2938 | 9 | | |
| Ethiopia | KG | 5968 | 14 | 877 | 1 | 5941 | 33 | | |
| Finland | KG | 14970 | 143 | 237881 | 503 | 286728 | 614 | | |
| France | KG | 1780948 | 4093 | 5085928 | 15566 | 2280532 | 4701 | | |
| Germany | KG | 22272322 | 91421 | 22922778 | 58594 | 31795836 | 95423 | | |
| Honduras | KG | 0 | 0 | 8100 | 40 | 0 | 0 | | |
| Hong Kong | KG | 87958015 | 734756 | 62352264 | 145521 | 69895360 | 141679 | | |
| Hungary | KG | 5408 | 25 | 0 | 0 | 3934 | 6 | | |
| Indonesia | KG | 137274 | 110 | 781188 | 7630 | 1114280 | 2225 | 1,114,286 | 2,225 |
| Iran | KG | 0 | 0 | 284454 | 840 | 545719 | 16057 | | |
| Ireland | KG | 20113 | 46 | 49489 | 134 | 151190 | 398 | | |
| Israel | KG | 1501555 | 5991 | 3799462 | 1826 | 3406607 | 4861 | | |
| Italy | KG | 3195981 | 8312 | 8226400 | 11427 | 6642042 | 14366 | | |
| Japan | KG | 614994 | 1609 | 596938 | 2126 | 1548608 | 2801 | | |
| Jordan | KG | 4536 | 24 | 0 | 0 | 0 | 0 | | |
| Kenya | KG | 8916 | 25 | 0 | 0 | 0 | 0 | | |
| Korea North | KG | 0 | 0 | 114804 | 57 | 0 | 0 | | |
| Korea South | KG | 1973692 | 5300 | 2750389 | 6037 | 4366018 | 19350 | 4,966,018 | 19,350 |
| Kuwait | KG | 31347 | 390 | 37624 | 500 | 112249 | 211 | | |
| Malaysia | KG | 64431203 | 242725 | 36177288 | 79876 | 35014630 | 52277 | | |
| Mexico | KG | 75908 | 219 | 61661 | 219 | 63164 | 446 | | |
| Netherlands | KG | 984857 | 3023 | 2706176 | 5356 | 1122723 | 3763 | | |
| Netherlands Antilles | KG | 0 | 0 | 296331 | 360 | 0 | 0 | | |
| New Zealand | KG | 0 | 0 | 68344 | 232 | 0 | 0 | | |
| Norway | KG | 262 | 1 | 0 | 0 | 4879 | 2 | | |
| Oman | KG | 7721 | 55 | 22422 | 202 | 177246 | 631 | | |
| Pakistan | KG | 0 | 0 | 918 | 4 | 1149 | 3 | | |
| Philippines | KG | 0 | 0 | 0 | 0 | 16549 | 80 | | |
| Poland | KG | 0 | 0 | 8319 | 15 | 4931 | 1 | | |
| Portugal | KG | 71127 | 213 | 393650 | 516 | 94996 | 241 | | |
| Puerto Rico (U.S.) | KG | 83532 | 200 | 10120 | 8 | 1502 | 5 | | |
| Qatar | KG | 38148 | 115 | 24550 | 37551 | 77997 | 364 | | |
| Romania | KG | 13146 | 60 | 6092 | 12 | 47203 | 151 | | |
| Russia | KG | 33535 | 88 | 0 | 0 | 0 | 0 | | |
| Saudi Arabia | KG | 29731 | 56 | 7506 | 32 | 226632 | 256 | | |
| Serbia and Montenegro | KG | 0 | 0 | 0 | 0 | 124449 | 170 | | |
| Singapore | KG | 19587546 | 54718 | 4967615 | 11915 | 20007706 | 116730 | | |
| Slovakia | KG | 0 | 0 | 0 | 0 | 119708 | 340 | | |
| Slovenia | KG | 875681 | 1700 | 0 | 0 | 0 | 0 | | |
| South Africa | KG | 0 | 0 | 0 | 0 | 13758 | 55 | | |
| Spain | KG | 395560 | 1336 | 483854 | 2087 | 1160204 | 3603 | | |
| Sri Lanka | KG | 10219017 | 821983 | 16846428 | 29391 | 23366554 | 35110 | | |
| Sudan | KG | 0 | 0 | 0 | 0 | 3331 | 63 | | |
| Swaziland | KG | 153614 | 66093 | 0 | 0 | 0 | 0 | | |
| Sweden | KG | 1366201 | 6948 | 4106169 | 5056 | 2531090 | 5352 | | |
| Switzerland | KG | 629535 | 952 | 850302 | 2523 | 1471302 | 4020 | | |
| Taiwan | KG | 2614758 | 68468 | 3383181 | 8133 | 3955880 | 10934 | | |
| Thailand | KG | 1913522 | 3480 | 1586617 | 2458 | 49290082 | 61927 | 49,290,082 | 61,927 |
| Tunisia | KG | 0 | 0 | 0 | 0 | 14282 | 30 | | |
| Turkey | KG | 2569355 | 7699 | 712727 | 964 | 751389 | 1880 | | |
| Ukraine | KG | 7858 | 25 | 0 | 0 | 0 | 0 | | |
| Unidentified Country | KG | 2836364 | 24101 | 877627 | 3274 | 488913 | 2202 | 488,913 | 2,202 |
| United Arab Emirates | KG | 1801437 | 10062 | 1828350 | 5550 | 2318529 | 82659 | | |
| United Kingdom | KG | 7949013 | 14306 | 1718116 | 4643 | 5336333 | 24922 | | |
| United States | KG | 78027291 | 235222 | 52600580 | 151695 | 104399839 | 275860 | | |
| Vietnam | KG | 1893 | 6 | 1471 | 4 | 1305299 | 590 | 1,305,299 | 590 |

Source of Data: Ministry of Commerce        World, Less NMEs, Subsidy Countries, and Unknowns    325,085,382    912,001

356.4529 Rs/KG

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

India Import Statistics
Commodity: 44129990, Others
Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | M3 | 748941572 | 61874 | 1005227646 | 120128 | 1605437773 | 130930 | 1,605,437,773 | 130,930 |
| Argentina | M3 | 0 | 0 | 0 | 0 | 502830 | 18 | | |
| Australia | M3 | 0 | 0 | 16415439 | 1812 | 1038161 | 66 | | |
| Austria | M3 | 491616 | 73 | 838457 | 75 | 1608186 | 101 | | |
| Belgium | M3 | 3973457 | 190 | 2103654 | 190 | 15598677 | 1061 | | |
| Bhutan | M3 | 0 | 0 | 1956075 | 211 | 785573 | 30 | | |
| Brazil | M3 | 0 | 0 | 1471254 | 151 | 16252951 | 1092 | | |
| Cameroon | M3 | 0 | 0 | 331167 | 44 | 0 | 0 | | |
| Canada | M3 | 0 | 0 | 14463 | 4 | 0 | 0 | | |
| Chile | M3 | 0 | 0 | 0 | 0 | 1223228 | 77 | | |
| China | M3 | 262917182 | 38015 | 333732660 | 32490 | 792398167 | 84168 | 792,398,167 | 84,168 |
| Cote d Ivoire | M3 | 0 | 0 | 0 | 0 | 336235 | 40 | | |
| Czech Republic | M3 | 0 | 0 | 0 | 0 | 308283 | 43 | | |
| Denmark | M3 | 0 | 0 | 5253 | 1 | 2786812 | 160 | | |
| Egypt | M3 | 0 | 0 | 4356 | 1 | 1156831 | 80 | | |
| Finland | M3 | 4529605 | 372 | 10976205 | 16721 | 6719952 | 716 | | |
| France | M3 | 31364 | 6 | 142962 | 21 | 5731498 | 300 | | |
| Germany | M3 | 5857328 | 427 | 9514256 | 856 | 46432131 | 3743 | | |
| Greece | M3 | 49364 | 18 | 0 | 0 | 0 | 0 | | |
| Guyana | M3 | 0 | 0 | 0 | 0 | 1966242 | 47 | | |
| Hong Kong | M3 | 1950072 | 210 | 387070 | 58 | 1393785 | 124 | | |
| Indonesia | M3 | 98840499 | 3669 | 137679922 | 5537 | 172938004 | 6868 | 172,938,004 | 6,868 |
| Iran | M3 | 0 | 0 | 0 | 0 | 281259 | 38 | | |
| Israel | M3 | 0 | 0 | 28050 | 1 | 0 | 0 | | |
| Italy | M3 | 24668220 | 1021 | 28552784 | 2802 | 10874958 | 725 | | |
| Japan | M3 | 15371 | 1 | 0 | 0 | 1907710 | 192 | | |
| Korea South | M3 | 14388398 | 704 | 9043485 | 439 | 13036769 | 1068 | 13,036,769 | 1,068 |
| Kuwait | M3 | 0 | 0 | 6061 | 1 | 0 | 0 | | |
| Latvia | M3 | 0 | 0 | 838448 | 100 | 6257848 | 215 | | |
| Malaysia | M3 | 120821543 | 6632 | 180585760 | 8164 | 191378320 | 9657 | | |
| Myanmar | M3 | 103820013 | 4472 | 172032725 | 8816 | 179863027 | 10421 | | |
| Namibia | M3 | 0 | 0 | 0 | 0 | 742626 | 74 | | |
| Nepal | M3 | 266912 | 40 | 0 | 0 | 168931 | 13 | | |
| Netherlands | M3 | 0 | 0 | 2283654 | 362 | 2334367 | 219 | | |
| New Zealand | M3 | 0 | 0 | 62978 | 6 | 87373 | 8 | | |
| Nigeria | M3 | 0 | 0 | 60636 | 6 | 381922 | 43 | | |
| Norway | M3 | 1368698 | 100 | 276546 | 10 | 0 | 0 | | |
| Oman | M3 | 0 | 0 | 0 | 0 | 1449947 | 241 | | |
| Philippines | M3 | 983506 | 65 | 974820 | 73 | 1824721 | 132 | | |
| Poland | M3 | 0 | 0 | 0 | 0 | 3867716 | 235 | | |
| Romania | M3 | 0 | 0 | 1485279 | 136 | 0 | 0 | | |
| Russia | M3 | 3536695 | 138 | 3829282 | 181 | 9602628 | 320 | | |
| Singapore | M3 | 12179111 | 525 | 12919850 | 811 | 7665821 | 516 | | |
| South Africa | M3 | 0 | 0 | 0 | 0 | 415264 | 47 | | |
| Spain | M3 | 4994829 | 174 | 3782684 | 413 | 2681754 | 282 | | |
| Sri Lanka | M3 | 0 | 0 | 0 | 0 | 1066720 | 100 | | |
| Sweden | M3 | 7105058 | 411 | 3540832 | 386 | 1082596 | 102 | | |
| Switzerland | M3 | 108126 | 7 | 0 | 0 | 885081 | 93 | | |
| Taiwan | M3 | 0 | 0 | 974588 | 100 | 8275900 | 527 | | |
| Thailand | M3 | 64510816 | 3670 | 44176380 | 3270 | 31495064 | 2075 | 31,495,064 | 2,075 |
| Turkey | M3 | 2358674 | 235 | 0 | 0 | 0 | 0 | | |
| Unidentified Country | M3 | 2093704 | 198 | 0 | 0 | 8137070 | 478 | 8,137,070 | 478 |
| United Arab Emirates | M3 | 1455295 | 61 | 1481946 | 176 | 2908886 | 311 | | |
| United Kingdom | M3 | 10255 | 2 | 0 | 0 | 1141411 | 57 | | |
| United States | M3 | 4069328 | 255 | 22555362 | 35686 | 24891079 | 2020 | | |
| Vietnam | M3 | 1546533 | 183 | 162374 | 17 | 21553459 | 1987 | 21,553,459 | 1,987 |

Source of Data: Ministry of Commerce | World, Less NMEs, Subsidy Countries, and Unknowns | 565,879,240 | 34,286

16,504.6736 Rs/M3

| | | India Import Statistics | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Commodity: 44092990, Other | | | | | | | |
| | | Year Ending: May | | | | | | | |
| **Partner Country** | **Unit** | **2009** | | **2010** | | **2011** | | **2011** | |
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 178728311 | 1895833 | 226525036 | 2152855 | 262971515 | 2923518 | 262,971,515 | 2,923,518 |
| Argentina | KG | 1322593 | 18000 | 761368 | 9439 | 0 | 0 | | |
| Australia | KG | 0 | 0 | 1209735 | 22000 | 867675 | 2249 | | |
| Austria | KG | 167804 | 529 | 3065292 | 18994 | 999376 | 4634 | | |
| Belgium | KG | 0 | 0 | 3011207 | 25302 | 7580699 | 103619 | | |
| Brazil | KG | 0 | 0 | 5985995 | 58000 | 6237165 | 67208 | | |
| Canada | KG | 1055412 | 52700 | 434932 | 8000 | 689761 | 1570 | | |
| China | KG | 65761937 | 737411 | 72462936 | 849180 | 96392207 | 942784 | 96,392,207 | 942,784 |
| Denmark | KG | 0 | 0 | 122959 | 1600 | 981410 | 4725 | | |
| Finland | KG | 0 | 0 | 0 | 0 | 1736028 | 20178 | | |
| France | KG | 10742136 | 46138 | 4731870 | 36471 | 0 | 0 | | |
| Germany | KG | 31844354 | 270120 | 29981557 | 215317 | 46682949 | 404758 | | |
| Hong Kong | KG | 433356 | 8556 | 847191 | 8001 | 1416965 | 16425 | | |
| Hungary | KG | 0 | 0 | 1280976 | 7147 | 940 | 16 | | |
| Indonesia | KG | 36801449 | 431514 | 35128416 | 391634 | 31386154 | 425350 | 31,386,154 | 425,350 |
| Iran | KG | 0 | 0 | 0 | 0 | 928991 | 4000 | | |
| Ireland | KG | 0 | 0 | 0 | 0 | 1928311 | 8856 | | |
| Italy | KG | 473566 | 3729 | 3970931 | 18260 | 964858 | 4260 | | |
| Japan | KG | 0 | 0 | 0 | 0 | 3498232 | 17219 | | |
| Korea South | KG | 0 | 0 | 0 | 0 | 755113 | 17000 | 755,113 | 17,000 |
| Lithuania | KG | 0 | 0 | 52649 | 25 | 1271452 | 18250 | | |
| Malaysia | KG | 9105494 | 149274 | 3279622 | 28004 | 5404439 | 64023 | | |
| Norway | KG | 0 | 0 | 1676 | 16 | 0 | 0 | | |
| Oman | KG | 0 | 0 | 0 | 0 | 2906926 | 1686 | | |
| Pakistan | KG | 0 | 0 | 0 | 0 | 996980 | 5396 | | |
| Paraguay | KG | 1547339 | 7076 | 0 | 0 | 0 | 0 | | |
| Poland | KG | 0 | 0 | 0 | 0 | 1815035 | 11221 | | |
| Russia | KG | 299637 | 1000 | 0 | 0 | 139900 | 135 | | |
| Singapore | KG | 384854 | 1055 | 7111 | 204 | 8914 | 98 | | |
| Spain | KG | 0 | 0 | 7679 | 50 | 2596940 | 85797 | | |
| Sri Lanka | KG | 4718 | 34 | 0 | 0 | 0 | 0 | | |
| Sweden | KG | 4960875 | 15725 | 7418872 | 85537 | 1851643 | 21332 | | |
| Switzerland | KG | 607634 | 9484 | 0 | 0 | 0 | 0 | | |
| Taiwan | KG | 6360305 | 36920 | 0 | 0 | 4524801 | 13463 | | |
| Tanzania | KG | 0 | 0 | 0 | 0 | 1168549 | 30000 | | |
| Thailand | KG | 4949741 | 57503 | 34659835 | 162110 | 5216690 | 70278 | 5,216,690 | 70,278 |
| Turkey | KG | 0 | 0 | 826915 | 8729 | 0 | 0 | | |
| Unidentified Country | KG | 0 | 0 | 778952 | 2262 | 42489 | 190 | 42,489 | 190 |
| United Arab Emirates | KG | 29840 | 280 | 860244 | 12411 | 852719 | 6113 | | |
| United Kingdom | KG | 1836475 | 48545 | 128550 | 734 | 0 | 0 | | |
| United States | KG | 38792 | 240 | 15208327 | 180928 | 13779491 | 107241 | 17,347,713 | 443,444 |
| Vietnam | KG | 0 | 0 | 299239 | 2500 | 17347713 | 443444 | 17,347,713 | 443,444 |
| Source of Data: Ministry of Commerce | | | World, Less NMEs, Subsidy Countries, and Unknowns | | | | | 111,831,149 | 1,024,472 |

109.1598 Rs/KG

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

**India Import Statistics**
Commodity: 39235090, Othr Stoprs Lid Caps&Othr Clsres Of Plstcs
Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 720152480 | 3745853 | 787525296 | 3278867 | 835277408 | 3291822 | 835,277,408 | 3,291,822 |
| Argentina | KG | 0 | 0 | 816494 | 4000 | 0 | 0 | | |
| Australia | KG | 2589646 | 6561 | 769251 | 450 | 1700641 | 5900 | | |
| Austria | KG | 4518058 | 22306 | 1871002 | 10795 | 1102819 | 7251 | | |
| Bahrain | KG | 19430448 | 110171 | 5815393 | 20000 | 562916 | 1352 | | |
| Bangladesh | KG | 0 | 0 | 2737539 | 11500 | 0 | 0 | | |
| Belgium | KG | 7191934 | 16046 | 4040535 | 6083 | 8216872 | 30404 | | |
| Brazil | KG | 691967 | 1606 | 4468030 | 9454 | 9840828 | 26117 | | |
| Canada | KG | 5152208 | 224856 | 9385265 | 38911 | 6161310 | 13845 | | |
| China | KG | 85119066 | 354702 | 118230380 | 670994 | 196967734 | 872536 | 196,967,734 | 872,536 |
| Czech Republic | KG | 25110 | 98 | 137498 | 277 | 2166747 | 5168 | | |
| Denmark | KG | 645868 | 2007 | 3491628 | 12039 | 1925303 | 3127 | | |
| Egypt | KG | 6983956 | 40840 | 0 | 0 | 0 | 0 | | |
| Estonia | KG | 0 | 0 | 0 | 0 | 32417 | 110 | | |
| Finland | KG | 1227424 | 30163 | 206492 | 578 | 106137 | 333 | | |
| France | KG | 94545049 | 728025 | 58146765 | 202094 | 65065236 | 237467 | | |
| Germany | KG | 83343903 | 334881 | 108483575 | 439009 | 95227056 | 395573 | | |
| Hong Kong | KG | 3507005 | 9954 | 1837131 | 8936 | 4553751 | 15130 | | |
| Hungary | KG | 24306 | 37 | 10913 | 46 | 339358 | 1583 | | |
| Iceland | KG | 0 | 0 | 0 | 0 | 11883 | 40 | | |
| Indonesia | KG | 2601341 | 11423 | 6361393 | 12285 | 8208900 | 14363 | 8,208,900 | 14,363 |
| Iran | KG | 0 | 0 | 374008 | 1000 | 0 | 0 | | |
| Ireland | KG | 296752 | 1113 | 243120 | 707 | 16987 | 62 | | |
| Israel | KG | 0 | 0 | 2938 | 3 | 427352 | 1245 | | |
| Italy | KG | 15248041 | 66041 | 34405278 | 97786 | 36524660 | 140416 | | |
| Japan | KG | 3771718 | 11481 | 21216678 | 64795 | 31024303 | 46098 | | |
| Kenya | KG | 25310 | 100 | 0 | 0 | 0 | 0 | | |
| Korea North | KG | 171947 | 500 | 1728 | 5 | 0 | 0 | | |
| Korea South | KG | 10773377 | 37624 | 14235355 | 90773 | 40624007 | 111614 | 40,624,007 | 111,614 |
| Malaysia | KG | 9129077 | 35259 | 5157964 | 28244 | 11876148 | 57405 | | |
| Marshall Islands | KG | 0 | 0 | 149134 | 450 | 0 | 0 | | |
| Mexico | KG | 1210855 | 4866 | 175093 | 263 | 888198 | 2425 | | |
| Nepal | KG | 60151971 | 426951 | 19739530 | 121338 | 9998104 | 58300 | | |
| Netherlands | KG | 11748433 | 66463 | 22676411 | 78785 | 11368352 | 39141 | | |
| New Zealand | KG | 0 | 0 | 121771 | 424 | 0 | 0 | | |
| Norfolk Island | KG | 75690 | 370 | 0 | 0 | 0 | 0 | | |
| Oman | KG | 0 | 0 | 1132 | 6 | 0 | 0 | | |
| Philippines | KG | 7737499 | 45797 | 4064481 | 13454 | 5412219 | 22359 | | |
| Poland | KG | 1644568 | 6540 | 968935 | 2837 | 818836 | 2088 | | |
| Portugal | KG | 741199 | 903 | 39587 | 190 | 68154 | 23157 | | |
| Romania | KG | 0 | 0 | 0 | 0 | 11096 | 40 | | |
| Russia | KG | 7463 | 12 | 0 | 0 | 0 | 0 | | |
| Saudi Arabia | KG | 1073674 | 3400 | 3579565 | 13312 | 2120899 | 8314 | | |
| Singapore | KG | 6845162 | 4709 | 799995 | 3762 | 6557939 | 28656 | | |
| Slovakia | KG | 11794 | 50 | 73924 | 250 | 96271 | 412 | | |
| Slovenia | KG | 0 | 0 | 0 | 0 | 17301 | 46 | | |
| South Africa | KG | 9631633 | 22686 | 879907 | 1852 | 2068716 | 8066 | | |
| Spain | KG | 5573319 | 26606 | 2255362 | 4480 | 778821 | 2265 | | |
| Sri Lanka | KG | 127111 | 185 | 2983 | 10 | 1556356 | 3863 | | |
| Sweden | KG | 6568273 | 34756 | 5252091 | 21875 | 10339552 | 43083 | | |
| Switzerland | KG | 1704949 | 8089 | 5643205 | 22800 | 11726007 | 20600 | | |
| Taiwan | KG | 2890618 | 21852 | 4054618 | 13983 | 12654525 | 44114 | | |
| Thailand | KG | 15889348 | 63927 | 35630877 | 253651 | 17158359 | 64431 | 17,158,359 | 64,431 |
| Turkey | KG | 2511394 | 13288 | 14596437 | 49094 | 12618455 | 42531 | | |
| Unidentified Country | KG | 4762253 | 18583 | 187309 | 473 | 1853534 | 8215 | 1,853,534 | 8,215 |
| United Arab Emirates | KG | 5719078 | 13969 | 4700782 | 26387 | 5508440 | 27554 | | |
| United Kingdom | KG | 8980547 | 210113 | 2587517 | 15279 | 5183864 | 20016 | | |
| United States | KG | 207205459 | 704944 | 256896362 | 903144 | 193625216 | 834437 | | |
| Venezuela | KG | 0 | 0 | 0 | 0 | 162104 | 560 | | |
| Vietnam | KG | 326679 | 1000 | 1940 | 4 | 2725 | 10 | 2,725 | 10 |

Source of Data: Ministry of Commerce    World, Less NMEs, Subsidy Countries, and Unknowns    570,462,149    2,220,653

256.8894 Rs/KG

Appx2392

India Import Statistics
Commodity: 39239080, Othr Artcls For Cnveyce/Pckng Of Goods Nes

Year Ending: May

| Partner Country | Unit | 2009 IND | 2009 Quantity | 2010 IND | 2010 Quantity | 2011 IND | 2011 Quantity | 2011 IND | 2011 Quantity |
|---|---|---|---|---|---|---|---|---|---|
| World | KG | 1079449915 | 5422158 | 1182530104 | 6058146 | 1453351380 | 6206060 | 1,453,351,380 | 6,206,060 |
| Australia | KG | 1855876 | 6666 | 8353583 | 26614 | 11387397 | 15564 | | |
| Austria | KG | 1199025 | 6555 | 4228806 | 16778 | 1737777 | 5731 | | |
| Bahrain | KG | 0 | 0 | 0 | 0 | 2200 | 4 | | |
| Bangladesh | KG | 0 | 0 | 1074476 | 2580 | 1323158 | 31110 | | |
| Belgium | KG | 1097651 | 53226 | 19856519 | 318338 | 10725605 | 35587 | | |
| Brazil | KG | 998235 | 6684 | 226710 | 1591 | 4785 | 6 | | |
| Bulgaria | KG | 0 | 0 | 11270 | 108 | 2378 | 1075 | | |
| Canada | KG | 10568921 | 17021 | 4329649 | 10644 | 15176392 | 35921 | | |
| Chile | KG | 0 | 0 | 0 | 0 | 703914 | 2015 | | |
| China | KG | 213615939 | 1516146 | 226459330 | 1427644 | 369344116 | 2108234 | 369,344,116 | 2,308,234 |
| Costa Rica | KG | 0 | 0 | 0 | 0 | 2373330 | 18000 | | |
| Czech Republic | KG | 3338885 | 9621 | 16197461 | 76477 | 11497195 | 44778 | | |
| Denmark | KG | 449630 | 894 | 3318483 | 6691 | 6810353 | 19360 | | |
| Egypt | KG | 2911236 | 12519 | 10465557 | 71938 | 14606369 | 65538 | | |
| Estonia | KG | 28142 | 227 | 0 | 0 | 0 | 0 | | |
| Finland | KG | 3273879 | 3888 | 3113235 | 5249 | 1329124 | 3260 | | |
| France | KG | 49822532 | 83110 | 87167189 | 155754 | 95734185 | 186092 | | |
| Germany | KG | 67975511 | 215362 | 58585764 | 404722 | 94599572 | 291928 | | |
| Ghana | KG | 0 | 0 | 0 | 0 | 606829 | 2010 | | |
| Greece | KG | 33012110 | 185074 | 31440472 | 151343 | 1300507 | 3402 | | |
| Guadeloupe | KG | 0 | 0 | 0 | 0 | 255483 | 650 | | |
| Hong Kong | KG | 37791151 | 159996 | 32362606 | 154092 | 63245361 | 235011 | | |
| Hungary | KG | 222582 | 503 | 866 | 2 | 487139 | 1931 | | |
| Iceland | KG | 0 | 0 | 0 | 0 | 18841 | 55 | | |
| Indonesia | KG | 10876 | 39 | 9190743 | 25726 | 9524754 | 20793 | 9,524,754 | 20,793 |
| Iran | KG | 11937 | 25 | 0 | 0 | 0 | 0 | | |
| Ireland | KG | 4467556 | 20368 | 6743387 | 8559 | 1835126 | 2890 | | |
| Israel | KG | 2327522 | 10368 | 5974651 | 26987 | 3579313 | 10755 | | |
| Italy | KG | 86709186 | 545971 | 95657161 | 550780 | 78534803 | 279425 | | |
| Japan | KG | 13571668 | 44505 | 30152291 | 161833 | 11602108 | 44704 | | |
| Kenya | KG | 0 | 0 | 35920 | 100 | 1429712 | 3491 | | |
| Korea South | KG | 65721359 | 285287 | 64960536 | 310093 | 78372822 | 381348 | 78,372,822 | 381,348 |
| Lithuania | KG | 0 | 0 | 39117 | 124 | 0 | 0 | | |
| Luxembourg | KG | 0 | 0 | 0 | 0 | 34861 | 61 | | |
| Malaysia | KG | 18545029 | 148610 | 63628068 | 446272 | 58751837 | 308392 | | |
| Mali | KG | 0 | 0 | 0 | 0 | 335428 | 2000 | | |
| Marshall Islands | KG | 0 | 0 | 3386 | 12 | 0 | 0 | | |
| Mexico | KG | 0 | 0 | 674396 | 2821 | 832339 | 786 | | |
| Myanmar | KG | 0 | 0 | 0 | 0 | 152829 | 408 | | |
| Nepal | KG | 12200144 | 165808 | 6177046 | 88008 | 10408354 | 69008 | | |
| Netherlands | KG | 23930434 | 88627 | 7649353 | 44956 | 10099295 | 53290 | | |
| New Zealand | KG | 2016627 | 3757 | 1378436 | 1181 | 69176 | 140 | | |
| Nigeria | KG | 0 | 0 | 8532 | 25 | 8136 | 10 | | |
| Norway | KG | 51765 | 334 | 8435 | 22 | 46462 | 352 | | |
| Oman | KG | 0 | 0 | 0 | 0 | 2762 | 37 | | |
| Pakistan | KG | 32974 | 10000 | 0 | 0 | 2605 | 5 | | |
| Panama | KG | 8095 | 10 | 0 | 0 | 0 | 0 | | |
| Philippines | KG | 2021770 | 7323 | 5961149 | 31044 | 14674427 | 64337 | | |
| Poland | KG | 1174185 | 3550 | 2829804 | 12015 | 17744473 | 73724 | | |
| Portugal | KG | 1016039 | 2695 | 13672486 | 25892 | 18240651 | 32447 | | |
| Puerto Rico (U.S.) | KG | 0 | 0 | 0 | 0 | 419 | 3 | | |
| Qatar | KG | 1544 | 5 | 248 | 1 | 0 | 0 | | |
| Russia | KG | 0 | 0 | 0 | 0 | 31753 | 66 | | |
| Saudi Arabia | KG | 319144 | 941 | 4333733 | 16298 | 2319732 | 9467 | | |
| Seychelles | KG | 0 | 0 | 5566 | 8 | 514910 | 388 | | |
| Singapore | KG | 28193262 | 89549 | 33692840 | 234177 | 27503295 | 109825 | | |
| Slovenia | KG | 82240 | 245 | 0 | 0 | 5816 | 10 | | |
| South Africa | KG | 6781975 | 22523 | 0 | 0 | 236025 | 1783 | | |
| Spain | KG | 4106416 | 42397 | 8491172 | 45974 | 13121241 | 46902 | | |
| Sri Lanka | KG | 3432761 | 52022 | 920985 | 4568 | 373758 | 1024 | | |
| Swaziland | KG | 268994 | 1006 | 704168 | 1034 | 964704 | 3220 | | |
| Sweden | KG | 343016 | 1209 | 5363220 | 6541 | 4014343 | 13258 | | |
| Switzerland | KG | 1308390 | 2490 | 5781949 | 19808 | 15145730 | 47259 | | |
| Syria | KG | 6482476 | 32085 | 5661460 | 39816 | 0 | 0 | | |
| Taiwan | KG | 36561538 | 150928 | 29875421 | 59298 | 42155062 | 109016 | | |
| Tanzania | KG | 2173 | 4 | 0 | 0 | 0 | 0 | | |
| Thailand | KG | 38266471 | 78732 | 83547190 | 246220 | 111477290 | 304619 | 113,477,290 | 304,619 |
| Tunisia | KG | 0 | 0 | 0 | 0 | 14829 | 26 | | |
| Turkey | KG | 7162791 | 101263 | 3083689 | 12869 | 24255267 | 167803 | | |
| Ukraine | KG | 0 | 0 | 0 | 0 | 2997 | 10 | | |
| Unidentified Country | KG | 33476558 | 213565 | 19912190 | 73044 | 8738007 | 27581 | 8,738,007 | 27,581 |
| United Arab Emirates | KG | 12753801 | 54866 | 3655555 | 14671 | 2719253 | 15311 | | |
| United Kingdom | KG | 22817852 | 116546 | 26128244 | 115177 | 38956268 | 109789 | | |
| United States | KG | 172550490 | 822327 | 121297921 | 559012 | 116252800 | 509840 | | |
| Venezuela | KG | 0 | 0 | 28578 | 200 | 0 | 0 | | |
| Vietnam | KG | 11657802 | 29670 | 10156600 | 35185 | 23089464 | 73794 | 23,089,464 | 73,794 |

| Source of Data: Ministry of Commerce | World, less NMEs, Subsidy Countries, and Unknowns | 850,804,927 | 1,089,691 |

275.3689 Rs/KG

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 418463502 | 2971376 | 560506073 | 3647803 | 666957736 | 3969689 | 666,957,736 | 3,969,689 |
| Australia | KG | 0 | 0 | 0 | 0 | 10980 | 50 | | |
| Austria | KG | 9675 | 67 | 0 | 0 | 40925 | 134 | | |
| Bahrain | KG | 86760 | 400 | 0 | 0 | 0 | 0 | | |
| Bangladesh | KG | 0 | 0 | 182150 | 396 | 165781 | 372 | | |
| Belgium | KG | 1669547 | 7684 | 2175378 | 4914 | 7377307 | 21071 | | |
| Canada | KG | 108891 | 920 | 946904 | 9179 | 136662 | 1109 | | |
| China | KG | 37901032 | 128669 | 42833666 | 275418 | 71234282 | 310073 | 71,234,282 | 310,073 |
| Costa Rica | KG | 0 | 0 | 1658259 | 10688 | 0 | 0 | | |
| Czech Republic | KG | 0 | 0 | 132010 | 1455 | 158410 | 858 | | |
| Denmark | KG | 482852 | 3244 | 7782 | 25 | 241978 | 1132 | | |
| Finland | KG | 95531 | 800 | 689535 | 1933 | 111916 | 650 | | |
| France | KG | 687959 | 877 | 12756955 | 44579 | 2790064 | 4911 | | |
| Germany | KG | 14317358 | 38601 | 45748672 | 200316 | 35851876 | 106862 | | |
| Hong Kong | KG | 28882253 | 92314 | 56700040 | 205438 | 19867596 | 83611 | | |
| Hungary | KG | 0 | 0 | 15601 | 39 | 8682 | 20 | | |
| Indonesia | KG | 0 | 0 | 14805916 | 122761 | 3896888 | 21905 | 3,896,888 | 21,905 |
| Ireland | KG | 0 | 0 | 1493 | 4 | 68153 | 300 | | |
| Israel | KG | 0 | 0 | 75735 | 274 | 6840 | 10 | | |
| Italy | KG | 951758 | 3052 | 350461 | 1079 | 785580 | 2115 | | |
| Japan | KG | 23953 | 80 | 3731161 | 64222 | 150288 | 1062 | | |
| Korea South | KG | 16468988 | 97508 | 16047054 | 106254 | 17519965 | 102305 | 17,519,965 | 102,305 |
| Kuwait | KG | 2544070 | 50000 | 0 | 0 | 5734 | 20 | | |
| Malaysia | KG | 10342089 | 42899 | 9358459 | 46030 | 6397678 | 24527 | | |
| Nepal | KG | 1503339 | 16580 | 4780796 | 68902 | 0 | 0 | | |
| Netherlands | KG | 58492 | 127 | 372840 | 1335 | 390440 | 1222 | | |
| New Zealand | KG | 0 | 0 | 337238 | 1500 | 129317 | 1000 | | |
| Pakistan | KG | 117916262 | 930465 | 161794065 | 1293339 | 234415037 | 1753787 | | |
| Philippines | KG | 588438 | 1750 | 0 | 0 | 0 | 0 | | |
| Poland | KG | 3112420 | 9114 | 4563113 | 13682 | 542734 | 1674 | | |
| Qatar | KG | 0 | 0 | 0 | 0 | 2549217 | 30060 | | |
| Saudi Arabia | KG | 148427746 | 1328230 | 148601041 | 993936 | 209864736 | 1179647 | | |
| Singapore | KG | 865705 | 3274 | 1404875 | 8073 | 881536 | 3474 | | |
| Slovenia | KG | 11479 | 81 | 0 | 0 | 0 | 0 | | |
| South Africa | KG | 0 | 0 | 210322 | 1000 | 0 | 0 | | |
| Spain | KG | 539039 | 3481 | 41911 | 100 | 2650409 | 10812 | | |
| Sri Lanka | KG | 1130996 | 5811 | 890991 | 11123 | 4941891 | 15770 | | |
| Sweden | KG | 59826 | 102 | 0 | 0 | 0 | 0 | | |
| Switzerland | KG | 6146 | 50 | 4267 | 40 | 207778 | 1170 | | |
| Taiwan | KG | 737031 | 1428 | 846304 | 2858 | 1965018 | 9539 | | |
| Thailand | KG | 1302740 | 1880 | 4430179 | 55383 | 2026431 | 8578 | 2,026,431 | 8,578 |
| Turkey | KG | 0 | 0 | 380786 | 674 | 0 | 0 | | |
| Ukraine | KG | 0 | 0 | 457 | 2 | 0 | 0 | | |
| Unidentified Country | KG | 7743147 | 30000 | 0 | 0 | 4898962 | 34872 | 4,898,962 | 34,872 |
| United Arab Emirates | KG | 8543374 | 58431 | 3939287 | 19582 | 12182292 | 154343 | | |
| United Kingdom | KG | 2060135 | 21746 | 690458 | 1857 | 3525227 | 16770 | | |
| United States | KG | 9002032 | 89633 | 12315216 | 56034 | 15473219 | 53874 | | |
| Venezuela | KG | 146391 | 1078 | 0 | 0 | 0 | 0 | | |
| Vietnam | KG | 136048 | 1000 | 6684696 | 23379 | 3485907 | 10000 | 3,485,907 | 10,000 |

**India Import Statistics**
Commodity: 39232100, Sacks & Bags Of Polyethylene (Incl Cones)
Year Ending: May

Source of Data: Ministry of Commerce     World, Less NMEs, Subsidy Countries, and Unknowns     563,895,301     3,481,956

161.9479 Rs/KG

## India Import Statistics

Commodity: 63053300, Sacks And Bags Of Polyethylene Or Polypropylene Strip Or The Like

### Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 13330348 | 50509 | 19240294 | 134410 | 23983767 | 121512 | 23,983,767 | 121,512 |
| Bangladesh | KG | 0 | 0 | 64377 | 890 | 0 | 0 | | |
| Canada | KG | 0 | 0 | 1604 | 12 | 0 | 0 | | |
| China | KG | 3521654 | 11726 | 3903060 | 65756 | 7635786 | 51556 | 7,635,786 | 51,556 |
| Germany | KG | 331608 | 1000 | 0 | 0 | 0 | 0 | | |
| Hong Kong | KG | 8677 | 25 | 0 | 0 | 0 | 0 | | |
| Indonesia | KG | 0 | 0 | 413297 | 3600 | 0 | 0 | 0 | 0 |
| Malaysia | KG | 0 | 0 | 0 | 0 | 149160 | 672 | | |
| Oman | KG | 0 | 0 | 0 | 0 | 81638 | 1495 | | |
| Pakistan | KG | 0 | 0 | 0 | 0 | 1051296 | 3000 | | |
| Poland | KG | 0 | 0 | 2249500 | 3783 | 4776502 | 28084 | | |
| Sri Lanka | KG | 48198 | 240 | 377121 | 6458 | 29849 | 209 | | |
| Sweden | KG | 0 | 0 | 1065 | 2 | 550 | 1 | | |
| Taiwan | KG | 0 | 0 | 10958 | 20 | 0 | 0 | | |
| Thailand | KG | 3259583 | 13000 | 7988778 | 41600 | 6543735 | 20500 | 6,543,735 | 20,500 |
| Turkey | KG | 6160628 | 24518 | 4227559 | 12276 | 2482281 | 11440 | | |
| United Arab Emirates | KG | 0 | 0 | 2975 | 13 | 1052527 | 4000 | | |
| United Kingdom | KG | 0 | 0 | 0 | 0 | 157088 | 500 | | |
| United States | KG | 0 | 0 | 0 | 0 | 23355 | 55 | | |
| Source of Data: Ministry of Commerce | | World, Less NMEs, Subsidy Countries, and Unknown | | | | | | 9,804,246 | 49,456 |

198.2418 Rs/KG

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

| India Import Statistics | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Commodity: 56079090, Other Twine,Cordage,Rope & Cables | | | | | | | | |
| Year Ending: May | | | | | | | | |
| **Partner Country** | **Unit** | **2009** | | **2010** | | **2011** | | **2011** | |
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 462096880 | 13058889 | 537951689 | 9937493 | 952085821 | 19397009 | 952,085,821 | 19,397,009 |
| Australia | KG | 2075 | 64 | 0 | 0 | 357098 | 1730 | | |
| Austria | KG | 504681 | 590 | 1586887 | 13913 | 616306 | 10432 | | |
| Bangladesh | KG | 21352022 | 744962 | 43793271 | 1306720 | 226804950 | 5426980 | | |
| Belgium | KG | 13490 | 100 | 7758 | 100 | 89090 | 310 | | |
| Canada | KG | 132451 | 500 | 0 | 0 | 8736 | 40 | | |
| China | KG | 82631243 | 336153 | 71057857 | 311693 | 88558681 | 517311 | 88,558,681 | 517,311 |
| Czech Republic | KG | 0 | 0 | 325801 | 1284 | 135168 | 1610 | | |
| France | KG | 962462 | 5800 | 361476 | 3425 | 988287 | 21404 | | |
| Germany | KG | 7569071 | 19975 | 8968313 | 54826 | 9816979 | 44340 | | |
| Ghana | KG | 0 | 0 | 0 | 0 | 13243 | 250 | | |
| Greece | KG | 10136 | 50 | 16629 | 231 | 0 | 0 | | |
| Hong Kong | KG | 3321905 | 16018 | 5723273 | 16578 | 2212341 | 155841 | | |
| Indonesia | KG | 0 | 0 | 3546 | 150 | 0 | 0 | 0 | 0 |
| Iran | KG | 0 | 0 | 6003 | 50 | 0 | 0 | | |
| Italy | KG | 690890 | 2352 | 622352 | 2767 | 724399 | 5365 | | |
| Japan | KG | 955663 | 23283 | 115978 | 1400 | 6866613 | 28328 | | |
| Korea South | KG | 1360254 | 12431 | 2999539 | 89605 | 1781634 | 49873 | 1,781,634 | 49,873 |
| Kuwait | KG | 0 | 0 | 0 | 0 | 21249 | 300 | | |
| Malaysia | KG | 10767 | 25 | 0 | 0 | 38263 | 999 | | |
| Nepal | KG | 278122234 | 11566000 | 343172606 | 7808596 | 559824252 | 12664686 | | |
| Netherlands | KG | 934634 | 22700 | 1430063 | 7300 | 16742144 | 83275 | | |
| New Zealand | KG | 74115 | 502 | 152998 | 460 | 0 | 0 | | |
| Norway | KG | 1946904 | 2000 | 0 | 0 | 2347200 | 40000 | | |
| Pakistan | KG | 0 | 0 | 11779 | 50 | 82136 | 200 | | |
| Portugal | KG | 36038 | 546 | 0 | 0 | 0 | 0 | | |
| Romania | KG | 0 | 0 | 78980 | 112 | 0 | 0 | | |
| Singapore | KG | 1287780 | 1934 | 44793 | 261 | 262083 | 6248 | | |
| Slovenia | KG | 0 | 0 | 0 | 0 | 258 | 10 | | |
| South Africa | KG | 1235371 | 5011 | 36109 | 2000 | 429028 | 3490 | | |
| Spain | KG | 340979 | 3100 | 375161 | 170 | 864698 | 41180 | | |
| Swaziland | KG | 0 | 0 | 0 | 0 | 165233 | 2326 | | |
| Sweden | KG | 0 | 0 | 50974 | 5132 | 0 | 0 | | |
| Switzerland | KG | 219231 | 961 | 276721 | 1276 | 662512 | 8581 | | |
| Taiwan | KG | 1023123 | 3500 | 2321111 | 12985 | 1043491 | 46257 | | |
| Thailand | KG | 51037892 | 277013 | 38653520 | 228221 | 21970923 | 172188 | 21,970,923 | 172,188 |
| Turkey | KG | 273593 | 708 | 0 | 0 | 91102 | 303 | | |
| Unidentified Country | KG | 18730 | 20 | 13496 | 100 | 2364453 | 41568 | 2,364,453 | 41,568 |
| United Arab Emirates | KG | 9274 | 167 | 137501 | 399 | 3189 | 35 | | |
| United Kingdom | KG | 2388625 | 5614 | 12734689 | 44835 | 4374334 | 6743 | | |
| United States | KG | 3631247 | 6810 | 2872505 | 22854 | 1825748 | 14806 | | |

Source of Data: Ministry of Commerce     World, Less NMEs, Subsidy Countries, and Unknowns     837,410,130  18,616,069

44.9832 Rs/KG

Appx2396

| India Import Statistics |||||||||
| Commodity: 56074900, Othr Cordge Etc Of Polyethln/Polypropyln |||||||||
| Year Ending: May |||||||||
| Partner Country | Unit | 2009 || 2010 || 2011 || 2011 ||
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
|---|---|---|---|---|---|---|---|---|---|
| World | KG | 22669484 | 97420 | 15085899 | 66006 | 19305690 | 118163 | 19,305,690 | 118,163 |
| Australia | KG | 0 | 0 | 20800 | 320 | 9570 | 20 | | |
| Canada | KG | 0 | 0 | 0 | 0 | 30573 | 230 | | |
| China | KG | 6280487 | 47251 | 4932400 | 37538 | 5750243 | 29432 | 5,750,243 | 29,432 |
| Czech Republic | KG | 0 | 0 | 74571 | 100 | 0 | 0 | | |
| France | KG | 0 | 0 | 0 | 0 | 1970 | 10 | | |
| Germany | KG | 343 | 1 | 36761 | 180 | 125187 | 206 | | |
| Hong Kong | KG | 229683 | 609 | 2678017 | 12097 | 1488839 | 3594 | | |
| Italy | KG | 251084 | 985 | 40668 | 200 | 1822285 | 2432 | | |
| Japan | KG | 19711 | 172 | 766 | 2 | 15387 | 63 | | |
| Korea South | KG | 29546 | 90 | 346936 | 820 | 696291 | 2984 | 696,291 | 2,984 |
| Madagascar | KG | 0 | 0 | 198922 | 260 | 0 | 0 | | |
| Malaysia | KG | 0 | 0 | 0 | 0 | 8172 | 20 | | |
| Mexico | KG | 0 | 0 | 0 | 0 | 18423 | 187 | | |
| Netherlands | KG | 5120699 | 8186 | 11595 | 90 | 55802 | 250 | | |
| Norway | KG | 1593755 | 2284 | 0 | 0 | 0 | 0 | | |
| Philippines | KG | 0 | 0 | 0 | 0 | 9897 | 37 | | |
| Portugal | KG | 245553 | 1000 | 0 | 0 | 708136 | 2720 | | |
| Singapore | KG | 0 | 0 | 244847 | 1295 | 224301 | 866 | | |
| South Africa | KG | 2490480 | 2500 | 3144494 | 8413 | 4648346 | 3150 | | |
| Spain | KG | 338836 | 140 | 4100 | 10 | 0 | 0 | | |
| Sri Lanka | KG | 0 | 0 | 0 | 0 | 12903 | 12 | | |
| Sweden | KG | 0 | 0 | 0 | 0 | 25295 | 15 | | |
| Taiwan | KG | 1769769 | 7089 | 167338 | 396 | 519653 | 2796 | | |
| Thailand | KG | 0 | 0 | 144130 | 471 | 0 | 0 | 0 | 0 |
| Ukraine | KG | 0 | 0 | 6370 | 11 | 0 | 0 | | |
| Unidentified Country | KG | 202832 | 1755 | 263573 | 1392 | 96285 | 3587 | 96,285 | 3,587 |
| United Arab Emirates | KG | 0 | 0 | 0 | 0 | 2795809 | 64430 | | |
| United Kingdom | KG | 2723770 | 24000 | 2715939 | 2200 | 111210 | 703 | | |
| United States | KG | 1372936 | 1358 | 53672 | 211 | 129907 | 413 | | |
| Vietnam | KG | 0 | 0 | 0 | 0 | 1206 | 6 | 1,206 | 6 |

Source of Data: Ministry of Commerce            World, Less NMEs, Subsidy Countries, and Unknown  12,761,665   82,154

155.3383 Rs/KG

India Import Statistics

Commodity: 481910, Cartons, Boxes And Cases Of Corrugated Paper And Paperboard Used In Offices, Shops, Or The Like

Year Ending: May

| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
|---|---|---|---|---|---|---|---|---|---|
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 512277422 | 4182917 | 563407634 | 4155772 | 679888377 | 5434393 | 679,888,377 | 5,434,393 |
| Australia | KG | 2315266 | 14416 | 3792636 | 20244 | 2086560 | 23561 | | |
| Austria | KG | 2533177 | 23046 | 754758 | 4682 | 1345206 | 6793 | | |
| Bahrain | KG | 0 | 0 | 348375 | 7900 | 0 | 0 | | |
| Bangladesh | KG | 0 | 0 | 0 | 0 | 176645 | 282 | | |
| Belgium | KG | 285059 | 891 | 207144 | 695 | 210276 | 1856 | | |
| Brazil | KG | 3881332 | 38356 | 312220 | 1568 | 246323 | 1128 | | |
| Canada | KG | 2439685 | 14103 | 3617756 | 30597 | 390636 | 2119 | | |
| Chad | KG | 45808 | 150 | 0 | 0 | 0 | 0 | | |
| Chile | KG | 0 | 0 | 0 | 0 | 52429714 | 45523 | | |
| China | KG | 89312063 | 805447 | 120743508 | 1064797 | 191881422 | 1611080 | 191,881,422 | 1,611,080 |
| Czech Republic | KG | 3553250 | 10220 | 263404 | 2889 | 42014 | 326 | 42,014 | 326 |
| Denmark | KG | 1679214 | 11680 | 1353243 | 12531 | 600694 | 4852 | 600,694 | 4,852 |
| Egypt | KG | 0 | 0 | 2490 | 31 | 1084595 | 10428 | 1,084,595 | 10,428 |
| Finland | KG | 1249159 | 3532 | 223932 | 1762 | 153071 | 2839 | | |
| France | KG | 3459758 | 37570 | 4446594 | 39894 | 6979053 | 92145 | | |
| Germany | KG | 19652434 | 118459 | 11344787 | 78087 | 13710552 | 128639 | | |
| Greece | KG | 6820 | 45 | 74778 | 370 | 218387 | 1413 | | |
| Hong Kong | KG | 54615237 | 560867 | 55359659 | 468722 | 71231710 | 525239 | | |
| Hungary | KG | 17980 | 87 | 11098 | 100 | 167524 | 1527 | | |
| Iceland | KG | 0 | 0 | 0 | 0 | 69632 | 650 | | |
| Indonesia | KG | 10519149 | 60981 | 1711171 | 12642 | 20271008 | 196379 | 20,271,008 | 196,379 |
| Iran | KG | 0 | 0 | 3419 | 21 | 0 | 0 | | |
| Ireland | KG | 137792 | 1290 | 48104 | 1009 | 129377 | 500 | | |
| Israel | KG | 517 | 10 | 850575 | 15993 | 1035236 | 8705 | | |
| Italy | KG | 11500791 | 73166 | 5621307 | 36423 | 14381281 | 111128 | | |
| Japan | KG | 6304608 | 53805 | 1449485 | 13433 | 4079420 | 40032 | | |
| Jordan | KG | 0 | 0 | 171742 | 2279 | 0 | 0 | | |
| Korea South | KG | 1237212 | 10370 | 784158 | 5866 | 1400174 | 19427 | 1,400,174 | 19,427 |
| Lebanon | KG | 159848 | 489 | 500442 | 8555 | 785948 | 11332 | | |
| Madagascar | KG | 122068 | 870 | 0 | 0 | 0 | 0 | | |
| Malaysia | KG | 4276859 | 32607 | 2366948 | 22837 | 4601120 | 31955 | | |
| Mexico | KG | 229172 | 767 | 371169 | 2344 | 676471 | 4680 | | |
| Morocco | KG | 0 | 0 | 0 | 0 | 19635 | 139 | | |
| Mozambique | KG | 0 | 0 | 3672 | 30 | 11639 | 603 | | |
| Myanmar | KG | 544 | 5 | 0 | 0 | 0 | 0 | | |
| Netherlands | KG | 52714 | 575 | 525487 | 1696 | 768645 | 11429 | | |
| New Zealand | KG | 15495 | 225 | 1003002 | 4806 | 0 | 0 | | |
| Nigeria | KG | 0 | 0 | 2250965 | 13660 | 2126 | 20 | | |
| Norway | KG | 0 | 0 | 1547406 | 10000 | 4723 | 45 | | |
| Oman | KG | 0 | 0 | 0 | 0 | 10694 | 100 | | |
| Pakistan | KG | 27162 | 162 | 0 | 0 | 593837 | 3025 | | |
| Philippines | KG | 0 | 0 | 1499217 | 12787 | 7890950 | 28035 | | |
| Poland | KG | 527267 | 3952 | 575864 | 4013 | 1000488 | 5594 | | |
| Portugal | KG | 0 | 0 | 0 | 0 | 503347 | 5495 | | |
| Qatar | KG | 5897 | 50 | 0 | 0 | 0 | 0 | | |
| Romania | KG | 0 | 0 | 0 | 0 | 14271 | 52 | | |
| Russia | KG | 0 | 0 | 0 | 0 | 88114 | 1800 | | |
| Saudi Arabia | KG | 1894 | 2 | 65823 | 82 | 171347 | 5045 | | |
| Sierra Leone | KG | 1287 | 3 | 0 | 0 | 0 | 0 | | |
| Singapore | KG | 4099773 | 445814 | 32829010 | 54840 | 5109943 | 60755 | | |
| Slovenia | KG | 0 | 0 | 0 | 0 | 4332 | 60 | | |
| South Africa | KG | 27592607 | 146211 | 47330903 | 297048 | 52712173 | 398684 | | |
| Spain | KG | 1346875 | 4590 | 20766 | 156 | 1236428 | 16829 | | |
| Sri Lanka | KG | 51785941 | 320088 | 55252189 | 280479 | 37784662 | 318574 | | |
| Swaziland | KG | 0 | 0 | 176 | 2 | 0 | 0 | | |
| Sweden | KG | 3611063 | 18646 | 2188882 | 12135 | 4969852 | 22603 | | |
| Switzerland | KG | 4932685 | 46133 | 1285044 | 18528 | 3745019 | 32669 | | |
| Syria | KG | 4733 | 28 | 0 | 0 | 0 | 0 | | |
| Taiwan | KG | 27329603 | 170493 | 15363153 | 209541 | 13795013 | 115712 | | |
| Thailand | KG | 8091824 | 65754 | 5233352 | 73736 | 5626282 | 80150 | 5,626,282 | 80,150 |
| Tunisia | KG | 0 | 0 | 35175 | 350 | 0 | 0 | | |
| Turkey | KG | 274276 | 1701 | 148727 | 800 | 62654 | 338 | | |
| Ukraine | KG | 0 | 0 | 0 | 0 | 88 | 1 | | |
| Unidentified Country | KG | 789673 | 9648 | 10131678 | 139294 | 4224912 | 41169 | 4,224,912 | 41,169 |
| United Arab Emirates | KG | 53674648 | 304204 | 80860472 | 533833 | 109813582 | 1087682 | | |
| United Kingdom | KG | 3489651 | 22946 | 29148237 | 179661 | 5197882 | 25697 | | |
| United States | KG | 91295960 | 628813 | 58677591 | 400897 | 17762351 | 154106 | | |
| Vietnam | KG | 13898642 | 120250 | 6715941 | 51212 | 16385309 | 133394 | 16,385,309 | 133,394 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Source of Data: Ministry of Commerce | | | | World, Less NMEs, Subsidy Countries, and Unknowns | | | | 438,371,967 | 3,337,188 |
| | | | | | | | | 131.9597 Rs/KG | |

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

| India Import Statistics | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Commodity: 39206912, Packag Film Of Othr Polyestr Flexibl Plain | | | | | | | | |
| Year Ending: May | | | | | | | | |
| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | KG | 62763709 | 931566 | 191674176 | 2476109 | 98260091 | 784576 | 98,260,091 | 784,576 |
| China | KG | 2173283 | 17895 | 24447929 | 328551 | 46329955 | 467453 | 46,329,955 | 467,453 |
| Germany | KG | 10836 | 20 | 11650 | 80 | 6339 | 122 | | |
| Hong Kong | KG | 20564 | 200 | 115743 | 219 | 0 | 0 | | |
| Italy | KG | 0 | 0 | 0 | 0 | 777420 | 15000 | | |
| Jordan | KG | 0 | 0 | 46538 | 400 | 0 | 0 | | |
| Korea South | KG | 0 | 0 | 5421884 | 296504 | 370069 | 12441 | 370,069 | 12,441 |
| Malaysia | KG | 1005096 | 15108 | 1796852 | 7568 | 0 | 0 | | |
| Poland | KG | 1535789 | 61000 | 395629 | 28000 | 0 | 0 | | |
| Saudi Arabia | KG | 0 | 0 | 0 | 0 | 3011312 | 30283 | | |
| Spain | KG | 11432 | 140 | 0 | 0 | 0 | 0 | | |
| Taiwan | KG | 0 | 0 | 0 | 0 | 2079578 | 24778 | | |
| Thailand | KG | 6299775 | 75742 | 4405973 | 51563 | 4458388 | 21970 | 4,458,388 | 21,970 |
| Turkey | KG | 1487 | 35 | 0 | 0 | 0 | 0 | | |
| United Arab Emirates | KG | 51472281 | 759426 | 141881607 | 1745864 | 26370585 | 193017 | | |
| United States | KG | 233166 | 2000 | 13150371 | 17360 | 14856445 | 19512 | | |

Source of Data: Ministry of Commerce | World, Less NMEs, Subsidy Countries, and Unknowns | 47,101,679 | 282,712

166.6066 Rs/KG

Filed By: peggy@peggyclarkelaw.com, Filed Date: 9/5/12 3:25 PM, Submission Status: Approved

| | | India Import Statistics | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Commodity: 27011920, Steam Coal | | | | | | | |
| | | Year Ending: May | | | | | | | |
| Partner Country | Unit | 2009 | | 2010 | | 2011 | | 2011 | |
| | | IND | Quantity | IND | Quantity | IND | Quantity | IND | Quantity |
| World | T | 1.40212E+11 | 30601922 | 1.35016E+11 | 36214337 | 1.78658E+11 | 44174539 | 178,657,529,227 | 44,174,539 |
| Afghanistan | T | 0 | 0 | 0 | 0 | 193229 | 43 | | |
| Australia | T | 3206806096 | 630501 | 328625114 | 86295 | 1029163751 | 185243 | | |
| China | T | 207656978 | 59475 | 0 | 0 | 320938705 | 135310 | 320,938,705 | 135,310 |
| Colombia | T | 0 | 0 | 0 | 0 | 442785718 | 100000 | | |
| Germany | T | 0 | 0 | 0 | 0 | 5651354 | 1868 | | |
| Indonesia | T | 97615069023 | 23112740 | 84686090695 | 24842679 | 1.21805E+11 | 33277764 | 121,805,121,453 | 33,277,764 |
| Iran | T | 0 | 0 | 0 | 0 | 224202622 | 35902 | | |
| Mozambique | T | 159022168 | 42511 | 155708368 | 40406 | 13500000 | 5000 | | |
| Netherlands | T | 0 | 0 | 0 | 0 | 14152000 | 5000 | | |
| Pakistan | T | 73845 | 15 | 0 | 0 | 279409 | 60 | | |
| Philippines | T | 649337334 | 159040 | 1267526654 | 408474 | 197359377 | 59480 | | |
| Russia | T | 0 | 0 | 0 | 0 | 1096510500 | 184700 | | |
| Saudi Arabia | T | 0 | 0 | 0 | 0 | 15320000 | 5000 | | |
| Singapore | T | 0 | 0 | 0 | 0 | 34448620 | 10000 | | |
| South Africa | T | 38352960217 | 6591637 | 48578158572 | 10836483 | 50100543576 | 9481052 | | |
| Sri Lanka | T | 0 | 0 | 0 | 0 | 16703393 | 5000 | | |
| Turkey | T | 0 | 0 | 0 | 0 | 37442250 | 7500 | | |
| Unidentified Country | T | 21342562 | 6000 | 0 | 0 | 1643362856 | 309715 | 1,643,362,856 | 309,715 |
| United Arab Emirates | T | 0 | 0 | 0 | 0 | 37240000 | 10000 | 37,240,000 | 10,000 |
| United States | T | 26417 | 3 | 0 | 0 | 1622610414 | 355902 | 1,622,610,414 | 355,902 |

Source of Data: Ministry of Commerce    World, Less NMEs, Subsidy Countries, and Unknowns    53,228,255,799    10,085,848

5,277.5191 Rs/MT

Appx2400

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-898
POR: 06/01/2010 – 05/31/2011
~~Proprietary Document~~ *Public Version*
IA/O6: EH

DATE:              November 20, 2012

MEMORANDUM TO:     The File

THROUGH:           Barbara E. Tillman
                   Director
                   AD/CVD Operations, Office 6

                   Mark Hoadley
                   Program Manager
                   AD/CVD Operations, Office 6

FROM:              Taija Slaughter
                   Program Manager
                   Office of Accounting

                   Emily Halle *EH*
                   International Trade Analyst
                   AD/CVD Operations, Office 6

SUBJECT:           Verification of the Sales and Factors Response of Hebei Jiheng
                   Chemical Company Ltd. in the Antidumping Review of
                   Chlorinated Isocyanurates from the People's Republic of China

---

The Department of Commerce (the Department) conducted verification of Hebei Jiheng
Chemical Company Ltd. (Jiheng) and its cross-owned affiliate, Hebei Jiheng Baikang Chemical
Industry Co., Ltd. (Baikang), from October 15 through October 19, 2012, in Hengshui, Hebei
Province, People's Republic of China (PRC). The attached report outlines the procedures
followed at the verification and describes our findings. We have attached a separate list of
exhibits compiled at the verification, as well as a list of participants at the verification.

The purpose of this verification report is to provide parties with a factual report of the methods,
procedures and results collected and obtained during the Department's verification exercise. See
19 C.F.R. § 351.307(c). This report does not draw conclusions as to whether the reported
information was successfully verified, and further does not make findings or conclusions
regarding how the facts obtained at verification will ultimately be treated in the Department's
determinations.



INTERNATIONAL
T R A D E
ADMINISTRATION

Filed By: Andrew Huston, Filed Date: 11/21/12 1:08 PM, Submission Status: Approved

payable [      ]. Baikang records the sale under main operating costs, [      ], and inventory, [      ]. Jiheng officials explained that they meet with Baikang officials on a weekly basis to determine on an as needed basis how much Baikang should produce. Jiheng orally sets a price with Baikang, and Baikang issues an invoice to Jiheng.

> 2. Provide a diagram showing the paper trail for the recording of these sales in Jiheng and Baikang's accounting records. The diagram should start from the receipt of an order through final payment and the year-end posting of sales in the financial statements. Identify all entries that would be recorded in the books and ledgers, the name and number of the accounting code, and the name of the ledger, book, or journal in which each such entry is made. Use specific examples from the preselected sales listed in the Appendix.

The Department asked for details on the account numbers associated with each step.[23] Jiheng officials explained that at the end of every month, they close out the [      ] accounts to finished goods, inventory, work-in-process or cost of goods sold. To obtain its main business costs, Jiheng uses its last month inventory value and the current month's average production costs. Jiheng produces several intermediate products, which it considers to be semi-finished product because some of the intermediate products are sold as is. We noted that accounts receivable had three accounts, [      ] for Euros, [      ] for U.S. dollars and [      ] for RMB. Jiheng's sales revenue account is [      ], and there are various sub-accounts to denote whether the sale is a domestic or export sale. Jiheng's bank deposit account is [      ].

C.    Production Data System

> 1. Discuss the production process diagram submitted by Jiheng and Baikang.

Jiheng provided and we reviewed a diagram demonstrating its production process.[24] The Department paid particular attention to when and how the by-products were produced. During the chlor-alkali stage, the production staff explained that industrial grade salt is combined with hot water that is piped in to form a sodium chloride solution. This solution will then undergo one of two processes to produce caustic soda and chlorine: diaphragm process (at Headquarters), or ionic membrane process (at Wuyi branch). Baikang purchases the intermediate products that are the result of this stage. The production staff explained that the diaphragm process results in 10 percent caustic soda, while the ionic membrane process results in 30 percent caustic soda. The diaphragm process requires the use of much more energy, as it needs lots of steam to dry the caustic soda to reach a 30 percent concentration level, which makes it a more costly process. The lower concentration caustic soda must go through an additional drying process because at that low concentration, it cannot be sold or used to produce chloro isos.

There are several chemicals, such as barium chloride, that are introduced in the electrolysis stage. Jiheng's production staff explained that they purchase these chemicals as solids because they are easier to transport that way. The production staff then makes solutions of desired concentrations to use in the electrolysis step.

---

[23] See Verification Exhibit 10.
[24] See Verification Exhibit 12.

Filed By: Andrew Huston, Filed Date: 11/21/12 1:08 PM, Submission Status: Approved

One of the by-products from the electrolysis stage is hydrogen gas, which can be reintroduced into the production process, discharged or sold. Jiheng's staff explained that their first priority is to meet the demands of hydrogen gas in their production process. Another by-product from this stage is discharged chlorine gas.

The production staff noted two changes to the production process diagram at the TCCA stage. Both the filter aid and the calcium chloride are introduced during the drying process of TCCA damp to TCCA powder. Additionally, sodium hypochlorite is used to neutralize the TCCA solution so that it can be discharged and released to the sewage water facilities. During the SDIC stage, cyanuric acid, 30 percent caustic soda and purified chlorine gas are combined to make sodium dichloroisocyanurate, not sodium trichloroisocyanurate. The Department asked how two different end products are created using the same three inputs. The production staff explained that to make TCCA, the ratio of cyanuric acid to 30 percent caustic soda is [       ], while the ratio is [       ] in order to make SDIC.

> 2. Review a diagram of Jiheng's and Baikang's production facility. Identify on the diagram the location of each of the processes shown in the production process diagram discussed above. For any areas not involved in the production of the in-scope products, obtain a description of the processes performed within those areas.

See step IV.C. above.

> 3. Tour the production complex.
>    a. Observe:
>       i. the receipt and withdrawal of raw materials inventories,
>       ii. the entry of raw materials into the production processes,
>       iii. the processes used in the manufacture of subject merchandise,
>       iv. the generation and disposal of scrap,
>       v. the packing processes,
>       vi. the release of finished goods from production or packing processes,
>       vii. the receipt of finished goods into inventory, and
>       viii. the release of finished goods from inventory.
>
>    b. Discuss any processes or facilities observed that were not previously identified by Jiheng in its submissions to the Department.

We toured the Wuyi branch's production facilities. As part of the tour we went to the control room for sodium chloride solution and caustic soda. In this room, we observed the computers monitoring the production, and reviewed daily logs that were maintained on site. We note that these daily logs were examined during our testing of the FOPs as discussed below. We next viewed the location of the hydrogen and chlorine meters, as well as the hydrogen gas discharge line. We were also able to view cyanuric acid produced by Wuyi branch that was being stored, and finished SDIC as it was coming off the production line and into bags. We noticed that under an outdoor storage facility, there was a large quantity of aluminum sulfate in bags. The facilities staff explained that all the aluminum sulfate bags were for domestic consumption, and were used as fertilizers.

11

Appx3063

The facilities staff next took us to the cyanuric acid production stage warehouse, where we viewed urea being stored. The staff directed our attention to a large pipe leaving the building, and noted that the pipe contained ammonia gas that went straight from the cyanuric acid warehouse to the ammonium sulfate reactor. The staff noted that the pipe was too big and too hot to have a meter on it. We next viewed a warehouse containing packaging materials, and another facility containing TCCA and SDIC in packaging and getting ready to be packed. Lastly, we saw where [     ] picks up the products and confirmed with the warehouse staff that they load the product onto the truck, but that the truck and its driver are [          ] responsibility.

> 4. Discuss how and when the production data is integrated into Jiheng's accounting system(s).

Jiheng's production staff explained that the production data is manually recorded on a daily basis. At the end of the month the daily data is summarized into monthly production reports and sent to the accounting department. The accounting department inputs the monthly production data into the accounting system and uses the data to calculate the inventory value and cost of goods sold (COGS) for the month.

> 5. Identify all reports generated from the production data system in the ordinary course of business and obtain examples of these reports.

Jiheng confirmed that all the reports generated from the production data system were provided in its November 29, 2011 questionnaire response at exhibit DV-6. Jiheng also provided examples of workshop records and inventory movement ledgers that are also a result of the production process system.[25] During the plant tour, the Department was able to view original versions of these records.

## V.     DATE OF SALE

Demonstrate that the date of invoice is the appropriate date of sale for the U.S. market.

Jiheng officials explained that the prices for sales to the U.S. market are first established in the manufacturing agreement Jiheng has with [     ], and that quantity is first determined in the purchase orders. Because changes can occur after the purchase order (i.e., cancellations), Jiheng considers the date of the commercial invoice to be the date of sale since no changes can be made once the invoice is issued.[26] Jiheng provided email communications with [     ] that demonstrate that purchase orders were cancelled during the POR.[27]

---

[25] See Verification Exhibit 13.
[26] Jiheng notes that in some cases, date of shipment is before the date of the invoice, in which case Jiheng selects the earlier of the two dates.
[27] See Verification Exhibit 14.

Filed By: Andrew Huston, Filed Date: 11/21/12 1:08 PM, Submission Status: Approved

## XVII. <u>BY-PRODUCTS</u>

A.    Review the company's classification of by-products in the factors of production response.  Provide a package for every by-product which includes the following information: the total quantity of by-product or recovery generated during the production of subject merchandise during the POR, the total quantity of by-product sold during the POR, the identity of the parties that purchased the by-product during the POR and the amount purchased, and the quantity re-entered into the production process of subject merchandise during the POR.  Have source documentation for each item available for the Department's review.

We examined Jiheng's reported by-product quantities recovered for chlorine, ammonia, sulfuric acid, and hydrogen.[51]  For chlorine, we reviewed prepared by-product calculation worksheets with Jiheng's officials, which demonstrate that chlorine is recovered at three different production processes.  Jiheng notes that chlorine is not a reported by-product at Baikang because Baikang is reintroducing all the chlorine it produces into its production process.  To ascertain the amount of chlorine gas recovered, Jiheng first determines the amount of hydrochloric acid produced during the POR, less the amount of hydrochloric acid re-entered into the production process, using the amounts of hydrochloric acid reported in the finished goods sub-ledger of hydrochloric acid.  From this amount, Jiheng uses a conversion ratio, based on molecular weights, to reach the amount of chlorine gas recovered at a given production stage.  Then, Jiheng summed the amount of chlorine gas recovered at each stage, and this sum ties to its reported FOP by-product amount for chlorine (by production).  Jiheng provided the finished goods ledger, daily reports, workshop records, and meter readings to support the amount of chlorine gas produced and reintegrated into the production process.  The Department tied the quantities recorded in these supporting documents to Jiheng's by-product calculation worksheet without exception.  To test the reported consumption quantity for hydrogen gas, we reviewed similar supporting documentation, and were able to tie all documents to Jiheng's reported amounts without any inconsistencies.

Jiheng officials stated that the remaining two by-products, sulfuric acid and ammonia gas, are sold as ammonium sulfate.  The Department examined worksheets for each of these by-products which show the POR total amount recovered of each by-product during the production process.  Jiheng officials explained that to determine the amount of each by-product recovered during the POR, they started with the total production of ammonium sulfate during the POR, and used molecular weights to determine the amount of sulfuric acid and ammonia gas needed to produce the given amount of ammonium sulfate produced.  Jiheng explains that it chose [  ] percent as the concentration of ammonium sulfate because through testing, Jiheng knows that all of its ammonium sulfate has a concentration level that ranges between [          ] percent.  According to Jiheng officials, they chose the most conservative concentration level for reporting purposes.  We followed similar calculations in determining the amount of ammonia gas recovered during the production process.   Jiheng purchases sulfuric acid (but not ammonia gas), so we deducted the amount of sulfuric acid purchased by Jiheng (as this amount is not included in Jiheng's reported by-product-offset) from the amount of sulfuric acid produced (which in turn is a calculation based on the amount of sulfuric acid needed to produce the amount of aluminum sulfate that was produced during the POR) to reach the amount of sulfuric acid recovered from the production process during the POR.  Jiheng provided the sub-ledger for ammonium sulfate to demonstrate the amount produced during one month of the POR, which we were able to tie to the

---

[51] <u>See</u> Verification Exhibit 28.

Filed By: Andrew Huston, Filed Date: 11/21/12 1:08 PM, Submission Status: Approved

total production quantity worksheet Jiheng provided over the POR. We also reviewed the sub-ledger of sulfuric acid to determine the amount of sulfuric acid purchased that goes into the production of ammonium sulfate. We were able to tie this purchase amount to Jiheng's sulfuric acid by-product calculation worksheet without exception. We also examined the daily reports and workshop records of ammonium sulfate and sulfuric acid to see the production quantity of ammonium sulfate and the consumption amount of sulfuric acid, which tied to their respective sub-ledgers. We tied the calculated amount of sulfuric acid and ammonium gas recovered to the reported FOPs.

B.    Demonstrate how the by-product is sold. If Jiheng sells its by-products in packaging, please demonstrate how this packaging is allocated, and its origin and usage during the POR.

Jiheng officials provided sales vouchers and bank statements to show that the by-products were sold during the POR.[52] Chlorine is further produced and sold as hydrochloric acid. Hydrogen gas is sold as is, and Jiheng provided a sales voucher demonstrating that a Chinese customer had purchased the hydrogen gas (no packing details were on the voucher). Jiheng notes that it had no sales of sodium hypochlorite during the POR. Sulfuric acid and ammonia gas are further processed and sold as ammonium sulfate. The Department reviewed several sales vouchers of ammonium sulfate (all were sold to domestic customers).

Regarding the packing of by-products, Jiheng explained that the only by-product sold as-is is hydrogen gas. There was no packing for hydrogen gas because customers bring their own bottles, which Jiheng fills with the hydrogen gas.

## XVIII. <u>INSPECTION OF CERTIFICATIONS</u>

Pursuant to revised certification requirements applicable to proceedings initiated on or after March 14, 2011, you must maintain for five years the original versions of all certifications of accuracy filed with submissions of factual information. (<u>See</u> amendment to 19 CFR 351.303(g) in 76 FR 7491, February 10, 2011) Please have available for inspection by the verification team the original versions of all certifications of accuracy you have filed under these new requirements.

Officials from Jiheng provided original certifications for all documents submitted to the Department over the course of this review. Department officials inspected the documents, specifically confirming that the originals of all questionnaire and supplemental questionnaire certifications had been maintained and matched the copies submitted to the Department, and found no inconsistencies.

---

[52] <u>See</u> id.

Filed By: Andrew Huston, Filed Date: 11/21/12 1:08 PM, Submission Status: Approved

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

J. Christopher Wood
Direct: +1 202.955.8595
Fax: +1 202.530.9698
CWood@gibsondunn.com

Client: 68418-00017

December 3, 2012

<u>VIA IA ACCESS</u>

The Honorable Rebecca M. Blank
Acting Secretary of Commerce
Attention: Import Administration
APO/Dockets Unit, Room 1870
U.S. Department of Commerce
14th St. and Constitution Ave., NW
Washington, DC  20230

Case No. A-570-898
Number of Pages: 67
6th AD Admin Review
POR: 6/1/2010-5/31/2011
IA/China/NME/Office 6
**Public Version**

Business Proprietary Information of:
Hebei Jiheng Chemical Co., Ltd.
bracketed on pgs. 39-41, 44 of Brief;
Juancheng Kangtai Chemical Co. Ltd.
bracketed on pgs. 39-41, 44 of Brief;

Re:    Chlorinated Isocyanurates from China – Sixth Administrative Review:
       <u>Case Brief of Petitioners Clearon Corp. and Occidental Chemical Corporation</u>

Dear Secretary Blank:

On behalf of Clearon Corp. and Occidental Chemical Corporation, Petitioners and Domestic
Producers of chlorinated isocyanurates, we hereby submit the attached Case Brief for filing
in the above-referenced administrative review.

Pursuant to the Department's regulations, 19 C.F.R. §  351.303(f) (2012), we are serving
interested parties listed on the attached APO Certificate of Service with copies of this
submission today by hand delivery.

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

Appx3146

Filed By: cwood@gibsondunn.com, Filed Date: 12/4/12 4:30 PM, Submission Status: Approved

Africa and is consistent with the Department's stated preference "to value all FOPs utilizing data from the primary surrogate country and to consider alternative sources only when a suitable value from the primary surrogate country does not exist on the record." *Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not To Revoke in Part,* 77 Fed. Reg. 53,856 (Sept. 4, 2012), Issues and Decision Memorandum at 13, *available at* http://ia.ita.doc.gov/frn/summary/PRC/2012-21734-1.pdf.

II       TE     E I   E I THE E     T E T E E T THE
    HI I I E      THE   I              TE         T
        T
            B

The Department should use domestic price data from the Philippines to value urea in the Final Results. These data, which reflect dealer prices for urea throughout the Philippines and are regularly published by the Philippine Bureau of Agricultural Statistics, satisfy all of the regular criteria that the Department uses to evaluate surrogate value data. Moreover, the data are superior to GTA Philippine import data for urea in terms of specificity and also conform to the Department's preference for domestic price data over import prices in the primary surrogate country.

With respect to urea, the Department's options are (i) GTA import data, and (ii) monthly domestic urea price data from the Bureau of Agricultural Statistic ("BAS"). *See Hebei Jiheng Jan. 9, 2012 Surr. Values* at Exh. 2; *Petitioners' Jan. 17 Surr. Value Rebuttal* at Exh. 1. Both data sets satisfy the fundamental criteria of contemporaneity, specificity, and reliability for use as surrogate values. With respect to the GTA data, the Department regularly relies on import statistics as a source of FOP values. With respect to the BAS data, the Department has recently

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

analyzed this source in a remand redetermination filed with the Court of International Trade and determined that the data satisfy the relevant criteria. In particular, the Department has found that the BAS data (i) "represent broad market-average retail prices," (ii) "are specific to the urea input," (iii) "are exclusive of value added taxes," and (iv) "are publicly available from BAS or the Fertilizer and Pesticide Authority of the Philippines." *See Final Results of Redetermination Pursuant to Court Remand, Court No. 08-00364, Slip Op. 11-142* (Mar. 19, 2012) ("*2nd Review Remand Redetermination*"), at 7-8, *available at* http://ia.ita.doc.gov/remands/11-142.pdf.

While both urea price data sets satisfy the criteria for use, the domestic BAS data is plainly superior to the GTA data as a source of surrogate values for urea. It is well-established that "{a} domestic price is preferred for the calculation of surrogate values by prior practice, policy, and logic. All else being equal, tax- and duty-free domestic data is clearly preferable over import data . . . ." *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 C.I.T. 288, 300, 366 F. Supp. 2d 1264, 1274 (Ct. Int'l. Trade 2005); *Rhodia, Inc. v. United States*, 25 C.I.T. 1278, 1287, 185 F. Supp. 2d 1343, 1352 (Ct. Int'l. Trade 2001) ("Commerce has a stated preference for the use of the domestic price over the import price, all else being equal"). The Department itself has similarly stated a preference for domestic prices over import prices where data of comparable quality are available, correctly inferring that domestic prices are more likely to represent the input prices that are actually available to a hypothetical producer of subject merchandise operating in the surrogate country. *See, e.g.*, *Ferrovanadium and Nitrided Vanadium from the Russian Federation: Notice of Final Results of Antidumping Duty Administrative Review,* 62 Fed. Reg. 65,656, 65,661 (Dec. 15, 1997) (Commerce has "articulated a preference for a surrogate country's domestic prices over import values"); *Sulfanilic Acid From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 63

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

Fed. Reg. 63,834, 63,838 (Nov. 17, 1998) ("domestic prices are preferred . . . if both domestic

and import prices are available on a tax- and duty-exclusive basis, all else being equal").

Moreover, the BAS domestic urea price data has significant advantages over the GTA

import data in terms of specificity.  The import data, under HTS category 3102.10, includes

"Urea, Whether Or Not In Aqueous Solution In Packages Weighing More Than 10 Kg."  *Hebei*

*Jiheng Jan. 9, 2012 Surr. Values* at Exh. 2.  As an initial matter, the inclusion of urea "in

aqueous solution" introduces obvious problems with respect to use of the data for valuing the

solid urea used by respondents.  It is impossible for the Department to know how much of the

Philippine import data reflects imports of urea in aqueous solution, or the concentration level of

such imports.  It stands to reason, however, that an aqueous solution of urea will have a lower

concentration (and a lower unit value) relative to the solid urea purchased by respondents.

Conversely, the BAS data is free from this ambiguity because the scope of the data is

limited to sales of solid urea in 50-kilogram bags to dealers throughout the Philippines.  The

BAS data is also self-evidently nationwide in coverage, as it is calculated based on an average of

prices from 16 different regions of the Philippines, "covering 5 dealer-respondents per province."

*Petitioners' Jan. 17 Surr. Value Rebuttal* at Exh. 1.  As a true nationwide measure of solid urea

prices in the Philippines, the BAS data has none of the ambiguities that affect the GTA import

data.

In prior reviews, respondents have argued that the BAS urea price data should not be

used either because the data reflect sales for "agricultural use" rather than in chemical

production, and because sales of urea in 50 kilogram bags does not reflect respondent's

purchasing experience.  Neither of these objections have merit.  First, the Department noted in its

March 19, 2012 remand decision that the record in that case did not support any distinction

Filed By: cwood@gibsondunn.com, Filed Date: 12/4/12 4:30 PM, Submission Status: Approved

Official Document: A-570-898 Barcode:3108824-01 REV - Admin Review 6/1/10 - 5/31/11

**PUBLIC VERSION**
Business Proprietary Information Deleted
From Brackets or Summarized

between the urea purchased for industrial and agricultural use. *2nd Review Remand Redetermination*, at 8. The record in this review similarly contains no evidence that differentiates urea used for agriculture from any other use. Second, the claim that sales of urea in 50 kilogram bags cannot be used as a source of surrogate values fails because (i) there is no record information indicating the composition or packaging of urea imported into the Philippines during the POR, (ii) there is no record information quantifying the effect, if any, of packaging on urea pricing, and (iii) the Department does not have a practice of attempting to match surrogate values to the particular form of packaging used by respondents in any event. The Department should use the BAS price data to value urea based on its superior specificity and in accordance with the general principal of preferring domestic price data over import price data where both data sets satisfy the essential criteria for use.[1]

     **B**      **T**                                   **I**

In the *Preliminary Results,* the Department based the value for chlorine on the average of purchases of chlorine from four Indian chemical producers as listed in their 2010 annual reports. *See Surrogate Value Memo* at 12. The Department indicated that Indian data were used as a source of surrogate values because chlorine is "not frequently traded on an international basis." *Surrogate Value Memo* at 12. While this may have been the case in past segments of this proceeding, the record for the instant administrative review is different and warrants reconsideration by the Department. For the Final Results, the Department should rely on GTA import data for the Philippines under HTS subheading 2801.10 to calculate a surrogate value for chlorine.

---

[1] A chart summarizing the BAS urea price data is included as **2**.

Filed By: cwood@gibsondunn.com, Filed Date: 12/4/12 4:30 PM, Submission Status: Approved

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

The Department should use these annual reports to value hydrogen gas regardless of which country is selected as the primary surrogate country because the record does not contain reliable data from either the Philippines or South Africa for use in valuing hydrogen gas.

**T                                    I**

Section II.B of this Case Brief addresses the reasons why chlorine gas should be valued using GTA import data from the Philippines. In contrast to past circumstances, the record in this review includes evidence of substantial international trade in chlorine gas and there is no reason not to rely on the import data. Because South African imports of chlorine gas during the POR are limited to very small quantities (approximately 4 metric tons), the Department should rely on the Philippine import data for the Final Results.

**E      I                                I**

**B                I**

In the Preliminary Results, the Department calculated financial ratios based on data from the 2010-11 annual report of Kanoria Chemicals & Industries Ltd. ("Kanoria"), an Indian producer of comparable merchandise. If the Department continues to use Indian annual reports to calculate financial ratios in the Final Results, the Department should also use the annual report of Aditya Birla Chemicals (India) Ltd. ("Aditya") as a source of surrogate values.[5] Although the Department has declined to use Aditya's financial statements in the last two administrative reviews, the circumstances in this review are different and warrant reconsideration of those prior findings. First, there is no evidence to link any subsidies that Aditya may have received in the

---

[5] A spreadsheet summarizing financial ratios calculated from Aditya's annual report is included as **4**.

34

Appx3191

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

past to a specific program that the Department has found to be countervailable.  Second, it is clear from Aditya's annual report that the company did not receive countervailable subsidies during the POR in any case.

The Department's practice with respect to financial ratios is to avoid the use of financial statements that indicate the receipt of countervailable subsidies by the company during the POR. Specifically, the Department evaluates "whether the evidence indicates that the company received a countervailable subsidy during the relevant period from a program previously investigated by the Department."  *Stilbenic Optical Brightening Agents from China,* Issues and Decision Memorandum at 11; *see also Frozen Warmwater Shrimp from China 2010-2011 Review*, Issues and Decision Memorandum at 16 ("While the Department does generally disregard financial statements containing evidence of countervailable subsidies, the Department cannot determine that either Apex or Gemini received a countervailable subsidy in the relevant period"); *Certain Steel Nails From the People's Republic of China: Final  Results and Final Partial Rescission of the Second Antidumping Duty  Administrative Review*, 77 Fed. Reg. 12,556 (Mar. 1, 2012), Issues and Decision Memorandum at 12, *available at* http://ia.ita.doc.gov/frn/summary/prc/2012-4877-1.pdf  ("{B}ased on our examination of the financial statements, neither company received countervailable subsidies during the POR from programs previously investigated by the Department.").

As these statements indicate, an otherwise usable financial statement is excluded as a source of surrogate financial ratios only if two conditions are satisfied:  (i) the company must have received a subsidy that is identifiable with a specific program previously investigated by the Department, and (ii) there must be evidence that the company benefited from the subsidy during the POR.  Because neither condition is satisfied with respect to the Aditya financial statement,

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

the Department should use the Aditya annual report for the Final Results if it continues to rely on Indian financial statements.

First, the Aditya annual report does not identify receipt of any subsidies with sufficient specificity for the Department to conclude that the reference is to a specific program that has been found countervailable in a past proceeding. The "Significant Accounting Policies" section of the Aditya annual report describes the accounting treatment of "Government Grants/Capital Subsidy," but does not give any information regarding the terms of the program or even what government entity may offer the program. *Petitioners' Jan. 9, 2012 Surr. Values* at Exhibit 43 (page 37). Under the Department's precedent, this does not constitute the "specific information" necessary to establish a reasonable suspicion of subsidization. *See, e.g.*, *Certain Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 14,514 (Mar. 31, 2009), Issues and Decision Memorandum at 30, *available at* http://ia.ita.doc.gov/frn/summary/prc/E9-7093-1.pdf. The CIT has similarly upheld the Department's refusal to reject financial statements based on mere mentions of subsidies in financial statements. *Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1380 (Ct. Int'l Trade 2009); *see also Certain Steel Grating from the People's Republic of China: Initiation of Antidumping Duty Investigation*, 74 Fed. Reg. 30,273, 30,276 (June 25, 2009) ("line item for state subsidy" was "insufficient evidence" to exclude a financial statement).

In particular, there is no reason to believe that the reference to "Capital Subsidy" in the Aditya annual report has anything to do with the program that the Department countervailed in *PET Film from India*, in which the Department applied facts available to determine that a "capital subsidy" received by an Indian respondent was countervailable. *PET Film from India*,

36

Appx3193

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

Decision Memorandum (Feb. 13, 2006). The only information that the Department was able to learn about the "capital subsidy" in *PET Film from India* was that a single company received a single grant from the Indian government on one occasion in 1989. *Notice of Preliminary Results and Rescission in Part of Countervailing Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip From India*, 69 Fed. Reg. 18,542, 18,547 (Apr. 8, 2004). Given the generic nature of the term "capital subsidy" and the lack of any specific knowledge about either the original grant in *PET Film* or the reference in the Aditya annual report, it would be sheer speculation to claim that the "Capital Subsidy" reference in the Aditya report has any relationship to the program that was countervailed in *PET Film from India*.[6]

Second, even if the Department were to wrongly conclude that the "Capital Subsidy" reference in the Aditya report was somehow related to the program at issue in *PET Film from India*, the Aditya income statement is clear that no countervailable subsidies were received by the company during the POR. Aditya's income statement includes a line titled "Less: Transferred to State Capital Subsidy," which shows that no transfers were made in the two most recent fiscal years ending March 31, 2011 and March 31, 2010. *Petitioners' Jan. 9, 2012 Surr. Values* at Exhibit 43 (page 27). Schedule 2 to the annual report does show an increase in Aditya's Capital Reserve account due to "Subsidy received during the year," *id*. at 28, but this does not reflect the receipt of any subsidy that the Department has previously found to be

---

[6] The Department's decision to reject the use of the Aditya financial statement in the 4th administrative review did not address the issue of whether there was any basis to determine that the "Capital Subsidy" reference in the Aditya annual report was the same as the program from *PET Film from India*. The Court of International Trade held that this argument was not exhausted before the Department in the 4th review, such that this review is the first occasion for the Department to consider this issue on the merits. *See Clearon Corp. v. United States*, 800 F. Supp. 2d 1355 (Ct. Int'l Trade 2011).

Filed By: cwood@gibsondunn.com, Filed Date: 12/4/12 4:30 PM, Submission Status: Approved

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

countervailable.  The Department has previously found that a "mere statement in a financial statement that a subsidy was received, and for which there is no additional information as to the specific nature of the subsidy," is an insufficient basis for rejecting a financial statement.  *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of the Third New Shipper Reviews*, 74 Fed. Reg. 29,473 (June 22, 2009), Issues and Decision Memorandum at 4-5, *available at* http://ia.ita.doc.gov/frn/summary/vietnam/E9-14607-1.pdf.  In addition, the Accounting Policies to the Aditya financial statement make clear that there is only one circumstance in which receipt of a subsidy is credited only to the Capital Reserve account and has no impact on Aditya's income statement.  This is the circumstance in which "Capital subsidy/Government grants relating to specific non depreciable fixed assets *and in the nature of Promoter's Contribution* are credited to capital reserve account."  *Petitioners' Jan. 9, 2012 Surr. Values* at Exhibit 43 (page 37) (emphasis added).  Accordingly, any "subsidy" received by Aditya during the POR was in the nature of a contribution from its promoters (rather than the Government of India) and in any case had no impact on the company's income statement.

**III    B            T I    E**

                    **T**

                                    **B**

In the Preliminary Results, the Department credited both respondents for pure ammonia gas and sulfuric acid byproducts from the production of cyanuric acid, notwithstanding the fact that the only byproduct actually sold by the respondents was ammonium sulfate.  The values assigned to the byproducts under this methodology were patently unreasonable in that the byproducts were assigned higher values than the inputs used to produce the byproduct.  Moreover, the byproduct values assigned in the Preliminary Results imply that respondents are

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

acting irrationally – and destroying economic value – by processing ammonia gas and sulfuric acid into ammonium sulfate for sale.  If the Department continues to value ammonia gas and sulfuric acid as byproducts of cyanuric acid production, it should adjust its valuation methodology to reflect the value of the ammonium sulfate that is actually sold by respondents.

[                                                                    ] cyanuric acid, resulting in the claimed ammonia gas and sulfuric acid byproducts.  *See Hebei Jiheng Nov. 28, 2011 Section D. Resp.* at Exh. D-5.1; *Kangtai May 21, 2012 Second Supp. Qu. Resp.* at Exh. SQ2-1. The input material for cyanuric acid production is solid urea, which is heated in a kiln (releasing ammonia gas) and subsequently treated with sulfuric acid to produce refined cyanuric acid.  The waste sulfuric acid from the process is combined with ammonia gas to produce ammonium sulfate for sale.

The Department has previously recognized that "it may disregard a surrogate value when it is clear that the selection of that surrogate value would yield an unreasonable result." *Multilayered Wood Flooring from China*, Issues and Decision Memorandum at 89.  In several recent cases, the Department has found that it is unreasonable to assign a surrogate value to a byproduct that exceeds the surrogate value for the input product or products used to produce the byproduct.  *See id.* (rejecting value for wood dust that was higher than log, veneer, and core inputs); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Final Results of Antidumping  Duty Administrative Review*, 74 Fed. Reg. 3,987 (Jan. 22, 2009), Issues and Decision Memorandum at Comment 5, *available at* http://ia.ita.doc.gov/frn/summary/prc/E9-1219-1.pdf (rejecting steel scrap value higher than wire rod input); *Certain Steel Nails from the People's Republic of China: Final  Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*,

Filed By: cwood@gibsondunn.com, Filed Date: 12/4/12 4:30 PM, Submission Status: Approved

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

73 Fed. Reg. 33,977 (June 16, 2008), Issues and Decision Memorandum at Comment 12,

*available at* http://ia.ita.doc.gov/frn/summary/prc/E8-13474-1.pdf (rejecting scrap value higher

than wire rod input value).

The Department's reasoning in the three cases cited above is equally valid here. The

respondents' claimed ammonia gas byproduct is produced solely from the decomposition of

urea. The surrogate value assigned to urea in the Preliminary Results was 2.45 Rand/kg, which

is lower than the 2.70 Rand/kg value the Department assigned to the ammonia gas byproduct.

*Surrogate Values Memo*, at Appendix 1. With respect to sulfuric acid, the Department

[

                                                        ]. *Id.* As in *Multilayered*

*Wood Flooring* and the other cases cited above, this outcome is unreasonable because it amounts

to a claim that a byproduct (which is by definition a low value product that unavoidably results

from a production process) has a higher value than the inputs used to create it. The Department

should follow its prior precedents and reject the use of surrogate values for anhydrous gas and

[                    ] sulfuric acid to value respondents' byproducts in the Final Results.

Another indicator of the unreasonableness of the approach used in the Preliminary

Results is the comparison between (i) the byproducts as valued by the Department and (ii) the

value of the ammonium sulfate byproduct actually sold by respondents. The record includes

surrogate value data for ammonia gas, sulfuric acid, and ammonium sulfate in the Philippines.

From Philippine import data, the value of ammonia gas is 17.36 PhP/kg, the value of sulfuric

acid is 13.71 PhP/kg, and the value of ammonium sulfate is 11.59 PhP/kg. *Hebei Jiheng Jan. 9,*

*2012 Surr. Values* at Tabs 1-2; *Kangtai Jan. 9, 2012 Surr. Values* at Exhibits SV-12, SV-13.

Applying the surrogate values from the Preliminary Results leads to the counterintuitive

40

Appx3197

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

conclusion that respondents are combining two high-value byproducts (anhydrous ammonia and

[                    ] sulfuric acid) in order to produce a significantly *lower* value byproduct in

ammonium sulfate.  In reality, of course, no company would combine pure anhydrous ammonia

and [                  ] sulfuric acid to make a lower-value ammonium sulfate product.  That

the methodology employed in the Preliminary Results leads to this unreasonable conclusion

strongly indicates that the Department should adopt a different approach for the Final Results.

To the extent that the Department continues to value ammonia gas and sulfuric acid as

byproducts in the Final Results, the Department should value these byproducts using a surrogate

value derived from ammonium sulfate, the product that is actually sold by respondents.  The

value of ammonium sulfate reflects the actual economic value of the byproducts generated

through the respondents' cyanuric acid production process and is accordingly an appropriate

source to value the byproducts that are combined to produce ammonium sulfate.  The

Department could easily apply this methodology by apportioning the per metric ton value of

ammonium sulfate between the ammonia gas and sulfuric acid components by molecular weight,

the same methodology that the Department has used to calculate the production quantities of

these byproducts.  This would result in a fairer valuation of the ammonia gas and sulfuric acid

byproducts, and avoid the "unreasonable results" noted above with respect to the value of the

byproducts in comparison to their inputs.

**B    T            H            B
        E**

Hebei Jiheng's calculation of its ammonia gas byproduct includes an "absorption rate"

component, which acts to increase the amount of the byproduct claim.  The basis for this

"absorption rate" adjustment is not defined or explained by Hebei Jiheng anywhere in the record,

PUBLIC VERSION
Business Proprietary Information Deleted
From Brackets or Summarized

and the adjustment results in an overstatement of the claimed byproduct.  For the Final Results, the Department should deny this adjustment and require Hebei Jiheng to recalculate the amount of its claimed ammonia gas byproduct.

The Department's Verification Report notes that Hebei Jiheng is not able to measure the amount of ammonia gas that is piped from its cyanuric acid warehouse to the reactor where ammonium sulfate is produced.  *Nov. 20 2012 Verification Report* at 12.  Hebei Jiheng's claim for an ammonia gas byproduct is therefore based on an indirect calculation of the ammonia gas content of ammonium sulfate that is produced or sold during the POR.  Hebei Jiheng's calculation of this ammonia gas byproduct has several steps.  First, Hebei Jiheng multiplies its total production (or sales) quantity of ammonium sulfate by the molecular weight percentage of ammonia in the ammonium sulfate, which is 25.76 percent.  *See, e.g.*, *Hebei Jiheng Nov. 28, 2011 Section D Resp.* at Exh. D-12.9.  This amount reflects the maximum possible quantity of ammonia content in the ammonium sulfate;  that is, chemistry dictates that it is not possible for ammonium sulfate to have an ammonia content greater than 25.76 percent.

After that calculation, however, the next step in Hebei Jiheng's calculation is to divide the amount of ammonia gas by 0.95, which Hebei Jiheng describes as an "absorption rate."  *Id*. As noted, Hebei Jiheng nowhere explains what this absorption rate represents or why it is an appropriate adjustment.  The effect of the adjustment, however, is to *increase* the claimed amount of ammonia gas in ammonium sulfate by more than 5 percent.  Through including this step in its calculation, Hebei Jiheng is asserting that the ammonium sulfate that it produced or sold contained more than 25.76 percent ammonia, which is a chemical impossibility.  To the extent that the absorption rate is claimed to represent something other than the ammonia in ammonium sulfate (such as ammonia gas that is not reacted), the adjustment would still be

*Law Offices of Peggy A. Clarke*
1325 G Street, NW
Suite 500
Washington, D.C.  20005
Phone:  (202) 552-7407
Fax:  (202) 449-7701
E-mail:  peggy@peggyclarkelaw.com

December 10, 2012

Case Number:  A-570-898
Total Pages: 33
6th Administrative Review
06/01/2010 – 05/31/2011

**PUBLIC DOCUMENT**

**BY ELECTRONIC FILING**

The Honorable Rebecca Blank
Acting Secretary of Commerce
U.S. Department of Commerce
Central Records, Room 1870
14th Street and Constitution Avenue, NW
Washington, D.C.  20230

Re:     *Chlorinated Isocyanurates from China (Sixth Administrative Review) – Hebei Jiheng Chemical Company, Ltd. Rebuttal Brief*

Dear Acting Secretary Blank:

On behalf of Hebei Jiheng Chemical Company, Ltd. ("Jiheng Chemical"), a respondent in the above-captioned review, we are submitting the rebuttal brief in the above-captioned proceeding.   On November 23, 2012, the U.S. Department of Commerce's ("Department") established December 10, 2012 as the due date for all rebuttal briefs.

Appx3213

Chlorinated Isocyanurates from the People's Republic of China

Sixth Administrative Review (06/01/2010 – 05/31/2011)

A-570-898

Rebuttal Brief of Hebei Jiheng Chemical Company, Ltd.

## I.     Introduction

This rebuttal brief is filed on behalf of Hebei Jiheng Chemical Company, Ltd. ("Jiheng Chemical") in response to Clearon Corp. and Occidental Chemical Corporation's ("Petitioners") case brief.[1]  While Jiheng Chemical finds itself in agreement with certain of Petitioners' arguments, there are numerous others that are incorrect.  This rebuttal brief mainly addresses the most significant issues where Jiheng Chemical disagrees with Petitioners.

## II.     Petitioners' Arguments if the Philippines is the Primary Surrogate Country

### A.  The Bureau of Agricultural Statistics' Urea Prices Provided by Petitioners are Not Domestic Prices.

In their case brief, Petitioners argue that the Department should use domestic price data from the Philippines to value urea in the final results.  Petitioners' Case Brief at 13 – 16.  The problem with Petitioners' underlying premise is that the urea at issue is all imported, not domestic.  Jiheng Chemical provided the print-out of a page from the website of the Chemical Industries Association of the Philippines ("SPIK") discussing the agrichemicals industry.[2]  In that discussion, SPIK specifically states that all urea consumed in the Philippines is imported.  Therefore, there can be no domestic pricing for urea.

---

[1]     Clearon Corp. and Occidental Chemical Corporation, Case Brief (Dec. 5, 2012) ("Petitioners' Case Brief").
[2]     Jiheng Chemical, Resubmission of Surrogate Value Information for Factors of Production (Sept. 5, 2012), at Attachment 2 ("Jiheng Chemical Surrogate Values Submission").

1

Filed By: peggy@peggyclarkelaw.com, Filed Date: 12/10/12 2:17 PM, Submission Status: Approved

While the Department has some preference for domestic prices, all other things being equal, when determining surrogate values, that preference relates solely to the price of *domestic product*, not the retail (or even wholesale) prices of *imported* product.[3]  For example, in *Sulfanilic Acid from the People's Republic of China*, the Department in older reviews used import prices for aniline over domestic prices because of distortions in the domestic market caused by high import tariffs, among other reasons.  In reaching this determination, the Department noted that it:  "had two main options in selecting a surrogate value for aniline:  the Indian domestic price paid by the Indian producers of sulfanilic acid for the domestic market and the duty-free, Indian import price for aniline paid by Indian producers of sulfanilic acid for the export market."[4]  In a subsequent review, the Department reversed itself, stating among other reasons that "it is reasonable to conclude that domestically-produced aniline is being used in the manufacture and export of sulfanilic acid due to the consistent downward trend in the price of domestic aniline over several years to a level comparable to the published export price."[5]  Thus, the Department uses the term "domestic price" to refer to the price of domestically-produced product.

Similarly, in *Hebei Metals*, the court stated "the preference for domestic data is most appropriate where the circumstances indicate that a producer in a hypothetical market would be

---

[3]     Petitioners acknowledge the prices it provided are average prices by dealers in the Philippines.  According to a discussion of the fertilizer industry in the Philippines, Jiheng Chemical Surrogate Values Submission at Attachment 2 (page 4 of 6), "The dealers constitute the last step of the marketing channel and are the ones in direct contact with the farmers."  In other words, not only do these prices represent prices for imported product, they represent prices nearly at the end of the fertilizer distribution chain and in no manner represent prices that an industrial user would incur.

[4]     *Sulfanilic Acid From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*, 63 Fed. Reg. 63,834 (Department Commerce Nov. 17, 1998).

[5]     *Sulfanilic Acid from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 13,366 (Department Commerce March 13, 2000), *Issues and Decision Memorandum*, Cmt 2.

2

Appx3228

unlikely to use an imported factor in the production process."[6]  This discussion reinforces that

domestic prices, and the preference for domestic prices, refers to the price of domestically-

produced goods.

That is simply not the case with the prices Petitioners try to fit into this preference.  As

SPIK states, there is no Philippine production of urea.   If no domestic product is available there

can be no domestic price.

In such circumstances, the Department must use the average unit value of the urea

imports to value the urea factor of production in this review.

### B.  MERALCO's Electricity Prices are the Best Available Information on the Record with Which to Value Electricity.

Petitioners argue that the electricity rate from *Doing Business in Camarines Sur*

constitutes the best available information with which to value electricity in the Philippines in this

review.  Petitioners' Case Brief at 18 – 21.  However, this claim cannot withstand scrutiny.

MERALCO's electricity rates for heavy industrial users (GP 115 Kv) are the best available

information on the record.

Petitioners argue that the Department should use the Camarines Sur electricity rate

because it has used that rate in several previous reviews of antidumping duty orders.  In those

reviews, however, the Department never considered the MERALCO price data currently before

it.[7]  When the MERALCO data and Camarines Sur data are compared under the Department's

factors, the superiority of MERALCO's data is evident.

---

[6]      *Hebei Metals & Minerals Import & Export Corporation v. United States*, 29 C.I.T. 288, 300, 366 F. Supp. 2d 1264, 1274 (2005).

[7]      The Department has considered blended rates from MERALCO and rejected them because they included both industrial and household users and/or were based on rates electricity providers were charged rather than prices

3

Appx3229

LAW OFFICES OF

deKIEFFER & HORGAN, PLLC

729 FIFTEENTH STREET, N.W.

WASHINGTON, D.C. 20005

GREGORY S. MENEGAZ
TEL 202-783-6900

AFFILIATED OFFICE:
SAARBRÜCKEN, GERMANY

GMENEGAZ@DHLAW.COM
DHLAW.COM

December 10, 2012

ELECTRONIC FILING

Honorable Dr. Rebecca M. Blank
Acting Secretary
Room 1870
U.S. Dept. of Commerce
Washington, D.C. 20230

A-570-898
Pages:
AR: 6/1/2010-05/31/2011
AD/CVD Operations
Office 9

**Public Document**

RE:  Certain Chlorinated Isocyanurates from the People's Republic of China
     *Rebuttal Brief by Juancheng Kangtai*

Dear Acting Secretary Blank:

On behalf of Juancheng Kangtai Chemical Co., Ltd. ("Kangtai"), an exporter of certain

chlorinated isocyanurates from the People's Republic of China, we hereby provide their rebuttal

brief in the above captioned review.

Please let us know if you require any additional information.

Sincerely,

Gregory S. Menegaz
John J. Kenkel
J. Kevin Horgan

Philippines, and overall are significantly higher than Indian domestic prices.  Undoubtedly,

Philippine importers are bearing the fully loaded packing container costs that a local purchaser

does not bear in a domestic transaction.  For all these reasons, the only representative chlorine

market on the record is India. The Indian domestic chlorine prices remain the best source of

information to value Kangtai's chlorine inputs.

### C.    THE BEST AVAILABLE INFORMATION FOR THE SURROGATE VALUE OF UREA REMAINS AN IMPORT VALUE

The Department preliminarily valued urea based on South African import statistics at

2.73 Rand per kg.  Prelim. SV Memo. at 9.  This source meets all the standard critieria for

selection, *e.g.,* it is country-wide, tax-exclusive, contemporaneous, and specific.  Import statistics

have been consistently used to value this input, including upon and after court scrutiny and

remand.  *See Clearon Corp. v. United States*, Ct. No. 08-00364, Remand Redetermination

(March 19, 2012) at 4-17, pursuant to remand in Slip Op. 11-142 (CIT Nov. 18, 2011).

Petitioners argue, at pages 13-16 of its case brief, that, should the Department select the

Philippines as the primary surrogate country, the Department should value urea based on a

publication of the Bureau of Agricultural Statistics ("BAS").  Petitioners have held this out to be

a domestic source of urea in the form of urea fertilizer in 50 lb. bags.  Petitioners argue that such

domestic source should be preferred over imports.  Petitioners' suggestion is highly problematic

for the simple reason that record evidence demonstrates that the urea at issue is *imported*.  *See*

Website Materials of SPIK, provided at Jiheng Surr. Value Submission (Sept. 12, 2012) at

Attach. 2.  SPIK, the Chemical Industries Association of the Philippines, indicates

unambiguously that: "Urea, potash, and half of the ammonium sulfate are imported while all the

phosphatic graes (NP/NPK) and the rest of the ammonium sulfate are produced locally." *Id.* at 1.

25

Appx3278

It does not get clearer that that: there is no domestic production of urea in the Philippines. As such, the price proffered by Petitioners would necessarily include import duties and various taxes, retail mark ups, and even repackaging costs that are not borne by Kangtai when it purchases this input. Indeed, the Department has found that the BAS figures are "retail prices in the Philippines" for urea fertilizer. *Clearon Corp. v. United States*, Ct. No. 08-00364, Remand Redetermination (March 19, 2012) at 7, pursuant to remand in Slip Op. 11-142 (CIT Nov. 18, 2011). Meanwhile, a Philippine industry article confirms that imports go through several levels of trade: "The marketing of fertilizers passes through three main levels, namely: (1) importers/manufacturers; (2) distributors; (3) dealers." Jiheng Surr. Value Submission (Sept. 12, 2012) at Attach. 2, "The Philippine Fertilizer Industry" at 4. Kangtai, in contrast, purchases directly and locally without paying the mark-ups at all these different levels. *See* Kangtai Sect. D Response at Exh. 2 (Nov. 30, 2011) (reporting NME purchase of this input). It would be extremely unreasonable to rely on Petitioners' source in the circumstances. As in past segments, the import value remains the most appropriate match. The Department has not been presented with new facts sufficient to disturb its practice in proceedings under this segment of valuing urea from import values.

### D. THE DEPARTMENT SHOULD CONTINUE TO VALUE LABOR FROM THE INDIA ILO CH. 6A FOR THE FINAL RESULTS OF THIS REVIEW.

In their case brief, Petitioners argue that the Department should use average monthly earnings for manufacturing employees in South Africa to value Kangtai's labor costs. *See* Pet. Case Br. at 29-33 *citing to* Pet's SV Submission (Sept. 5, 2012) at Exh. 4, *in particular* pp. 17 and 31 of that publication. Petitioners' arguments are without merit, and the Department should continue to value Kangtai's labor costs using the ILO Ch. 6A statistics from India for the final

Appx3279

materials and one set of more contemporaneous materials. Since the later, more contemporaneous materials are just as specific but more contemporaneous by far to the POR, the Department should rely solely on the more recent data if it selects a labor rate from a Philippine source. That labor rate is $3.30 per hour. *See* Kangtai SV Submission (Jan. 9, 2012) at Exh. SV-14.

Kangtai has argued elsewhere in this section that the Department must, above all, take the labor rate from the country from which it took the surrogate financial ratios, as its new practice demands making deductions from those financial ratios to account for certain administrative labor costs captured in ILO category 6A. Thus, if the Department continues to rely on Kanoria's statement for the Final Results, it should select the labor rate from the ILO 6A data for India.

### E. THE DEPARTMENT SHOULD NOT RELY ON THE FINANCIAL STATEMENT OF ADITYA BIRLA FOR THE FINAL RESULTS.

Petitioners argue, at pages 34-38 of their case brief, that the Department should average the financial ratios of Aditya Birla with those of Kanoria if it continues to rely on Indian financial statements for the Final Results. Petitioners' first argument is that any subsidy received must be reflected in the POR financial statements or otherwise is received in the "relevant period." Unfortunately, this is not the full treatment of Department practice with respect to disqualifying companies for receipt of subsidies. Indeed, respondents challenged the Department on this very issue in court and lost. The Court of International Trade held that any evidence of any past receipt of countervailable subsidies is sufficient to justify excluding the surrogate financial statement from consideration. *See Jiaxing Brother Industries et al. v. United States*, 751 F. Supp. 2d 1345, 1350 ("Defendant, for its part, acknowledges that Deepak received the DEPB subsidy [**8] before the POI, but argues that Commerce's rejection of Deepak's financial

32

Appx3285

statements was nonetheless proper because what matters is whether a company received or may have received a countervailable subsidy at any point."). The *Jiaxing Brother* Court further discussed the legislative history, and upheld the Department's decision to exclude the statement of Deepak Fasteners due to the past receipt of a countervailable subsidy even though the amount listed for the relevant period corresponding to the POR was listed as "0" on its financial statement). *Id.* at 1350-53. As such, Petitioners' argument that the receipt of the subsidy may have been in a past period is unavailing. Aditya Birla benefited from subsidies and thus is forever less representative of industry than remaining financial statements of record and for that reason should not be averaged into the surrogate financial ratios.

Second, Petitioners argue that there is no specific link between the alleged subsidy and a subsidy countervailed by the Department. On this point, Petitioners have not prevailed in the previous segments of this proceeding, and there is no reason for the Department to revisit its findings now. The legislative history merely requires "reason to believe or suspect" a countervailable subsidy was received. *See Jiaxing Brother* at 1352, *citing* Omnibus Trade and Competitiveness Act of 1988, H.R. Rep. No. 100 576, at 59, (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623, 24. Moreover, the legislative history indicates that Congress did not intend to hobble the Department by limiting its exclusion of data to situations where the exact subsidy program had been subject to a full countervailing duty investigation. Rather, mere "reason to believe or suspect" is enough to force the conclusion that the data is not representative of the industry at issue. In short, there is no cause for the Department to disturb long-established precedent on this issue. Aditya Birla should not be considered for the surrogate financial ratios in this segment.

Petitioners suggest that the Department must compare the capital subsidy evident on

33

Aditya Birla's financial statement to other cases. Kangtai suggests this is not necessary. The Department has excluded Aditya Birla due to this same subsidy in the 4th and 5th administrative reviews in proceedings involving this issue. The Department continues to have "reason to believe or suspect" that "capital subsidy" is countervailable, and that Congress did not intend or demand that the Department conduct sub-investigations of such issues in every case in making its determinations that data it suspects may be distorted by subsidies should be excluded from consideration. Similarly, it is of no moment that the subsidy/grant did not hit the income statement. Pet. Br. at 38. The point is that the Department has reason to suspect the company benefited from a countervailable subsidy. The inquiry ends there. This harkens back to the very argument lost by Jiaxing Brother, which argued that a "0" could not have impacted the period of review financial ratios but ultimately lost because the Department has held that the very fact of receiving any subsidy in the past makes the financial statement unrepresentative. Accordingly, the Department should continue its practice of excluding the financial statements of Aditya Birla from its surrogate financial ratio calculations for the Final Results.

### F.    THE BEST AVAILABLE INFORMATION FOR THE SURROGATE VALUE OF STEAM IS THE DOMESTIC COST IN INDIA.

Petitioners argue that the Department should continue to value steam based on the South African import statistics, even if the Department selects the Philippines as the primary surrogate country, and reject the Indian figure on the record. Kangtai disagrees. Kangtai submits that the price of steam reported in the financial statement of Hindalco Industries Limited in India that the Department relied upon in the Multilayered Wood Flooring from China investigation, Petitioner Case Brief at 28, represents the best available information on the record. First, the steam is a truly domestic price, which matches Kangtai's production experience. International shipping in

34



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-898
POR: 06/01/10-5/31/11
IA/O6: EH
**Public Document**

January 14, 2013

MEMORANDUM TO:      Paul Piquado
                    Assistant Secretary
                     for Import Administration

FROM:               Christian Marsh
                    Deputy Assistant Secretary
                     for Antidumping and Countervailing Duty Operations

SUBJECT:            Issues and Decision Memorandum for the Final Results of the
                    2010-2011 Administrative Review of Chlorinated Isocyanurates
                    from the People's Republic of China

## SUMMARY:

We have analyzed the case and rebuttal briefs of interested parties in the antidumping duty administrative review of chlorinated isocyanurates (chlorinated isos) from the People's Republic of China (PRC). The period of review (POR) is June 1, 2010, through May 31, 2011. As a result of our analysis, we have made changes in the margin calculation. We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum. Below is the complete list of the issues for which we received comments and rebuttal comments by the parties.

### Selection of Primary Surrogate Country
Comment 1:   Whether Sodium Hypochlorite is Comparable Merchandise
Comment 2:   Surrogate Country Selection
Comment 3:   Surrogate Values if the Philippines is Not Selected as the Surrogate Country

### Surrogate Value Selection Comments
Comment 4:   Sodium Chloride
Comment 5:   Urea
Comment 6:   Water
Comment 7:   Chlorine
Comment 8:   Hydrogen
Comment 9:   Steam Coal
Comment 10: Electricity
Comment 11: Steam
Comment 12: Labor
Comment 13: Financial Ratios
Comment 14: Whether the Ammonia Gas and Sulfuric Acid Surrogate Values are Reasonable



Appx3291

**Jiheng-Specific Comments**
Comment 15:  Whether Jiheng's Ammonia Gas "Absorption Rate" Adjustment is Warranted
Comment 16:  Whether Jiheng's Normal Value was Correctly Adjusted for Transportation Costs

**Kangtai-Specific Comments**
Comment 17:  Whether Kangtai's Ammonia Gas By-product Was Calculated Using the Correct
                    Concentration Level
Comment 18:  Whether Kangtai's Sodium Hydroxide Surrogate Value Should be
                     Adjusted

## BACKGROUND:

On July 16, 2012, the Department of Commerce (Department) published its preliminary results of review of the antidumping duty order on chlorinated isos from the PRC.[1]  The Department conducted verification of Hebei Jiheng Chemical Company Ltd. (Jiheng) from October 15 through 19, 2012, and released the verification report on November 21, 2012.[2]  On December 3, 2012, the Department received case briefs from Jiheng, Juancheng Kangtai Chemical Co., Ltd. (Kangtai), Zhucheng Taisheng Chemical Co., Ltd. (Zhucheng), and Clearon Corporation and Occidental Chemical Corporation (Petitioners).  On December 10, 2012, the Department received rebuttal briefs from Jiheng, Kangtai, and Petitioners.  On December 21, 2012, the Department conducted a public hearing with interested parties.

## SCOPE OF THE ORDER:

The products covered by the order are chlorinated isocyanurates (chlorinated isos), which are derivatives of cyanuric acid, described as chlorinated s-triazine triones.  There are three primary chemical compositions of chlorinated isos:  (1) trichloroisocyanuric acid ($Cl_3(NCO)_3$), (2) sodium dichloroisocyanurate (dihydrate) ($NaCl_2(NCO)_3(2H_2O)$), and (3) sodium dichloroisocyanurate (anhydrous) ($NaCl_2(NCO)_3$).  Chlorinated isos are available in powder, granular, and tableted forms.  The order covers all chlorinated isos.

Chlorinated isos are currently classifiable under subheadings 2933.69.6015, 2933.69.6021, 2933.69.6050, 3808.40.50, 3808.50.40 and 3808.94.5000 of the Harmonized Tariff Schedule of the United States (HTSUS).  The tariff classification 2933.69.6015 covers sodium dichloroisocyanurates (anhydrous and dihydrate forms) and trichloroisocyanuric acid.  The tariff classifications 2933.69.6021 and 2933.69.6050 represent basket categories that include chlorinated isos and other compounds including an unfused triazine ring.  Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the order is dispositive.

---

[1] See Chlorinated Isocyanurates From the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review, 77 FR 41746 (July 16, 2012) (Preliminary Results).
[2] See Memorandum titled "Verification of the Sales and Factors Response of Hebei Jiheng Chemical Company Ltd. in the Antidumping Review of Chlorinated Isocyanurates from the People's Republic of China," November 20, 2012 (Verification Report).

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

**DISCUSSION OF THE ISSUES:**

**Comment 1:**  Whether Sodium Hypochlorite is Comparable Merchandise

Petitioners' Arguments
- Sodium hypochlorite should be considered comparable merchandise because it has similar physical characteristics and has similar end-uses as chlorinated isos.  It is a bleaching agent that results from the reaction of chlorine and caustic soda.  Sodium hypochlorite has an available chlorine percentage that is consistent with other products previously determined to be comparable merchandise (i.e., stable bleaching powder).  Furthermore, sodium hypochlorite has uses similar to subject merchandise as a disinfectant.

Jiheng's Arguments
- Sodium hypochlorite, like calcium hypochlorite and stable bleaching powder, is a product comparable to chlorinated isos.
- Sodium hypochlorite is derived from two of the three main inputs used in the production of chlorinated isos, and uses salt as a significant input, similar to chlorinated isos.  Additionally, its chlorine content is at the same level as the other comparable products.
- Sodium hypochlorite involves a similar level of complexity in the production process as chlorinated isos.
- Similar to chlorinated isos, sodium hypochlorite is used as a bleaching agent or disinfectant.

Zhucheng's Arguments
- By not expanding the definition of comparable merchandise, i.e., considering sodium hypochlorite to be comparable merchandise, the Department faced a number of difficulties when using the South African data relied upon in the Preliminary Results.
- Since sodium hypochlorite has similar physical characteristics, end uses, and production process as subject merchandise, the Department should treat it as a comparable product.

**Department's Position:**  The Department finds that sodium hypochlorite is comparable to the subject merchandise because it has similar physical characteristics and end uses, and a similar production process, as the subject merchandise.  These criteria are the same criteria the Department considered in previously determining that calcium hypochlorite and stable bleaching powder are products comparable to subject merchandise.[3]

Regarding physical characteristics, the subject merchandise contains three major intermediate inputs:  cyanuric acid, caustic soda, and chlorine gas.  According to Kirk-Othmer's Encyclopedia of Chemical Technology (Kirk-Othmer Encyclopedia), sodium hypochlorite is prepared using

---

[3] See Notice of Final Determination of Sales at Less Than Fair Value:  Chlorinated Isocyanurates From the People's Republic of China, 70 FR 24502 (May 10, 2005) (Isos Final Determination), and accompanying Issues and Decision Memorandum at 18-21 (Investigation IDM).

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

chlorine gas and caustic soda.[4]  Salt, a main input into subject merchandise, is also a main input used to form sodium hypochlorite.[5]  One difference in the physical characteristics between chlorinated isos and sodium hypochlorite is that the latter is a liquid.  One report did note, however, that solid sodium hypochlorite is available, although not used commercially.[6]  Despite this difference, several toxicology reports and chemical fact sheets, while noting this difference, handle their analysis of sodium hypochlorite and calcium hypochlorite in the same manner.[7]  The chlorine content in finished sodium hypochlorite ranges from five to six percent (for household purposes) and ten to fifteen percent (for pool and industrial uses).[8]  Subject merchandise has chlorine content in the range of fifty-six to ninety percent, but stable bleaching powder, a product the Department has previously deemed comparable merchandise, has chlorine content at a level comparable to sodium hypochlorite.[9]  Therefore, we determine that sodium hypochlorite and the subject merchandise have similar physical characteristics.

According to the Agency for Toxic Substances and Disease Registry, "Sodium and calcium hypochlorite are used primarily as bleaching agents or disinfectants.  They are components of commercial bleaches, cleaning solutions, and disinfectants for drinking water and waste water purification systems and swimming pools."[10]  The Soap and Detergent Association's report on sodium hypochlorite indicates that "Sodium hypochlorite is one of the most effective disinfectant and bleaching agents known."[11]  Finally, the Kirk-Othmer Encyclopedia notes that sodium hypochlorite is used in "sewage and wastewater treatment and in commercial laundries, large swimming pools, and aboard ships."[12]  These listed end uses are the same or similar to the end uses of subject or comparable merchandise.

We also examined the production process of sodium hypochlorite and determined that, based on record evidence, it has a production process similar to chlorinated isos and other products, such as calcium hypochlorite, that the Department has previously determined constitute comparable merchandise.  As the Department has stated, "with respect to production processes, the subject merchandise is produced in three different steps with the first step making intermediate inputs (cyanuric acid, caustic soda, and chlorine gas), the second step combining these intermediate inputs, and the third step shaping the finished products."[13]  Based on the description of Kirk-Othmer's Encyclopedia, we find that the production processes of sodium hypochlorite and calcium hypochlorite are similar, if not identical, in nature, and are therefore similar to the production process of subject merchandise.  Record evidence indicates that, like calcium hypochlorite, sodium hypochlorite is primarily made by reacting chlorine with a solution of

---

[4]  See Letter from Arch Chemicals, Inc. (Arch), "Chlorinated Isocyanurates from China (Sixth Administrative Review) – Comments on Surrogate Country Selection," December 19, 2011(Arch Surrogate Country Submission), at Exhibit 1.

[5]  See id.

[6]  See Letter from Arch, "Chlorinated Isocyanurates from China (Sixth Administrative Review) - Arch Chemicals, Inc. Resubmission of Surrogate Value Information for Factors of Production," September 5, 2012(Arch Surrogate Value Submission), at Attachment 3.

[7]  See id.

[8]  See id.

[9]  See Investigation IDM at 19.

[10]  See Arch Surrogate Value Submission at Attachment 3.

[11]  See id. at Attachment 2.

[12]  See Arch Surrogate Country Submission at Exhibit 1.

[13]  See Investigation IDM at 19.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

caustic soda. The Kirk-Othmer's Encyclopedia states that the manufacture of calcium hypochlorite is "only slightly different than that of sodium hypochlorite, and the heat liberated per mol of chlorine is approximately the same."[14] The similarities in the chemical composition of sodium hypochlorite and calcium hypochlorite strongly suggest that the general manufacturing processes used to produce both products are similar, if not identical, in nature. The record includes additional information detailing the sodium hypochlorite manufacturing process, and describes the materials needed for its manufacture.[15] This information confirms that sodium hypochlorite has a chemical complexity similar to calcium hypochlorite, that the production processes for the two products are of similar duration, and that both chemicals use similar types of production equipment.[16] Therefore, the Department determines that the production process of sodium hypochlorite is similar to that of calcium hypochlorite and of the subject merchandise.

Based on the foregoing, the Department finds that sodium hypochlorite is comparable to the subject merchandise.

**Comment 2:** Surrogate Country Selection

Petitioners' Arguments
- The Philippines is economically comparable to the PRC.
- The record developed since the <u>Preliminary Results</u> includes evidence demonstrating that sodium hypochlorite is comparable to subject merchandise and that a significant amount of sodium hypochlorite is produced in the Philippines. Thus, the Philippines should be considered a significant producer of comparable merchandise.
- The Philippines has superior data on the record compared to South Africa, allowing the Department to value nearly all inputs using a single country.

Jiheng's Arguments
- South Africa is a poor choice for use as a surrogate country. Due to a lack of data availability, the Department had to use data from a secondary surrogate country for several significant inputs (i.e., labor and financial ratios) in the <u>Preliminary Results</u>. Evidence on the record indicates that the South African Global Trade Atlas (GTA) data do not include import statistics from members of the South African Customs Union (SACU).
- The Philippines is economically comparable to the PRC.
- In previous reviews, the Department has used or considered using data from the Philippines, implying that the Philippines satisfies the Department's requirement of being a significant producer of the identical or comparable merchandise.
- The Department now has Philippine production data on the record (the only production data outside of India that is on the record), which clearly demonstrate it is a significant producer of comparable merchandise.
- Contrary to South African data, the quantity and quality of data on the record for the Philippines are reliable and available for most factors.

---

[14] <u>See</u> Arch Surrogate Country Submission at Exhibit 1.
[15] <u>See</u> Arch Surrogate Value Submission at Attachment 1.
[16] <u>See</u> Arch Surrogate Country Submission at Exhibit 1.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

- The Department should use India as a surrogate country if it determines that the Philippines is not a significant producer of identical or comparable merchandise.

Zhucheng's Arguments
- The Philippines is a significant producer of sodium hypochlorite, which is a product the Department should treat as comparable merchandise. As such, the Philippines should be used as the surrogate country in this review.

Kangtai's Rebuttal Arguments
- The quality of data from India is superior. The Department's list of economically comparable surrogate countries is non-exhaustive and based on a crude gross national income (GNI) benchmark.
- If the Department does not select India as the surrogate country, the Department should rely on South Africa as the primary surrogate country because it is a significant producer of comparable merchandise and has data that is superior to any other data proposed by parties.

Petitioners' Rebuttal Arguments
- The Department should only use Indian sources for factors where there is no usable surrogate value data on the record from any of the economically comparable countries.

**Department's Position:** For these final results, the Department is selecting the Philippines as the primary surrogate country. In the Preliminary Results, the Department stated that, for the purpose of selecting a surrogate country, Colombia, Indonesia, the Philippines, South Africa, Thailand and Ukraine were equally comparable to the PRC in terms of economic development.[17] The list is comprised of countries that are proximate to the PRC in terms of GNI, and the Department considers all countries on the list to be equal in terms of economic comparability for purposes of evaluating their suitability for use as a surrogate country. The list did not include India because India's per capita GNI did not fall within the range of countries proximate to the PRC.[18] The Department finds that the selection of the range of economically comparable countries based on GNI, included in the Surrogate Country Memorandum, is reasonable and consistent with the Tariff Act of 1930, as amended (the Act). Despite Kangtai's arguments, it is also consistent with the Department's long-standing and predictable practice of selecting economically comparable countries on the basis of absolute GNI.[19] Further, when selecting a primary surrogate country, the Department will normally look first to the list of countries included in the Surrogate Country Memorandum, as these countries have been determined to be equally comparable to the PRC for this purpose. The Department may find it is appropriate to rely on data from other countries, if it is determined that none of the countries in the Surrogate Country Memorandum are viable options because they either are not significant producers of

---

[17] See Preliminary Results, 77 FR at 41748.

[18] See Memorandum to Mark Hoadley, "Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates ("CLI") from the People's Republic of China ("China")," September 9, 2011 (Surrogate Country Memorandum).

[19] See, e.g., Magnesium Metal From the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review of the Antidumping Duty Order, 75 FR 65450 (October 25, 2010), and accompanying Issues and Decision Memorandum at Comment 4.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

comparable merchandise, do not provide sufficient reliable sources of publicly available surrogate value data, or are otherwise unsuitable. However, as discussed below, those facts are not present in these final results. The record evidence continues to support the conclusion that the Philippines is economically comparable to the PRC.

When selecting a surrogate country, the Department next reviews whether any of the economically comparable countries are significant producers of identical or comparable merchandise. In the Preliminary Results, the Department relied on GTA export data to determine which countries were significant producers of identical or comparable merchandise.[20] Because of its exports of calcium hypochlorite, we determined that South Africa was the largest exporter of identical or comparable merchandise and selected it as the surrogate country. Since the Preliminary Results, however, parties have placed production data on the record for sodium hypochlorite from the Philippines. According to a Philippines Securities and Exchange Commission Management Report, Mabuhay Vinyl Corporation (MVC), a Philippine producer of sodium hypochlorite, "has a production capacity {for sodium hypochlorite} of about 2,500 metric tons per month or 30,000 MTPY," and has a 55 percent market share of the Philippines sodium hypochlorite market.[21] As discussed in Comment One, above, the Department now finds that sodium hypochlorite is comparable merchandise. Additionally, Policy Bulletin 04.1 states that "a country producing comparable merchandise is sufficient in selecting a surrogate country."[22] Thus, the Department now has production data on the record demonstrating that the Philippines is a significant producer of comparable merchandise.

The Department next looks at data availability for the potential surrogate countries. In the Preliminary Results, the data available from South Africa did not include values for a number of key factors, including labor, financial ratios, and several chemical inputs. The Department preliminarily selected Indian sources to value these inputs where a South African source did not exist, as India was the only alternative on the record at that time. However, as noted, India did not qualify as one of the economically comparable countries identified in this review. As such, the Department considers India to be less economically comparable to the PRC than the countries included in the Surrogate Country Memorandum, and will only resort to using Indian data sources when no other data from these economically comparable countries are available.[23] In addition, the Department "normally will value all factors in a single surrogate country" and "normally will use publicly available information to value factors."[24] Except for one factor, the Department can value all factors, including labor and financial ratios, using data from the Philippines placed on the record by interested parties.[25] Therefore, for these final results, the

---

[20] See Preliminary Results, 77 FR at 41748.

[21] See Letter from Jiheng, "Chlorinated Isocyanurates from China (Sixth Administrative Review) – Hebei Jiheng Chemical Company, Ltd. Resubmission of Surrogate Value Information for Factors of Production," September 5, 2012, at Attachment 1 (Jiheng Surrogate Value Submission).

[22] See the Department's Policy Bulletin No. 04.1, "Non-Market Economy Surrogate Country Selection Process," (March 1, 2004) (Policy Bulletin 04.1), available on the Department's Web site at http://ia.ita.doc.gov/policy/bull04-1.html at note 6.

[23] See Surrogate Country Memorandum.

[24] See 19 CFR 351.408(c)(1)-(2).

[25] The single exception is for steam. See Memorandum to the File, "2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Final Results Surrogate Value Memorandum," January 14, 2013 (Final Surrogate Value Memorandum).

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

Department is selecting the Philippines as the surrogate country given its superior data availability.

**Comment 3:** Surrogate Values if the Philippines is Not Selected as the Surrogate Country

Petitioners' Arguments
- If the Department continues to use South Africa as a surrogate country, it should use the following surrogate values.
  - Labor should be valued using the Quarterly Employment Statistics as published by Statistics South Africa.
  - Chemical Weekly, an Indian publication, should not be used to value any factors. With the exception of hydrogen gas, surrogate value information is available for all factors from economically comparable countries.
  - Hydrogen gas should be valued using Indian financial statements.
  - Chlorine should be valued using Philippine GTA data.
- If the Department continues to use Indian financial statements, it should include Aditya Birla's statements in its calculation of financial ratios.

Jiheng's Rebuttal Arguments
- The labor data from South Africa proposed by Petitioners should not be used because it is unclear what is included in the rates.
- The Department should continue to exclude Aditya Birla's financial statements since there are other usable financial statements on the record that do not indicate a receipt of countervailable subsidies.

Kangtai's Rebuttal Arguments
- The Department should continue to value labor using Indian International Labour Organization (ILO) data as the Department has determined that this is the best data source for industry specific labor rates.[26] The South African data – a non-ILO source – has less specific industry categories, and it is unclear whether the statistics include both direct and indirect labor costs.
- The Department should use labor data from the same surrogate country from which the financial statements are taken to ensure the comparability of the values the Department uses for labor costs and the labor costs deducted from the financial statements.
- The Department should not rely on the financial statements of Aditya Birla if it continues to rely on Indian financial statements. Courts have stated that any evidence of the past receipt of countervailable subsidies is sufficient to justify excluding surrogate financial statements from consideration.

**Department's Position:** As discussed above, the Department has selected the Philippines as the surrogate country. Since the Department has usable information from the Philippines on the record to value all inputs, except for steam, the issues raised above are moot.[27]

---

[26] See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 FR 36092 (June 21, 2011) (Labor Methodologies).
[27] See Final Surrogate Value Memorandum.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

**Comment 4:**  Sodium Chloride

Jiheng's Arguments

- The Department should not use GTA data from South Africa to value sodium chloride (i.e., salt) because it is unreliable (record evidence indicates a majority of salt imports are not captured by the GTA data) and because the Harmonized Tariff Schedule (HTS) subheading for salt is an overly broad basket category.
- Other data on the record indicates that the South African GTA data reflect aberationally high prices and very small import quantities.
- The Department should use domestic pricing data on the record, which is publicly available, contemporaneous and published country-wide, to value salt in South Africa.

Zhucheng's Arguments

- The Department should use the Government of South Africa's Department of Minerals report to value salt because it is specific to the product used by the respondents and contemporaneous with the POR, thereby representing the best available data on the record.

Petitioners' Rebuttal Arguments

- If the Department selects South Africa as the primary surrogate country, the Department should continue using South African GTA data to value salt.
- South Africa considers trade with SACU members as internal domestic trade.  The GTA data is complete in that it shows all of South Africa's external trade with all countries outside the SACU.
- The Department should not use the data placed on the record by Zhucheng because the report does not detail the methodology used to collect the data, nor does it state whether the values include taxes.  Additionally, the data indicates that it is preliminary and could therefore change.

**Department's Position:**  As discussed above, the Department has selected the Philippines as the surrogate country.  Also as discussed above, the Department prefers to rely on a single surrogate country to value all factors when possible.[28]  Since the Department has reliable, contemporaneous and product-specific data to value salt in the Philippines, the primary surrogate country, the issue of which South African data to use is moot.

**Comment 5:**  Urea

Petitioners' Arguments

- The Department should use domestic price data as published by the Philippine Bureau of Agricultural Statistics (BAS) to value urea.
- The BAS data is superior to GTA data because it includes specific information regarding the concentration of urea sold and reflects domestic prices, which the Department has a preference for using.

---

[28] See 19 CFR 351.408(c)(2).

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

Jiheng's Rebuttal Arguments
- The Department's preference is for a surrogate value to be the price of the domestic product, not the domestic price of imported product. Since the record indicates that all urea consumed in the Philippines is imported, there can be no domestic price for domestic products, and the Department must use import prices to value urea.

Kangtai's Rebuttal Arguments
- The Department should continue to use an import value for urea since evidence on the record indicates that the BAS data is not for domestic production, and would therefore have a price that includes import duties, taxes, retail markups and repackaging costs.

**Department's Position:**  For these final results, the Department has valued urea using Philippine GTA data (i.e., import data).  The record of this review contains the Philippine BAS data, which allegedly reflects domestic prices of domestically produced urea in the Philippines and the Philippine GTA data which contains imports of urea into the Philippines.  Both sources of data are from the Philippines, publicly available, contemporaneous with the POR, and appear to be free of taxes.  However, there is record evidence that urea is not produced in the Philippines.[29]  As a result, the BAS data, which purportedly reflects Philippine domestic production, may not be for domestically produced urea.  Given the conflicting record evidence concerning the Philippine domestic production of urea and the BAS data, we are unsure what the BAS data values actually represent.  Therefore, we are selecting the Philippine GTA data as the best available information to value urea.

**Comment 6:**  Water

Petitioners' Arguments
- The Department should use the <u>Doing Business in Camarines Sur</u> (<u>Camarines Sur</u>) publication to value water, using the highest usage amount for each city.

Jiheng's Rebuttal Arguments
- Jiheng agrees that the water value should be obtained from the <u>Camarines Sur</u> publication, and provided the factor for converting a cubic meter of water (as reported in the publication) to a metric ton (the unit used by the respondents).

**Department's Position:**  The Department agrees with both parties and, for these final results, we have valued water using an average of the prices paid in the highest usage rate category in each city.[30]  The Department has used the <u>Camarines Sur</u> publication in recent cases, and noted that it was "a publicly available and easily accessible document, published for the purpose of giving the international community information, including the costs of doing business in the province of Camarines Sur, Philippines."[31]  The Department continues to find that this publication is publicly available, and representative of the costs a company would pay for water over the POR.  The

---

[29] <u>See</u> Jiheng Surrogate Value Submission at Attachment 2.

[30] <u>See</u> Final Surrogate Value Memorandum.

[31] <u>See</u> <u>Wooden Bedroom Furniture from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and New Shipper Review</u>, 73 FR 49162 (August 20, 2008) (<u>Wooden Bedroom Furniture</u>) and accompanying Issues and Decision Memorandum at 23.

-10-

Department converted the surrogate value units to the reported value units using a one-to-one conversion ratio, as done in previous cases.[32]

**Comment 7:**  Chlorine

Petitioners' Arguments
- The record in this review indicates that chlorine is traded in substantial quantities in the Philippines.
- Since India is not listed as an economically comparable country in this review, consistent with the Department's recent determination,[33] the Department should rely on GTA data under HTS subheading 2801.10 to value chlorine.

Kangtai's Rebuttal Arguments
- The Department should continue to rely on domestic prices from India to value chlorine.  The Department prefers to use domestic prices to value inputs.
- The Department has found that import data for chlorine is aberrational, and average unit prices vary dramatically in this review, in part due to the small quantity of imports and because chlorine is not frequently traded internationally.
- The Philippines does not contain the best available information on the record because evidence indicates that the domestic market for chlorine is miniscule when compared with the Indian market.
- Chlorine is a by-product of producing caustic soda (i.e., sodium hydroxide) from sodium chloride.  Petitioners suggested Philippine surrogate value for chorine is higher than the surrogate value for either sodium chloride or caustic soda.  It is unreasonable for a by-product to be priced higher than the material used to produce it (sodium chloride) or the main product produced (caustic soda).

**Department's Position:**  To value chlorine, the Department has relied on GTA import data from the Philippines for these final results.  The Department's practice when selecting the best available information for valuing factors of production (FOPs), in accordance with section 773(c)(1) of the Act, is to select surrogate values which are product-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and free of taxes and duties.[34]  The Department undertakes its analysis of valuing the FOPs on a case-by-case basis, carefully considering available record evidence regarding the particular facts of each industry.[35]  Although there is no hierarchy for applying the surrogate value selection criteria, "the Department must weigh available information with respect to each input value and make a

---

[32] See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Chlorinated Isocyanurates From the People's Republic of China, 69 FR 75294, 75301 (December 16, 2004), unchanged in Isos Final Determination.

[33] See Glycine from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, 77 FR 64100 (October 18, 2012) (Glycine).

[34] See, e.g., First Administrative Review of Certain Polyester Staple Fiber From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 75 FR 1336 (January 11, 2010), and accompanying Issues and Decision Memorandum at Comment 1.

[35] See Glycine from the People's Republic of China:  Notice of Final Results of Antidumping Duty Administrative Review, 70 FR 47176 (August 12, 2005), and accompanying Issues and Decision Memorandum at Comment 1.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

product-specific and case-specific decision as to what the 'best' surrogate value is for each input."[36]

Pursuant to section 773(c)(1) of the Act, we find that the value derived from the GTA data for Philippine imports represents "the best information available" for valuing liquid chlorine. This data represents information that is product-specific, is representative of a broad-market average, is publicly available, is contemporaneous with the period of review, and is free of taxes and duties. With respect to specificity, the Department continues to view imports of "Chlorine", under the HTS subheading 2801.10, as the most specific available data for this raw-material input from the Philippines. We note that the GTA value was the only value for liquid chlorine from a Philippine source suggested by parties and placed on the record.[37]

Kangtai has argued that the Philippine value for liquid chlorine is aberrational when compared to Indian values selected as the surrogate value for liquid chlorine in previous administrative reviews. The Department does not find these Indian values to be a proper comparison in deciding whether the Philippine value is aberrational. Rather, in determining whether a surrogate value derived from GTA data is aberrational, it is the Department's practice to compare it with the GTA data for the input at issue from the other countries found by the Department to be equally economically comparable to the PRC.[38] As noted in the Preliminary Results, the Department identified, for the purpose of selecting a surrogate country, Colombia, Indonesia, the Philippines, South Africa, Thailand, and Ukraine as the countries equally comparable to the PRC in terms of economic development for purposes of this review.[39] Parties have placed data on the record to value chlorine from the Philippines and South Africa (both using GTA data). A review of this data show that the Philippines has imports over 1,000 metric tons, while South Africa has much smaller imports. Because the volume of imports for the Philippines exceeded 1,000 metric tons, we find liquid chlorine was imported into the Philippines in commercial quantities during the POR. We further find that record evidence does not support a finding that the average unit value from any of the other countries, when compared with that of the Philippines, either is more specific to the input or demonstrates that the value from the Philippines is aberrational. Therefore, we can find no basis to consider the Philippines GTA value for liquid chlorine to be unreliable and find no reason to consider information from a non-Philippine source.

Kangtai has stated that the Department should continue to use India to value chlorine because the Department could have selected GTA data from South Africa or the Philippines for the Preliminary Results, but instead chose Indian domestic prices. According to Kangtai, no new facts have been placed on the record since the Preliminary Results that would justify the Department changing its position and valuing chlorine outside of India. Contrary to Kangtai's assertion, the record in this instant review has been significantly developed since the Preliminary Results. The Department did not have Philippine production data on the record, and could not

---

[36] See, e.g., Polyethylene Terephthalate Film, Sheet, and Strip from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 73 FR 55039 (September 24, 2008), and accompanying Issues and Decision Memorandum at Comment 2.

[37] See Letter from Jiheng, "Chlorinated Isocyanurates from China (Sixth Administrative Review) – PrePreliminary Surrogate Value Information," January 9, 2012 (Jiheng January 9 Surrogate Value Submission), at Tab 2.

[38] See Trust Chem Co., Ltd. v. United States, 791 F. Supp. 2d 1257, 1264 (CIT 2011) (Trust Chem).

[39] See Surrogate Country Memorandum.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

determine at the time of the Preliminary Results whether it was a significant producer, and therefore whether data from it could be used for surrogate values. The Department selected South Africa as the primary surrogate country, and India as a secondary surrogate country, based on the information available to the Department at that time. Since then, based on the evidence placed on the record since the Preliminary Results, the Department has now been able to determine that the Philippines is a significant producer of comparable merchandise, and selected it as the primary surrogate country in this review. The Department has a regulatory preference to value all factors in a single country where possible.[40] Jiheng had placed Philippine GTA data on the record to value chlorine. We find that it is the burden of Kangtai to provide sufficient factual evidence in support of its argument that these import data are aberrational. Even assuming, arguendo, that these import data could be found aberrational, Kangtai did not provide the Department with alternative data from the Philippines or one of the five equally economically comparable countries to use as a comparison but simply reverted back to company data from India – a country not on the list of equally economically comparable countries to the PRC. As a result, we find that the record does not support a finding that the chlorine import data from the Philippines are aberrational.

Kangtai next raises concerns that, in previous reviews, the Department has found that due to the very nature of chlorine, it faces special concerns both in transporting and in packaging, which are exacerbated over longer distances, greatly adding to the cost of chlorine and leading to it being infrequently traded internationally.[41] The Department reached this conclusion in the previous review of this case, where India was the primary surrogate country, and parties had provided Indian GTA data, GTA data from other potential surrogate countries, and data from individual Indian companies for the surrogate valuation of chlorine. The Department's decision to use the Indian company data to value chlorine was partly based on the wide range of import volumes reported in the Indian GTA data as compared to other potential surrogate countries, and partly attributed to the various means and costs associated with transporting chlorine over long distances. Because of these deficiencies, and because other viable source information from the primary surrogate country was on the record, the Department opted to disregard the Indian GTA data. For the Preliminary Results, the Department relied heavily on the decision made in the 2009-2010 administrative review, and opted to value chlorine from the previous review's data, adjusted for inflation, from Indian companies. For these final results, the Department analyzed the complete record available in the instant review. Similar to the 2009-2010 administrative review analysis, we first reviewed the surrogate value information from the primary surrogate country, which for these final results, is the Philippines. As stated above, the Department does not find the Philippines GTA import data, the only data available to value chlorine from the Philippines, to be aberrational. Additionally, the data on the record of this instant review led the Department to conclude that the Philippines does have imports of chlorine at commercial quantities. In the 2009-2010 administrative review, the Department was able to compare import prices and domestic prices in the primary surrogate country, and was able to conclude that, due to a discrepancy in the pricing between domestic prices and import prices, as well as the average unit prices ranges of the potential surrogate countries, chlorine was not frequently traded

---

[40] See 19 CFR 351.408(c)(2).

[41] See Chlorinated Isocyanurates From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, 77 FR 40689 (July 11, 2011) (2009-2010 Preliminary Results), unchanged in Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 76 FR 70957 (November 16, 2011) (2009-2010 Final Results).

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

internationally. A recent case since the <u>Preliminary Results</u> determined that chlorine is traded internationally,[42] and evidence on the record of this review does not support a claim that chlorine is not frequently traded.

Kangtai argues that the Philippine imports of chlorine are miniscule compared to the amount of chlorine produced by Indian companies, and are also much smaller than the Philippine domestic production of chlorine, which by itself is insignificant. Kangtai later argues that "during the POR, Kangtai alone consumed 10 times more chlorine than market imports of chlorine into the Philippines and more than all chlorine imported into the entire Philippines," and that, because GTA import data does not represent Kangtai's production experience, domestic Indian prices should be used.[43] Similar to an argument in the recent review of <u>Glycine</u>, we do not find this argument persuasive to demonstrate that the Philippine's import volumes are not of commercial quantity. As stated above, it is our policy to compare the total import volumes of potential surrogate countries to one another, not to compare import volume to the purchases of respondent companies nor other companies in a country which the Department has determined is less economically comparable.[44] Because the import volume for the Philippines exceeded those of any other equally economically comparable countries' imports on the record of this review, we are satisfied that this volume represents significant commercial quantities during the POR.

Kangtai's next concern is that chlorine, a by-product formed through the electrolysis of sodium chloride to caustic soda, has a higher surrogate value than either the main input (sodium chloride) or the main product (caustic soda). As Kangtai argues, "In Paslode, the Department found it was clearly unreasonable to have a value of a by-product exceed the costs of its inputs."[45] Kangtai did not accurately reflect the Department's position, which stated that "{i}t is clear that our steel scrap value selection produced an unreasonable result."[46] In that situation, the Department was discussing the fact that the value of steel scrap should not be valued higher than the input the scrap came from. However, chlorine is a by-product, and not scrap, therefore Kangtai's reference to this case is misguided. Furthermore, Jiheng submitted its production process diagrams, which the Department reviewed during verification, where we noted that during the electrolysis stage, several other inputs are used resulting in caustic soda, chlorine and hydrogen gas.[47] Kangtai has not provided any evidence that the cost of <u>all</u> the inputs resulting in a chlorine by-product are less than the surrogate value used for chlorine. Moreover, whether the value of a by-product is more or less than the value of the inputs is a meaningless comparison. The value of the by-product is the value it can obtain in the market. The Department is therefore not adjusting the chlorine by-product offset.

---

[42] <u>See</u> <u>Glycine</u>, and accompanying Issues and Decision Memorandum at Comment 1.
[43] <u>See</u> Letter from Kangtai, "Certain Chlorinated Isocyanurates from the People's Republic of China Rebuttal Brief by Juancheng Kangtai," December 10, 2012 (Kangtai Rebuttal Brief), at 24.
[44] <u>See</u> <u>Glycine</u>, and accompanying Issues and Decision Memorandum at Comment 1.
[45] <u>See</u> Kangtai Rebuttal Brief, at 21.
[46] <u>See</u> <u>id</u>.
[47] <u>See</u> Verification Report at 10.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

**Comment 8:** Hydrogen

Petitioners' Arguments
- Imports of hydrogen gas into the Philippines are extremely small. The Department should rely on the 2010-2011 annual reports of four Indian producers of chlorine and caustic soda to value hydrogen gas.

Jiheng's Rebuttal Arguments
- Even if the hydrogen import volume is small, Petitioners have not provided any information indicating that the import data is aberrational, compared to data from other economically comparable countries. Courts have stated that there must be data supporting a party's claim that import values are aberrational; a small import volume alone is not enough.[48] India is no longer considered an economically comparable country. Its hydrogen values are therefore irrelevant to this analysis.
- Petitioners have not provided any alternative surrogate value from an economically comparable country.

**Department's Position:** The Department has valued hydrogen using GTA data from the Philippines for these final results. Based on the evidence on the record of this review, the Department had the option of valuing hydrogen with either 1) sales data from several Indian companies, or 2) GTA data from the Philippines. Petitioners argue that the amount of hydrogen imports into the Philippines are extremely small. As Jiheng correctly states, "{I}n determining whether a surrogate value derived from GTA data is aberrational, it is the Department's practice to compare it with GTA data for the input at issue of the other five countries found by the Department to be equally economically comparable to the PRC."[49] Petitioners did not provide any data from any of the other equally economically comparable countries to show that the Philippine GTA data are aberrational. As noted in Glycine, in our discussion of a similar allegation concerning chlorine imports into Indonesia:

> {Respondent} bases this assertion on a comparison of this import data to the surrogate values in the previous reviews and the average unit value of sales by two Indian companies. We find that it is the burden of {Respondent} to provide sufficient factual evidence in support of its argument that this import data is aberrational. Even assuming, arguendo, that this import data could be found aberrational, {Respondent} did not provide the Department with alternative data from Indonesia or one of the five countries to use as a comparison but simply reverted back to company data from India – a country not on the list of economically-comparable countries to the PRC. As a result, we find that {Respondent} failed to provide sufficient factual evidence in support of its claims that the import data from all six countries is aberrational.[50]

The Court of International Trade has stated much the same: even if import volumes are small, parties must submit information illustrating that the data is aberrational, such as import values from other economically comparable countries.[51] There is no evidence on the record

---

[48] See Trust Chem., 791 F. Supp. 2d at 1264.
[49] See Glycine, and accompanying Issues and Decision Memorandum at Comment 1.
[50] See id.
[51] See Trust Chem., 791 F. Supp. 2d at 1264.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

demonstrating that the GTA data for hydrogen, while small in volume, is aberrational. Moreover, there is no evidence on the record to value hydrogen using a source from one of the other equally economically comparable countries. While we have previously found that problems with transporting hydrogen internationally results in unreliable GTA data, in this review there is no better alternative on the record. The only other option is data from India, which is no longer on the list of equally economically comparable countries. As discussed previously, the Department has a regulatory preference to value all factors in a single country where possible.[52]

Therefore, we determine that the best available data to value hydrogen are GTA import data from the Philippines.

**Comment 9:** Steam Coal

Kangtai's Arguments
- The Department should use a domestic price from India, as done in several reviews, to value steam coal in this review, as it represents the best available information.
- If the Department declines to use India, it should value steam coal using Indonesian coal prices, which are more specific to the grade of steam coal used by Kangtai and which are tied to the international market.

Petitioners' Rebuttal Arguments
- Whether the Department selects the Philippines or South Africa as the surrogate country, it should use data from the primary surrogate country, e.g., GTA import data from the respective country, to value steam coal.
- Kangtai makes no claims that the GTA data are aberrational or unreliable and even submitted GTA data from the Philippines to use as a surrogate value.
- Because reliable and usable data exist in the primary surrogate country, and because Kangtai has not submitted any evidence to suggest that the GTA data are different in any meaningful way from the steam coal it consumes, the Department has no need to consider surrogate data from outside the primary surrogate country.

**Department's Position:** We find that the best available information to value steam coal in this review is the GTA import data from the Philippines. As an initial matter, the GTA Philippine import data for steam coal is the only steam coal value from the primary surrogate country on the record. As discussed above, for the Department to consider data from outside the primary surrogate country, in this case the Philippines, parties must 1) demonstrate that the GTA import data in the primary surrogate country are aberrational when compared to the GTA import data in other equally economically comparable countries, and 2) the record must contain alternative sources, preferably in an equally economically comparable country, to value the input.[53] Kangtai has provided data to value steam coal from Indonesia, which the Department considers to be an equally economically comparable country. Kangtai, however, has not presented any evidence to satisfy the first prong of the Department's requirements. The Department's regulatory preference is to value all factors from a single surrogate country when we have usable and

---

[52] See 19 CFR 351.408(c)(2).
[53] See Comment 8, above, and Glycine, and accompanying Issues and Decision Memorandum Comment 1.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

reliable data.[54]  To that end, Kangtai itself submitted Philippines GTA import data to value steam coal.  While Kangtai specifies the type of coal it uses, Kangtai has not submitted any information documenting that the GTA import data cover steam coal that is meaningfully different from the steam coal it consumes.  Kangtai's only attempt to show that the GTA data are not specific to the type of coal it consumes is to claim that "no party has put the definition of South African HTS number 2701.19.00 on the record," which, after reviewing the record, the Department concludes is simply not the case.  Petitioners did put such definitions on the record (although they are no longer directly relevant, given the Department's determination to rely on the Philippines).[55]

Furthermore, the Indonesian data placed on the record itself has serious flaws.  The Department continues to find that "the ESDM {the Ministry of Energy and Mineral Resources of the Republic of Indonesia source} contains information from international benchmark steam coal indexes and certain brand name prices, rather than actual transactions involving parties in Indonesia."[56]  We next note that the values Kangtai suggests to use appear to be company brands or otherwise sub-national level indicators.  These values therefore are more similar to company-specific values rather than a broad, country-wide average, which the Department prefers, and which is available using GTA data.  Kangtai also has not provided a clear step-by-step explanation as to how it utilized the data from ESDM's various indexes and prices to calculate the POR-specific values it would like the Department to use, and it unclear to the Department how to calculate the values based on the record evidence.  For these concerns, the GTA import data from the Philippines represents the best available information on the record.

As Petitioners note, the other cases Kangtai refers to have markedly different fact patterns than the ones in the instant review.  First, Kangtai has not demonstrated that the GTA import data cover a product that is dissimilar to its input.[57]  Second, the Department is not considering domestic prices versus import prices, nor are we faced with import data covering a basket category of goods.[58]  Kangtai is concerned that the GTA data are not product specific, but provided no evidence demonstrating that the data, which it put on the record itself, are not specific.  To the contrary, the evidence on the record demonstrates that the GTA data are specific to steam coal because the HTS category is the best match to steam coal.[59]  The Department reviewed the HTS categories for coal (HTS number 2701), and reviewed the sub-heading options to see which sub-heading best matched steam coal.  The sub-heading descriptions themselves

---

[54] See 19 CFR 351.408(c)(2) and (3); see also Glycine, and accompanying Issues and Decision Memorandum Comment 1.

[55] Petitioners placed excerpts from the South African Harmonized Customs and Excise Tariff schedule, including the description for HTS 2701.19, on the record.  See Letter from Petitioners, "Chlorinated Isocyanurates from the People's Republic of China (6th Antidumping Administrative Review):  Petitioners' Submission of Information Regarding Surrogate Values for Factors of Production," January 9, 2012, at Exhibit 1.

[56] See Certain Polyester Staple Fiber from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2010-2011, 78 FR 2236 (January 11, 2013), and accompanying Issues and Decision Memorandum at Comment 1.

[57] Contrary to the situation faced in Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part, 77 FR 63791 (October 17, 2012) and accompanying Issues and Decision Memorandum at 43.

[58] Contrary to the circumstances in Taian Ziyang Food Company, Ltd. v. United States, 783 F. Supp. 2d 1292 (CIT 2011).

[59] See, e.g., Glycine, and accompanying Issues and Decision Memorandum at Comment 1.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

made evident that HTS number 2701.19 was the best option for steam coal as the other available sub-headings were for other specific types of coal, i.e., anthracite or bituminous coal. Because Kangtai has not met the threshold required for the Department to consider values outside the primary surrogate country, shown that that data outside the surrogate country is usable, or provided evidence demonstrating that the GTA data are not specific, we find that the GTA Philippine import data is the best available source to value coal.

**Comment 10:** Electricity

Petitioners' Arguments
- The Department should use industrial end-user rates listed in the Camarines Sur publication, relied upon in other reviews, to value electricity.[60] It is a publicly available source and specific to industrial end-users, thereby representing the best available data.
- Electricity rates from MERALCO should not be used because the charges to industrial users list significant components in kilowatts rather than kilowatt hours. By only including the kilowatt components, the rate would be significantly understated.
- The MERALCO data on the record exists only for December 2010, and includes a footnote indicating that the components of the electricity charge change every month. The Department cannot conclude that the December 2010 rates are reflective of the entire POR.

Jiheng's Rebuttal Arguments
- The data from MERALCO is superior to the Camarines Sur data. While both data sets are publicly available, the MERALCO data is contemporaneous with the POR, specifically excludes taxes, covers a broader geographic range, and is more specific.
- The MERALCO rate schedule is broken down into its components, and the Department is able to calculate all such components using kilowatt hours.

**Department's Position:** Jiheng argues that by any measure, save public availability, MERALCO data is superior to Camarines Sur data. A careful review of the evidence shows that this is not the case.

The MERALCO and Camarines Sur data represent electricity rates from different areas of the Philippines. The MERALCO data Jiheng submitted on the record of this review is only for December 2010. While that month falls within the POR, the one-month of MERALCO data expressly notes that several of the components of the rate fluctuate on a monthly basis.[61] While the difference components are identified, it is not clear what is included in these components. Moreover, the MERALCO data is a rate per kilowatts and we need a rate per kilowatt hour for surrogate values. While Jiheng has provided a suggested method for converting kilowatts to kilowatt hours, its methodology makes certain assumptions, e.g., with regard to transmission charges, which are not supported by the record. We simply do not have the information to make a conversion of kilowatts to kilowatt hour. Furthermore, based on the identified monthly

---

[60] See Wooden Bedroom Furniture.
[61] See Jiheng January 9 Surrogate Value Submission at Tab 5.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

variability of the certain parts of the MERALCO data, the Department cannot evaluate whether the rates charged in December 2010 are similar to the rates that would have been effective during other months of the POR, as only one month of data was put on the record.

While as Jiheng argues, the Camarines Sur publication is from 2009 and is therefore not contemporaneous with the POR, there is no record indication that it suffers from the same monthly variability problems as the MERALCO data. When examining electricity rates in other reviews, the Department has determined that utility rates represent a current rate as indicated by the effective date listed for each of the rates provided.[62] Therefore, in the Department's estimation, the rates from the publication likely were, absent evidence to the contrary, effective beginning in 2009, and thus continued to represent the current rate during the POR. Moreover, the Camarines Sur data is in kilowatt hours, the unit we need to value the kilowatt hour factor reported by the respondent.

Jiheng argues that it is unclear whether the Camarines Sur data include taxes and duties. While the MERALCO data specifically do not include taxes or duties, there is no evidence on the record that the Camarines Sur data include taxes and duties either. Jiheng also notes that the MERALCO data cover a broader range, but neither data source is nation-wide, and Camarines Sur does cover rates available in two cities in the Philippines.[63] With regard to product specificity, both sources include rates for different users. While the MERALCO data are broken down further, Camarines Sur includes rates for industrial users, the category to which the respondents belong.[64]

Because, the Camarines Sur electricity rate matches the factor rate in kilowatt hours for industrial users, is publicly available from the primary surrogate country, represents electricity rates from two cities in the Philippines, does not appear to include taxes or duties, and does not suffer from the unknown variability factors of the MERALCO rate, we have selected the Camarines Sur electricity rate as the best available information with which to value the electricity factor.

**Comment 11:** Steam

Petitioners' Arguments
- Since no party has submitted data from the Philippines to value steam, the Department should continue to use South African GTA import data for natural gas to value steam, like it did in the Preliminary Results.
- The Department could value steam using an Indian source on the record, but its first priority is to use data from economically comparable counties, i.e., South Africa.

Jiheng's Rebuttal Arguments
- The Department should not use import statistics from South Africa because, as Jiheng demonstrated, the statistics exclude imports from other SACU members.

---

[62] See 2009-2010 Preliminary Results, unchanged in 2009-2010 Final Results.

[63] See Letter from Kangtai, "Chlorinated Isocyanurates from the People's Republic of China Surrogate Values for Preliminary Determination," January 9, 2012, at Exhibit SV-16b.

[64] See id.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

- The Department can value steam using Indian data or natural gas imports into the Philippines.

Kangtai's Rebuttal Arguments
- The best information to use to value steam is the financial statements of Hindalco Industries Limited, which represent an Indian domestic price and are reflective of the commercial reality.

**Department's Position:** The Department prefers to value all inputs in one primary surrogate country. However, there are no data from the Philippines with which to value this input as no party placed this information on the record. Therefore, the Department must go outside of its primary surrogate country to select a surrogate value. The Department has two choices on the record to value steam: 1) financial statements from an Indian company, or 2) GTA import data for natural gas from South Africa. Of these two options, only one data source is from an equally economically comparable country. While data from an Indian company may represent a product-specific domestic price, India is considered less economically comparable to the PRC, and there are other data on the record from an equally economically comparable country for the Department to select.[65] No party has raised any concerns about valuing steam using GTA import data for natural gas (i.e., no party has argued that the GTA data is for a basket category, or unrepresentative of the factor, etc.), or concerns that the Department uses GTA import data for natural gas to value steam.[66]

Kangtai argues that the use of GTA data to value steam leads to a value that does not reflect commercial reality because there is no international shipping of steam. The Department disagrees. Kangtai has not stated that the use of GTA data is inconsistent with past precedents, nor does it provide any support that the GTA data are aberrational, or unreflective of the real world beyond mere assertions. Therefore, the Department is using GTA import data from South Africa, an economically comparable country to the PRC, to value steam rather than the data from India which is less economically comparable to the PRC than South Africa.

**Comment 12:** Labor

Kangtai's Arguments
- If the Department selects the Philippines as the primary surrogate country, it should value labor using the most contemporaneous data on the record.

**Department's Position:** Using ILO 6A sub-classification 24, "Manufacture of Chemicals and Chemical Products," Kangtai submitted two labor values, one from 2002 and one from 2008. The Department reviewed the ILO data and, besides the time frame, the other difference between the two values is that one from 2002 represents "labour cost," while the other from 2008 represents "compensation of employees." While the Department normally will "use labor cost

---

[65] See Comment 2 above for further discussion.

[66] See Preliminary Results, 77 FR at 41752; see also Memorandum to the File, "2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results Surrogate Value Memorandum," June 29, 2012 (where the Department valued steam using natural gas). Natural gas and steam have the same British Thermal Unit content and the parties did not contest the equivalency of steam and natural gas.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

data if available and compensation of employees where labor cost data are not available,"[67] the "labor cost" data is quite old and the Department must balance contemporaneity with accuracy. Here, we believe the age of the data weighs against relying on it as the best available information.  Since the compensation data is from before the POR, we have inflated the compensation data to obtain a rate contemporaneous with the POR.

**Comment 13:**  Financial Ratios

Petitioners' Arguments
- The 2010 annual report of Mabuhay Vinyl Corporation (MVC), a Philippine producer of sodium hypochlorite, should be used to value the financial ratios as it is contemporaneous, publicly available, and is comparable to the experience of the respondents.
- The production of subject merchandise is an energy intensive process; thus MVC's electricity costs are likely captured in its direct manufacturing costs (i.e., raw materials used) and not as part of its overhead.  Therefore, the Department should include electricity as part of raw materials in its cost build up in order to avoid understating normal value.

Jiheng's Rebuttal Arguments
- Jiheng agrees with Petitioners that the financial statements from MVC should be used to calculate the financial ratios.  However, Petitioners' calculations of the ratios are inconsistent with the Department's practice.  The Department should ensure the following:
    - Employee Benefits/Retirement Benefits should be included in labor, not selling, general and administrative (SG&A) expenses.
    - Interest income (from "cash and equivalents") should be included as an offset to SG&A expenses.
    - Long-term debt is not an SG&A expense.
    - "Rent, light and water" should be treated as part of raw materials or energy, and, to avoid double-counting, should not be treated as part of SG&A expenses.
    - "Repairs and maintenance" are normally categorized as part of overhead, not as part of SG&A expenses.

**Department's Position:**  The Department agrees with Petitioners and Jiheng that the 2010 annual report of MVC, a Philippine producer of sodium hypochlorite, should be used to value the financial ratios as it is contemporaneous, publicly available, and is comparable to the experience of the respondents.  The Department agrees in part with several of Jiheng's suggested categorizations of certain line items from the surrogate financial statements.  It is the Department's practice to treat interest income generated from short-term sources as an offset to interest expenses.[68]  Here the notes to the financial statements indicate that the interest income

---

[67] See Labor Methodologies at Footnote 11.

[68] See Polyethylene Retail Carrier Bags From Thailand:  Final Results of Antidumping Duty Administrative Review, 74 FR 65751 (December 11, 2009) and accompanying Issues and Decision Memorandum at Comment 5.

-21-

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

was earned from cash and cash equivalents.[69]  Therefore, we are treating interest income on the financial statements as an offset to the interest expenses.  With respect to the long-term debt referenced by Jiheng, the financial statements clearly provide information that the amount in question is associated with the current year's interest expense incurred on loans.[70]  Therefore, for purposes of calculating the financial ratios we have included the interest expenses in question because it is the Departments practice to include the entire borrowing experience of a company as part of interest expenses.[71]

We disagree with Jiheng that the employee benefits and retirement benefits, repairs and maintenance, and rent, light and water expenses which are classified as period costs and not cost of goods sold on the income statement, should be included as labor, energy or overhead costs, respectively.  Here the financial statements provide clear and separate classifications for manufacturing costs and general expenses (i.e., period costs).  Manufacturing costs are those costs that, when incurred, are initially allocated and capitalized as inventory and are subsequently expensed in the form of "cost of goods sold" when the units in inventory are sold.[72]  These costs typically include direct materials, direct labor, and manufacturing or factory overhead costs.[73]  It is expected that the manufacturing costs allocated to each product include all factory related repairs and maintenance and labor cost including benefits, because, in accordance with the matching principal of accounting, the product costs should be expensed only when the products are sold to ensure an accurate matching of costs to the sales revenue that occurs in any given period.[74]  The manufacturing costs incurred to produce each product are tracked and assigned to that product as it enters into the inventory.[75]  It is only when specific products are sold that they become expenses in the current period, as part of the cost of goods sold.[76]

Period costs (classified here as operating expenses) are expensed in full in the period in which these costs are incurred.[77]  Period costs do not relate to the production of any specific product and are not capitalized, nor do they go through inventory.[78]  In this case, we consider it reasonable to assume that the employee and retirement benefits, repairs and maintenance and rent, light and water classified as period costs relate to the selling and administrative expenses of the company.  This is precisely why these costs are recognized as incurred during the year,[79] and are not associated with the production of any specific products that were initially inventoried and subsequently sold.  Likewise, it is reasonable to assume that the repairs and maintenance costs associated with manufacturing, inventory and the cost of goods sold (different from the repairs and maintenance reported in operating expenses and addressed above) reflect all costs associated with manufacturing overhead incurred to produce the products that were sold.

---

[69] See Jiheng January 9 Surrogate Value Submission at Tab 4.

[70] See id.

[71] See Final Determination of Sales at Less Than Fair Value:  Greenhouse Tomatoes from Canada, 67 FR 8781 (February 26, 2002) and accompanying Issues and Decision Memorandum at Comment 25.

[72] See Charles T. Horngren, George Foster, and Srikant M. Datar, Cost Accounting: A Managerial Emphasis at Chapter 2 (Prentice Hall, Seventh Edition, 1991).

[73] See id.

[74] See id.

[75] See id.

[76] See id.

[77] See id.

[78] See id.

[79] See Jiheng January 9 Surrogate Value Submission at Tab 4, page 20.

-22-

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

While we agree with Petitioners that the production of subject merchandise is an energy intensive process and should be accounted for using the reported electricity factors in determining the normal value, MVC's financial statements do not separately identify electricity costs. However, MVC's financial statements do provide information in a detailed cost of goods sold line item, rental, light, janitorial, and security expenses, that are associated with electricity costs. While we acknowledge that this line item may include certain expenses that are not related to electricity, to avoid double counting of the electricity costs, and likewise ensure we account for the energy intensive nature of the production process by using the reported electricity FOPs, we are treating the line item rental, light, janitorial and security expenses as energy costs, and not as part of manufacturing overhead.

**Comment 14:** Whether the Ammonia Gas and Sulfuric Acid Surrogate Values are Reasonable

Petitioners' Arguments
- In the Preliminary Results, the ammonia gas and sulfuric acid by-products were assigned higher surrogate values than the inputs (e.g., urea) used to produce them. The surrogate values were also higher than the surrogate value for ammonium sulfate, the downstream product made from ammonia gas and sulfuric acid.
- Both results are unreasonable. A by-product is an attempt to limit costs by avoiding waste. Therefore, a by-product is not more valuable than the inputs from which it is derived. Likewise, it does not make sense to produce a downstream product (ammonium sulfate) if it is less valuable than the inputs used to produce it.
- The Department should either disregard the by-product offsets,[80] or limit the amount of the offset to the surrogate value for ammonium sulfate.

Jiheng's Rebuttal Arguments
- Petitioners' arguments are all based on precedents involving scrap valued at more than the original inputs generating the scrap.

**Department's Position:** For these final results, we are adjusting the manner in which we calculate the by-product offsets for both Jiheng and Kangtai to conform to the Department's recent practice. The Department considers this by-product methodology more reasonable than the by-product methodology employed for the Preliminary Results because it consistent with the information the Department requests in our questionnaire, which asks respondents: "{i}f the by-product for which you are claiming an offset is a downstream by-product, in addition to responding to the items above, please also: (i) Provide the per-unit usage rate of each input used to produce the downstream by-product."[81]

Consistent with this practice, the Department first starts with the value of the downstream product actually sold by the respondents, ammonium sulfate, produced during the POR.[82] From this amount, the Department would normally deduct the costs associated with converting the by-

---

[80] See Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 76 FR 64318 (October 18, 2011) and accompanying Issues and Decision Memorandum at 89.
[81] See Letter to Jiheng, "2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China," October 6, 2011, at D-10.
[82] See id., at D-9.

products into the downstream product, such as labor and electricity.[83]  Since this information is not on the record of this review, the Department is not able to deduct such costs for these final results.  In the future, the Department will require such information in order to grant this offset.  But in this instance, we are using the full value of the ammonium sulfate as the by-product offset.  We calculated this amount by multiplying the quantities of ammonium sulfate produced and sold by respondents during the POR by the surrogate value (Philippine GTA data) for ammonium sulfate.

**Comment 15:**  Whether Jiheng's Ammonia Gas "Absorption Rate" Adjustment is Warranted

Petitioners' Arguments
- Jiheng does not define or explain its "absorption rate" adjustment to its ammonia gas by-product calculation.  The Department should eliminate this adjustment, which currently increases Jiheng's claimed ammonia gas by-product by more than five percent.
- Jiheng is only entitled to a by-product offset claim for ammonia gas that is sold or reintroduced into production.

Jiheng's Rebuttal Arguments
- Jiheng has used the same formula to calculate its ammonia gas by-product since the investigation, and the formula has been thoroughly verified three times.
- A by-product offset may be claimed for by-products produced during the POR that have commercial value, including the amount that is not absorbed into the finished non-subject merchandise.

**Department's Position:**  Jiheng is only entitled to an offset for the amount of ammonia gas generated and sold or reintroduced into the production process during the POR.  A by-product offset reflects the reality that a producer's POR costs can be lowered if its produces and sells a by-product during the POR.  Jiheng's costs are not lowered as the result of any other ammonia gas that is lost as waste during the production of ammonium sulfate.  It does not matter that the loss of the ammonia gas may be an unavoidable fact of the ammonium sulfate production process.  Because it is waste, it generates no revenue to offset production costs and it cannot be reintroduced as a substitute for purchased materials in the production process, thereby saving Jiheng the expense of purchasing new materials.  Thus, the offset must be limited to the amount of ammonia gas incorporated into the ammonium sulfate sold.  Such a limit is an automatic result of the revised by-product offset methodology described in response to the previous comment because the by-product offset is based on the value of the product produced and sold (or reintroduced) during the POR.

**Comment 16:**  Whether Jiheng's Normal Value was Correctly Adjusted for Transportation Costs

Jiheng's Arguments
- Jiheng's consolidated FOP database includes the intermediate inputs' build-up costs, i.e., the costs of manufacturing the intermediate products were included in the FOP

---

[83] See id.

-24-

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

database. Jiheng's FOPs reflect all the consumption allocated to all production at the consolidated level.

- The Department should eliminate its adjustment to the FOPs for merchandise Baikang provided to Jiheng to avoid double-counting certain inputs.

Petitioners' Rebuttal Arguments
- The adjustment the Department made to Jiheng's normal value is appropriate because it adds the cost of transporting the products supplied from Baikang to Jiheng, not the cost of any material input. The record does not indicate that this transportation cost is already included in the FOPs.

**Department's Position:** The Department agrees with Petitioners that the adjustments done to normal value in the <u>Preliminary Results</u> were simply to capture the cost of transporting the semi-finished goods from one factory location to another. When the Department conducted verification, we carefully examined the costs reported for each input. The Department found that not only were the transportation costs for the semi-finished goods not included anywhere in Jiheng's FOP build-up, but also that the costs of transporting intermediate inputs from one factory location to another were absent from the FOP build-ups.[84] While Jiheng contends that these costs are part of overhead, it has not provided any record evidence to support this contention. Furthermore, the Department's practice is to calculate freight costs for inputs transported between factories and to include those costs as part of raw materials.[85] Since these transportation costs are not included in any of Jiheng's FOP build-ups, the Department is adding these costs to Jiheng's normal value calculation as a raw materials expense.[86]

**Comment 17:** Whether Kangtai's Ammonia Gas By-product Was Calculated Using the Correct Concentration Level

Petitioners' Arguments
- Both respondents derived their reported amounts of ammonia gas by-product by calculating the amount of ammonia gas needed to produce the ammonium sulfate they produced and sold. To calculate the quantity of its ammonia gas by-product, Kangtai assumed the ammonium sulfate it produced has a 100 percent solution strength; <u>i.e.</u>, more ammonia gas is required to produce 100 percent ammonium sulfate than a lower concentrated ammonium sulfate.
- The Department should reduce Kangtai's ammonia gas by-product to reflect commercial purity levels for ammonium sulfate. The Department should apply Jiheng's reported concentration levels for ammonium sulfate to Kangtai's by-product calculation. This is the only data on the record for ammonium sulfate concentration levels.

---

[84] <u>See</u> Verification Report.

[85] <u>See e.g.</u>, <u>Utility Scale Wind Towers From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination</u>, 77 FR 46034 (August 2, 2012), unchanged in <u>Utility Scale Wind Towers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value</u>, 77 FR 75992 (December 26, 2012).

[86] <u>See</u> Memorandum to the File, "Analysis for the Final Results of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Hebei Jiheng Chemical Company Ltd.," January 14, 2013.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

Kangtai's Rebuttal Arguments
- The Department should reject Petitioners' argument to decrease the reported amount of Kangtai's ammonia gas by-product. The Department never asked Kangtai about its ammonium sulfate concentration level in the several questionnaires issued to Kangtai.
- Relying on Jiheng's concentration level to adjust Kangtai's calculation would divulge Jiheng's business proprietary information to Kangtai.

**Department's Position:** There is no evidence on the record to indicate that the concentration level reported by Jiheng for ammonium sulfate applies to the product produced by Kangtai. There is no other evidence on the record indicating the concentration level for ammonium sulfate produced by Kangtai is other than what it used in its calculations (i.e., a concentration level of 100 percent). Therefore, no adjustment to Kangtai's calculation is warranted.

**Comment 18:** Whether Kangtai's Sodium Hydroxide Surrogate Value Should be Adjusted

Kangtai's Arguments
- The Department should adjust the surrogate value for sodium hydroxide to account for the difference between the concentration level used by Kangtai (32 percent) and the concentration level of commercially sold sodium hydroxide (50 percent).[87] The GTA data used as a surrogate value likely reflect sodium hydroxide sold at this 50 percent concentration level.
- The Department should strike Petitioners' surrogate value rebuttal information concerning sodium hydroxide concentration levels. Leaving this new information on the record could legally compel the Department to use those values in these final results.

Petitioners' Rebuttal Arguments
- The Department should deny Kangtai's request to adjust the surrogate value of sodium hydroxide.
- In recent cases, the Department has refused to make concentration level adjustments to sodium hydroxide when surrogate value sources do not indicate levels of purity. In this case, the GTA data do not indicate a concentration level.[88]

**Department's Position:** The Department agrees with Petitioners that an adjustment to sodium hydroxide would be arbitrary and we have not made this adjustment for these final results. While the information placed on the record from Kangtai indicates that sodium hydroxide is sold at 50 percent concentration levels commercially, there is also unambiguous evidence that it can be purchased at other concentration levels. Specifically, the product that Kangtai itself purchases is sold at a 32 percent concentration level. Moreover, regardless of what might be the typical

---

[87] See Synthetic Indigo From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 68 FR 53711 (September 12, 2003), and accompanying Issues and Decision Memorandum at Comment 5.
[88] See Final Determination of Sales at Less than Fair Value: Certain Activated Carbon from the People's Republic of China, 72 FR 9508 (March 2, 2007), and accompanying Issues and Decision Memorandum at 64; see also Citric Acid and Certain Citrate Salts From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, 74 FR 16838 (April 13, 2009), and accompanying Issues and Decision Memorandum at 37.

Filed By: Emily Halle, Filed Date: 1/15/13 12:24 PM, Submission Status: Approved

concentration level for commercially traded sodium hydroxide, Kangtai provided no evidence demonstrating that the either the Philippine or South African GTA data reflects that typical concentration level. Consistent with our practice, the Department does not adjust respondents' FOPs when the concentration level in the data source is unknown.[89]

The Department also finds that the evidence placed on the record by Petitioners was merely to rebut Kangtai's assertions regarding the concentration level of commercially traded sodium hydroxide. In other words, Petitioners did not place additional surrogate value options on the record in their rebuttal submission, which would have been untimely. Instead, in order to rebut Kangtai's claim that sodium hydroxide is sold exclusively or commonly at a 50 percent concentration level, Petitioners submitted information indicating that sodium hydroxide is, in fact, traded at various concentration levels. Since Petitioners did not place new surrogate value options on the record, but merely rebutted Kangtai's argument with contrary information concerning concentration levels, we have not stricken this information from the record.

## RECOMMENDATION:

Based on our analysis of the comments received, we recommend adopting all of the above positions. If accepted, we will publish the final results of review and the final dumping margins in the Federal Register.

AGREE_____✓_____ DISAGREE_____

_____
Paul Piquado
Assistant Secretary
 for Import Administration

_____
 14 JANUARY 2013
Date

---

[89] See Certain Helical Spring Lock Washers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 75 FR 29720 (May 27, 2010), and accompanying Issues and Decision Memorandum at Comment 5.



**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-570-898
POR: 06/01/2010 - 05/31/2011
IA/O6: EH
**Public Document**

January 14, 2013

**MEMORANDUM TO**:    The File

**THROUGH**          Mark Hoadley
                     Program Manager, Office 6
                     AD/CVD Operations

**FROM**:            Emily Halle
                     International Trade Analyst, Office 6
                     AD/CVD Operations

                     Andrew Huston
                     International Trade Analyst, Office 6
                     AD/CVD Operations

**CASE:**            2010-2011 Administrative Review of the Antidumping Duty Order
                     on Chlorinated Isocyanurates from the People's Republic of China

**SUBJECT:**         Final Results Surrogate Value Memorandum

---

## I.    Background

The Department of Commerce (Department) calculated normal value (NV) based on factors of production (FOP) data reported by Hebei Jiheng Chemical Company Ltd. (Jiheng) and Juancheng Kangtai Chemical Co., Ltd. (Kangtai) (respondents), producers and exporters of the subject merchandise, in accordance with section 773(c) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.408. A summary of surrogate value selections is provided at Appendix I.

Section 773(c)(1) of the Act provides that, in the case of a non-market economy (NME), the Department shall determine NV using an FOP methodology if the merchandise is exported from an NME and the information does not permit the calculation of NV using home-market prices, third-country prices, or constructed value under section 773(a) of the Act. The Department will base NV on FOPs because the presence of government controls on various aspects of these economies renders price comparisons and the calculation of production costs invalid under normal methodologies. Therefore, NV was calculated using FOPs, which is in accordance with sections 773(c)(3) and (4) of the Act and 19 CFR 351.408(c).



Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

## Summary of Surrogate Values

| Category | Appendix | Factor | HTS Number | Source of Data | Period of Data | Source Value | Source Unit | Jiheng Reported Unit* | Xiangtai Reported Unit* | Inflator/ Deflator | Variable Name | Surrogate Value | SV Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct Materials | 1 | Aluminum Sulfate | 2833.22 | GTA - Philippines | 06/2010/05/2011 | 119.8826 | PHP/KG | MT/MT | | 1 | Aluminum_Sulfate_SV | 119.88 | PHP/KG |
| | 2 | Ammonium Chloride | 2827.10 | GTA - Philippines | 06/2010/05/2011 | 116.0476 | PHP/KG | MT/MT | | 1 | Ammonium_Chloride_SV | 116.05 | PHP/KG |
| | 3 | Barium Chloride | 2827.39.0001 | GTA - Philippines | 06/2010/05/2011 | 7.1390 | PHP/KG | MT/MT | | 1 | Barium_Chloride_SV | 7.13 | PHP/KG |
| | 4 | Boric Acid | 2810.00 | GTA - Philippines | 06/2010/05/2011 | 90.5869 | PHP/KG | MT/MT | | 1 | Boric_Acid_SV | 90.59 | PHP/KG |
| | 5 | Calcium carbonate | 2836.50 | GTA - Philippines | 06/2010/05/2011 | 9.6221 | PHP/KG | | kg/MT | 1 | Calcium_Carbonate_SV | 9.62 | PHP/KG |
| | 6 | Calcium Chloride | 2827.20.1000 | GTA - Philippines | 06/2010/05/2011 | 44.3972 | PHP/KG | | kg/MT | 1 | Calcium_Chloride_SV | 44.40 | PHP/KG |
| | 39 | Chlorine | 2801.10 | GTA - Philippines | 06/2010/05/2011 | 13.3427 | PHP/KG | | kg/MT | 1 | Chlorine_SV | 13.34 | PHP/KG |
| | 7 | Citric Acid | 2918.14 | GTA - Philippines | 06/2010/05/2011 | 194.6924 | PHP/KG | | kg/MT | 1 | Citric_Acid_SV | 194.69 | PHP/KG |
| | 8 | Copper Sulfate | 2833.25 | GTA - Philippines | 06/2010/05/2011 | 97.8621 | PHP/KG | MT/MT | | 1 | Copper_Sulfate_SV | 97.86 | PHP/KG |
| | 9 | Disodium Carbonate | 2836.20 | GTA - Philippines | 06/2010/05/2011 | 8.2099 | PHP/KG | MT/MT | | 1 | Disodium_Carbonate_SV | 8.21 | PHP/KG |
| | 10 | Ferric Trichloride Chloride of Iron | 2821.39.0009 | GTA - Philippines | 06/2010/05/2011 | 17.8105 | PHP/KG | MT/MT | | 1 | Ferric_Trichloride_SV | 17.81 | PHP/KG |
| | 11 | Filter Aid (silicon dioxide) | 2811.22 | GTA - Philippines | 06/2010/05/2011 | 129.1606 | PHP/KG | MT/MT | | 1 | Filter_Aid_SV | 129.16 | PHP/KG |
| | 12 | Liquid Ammonia | 2814.10 | GTA - Philippines | 06/2010/05/2011 | 17.3619 | PHP/KG | MT/MT | | 1 | Liquid_Ammonia_SV | 17.36 | PHP/KG |
| | 13 | Magnesium Stearate | 2915.70 | GTA - Philippines | 06/2010/05/2011 | 89.2909 | PHP/KG | MT/MT | | 1 | Magnesium_Stearate_SV | 89.29 | PHP/KG |
| | 14 | Polyacrylate Sodium | 3906.90 | GTA - Philippines | 06/2010/05/2011 | 80.9229 | PHP/KG | MT/MT | | 1 | Polyacrylate_Sodium_SV | 80.92 | PHP/KG |
| | 15 | Sodium Bicarbonate | 2836.30 | GTA - Philippines | 06/2010/05/2011 | 12.9824 | PHP/KG | MT/MT | | 1 | Sodium_Carbonate_SV | 12.98 | PHP/KG |
| | 16 | Sodium Chloride | 2501.00.9002 | GTA - Philippines | 06/2010/05/2011 | 2.3041 | PHP/KG | MT/MT | | 1 | Sodium_Chloride_SV | 2.30 | PHP/KG |
| | 17 | Sodium Hydroxide | 2815.12 | GTA - Philippines | 06/2010/05/2011 | 11.2670 | PHP/KG | | kg/MT | 1 | Sodium_Hydroxide_SV | 11.27 | PHP/KG |
| | 18 | Sodium Sulfate | 2833.11 | GTA - Philippines | 06/2010/05/2011 | 5.1602 | PHP/KG | MT/MT | | 1 | Sodium_Sulfate_SV | 5.16 | PHP/KG |
| | 19 | Sodium Sulfite | 2832.10 | GTA - Philippines | 06/2010/05/2011 | 19.6208 | PHP/KG | MT/MT | | 1 | Sodium_Sulfite_SV | 19.62 | PHP/KG |
| | 20 | Sulfuric Acid | 2807.00 | GTA - Philippines | 06/2010/05/2011 | 13.7102 | PHP/KG | MT/MT | | 1 | Sulfuric_Acid_SV | 13.71 | PHP/KG |
| | 21 | Urea | 3102.10 | GTA - Philippines | 06/2010/05/2011 | 13.7280 | PHP/KG | MT/MT | | 1 | Urea_SV | 13.73 | PHP/KG |
| | 22 | Water | | Doing Business in Canarias Sur | 2009 | 33.5500 | PHP/MT | MT/MT | | | Water_SV | 33.55 | PHP/MT |
| | 23 | Zinc Oxide | 2817.00.1000 | GTA - Philippines | 06/2010/05/2011 | 66.2949 | PHP/KG | MT/MT | | 1 | Zinc_Oxide_SV | 66.29 | PHP/KG |
| | 24 | Zinc Sulfate | 2833.29.0009 | GTA - Philippines | 06/2010/05/2011 | 16.9859 | PHP/KG | MT/MT | | 1 | Zinc_Sulfate_SV | 16.99 | PHP/KG |
| Packing | 25 | Carton | 4819.10 | GTA - Philippines | 06/2010/05/2011 | 90.6932 | PHP/KG | kg/MT | | 1 | Carton_SV | 90.70 | PHP/KG |
| | 26 | Desiccant | 2811.22 | GTA - Philippines | 06/2010/05/2011 | 129.1606 | PHP/KG | kg/MT | | 1 | Desiccant_SV | 129.16 | PHP/KG |
| | 27 | Labels | 4821.10.9000 | GTA - Philippines | 06/2010/05/2011 | 471.5892 | PHP/KG | kg/MT | | 1 | Label_SV | 471.59 | PHP/KG |
| | 28 | Palm Rope | 5607.90 | GTA - Philippines | 06/2010/05/2011 | 288.5321 | PHP/KG | kg/MT | | 1 | Palm_Rope_SV | 288.53 | PHP/KG |
| | 29 | Plastic Bag | 3923.21.1000 | GTA - Philippines | 06/2010/05/2011 | 55.1196 | PHP/KG | kg/MT | kg/MT | 1 | Inner_Plastic_Bag_SV | 55.12 | PHP/KG |
| | 30 | Plastic Film | 3920.69 | GTA - Philippines | 06/2010/05/2011 | 412.0700 | PHP/KG | kg/MT | kg/MT | 1 | Plastic_Film_SV | 412.07 | PHP/KG |
| | 31 | Plastic Pail | 3923.90 | GTA - Philippines | 06/2010/05/2011 | 231.2495 | PHP/KG | kg/MT | kg/MT | 1 | Plastic_Pail_SV | 231.25 | PHP/KG |
| | 32 | Plastic Pail Lid | 3923.50 | GTA - Philippines | 06/2010/05/2011 | 207.2933 | PHP/KG | kg/MT | kg/MT | 1 | Plastic_Pail_Lid_SV | 207.29 | PHP/KG |
| | 33 | Plywood | -- | Philippines Forest Management Bureau | 2009 | 36.5258 | PHP/KG | kg/MT | | 1.057580969 | Plywood_SV | 38.64 | PHP/KG |
| | 34 | Rope | 5607.49 | GTA - Philippines | 06/2010/05/2011 | 129.0149 | PHP/KG | kg/MT | | 1 | Rope_SV | 129.01 | PHP/KG |
| | 35 | Superstacks | 6305.33 | GTA - Philippines | 06/2010/05/2011 | 26.3242 | PHP/KG | kg/MT | | 1 | Superstack_SV | 26.32 | PHP/KG |
| | 36 | Wooden Pallet | 4415.20 | GTA - Philippines | 06/2010/05/2011 | 52.4148 | PHP/KG | pieces/MT | pieces/MT | 1 | Wooden_Pallet_SV | 52.41 | PHP/KG |
| | 37 | Wooden Rods | 4409.20.9000 | GTA - Philippines | 06/2010/05/2011 | 37.5256 | PHP/KG | kg/MT | | 1 | Wooden_Rods_SV | 37.53 | PHP/KG |
| | 38 | Ammonium Sulfate | 3102.21 | GTA - Philippines | 06/2010/05/2011 | 10.6173 | PHP/KG | MT/MT | | 1 | Ammonium_Sulfate_SV | 10.62 | PHP/KG |
| By-Products | 39 | Chlorine | 2801.10 | GTA - Philippines | 06/2010/05/2011 | 13.3427 | PHP/KG | MT/MT | | 1 | Chlorine_BY_SV | 13.34 | PHP/KG |
| | 40 | Hydrogen Gas | 2804.10 | GTA - Philippines | 06/2010/05/2011 | 462.2509 | PHP/KG | kg/MT | | 1 | Hydrogen_Gas_SV | 462.25 | PHP/KG |
| | 41 | Coal (Steam Coal) | 2701.19 | GTA - Philippines | 06/2010/05/2011 | 1.4437 | PHP/KG | MT/MT | kg/MT | 1 | Steam_Coal_SV | 1.44 | PHP/KG |
| Utilities | 42 | Electricity | -- | Doing Business in Canarias Sur | 2009 | 7.81 | PHP/KwH | kwh/MT | kWh/MT | 1 | Electricity_SV | 7.81 | PHP/KwH |
| | 43 | Steam | 2711.11 | GTA - South Africa | 2008 | 0.0835 | rand/KG | MT/MT | | 1 | Steam_SV | 0.08 | rand/KG |
| Labor | 44 | Labor/ Skilled and Unskilled | -- | Philippines ILO Chapter 6A | 2008 | 3.33 | USD/hour | hour/MT | hour/MT | 1 | Labor_SV | 3.33 | USD/hour |
| Financial Ratios | 45 | Overhead | -- | Mabuhay Vinyl Corporation Financial Statements | 2010-2011 | 24.58% | percent | | | | OVRHDSV | 0.2458 | % as a decimal |
| | | SG&A | -- | | | 13.28% | percent | | | | SGASV | 0.1328 | |
| | | Profit | -- | | | 6.51% | percent | | | | PROFTSV | 0.0651 | |
| Transportation | 46 | Truck Freight | -- | CTAP | 2010 | 0.0120 | PHP/Km/Kg | km | km | 1 | Truck_SV | 0.01 | PHP/Km/Kg |

\* Where reported unit and source unit differ, the source unit has been converted in the margin calculation program to match the reported unit.

IMF - International Financial Statistics
Consumer Prices, All Items
Philippines

| Month/Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 129.958 | 131.540 | 131.962 | 132.489 | 132.700 | 133.439 | | | | | | |
| 2010 | 125.000 | 125.633 | 125.844 | 126.582 | 126.477 | 126.793 | 127.215 | 127.743 | 127.743 | 127.637 | 128.797 | 129.219 |
| 2009 | 120.359 | 120.886 | 121.097 | 121.730 | 121.730 | 122.363 | 122.574 | 122.679 | 123.101 | 123.523 | 124.156 | 124.684 |
| 2008 | 112.342 | 112.764 | 113.502 | 115.295 | 116.667 | 118.565 | 120.042 | 120.570 | 120.359 | 120.148 | 119.937 | 119.409 |
| 2007 | 107.384 | 107.278 | 107.278 | 107.489 | 107.806 | 108.333 | 108.966 | 109.072 | 109.283 | 109.494 | 109.916 | 110.759 |
| 2006 | 103.481 | 104.219 | 104.536 | 104.747 | 104.958 | 105.591 | 105.907 | 106.224 | 106.224 | 106.435 | 106.646 | 106.857 |
| 2005 | 97.679 | 97.890 | 98.101 | 98.523 | 99.051 | 99.684 | 100.422 | 100.949 | 101.266 | 101.688 | 102.321 | 102.637 |

| CPI for POR: | 129.5 |
|---|---|

| | CPI | Inflator |
|---|---|---|
| Philippine Forest Management Bureau Plywood Statistics (2009) | 122.4 | 1.05781 |

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898  Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.1

| Philippines Import Statistics |
| Aluminum Sulfate |
| Commodity: 2833.22, Aluminum Sulfate |

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
| | PHP | Quantity (KG) | |
|---|---|---|---|
| Czech Republic | 160,992.82 | 2186 | 73.64721866 |
| Hong Kong | 0 | 0 | 0 |
| Japan | 84,821.89 | 67 | 1265.998358 |
| Malaysia | 314,444.09 | 67210 | 4.67853132 |
| Mexico | 4,430,668.46 | 91948 | 48.18667573 |
| Singapore | 0 | 0 | 0 |
| Taiwan | 857,974.45 | 135750 | 6.320253775 |
| United States | 0 | 0 | 0 |
| China | 37,163,283.80 | 4963270 | 7.48909927 |
| India | 247,576.77 | 22467 | 10.33035458 |
| Indonesia | 5,961,632.28 | 792280 | 7.524640632 |
| Korea, South | 2,177,154.29 | 12300 | 177.0094138 |
| **Total** | 5,848,901.71 | 297161 | 19.68260206 PHP/KG |

Appx3337

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.2

**Philippines Import Statistics**
**Ammonium Chloride**
**Commodity: 2827.10, Ammonium Chloride**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 406,505.35 | 8899 | 45.679891 |
| Germany | 0 | 0 | 0 |
| Japan | 238,170.81 | 1296 | 183.7737731 |
| Malaysia | 0 | 0 | 0 |
| Singapore | 0 | 0 | 0 |
| Taiwan | 0 | 0 | 0 |
| United States | 915,235.27 | 3247 | 281.871041 |
| China | 134,069,061.56 | 18424012 | 7.25717086 |
| Thailand | 895,167.73 | 13125 | 68.20325562 |
| **Total** | 1,559,911.43 | 13442.0000 | 116.0475696 PHP/KG |

Appx3338

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Appendix III.3

| Philippines Import Statistics | | | |
|---|---|---|---|
| **Barium Chloride** | | | |
| **Commodity: 2827.39.0001, Barium Chloride** | | | |
| | | | |
| **Partner Country** | **06/01/2010-05/31/2011** | | **PHP AUV** |
| | **PHP** | **Quantity (KG)** | |
| Japan | 0 | 0 | 0 |
| Spain | 0 | 0 | 0 |
| Taiwan | 151,441.01 | 21240 | 7.129991055 |
| ~~China~~ | ~~1,014,299.92~~ | ~~53700~~ | ~~18.88826667~~ |
| **Total** | 151441.01 | 21240.0000 | 7.129991055 **PHP/KG** |

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.4

**Philippines Import Statistics**
**Boric Acid**
**Commodity: 2810.00, Oxides Of Boron; Boric Acids**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Japan | 50,285.52 | 364 | 138.1470 |
| Malaysia | 0 | 0 | 0.0000 |
| Mexico | 0 | 0 | 0.0000 |
| Peru | 0 | 0 | 0.0000 |
| Taiwan | 10,167.84 | 416 | 24.4419 |
| United States | 9,833,266.51 | 108438 | 90.6810 |
| China | 1,187,215.27 | 38460 | 30.8688 |
| Korea, South | 547,461.41 | 9802 | 55.8520 |
| **Total** | 9,893,719.87 | 109218 | 90.5869 **PHP/KG** |

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.5

**Philippines Import Statistics**
**Calcium Carbonate**
**Commodity: 2836.50, Calcium Carbonate**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 4,487,233.82 | 295550 | 15.18265546 |
| Austria | 839,257.93 | 33660 | 24.93339067 |
| Belgium | 820,305.30 | 43848 | 18.70792967 |
| Canada | 0 | 0 | 0 |
| Finland | 0 | 0 | 0 |
| France | 0 | 0 | 0 |
| Germany | 2,227,563.14 | 61386 | 36.28780406 |
| Hong Kong | 1,229,499.99 | 208400 | 5.899712044 |
| Iran | 83,922.21 | 8935 | 9.392524902 |
| Italy | 531,227.75 | 18544 | 28.64688039 |
| Japan | 20,122,869.67 | 1250760 | 16.08851392 |
| Jordan | 555,722.20 | 82112 | 6.767856099 |
| Malaysia | 65,696,047.46 | 5824854 | 11.2785741 |
| Netherlands | 0 | 0 | 0 |
| Saudi Arabia | 0 | 0 | 0 |
| Singapore | 31,858,734.77 | 2691230 | 11.83798292 |
| South Africa | 0 | 0 | 0 |
| Switzerland | 2,186,895.13 | 70864 | 30.86045284 |
| Taiwan | 48,876,197.29 | 8563861 | 5.707261864 |
| United Kingdom | 5,182,748.93 | 162095 | 31.97352744 |
| United States | 1,548,645.31 | 40096 | 38.6234365 |
| China | 70,706,467.57 | 12493997 | 5.659235197 |
| India | 11,852,526.36 | 4472038 | 9.404059067 |
| Indonesia | 134,729,649.12 | 22552368 | 5.976296996 |
| Korea, South | 7,120,840.58 | 503550 | 14.14421851 |
| Thailand | 64,391,134.35 | 5319243 | 12.10531919 |
| Vietnam | 50,724,069.48 | 4524382 | 13.20047765 |
| **Total** | 186,246,870.90 | 19356195 | 9.622080729 **PHP/KG** |

Appx3341

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Appendix III.6

| Philippines Import Statistics | | | |
|---|---|---|---|
| Calcium Chloride | | | |
| Commodity: 2827.20.1000, Commercial Grades | | | |

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Canada | 0 | 0 | 0.0000 |
| Czech Republic | 335,114.36 | 3411 | 98.2452 |
| France | 0 | 0 | 0.0000 |
| Germany | 26,988.25 | 202 | 133.6052 |
| Singapore | 102,130.37 | 2121 | 48.1520 |
| Switzerland | 112,968.92 | 1044 | 108.2078 |
| United States | 967,289.39 | 28010 | 34.5337 |
| ~~China~~ | ~~3,359,812.29~~ | ~~418502~~ | ~~8.0282~~ |
| ~~Korea, South~~ | ~~0~~ | ~~0~~ | ~~0.0000~~ |
| **Total** | 1544491.29 | 34788 | 44.39724 **PHP/KG** |

Appx3342

Official Document: A-570-898  Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.7

**Philippines Import Statistics**
**Citric Acid**
**Commodity: 2918.14, Citric Acid**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 0 | 0 | 0 |
| Austria | 3,056,781.27 | 49887 | 61.27410488 |
| Brazil | 3,477,062.46 | 41360 | 84.0682413 |
| Germany | 61,132.82 | 163 | 375.0479755 |
| Hong Kong | 0 | 0 | 0 |
| Japan | 5,221,711.99 | 4160 | 1255.219228 |
| Malaysia | 0 | 0 | 0 |
| Poland | 0 | 0 | 0 |
| Singapore | 1,095,406.46 | 9171 | 119.4424229 |
| Spain | 0 | 0 | 0 |
| Sweden | 10,600.51 | 34 | 311.7797059 |
| Switzerland | 27,966.32 | 226 | 123.7447788 |
| Taiwan | 106,180.64 | 1749 | 60.70934248 |
| United Kingdom | 346,296.05 | 2784 | 124.387949 |
| United States | 19,013,042.69 | 57141 | 332.7390611 |
| Uruguay | 162,673.00 | 660 | 246.4742424 |
| China | 365,799,513.23 | 9042521 | 40.78487696 |
| Indonesia | 22,842.83 | 313 | 72.98038754 |
| Korea, South | 2,274,717.48 | 46334 | 49.09709439 |
| Thailand | 936,989.25 | 2296 | 408.0964068 |
| **Total** | 32578854.21 | 167335 | 194.6924087 **PHP/KG** |

Appx3343

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Appendix III.8

| Philippines Import Statistics |
|---|
| Copper Sulfate |
| Commodity: 2833.25, Copper Sulfate |

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 51,966.17 | 489 | 106.2703 |
| Austria | 0 | 0 | 0.0000 |
| Canada | 1,873,565.57 | 8466 | 221.3047 |
| Germany | 0 | 0 | 0.0000 |
| Italy | 0 | 0 | 0.0000 |
| Japan | 547,646.20 | 2287 | 239.4605 |
| Malaysia | 111,050.45 | 142 | 782.0454 |
| Mexico | 801,871.72 | 22430 | 35.7500 |
| Singapore | 366,179.87 | 126 | 2906.1894 |
| Sweden | 0 | 0 | 0.0000 |
| Taiwan | 175,807,046.62 | 1744361 | 100.7859 |
| United States | 16,249,015.35 | 222559 | 73.0099 |
| China | 28,442,955.37 | 274092 | 103.7746 |
| India | 53,876.92 | 112 | 481.0439 |
| Korea, South | 2,228,956.32 | 25036 | 88.8880 |
| Thailand | 9,453,301.44 | 103020 | 91.7648 |
| **Total** | 195,808,341.95 | 2000860 | 97.86209028 PHP/KG |

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.9

**Philippines Import Statistics**
**Disodium Carbonate**
**Commodity: 2836.20, Disodium Carbonate**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 3,457,941.16 | 214889 | 16.0918 |
| Bulgaria | 30,405,979.84 | 3818146 | 7.9635 |
| Germany | 109,691.20 | 580 | 189.1228 |
| Hong Kong | 0 | 0 | 0.0000 |
| Iran | 0 | 0 | 0.0000 |
| Japan | 2,439,653.39 | 50379 | 48.4260 |
| Kenya | 105,799,785.12 | 12584750 | 8.4070 |
| Malaysia | 0 | 0 | 0.0000 |
| Singapore | 2,031,421.96 | 654000 | 3.1061 |
| Spain | 812,525.50 | 95285 | 8.5273 |
| Taiwan | 1,120,471.22 | 259593 | 4.3163 |
| United States | 302,138,766.68 | 36929000 | 8.1816 |
| China | 520,935,228.91 | 75709629 | 6.8809 |
| India | 40,377,295.46 | 8984006 | 4.4944 |
| Indonesia | 0 | 0 | 0.0000 |
| Korea, South | 1,051,053.36 | 214086 | 4.9095 |
| Thailand | 82,507.46 | 5442 | 15.1778 |
| **Total** | 448,316,236.07 | 54606622 | 8.2099244 PHP/KG |

Appx3345

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

**Philippines Import Statistics**
**Ferric Trichloride**
**Commodity: 2827.39.0009, Other**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
| --- | --- | --- | --- |
| | PHP | Quantity (KG) | |
| Australia | 18,317.05 | 20 | 915.8525 |
| Chile | 309,343.97 | 24058 | 12.8583 |
| Czech Republic | 176,462.02 | 1646 | 107.2066 |
| France | 352,862.45 | 22219 | 15.8811 |
| Germany | 2,128,792.17 | 20640 | 103.1392 |
| Japan | 6,697,884.91 | 121397 | 55.1734 |
| Malaysia | 4,535,934.21 | 708600 | 6.4013 |
| Singapore | 0 | 0 | 0.0000 |
| Spain | 0 | 0 | 0.0000 |
| Taiwan | 6,038,282.32 | 391944 | 15.4060 |
| United Kingdom | 0 | 0 | 0.0000 |
| United States | 3,012,163.72 | 16008 | 188.1661 |
| China | 1,169,465.15 | 32158 | 36.3662 |
| India | 0 | 0 | 0.0000 |
| Thailand | 32,671,637.42 | 129926 | 97.5297 |
| **Total** | 23,270,042.82 | 1306532 | 17.8105418 **PHP/KG** |

Appx3346

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.11

**Philippines Import Statistics**
**Filter Aid**
**Commodity: 2811.22, Silicon Dioxide**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 0 | 0 | 0 |
| Belgium | 3,886,622.48 | 21055 | 184.593801 |
| Gabon | 0 | 0 | 0 |
| Germany | 24,692,467.79 | 67584 | 365.3596678 |
| Hong Kong | 975,494.69 | 18486 | 52.76937628 |
| Hungary | 0 | 0 | 0 |
| Iran | 124,442.78 | 12680 | 9.814099369 |
| Italy | 0 | 0 | 0 |
| Japan | 30,983,604.40 | 197624 | 156.7805752 |
| Malaysia | 2,285,063.06 | 23837 | 95.86202374 |
| Netherlands | 2,780,954.84 | 10835 | 256.6640369 |
| Portugal | 45,734.00 | 11 | 4157.636364 |
| Singapore | 1,420,596.05 | 98091 | 14.48243009 |
| Spain | 3,931.25 | 7 | 561.6071429 |
| Switzerland | 0 | 0 | 0 |
| Taiwan | 8,231,535.70 | 144187 | 57.08930555 |
| United Kingdom | 1,116,128.95 | 1566 | 712.7260217 |
| United States | 3,977,199.91 | 27476 | 144.7517801 |
| ~~China~~ | ~~68,713,580.44~~ | ~~2090554~~ | ~~32.86659866~~ |
| ~~India~~ | ~~17,961,100.24~~ | ~~444758~~ | ~~40.38398464~~ |
| ~~Indonesia~~ | ~~4,722,042.97~~ | ~~72582~~ | ~~65.05804428~~ |
| ~~Korea, South~~ | ~~25,019,467.30~~ | ~~445385~~ | ~~56.17492125~~ |
| ~~Thailand~~ | ~~2,770,714.47~~ | ~~73714~~ | ~~37.58735749~~ |
| ~~Vietnam~~ | ~~7,084.90~~ | ~~1030~~ | ~~6.878543689~~ |
| **Total** | 80523775.9 | 623439 | 129.160633 **PHP/KG** |

Appx3347

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.12

**Philippines Import Statistics**
**Liquid Ammonia**
**Commodity: 2814.10, Anhydrous Ammonia**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 949,751,657.25 | 55000000 | 17.26821195 |
| Egypt | 648,252,300.80 | 33028178 | 19.62724982 |
| Germany | 926,278.00 | 5221 | 177.4139054 |
| Iran | 0 | 0 | 0 |
| Japan | 4,093,557.13 | 22810 | 179.4632674 |
| Malaysia | 0 | 0 | 0 |
| Qatar | 0 | 0 | 0 |
| Saudi Arabia | 91,977,834.98 | 9575933 | 9.605104273 |
| Singapore | 41,148.21 | 600 | 68.58035 |
| Taiwan | 0 | 0 | 0 |
| United States | 45,533.43 | 20 | 2276.6715 |
| China | 2,345,637.81 | 155280 | 15.10585916 |
| Indonesia | 231,288,022.06 | 18128040 | 12.75857854 |
| Thailand | 0 | 0 | 0 |
| **Total** | 1,695,088,309.80 | 97632762 | 17.36188012 **PHP/KG** |

Appx3348

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.13

**Philippines Import Statistics**
**Magnesium Stearate**
**Commodity: 2915.70, Palmitic Acid, Stearic Acid, Their Salts And Esters**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 0 | 0 | 0.0000 |
| Belgium | 0 | 0 | 0.0000 |
| Canada | 1,005,253.49 | 11432 | 87.9333 |
| Denmark | 449,567.54 | 2804 | 160.3308 |
| France | 1,378,281.94 | 1098 | 1255.2659 |
| Germany | 5,085,223.59 | 27625 | 184.0805 |
| Ireland | 0 | 0 | 0.0000 |
| Italy | 1,377,714.15 | 6670 | 206.5538 |
| Japan | 227,912.37 | 542 | 420.5025 |
| Malaysia | 32,187,925.65 | 398489 | 80.7749 |
| Netherlands | 0 | 0 | 0.0000 |
| Singapore | 7,095,250.74 | 76437 | 92.8248 |
| Switzerland | 0 | 0 | 0.0000 |
| Taiwan | 3,218,821.78 | 98088 | 32.8157 |
| United Kingdom | 0 | 0 | 0.0000 |
| United States | 5,439,327.91 | 20389 | 266.7776 |
| ~~China~~ | ~~4,243,243.75~~ | ~~56644~~ | ~~75.4448~~ |
| ~~India~~ | ~~16,730,260.24~~ | ~~159811~~ | ~~104.6843~~ |
| ~~Indonesia~~ | ~~19,506,223.41~~ | ~~514675~~ | ~~37.9003~~ |
| ~~Korea, South~~ | ~~0~~ | ~~0~~ | ~~0.0000~~ |
| ~~Thailand~~ | ~~4,408,517.72~~ | ~~26573~~ | ~~165.9574~~ |
| **Total** | 57465279.16 | 643574 | 89.29086501 **PHP/KG** |

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Appx3349

Appendix III.14

**Philippines Import Statistics**
**Polyacrylate Sodium**
**Commodity: 3906.90, Acrylic Polymers Nesoi, In Primary Forms**

| Partner Country | 06/01/2010-05/31/2011 | | |
|---|---|---|---|
| | PHP | Quantity (KG) | PHP AUV |
| Australia | 18,150,527.30 | 106565 | 170.3235 |
| Belgium | 52,186,494.10 | 124062 | 420.6485 |
| Denmark | 0 | 0 | 0.0000 |
| Egypt | 468,752.15 | 2913 | 160.9173 |
| Finland | 2,233,474.77 | 15510 | 144.0022 |
| France | 1,618,077.86 | 9133 | 177.1683 |
| Germany | 3,967,004.53 | 34695 | 114.3394 |
| Hong Kong | 2,991,591.65 | 22769 | 131.3888 |
| Italy | 583,653.08 | 6340 | 92.0588 |
| Japan | 462,580,297.38 | 5256601 | 87.9999 |
| Malaysia | 25,743,579.89 | 450303 | 57.1695 |
| Mexico | 32,031,474.98 | 284320 | 112.6599 |
| Netherlands | 1,396,103.39 | 19086 | 73.1480 |
| New Zealand | 4,883,698.48 | 38165 | 127.9628 |
| Qatar | 3,477,099.08 | 104000 | 33.4336 |
| Saudi Arabia | 9,671,342.61 | 279281 | 34.6294 |
| Singapore | 323,771,248.56 | 3159306 | 102.4818 |
| Spain | 2,934,496.23 | 25077 | 117.0194 |
| Sweden | 190,460.81 | 387 | 492.1468 |
| Switzerland | 1,156,155.86 | 13824 | 83.6340 |
| Taiwan | 493,024,487.80 | 8246481 | 59.7860 |
| Turkey | 992,928.01 | 20952 | 47.3906 |
| United Kingdom | 13,382,614.06 | 151574 | 88.2910 |
| United States | 116,957,299.28 | 1084126 | 107.8816 |
| China | 177,021,956.66 | 2695786 | 65.6673 |
| India | 50,901,109.45 | 998991 | 50.9526 |
| Indonesia | 156,623,757.64 | 1848620 | 84.7247 |
| Korea, South | 56,464,427.64 | 897385 | 62.9211 |
| Thailand | 182,622,156.90 | 2302173 | 76.3445 |
| Vietnam | 562,994.79 | 1056 | 533.1390 |
| Argentina | 0 | 0 | 0.0000 |
| **Total** | 1,574,392,861.86 | 19455470 | 80.92289016 PHP/KG |

Appx3350

Official Document: A-570-898  Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Appendix III.15

**Philippines Import Statistics**
**Sodium Bicarbonate**
**Commodity: 2836.30, Sodium Hydrogencarbonate (Sodium Bicarbonate)**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 15,830,200.54 | 1010064 | 15.6725 |
| Czech Republic | 433,000.28 | 8387 | 51.6276 |
| France | 155,342.72 | 1154 | 134.6124 |
| Germany | 2,859,193.32 | 22836 | 125.2055 |
| Hong Kong | 0 | 0 | 0.0000 |
| Japan | 7,641,520.31 | 12248 | 623.8994 |
| Kenya | 16,129,761.06 | 2530570 | 6.3740 |
| Malaysia | 0 | 0 | 0.0000 |
| Norway | 0 | 0 | 0.0000 |
| Singapore | 85,923.59 | 265 | 324.2400 |
| Sweden | 485,806.35 | 1560 | 311.4143 |
| Switzerland | 137,915.30 | 1956 | 70.5088 |
| Taiwan | 0 | 0 | 0.0000 |
| United Kingdom | 119,562.03 | 5410 | 22.1002 |
| United States | 7,760,110.72 | 383113 | 20.2554 |
| ~~China~~ | ~~47,585,347.96~~ | ~~7180040~~ | ~~6.6274~~ |
| ~~India~~ | ~~2,025,906.00~~ | ~~431679~~ | ~~4.6931~~ |
| ~~Korea, South~~ | ~~2,228,424.94~~ | ~~115440~~ | ~~19.3038~~ |
| ~~Thailand~~ | ~~876,402.79~~ | ~~7200~~ | ~~121.7226~~ |
| **Total** | 51,638,336.22 | 3977563 | 12.98240561 **PHP/KG** |

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Appendix III.16

**Philippines Import Statistics**
**Salt**
**Commodity: 2501.00.9002, Sea Water**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 896,785,463.14 | 390253000 | 2.2980 |
| Canada | 1,092,082.48 | 78780 | 13.8624 |
| Germany | 200,979.68 | 7446 | 26.9916 |
| Hong Kong | 0 | 0 | 0.0000 |
| Ireland | 6,745.85 | 1500 | 4.4972 |
| Israel | 1,361,264.40 | 294000 | 4.6302 |
| Italy | 415,206.57 | 12010 | 34.5717 |
| Malaysia | 0 | 0 | 0.0000 |
| New Zealand | 265,297.23 | 24616 | 10.7774 |
| Singapore | 0 | 0 | 0.0000 |
| Switzerland | 29,309.54 | 5559 | 5.2724 |
| United States | 0 | 0 | 0.0000 |
| China | 262,219.97 | 22864 | 11.0913 |
| India | 0 | 0 | 0.0000 |
| Thailand | 10,044,474.37 | 1918844 | 5.2341 |
| **Total** | 900,156,348.89 | 390676911 | 2.304094057 PHP/KG |

Appx3352

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.17

**Philippines Import Statistics**
**Sodium Hydroxide**

**Commodity: 2815.12, Sodium Hydroxide (Caustic Soda), In Aqueous Solution (Soda Lye Or Liquid Soda)**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 0 | 0 | 0.0000 |
| Germany | 353,553.15 | 5811 | 60.8420 |
| Japan | 221,775,740.12 | 19274046 | 11.5064 |
| Malaysia | 165,411.26 | 1082 | 152.8755 |
| Singapore | 1,615,913.88 | 4816 | 335.5303 |
| Switzerland | 0 | 0 | 0.0000 |
| Taiwan | 167,446,415.78 | 15526086 | 10.7848 |
| United States | 964,122.29 | 8525 | 113.0935 |
| China | 299,752,151.30 | 27485380 | 10.6642 |
| India | 12,172.65 | 24 | 507.1896 |
| Korea, South | 50,846,541.06 | 5036225 | 11.7896 |
| Thailand | 31,190,597.11 | 2663529 | 11.7103 |
| **Total** | 392321156.5 | 34820866 | 11.26700266 PHP/KG |

Appx3353

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.18

**Philippines Import Statistics**
**Sodium Sulphate**
**Commodity: 2833.11, Disodium Sulfate**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 0 | 0 | 0.0000 |
| Hong Kong | 0 | 0 | 0.0000 |
| Japan | 0 | 0 | 0.0000 |
| Singapore | 70,798.56 | 538 | 131.5958 |
| Taiwan | 581,676.12 | 125906 | 4.6199 |
| United Kingdom | 0 | 0 | 0.0000 |
| United States | 0 | 0 | 0.0000 |
| ~~China~~ | ~~152,931,689.01~~ | ~~16542741~~ | ~~9.2554~~ |
| ~~India~~ | ~~0~~ | ~~0~~ | ~~0.0000~~ |
| ~~Indonesia~~ | ~~0~~ | ~~0~~ | ~~0.0000~~ |
| **Total** | 652474.68 | 126444 | 5.16018696 **PHP/KG** |

Appx3354

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.19

**Philippines Import Statistics**
**Sodium Sulfite**
**Commodity: 2832.10, Sodium Sulphites**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
| --- | --- | --- | --- |
| | PHP | Quantity (KG) | |
| Bahrain | 0 | 0 | 0.0000 |
| Germany | 11,339,529.59 | 552400 | 20.5278 |
| Hong Kong | 1,670,395.44 | 125500 | 13.3099 |
| Italy | 1,869,408.09 | 85936 | 21.7535 |
| Japan | 26,550.62 | 197 | 134.7747 |
| Singapore | 0 | 0 | 0.0000 |
| United States | 102,323.09 | 882 | 116.0126 |
| ~~China~~ | ~~87,169,728.09~~ | ~~7689365~~ | ~~11.3351~~ |
| ~~Indonesia~~ | ~~217,233.39~~ | ~~11130~~ | ~~19.5178~~ |
| ~~Korea, South~~ | ~~0~~ | ~~0~~ | ~~0.0000~~ |
| ~~Thailand~~ | ~~29,589,550.27~~ | ~~1482912~~ | ~~19.9492~~ |
| **Total** | 15008206.83 | 764915 | 19.620751 **PHP/KG** |

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Appx3355

Appendix III.20

| Philippines Import Statistics<br>Sulfuric Acid<br>Commodity: 2807.00, Sulfuric Acid; Oleum | | | |
|---|---|---|---|
| **Partner Country** | **06/01/2010-05/31/2011** | | **PHP AUV** |
| | **PHP** | **Quantity (KG)** | |
| Australia | 0 | 0 | 0.0000 |
| Belgium | 0 | 0 | 0.0000 |
| Germany | 0 | 0 | 0.0000 |
| Hong Kong | 0 | 0 | 0.0000 |
| Japan | 6,479,191,868.82 | 476476759 | 13.5981 |
| Malaysia | 1,531,316.96 | 44526 | 34.3915 |
| Singapore | 8,386,200.64 | 67479 | 124.2787 |
| Spain | 0 | 0 | 0.0000 |
| Taiwan | 167,605,672.60 | 9953796 | 16.8384 |
| United States | 16,991,767.43 | 225172 | 75.4613 |
| ~~China~~ | ~~773,852,120.24~~ | ~~56361740~~ | ~~13.7301~~ |
| ~~India~~ | ~~0~~ | ~~0~~ | ~~0.0000~~ |
| ~~Korea, South~~ | ~~355,614,654.26~~ | ~~24659098~~ | ~~14.4212~~ |
| ~~Thailand~~ | ~~4,891,892.29~~ | ~~173739~~ | ~~28.1566~~ |
| **Total** | 6673706826 | 486767732 | 13.710249 **PHP/KG** |

Appx3356

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

**Philippines Import Statistics**
**Urea**
**Commodity: 3102.10, Urea, Whether Or Not In Aqueous Solution**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 41,084,211.77 | 2807000 | 14.6363 |
| Bangladesh | 81,970,137.35 | 6598697 | 12.4222 |
| Belgium | 10,831,207.95 | 737140 | 14.6936 |
| Egypt | 0 | 0 | 0.0000 |
| France | 51,176.54 | 280 | 182.7734 |
| Hong Kong | 72,702,699.31 | 5593000 | 12.9989 |
| Japan | 66,147,500.83 | 8249347 | 8.0185 |
| Malaysia | 1,280,358,913.22 | 92807132 | 13.7959 |
| Malaysia, Sarawak | 0 | 0 | 0.0000 |
| Netherlands | 10,810,904.03 | 713340 | 15.1553 |
| Poland | 0 | 0 | 0.0000 |
| Qatar | 1,176,463,158.83 | 81122590 | 14.5023 |
| Russia | 86,790,420.08 | 5614000 | 15.4596 |
| Saudi Arabia | 278,648,536.50 | 22000000 | 12.6658 |
| Singapore | 0 | 0 | 0.0000 |
| Switzerland | 0 | 0 | 0.0000 |
| Ukraine | 0 | 0 | 0.0000 |
| ~~China~~ | ~~3,020,877,671.81~~ | ~~242502376~~ | ~~12.4571~~ |
| ~~Indonesia~~ | ~~1,933,941,073.46~~ | ~~120699262~~ | ~~16.0228~~ |
| ~~Korea, South~~ | ~~84,286,636.73~~ | ~~5848000~~ | ~~14.4300~~ |
| ~~Thailand~~ | ~~0~~ | ~~0~~ | ~~0.0000~~ |
| ~~Vietnam~~ | ~~74,095,002.82~~ | ~~4943250~~ | ~~14.9891~~ |
| **Total** | 3,105,858,866.41 | 226242526 | 13.7280065 **PHP/KG** |

Appx3357

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.22

| Doing Business in Camarines a Sur |
| Water |

**Commercial Use**
Naga City (51 up)                    26.3 PHP/cu.m.
Iriga City/Pili (41 and over)        40.8 PHP/cu.m.

**Average rate:**                    **33.55 PHP/MT**

Appx3358

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.23

| Philippines Import Statistics | | |
|---|---|---|
| Zinc Oxide | | |
| Commodity: 2817.00.1000, Zinc Oxide | | |

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Canada | 108,752.01 | 10250 | 10.6100 |
| Germany | 3,116,871.73 | 2180 | 1429.7577 |
| Hong Kong | 0 | 0 | 0.0000 |
| Japan | 3,532,506.01 | 3546 | 996.1946 |
| Malaysia | 2,065,839.40 | 27642 | 74.7355 |
| Peru | 9,693,687.90 | 98150 | 98.7640 |
| Singapore | 1,342,560.11 | 6531 | 205.5673 |
| Taiwan | 58,354,779.06 | 1051610 | 55.4909 |
| United States | 1,409,417.64 | 1155 | 1220.2750 |
| China | 59,800,396.69 | 800501 | 74.7037 |
| India | 4,188,755.49 | 83695 | 50.0479 |
| Indonesia | 10,902,988.05 | 104212 | 104.6232 |
| Korea, South | 9,835,428.26 | 265927 | 36.9854 |
| Thailand | 6,886,990.48 | 101515 | 67.8421 |
| **Total** | 79,624,413.86 | 1201064 | 66.29489674 **PHP/KG** |

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Appendix III.24

| **Philippines Import Statistics** <br> **Zinc Sulphate** <br> **Commodity: 2833.29.0009, B. Other** | | | |
|---|---|---|---|
| **Partner Country** | **06/01/2010-05/31/2011** | | **PHP AUV** |
| | **PHP** | **Quantity (KG)** | |
| Canada | 34,712.01 | 157 | 221.0956 |
| Germany | 7,576,796.94 | 45553 | 166.3293 |
| Hong Kong | 254,324.59 | 5154 | 49.3451 |
| Italy | 141,729.09 | 10000 | 14.1729 |
| Japan | 3,250,819.13 | 56518 | 57.5183 |
| Malaysia | 10,597,241.77 | 1904075 | 5.5656 |
| Mexico | 1,461,982.96 | 40716 | 35.9068 |
| Saudi Arabia | 0 | 0 | 0.0000 |
| Singapore | 0 | 0 | 0.0000 |
| Sweden | 0 | 0 | 0.0000 |
| Switzerland | 0 | 0 | 0.0000 |
| Taiwan | 1,050,772.84 | 73709 | 14.2557 |
| United Kingdom | 629,265.18 | 5489 | 114.6411 |
| United States | 12,520,697.58 | 67424 | 185.7009 |
| ~~China~~ | ~~105,988,965.71~~ | ~~7032988~~ | ~~15.0703~~ |
| ~~India~~ | ~~4,927,893.43~~ | ~~118094~~ | ~~41.7286~~ |
| ~~Indonesia~~ | ~~8,595,655.94~~ | ~~433920~~ | ~~19.8093~~ |
| ~~Korea, South~~ | ~~85,652,022.84~~ | ~~7059643~~ | ~~12.1326~~ |
| **Total** | 37,518,342.09 | 2208795 | 16.98588692 **PHP/KG** |

Appx3360

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

Appendix III.25

**Philippines Import Statistics**
**Cartons**
**Commodity: 4819.10, Cartons, Boxes And Cases, Of Corrugated Paper Or Paperboard**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 3,412,065.71 | 31270 | 109.1163 |
| Austria | 0 | 0 | 0.0000 |
| Bangladesh | 0 | 0 | 0.0000 |
| Belgium | 74,765.66 | 2923 | 25.5784 |
| Canada | 64,789.36 | 1101 | 58.8459 |
| Denmark | 0 | 0 | 0.0000 |
| Finland | 117,819.73 | 213 | 553.1443 |
| France | 5,450,422.43 | 8423 | 647.0880 |
| Germany | 3,508,575.22 | 13763 | 254.9281 |
| Guam | 0 | 0 | 0.0000 |
| Hong Kong | 25,278,955.91 | 179831 | 140.5706 |
| Hungary | 0 | 0 | 0.0000 |
| Israel | 130,814.53 | 492 | 265.8832 |
| Italy | 11,862,777.15 | 309030 | 38.3871 |
| Japan | 27,539,834.45 | 166508 | 165.3965 |
| Malaysia | 16,350,774.53 | 271611 | 60.1992 |
| Mexico | 12,331.21 | 220 | 56.0510 |
| Netherlands | 705,595.98 | 96 | 735.3748 |
| Poland | 5,276.58 | 21 | 251.2657 |
| Singapore | 6,158,655.44 | 86718 | 71.1347 |
| Spain | 0 | 0 | 0.0000 |
| Sri Lanka | 0 | 0 | 0.0000 |
| Sweden | 71,040.87 | 455 | 156.1338 |
| Switzerland | 109,214.33 | 2361 | 46.2577 |
| Taiwan | 4,667,101.80 | 72322 | 64.5323 |
| United Kingdom | 155,512.74 | 252 | 617.1140 |
| United States | 4,374,094.38 | 58908 | 74.2530 |
| ~~China~~ | ~~30,368,548.69~~ | ~~672735~~ | ~~45.1434~~ |
| ~~India~~ | ~~24,196,669.27~~ | ~~1093442~~ | ~~22.0624~~ |
| ~~Indonesia~~ | ~~33,316,845.05~~ | ~~886191~~ | ~~37.5956~~ |
| ~~Korea, South~~ | ~~2,888,800.01~~ | ~~18886~~ | ~~152.9566~~ |
| ~~Thailand~~ | ~~401,703.12~~ | ~~12858~~ | ~~31.2414~~ |
| ~~Vietnam~~ | ~~6,514,442.46~~ | ~~88768~~ | ~~73.3870~~ |
| **Total** | 109,425,418.01 | 1206518 | 90.69522213 PHP/KG |

Appx3361

Official Document: A-570-898 Barcode:3115470-01 REV - Admin Review 6/1/10 - 5/31/11

Appendix III.26

**Philippines Import Statistics**
**Dessicant**
**Commodity: 2811.22, Silicon Dioxide**

| Partner Country | 06/01/2010-05/31/2011 | | PHP AUV |
|---|---|---|---|
| | PHP | Quantity (KG) | |
| Australia | 0 | 0 | 0.0000 |
| Belgium | 3,886,622.48 | 21055 | 184.5938 |
| Gabon | 0 | 0 | 0.0000 |
| Germany | 24,692,467.79 | 67584 | 365.3597 |
| Hong Kong | 975,494.69 | 18486 | 52.7694 |
| Hungary | 0 | 0 | 0.0000 |
| Iran | 124,442.78 | 12680 | 9.8141 |
| Italy | 0 | 0 | 0.0000 |
| Japan | 30,983,604.40 | 197624 | 156.7806 |
| Malaysia | 2,285,063.06 | 23837 | 95.8620 |
| Netherlands | 2,780,954.84 | 10835 | 256.6640 |
| Portugal | 45,734.00 | 11 | 4157.6364 |
| Singapore | 1,420,596.05 | 98091 | 14.4824 |
| Spain | 3,931.25 | 7 | 561.6071 |
| Switzerland | 0 | 0 | 0.0000 |
| Taiwan | 8,231,535.70 | 144187 | 57.0893 |
| United Kingdom | 1,116,128.95 | 1566 | 712.7260 |
| United States | 3,977,199.91 | 27476 | 144.7518 |
| China | 68,713,580.41 | 2090054 | 32.8686 |
| India | 17,961,100.24 | 444758 | 40.3840 |
| Indonesia | 4,722,042.97 | 72582 | 65.0580 |
| Korea, South | 25,019,467.30 | 445385 | 56.1749 |
| Thailand | 2,770,714.47 | 73714 | 37.5874 |
| Vietnam | 7,084.90 | 1030 | 6.8785 |
| **Total** | **80523775.9** | **623439** | **129.160633 PHP/KG** |

Appx3362

Filed By: Emily Halle, Filed Date: 1/18/13 9:04 AM, Submission Status: Approved

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE R. KENTON MUSGRAVE, JUDGE

_____

|  |  |  |
|---|---|---|
| CLEARON CORPORATION, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | Consol. Ct. No. 13-00073 |
| and | ) | |
| | ) | |
| ARCH CHEMICALS, INC., | ) | |
| | ) | |
| Defendant-Intervenor, | ) | |
| and | ) | |
| | ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

_____)

## CONSOLIDATED PLAINTIFF JUANCHENG KANGTAI CHEMICAL CO., LTD.'S
## RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION
## FOR JUDGMENT UPON THE AGENCY RECORD

Gregory S. Menegaz
J. Kevin Horgan
John J. Kenkel
deKIEFFER & HORGAN
729 Fifteenth Street, N.W. Suite 800
Washington, D.C. 20005
(202)783-6900

*On behalf of Consolidated Plaintiff*
*Juancheng Kangtai Chemical Co., Ltd.*

August 15, 2013

surrogate values newly at issue in AR 6.  Kangtai had a *de minimis* rate and only needed to brief

a limited set of issues in its case brief.  *See* Kangtai Case Br. (Dec. 3, 2012), PR 152.  But as the

parties made arguments concerning multiple competing surrogate countries and surrogate values

within them, Kangtai's rebuttal brief necessarily covered a more extensive set of issues.  *See*

Kangtai Rebuttal Br. (Dec. 10, 2012), PR 159.

In the *Final Results*, the Department rejected South Africa and India in their entirety,

despite having relied on India in the original investigation and subsequent reviews up to this one

(and to a very significant degree even in the *Preliminary Results*).  The Department instead

relied solely on the Philippines for the first time.  The Department also denied certain treatment

of Kangtai's data requested by Kangtai in its case brief.  *See Chlorinated Isocyanurates from the*

*People's Republic of China:  Final Results of Antidumping Duty Administrative Review: 2010-*

*2011,* 78 Fed. Reg. 4386 (Jan. 22, 2013) ("*Final Results*").  As the *Final Results* was a brand

new decision with all brand new surrogate values, Kangtai and Jiheng appealed various of those

new surrogate value decisions in these consolidated appeals.

## Argument

### I. The Department's Methodology for Making the Surrogate Country Selection Was Unreasonable.

Kangtai argued that the Department should have selected India as the sole surrogate

country and source of surrogate values.  *See* Kangtai Rebuttal Br. at 4-8.  The Department

disagreed.  *See* AR 6 IDM at Cmt. 2.

The United States' threshold defense was its finding that reliance on *per capita* gross

national product ("GNI") to select economically comparable countries was reasonable and

consistent with its past practice.  *Id.* at Cmt. 2, p. 6.  The Department fails to note that in the 20

6

or more years of Department history on this issue, it had nearly always selected India as the

surrogate country for China unless India utterly lacked an industry, which is not the case here.

In this case, India has, and has had, a large and established chemicals industry from which to

draw surrogate values—far more established than the other countries under consideration.  As

discussed below, the Department relied on the public financial statements of four Indian

chemical companies consuming chlorine to value chlorine in the *Preliminary Results*—there

were no such sources from any other surrogate country that the Department claims were

economically comparable to China.[1]  In short, having selected India as economically comparable

to China for the past 25 years, the reasonableness of the Department's regulation placing primary

reliance on GNI data for country selection was never truly tested.  It is being tested here.  It is

self-evident that India is more economically developed than the Philippines but only due to its

large population its *per capita* GNI ranking falls below the Philippines.  Accordingly, reliance on

GNI ranking has proven unreasonable as a method of identifying economically comparable

countries.  As such, reliance on GNI ranking is contrary to law.  *See* 19 U.S.C.

§1516a(b)(1)(B)(i); *see also*, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,

467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) ("*Chevron*") (holding that agency

interpretations of statutes must be reasonable).

      The *per capita* GNI ratio is a crude benchmark that does not take into account all factors

---

[1] Other examples abound.  For instance, when domestic industry filed antidumping duty and countervailing duty petitions against China's solar cell and panel industry, they looked to India as the surrogate country.  *See e.g., Crystalline and Photovoltaic Cells, Whether or Not Assembled into Modules, Peoples Republic of China:  Initiation of Antidumping Duty Investigation*, 76 Fed. Reg. 70960 (Nov. 16, 2011).  We note that this Notice of Initiation post-dates the instant AR 6 on appeal, indicating that sophisticated U.S. industries considered India economically developed and sophisticated long after the time that the Department unreasonably demoted India's economic development based solely on *per capita* GNI.

7

that bear on whether a country has a significant industry comparable to the subject merchandise or a sophisticated industrial base generally.  The GNI for India is necessarily diluted by the fact that India has one of the largest populations (the denominator in the ratio) in the world.  But at the same time, India is one of the world's largest countries with one of the largest economies (the numerator in the *per capita* GNI ratio).  In modern times, China, India, and the United States are compared frequently and generally as leading world economies so the *per capita* GNI has limited usefulness as an absolute benchmark for country comparability.  This case demonstrates the shortcomings of the GNI ranking.

Indeed, the record reflects that India has a very developed chemical industry with numerous financial statements and public data on chemical pricing, whether from financial statements or *Chemical Weekly*.  No other country comes close to this amount of quality data. The Department noted specifically the complaints of several interested parties including Petitioners about the difficulty of finding surrogate values looking beyond India as the primary surrogate country as well as its own difficulties in finding information from the potential surrogate countries ranked closer to China by per capita GNI.  *Memorandum from Emily Halle and Andrew Huston through Mark Hoadley re: 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China, Preliminary Results Surrogate Value Memorandum* (June 29, 2012) at 2 ("Prelim SV Memo"). PR 104.  As Petitioners correctly noted, the Department's policy emphasizes "good data availability and quality."  Pet. Br. at 6 (PR 155) *citing* Dep't Surr. Country Memo (Sept. 9, 2011) at 2, PR 5.  This review has only demonstrated that there is no good substitute for India in terms of this "good data availability and quality."  As such, the Department should have designated India as its primary surrogate country for the *Final Results*.

8

The Department already valued many of the key costs in India itself in the *Preliminary Results*.  In its *Preliminary Results*, the Department already selected **from India** the surrogate labor rate, the financial ratios, hydrogen gas, and chlorine as well as other chemical factors derived from India's *Chemical Weekly*:  calcium chloride, barium chloride, zinc sulfate, and sulfuric acid.  *See* Prelim SV Memo at 4, PR 104.  The very fact that India publishes a source like *Chemical Weekly* (and the other potential surrogate countries apparently do not publish any such source) speaks volumes about the preeminence of India with respect to its economic comparability as a sophisticated producer of chemicals and to "good data availability and quality."  In short, India counterbalances its lesser *per capita* GNI ranking in this case in many ways that justify its selection as the best surrogate country from which to derive the surrogate values in this case.  The Department's slavish reliance on GNI data in the *Final Results* yields absurd results—that the Philippines is economically developed like China and India is not.

The United States' second defense is that it "will normally look first to the list of countries included in the Surrogate Country Memorandum."  AR 6 IDM at 6.  The Department concedes that it may rely on other surrogate countries if various policy conditions are not satisfied (e.g., lack of sufficient reliable data) in the listed countries but found that such conditions are not present in this case.  *Id.* at 6-7.  This defense is closely linked to the first one in that the countries listed by the Office of Policy are based solely on relative GNI ranking— which Kangtai challenges in this appeal.  In other words, the initial list itself was flawed because it was based only on GNI rankings and ignored precedents and India's obvious economic development.

Kangtai also disputes in this appeal the Department's conclusion that there were no facts with respect to the other surrogate countries that would justify resort to India, i.e., resort to a

9

indicate in its response brief where this statement was placed on the record before case briefs were due. If MVC's 2011 Financial Statement was not available, the Court should order the Department to place the 2011 statement on the administrative record on remand and open the statement to full comment by the parties. As things stand now, it appears that the parties were deprived of the opportunity to comment on or brief this financial statement.

### V. By Product Offset for Ammonium Sulfate

The Department did not select the "best available information" for the surrogate value of Kangtai's by-product offset for ammonium sulfate, contrary to 19 U.S.C. §1677b(c)(1). In the *Preliminary Results*, the Department established the offset based on the surrogate value of the inputs, i.e., ammonia gas or sulfuric acid as contained in ammonium sulfate, as those two components were actually generated in the production of subject merchandise to yield the ammonium sulfate. *See* Dep't Memo. re Surrogate Values for Preliminary Results at 12. PR 104. In contrast, for the *Final Results*, the Department offset cost merely by applying the surrogate value of ammonium sulfate itself. *See* Dep't Memo. re Surrogate Values for Final Results at 10. PR 167. The Department claims that Kangtai suggested doing so but Kangtai did not raise that issue at all in its case or rebuttal brief. The Department cites to Comment 14 of its Issues Memorandum for a discussion of the change in methodology. That Comment confirms that Kangtai did not raise the issue at all, as the Department only summarizes comments by petitioners and Jiheng at that Comment. *See* AR 6 IDM at Cmt. 14.

The explanation provided by the Department is not sufficient. The Department explains in Comment 14 that the Final Results methodology is more consistent with its questionnaire. *Id.* However, the questionnaire it cites is only the one issued to Jiheng, the more integrated producer. Moreover, the questionnaire specifically asks the respondent to provide the inputs to

39

production of the by-product in the excerpt contained in Comment 14. The logical inference is that the value of the inputs is what is most pertinent, *i.e.,* the method that the Department used for the *Preliminary Results*, whereby it valued the inputs consumed in production of the ammonium sulfate.

The Department goes on to explain that normally it would deduct the processing costs from the value of the downstream by-product, *i.e*., ammonium sulfate (*e.g.,* labor and electricity to yield it) but that it did not ask for that information on this record. *Id.* In other words, the Department conceded that it was missing the information needed to effect its change in methodology.

The Department's determination was unreasonable for a number of reasons. First and foremost, no party argued for this change in Kangtai's valuation methodology. Second, the Department conceded that it lacked information to fully implement its change in methodology. As Jiheng points out in its separate Rule 56.2 brief, the Department has a long history of handling the valuation the way it was handled in the *Preliminary Results*. Accordingly, the Department's valuation of the by-product offset was unlawful and unsupported by substantial evidence.

### VI. The Department Should Use the Record Data from the Philippine Electricity Provider Meralco for Calculating the Surrogate Value for Kangtai's Electricity Cost.

Kangtai expressly adopts and incorporates into this brief the arguments and conclusions stated by Jiheng regarding the Department's improper selection of surrogate values for electricity in this administrative review. In particular, the Department's decision to use data from the website of the regional government of Camarines Sur rather than the extensive data published by

40

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE R. KENTON MUSGRAVE, SENIOR JUDGE

|  |  |  |
|---|---|---|
| CLEARON CORP. and OCCIDENTAL CHEMICAL CORPORATION, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| *Defendant,* | ) ) | Consol. Court. No. 13-00073 |
| and | ) ) | |
| ARCH CHEMICALS, INC., HEBEI JIHENG CHEMICAL CO., LTD., and JUANCHENG KANGTAI CHEMICAL CO., LTD., | ) ) ) ) | |
| *Defendant-Intervenors.* | ) ) | |

---

## RULE 56.2 BRIEF IN SUPPORT OF THE MOTION FOR JUDGMENT ON THE AGENCY RECORD FILED BY CLEARON CORP. AND OCCIDENTAL CHEMICAL CORPORATION

James R. Cannon Jr.
Thomas M. Beline

CASSIDY LEVY KENT (USA) LLP
2000 Pennsylvania Ave, N.W.
Suite 3000
Washington, D.C. 20006
(202) 567-2300

August 15, 2013

*Counsel to Plaintiffs Clearon Corp. and Occidental Chemical Corporation*

value labor and the surrogate financial ratios, for which there were no South African

values available. P.R. 108 at 41,751-53. *See also* P.R. 104 (surrogate value memo).

      B.     The Final Phase and Determination

Following the preliminary results, the parties placed additional surrogate value

data on the record and filed case and rebuttal briefs. Among other decisions made in the

*Final Results*, Commerce abandoned the use of South Africa as a surrogate and selected a

country advocated by Kangtai and Jiheng, the Philippines. P.R. 169 at 4387. Commerce

calculated antidumping duty margins of 29.91 percent, *ad valorem*, for Jiheng, and 38.25

percent, *ad valorem*, for Kangtai. P.R. 169 at 4388. This appeal challenges three of the

surrogate value determinations in the *Final Results* addressed below.

      1.     Valuation of urea

One factor of production valued by Commerce is urea. Urea is a nitrogen-based

fertilizer that is a main input into the production of chlorinated isocyanurates. Although

the primary worldwide use for urea is agricultural, urea is also utilized in the production

of various chemicals. The parties presented Commerce with two options for valuing urea

— (1) Philippine import statistics published by Global Trade Atlas ("GTA")[4] or (2)

monthly domestic price data compiled by the Philippine Bureau of Agricultural Statistics

("BAS").[5] Commerce determined that "{b}oth sources of data are from the Philippines,

publicly available, contemporaneous with the POR, and appear to be free of taxes." P.R.

_____

[4] P.R. 122 at Att. 2 (Jiheng Surrogate Value Submission, January 9, 2012).

[5] P.R. 77 at Exh. 1 (Petitioners Surrogate Value Rebuttal, January 17, 2012).

164 at 10 (Comment 5). However, Commerce declined to use BAS data because "there is record evidence that urea is not produced in the Philippines." *Id.*

To reach this conclusion, Commerce relied upon an undated report regarding fertilizer production and consumption in the Philippines that appeared to be from the 1980's. P.R. 164 at 10, citing P.R. 122 at Att. 2. On its face, the document cited by Commerce stated only that urea was imported into the Philippines, not that *all urea* was imported. In fact, the cited report also included a discussion of subsidies to encourage domestic production of fertilizer in the Philippines. *Id.*

Moreover, a 2006 article following the cited webpage and found in the same exhibit, indicated that fertilizer producers (urea is one of the four largest types of fertilizer used in the Philippines) imported ammonia – the major ingredient in urea production. P.R. 122 at Att. 2. The record thus supported the conclusion that urea was manufactured in the Philippines.

Nevertheless, Commerce found that urea was not produced in the Philippines and, therefore, rejected the domestic prices for urea reported by the Philippines Bureau of Agricultural Statistics. P.R. 164 at 10 (Comment 5).

2. Valuation of hydrogen gas

The parties presented Commerce with two options for valuing hydrogen gas — (1) GTA data from the Philippines or (2) sales data from several Indian chemical companies. In the preliminary results, Commerce found that "the GTA does not provide the best representative value for hydrogen because hydrogen, like chlorine, is not frequently traded on an international basis, and incurs special transport costs over long distances." P.R. 104 at 13. Finding that no other South African data existed, Commerce

7

there is a preference for Commerce's use of domestic data, rather than import statistics such as those that the agency relied on in this case."); *Dorbest v. United States*, 30 CIT 1671, 462 F. Supp. 2d 1262, 1278-79 (2006) ("*Dorbest I*") ("the court has always emphasized that in order for import data to be used, there must be reason to believe that the industry in question would use imported inputs"); *Yantai Oriental Juice Co. v. United States*, 26 CIT 605, 617 (2002); *Wuhan Bee Healthy Co. v. United States*, 29 CIT. 587, 374 F. Supp. 2d 1299, 1310 (2005)); *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 288, 366 F. Supp. 2d 1264, 1273-1274 (2005) ("*Hebei II*") ("A domestic price is preferred for the calculation of surrogate values by prior practice, policy, and logic."); *Hebei I*, 28 CIT at 1194 ("Commerce here did not explain why an Indian manufacturer would pay for imported coal.").

Commerce has often relied upon this preference, stating that "domestic prices are preferred" when "both domestic and import prices are available on a tax- and duty-exclusive basis, all else being equal." *Sulfanilic Acid from the People's Republic of China*, 63 Fed. Reg. 63,834, 63,838 (Dep't of Commerce Nov. 17, 1998) (final admin. rev.). And, the preference is longstanding. *Ferrovanadium and Nitrided Vanadium from the Russian Federation*, 62 Fed. Reg. 65,656, 65,661 (Dep't of Commerce Dec. 15, 1997) ("The Department has also articulated a preference for a surrogate country's domestic prices over import values.").

        2.    <u>Commerce erred by concluding that domestic prices did not include domestically produced urea</u>

As just noted, domestic prices are preferred "all else being equal." In other words, domestic prices are preferred over import data when all of the qualifications for

using the surrogate value are equal.  Here, Commerce determined that "{b}oth sources of data are from the Philippines, publicly available, contemporaneous with the POR, and appear to be free of taxes."  P.R. 164 at 10 (Comment 5).[6]  The only issue disqualifying the BAS domestic prices was the finding that urea was not produced in the Philippines.

Thus, the crux of the matter is whether the BAS data reflect resale prices for imported urea or domestic prices for urea produced in the Philippines.  Stated differently, the issue is whether the prices for urea, reported by the Philippine BAS, were in fact "duty-exclusive."  Import prices reported by GTA are "duty-exclusive."  The question is whether the BAS prices were *resale* prices for imported urea, which would include any import duty, or whether the BAS prices were prices for the sale of domestically produced urea, which would not include any import duty.

As support for the proposition that urea is not produced in the Philippines, Commerce relied upon an undated excerpt from the website of the SPIK (the "Agrichemicals & Fertilizers Industry, Samahan sa Pilipinas ng mga Industriyang Kimika").  P.R. 122 at Att. 2 (page 1 of 2).  The reference states: "Urea, potash, and half of the ammonium sulfate are imported while all the phosphatic grades (NP/NPK) and the rest of the ammonium sulfate are produced locally." *Id*.  First, this statement does not state, much less establish, that 100 percent of the urea sold in the Philippines is imported.

---

[6] Likewise, in its November 2011 remand determination in *Clearon Corp. v. United States*, Ct. No.  08-00364, Commerce found that the Philippine Bureau of Agricultural Statistics data represent (1) a broad market segment of retailers across the Philippines, (2) specific to the urea input, (3) exclusive of value added taxes, (4) contemporaneous with the period of review, and, (5) publicly available.  *See Final Results of Redetermination Pursuant to Court Remand*, Court No. 08-00364, Slip Op. 11-142 (Mar. 19, 2012) (available at http://ia.ita.doc.gov/remands/11-142.pdf).

14

Second, the SPIK excerpt indicates that the fertilizer industry "has been liberalized in 1987 fostering free competition particularly in the urea market." P.R. 122 at Att. 2 (page 1 of 2). The page goes on to state that (apparently in 1987) the government provided subsidies "{a}s further incentive for the local producers of fertilizers." *Id.* This reference, therefore, does not establish that all of the urea sold in the Philippines is imported. To the contrary, the excerpt is reasonably understood to mean that there is a competitive urea market in the Philippines that includes local producers (albeit subsidized in 1987).

Following the SPIK excerpt, moreover, the Attachment next includes a 2006 report by Florence Mojica-Sevilla, Senior Agribusiness Specialist, Center for Food and Agri Business, University of Asia and the Pacific, entitled "The Philippine Fertilizer Industry." P.R. 122, Att. 2 (at 1 of 6). This report states that "local fertiliser plants depend partly upon the use of imported raw materials such as rock phosphate, anhydrous ammonia, and sulphuric acid." *Id.* (at 3 of 6). As ammonia is the principle raw material for the production of urea,[7] it appears from the context that urea is in fact produced by "local fertilizer plants" in the Philippines.

The attachment cited by Commerce, read in its entirety, thus contradicts the conclusion that urea is not produced in the Philippines. Commerce's determination is therefore unsupported by substantial evidence. *See, e.g. U.S. Steel Group v. United States,* 96 F. 3d 1352, 1362-63 (Fed. Cir. 1996) (a determination based on incorrect assertions is not supported by substantial evidence).

---

[7] Hawley's Condensed Chemical Dictionary, 1153 (Richard J. Lewis, Sr., ed., John Wiley & Sons, Inc., 14th ed. 2001) (1919).

15

Here, Commerce found that the BAS and GTA data were essentially equivalent in all respects but one.  Commerce found that "{b}oth sources of data {(i.e., BAS and GTA)} are from the Philippines, publicly available, contemporaneous with the POR, and appear to be free of taxes."  P.R. 164 at 10 (Comment 5).  The only reason to reject the BAS (domestic) prices in favor of the GTA (import) prices is the flawed conclusion that the BAS data consisted of sales of imported urea that included duties in the resale price.  Given that the source cited by Commerce does not support that conclusion, the matter should be remanded for reconsideration.

        C.         <u>Commerce's Selection of the Surrogate Value for Hydrogen Gas Was Unsupported by Substantial Evidence and Contrary to Law</u>

In the *Final Results*, Commerce selected Philippine import data as the surrogate value for hydrogen gas despite the record evidence establishing that the total volume of imports into the Philippines was one metric ton and despite the fact that Commerce had previously found GTA data to be "unreliable" because of "problems with transporting hydrogen internationally…."  P.R. 164 at 15-16 (Comment 8).  Commerce failed to consider whether domestic prices reported by Indian companies were more reliable.  *Id.*  By merely stating that India "is no longer on the list of equally economically comparable countries," Commerce abrogated its statutory duty to evaluate whether the data from India were "the best available information" as compared with the problematic data from the Philippines notwithstanding that India might be a less economically comparable market economy country to China than the Philippines.

16

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HONORABLE R. KENTON MUSGRAVE, SENIOR, JUDGE

| | |
|---|---|
| CLEARON CORPORATION and OCCIDENTAL CHEMICAL CORPORATION, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | )  Consol. Ct. No. 13-00073 ) |
| ARCH CHEMICALS, INC., | ) ) |
| Defendant-Intervenor, and | ) ) ) |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. | ) ) |
| Defendant-Intervenor. | ) ) |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

STUART F. DELERY
Assistant Attorney General

JEANNE E. DAVIDSON
Director

PATRICIA M. McCARTHY
Assistant Director
Commercial Litigation Branch
Civil Division
OF COUNSEL:
P.O. Box 480
DAVID RICHARDSON
Ben Franklin Station
Senior Attorney
Washington, D.C. 20530
Office of the Chief Counsel
Tel: (202) 307-0164
   for Trade and Enforcement
Fax: (202) 514-7969
U.S. Department of Commerce
Patricia.McCarthy@usdoj.gov

February 24, 2014
Attorneys for Defendant United States

77.  The other is the GTA Philippine import prices.  Kangtai's First Surrogate Value Submission, Jan. 9, 2012, at Exhibit SV-13, Pub.Doc. 70.

In the Final Results, Commerce selected the GTA Philippine import prices because there was record evidence which raised concerns about the urea domestic production in the Philippines.  I&D Memo, cmt. 5, at 9-10, Pub. Doc. 164.

### 2. Commerce Properly Selected The Philippine Urea Import Pricing Data Over The Domestic Urea Production Data Because Record Evidence Raised Concerns About Domestic Production In 2010

In the Final Results, of the two Philippine surrogate values for urea, an import price and a domestic price, Commerce selected the import price because the record evidence raised concerns about the domestic data.  I&D Memo, cmt. 5 at 9-10, Pub.Doc. 164.  Clearon argues that Commerce's production of domestic production of urea analysis is not supported by the record. Clearon Br. at 11-16.  As we demonstrate below, Commerce's concerns about the market representativeness of domestic production of urea in the Philippines are supported by substantial record evidence.  Commerce appropriately relied on the Philippine import data for the surrogate value for urea.

As explained above, when choosing between two eligible surrogate values in the primary surrogate country, Commerce uses five factors to evaluate which is the best available information:  specificity, broad market average, public availability, contemporaneity, and tax and duty exclusive.  *See Certain Polyester Staple Fiber From the People's Republic of China*, 75 Fed. Reg. 1,336 (Dep't of Commerce Jan. 11. 2010), and accompanying I&D Memo at cmt. 1. Clearon does not dispute that both prices are specific, publicly available, contemporaneous, and duty and tax free.   Clearon is challenging Commerce's determination that, based on record evidence concerning lack of production of urea in the Philippines, the evidence of domestic

48

prices is not representative of a broad market average of Philippine production. Clearon Br. at 11-16.

The record contains evidence that production of urea in the Philippines had declined drastically and that 92 percent of the urea consumed in the Philippines was imported. Jiheng's Second Surrogate Value Submission, Sept. 5, 2012, at Attachment 2, Pub.Doc. 118. An article from the Philippine website, the "Business Mirror," examines the fertilizer requirements in the Philippines and explains that from 2006 to 2010, production of urea in the Philippines has declined such that increasing reliance on imports make the farmers subject to price spikes if the price of oil goes up. *Id*. Although Clearon is correct that, all else being equal between an import and domestic surrogate value, Commerce prefers domestic prices, under the circumstances of this case, it was reasonable for Commerce to rely on the import data as a better market representation of the price of urea in the Philippines rather that the domestic price.

Clearon focuses on the language of Commerce's decision discussing the absence of urea production in the Philippines. Clearon Br. at 11-16. But the Final Results specifically refer to Jiheng's Second Surrogate Value Submission, September 5, 2012, at Attachment 2 (Pub.Doc. 118), which contains the "Business Mirror" article. I&D Memo at 10 n.29, Pub.Doc. 164. As a result, although Commerce's language suggested lack of production, the evidence cited shows there is production in the Philippines. But the underlying concern of the data is that the price of urea in domestic Philippine market is not really representative of the domestic price of urea because domestic production had dropped significantly over time and imports comprised 92 percent of Philippine demand.

In short, because the record contains evidence undermining the representativeness of the Philippine domestic values of urea in the Philippine market, Commerce properly selected the

49

Philippine value for imports of urea into the Philippines, which represent 92 percent of the fertilizer requirements in the Philippines, over the domestic values on the record. As a result, Commerce's selection of the surrogate value for urea should be sustained.

**IV.    Contrary to Kangtai's Argument, Commerce Relied On The 2010 MVC Financial Statement To Derive The Surrogate Financial Ratios**

For the Final Results, Commerce calculated the surrogate financial ratios for SG&A, overhead, and profit using the only Philippine financial statement on the record of the proceeding, the 2010 Mabuhay Vinyl Corporation (MVC) financial statement. I&D Memo, cmt. 13 at 21, Pub.Doc. 164. Kangtai argues that Commerce actually used instead the 2011 MVC financial statement based on a reference in the surrogate value chart attached to the surrogate value memorandum and requests that the Court order Commerce to include it in the administrative record. Kangtai Br. at 38-39. As we explain below, Commerce actually used the 2010 MVC financial statement, and the 2011 MVC financial statement is not properly part of the administrative record.

Kangtai is correct that the chart Appendix III.45 does indicate that the information came from the 2011 MVC financial statement. *See* Final Surrogate Value Memorandum, App.III.45, Pub.Doc. 167. This, however, is merely a typographical error. The 2011 MVC was never submitted on the record of the proceeding. Commerce stated in the Final Results that it agreed that the 2010 MVC financial statement should be used to derive the surrogate financial ratios. I&D Memo, cmt. 13 at 21, Pub.Doc. 164. And, last but not least, the numbers in Commerce's financial ratio chart, contrary to Kangtai's assertion on page 38 of its brief to this Court, do correspond to the numbers in the 2010 MVC financial statement as explained below.

50

In its January 12, 2009 surrogate value submission, Jiheng provided a copy of MVC's 2010 financial statement in a separate segment of this proceeding.  *See* Jiheng's January 12, 2009, Surrogate Value Submission, Tab 4, Consolidated Statements of Income (this is the 67th page of the document).   At the Consolidated Statements of Income section of MVC's 2010 financial statement, the value of the Net Sales is identified as 1,217,602,316 Philippine pesos.  *Id*.  That same figure is the first figure in Commerce's appendix chart in the Final Surrogate Value Memo, App.III.45,) Pub.Doc. 167.  Similarly, on the same page of the 2010 MVC financial statement, interest income is identified as 1,961,057 Philippine pesos. *See* Jiheng's Janaury 12, 2009, Surrogate Value Submission, Tab 4, Consolidated Statements of Income (this is the 67th page of the document).  That same figure appears in second line in Commerce's financial ratio chart in the Final Surrogate Value Memo, at App.III.45, Pub.Doc. 167.  The row identified as Cost of Sales in Commerce's financial ratio chart contains the figure, 863,303,184 Philippine Pesos.  Final Surrogate Value Memo, at App.III.45, Pub.Doc. 167.  This same number can be found in the Cost of Sales section of the 2010 MVC financial statement. *See*, Jiheng's January 12, 2009, Surrogate Value Submission, Tab 4, Consolidated Statements of Income (this is the 82nd page of the document).  These are just examples but all of the other relevant figures were also derived from the 2010 MVC financial statement.

In short, notwithstanding the typographical error on the chart concerning "2011," the record demonstrates that the figures Commerce actually used to calculate the surrogate financial ratios were derived directly from the 2010 MVC financial statement.

Kangtai's request that the Court order Commerce to place the 2011 MVC financial statement on the record for full comment by the parties is improper.  The 2011 MVC financial statement is not part of the administrative record, and Commerce did not rely on it in reaching

51

the Final Results.  Thus, contrary to Kangtai's assertions, no one was denied the opportunity to

comment on or brief the 2011 MVC financial statement.  The 2011 MVC financial statement was

never "presented to or obtained by" Commerce during the administrative proceeding so it is not

properly part of the administrative record for review. 28 U.S.C. § 1516a(b)(2)(A).

In short, the record does not support Kangtai's claim that Commerce used the 2011 MVC

financial statements for the Final Results.  The record shows that Commerce actually used the

2010 MVC financial statement.  Kangtai's request to order Commerce to include it in the

administrative record must be denied because the 2011 MVC financial statement is not properly

part of the administrative record.

**V.     We Respectfully Request A Remand For Commerce To Consider Kangtai's and
        Arch Chemicals' Arguments Concerning Whether It Properly Calculated The
        SG&A Financial Ratio From The Philippine Surrogate Country Financial
        Statement_____**

In the Final Results, Commerce used the labor wage rates from chapter 6A of the

International Labor Organization Yearbook data for the Philippines.  I&D Memo at 12, Pub.

Doc. 164.  Kangtai and Arch Chemicals argue that Commerce failed to properly calculate SG&A

financial ratio because the ILO wage rate that Commerce used to value the labor factor of

production already includes certain wage and benefit expenses that will be double counted if an

adjustment to the financial ratio is not made.  Kangtai Br. at 31-38; Arch Br. at 21-24.  We

respectfully request a voluntary remand for Commerce to consider these comments in the first

instance.

The Court of Appeals for the Federal Circuit has expressed the circumstances under

which it is appropriate to grant a remand.  *See SKF USA, Inc. v. United States*, 254 F.3d 1022

(Fed. Cir. 2001).  In *SKF USA*, the Federal Circuit held that the reviewing court has the

discretion to grant a remand, if an agency requests a remand, without confessing error, in order to reconsider its previous position. *Id*. at 1029.

In this case, it is appropriate for the Court to exercise its discretion in granting the requested remand because given the numbers of viable potential surrogate countries after the preliminary results, Kangtai and Arch Chemicals did not comment, and Commerce did not have the opportunity to respond to comments on Commerce's calculation of the financial ratios using the Philippine data. As explained above, under the governing standard of review, the Court determines if the agency determination is supported by substantial record evidence and is otherwise in accordance with law. *NSK Ltd. v. United States*, 481 F.3d 1355, 1359 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)). The Court would not be able review Commerce's determination, if the interested parties and Commerce have not in the first instance raised, considered and addressed the arguments.

As a result, we respectfully request that the Court remand the financial ratio calculation issue for Commerce to reconsider the SG&A financial ratio calculation in light of the comments concerning the alleged overstatement of labor in the normal value calculation.

## VI. We Respectfully Request A Remand For Commerce To Reconsider Its By-Product Valuation Decision

In the Preliminary Results, Commerce valued the by-products, ammonia gas, and sulfuric acid, with individual surrogate values for ammonia gas and sulfuric acid. Preliminary Results, 77 Fed. Reg. at 41,752, Pub.Doc. 108. In the Final Results, Commerce valued the ammonia gas and sulfuric acid by using the value of the down-stream product made from the ammonia gas and sulfuric acid, ammonium sulfate. I&D Memo, cmt. 14 at 23-24, Pub.Doc. 164. But, because the record did not contain the information on the inputs used to make the down-stream product from

53

the ammonia gas and sulfuric acid, Commerce used the value of the ammonia sulfate as the combined surrogate value for both ammonia gas and sulfuric acid.  *Id*.  Commerce did not explain why it changed its by-product valuation methodology.

Clearon challenges Commerce's determination, stating that using the value of the down-stream product, ammonia sulfate, overstates the value of the by-products, ammonia gas and sulfuric acid, and that the issue should be remanded to Commerce so that the appropriate information can be collected and used to adjust the ammonia sulfate value to only include the value of the by-products, ammonia gas and sulfuric acid.  Clearon Br. at 20-25.

Kangtai and Arch Chemicals challenge the by-product valuation, claiming that Commerce changed its by-product methodology without explanation and should be required to individually value the ammonia gas and sulfuric acid with ammonia gas and sulfuric acid surrogate values as Commerce had in prior reviews.  Kangtai Br. at 39-40; Arch Br. at 24-31.

Because Commerce did not provide an explanation for the new by-product valuation methodology, we respectfully request a voluntary remand of the surrogate country selection for Commerce to consider these comments, provide an explanation and collect additional relevant information if necessary. *See SKF USA*, 254 F.3d at 1029.

## VII.  Commerce's Treatment And Calculation Of Intra-Company Transportation Of Intermediate Products Should Be Voluntarily Remanded For Reconsideration

In the Final Results, Commerce valued the intra-company transportation of intermediate products factor as a separate factor of production rather than considering it to be included in overhead.  I&D Memo, at 25-25, Pub.Doc. 164.   Arch Chemicals challenges this determination, arguing that Commerce changed its intra-company transportation of intermediate products valuation methodology without sufficient notice or explanation.  Arch Br. at 31-35.  Commerce

54

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE R. KENTON MUSGRAVE, JUDGE

_____
                                                     )
CLEARON CORPORATION, *et al.*,                       )
                                                     )
                       Plaintiff,                    )
              v.                                      )
                                                     )
UNITED STATES,                                       )
                                                     )
                       Defendant,                    )     Consol. Ct. No. 13-00073
              and                                    )
                                                     )
ARCH CHEMICALS, INC.,                                )
                                                     )
                       Defendant-Intervenor,         )
              and                                    )
                                                     )
JUANCHENG KANGTAI CHEMICAL CO., LTD. )
                                                     )
                       Defendant-Intervenor.         )
_____)

## CONSOLIDATED PLAINTIFF JUANCHENG KANGTAI CHEMICAL CO., LTD.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Gregory S. Menegaz
J. Kevin Horgan
John J. Kenkel
**deKieffer & Horgan**
1455 Pennsylvania Ave., N.W.
Suite 900B
Washington, D.C. 20004
(202)783-6900

*On behalf of Consolidated Plaintiff*
*Juancheng Kangtai Chemical Co., Ltd.*

April 23, 2014

limited population could focus on the service sector (e.g. tourism and offshore banking) and thus demonstrate a high per capita GNI. That this per capita GNI might correspond closely to that of China would be of no moment if that country did not have a chemicals industry for purposes of this case. The Department must look beyond the per capita GNI ranking when issue has been made of it in the review and when a party has made a credible argument that high quality and high quantities of chemical valuation data exist in a different country that may be more removed from China based merely on per capita GNI ranking.

**B.      Kangtai's By-Product Valuation Should Not Be Remanded.**

In these consolidated appeals, both Kangtai and petitioners separately appealed the Department's costing of Kangtai's by-products. Defendant has metaphorically "thrown up its hands", seeking voluntary remand to "consider these comments, provide an explanation, and collect additional relevant information if necessary." U.S. Resp. Br. at 54. Kangtai disagrees strongly with the defendant's approach. Kangtai proposes two alternative resolutions of this issue.

First, if the Court agrees with Kangtai's response brief and finds that Clearon failed to exhaust administrative remedies, *see* 28 U.S.C. § 2637(d) ("The courts shall, *where appropriate*, require the exhaustion of administrative remedies."), then Kangtai's by-product claim would be the only claim remaining before the Court. In that case, Kangtai is prepared to abandon the claim, rendering remand inappropriate.

If, alternatively, the Court does not require that Clearon exhaust administrative remedies, then Kangtai opposes remand on this issue. Defendant claims that the record did not contain information on the upstream initial by-products. U.S. Resp. Br. at 53-54. This claim is

inaccurate.  Indeed, the Department readily calculated surrogate value costs for those two by-products in the Preliminary Results, in accordance with longstanding practice.  The quantities of those inputs can be and was determined by a chemical formula.  Making a simple illustration, assume for a moment that a company produced two water molecules as a downstream by-product, $2H_2O$.  The claimed initial by-products are hydrogen and oxygen.  By formula, Kangtai is only claiming the absolute formula minimum initial by-product credit, i.e., the equivalent of $2H_2$ and $2O$.  Kangtai is not claiming $5H_2$ and $10O$.  Kangtai's claim is physically and chemically as conservative as it can be.  Further, as noted in Kangtai's response brief, all energy and labor costs were already conservatively reported and attributed to the subject merchandise.  As such, there is no cause to remand this matter to determine the amounts of those initial inputs or additional non-existent processing costs. Moreover, the Court should not grant remand to consider the issues anew and gather new information because the United States excessively delayed briefing and ultimately never answered the question of why the Department's longstanding practice to value the immediate by-products generated in production of the subject merchandise should be abandoned.

Case law supports Kangtai's opposition to remand on these facts. *See Corus Staal BV v. United States*, 387 F. Supp. 2d 1291 (Ct. Int'l Trade 2005), aff'd *Corus Staal BV v. United States*, 186 Fed. Appx. 997; 2006 U.S. App. LEXIS 15022 (Fed. Cir., June 13, 2006).  Just as in the case at bar, the defendant in *Corus Staal* offered little explanation for its remand request, and the expense and delay of the proceedings were projected to be substantial.  The *Corus Staal* Court was displeased that:

> Commerce did not even brief the issue. . . relying instead on its unsupported request for remand to delay the day of reckoning.  This was a disservice to the court, as the court must resolve the issue.  The interests of both plaintiffs and

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-898
Remand
POR: 06/01/2010-05/31/2011
E&C/Office VII: EH
**Public Document**

August 13, 2014

Re:    Remand of the 2010-2011 Administrative Review of the Antidumping Duty Order on
       Chlorinated Isocyanurates from the People's Republic of China: Placing Data on the
       Record and Deadline for Comments

To All Interested Parties:

On July 24, 2014, the United States Court of International Trade (the Court) remanded, in part,[1]
the final results of the June 1, 2010 through May 31, 2011 administrative review in the
antidumping duty order of chlorinated isocyanurates from the People's Republic of China (PRC)
issued by the Department of Commerce (the Department). Per the Court's order, the Department
is placing information on the record concerning: (1) whether the SG&A financial ratio should be
recalculated due to alleged overstatements of labor in the normal value calculation; and (2) the
data that the Department relied on to make our determination of economic comparability.[2]

Please note the Department will only consider comments and rebuttal or clarifying information
concerning the attached information the Department is placing on the record. Parties who wish
to comment on the information contained in the attachments to this letter must do so by COB,
**August 20, 2014**.

Should you have any questions please contact Emily Halle at (202) 482-0176.

Sincerely,

Mark Hoadley
Program Manager
AD/CVD Operations, Office VII

---

[1] *See Clearon Corp., and Occidental Chemical Corp and Juangcheng Kangtai Chemical Co. Ltd., Hebei Jiheng
Chemical Co., Ltd., and Arch Chemicals, Inc., v. United States*, Consolidated Court No. 13-00073. Slip Op. 14-88
(CIT 2014).
[2] The Department has also opened the record to request company specific information from Hebei Jiheng Chemical
Company, Ltd. (Jiheng). Specifically, the Department has requested details on (1) intra-company transportation of
intermediate goods, and (2) the appropriate valuation of one of the by-products, ammonium sulfate. *See* Letter to
Jiheng, "Remand of the 2011-2012 Administrative Review of the Antidumping Duty Order on Chlorinated
Isocyanurates from the People's Republic of China: Questionnaire," August 11, 2014.

You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

This list provides you the countries that are economically comparable to China and most likely to have good data availability and quality. You may also consider other countries on the case record if the record provides you adequate information to evaluate them. You may be unable to obtain the necessary factor price information in a suitable surrogate country. If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

| Country | Per Capita GNI, 2009 ($USD) |
| --- | --- |
| China | 3,590 |
| Philippines | 1,790 |
| Indonesia | 2,230 |
| Ukraine | 2,800 |
| Thailand | 3,760 |
| Colombia | 4,930 |
| South Africa | 5,770 |

\* World Development Report 2011, World Bank.

If you find that more than one of the five countries satisfies both statutory requirements, then you should, if possible, narrow the field to a single country on the basis of data availability and quality.  See <u>Pencils from the PRC</u> (59 FR 55625).  Following the practice specified in <u>Certain Butt-Weld Carbon Steel Pipe Fittings from the PRC</u> (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures.   You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

If none of the five countries on the list is a significant producer of merchandise comparable to Petroleum Wax Candles, you may go off the list and use a country that is, provided that the country is at a level of economic development comparable to that of the PRC.

You may be unable to obtain the necessary factor price information in a suitable surrogate country.   If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

Note:   Pursuant to section 351.408(c)(3) of the AD regulations, you must use regression-based wages to value the NME labor input.  You can find a list of these wages in the Central Records Unit and on the IA INTERNET home page.

| Country | Per Capita GNP, 2001 US$ * | % of Labor Force in Ag. ** | Avg. Ann. Real GDP Growth (%) * |
|---|---|---|---|
| PRC | 890 | 50 | 6.5 |
| India | 460 | 60 | 2.7 |
| Pakistan | 420 | 44 | 0.9 |
| Indonesia | 680 | 45 | 1.8 |
| Sri Lanka | 830 | 38 | 1.0 |
| Philippines | 1,050 | | |

If you find that more than one of the six countries satisfies both statutory requirements, then you should, if possible, narrow the field to a single country on the basis of data availability and quality.   See <u>Pencils from the PRC</u> (59 FR 55625).  Following the practice specified in <u>Certain Butt-Weld Carbon Steel Pipe Fittings from the PRC</u> (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures.   You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

If none of the six countries on the list is a significant producer of merchandise comparable to glycine you may go off the list and use a country that is, provided that the country is at a level of economic development comparable to that of the PRC.

You may be unable to obtain the necessary factor price information in a suitable surrogate country.   If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

Note:   Pursuant to section 351.408(c)(3) of the AD regulations, you must use regression-based wages to value the NME labor input.  You can find a list of these wages in the Central Records Unit and on the IA INTERNET home page.

| Country | Per Capita GNI, 2002 US$ * | % of Labor Force in Ag. ** | Avg. Ann GDP Growth 1990-2001 (%) *** |
|---|---|---|---|
| PRC | 940 | 50 | 10.0 |
| India | 480 | 60 | 5.9 |
| Indonesia | 710 | 45 | 3.8 |
| Sri Lanka | 840 | 38 | 5.1 |
| Philippines | 1,020 | 40 | 3.3 |
| Morocco | 1,190 | 50 | |

|       |       |    | 2.5 |
|-------|-------|----|-----|
| Egypt | 1,470 | 29 | 4.6 |

\* <u>World Development Report 2004</u>, World Bank.
  \*\* <u>The World Factbook 2003</u>, Central Intelligence Agency.
  \*\*\* <u>World Development Report 2003</u>, World Bank.

requirements, then you should, if possible, narrow the field to a single country on the basis of data availability and quality. See Pencils from the PRC (59 FR 55625). Following the practice specified in Certain Butt-Weld Carbon Steel Pipe Fittings from the PRC (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures. You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

If none of the five countries on the list is a significant producer of merchandise comparable to brake rotors you may go off the list and use a country that is, provided that the country is at a level of economic development comparable to that of the PRC.

You may be unable to obtain the necessary factor price information in a suitable surrogate country. If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

Note:   Pursuant to section 351.408(c)(3) of the AD regulations, you must use regression-based wages to value the NME labor input. You can find a list of these wages in the Central Records Unit and on the IA INTERNET home page.

| Country | Per Capita GNI, 2003 US$ * |
|---|---|
| PRC | 1100 |
| India | 530 |
| Indonesia | 810 |
| Sri Lanka | 930 |
| Philippines | 1,080 |
| Egypt | 1,390 |

* World Development Report 2005, World Bank.

If you find that more than one of the five countries satisfies both statutory requirements, then you should, if possible, narrow the field to a single country on the basis of data availability and quality. See Pencils from the PRC (59 FR 55625). Following the practice specified in Certain Butt-Weld Carbon Steel Pipe Fittings from the PRC (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures. You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

If none of the five countries on the list is a significant producer of merchandise comparable to hand trucks, you may go off the list and use a country that is, provided that the country is at a level of economic development comparable to that of the PRC.

You may be unable to obtain the necessary factor price information in a suitable surrogate country. If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

Note: Pursuant to section 351.408(c)(3) of the AD regulations, you must use regression-based wages to value the NME labor input. You can find a list of these wages in the Central Records Unit and on the IA INTERNET home page.

| Country | Per Capita GNI, 2004 US$ * |
|---------|---------------------------|
| PRC | 1290 |
| India | 620 |
| Sri Lanka | 1010 |
| Indonesia | 1140 |
| Philippines | 1170 |
| Egypt | 1310 |

* World Development Report 2006, World Bank.

If you find that more than one of the five countries satisfies both statutory requirements, then you should, if possible, narrow the field to a single country on the basis of data availability and quality.   See <u>Pencils from the PRC</u> (59 FR 55625). Following the practice specified in <u>Certain Butt-Weld Carbon Steel Pipe Fittings from the PRC</u> (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures.   You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

If none of the five countries on the list is a significant producer of merchandise comparable to glycine, you may go off the list and use a country that is, provided that the country is at a level of economic development comparable to that of the PRC.

You may be unable to obtain the necessary factor price information in a suitable surrogate country.   If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

Note:   Pursuant to section 351.408(c)(3) of the AD regulations, you must use regression-based wages to value the NME labor input.  You can find a list of these wages in the Central Records Unit and on the IA INTERNET home page.

| <u>Country</u> | <u>Per Capita GNI, 2005 US$</u> * |
|---|---|
| PRC | 1740 |
| India | 720 |
| Sri Lanka | 1160 |
| Egypt | 1250 |
| Indonesia | 1280 |
| Philippines | 1300 |

* <u>World Development Report 2007</u>, World Bank.

of data availability and quality.  See <u>Pencils from the PRC</u> (59 FR 55625).  Following the practice specified in <u>Certain Butt-Weld Carbon Steel Pipe Fittings from the PRC</u> (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures.  You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

This list provides you the countries that are economically comparable to the PRC and most likely to have good data availability and quality.  You may also consider other countries on the case record if the record provides you adequate information to evaluate them.

You may be unable to obtain the necessary factor price information in a suitable surrogate country.  If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

Note:  Pursuant to section 351.408(c)(3) of the AD regulations, you must use regression-based wages to value the NME labor input.  You can find a list of these wages in the Central Records Unit and on the IA INTERNET home page.

| Country | Per Capita GNI, 2006 US$ * |
|---|---|
| PRC | 2010 |
| India | 820 |
| Indonesia | 1420 |
| Philippines | 1420 |
| Colombia | 2740 |
| Thailand | 2990 |

* World Development Report 2008, World Bank.

If you find that more than one of the six countries satisfies both statutory requirements, then you should, if possible, narrow the field to a single country on the basis of data availability and quality. See <u>Pencils from the PRC</u> (59 FR 55625). Following the practice specified in <u>Certain Butt-Weld Carbon Steel Pipe Fittings from the PRC</u> (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures. You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

This list provides you the countries that are economically comparable to the PRC and most likely to have good data availability and quality. You may also consider other countries on the case record if the record provides you adequate information to evaluate them.

You may be unable to obtain the necessary factor price information in a suitable surrogate country. If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

Note:    Pursuant to section 351.408(c)(3) of the AD regulations, you must use regression-based wages to value the NME labor input. You can find a list of these wages in the Central Records Unit and on the IA INTERNET home page.

| Country | Per Capita GNI, 2007 US$ * |
|---------|----------------------------|
| PRC | 2360 |
| India | 950 |
| Philippines | 1620 |
| Indonesia | 1650 |
| Colombia | 3250 |
| Thailand | 3400 |
| Peru | 3450 |

* World Development Report 2009, World Bank.

define "significant" or "comparable," although "comparable" encompasses a larger set of products than "like product."  We have in past cases identified comparable merchandise on the basis of similarities in production factors (physical and non-physical) and factor intensities (see, for example, <u>Magnesium</u>).  See Import Administration Policy Bulletin 04.1 for further guidance.

If you find that more than one of the six countries satisfies both statutory requirements, then you should, if possible, narrow the field to a single country on the basis of data availability and quality.  See <u>Pencils from the PRC</u> (59 FR 55625).  Following the practice specified in <u>Certain Butt-Weld Carbon Steel Pipe Fittings from the PRC</u> (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures.  You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

The following six countries are economically comparable to the PRC and likely to have good data availability and quality.[1]  However, you may also consider other countries on the case record if the record provides you adequate information to evaluate them.  You may be unable to obtain the necessary factor price information in a suitable surrogate country.  If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

| Country | Per Capita GNI, 2008 US$ * |
|---------|----------------------------|
| PRC | 2940 |
| India | 1070 |
| Philippines | 1890 |
| Indonesia | 2010 |
| Thailand | 2840 |
| Ukraine | 3210 |
| Peru | 3990 |

* World Development Report 2010, World Bank.

---

1 The Department does not consider nonmarket economies or non-state territories as suitable surrogate countries for use in its analysis.

LAW OFFICES OF
## DEKIEFFER & HORGAN, PLLC
1455 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20004

GREGORY S. MENEGAZ
TEL 202-783-6900

AFFILIATED OFFICE:
SAARBRÜCKEN, GERMANY

GMENEGAZ@DHLAW.COM
DHLAW.COM

August 20, 2014

A-570-898
REMAND
POR: 6/1/2010-05/31/2011
E & C
Office VII: EH

ELECTRONIC FILING

Honorable Penny Pritzker
Secretary
Room 1870
U.S. Dept. of Commerce
Washington, D.C. 20230

**Public Document**

RE:  Certain Chlorinated Isocyanurates from the People's Republic of China –
Rebuttal Information

Dear Madam Secretary:

On behalf of Juancheng Kangtai Chemical Co., Ltd. ("Kangtai"), an exporter of certain

chlorinated isocyanurates from the People's Republic of China, we hereby file information to

rebut or clarify the information the Department placed on the record on August 13, 2014.  See

Dep't Memo Placing Data on the Record and Deadline for Comments (Aug. 13, 2014).

The Department placed information on the record concerning (1) whether the SG&A

financial ratio should be recalculated due to alleged overstatement of labor in the normal value

calculation; and (2) the data that the Department relied on to make the determination of

economic comparability. *Id.*  In relation to the labor issue, the Department placed the ILO

definition of labour cost and the full printout of the Philippines labour cost data.  Kangtai

provides clarifying information about the definition and coverage of labour cost in Exhibits 5-8.

**Exhibit 5** contains the Philippines specific labor source document located on the ILO Laborsta

**Remand AR 06/01/2010 – 5/31/2011**

**Juancheng Kangtai Chemical Co., Ltd.**

**Rebuttal Information**

**LIST OF EXHIBITS**

Exhibit 1    Additional Surrogate Country Lists
Exhibit 2    CIA Factbook Country Pages
Exhibit 3    UN Industrial Development Organization Country Pages
Exhibit 4    World Chemistry Industry Information
Exhibit 5    ILO Laborsta Philippines Labor Source Document
Exhibit 6    ILO Survey of Country Practices
Exhibit 7    Annual Survey of Philippine Business and Industry
Exhibit 8    Quarterly Survey of Philippines Business and Industry

# Exhibit 1
## Additional Surrogate Country Lists

| date | case | year of GNI data | number of countries | lowest GNI | highest GNI | China's GNI | GNI BAND | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | below China | above China |
| **DOC PLACED ON REMAND** | | | | | | | | |
| 12/9/2002 | Petroleum Wax Candles from PRC | 2001 | 5 | 460 | 1050 | 890 | 430 | 160 |
| 2/23/2004 | Glycine from PRC | 2002 | 6 | 480 | 1470 | 940 | 460 | 530 |
| 2/9/2005 | Hand Trucks from PRC | 2004 | 5 | 620 | 1310 | 1290 | 670 | 20 |
| 6/21/2005 | Brake Rotors from PRC | 2003 | 5 | 530 | 1390 | 1100 | 570 | 290 |
| 9/17/2007 | Glycine from PRC | 2005 | 5 | 720 | 1300 | 1740 | 1020 | -440 |
| 11/3/2008 | Chlorinated Isocyanurates from PRC | 2006 | 5 | 820 | 2990 | 2010 | 1190 | 980 |
| 10/31/2009 | Magnesium Metal from PRC | 2007 | 6 | 950 | 3450 | 2360 | 1410 | 1090 |
| 10/28/2010 | HDEP Acid from PRC | 2008 | 6 | 1070 | 3990 | 2940 | 1870 | 1050 |
| 5/12/2011 | Sodium Hex from PRC | 2009 | 6 | 1790 | 5770 | 3590 | 1800 | 2180 |
| **ON RECORD** | | | | | | | | |
| 9/9/2011 | Chlor Isos -- REVIEW ON REMAND | 2009 | 6 | 1790 | 5770 | 3590 | 1800 | 2180 |
| **PLACE ON RECORD IN REBUTTAL/CLARIFICATION** | | | | | | | | |
| 4/12/2012 | Garlic from PRC | 2010 | 7 | 2050 | 6100 | 4260 | 2210 | 1840 |
| 2/7/2013 | Chlor Isos from PRC (AR11-12) | 2011 | 6 | 2210 | 7660 | 4940 | 2730 | 2720 |
| 2/12/2014 | Chlor Isos from PRC (AR12-13) | 2012 | 6 | 3420 | 7610 | 5740 | 2320 | 1870 |

You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

This list provides you the countries that are economically comparable to China and most likely to have good data availability and quality. You may also consider other countries on the case record if the record provides you adequate information to evaluate them. You may be unable to obtain the necessary factor price information in a suitable surrogate country. If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

| Country | Per Capita GNI, 2010 ($USD) |
|---------|------------------------------|
| China | 4,260 |
| Philippines | 2,050 |
| Indonesia | 2,580 |
| Ukraine | 3,010 |
| Thailand | 4,210 |
| Peru | 4,710 |
| Colombia | 5,510 |
| South Africa | 6,100 |

* World Development Report 2012, World Bank.

You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

This list provides you the countries that are economically comparable to China and most likely to have good data availability and quality. You may also consider other countries on the case record if the record provides you adequate information to evaluate them. You may be unable to obtain the necessary factor price information in a suitable surrogate country. If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States.

The Department relies on GNI data published annually in the World Bank Development Reports (WDR). The 2013 WDR, published in October 2012, does not contain the GNI on which the Department typically relies. Therefore, for the purposes of surrogate country selection this year, the Department will rely on GNI data published in the World Bank Development Indicators database, located at http://databank.worldbank.org/databank/download/GNIPC.pdf.

| Country | Per Capita GNI, 2011 ($USD) |
| --- | --- |
| China | 4,940 |
| Philippines | 2,210 |
| Indonesia | 2,940 |
| Thailand | 4,420 |
| Colombia | 6,110 |
| South Africa | 6,960 |
| Costa Rica | 7,660 |

* World Development Indicators database, World Bank, September 27, 2012.

If you find that more than one of the six countries satisfies both statutory requirements then you should, if possible, narrow the field to a single country on the basis of data availability and quality. See Pencils from China (59 FR 55625). Following the practice specified in Certain Butt-Weld Carbon Steel Pipe Fittings from China (57 FR 21062), all else being equal and to the extent possible, you should use broad, publicly available price measures. You should use, to the extent possible, factor prices reported on a duty- and tax-exclusive basis, giving due consideration, of course, to aggregation, small-quantity, contemporaneity, and data-source concerns.

This list provides you countries that are at the same level of economic development as China. In general, the countries listed below are likely to have good data availability and quality, i.e., the specificity of these countries' data are more likely to assist the team in its valuation of inputs. However, you may also consider other countries on the case record that are significant producers of comparable merchandise if the record provides you adequate information to evaluate them. Countries on the case record that are at the same level of economic development as China should be given equal consideration for the purposes of selecting a surrogate country. Countries that are not at the same level of economic development as China's, but still at a level of economic development comparable to China, should be selected only to the extent that data considerations outweigh the difference in levels of economic development. As noted above, GNI is the primary indicator of a country's level of economic development.

In exceptional cases, you may not be able to find an appropriate market economy country or countries that provide adequate factor data for the determination of normal value. If that is the case, you will have to rely on the price of comparable merchandise that is produced in a surrogate country and sold in other countries, including the United States. See section 773(c)(2) of the statute and Import Administration Policy Bulletin 04.1 for further guidance.

| Country | Per Capita GNI, 2012 ($USD)* |
|---|---|
| China | 5,740 |
| South Africa | 7,610 |
| Colombia | 6,990 |
| Bulgaria | 6,870 |
| Thailand | 5,210 |
| Ecuador | 5,190 |
| Indonesia | 3,420 |

* World Development Report 2014, World Bank.

Filed By: Sean Carey, Filed Date: 2/12/14 1:10 PM, Submission Status: Approved

**Clearon Corp. and Occidental Chemical Corp., et. al., v. United States**
Court of International Trade Consolidated Court No. 13-00073

## FINAL RESULTS OF REDETERMINATION
## PURSUANT TO REMAND

### A.     Summary

The Department of Commerce (Department) prepared these final results of

redetermination (Final Remand Results) pursuant to the decision and remand order of the U.S.

Court of International Trade (Court) issued on July 24, 2014, in *Chloro Isos 6th Final Results*.[1]

These Final Remand Results concern the Department's final results of an administrative review

under the antidumping duty (AD) order on chlorinated isocyanurates from the People's Republic

of China (PRC).[2]  For these Final Remand Results, the Department continues to find that the

sales of Juangcheng Kangtai Chemical Co. Ltd. (Kangtai), and Hebei Jiheng Chemical Co., Ltd.

(Jiheng) during the period of review (POR) were made for less than normal value (NV).

### B.     Background

On January 22, 2013, the Department published the *Chloro Isos 6th Final Results*, which

covered Kangtai and Jiheng, along with other exporters.[3]  The POR covers June 1, 2010, through

May 31, 2011.  Following our non-market economy (NME) methodology, we selected the

Philippines over India as the primary surrogate country because, based on gross national income

(GNI) statistics for the POR, we found that India is not as economically comparable to the PRC;

India was not listed as a surrogate country on the Surrogate Country Memorandum.[4]  Based on

---

[1] *See Clearon Corp., and Occidental Chemical Corp., et. al. v. United States*, Slip Op. 14-88, Consolidated Court No. 13-00073 (CIT 2014) (*Clearon Remand*); *see also Chlorinated Isocyanurates From the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2010–2011*, 78 FR 4386 (January 22, 2013) (*Chloro Isos 6th Final Results*).
[2] *Id.*
[3] *Id.*
[4] *See* Memorandum, "Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China," (September 9, 2011) (Surrogate Country Memorandum).

the Philippine company's financial statements that we selected, we adjusted the financial ratios to account for any overlap that existed between the financial statements and the International Labor Organization (ILO) wage rate we selected to value the labor factor of production (FOP). We also valued the intermediate goods' transportation costs between factories as part of the raw materials build up and adjusted the by-product offset calculation for one by-product to account for its build up costs for the first time in the *Chloro Isos 6th Final Results*.

In its July 24, 2014 opinion, the Court remanded the final results to the Department regarding our primary surrogate country selection as follows: (1) provide a reasonable explanation why the range of the GNIs listed on the Surrogate Country Memorandum qualify the countries as proximate and "economically comparable" to the PRC, including a discussion of why the Department believes India's GNI does not, if that continues to be our determination, qualify it as an economically comparable country, and (2) place the data on the record that the Department relied upon to make our determination. The Court also accepted the Department's request for a voluntary remand of the final results with the following instructions to: (1) reconsider whether the ILO wage rate used to value the labor FOP includes labor, retirement, and employee benefit expenses, and whether these expenses are double counted if the Department does not adjust the financial ratio to correctly reflect overlapping expenses in the financial statements; (2) explain the Department's change in methodology for calculating intra-company transportation costs by collecting additional information if necessary and to provide parties an opportunity to comment on any new additional information; and (3) explain our change in the calculation of our by-product methodology and to request additional information if necessary, and to provide parties an opportunity to comment on any new additional information.

Pursuant to these instructions, in our Draft Remand Results,[5] we provided further explanations and addressed the deficiencies identified by the Court in the *Chloro Isos 6ᵗʰ Final Results*. We placed additional information on the record and provided parties an opportunity to comment on the information.[6] On August 20, 2014, Clearon Corp., and Occidental Chemical Corp. (Petitioners), and Kangtai submitted comments.[7] The Department also issued questionnaires to Jiheng and Kangtai on August 11, 2014, requesting additional information on intra-company transport of goods and by-product offsets. In addition, we adjusted our NV calculation by recalculating the transportation cost of intermediate goods between factories (for Jiheng), and recalculating the by-product offset using company specific information (for Jiheng and Kangtai). In response to comments received on the Draft Remand Results, we revised the by-product calculation made to the Draft Remand Results calculations. We also clarified certain sentences in our explanation of our decision not to adjust our financial ratios to account for benefits included in the ILO surrogate value for labor. Besides minor grammatical and formatting changes, the Final Remand Results below contain no other revisions to the Draft Remand Results. Our responses to all comments received are addressed below following the Final Remand Results. As a result of these changes, we determine a weighted-average dumping margin of 31.22 percent for Jiheng and 34.21 percent for Kangtai.

---

[5] *See* Memorandum, "Draft Remand Redetermination: Chlorinated Isocyanurates from the People's Republic of China," September 16, 2014 (Draft Remand Results).

[6] *See* Letter to all Interested Parties, "Remand of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Placing Data on the Record and Deadline for Comments," August 13, 2014 (Remand Data Memorandum).

[7] *See* Letter from Petitioners, "Remand of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Comments Regarding New Data Placed on the Record," August 20, 2014 (Petitioners Remand Comments); *see also* Letter from Kangtai, "Certain Chlorinated Isocyanurates from the People's Republic of China Rebuttal Information," August 20, 2014 (Kangtai Rebuttal Information).

## C.    Final Analysis

### 1)    <u>Surrogate Country Selection</u>

The Court determined that the Department's selection of the GNI range for economically comparable countries on the potential surrogate country list and its determination that India does not qualify as an economically comparable country is not supported by a reasonable analysis and record evidence.  For these reasons, the Court remanded this issue to the Department to (1) provide a reasonable explanation why the range of the GNIs listed on the Surrogate Country Memorandum qualify the countries as proximate and "economically comparable" to the PRC, including a discussion of why it believes India's GNI does not, if that continues to be the Department's determination, qualify it as an economically comparable country, and (2) place the data on the record that it relied upon to make its determination.

*Surrogate Country Selection Policy*

Section 773(c)(4)(A) of the Tariff Act of 1930, as amended (the Act) states that the Department should "to the extent possible" utilize the prices or costs of FOPs in one or more market economy countries that are, *inter alia,* "at a level of economic development comparable to that of the nonmarket economy country."  The statute is silent with respect to how or on what basis the Department may make this determination, but it is the Department's long-standing practice to use as an indicator of level of economic development *per capita* GNI data reported in the World Bank's *World Development Report.*[8]

---

[8] *See, e.g.*, *Preliminary Determination of Sales at Less Than Fair Value:  Steel Wire Garment Hangers from the People's Republic of China*, 73 FR 15726, 15728 (March 25 2008), unchanged in *Steel Wire Garment Hangers from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 73 FR 47587 (August 14, 2008);  *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam:  Final Results and Final Partial Rescission of Antidumping Duty Administrative Review,* 76 FR 56158 (September 12, 2011), and accompanying Issues and Decision Memorandum, at Comment 1; *Fresh Garlic From the People's Republic of China, Final Results and Partial Rescission of the 18th Antidumping Duty Administrative Review; 2011-2012,* 79 FR 36721 (June 30, 2014), and accompanying Issues and Decision Memorandum, at Comment 1.

4

The statute does not require that the Department use a surrogate country that is at a level of economic development *most* comparable to the NME country and that is the *most* significant producer of comparable merchandise.[9] The statute requires only that the Department use a surrogate market economy country that is at a level of economic development comparable to that of the NME country and that is a significant producer of comparable merchandise. Even these requirements are not binding, as the statute requires that they be met *only to the extent possible*.

As explained in the Department's *Policy Bulletin*, "{t}he surrogate countries on the {(non-exhaustive) surrogate country} list are not ranked."[10] This lack of ranking reflects the Department's long-standing practice that, for the purpose of surrogate country selection, the countries on the list "should be considered equivalent" from the standpoint of their level of economic development, based on *per capita* GNI, as compared to the PRC's level of economic development.[11] This also recognizes that the "level" in an economic development context necessarily implies a range of *per capita* GNI, not a specific *per capita* GNI.[12] The Department's long-standing practice of selecting, if possible, a surrogate country from a non-exhaustive list of countries at the same level of economic development as the NME country, or another country at the same level of economic development, fulfills the statutory requirement to value FOPs using data from "one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country…"[13] In this regard, "countries that are at a level of economic development comparable to that of the NME

---

[9] *See* the Department's Policy Bulletin No. 04.1, ''Non-Market Economy Surrogate Country Selection Process,'' (March 1, 2004) (Policy Bulletin 04.1), available on the Department's Web site at http://enforcement.trade.gov/policy/bull04-1.html.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *See* section 773(c)(4) of the Act.

country" *necessarily includes* any countries that are at the same level of economic development as the NME country.

Because the non-exhaustive list is only a *starting point* for the surrogate country selection process, the Department also considers other countries at the same level of economic development that interested parties propose, as well as other countries that are not at the same level of economic development as the NME country, but nevertheless still at a level comparable to that of the NME country. As a general rule, the Department selects a surrogate country that is at the same level of economic development as the NME unless it is determined that none of the countries are viable options because (a) they either are not significant producers of comparable merchandise, (b) do not provide sufficient reliable sources of publicly available surrogate value (SV) data, or (c) are not suitable for use based on other reasons.[14] Surrogate countries that are not at the same level of economic development as the NME country, but still at a level of economic development comparable to the NME country, are selected only to the extent that data considerations outweigh the difference in levels of economic development.[15]

*Reasonableness of the Income Range the Department Selected*

In the Court's remand decision, it directed the Department to "provide a reasonable explanation why the range of the GNIs listed on the Surrogate Country Memorandum qualify the countries as proximate and 'economically comparable' to the PRC." Before examining the

---

[14] *See, e.g., Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 4386 (January 22, 2013) and the accompanying Issues and Decision Memorandum at Comment 2; *Certain Steel Threaded Rod From the People's Republic of China: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*; 2010-2011, 77 FR 67332 (November 9, 2012) and the accompanying Issues and Decision Memorandum at Comment 1; *Certain Steel Wheels From the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value, Partial Affirmative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination*, 76 FR 67703, 67708 (November 2, 2011), unchanged in *Certain Steel Wheels From the People's Republic of China: Notice of Final Determination of Sales at Less Than Fair Value and Partial Affirmative Final Determination of Critical Circumstances*, 77 FR 17021 (March 23, 2012).
[15] *See* Surrogate Country Memorandum.

specific GNI range of this record, it is important to recall the two basic objectives that underlie the generation of the surrogate country list. The first objective is to provide a consistent starting point for all proceedings involving the same NME country, in this case the PRC.[16] The second objective is to provide a reasonably predictable process so that, in any proceeding involving an NME country, interested parties understand the process and methodology that the Department follows.[17]

At the same time, however, as noted and upheld by the Court, the Department's longstanding practice is to treat each segment of an AD proceeding, including the AD investigation and the administrative reviews that may follow, as independent proceedings with separate records and which lead to independent determinations.[18] In each segment of a proceeding, parties are given opportunities to present and comment on all aspects of surrogate country selection. Because of this, the Department must attempt to balance the need for consistency and predictability with the need to retain a certain degree of flexibility in order to make case-specific determinations in response to parties' comments, as well as satisfy the statute's requirement to use the best available information.

While the methodology of evaluating surrogate countries has remained consistent over the years, the process of generating the list itself has developed in response to a number of different factors, including (1) the PRC's rapid economic growth; (2) issues and arguments that arise in the context of specific proceedings; (3) the quality and availability of SV data; and (4) litigation or further guidance provided by the Courts.

---

[16] The Court notes that the Surrogate Country Memorandum puts parties on notice early in the process, so that they are "presumed aware of the possible countries that may be selected." *See Clearon Remand,* at 29.

[17] The Court notes that "as a participant in previous administrative reviews it is aware of the process and methodology Commerce follows." *See Clearon Remand,* at 30.

[18] *See Clearon Remand* at footnote 42.

With respect to the fourth factor, the Court and the U.S. Court of Appeals for the Federal Circuit (CAFC) ruled on the question of the level of economic development in various litigation.[19]  In May 2010, the CAFC invalidated the regression methodology used for labor values, in part, because the Department relied on countries that were not at a level of economic development comparable to the PRC.  In that context, the CAFC noted that the Department could rely on market economy countries on the case record that were between half of the PRC's GNI and between one to two times the PRC's GNI.[20]  While the Department's surrogate country lists do not employ, or endorse, this particular ratio or bright-line, we observe that the GNIs of surrogate countries selected for the PRC's surrogate country list fall within or near the range that the CAFC identified in 2010.[21]

Court decisions subsequent to the *Dorbest* decision provided further guidance with regard to countries selected for the surrogate country list.[22]  In February 2011, for example, the Court faulted the Department for not selecting any surrogate countries with GNIs *higher* than the PRC, and suggested that the Department develop "a more balanced range of countries" so that the range is not "arbitrarily biased towards the low end of the *per capita* GNI."[23]  Subsequent Court decisions, such as the *Dongguan* litigation, also seemed to find merit in surrogate country lists

---

[19] The Department notes that the Surrogate Country Memorandum issued for this record in September 9, 2011, was based on a list that was developed for an administrative review of sodium hexametaphosphate from the People's Republic of China proceeding and issued in May 25, 2011.

[20] *See Dorbest Ltd., et al. v. United State*, 604 F. 3d 1363, 1372 (Fed. Cir. 2010) (*Dorbest* CAFC) ("Here, there were five market-economy countries with gross national incomes less than that of China and an additional eleven countries with gross national incomes between one and two times that of China.  Although we need not resolve which of these countries, or which additional countries, could properly be considered economically comparable to China, some subset of these countries must surely fit the bill").  The Department notes that Pakistan (one of the five market economy countries below the PRC) and the PRC have a *per capita* GNI of $420 and $960, respectively.  That implies a lower GNI range of 56.25 percent in relative terms.  For the purposes of this remand redetermination, we relied on 50 percent as the lower threshold herein to illustrate the growing separation between India and the PRC over time.

[21] *See* Chart 1 below.

[22] We acknowledge that these decisions involved the labor methodology.  However, these decisions did factor heavily into the Department's consideration of future surrogate country lists.

[23] *See Dorbest Ltd. v. United States*, 755 F. Supp. 2d 1291, *1297-98, fn 17 (CIT 2011)(*Dorbest*).

with GNI ranges that are "evenly distributed around the PRC's GNI."[24]  In creating such lists, however, the Court acknowledged that the Department "does not have to achieve mathematical perfection" when selecting the upper and lower GNI range.[25]

*General Methodology for Selecting Surrogates for the List*

The annual release of the *World Bank Development Report,* which includes the latest *per capita* GNI data, initiates the process of revising the surrogate country list.  The Department examines the new *per capita* GNI data for the PRC and the change in *per capita* GNI from the year before, and compares the change in the PRC's *per capita* GNI to the respective changes in *per capita* GNIs of the existing set of surrogate countries.  Next, we determine whether it is necessary to re-center the GNI range in light of the year-to-year GNI changes.  Due to the PRC's rapid GNI growth rate, it is almost always the case that the GNI range relied on in the previous year may need to be reset or re-centered.  Over the last nine years leading up to this proceeding, the PRC's GNI quadrupled, from $890 to $3,590.  Accordingly, in each year, the Department reevaluated the GNI range and expanded it at roughly the same rate.[26]

---

[24] *See Dongguan Sunrise Furniture Co. Ltd. v. United States*, 865 F. Supp. 2d 1216, 1238 (CIT 2012).
[25] *See Dorbest,* 755 F. Supp. 2d at 1298.
[26] *See* Table 1.

**Table 1:  Per Capita GNI Range (2001-2009)**

| GNI Range | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | Change (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| PRC's GNI | 890 | 940 | 1,100 | 1,290 | 1,740 | 2,010 | 2,360 | 2,940 | 3,590 | 303% |
| Highest GNI country on the Surrogate List | 1,050 | 1,470 | 1,390 | 1,310 | 1,740 | 2,990 | 3,450 | 3,990 | 5,770 | 370% |
| Lowest GNI country on the Surrogate List | 420 | 710 | 530 | 620 | 720 | 820 | 950 | 1,070 | 1,790 | 326% |
| Implied GNI range (difference between highest and lowest country on the list) | 630 | 760 | 860 | 690 | 1,020 | 2,170 | 2,500 | 2,920 | 3,980 | 398% |

Moreover, we also find that the implied GNI range relied on in this proceeding is a reasonable basis for determining whether countries are proximate to the PRC – in other words, that they are at the same level of economic development as the PRC.  It is generally accepted that the *per capita* GNI range associable with a given "level" of economic development increases (in dollar terms) for higher levels of economic development.  The World Bank, for example, places all countries into one of four income groups based on *per capita* GNI:  low income ($995 or less), lower middle income ($996 to $3,945), upper middle income ($3,946 to $12,195), and high income ($12,196 and higher).[27]  For low income countries, only one thousand dollars separates

---

[27] *See* Remand Data Memorandum at 343 of the "World Development Report 2011."

the countries within that group,[28] whereas for high income countries, tens of thousands of dollars

separate countries at the same group.[29]  For example, Hungary ($12,980) and Switzerland

($56,370) are considered to be both within the same income group, whereas India ($1,180) and

Kenya ($770) are not.[30]  The *per capita* GNI range that the PRC occupies as a lower middle

income country, $2,949 using the World Bank's range, is roughly consistent with the implied *per*

*capita* GNI range that the Department used $3,140 (as measured from the highest GNI country to

the lowest *per capita* GNI country on the surrogate country list).

The analysis of the World Bank income groups above is meant to illustrate the

reasonableness of the *per capita* GNI range that the Department selected in 2009.  It is not meant

to imply that the Department relies on these income ranges to develop the surrogate country list.

As a matter of policy, the Department decided not to adopt the World Bank income groups <u>as is</u>

for the purpose of defining a "level of economic development" under section 773(c)(4)(A) of the

Act.  One of the primary reasons is that these income groups are not sufficiently "centered" on

the NME countries that are subject to our AD proceedings.  For example, the PRC ($3,590) is

very close to the upper end of the lower middle income group cut-off ($3,945); so, if the World

Bank's lower middle income group were adopted "off-the-shelf," this would eliminate a number

of potential surrogate countries that are close to the PRC on the upper range.  The PRC ($3,590)

and Albania ($3,950), for instance, would not be at the same "level" within the meaning of

section 773(c)(4)(A) of the Act despite their relative proximity; whereas, Nicaragua ($1,000) and

the PRC would be at the same level.  Nevertheless, the World Bank's general premise of more

expansive income ranges for higher *per capita* income countries is informative to the

Department's analysis, even if the exact definitions are not necessarily appropriate for the

---

[28] *Id.*
[29] *Id.*
[30] *Id.*

context here of determining which set of countries are at the PRC's "level" of economic

development under section 773(c)(4)(A) of the Act.

Once the *per capita* GNI range is preliminary determined using the latest data, the

Department then searches for countries within that range which are suitable candidates for

inclusion on the list. For example, based on the 2009 data, the Department selected a new

candidate country, South Africa ($5,770), to take the place of Peru ($3,990), and removed India

from the list (explained in greater detail below). Consistent with the judicial guidance, as

described above, the Department, in more recent periods, placed more emphasis on achieving a

degree of "balance" in the GNI range represented by the list. We also try to preserve the same

number of surrogate countries above and below the PRC (often three countries with *per capita*

GNIs higher/lower than the PRC, for a total of six). On some occasions, a surrogate country may

change from having a higher *per capita* GNI than the PRC, to having a lower *per capita* GNI

than the PRC, or vice versa. When this happens, the Department may consider whether it is

appropriate to "rebalance" the list in order to maintain the same number of surrogate countries

above and below the PRC. Using 2007 *per capita* GNI data, for example, Thailand's *per capita*

GNI was higher than the PRC's but this relationship reversed in 2008, and, then reverted back

again using 2009 data. This interchange is more likely to occur with surrogate countries in close

proximity to the PRC than it is for those surrogate countries whose *per capita* GNIs are further

away.

It is often the case that several of the existing surrogate countries sufficiently track the

PRC and are found to be actively used – and advocated for by interested parties – in on-going

proceedings. For countries such as these, there is a strong inclination to continue relying on

them, so long as the *per capita* GNIs are within the Surrogate Country Memorandum's implied

income range.  In other instances, however, countries on the list are periodically evaluated if they

are not selected over time and sometimes replaced.  For example, the Department selected Peru

for the surrogate country list for two years (2007 and 2008 *per capita* GNI data), but ultimately

removed it because no interested party proposed, and the Department did not consider, Peru for

selection as the primary surrogate country.

When changes, such as those described above, warrant consideration of adding or

removing countries from the list, the Department considers a range of factors, including the SV

requirements for the existing products under investigation, the data quality and availability of

alternative surrogate countries, economic diversity of the manufacturing sector in the alternative

countries, and the degree of specificity in the import data relied on to value the FOP.  For

example, with 2009 data, there were several market economy countries in close proximity to the

PRC ($3,590) when looking at the *per capita* GNI metric alone, such as Belize ($3,740) and the

Maldives ($3,870).  But, we do not consider these smaller and less diversified economies as

viable surrogate countries for use across all PRC cases when measured against the factors

outlined above, *e.g.*, the data quality and availability of alternative surrogate countries, economic

diversity of the manufacturing sector in the alternative countries.

During the process of selecting the surrogate countries, the Department relies on its case

experience and professional judgment to develop this list of surrogate countries.  But, it is critical

to note that the list is non-exhaustive.  When an interested party, therefore, identifies another

alternative surrogate country that is within the *per capita* GNI range of surrogates on the list, the

Department accords that surrogate country the same consideration as given to those identified by

the Department.[31]  As noted above, the Department also considers surrogate countries on the record that are outside the implied *per capita* GNI range of the list, but selection of such a country as the primary surrogate requires that data or significant producer considerations outweigh *per capita* GNI proximity concerns.

Taken in this context, the implied *per capita* GNI range of countries on the list represents a guideline for interested parties consistent with the statutory factors under section 773(c)(4)(A) of the Act and 19 CFR 351.408(b).  It is intended to initiate a process whereby parties can focus their attention on a manageable set of potential surrogate countries.  To initiate the process of evaluating countries for the primary surrogate country, a range of *per capita* GNI, as reflected by potential surrogate countries on the list, is provided to parties as a starting point.  One benefit of this is interested parties do not end up expending their resources focusing on potential surrogate countries that are not at a level of economic development comparable to the PRC.

*Proximity of India Compared to the PRC*

In the second part of the remand, the Court directed the Department to explain "why it believes India's GNI does not, if that continues to be the Department's determination, qualify it as an economically comparable country."  In the underlying proceeding, the Department stated:

> The list is comprised of countries that are proximate to the PRC in terms of GNI, and the Department considers all countries on the list to be equal in terms of economic comparability for purposes of evaluating their suitability for use as a surrogate country. The list did not include India because India's per capita GNI did not fall within the range of countries proximate to the PRC….However, as noted, India did not qualify as one of the economically comparable countries identified in this review.  As such, the Department considers India to be less economically comparable to the PRC than the countries included in the Surrogate Country Memorandum, and will only resort to using Indian data sources when no other data from these economically comparable countries are available.

---

[31] *See Hardwood and Decorative Plywood From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 58273 (September 23, 2013), and accompanying Issues and Decision Memorandum at Comment 7.

Based on 2009 data, we continue to find that India is at a level of economic development less comparable than the PRC. This does <u>not</u> mean India is beyond consideration as a surrogate country and it does not mean that India fails to "qualify" under the economic comparability factor of the statue. In order for the Department to select India, however, the data quality and availability from India must outweigh its *per capita* GNI disparity with respect to the PRC in order for the Department to select it over one of the other countries which are at the *same* level of economic development as the PRC. In other words, as the *per capita* GNI disparity increases, the Department can no longer discount this fact when selecting among competing surrogate countries. From the perspective of valuing FOPs, we believe that once countries fall within a certain *per capita* GNI range – as reflected by the Surrogate Country Memorandum – data quality and availability considerations are more predominant factors than *per capita* GNI differences.

It is also important to note that India did not suddenly drop-off the list. In January 2010, the Department put interested parties on notice that we were concerned with the growing *per capita* GNI disparity:

> While we recognize that India is not as close to China as the other surrogate countries in the list, relative to all countries and GNI levels worldwide, India still remains sufficiently close to China in terms of per capita GNI to be considered economically comparable. Moreover, like China, India has a broad and diverse production base. In addition, India has been the primary surrogate in many of the Department's past NME proceedings involving China, and has a robust set of well-developed and reliable data sources. However, we note that the disparity in per capita GNI between India and China has consistently grown in recent years and, should this trend continue, the Department may determine in the future that the two countries are no longer "at a comparable level of economic development" within the meaning of the statute.[32]

---

[32] *See* Remand Data Memorandum, specifically the attachment, "Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Duty Order on 1-Hydroxyethylidene-1, 1-Diphosphonic Acid ("HEDP Acid") from the People's Republic of China ("PRC")," October 28, 2010.

In January 2010, the *per capita* GNI difference between the PRC and India was $1,870, and that increased in the following year's data to $2,410.[33]  This difference translates into approximately 17 market economy countries that fall between India and the PRC.[34]  The growing distance between India and the PRC was part of a long-term divergence.[35]  As the trend below makes clear, it was only a matter of time before the PRC – regardless of whatever "bright line" or range is used to define a level of economic development under section 774(c)(4)(A) of the Act – would eventually move into a different level of economic development than India.

**Table 2:  Comparison of the PRC and India's *per capita* GNIs (2001-2009)**

|       | 2001 | 2002 | 2003  | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  |
|-------|------|------|-------|-------|-------|-------|-------|-------|-------|
| PRC   | 890  | 940  | 1,100 | 1,290 | 1,740 | 2,010 | 2,360 | 2,940 | 3,590 |
| India | 460  | 480  | 530   | 620   | 720   | 820   | 950   | 1,070 | 1,180 |

Using the *Dorbest* guideline of half of the PRC's *per capita* GNI, we note that India actually crossed below that "threshold" sometime between calendar years 2004 and 2005 (based on 2002 and 2003 year GNI data which is lagged two years).[36]  According to Chart 1, *infra*, illustrates that distance grew even more pronounced in the 2007 and 2008 data.  And, it was only with the ultimate removal of India from the surrogate country list with the 2009 data, that the lower *per capita* GNI range kept a more reasonable track with the PRC's income growth.  Finally, the Department notes that it also examined this divergence relying on a *per capita* GNI metric that removes the differences in inflation across time, confirming the real growth differentials between

---

[33] In 2008, India and the PRC's GNIs were $1,070 and $2,940, respectively.  In 2009, India and the PRC's GNIs were $1,180 and $3,590, respectively.  *See* Remand Data Memorandum.

[34] Determined from the Table 1 of the 2011 World Bank Development Report and removing NME countries, *see* Remand Data Memorandum.

[35] *See* Chart 2, *infra*, and Table 2.

[36] *See* footnote 19 above.  If the 56.25 percent implied lower range from *Dorbest CAFC* decision were used instead, that would mean that India crossed below the guideline two years later (calendar years 2006 to 2007 based on 2004 to 2005 GNI data) as compared to the 50 percent threshold.  Regardless of which particular threshold is selected, however, the broader point remains that India would have eventually crossed below it prior to this proceeding.

India and the PRC.[37]   Based on all of the above, we continue to find that, irrespective of the particular metric used, that India remains at a less comparable level of economic development than the PRC.

---

[37] *See* Chart 2.

**Chart 1**

**Range of *per capita* GNIs for the PRC on the Surrogate Country List
Compared to the *per capita* GNI Range Suggested by the CAFC[38]**



---

### 4) **By-Product Valuation Methodology**

In past reviews of this order and in the *Preliminary Results*, we determined Jiheng's and Kangtai's by-products of ammonia gas and sulfuric acid by starting with the amount of ammonium sulfate and calculating the amount of the two by-products chemically required to produce that amount of ammonium sulfate. We then applied SV's for ammonia gas and sulfuric acid to the two by-products. We stated in the *Chloro Isos 6th Final Results* that, at that time, we were "adjusting the manner in which we calculate the by-product offsets for both Jiheng and Kangtai to conform to the Department's recent practice."[67] We stated that it was still the Department's practice to first start with the value of the downstream product (*i.e.*, ammonium sulfate) that was actually sold by the respondents and produced during the POR. In a departure from our previous method in this case, we sought to deduct any costs associated with converting the by-product into the downstream product, such as labor and electricity, using an FOP and SV cost methodology. For the *Chloro Isos 6th Final Results*, we did not have the FOPs to deduct, so we used the full value of the ammonium sulfate as the full value of the two by-products combined as the by-product offset.[68] We modified the methodology we used in the *Chloro Isos 6th Final Results* to avoid overstating the value of the by-product offsets and (as with the intra-company transport issue discussed above) to bring the calculation into conformity with agency-wide policy. To do this, we must grant an offset equal to the amount of value a company actually receives, less any processing costs, and not a hypothetical value that is unrelated to a

---

[67] See Chloro Isos 6th Final Results, and accompanying Issues and Decision Memorandum at Comment 14; see also Glycine from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, 77 FR 64100 (October 18, 2012), and accompanying Issues and Decision Memorandum at Comment 5 (where we note that a by-product offset should be granted because the company properly accounted for the costs for its by product production:  "given that it properly reported its by-product factors of production and the Department verified the period-of-review sales of the by-products, there is no factual basis upon which to deny their offsets").
[68] Id.

company's financial books and records.[69] It is clear from the underlying review that ammonium sulfate is the product actually sold by the companies.[70] Reviews under separate orders provide examples of the policy employed in this underlying review:

> As citric acid and dry high protein scrap are the *saleable products* that result closest to the split-off point, we started with SVs from the selected surrogate country, for these products, then reduced the values by the cost of further processing each product after the split-off point. The further processing costs were calculated based on RZB's reported FOPs after the split-off point and the respective SVs from the selected surrogate country for each FOP. This analysis demonstrated that the net realizable value (NRV) of high protein scrap at the split-off point is significant as compared to that of the liquefied liquid.[71]

In other words, to derive the NRV of each by-product, the Department obtains a reasonable market value for each by-product, as close to the split-off point as possible. To do so, the Department starts with the value of the *saleable products* that result closest to the split-off point and then reduces this value by the cost of further processing each by-product after the split-off point. For the *Chloro Isos 6th Final Results*, we did not elaborate on this methodological change for the final results, or why we felt it was warranted, given the record facts.[72] However, this policy is evident from our boilerplate questionnaire, used in the underlying review, which asks parties to report the FOPs required to process the by-products into the saleable downstream product.[73]

---

[69] *See Magnesium Metal from the Russian Federation: Final Results of Antidumping Duty Administrative Review*, 73 FR 52642 (September 10, 2008), and accompanying Issues and Decision Memorandum at Comment 1.B and C (where we discuss the valuation of factors, "this method keeps the value allocated to chlorine tied to a real world price and avoids the distortion of tying the value of chlorine to the profits earned on titanium").

[70] *See* Jiheng Verification Report at 32.

[71] *See Citric Acid and Certain Citrate Salts From the People's Republic of China; Final Results of Antidumping Duty Administrative Review*; 2011-2012, 79 FR 101 (January 2, 2014), and accompanying Issues and Decision Memorandum at 12 (emphasis added).

[72] Petitioners noted in their case brief that "The values assigned to the byproducts under this methodology were patently unreasonable in that the byproducts were assigned higher values than the inputs used to produce the byproduct," *see* Letter from Petitioners, "Chlorinated Isocyanurates from China – Sixth Administrative Review: Case Brief of Petitioners Clearon Corp. and Occidental Chemical Corporation," December 3, 2012, at 38.

[73] *See* Letter to Jiheng, "2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China," October 6, 2011, at D-9.

29

We specifically requested this cost information in other cases where parties did not provide the details in their initial questionnaire response,[74] but given the time frame in the underlying review, we did not have an opportunity to follow up with parties and request this company specific information for the *Chloro Isos 6th Final Results*.

Parties argue that they were not given an opportunity to provide the information required by the Department to calculate by-product offsets for this new methodology. As part of the Department's voluntary remand request, we issued a questionnaire to Jiheng and Kangtai requesting this information on August 11, 2014. Jiheng and Kangtai timely provided the requested information. We revised the by-product offset calculation for both companies consistent with the Department's recent practice.[75]

## D. Comments on Draft Remand Results

## Comment 1: Surrogate Country Selection

*Kangtai Comments*
- The Draft Remand Results were the first time Kangtai was made aware of the policy considerations in the surrogate country selection process as the Department did not vet this change with the trade bar, nor did it give advanced warning to exporters.
- There is no consistency and predictability from review to review - both in terms of the GNI band itself and the countries on the surrogate country list.
- The Department erred in its calculation in Table 1 of the Draft Remand Results, "Implied GNI range (difference between highest and lowest country on the list)," which should be corrected for the Final Remand Results.
- India is a major economically important industrial country. The Department has not addressed the true economic comparability of India to the PRC nor the data that suggest India is the most economically comparable country to the PRC, and more comparable than the Philippines to the PRC.
- The Department admits that the surrogate country list and the GNI band are a moveable concept. To select a country not on the surrogate country list, the Department must consider whether the data quality and availability from India outweighs India's per capita GNI discrepancy with the PRC. The Department never conducted this analysis.

---

[74] *See Final Determination of Sales at Less Than Fair Value: Certain Activated Carbon from the People's Republic of China*, 72 FR 9508 (March 2, 2007), and accompanying Issues and Decision Memorandum at Comment 9.
[75] *See* Jiheng Analysis Memorandum; *see also* Memorandum, "Analysis for the Remand of the Final Results of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Juancheng Kangtai Chemical Co., Ltd.," September 16, 2014.

- Analysis would show that due to the variant nature of imports of certain chemical inputs, India's developed chemical market is the only quality source of information for these inputs on the record.
- The Department should reinstate India on the surrogate country list for this review and consider it economically comparable to the PRC.

**Department's Position:**  The Department is continuing to use the Philippines as the primary surrogate country for these Final Remand Results.  Kangtai argues that the Department should have provided the trade bar with notice that India was being removed from the surrogate country list, and allowed parties to fully vet this issue.  The statute provides that in each review involving goods from an NME country that the Department shall select a surrogate country in which to value the factors of production based on the statutory criteria that the country be at a level of economic development comparable to the NME under review and that the surrogate country be a significant producer of comparable merchandise.[76]  During the review, Kangtai was provided with the opportunity to comment on the surrogate country selection, and it did not do so.   India's removal from the list merely reflects its growing separation from the PRC in view of the statute's requirement to determine that a country is at a level of economic development comparable to the NME country.[77]  The Department provided all of the notice required by law.  Kangtai's claim that the Department is required to generally put the trade bar on notice of a change in the surrogate country lists is found nowhere in the statute or regulations.  Moreover, taking Kangtai's argument to its logical conclusion, the Department would be required to ignore changes in the level of economic development of countries over time and simply rely on the surrogate country used in the past unless the trade bar is generally put on notice.  The determination of which surrogate country to select is a fact-specific determination made in each segment of the proceeding on the administrative record of each segment.  The statute does not

---

[76] *See* section 773(c)(4) of the Act.
[77] *Id.*

require the Department to construct special notification to the trade bar in general before establishing the potential surrogate country list in a particular review based on the record in that review.

Kangtai states that "{o}nce the Department changes the list based on a more recent per capita GNI ranking, consistency is lost." Kangtai misconstrues the concept of consistency in an attempt to claim that the Department, in updating the list of potential surrogate countries from review to review, is somehow being inconsistent. However, as explained above, the statute and regulations do not contemplate that the surrogate country list should be the same from review to review, but instead the selection of a surrogate country must be based on the facts on the record of the review evaluated under the statutory criteria. The consistency we refer to in the Draft Remand Results is to have a consistent methodology for selecting the primary surrogate country across all cases. It would be completely unrealistic and contrary to law to expect that the list itself must be "consistent" across time. That would produce an absurd result of the list never changing, irrespective of the changes in the underlying facts regarding countries' economic growth and production over time. In the CIT's remand of this underlying review, the Court stated:

> {T}he Department is not required by statute or regulation to select the same potential surrogate countries or final surrogate country in each review, nor is it required to select the same surrogate country from the *Preliminary Results* to the *Final Results*. In each review, parties are given opportunities to present and comment on surrogate country selection and are presumed aware of the possible countries that may be selected as well as of the possibility that the selected surrogate country may change from review to review. This is true for the present review where Kangtai commented on the surrogate country selection after being informed early in the proceedings of the potential countries that may be selected. {cites omitted}. Although, Kangtai may not be completely certain of the country Commerce will choose as a surrogate, as a participant in previous administrative reviews it is aware of the process and methodology

Commerce follows, and that the surrogate country selection occurs as part of a retroactive process where Commerce applies duties to entries after they have been sold.[78]

The Department clearly strives for a predictable process, as the Court notes above, that is consistent across all AD cases involving that NME country for a given set of GNI data. Our stated policy does not include, nor require us to maintain, a consistent set of surrogate countries across the years.

Kangtai's argument that the GNI band also is not consistent fails to recognize that *per capita* GNI changes over time. Countries' different growth rates will necessarily change the composition of the list and affect the surrogates that represent the upper and lower end of the implied GNI range represented by the list. Kangtai is correct that the Department's GNI band and the countries it selects from year to year are not "consistent"; however, the surrogate country list is predictable using the methodology explained by the Department. Further, Kangtai overlooks the fact that, regardless of where one draws the implied GNI range, India would have fallen into a "less comparable" level of economic development. We would obtain the same result using the range considered appropriate by CAFC in *Dorbest*.

Kangtai correctly noted a mistake the Department made on the last year of Table 1, above. The correct "Implied GNI range (difference between highest and lowest country on the list)" should be 3,980 for 2009.[79] Kangtai acknowledges that our point is NOT to show any mathematical equivalency in the growth of the implied GNI band versus the PRC. Our point is that you cannot keep the same implied GNI range across time, as demonstrated by Table 1. There must be some recognition that the PRC's GNI changed considerably over time and the

---

[78] *Id.,* at *45.
[79] We have corrected Table 1 above. South Africa had the highest GNI on the list in 2009, but we mistakenly did not use it as such in Table 1 in the Draft Remand Results. We corrected the "highest" value to South Africa's GNI, which then led to a difference between the highest and lowest country's GNI of 3,980.

surrogate country list should be updated to reflect the economic reality of different GNI growth rates over time.

We agree with Kangtai that India is a major economically important industrial country. However, Kangtai's only affirmative argument that addresses India's level of economic development involve factors that have been discounted by the Department and the Court and are entirely unrelated to the applicable regulatory standard. In *Jiaxing Brother,* for example, the plaintiff proposed seven different economic variables.[80] Kangtai never explains why their economic factors are more relevant than the statutory or regulatory standard used by the Department. The CIT has upheld that the *per capita* GNI is a "consistent, transparent, and objective metric to identify and compare a country's level of economic development."[81] We further believe the Court has already dismissed this laundry list of economic variables before, not only on substantive reasons, but in light of the difficulty of actually trying to implement a multi-variable weighing of these across all NME cases:

> The court wonders how such an approach could possibly be administrable across all NME cases. Commerce must efficiently identify a primary surrogate country early in the proceeding, and Plaintiffs' approach makes that difficult if not impossible. Commerce's method, on the other hand, has established a consistent, transparent, and objective measure to determine economic comparability. Commerce's use of per capita GNI as the measure of economic comparability (as opposed to some other assortment of metrics that account for the specific features of relevant industries in potential surrogate countries) is a reasonable interpretation of the statutory mandate to identify and select a primary surrogate country at a "level of economic development comparable" to the nonmarket economy country. 19 U.S.C. § 1677b(c)(4)(A). Accordingly, the court must defer to Commerce's permissible construction of the statute.[82]

---

[80] *See Jiaxing Brother Fastener Co., Ltd., v United States*, 916 F. Supp. 2d 1323, 1330 (CIT 2014) (*Jiaxing Brother*) (These include: (1) GDP; (2) GNI; (3) World Bank 'Doing Business' Report ranking; (4) Unemployment; (5) Investment; (6) Industrial Production Growth Rate; (7) Household Income by Percentage Share).
[81] *Id.,* at 1330.
[82] *See Jiaxing Brother,* 961 F.Supp. 2d at 1323.

The *Jiaxing Brother* decision is persuasive on this issue and the Department's use of GNI as a measure of economic comparability in the instant review is a reasonable interpretation of the statute and is in accordance with law.

Kangtai argues that despite its earlier acknowledgment that the surrogate country list is a non-exhaustive list, and that the GNI band is a moveable concept, the Department has not explained its selection of the countries on the surrogate country list itself, nor does the Department conduct analysis to determine if we should select countries proposed by interested parties that are not on the surrogate country list. As we enumerated in the Draft Remand Results, the surrogate country list is a non-exhaustive starting point for the Department's analysis. The inclusion or exclusion from the list is not the final word. The list itself simply defines what implied GNI range constitutes a level of economic development comparable to the NME country. Parties are entitled to submit data and argue for any other surrogate country they want to, and we consider those countries and arguments to the extent that they meet the statutory and regulatory criteria. For example, the Ukraine, which falls within the implied GNI range during the POR, but was not on the surrogate country list, would be given the same treatment as listed countries if parties identified the Ukraine as a potential surrogate country that was not originally on the surrogate country list and provided the data and arguments supporting selecting a country not on the list over countries on the list. Countries outside the implied GNI range are also considered, and are selected *only* to the extent that the data considerations outweigh the level of economic development factor (as indicated by disparate GNIs).

As we stated in the Surrogate Value Memorandum, we conducted the above analysis for the Philippines, and found that "the Philippines has reliable and usable data to value a majority

of the inputs, including labor and financial ratios."[83] Kangtai argues that the data from India is better; however, "better" on its own does not necessarily overcome the disparate GNI between India and the PRC. In contrast we found that the Philippines, a country at the same level of economic development as China, had reliable and usable data to value the inputs. When considered in light of the level of economic development statutory criteria, India's data is not "better" because it is not from a country that is at a level of economic development comparable to the PRC, whereas the Philippines data is. Barring some other extraordinary situation in which, for example, record based data reliability concerns arose, the Department correctly prefers to use data from a surrogate country that is at a comparable level of economic development rather than data from a country that is at a less comparable level of economic development.

Kangtai specifically argues that India has better data to value chlorine (*i.e.*, an Indian domestic price), an input that composes 25 percent of its raw material cost, and that the Philippines has an insignificant quantity of chlorine imports. As stated in the underlying review, "even if import volumes are small, parties must submit information illustrating that the data is aberrational, such as import values from other economically comparable countries."[84] Kangtai did not provide evidence that the Philippine chlorine data was aberrational in the underlying review, nor in its draft remand comments. While the Philippines data source may represent less chlorine than the Indian data source, this is not a factor the Department considers in its data analysis. The Department's clearly stated practice is, "{i}n assessing data and data sources, it is the Department's stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are

---

[83] *See* Memorandum, "Final Results Surrogate Value Memorandum," January 14, 2013 (Surrogate Value Memorandum), at 2.
[84] *See Chloro Isos 6th Final Results,* and accompanying Issues and Decision Memorandum at 15.

contemporaneous with the period of investigation or review, and publicly available data."[85]  The

Department was able to use surrogate values from countries listed in the Surrogate Country

Memorandum that met our standard practice.  Kangtai has not provided any evidence of a serious

deficiency in the Philippines data that would cause us in the underlying review or in these Final

Remand Results, to conclude that the Philippines is not economically comparable to the PRC or

that the data we selected was deficient.  More importantly, while the Department did review data

from India, and acknowledge that the record in the underlying reviews shows that India does

provide adequate quality and availability of data to value the FOPs, because we have a country

on the surrogate country list that also has adequate data as well, the fact that India has sufficient

data does not overcome the fact that India is at a less comparable level of economic development

as represented by the disparate GNI between India and the PRC than the Philippines, which is at

a level of economic comparability to the PRC.  Indeed the CIT has recently upheld this analytical

framework in a separate proceeding, explaining that

> Plaintiffs argue that Commerce erred by not selecting India as the primary
> surrogate country.  India, though, had a *per capita* GNI of $1,340, whereas
> the PRC had a *per capita* GNI of $4,260.  Given that disparity, as well as
> the availability of surrogate value data from two other economically
> comparable countries, Commerce's decision to not select India appears
> reasonable; it is difficult to envision how India would have been a
> reasonable or defensible choice on this administrative record.[86]

The facts in this underlying review are similar to the ones relied on by the CIT in this

decision, namely that given the *per capita* GNI disparity between the PRC and India, the fact that

the Department had available surrogate value data from a country at the same level of economic

development as the PRC, and selected the Philippines as the surrogate country over India is

---

[85] *See* the Department's Policy Bulletin No. 04.1, "Non-Market Economy Surrogate Country Selection Process,"
(March 1, 2004) (Policy Bulletin 04.1), available on the Department's Web site at
http://enforcement.trade.gov/policy/bull04-1.html.
[86] *See Jiaxing Brother Fastener Co., Ltd., v United States*, 916 F. Supp. 2d 1323 (CIT 2014) (*Jiaxing Brother*).

reasonable.  The Department has not ignored the fact that parties have placed Indian data on the record.  But because the Philippines, a country listed on the surrogate country list, had quality data to value the FOPs, the Department was not required to conduct an extensive analysis on data from India.  If India was still within the GNI band, or if the Philippines did not have quality data, further analysis of the Indian data would have been the logical next step in determining the appropriate surrogate country.  However, this scenario is not what the Department was facing in the underlying review.

Additionally, while India may have a significant chemical industry comparable to the PRC, as claimed by Kangtai, the significance of the chemical industry is irrelevant to the Department's analysis of the level of economic development.  This argument goes to another factor entirely, that is of significant producer.  Kangtai suggests that instead of using *per capita* GNI to measure economic comparability, the Department should have considered the chemical industry under review.  Pointing to Indian data available for the subject merchandise, Kangtai argues that India "has, and has had, a large and established chemicals industry from which to draw surrogate values - far more established than the other countries under consideration," and that "{N}o other country comes close to this amount of quality data."[87]  The Court has twice already found against Kangtai on very similar industry sensitive proposals stating that the metric proffered by Kangtai only addresses the second prong of the surrogate country criteria which require a country be a "significant producer of comparable merchandise" without addressing economic comparability.[88]  If a country is a significant producer of comparable merchandise, then the economy of the surrogate country is developed enough to support an industry in the comparable merchandise.  This ensures that the surrogate country has a market in which the

---

[87] *See Clearon Remand* at *34-37 and *Jiaxing Brother*, supra, Slip Op 14-12 at 9-10.
[88] *Id.*

comparable merchandise is actually produced from to get appropriate market based values for

the NME respondent's FOPs.

For these reasons, the Department is continuing to use the Philippines as the surrogate

country.

**Comment 2: Calculation of Financial Ratio**

*Kangtai Comments*
- According to the Department's *Labor Methodology*, the SG&A labor expenses are captured in the ILO labor rate.
- The numerous surveys and descriptions Kangtai placed on the record demonstrate that the ILO chapter 6A labor data covers all types of employment.
- To avoid double-counting, the Department must adjust the SG&A financial ratio by the employee benefits found in MVC's financial statements.

*Jiheng Comments*
- The record evidence demonstrates that the labor information provided by the Philippines to the ILO includes both production workers and other employees and all retirement benefits. The Department should conclude that employee benefits/retirement benefits are included in the surrogate value selected for the *Chloro Isos 6th Final Results*.
- According to the Department's stated practice, an adjustment for the SG&A expenses is required in instances in which identifiable indirect labor costs were included as a line item under SG&A (as is the case here). This also means that the Department must recognize that expenses it categorizes as indirect labor expenses may well be reported as part of SG&A expenses on an income statement.
- The record establishes that MVC pays retirement benefits to all its permanent employees including the "rank and file" production workers and that all expenses related to those benefits are included in the line item "retirement benefits" reported under "operating expenses" in the income statement.

**Department's Position:** The Department is not adjusting the SG&A ratio for these Final

Remand Results. The bulk of Kangtai's arguments center around its belief that the "ILO

Philippines labor cost explanation states that earnings, wages, and salaries include all paid

employees and specifically mentions 'managers, executive and supervisors.'"[89] However,

Kangtai is mistaken. The ILO data for Philippine labor identifies several surveys as the source

---

[89] *See* Letter from Kangtai, "Certain Chlorinated Isocyanurates from the People's Republic of China Comments on Draft Remand," September 23, 2014 (Kangtai Draft Remand Comments), at 17.

for different labor data.  The two surveys are the "Labour-related establishment survey," and

"Industrial/commercial survey."  The SV labor data we used was taken from the latter survey.[90]

While Kangtai did put information on the record regarding this second survey, there is nothing in

the background or definitions of this survey that specifically mentions covering managers,

executives, or supervisors.  Kangtai cites to the first survey, the labour-related establishment

survey, to argue that the SV we used covers managers.  However, that survey was not the source

of labor data we used in the underlying review or draft remand results.  Nowhere in the

industrial/commercial survey, which is the survey relied upon by the Department, does it

specifically mention that managers, executives, or supervisors are included in the labor cost

calculations.  We find that, even after reviewing the preliminary results of the

industrial/commercial survey,[91] there is no evidence that support's Kangtai's statement that the

ILO survey underlying the Chapter 6A labor cost in manufacturing includes managers,

supervisors, and executives.

Jiheng argues that the Department must make an adjustment for "employee benefits"

included in the administrative expenses of the surrogate financial statement under the

Department's *Labor Methodology*.  Jiheng claims that these employee benefits apply to both

production labor and administrative labor.  In other words, Jiheng is claiming that the surrogate

company incorrectly accounted for production labor employee benefits in the administrative

labor accounts.  However, Jiheng is incorrect.  The record evidence does not support a finding

that the surrogate company misallocated its employee benefits.

While Jiheng cites to the Department's *Labor Methodology* as the source of the authority

for an adjustment, the *Labor Methodology* does not apply to these circumstances.  The *Labor*

---

[90] *See* Surrogate Value Memorandum, at Appendix III.44; *see also* Kangtai Rebuttal Information at exhibit 7.
[91] *Id.*

*Methodology* applies to circumstances in which it is demonstrated on the basis of record evidence that the SV labor rate may be overstating the production labor rate, such as when the SV labor rate includes both production labor data and administrative labor data.[92]  If the record supports such a finding, under *Labor Methodology*, the Department, to the extent the surrogate financial statements break out the various types of labor data with specificity, may make an adjustment to compensate for the overstatement in the SV labor wage rate.[93]

What Jiheng is arguing about is an alleged misallocation of labor expenses within the surrogate financial statements.  Jiheng is claiming that the employee benefits listed in the administrative cost section of the surrogate financial statement includes employees' benefits for factory labor, instead of only administrative labor.  This is not a *Labor Methodology* issue but simply a factual issue of what the record indicates with regard to what the data in the financial statements reflect.

Jiheng questions the Department's interpretation of a "regular employee."  Jiheng argues that, "{i}n its filing with the Philippine SEC authorities, MVC stated 'The company has a registered, non-contributory retirement plan.  *All regular employees are covered from the President down to the rank and file*.'"[94]  Our conclusion on the definition of a regular employee is simply based on the Department's understanding of the Philippines generally accepted accounting principles.[95]  As noted by Petitioner, pointing out this incongruity, "there is no basis to assume that the ILO labor cost data would include employee and retirement benefits associated with direct production workers, but that the same employee and retirement benefits

---

[92] *See Labor Methodology*, 76 FR at 36094.
[93] *Id.*
[94] *See* Jiheng Draft Remand Comments.
[95] *See* Letter from Petitioner, "Remand of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Comments Regarding New Data Placed on the Record," August 20, 2014.

**Comment 4:  By-Product Valuation Methodology**

*Jiheng Comments*
- The Department has previously stated that because Jiheng's by-products do not require further refining to have commercial value, the downstream byproduct methodology did not apply to Jiheng's by-products.
- The Department's practice is to determine whether the by-product has commercial value through either sales or the reintroduction into the production of the same or other products.  The Department has ignored these factors in its determination of the commercial value of the by-products.

*Kangtai Comments*
- The Department has not explained why it changed its practice from previous reviews or why the new practice is more reasonable.
- Ammonia gas and sulfuric acid clearly have commercial value, as supported by the record.
- This new methodology overcomplicates the by-product methodology by measuring a downstream product, which could distort NV.
- If the Department continues to use this new methodology for Kangtai, it should not deduct the cost of bags from the downstream by-product.

*Petitioner's Comments*
- Jiheng's ammonium sulfate by-product, sulfuric acid, labor and energy inputs should first be allocated to the production of cyanuric acid, the production process in which the by-product is generated from.  The resulting per-ton amount should then be allocated to the appropriate subject merchandise, as done in the underlying review.
- The Department should adjust Jiheng's by-product offset to avoid over counting the value.
- Kangtai's by-product offset should be denied because it does not record income from these sales in its accounting records.
- Alternatively, if Kangtai is granted a by-product offset, the Department should adjust the inputs used to produce the by-product as reported by Kangtai to avoid double counting.

**Department's Position:**  For these Final Remand Results, we are continuing to use the methodology from the underlying review to value the by-product offset, but are incorporating company-specific information provided by Jiheng and Kangtai.  We are also recalculating several of the by-product inputs to capture more accurate costs.

Jiheng argues that the Department's by-product methodology requires the product to have a commercial value, not to be a saleable product.  According to Jiheng, the Department's practice acknowledges two different ways a company can demonstrate commercial value:  (1) sales or (2)

45

reintroduction into production of the same or other (non-subject) products. Additionally, because Jiheng's by-products do not require further refining to have commercial value, the Department declared previously that the downstream by-product methodology did not apply to Jiheng's by-products.[101]  In spite of our explanation of the by-product methodology used in the underlying review, Jiheng argues that the method is a departure from the Department's standard practice and is not justified. We first note that Jiheng provided no substantive comments on the methodology we used in and of itself, just that it does not believe it is the current practice. Kangtai also takes issue with the Department's Draft Remand Results, noting that the Department did not explain why it changed from its prior practice, and why the new practice is more reasonable. Kangtai argues that the new practice over complicates the process, and that the most accurate way to measure the cost of the actual subject merchandise is to measure the cost of its production minus the value of immediate by-products.

In response to respondents' criticisms that the Department did not satisfactorily explain why we changed methods and why the new method is more reasonable, the Department disagrees. In the Draft Remand Results, we stated that "we modified the methodology we used in the *Chloro Isos 6th Final Results* to avoid overstating the value of the by-product offsets." Indeed, we re-evaluated the methodology we used in the underlying review due to concerns raised in Petitioner's case brief. The issue of the appropriate by-product valuation was not mentioned until the briefing stage of the review (after the preliminary results). While parties were not on notice at the time of the *Chloro Isos 6th Final Results*, parties have now had an opportunity to present their arguments regarding this new methodology, and we again note that no party has taken substantive issue with the methodology itself, but merely questioned why the Department changed its methodology.

---

[101] *See* Jiheng Draft Remand Comments at 12.

Petitioner noted in its case brief that:

> The record includes surrogate value data for ammonia gas, sulfuric acid, and ammonium sulfate in the Philippines. From Philippine import data, the value of ammonia gas is 17.36 PhP/kg, the value of sulfuric acid is 13.71 PhP/kg, and the value of ammonium sulfate is 11.59 PhP/kg. Applying the surrogate values from the Preliminary Results leads to the counterintuitive conclusion that respondents are combining two high-value byproducts (anhydrous ammonia and…sulfuric acid) in order to produce a significantly lower value byproduct in ammonium sulfate. In reality, of course, no company would combine pure anhydrous ammonia and…sulfuric acid to make a lower-value ammonium sulfate product.[102]

Petitioner further suggested that "the Department should value these byproducts using a surrogate value derived from ammonium sulfate, the product that is actually sold by respondents. The value of ammonium sulfate reflects the actual economic value of the byproducts generated through the respondents' cyanuric acid production process and is accordingly an appropriate source to value the byproducts that are combined to produce ammonium sulfate."[103] Thus the Department's methodology reflects the actual value that the company receives for the by-products which are contained in the downstream product which Kangtai and Jiheng actually sell. Indeed, Kangtai itself, in its initial questionnaire response, reported ammonium sulfate as its by-product.[104] Based on these record facts, we reviewed the methodology we used in the preliminary results, and agreed with Petitioners that that methodology led to results that did not reflect the actual value received by Kangtai and Jiheng for the ammonia gas and sulfuric acid by-products. We continue to believe the more appropriate methodology, in the underlying review, is to value the downstream products and subtract the costs of the respondents to turn the two by-products into ammonium sulfate to arrive at the actual value that the respondents receive for the by-products. Reverting to the previous practice would lead to illogical conclusions that do not

---

[102] See Letter from Petitioner, "Chlorinated Isocyanurates from China – Sixth Administrative Review: Case Brief of Petitioners Clearon Corp. and Occidental Chemical Corporation," December 3, 2014, at 41-42.
[103] Id.
[104] See Kangtai Section D QR Response at 17.

match the real world experience of Jiheng and Kangtai.  The facts of the underlying review regarding the valuation of by-products departed from the facts from previous reviews.  The Department must consider in each individual review the appropriate method given the facts on hand as we have done in this case.  Given the underlying review facts, we had to re-evaluate the best methodology to use,[105] which is what we did in the *Chloro Isos 6th Final Results*, and what we have explained in these Draft Remand Results.

Kangtai argues that its packing expense was double counted in the Draft Remand Results.  The Department deducted the cost of bags from the ammonium sulfate by-product offset, but charged Kangtai the full price for urea, which includes the cost of the bags Kangtai recycles and uses to package ammonium sulfate.  Kangtai states that if "the Department is going to allocate the cost of the bag downstream to the by-product, then the Department must deduct/remove the cost of the bag from cost of the urea to avoid double-counting this cost."[106]  As Kangtai also notes, it paid for these bags when it paid for the urea, and the surrogate value of urea must include the bags/packaging it came in.  We agree that the surrogate value used for urea, as well as for ammonium sulfate (both from Global Trade Atlas), includes the price for packaging the products.  Since the urea surrogate value we used includes packaging, we agree with Kangtai that we have double counted its costs.  We have, therefore, adjusted Kangtai's ammonium sulfate by-product and not deducted packaging from its offset.[107]

We are changing certain allocations in how we calculated the by-product offset in the Draft Remand Results to follow the calculations employed in the underlying review.  In the underlying review, we allocated the ammonium sulfate by-product first to the production of

---

[105] *See, infra,* at note 57.
[106] *See* Kangtai Draft Remand Comments at 21-22.
[107] *See* Memorandum, "Analysis for the Remand of the Final Results of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China:  Juancheng Kangtai Chemical Co., Ltd.," December 11, 2014.

cyanuric acid, and then to the total amount of subject merchandise produced.[108] As noted by Petitioner, we did not use this same process for the Draft Remand Results. Due to this oversight in the Draft Remand Results, we have used the allocation calculations employed in the underlying review, with the company-specific data provided by Jiheng earlier in this remand proceeding, for these Final Remand Results. [109]

Petitioner raised concerns in its comments on the Draft Remand Results that because Kangtai was unable to demonstrate in a subsequent review that the sale of its by-products was recorded in its books and records, and Kangtai did not note any significant accounting changes from previous years, we should assume that Kangtai did not record its sales of by-products in the books and records for the POR. Regardless of what Kangtai has been able to demonstrate in subsequent reviews, we have no information on the record of the review underlying this remand that indicates Kangtai did not record sales of its by-products in the books and records for this review period. Therefore there is no basis to deny the offset for lack of sales.

Petitioner requests that we adjust the amounts reported for several inputs into the production of ammonium sulfate. First, Petitioner argues that Kangtai's allocation of sulfuric acid consumption in the production of ammonium sulfate and cyanuric acid is not a best estimate. However, based on the facts and experiences presented by Kangtai, Petitioner did not provide information that this best estimate is unreasonable. The Department finds that the method Kangtai followed to report the by-product FOPs was logical, is consistent with the level of detail

---

[108] *See* Letter from Petitioner, "Chlorinated Isocyanurates from the People's Republic of China: Comments on the Draft Results of Redetermination Pursuant to Court Order, Clearon Corp. and Occidental Chemical Corp. v. United States, Court No. 13-00073, Slip Op.," September 23, 2014, at exhibit 1. 14-88 (July 24, 2014)
[109] *See* Memorandum, "Analysis for the Remand of the Final Results of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Hebei Jiheng Chemical Company Ltd.," December 11, 2014.

provided in its books and records, and is therefore the best information on the record concerning the actual allocation of sulfuric acid between ammonium sulfate and cyanuric acid.

Petitioner also commented that the Department should continue to treat all electricity and labor consumed in the cyanuric acid workshop as direct inputs into the production of cyanuric acid, and not allocate these FOPs by production quantity of cyanuric acid and ammonium sulfate. In its questionnaire response, Kangtai explained that "For electricity and labor, Kangtai did not separately capture the consumption for CYA {cyanuric acid} or ammonium sulfate production in its normal business operations. Kangtai allocated total electricity KWH and labor hours by the production quantity of CYA and ammonium sulfate as a reasonable allocation methodology."[110] Kangtai argues that there are three important production processes to produce cyanuric acid, and that only one of those steps would require sufficient amounts of electricity. Ammonium sulfate, which Kangtai argues has only two main production steps, only has one production step that involves a large amount of electricity. Therefore, allocating electricity between the production quantity of cyanuric acid and ammonium sulfate is a reasonable method, according to Kangtai. Kangtai also notes that a similar level of labor is used to produce both outputs. However, after explaining this allocation methodology, Kangtai states that if "the Department does not agree with Kangtai's allocation methodology as described above, the Department should simply award the by-product offset with no additional by-product FOPs and with the Direct Material FOPs as previously reported at Exhibit D-7 of Section D response dated November 28, 2011, where Kangtai attributed all and total consumption to the CYA production."[111] Based on proprietary concerns raised by Petitioner, we find that given the production experience of Kangtai, and the fact that it does not separately track these inputs for the different production process, the labor

---

[110] *See* Letter from Kangtai, "Certain Chlorinated Isocyanurates from the People's Republic of China - Remand Questionnaire Response," August 18, 2014, at 3-4.
[111] *Id.*

and electricity allocation method used by Kangtai is not supported by the record. For these Final Remand Results, we are continuing to grant a by-product offset to Kangtai, but will treat all electricity and labor consumed in the cyanuric acid workshop as direct inputs into the production of cyanuric acid, and not deduct these inputs from the ammonium sulfate by-product.

**E.     Final Remand Results**

Per the Court's instructions, we provided further explanations supporting the determinations of the *Chloro Isos 6th Final Results*. In addition, we adjusted our NV calculation by recalculating the transportation cost of intermediate goods between factories (for Jiheng), and recalculating the by-product offset using company specific information (for Jiheng and Kangtai). As a result of these changes, we determine a weighted-average dumping margin of 31.22 percent for Jiheng and 34.21 percent for Kangtai.

Paul Piquado
Assistant Secretary
 for Enforcement and Compliance

11 DECEMBER 2014
(date)

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE R. KENTON MUSGRAVE, JUDGE

_____
                                              )
CLEARON CORPORATION, *et al.*,                )
                                              )
                   Plaintiff,                 )
          v.                                  )
                                              )
UNITED STATES,                                )
                                              )
                   Defendant,                 )        Consol. Ct. No. 13-00073
          and                                 )
                                              )
ARCH CHEMICALS, INC.,                         )
                                              )
                   Defendant-Intervenor,      )
          and                                 )
                                              )
JUANCHENG KANGTAI CHEMICAL CO., LTD.          )
                                              )
                   Defendant-Intervenor.      )
_____)


## CONSOLIDATED PLAINTIFF JUANCHENG KANGTAI CHEMICAL CO., LTD.'S COMMENTS ON REMAND REDETERMINATION

Gregory S. Menegaz
J. Kevin Horgan
John J. Kenkel
**DEKIEFFER & HORGAN**
1455 Pennsylvania Ave., N.W.
Suite 900B
Washington, D.C. 20004
(202)783-6900

*On behalf of Consolidated Plaintiff
Juancheng Kangtai Chemical Co., Ltd.*

January 28, 2015

## TABLE OF CONTENTS

I.   The Department's Elaborate Explanation of Its Country Selection Process and the Information It Relied Upon Demonstrates Prejudice to Kangtai in This Segment .....1

   A.   The Department Has Failed to Complete the Analysis Required by the Court as a Predicate for the Continued Rejection of Indian Data ...................3

   B.   The Department Has Failed to Complete the Analysis Required by the Statute and the Court for Selecting a Surrogate Country .................................8

   C.   The Department's Detailed Explanation of Its Country List Still Does Not Establish Consistency and Predictability In The Surrogate Country Selection Process ..................................................................................18

II.  SURROGATE FINANCIAL RATIOS – LABOR ADJUSTMENT ...........................24

   A.   The Methodological Context ................................................................................24

   B.   According to the Department's *Labor Methodologies*, the SG&A Labor Expenses Are Captured in the Labor Rate .........................................................27

III. BY-PRODUCT ..................................................................................................34

IV.  CONCLUSION ..................................................................................................37

Appx3877

surrogate countries…").  At a minimum, the Department should consider other economic factors in its determination when parties present and argue for a country, as Kangtai did in this case for India. Critically, the Department is unable to explain any consistent and predictable methodology for determining economic comparability based on per capita GNI.  This begs the question then why per capita GNI is the only factor the Department will consider when it seems to provide no more reliability than any other economic factor.

### C.    The Department's Detailed Explanation of Its Country List Still Does Not Establish Consistency and Predictability In The Surrogate Country Selection Process.

Throughout the Department's explanation of the country list formation, the Department stresses the need for consistency and predictability.  The Department even goes so far as to say that the two basic objectives underlying the generation of the surrogate country list are these very two principles: (1) to provide a consistent starting point for all proceedings involving the PRC, and (2) provide a reasonably predictable process so that interested parties understand the process and methodology the Department follows.  Remand Redetermination at 7.  The fact that this is the very first time the Department has ever explained the process of forming the surrogate country list plainly undermines the Department's second objective.  While the country list may provide some low measure of consistency for other reviews involving the PRC, that consistency only extends to the list itself (not the country chosen from the list) and only for the year that the Department relies on that same list.  Once the Department changes the list based on a more recent per capita GNI ranking, consistency is lost.  As such, there is no consistency and predictability from review to review—both in terms of the GNI band itself and the countries on the list.

While the Department explained at length its considerations for the GNI band and what it does

18

not rely upon—the Department does not actually explain a method that would produce a consistent and predictable GNI band or country list. *See* Remand Redetermination at 8-14. First, the Department discusses the CAFC case that invalidated the regression methodology used for labor rates. *Id*. at 8. Kangtai notes that the economic comparability in relation to labor rate alone is different than overall economic comparability. GNI per capita as a measure of economic comparability for labor makes far more sense than the Department's use of GNI for overall comparability. That aside, the Department discusses the CAFC comment that relying on market economy countries with a per capita GNI between half of China's and one to two times of China's GNI would be reasonable. Yet, the Department states that it does "not employ, or endorse, this particular ratio or bright-line." *Id*. at 9[4].

The Department also discusses the World Bank Development report, the source of its per capita GNI information. The Department notes that the World Bank places all countries into different income groups, China falling at the upper range of the lower middle income group. But then the Department says it does not advocate using the World Bank income groups or even the range of the world income groups as a GNI band. *Id*. at 11.

The Department did say it considers the *Dorbest* decision guidance to provide a balanced range of countries—meaning the Department seeks to provide an even number of countries above and below China's GNI. *Id*. at 9. The Department then makes its only attempt at an explanation of the GNI band, stating that each year it reevaluates the GNI range and expands it based roughly on the same rate of China's GNI increase. *Id*. at 10. To demonstrate, the Department placed a chart

---

[4] Also wholly lacking from the Department's analysis is the Court's admonition that the (labor) countries selected must be significant producers. *See Shandong Rongxin Imp. & Exp. Co. v. United States*, 774 F. Supp. 2d 1307, 1315-1316 (Ct. Int'l Trade 2011). The Department has yet to establish that the Philippines is a significant producer in comparison to India.

19

showing China's GNI and the implied GNI range based on the country list from 2001-2009. China's GNI per capita increased 303% over the entire span of those years while the Department's GNI range expanded 532[5]%, already demonstrating inconsistency. *Id.*

Even so, the important issue is not the overall expansion but the change in the GNI band from year to year. If parties are supposed to be able to predict the GNI band and determine whether countries will drop off the list, this GNI band must be semi-predictable and consistent. However, using the Department's explanation renders nonsensical results:

| year | PRC's GNI | change | implied GNI band | change |
|------|-----------|--------|------------------|--------|
| 2001 | 890 |  | 630 |  |
| 2002 | 940 | **6%** | 760 | **21%** |
| 2003 | 1100 | **17%** | 860 | **13%** |
| 2004 | 1290 | **17%** | 690 | **-20%** |
| 2005 | 1740 | **35%** | 1020 | **48%** |
| 2006 | 2010 | **16%** | 2170 | **113%** |
| 2007 | 2460 | **22%** | 2500 | **15%** |
| 2008 | 2940 | **20%** | 2920 | **17%** |
| 2009 | 3590 | **22%** | 3980 | **36%** |
|  | overall | **303%** | overall | **532%** |

Kangtai also submitted during the remand the Department's surrogate country list in later reviews based on 2010, 2011, and 2012 per capita GNI. *See* Kangtai Remand Rebuttal Information at Exh. 1. The later lists and implied GNI band continues to show the complete lack of consistency in the GNI band:

| year | PRC's GNI | change | implied GNI band | change |
|------|-----------|--------|------------------|--------|
| 2010 | 4260 | **19%** | 4050 | **2%** |
| 2011 | 4940 | **16%** | 5450 | **35%** |
| 2012 | 5740 | **16%** | 4190 | **-23%** |

---

[5] The Department mistakenly stated the change in the implied GNI range was 398%. However the change from 630 in 2001 to 3,980 in 2009 represents a 532% change over time. 532%= (3980-630)/63. Remand Redetermination at 10.

In light of the foregoing facts, even the Department's one explanation of how it determines the GNI band does not line up. The expansion in the GNI band of the country list does not mimic China's GNI change from year to year. The Department has still not explained how the list of surrogate countries and its implied GNI band are selected. Parties cannot predict what the Department's GNI band will be from one year to the next. The changes in the GNI band are not minimal either. The GNI band can contain upwards of 50 countries; changing the band by the ranges the Department has applied can add or drop over 20 countries to the band of countries at the same economic level as China.

The Department's GNI band and the countries it selects from year to year emphatically are not consistent or predictable. The complete lack of consistency is exemplified in this case and others after India was left off of the surrogate country list. For example, the source of the surrogate value for chlorine, Kangtai's most critical input, was valued from domestic sources in India in the final results of Kangtai's new shipper review and preliminary results of AR6 (when Kangtai was next a mandatory respondent); then Philippines import data in the AR6 final (where the Philippines was the primary country) and AR7 (where the Philippines was the primary country; but in AR8, where Thailand was the primary country, the Department preliminarily valued chlorine from Indonesian imports and valued chlorine in the final results from Bulgarian imports. What reasonable producer would move each year—India, the Philippines, Thailand, and so on,[6] selecting a country where its main raw material must be imported despite the fact that it is hazardous and expensive to ship internationally?

Taking *Fresh Garlic from China* as another example, India was the surrogate country for the

---

[6] In AR 9, petitioners have already argued that the Department should not select Thailand as the primary country. In fact, in every review since AR 6, petitioners were able to dictate Kangtai's home market; not Kangtai.

Appx3898

first 16 administrative reviews.  The Department left India in a favor of Ukraine in AR17; then left

Ukraine off the Country List in AR18 even thought its GNI was within the band—without

explanation. In the most recent segment, AR18, the Department selected the Philippines; yet new

countries were proposed for the following segment as the Philippines itself is now excluded from the

Country List based upon 2012 GNI rankings.  Kangtai asks the Court to seriously consider whether

any reasonable NME respondent could comply with the U.S. antidumping duty laws under these

circumstances.

Lastly, the Department also has not explained its selection of the countries on the surrogate

country list itself.  The Department says it considers availability and quality of data in forming the

list; in practice, there is no evidence of this.  For example, the Department chose to exclude Ukraine

from the list despite its still being in the GNI range and having been relied upon and argued for in

several unrelated reviews.  The exclusion is arbitrary and unexplained.  Likewise, while the

Department shows that India was declining in comparability to China based on per capita GNI and

excluded it from the list based on 2009 GNI, India was only $230 outside of the implied GNI range[7].

Further, based on the Department's GNI range in a later year, ***India would have been included***.

India's per capita GNI in 2009 was $2,410 below China's but the Department has included countries

on the surrogate country list that were over $2,700 above and below China.  *See* Kangtai Remand

Rebuttal Information at Exh. 1.  Moreover, if the Department was actually considering the quality and

availability of data in the surrogate country process, surely India would have continued to be on the

list given the great economic diversity of the manufacturing sector and years of reliable and available

(a persistent issue in the countries provided by the Department) quality data.

---

[7] South Africa's per capita GNI was $2,180 above China's.

In response to Kangtai's comments on the Draft Remand pointing out the complete inconsistencies in the range of GNI and countries on the list, the Department actually conceded that "Kangtai is correct that the Department's GNI band and the countries it selects are not 'consistent'." Remand Redetermination at 33. Yet in the very same sentence, the Department attempts to say that the "surrogate country list is predictable using the methodology explained by the Department." In what way is the above process predictable? The Department even says that the "point is NOT to show any mathematical equivalency in the growth of the implied GNI band versus the PRC. Our point is that you cannot keep the same implied GNI range across time." *Id.* Again, Kangtai, given this statement, is left mystified by how the Department can pretend there is any predictability in the general process of establishing the surrogate country list or determining why a country such as India is not at the same level of economic comparability.

Despite spending several pages discussing the surrogate country selection process and implied GNI band, the Department has still not presented an actual explanation that can be replicated from year to year with any consistency or predictability. If the Department cannot articulate a method to its list, then the parties certainly cannot predict the surrogate country list or surrogate country from year to year. For these reasons, the Court should order the Department to reinstate India on the country list for this review and consider it economically comparable to China.

## II.   SURROGATE FINANCIAL RATIOS – LABOR ADJUSTMENT

The Remand Redetermination continues to demonstrate that the Department misunderstands its *Labor Methodologies*, the ILO labor rate, and the Mabuhay Vinyl Corporation ("MVC") labor line items. Kangtai notes that the Department did not directly reference Kangtai's arguments in the body

the Department changed its methodology.  *See Labor Methodologies.*  Yet, in this case, the

Department inexplicably completely failed to understand and apply the *Labor Methodologies*.  The

Department is acting in the most arbitrary manner by refusing to apply the very methodologies it said

it would implement when it was published and that it is implementing in other cases.  The

Department must accurately allocate labor in the financial ratios, consistent with its Labor

Methodologies and practice.  *See, e.g., Sinks Investigation IDM* at Cmt. 4; *see also, Certain Steel

Nails From the People's Republic of China: Final Results of the Fourth Antidumping Duty

Administrative Review*, 79 Fed. Reg. 19,316 (Apr. 8, 2014) and accompanying *I&D Memo* at Cmt. 2

(in which it cited to its labor methodologies and eliminated all delineated labor categories from the

financial statements to avoid double counting).

Accordingly, when the record evidence regarding the labor rates and the Department's own

policy on labor methodology are fairly considered, its position on remand is unsupported by

substantial evidence and contrary to law, i.e., contrary to the Department's own *Labor

Methodologies*.  The Court should remand labor to the Department to calculate the labor rate and

financial ratios in such a way that the Department does not double-count labor costs.  Namely, the

Department must either (1) follow its own labor methodology as explained above or, (2) resort to

using a labor rate that does not overstate labor, such as ILO 5B which the Department relied on

before its changed methodology.

## III.     BY-PRODUCT

The Department still has not explained its new methodology and recent administrative

decisions (including a very recent remand to the Court in another case) confirming Kangtai's and

Jiheng's allegations that this is no policy at all – it was just applied arbitrarily in this case to increase

Appx3910

the antidumping duty margins. The Department has always held, as a matter of policy, that there were two principle and independent methods by which a respondent could establish the right to a by-product offset. *See* Kangtai R. 56. 2 Br. at 39-40; Kangtai Reply Br. at 9-11; Jiheng 56.2 Br. at 24-30; Kangtai Cmt on Draft Remand at 20-22, Remand PD 68; Jiheng Cmt. on Draft Remand at10-13, Remand PD 67. The first of these two methods was satisfied by respondents, namely that they reintroduced the immediate by-products into production without the need to further process them. This fact is indisputable and hardly surprising. The immediate by-products, ammonia gas and sulfuric acid, are common commodity chemicals suitable for a myriad of downstream uses without further processing before they are used. In fact, in Kangtai's case, the undisputed record indicates that they are piped directly from where they are generated into a centrifuge tank to make ammonium sulfate.

In a recent Remand to Court, the Department even reiterated that a by-product has commercial value when it is reintroduced into production. *See DuPont Teijin Films China Limited, et al. v. United States*, Consol. Court No. 13-00229, Slip Op. 14-106 (Ct. Int'l Trade Sept. 11, 2014), Final Results of Redetermination Pursuant to Court Remand (Jan. 9, 2015). The Department found:

> The Department grants an offset for by-products generated during the production of subject merchandise if evidence is provided that such by-product has commercial value. The Department considers that a by-product has commercial value if it is sold, or if, as in this instance, it is reintroduced into production. Thus, the Department's practice is to attribute the commercial value to a byproduct by virtue of its reintroduction. Given that DuPont Group ultimately reintroduces the PETWASTEOUT into production, this demonstrates that this byproduct has commercial value.

*Id*. at 5-6[10]. As Kangtai's two immediate by-products meet the Department's "established" criteria,

---

[10] *citing Silicon Metal from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 77 FR 54563 (September 5, 2012), and accompanying Issues and Decision Memorandum at Issue 3;

34

the Department must grant the immediate by-product offset and assign surrogate values to ammonia gas and sulfuric acid in the amounts generated as reported (which is not in dispute) in Kangtai's Section D FOP database and offset them from the cost of production.

The Department claims that neither Jiheng nor Kangtai take any substantive issue with the downstream by-product valuation methodology itself. Remand Determination at 46. Of course Kangtai takes issue and that is why it appealed this issue. In switching methodologies, the Department devalued Kangtai's by-product offset to production costs. So the method chosen by the Department does matter and the Court should, at the very least, hold the Department to its established practice. Otherwise, the compliance purpose of the antidumping statute will be frustrated. Moreover, Kangtai further argued that moving far downstream of the subject merchandise creates conditions whereby normal value is determined not by the manufacture of the subject merchandise itself but by the manufacture of non-subject merchandise (*i.e.*, the downstream ammonium sulfate).

The Department's latest explanation is actually a capping argument (*i.e.*, the value of the inputs cannot exceed the value of the downstream by-product). Because this argument was only raised at the briefing stage in petitioner's case brief, respondents did not have the opportunity to argue whether the surrogate value for ammonium sulfate was artificially low. Moreover, in the case originally cited by the Department for capping by product values, the *Multilayered Wood Flooring from China* investigation, the Department used yet a different methodology, averaging the unit values of the two inputs and using that as a cap on the by-product unit value. *See Multilayered Wood*

*Multilayered Wood Flooring from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (October 18, 2011), and accompanying Issues and Decision Memorandum at Comment 23; *Frontseating Service Valves From the People's Republic of China: Final Results of the 2008-2010 Antidumping Duty Administrative Review of the Antidumping Duty Order*, 76 FR 70706 (November 15, 2011) and accompanying Issues and Decision Memorandum at Comment 18, *Utility Scale Wind Towers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 FR 75992 (December 26, 2012), and accompanying Issues and Decision Memorandum at Comment 17.

35

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HONORABLE R. KENTON MUSGRAVE, SENIOR, JUDGE

_____

|  |  |  |
|---|---|---|
| CLEARON CORPORATION and OCCIDENTAL CHEMICAL CORPORATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) ) | Consol. Ct. No. 13-00073 |
| and | ) ) | |
| ARCH CHEMICALS, INC., | ) ) | |
| Defendant-Intervenor, and | ) ) ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. , | ) ) | |
| Defendant-Intervenor. | ) ) | |

_____)

## DEFENDANT'S RESPONSES TO COURT'S QUESTIONS

Defendant, the United States, respectfully submits the following responses to the Court's

May 8, 2015 questions.

Commerce's denial of a by-product offset for ammonia gas and sulfuric acid. Commerce had

denied a by-product offset for Kangtai because: (1) its accounting records had not reflected any

income from sales of ammonia sulfate, the final downstream product; and (2) Kangtai had not

maintained any inventory control accounts for the ammonia sulfate. Consol. Ct. No. 14-0056

Issues & Decision Memorandum at 30-31. Jiheng challenged, as it had done in Consol. Ct. No.

13-00073, Commerce's application of its new methodology to calculate the by-product offset

amounts for ammonia gas and sulfuric acid. *See id.* at 30.

> **3.** **Regarding pages 12-13 of Arch's comments on the remand results for Consol. Court No. 13-00073, the arguments therein were purportedly presented to Commerce in Arch's comments upon the draft remand results. What is required for a policy of Commerce's to be considered "agency-wide" as stated on page 28 of the remand results? Please clarify.**

The term "agency-wide" as used on page 28 of the remand results is not a term of art

upon which Commerce intended to import any special meaning. Commerce simply used that

term to reflect its departure from its past practice of calculating Jiheng's and Kangtai's ammonia

gas and sulfuric acid by-products to conform to its then-recent practice as established by

Enforcement and Compliance. *See* Consol. Ct. No. 13-00073 Final Remand Results at 28 (citing

*Glycine from the People's Republic of China*, 77 Fed. Reg. 64,100 (Dep't of Commerce October

18, 2012) (final results of antidumping duty admin. review)). In conforming to its modified

methodology, Commerce calculated the actual value Jiheng and Kangtai received for the by-

products rather than determine a value based upon an artificial calculation – *e.g.*, without

consideration of values a company actually receives – which could have overstated or

understated the values of the by-products. *See id.*

6



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-898
Second Remand
06/01/2010 – 05/31/2011
E&C/Office VII:  KMW
**Public Document**

March 22, 2016

MEMORANDUM TO:              The File

THROUGH:                    Edward Yang
                            Office Director
                            AD/CVD Operations, Office VII

FROM:                       Mark Hoadley
                            Program Manager
                            AD/CVD Operations, Office VII

SUBJECT:                    Antidumping Duty Administrative Review of Chlorinated
                            Isocyanurates from the People's Republic of China:  Final
                            Results of Second Redetermination Pursuant to Remand

---

Attached are the final results from the Department of Commerce (the Department) in the second redetermination pursuant to remand, in accordance with *Clearon Corp. v. United States*,[1] regarding the Department's final results in the antidumping duty administrative review of chlorinated isocyanurates from the People's Republic of China.  The applicable period of review is June 1, 2010, through May 31, 2011.

---

[1] *See Clearon Corp., and Occidental Chemical Corp., et al. v. United States*, Slip Op. 15-91, Consol. Ct. No. 13-00073 (CIT 2015).

Case: 17-1520    Document: 47    Page: 494    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

allocated to the direct labor employees, *i.e.*, "Cost of Sales," from the SG&A expenses and included the amount as direct labor cost, whereby we increased the denominator of surrogate financial ratio calculations in order to avoid double counting the labor included in ILO's wage rate. Likewise, we continued to include the portion allocated to administrative employees, *i.e.*, "Operating Expenses" in the SG&A expenses. As a result, the surrogate financial ratios for overhead, and SG&A and interest decreased, from 24.58 percent and 13.28 percent, to 24.37 percent and 12.47 percent, respectively.

However, the "employee benefits" line item under MVC's operating expenses does not have any such note indicating that the benefits apply to all or regular employees. The Court's opinion also indicated that the "{MVC's financial statements} does not provide as much information on these {employee benefits} as for retirement benefits."[16] Specifically, nowhere in the financial statements is there any definite indication that these benefits apply to "regular" employees as there is in the notes for retirement benefits. Because the record provides no further details on these employee benefits, and because these benefits are presented on the face of the financial statements as "Operating Expenses," we are continuing to treat this line item as part of SG&A expenses.

### 2) By-Product Valuation Methodology

In past reviews of this order and in the *Preliminary Results*, we determined Jiheng's and Kangtai's by-product offset for ammonia gas and sulfuric acid by first calculating the amount of the two by-products produced during the review period. To calculate the quantity of the two by-products produced we relied on what was chemically required as inputs of the two by-products to produce the quantity of the downstream product (*i.e.*, ammonium sulfate) produced during the

---

[16] *See Clearon 2015 Remand* at 45.

7

Case: 17-1520    Document: 47    Page: 495    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

review period.  We then applied SVs to the calculated quantity of ammonia gas and sulfuric acid produced to determine the offset to the reported costs of subject merchandise for the two by-products.  We stated in the *Chloro Isos 6th Final Results* that, at that time, we were "adjusting the manner in which we calculate the by-product offsets for both Jiheng and Kangtai to conform to the Department's recent practice."[17]  We modified the methodology we used in the *Chloro Isos 6th Final Results* to avoid overstating the value of the by-product offsets.  We stated at that time that it was the Department's practice to first start with the value of the downstream product (*i.e.*, ammonium sulfate) that was actually sold by the respondents and produced during the POR, and deduct the further processing costs incurred to produce the downstream product.  Thus, in a departure from our previous methodology in this case, we attempted to calculate the by-product offset by deducting from the downstream product (*i.e.*, ammonium sulfate) value any costs associated with converting the by-products into the downstream product, such as labor and electricity, using the FOPs and SVs in calculating the further processing costs.  However, for the *Chloro Isos 6th Final Results*, we did not have the FOPs for these costs to deduct the further processing, so we used the full value of the ammonium sulfate produced (*i.e.*, quantity produced and SV of ammonium sulfate) as the by-product offset for the two by-products combined.[18]  In the First Remand Results, we opened the record, and Jiheng and Kangtai provided the costs associated with converting the ammonia gas and sulfuric acid to ammonium sulfate.  We deducted these costs from the ammonium sulfate by-product to obtain our by-product offset.

---

[17] *See Chloro Isos 6th Final Results*, and accompanying Issues and Decision Memorandum at Comment 14; s*ee also Glycine from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 77 FR 64100 (October 18, 2012), and accompanying Issues and Decision Memorandum at Comment 5 (where we note that a by-product offset should be granted because the company properly accounted for the costs for its by product production:  "given that it properly reported its by-product factors of production and the Department verified the period-of-review sales of the by-products, there is no factual basis upon which to deny their offsets").
[18] *Id.*

Filed By: Kaitlin Wojnar, Filed Date: 3/22/16 3:22 PM, Submission Status: Approved

Case: 17-1520    Document: 47    Page: 496    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

To clarify, the Department has not changed its practice regarding joint products and its associated by-product methodology. The Department's long standing practice of valuing by-products is to value the products as close to the split-off point as possible (in this case, that would be ammonia gas and sulfuric acid).[19] However, in the underlying review, we stated, "we are adjusting the manner in which we calculate the by-product offsets for both Jiheng and Kangtai to conform to the Department's recent practice."[20] We did not explain why we were making this adjustment, and how this adjustment was consistent with our normal by-product methodology. One of the Department's concerns regarding this issue is neither respondent during the period of review could measure and keep records of the actual amount of waste ammonia gas and sulfuric acid which was being produced. As a result, we were forced to go to the downstream product production records to obtain the data to derive the amounts of ammonia gas and sulfuric acid. Therefore the first point at which the Department could determine the amount of by-product produced was from the companies' books and records on the downstream product production. Another concern raised by parties, and supported by the record, is that if we valued the by-products as close to the split off point as possible in this proceeding, as we had done in all prior reviews and the investigation of this case, then the amount of the by-product offset would result in an illogical outcome because the value of the ammonia gas and sulfuric acid (the immediate by-products) would be higher than the value of the ammonium sulfate (the by-product that is actually sold).[21] In reality, as pointed out by the Court, in general no company

---

[19] See, e.g., *Magnesium Metal from the Russian Federation: Final Results of Antidumping Duty Administrative Review*, 76 FR 56396 (September 13, 2011), and accompanying Issues and Decision Memorandum at Comment 1a.
[20] See *Chloro Isos 6th Final Results*, and accompanying Issues and Decision Memorandum at Comment 14.
[21] See, e.g., Memoranda, "Analysis for the Second Remand of the Final Results of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Hebei Jiheng Chemical Company Ltd.," and "Analysis for the Second Remand of the Final Results of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of

9

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

would combine two inputs, and incur additional processing costs, in order to make a lower-valued ammonium sulfate by-product. This was a clear indication that applying our methodology in the normal manner was not appropriate.

Because the Department's normal methodology, to value the by-products as close to the split-off point as possible, resulted in illogical results and could not be directly obtained from the respondents books and record but only from their books and records on the production of the downstream product, we calculated the by-product offset for ammonia gas and sulfuric acid using the POR production quantity and SV for ammonium sulfate, the downstream product produced, and reduced that value by the further processing costs incurred to convert the ammonia gas and sulfuric acid by-products to ammonium sulfate. We called this next step an "adjustment" in the *Chloro Isos 6th Final Results*. Following our normal methodology, for this redetermination, we are calculating the by-product offset for ammonia gas and sulfuric acid using the value of ammonium sulfate production, less the further manufacturing costs necessary to produce ammonium sulfate. The net value of the ammonium sulfate reflects the product closest to the split-off point that does not result in the illogical outcome when we value the ammonia gas and sulfuric acid generated at the split-off point.

Furthermore, we are not making any changes to Kangtai's by-product offset. The Department correctly acknowledged that production of ammonium sulfate involves a large amount of electricity. However, Kangtai does not separately record the FOPs used to convert the by-products (*i.e.*, ammonia gas and sulfuric acid) into the downstream product, ammonium

---

China: Juancheng Kangtai Chemical Co., Ltd.," dated concurrently with this final remand (collectively, Final Remand Analysis Memoranda).

Filed By: Kaitlin Wojnar, Filed Date: 3/22/16 3:22 PM, Submission Status: Approved

Case: 17-1520    Document: 47    Page: 498    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

sulfate.[22] Therefore, in the by-product methodology used in the First Remand Results, we followed Kangtai's own suggestion, that the Department should simply allow the by-product offset Kangtai previously reported at Exhibit D-7 of its Section D response dated November 30, 2011, and not deduct the further processing costs because Kangtai allocated all the further processing costs to the cyanuric acid production.[23] Therefore, as the Court states, "since the remand results are apparently in accordance with what Kangtai itself argues, they are therefore not unreasonable to that extent."[24]

### 3) Urea Surrogate Value

In the *Chloro Isos 6th Final Results*, we used GTA data from the Philippines to value the urea FOP. We used this data because we found at that time that urea was not produced domestically in the Philippines. However, as the Court points out, the Department later stated that the record evidence does indicate there is production of urea in the Philippines. The Court requested that the Department reconsider its SV for urea given that the Department has refuted its own previous basis for not selecting domestic Philippine data to value urea.

We have reviewed the record in the underlying review, specifically the Philippines' Bureau of Agricultural Statistics (BAS) "Updates on Fertilizer Prices" submitted by Petitioner for all months of the POR.[25] As we stated in the *Chloro Isos 6th Final Results*, we found that the BAS data is "from the Philippines, publicly available, contemporaneous with the POR, and

---

[22] *See* Letter from Kangtai, "Certain Chlorinated Isocyanurates from the People's Republic of China - Remand Questionnaire Response," August 18, 2014, at 5-6.
[23] *Id.*
[24] *See Clearon 2015 Remand* at 61.
[25] *See* Letter from Petitioner, "Chlorinated Isocyanurates from the People's Republic of China (6th Antidumping Administrative Review): Petitioners' Submission of Rebuttal Information Regarding Surrogate Values for Factors of Production," January 17, 2012, at exhibit 1.

11

Case: 17-1520    Document: 47    Page: 499    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

appear to be free of taxes."[26]  Our concern with the BAS data was that "there is record evidence that urea is not produced in the Philippines."[27]  During litigation, we contradicted this administrative finding, but we raised a second concern with the Court about the market representativeness of domestic production of urea in the Philippines.  Petitioner is challenging this assertion that the evidence of domestic prices is not representative of a broad market average of Philippine production and that there is no production of urea in the Philippines.

Jiheng provided background information on the fertilizer market in the Philippines, including "The Business Monitor Report," which indicates that 92 percent of the total supply of fertilizers (which include urea, as well as other fertilizers such as potash) were imported.[28]  In the underlying review, we used this fact as part of the basis to conclude there was no production of urea in the Philippines.  However, while the record indicates that 92 percent of Philippine fertilizers, including urea, are imported, our definitive assertion that there is no urea production in the Philippines is not supported by this or any other record facts.  There is nothing on the record saying 100 percent of urea is imported, or that fertilizers, including urea, are not domestically produced.  Indeed, the record indicates that there is domestic production of fertilizer, although it does not indicate urea production specifically.[29]  We are using the BAS data because, as the Court concludes, our prior statements regarding domestic production are not supported by the record, and because, all else being equal (public availability, contemporaneity,

---

[26] *See Chloro Isos 6th Final Results* and accompanying Issues and Decision Memorandum at Comment 5.
[27] *Id.*
[28] *See* Letter from Jiheng, "Chlorinated Isocyanurates from China (Sixth Administrative Review) – Hebei Jiheng Chemical Company, Ltd. Resubmission of Surrogate Value Information for Factors of Production," September 5, 2012 (Jiheng SV Submission), at Attachment 2.
[29] *Id.*

12

Case: 17-1520     Document: 47     Page: 500     Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand   -   Consol. Court No. 13-00073

etc.), the BAS data, which represents dealer prices in the Philippines, is the preferred source over the GTA data used in the underlying review.

Our statement that the BAS data is not really representative of the domestic price of urea because domestic production had dropped significantly over time also is not borne out by a re-examination of the complete record. As Petitioner notes, we have analyzed BAS data in the past, and specifically found that the BAS data "(i) 'represent broad market-average retail prices,' (ii) 'are specific to the urea input,' (iii) 'are exclusive of value added taxes,' and (iv) 'are publicly available from BAS or the Fertilizer and Pesticide Authority of the Philippines.'"[30] Thus, we are now concluding that the BAS data is representative of the domestic price of urea. First, while the underlying data does note that fertilizer production had decreased in the Philippines, there are no specific statistics about the decrease of urea production itself, and there is no indication that this trend is significant. Second, while the record indicates that the domestic price of urea had slightly decreased from the previous year (the smallest decrease in price compared to other fertilizers), the "The Business Monitor Report" article explains that the import price for fertilizers is sensitive to oil prices (because many of the fertilizers, such as urea, are by-products of oil).[31] The article specifically noted that high oil prices in the international market could cause fertilizer prices to spike.[32] Thus, changes in domestic prices can be explained by changes in relevant market factors rather than by aberrationally small domestic production. Finally, as explained in detail in our discussion of the surrogate values for chlorine and hydrogen and of the selection of the primary surrogate country, the Department does not take economies of scale into

---

[30] *See Final Results of Redetermination Pursuant to Court Remand, Court No. 08-00364, Slip Op. 11-142* (March 19, 2012), at 7-8.
[31] *See* Jiheng SV Submission, at Attachment 2.
[32] *Id.*

13

Case: 17-1520    Document: 47    Page: 501    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

consideration when choosing a surrogate value.  As explained in those discussions, the

Department only examines quantities in an effort to root out misclassifications, sample

transactions, and other values that do not appear to be representative of commercial transactions

for the input in question.

Therefore, we are changing the SV for urea, and are valuing it using BAS data provided

by Petitioner.

### 4) Process of Selecting the Primary Surrogate Country

As discussed below, the Department has determined that, in order to comply with the Court's

remand, it must value chlorine and hydrogen with Indian data, a country not on the list of

economically comparable countries.  The Court leaves open the question of the proper surrogate

country for the remaining FOPs, suggesting the Department may wish to reconsider India in light

of the Court's instructions regarding chlorine and hydrogen.  In so doing, the Court noted:

"While it is reasonable for Commerce to prefer to use data from a surrogate country that is at a

comparable level of economic development over one that is at a less comparable level of

development, when presented with a 'less economically comparable' country off the list it must

still provide an analysis of how the data from the less comparable country presented does not

outweigh its economic disparity."[33]  The Court continued by explaining such a "full comparative

evaluation of the data quality" is not necessary unless the party proposing a non-listed country

demonstrates "that no country on the surrogate country list provides the scope of 'quality' data

that it requires in order to make a primary surrogate country selection;" *i.e.*, the party proposing

to go off the list has the burden of demonstrating quality data is not available from countries on

---

[33] *See Clearon 2015 Remand* at 9.

14

Case: 17-1520    Document: 47    Page: 502    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

the list.[34]  Only then, if that "threshold" is not met, must the Department "consider the quality of the data on the country not on the list that a party proposes."[35]

Upon remand, the Department continues to conclude that the Philippines is a source of quality data for all FOPs besides chlorine and hydrogen and, thus, we see no reason to choose a primary surrogate country "off the list."  As the Court notes, "Commerce's selection of the Philippines as the primary surrogate country from the Surrogate Country List has general support in the record."[36]  While the Court suggests the choice of surrogate country turns largely on the source for valuing chlorine and hydrogen, the use of Indian data for two factors does not change the conclusion that the selection of the Philippines is supported by the record.  Chloro isos requires more than 40 FOPs, depending on the producer's level of integration.[37]  Aside from dozens of chemical inputs, packing materials, electricity, labor, overhead, selling, general, and administrative expenses, and profit must also be valued.  In fact, as explained in the Draft Remand Analysis Memoranda, chlorine and hydrogen are not so critical as to warrant switching to India as the primary surrogate country, at the expense of quality data for all other factors chosen from a country at the same level of economic development.[38]

When we emphasized the importance of chlorine and hydrogen in considering the choice between the Philippines and Thailand, we were looking at two countries on the list of economically comparable countries.  All else being equal, including economic comparability, it makes sense to choose the country with better data for chlorine and hydrogen, as it would make sense to choose the country with better data for any other FOP, all else being equal.  By

---

[34] *See Clearon 2015 Remand* at 10-11.
[35] *Id.*
[36] *Id.*, at 12.
[37] *See, e.g.,* Draft Remand Analysis Memoranda at Attachment 2.
[38] *Id.*

15

Case: 17-1520    Document: 47    Page: 503    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

definition, all else is not equal when choosing between a country at the same level of economic development and one that is less comparable.  Data from a less comparable country is automatically at a disadvantage to data from a country at the same level of economic development.  Data from countries at the same level of economic development reflect an overall economic environment similar to the one of the country under investigation, including general labor and professional wages, interest rates, the availability of financing, the sophistication of infrastructure, etc.

Importantly, "economic comparability" is not an industry-focused analysis.  Section 773(c) of the Act refers to a comparison of "countries," not industries, in choosing the best surrogate.  Such a focus, in the view of the Department, is necessary to take into consideration an overall economic environment.  A focus on industry similarity, which Kangtai appears to propose in its emphasis on the scale of India's chemical industry, ignores the statutory "country"/macro considerations in favor of non-statutory "industry"/micro considerations. Undoubtedly, the PRC and India both have large-scale chemical industries, as does the United States, but this similarity does not mean all three countries enjoy similar financing expenses, overhead, labor rates, natural resources, legal and taxation regimes, government policies, etc. The United States could not be considered economically comparable to the PRC and the use of U.S. SVs would not normally be appropriate unless there was no other evidence on the record; the same is true for less comparable countries.

Thus, to view industry similarity as a factor in choosing a surrogate country arguably results in reading Congress' focus on country economic similarity out of the statute.  Since India, with its large population and high GNI (aggregate, not per-capita GNI) has many large-scale

16

Case: 17-1520     Document: 47     Page: 504     Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

industries, an industry-specific focus could result in the Department routinely choosing India (a less economically comparable country), in direct contradiction of the Act, and the SVs chosen would not reflect the higher demands of a comparable economy.  For similar reasons, the Department noted in the *Chloro Isos 6th Final Results* that it does not take the aggregate size of an economy, aggregate GDP, and workforce population into consideration in determining economic comparability.  Instead, the Department looks at per-capita GNI.

Finally, choosing a surrogate country by comparing the size of the industry in the potential surrogate country to the size of the industry in the country under examination is incorrect because, by definition in an NME proceeding, the economy of the country under examination does not adhere to market principals.  While the PRC's chemical industry may match that of India's in terms of size, the size of the PRC's chemical industry may be due to non-market distortions inherent in the PRC's economy.  However, in determining a dumping margin, the Department seeks to determine what the NV of the product would be if the economy of the country under examination were free of such distortions.  In effect, that the PRC's chemical industry might more closely resemble, in terms of size, that of India than of a comparable economy like the Philippines might well be the result of non-market distortions.  Dumping of the product under examination may be another factor leading to the industry under examination being larger than it might be otherwise because dumping may lead to a larger export market for the dumped produce and, correspondingly, a larger foreign industry.  Thus, non-market distortions in the PRC and the pricing behavior of the Chinese industry are both potential factors explaining the large size of the Chinese chloro isos industry, and it is not necessary to conclude

17

Case: 17-1520    Document: 47    Page: 505    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

that the similarity of the Chinese and Indian industries in terms of size is proof of economic comparability between the two countries.

For all these reasons, the Department would not choose a less economically comparable country as the primary surrogate country because of two factors accounting for only a fraction of NV when there is quality data available for the remaining factors.  The only reason the Department is relying on India even for those two factors is because, given the Court's findings regarding Philippine GTA data, there is no quality data available from countries at the same level of economic development on the record.  As the Court notes, such a choice would be made only when "no country on the surrogate country list provides the scope of 'quality' data that it requires in order to make a primary surrogate country selection,"[39] not simply because data from an off-list country might appear to be better at first glance (because it is from a large-scale chemical producing country).

Although the Department did place emphasis in the First Remand Results on these two chemicals when discussing the possibility of India as a surrogate country, that is simply because the issue was first raised by Kangtai.  Kangtai argued that chlorine and hydrogen were best valued in India and that therefore, for that reason among others, the Department should choose India as the primary surrogate country.  When the Department responded with the position that adequate Philippine data was available, we did not intend to concede the point that the lack of data for two chemicals would justify replacing the Philippines with India as the surrogate country.  Furthermore, the Court notes that the "relevant regulation, 19 C.F.R. §351.408(c)(2), expresses leeway in providing that Commerce '*normally* will value all factors in a single

---

[39] *See Clearon 2015 Remand* at 11.

18

Case: 17-1520    Document: 47    Page: 506    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

surrogate country'."[40]  As the Court's emphasis indicates, this regulation does not require that

the Department value all factors in a single surrogate country.  We must consider this regulation

in the context of each proceeding, and in light of our surrogate country selection methodology,

which places emphasis on the level of economic development of the surrogate country.  Thus, it

is the Department's preference to value all the factors of production in a single surrogate country.

However, in this proceeding, there is no single country that is both at the same level of economic

development as the PRC and provides the data to value all FOPs.  We must balance our

regulatory preference and statutory directives in selecting surrogate countries.  None of the

potential surrogate countries (those at the same level of economic development as the PRC)

contain data to value all of the FOPs.  However, we keep our regulatory preference in mind, and

have been able to value nearly all of the FOPs in a single economically comparable surrogate

country, the Philippines.  The statute and the Department consider it preferable to value most of

the factors in an economically comparable country than switching to data from a less

economically comparable country because the data from the less economically comparable

country is just that – less comparable – and does not fulfill the purpose of the statute to value the

FOPs, to the extent practicable, in a country at the same level of economic development.

Finally, the Department wishes to clarify the following statement made in the First

Remand Results, noted by the Court in footnote 10:  "{i}f a country is a significant producer of

comparable merchandise, then the economy of the surrogate country is developed enough to

support an industry in the comparable merchandise."[41]  The Court asks whether this means a

country without comparable GNI cannot be a significant producer of comparable merchandise or

---

[40] *See Clearon 2015 Remand* at 25.
[41] *Id.*, at 10, referring to First Remand Results at 38.

19

Case: 17-1520     Document: 47     Page: 507     Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

whether it means a country with significant production of comparable merchandise must be

economically comparable and thus an appropriate source of SVs.  The Department, in fact,

considers these two statutory factors (economic comparability and significant production) to be

independent of each other.  A finding regarding one does not imply a finding regarding the other.

Moreover, both factors are threshold; they are either met or they are not:  "The statute does not

require that the Department use a surrogate country that is at a level of economic development

*most* comparable to the NME country and that is the *most* significant producer of comparable

merchandise."[42]  Thus, "significant" is not measured in comparison to the respondent's own

level of production or the scale of the industry in the NME country under investigation.  As

explained above, requiring a match between the scale of the industry in the NME country and the

scale of the industry in the surrogate country would undermine the statute's focus on the

country's overall economic environment.  Thus the key word in the sentence is "support;" "{i}f a

country is a significant producer of comparable merchandise, then the economy of the surrogate

country is developed enough to *support* an industry in the comparable merchandise."[43]  In other

words, a country is a suitable surrogate if it is able to produce comparable merchandise in a

similar economic environment, a conclusion reached through examination of economic

comparability and, separately, examination of evidence of actual production of comparable

merchandise, even though it may be on a much smaller scale than that of the respondents or the

NME under examination.  As for matching a respondent's production, the statute requires the

Department to use the FOPs of the respondent.  It is through this method of NV calculation that

---

[42] *See* First Remand Results at 4.
[43] *Id*., at 38.

20

Case: 17-1520    Document: 47    Page: 508    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

the respondent's production is represented and again nothing about the scale of production is included in the FOPs provision.

### 5) Hydrogen and Chlorine Surrogate Values

The Court remanded the Department's selection of SVs for hydrogen and chlorine, stating that the rationale in the underlying review "does not reflect a full consideration of the parties' arguments, {but} instead reflects inconsistent logic as compared with Commerce's treatment of the chlorine surrogate value in the *Preliminary Results* and prior reviews."[44] Additionally, the Court stated that the Department's findings do not approximate a surrogate country with comparable production experience to the respondents.

In the *Chloro Isos 6th Final Results*, we changed the SV for hydrogen and chlorine from domestic production data found in financial statements from Indian producers of the inputs (used in the *Preliminary Results*) to GTA import data from the Philippines for the respective inputs. The Court's opinion notes that the Department is required to use the best available information in choosing SVs.

In prior reviews, to which both respondents were a party, the Department made specific findings regarding the nature of hydrogen and chlorine; the higher transportation and packaging costs associated with movement of these chemicals are exacerbated over longer distances, greatly adding to the cost of the inputs. Therefore, the Department found that GTA data does not provide the best SV for these inputs in prior reviews and in the *Preliminary Results*.[45] The Court states that the Department provided no record evidence overcoming this prior finding on the nature of these two inputs. Further, the Court states that "{r}ather than abide by its previous

---

[44] *See Clearon 2015 Remand* at 27.
[45] *See* Memorandum, "Preliminary Results Surrogate Value Memorandum," June 29, 2012, at 4.

21

Case: 17-1520    Document: 47    Page: 509    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

to production labor, either in a note or by classification under COS,[70] as required in *Labor Methodology* and discussed above, it is not appropriate to exclude these costs from SG&A expenses when they are clearly identified as "Operating Expenses."  As stipulated by our *Labor Methodology*, we are continuing to treat this line item as part of SG&A expenses.

## Comment 2:  By-Product Valuation Methodology

*Jiheng Comments*
- The one case cited by the Department to support its "recent" by-product methodology explanation did not employ the by-product methodology at issue in this case.[71]
- The Department's explanations are inconsistent with the remand order issued by the Court.  They do not address the concerns raised by the Court with respect to the reasonableness or accuracy of the methodology employed by the Department, nor does the Department explain how the new methodology is more accurate than the previous methodology, especially in light of the use of SVs at each stage of the calculation.[72]
- The Department fails to answer the Court's question of why any concerns over the value to be applied to ammonia gas and sulfuric acid could not have been addressed through "capping" the SV used.[73]
- The Department made CONNUM-specific adjustments – although it did not mention that in the analysis memorandum or in the Draft Remand Results.  There appear to be numerous problems with the Department's CONNUM-specific by-product offset calculation.[74]

*Kangtai Comments*
- The Department did not attempt to explain why respondents did not have a right to rely on the former by-product methodology.[75]
- The Department did not attempt to address any of the parties' concerns about notice and comment regarding this new methodology.[76]

---

[70] Consistent with *Steel Nails*, with the exception of the retirement benefit allocation already discussed, we have not excluded benefits that are listed under an operating expense or other SG&A header in the notes to the financial statements.

[71] *See* Letter from Jiheng, "*Clearon Corp. and Occidental Chemical Corp. et al., v. United States*, Consol. Ct. No. 13-00073 – *Arch Chemicals, Inc.* and *Hebei Jiheng Chemical Co., Ltd.*, *Comments on Draft 2nd Remand Results*," February 5, 2016 (Jiheng Comments), at 5-13.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *See* Kangtai Comments at 19-21.

[76] *Id.*

31

Case: 17-1520   Document: 47   Page: 510   Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

**Department's Position:**  For these Final Remand Results, we are continuing to use the methodology from the underlying review and First Remand Results to value the by-product offset.

Jiheng places great emphasis on the fact that the Department cited to just one case, *Magnesium Metal from Russia*, to support the Department's statement that the change used in the underlying review was done to conform to the Department's recent practice.[77]  However, the Department cited to *Magnesium Metal from Russia* not to support the by-product adjustments made, but to explain our normal by-product methodology.  As we stated above,

> The Department's long standing practice of valuing by-products is to value the products as close to the split-off point as possible (in this case, that would be ammonia gas and sulfuric acid).[78]  However, in the underlying review, we stated, "we are adjusting the manner in which we calculate the by-product offsets for both Jiheng and Kangtai to conform to the Department's recent practice."[79]  We did not explain why we were making this adjustment, and how this adjustment was consistent with our normal by-product methodology.

As is clear from this passage, *Magnesium Metal from Russia* was cited to explain that, consistent with Jiheng and Kangtai's arguments in this remand, the Department normally values the by-products as close to the split off point as possible, which in this case, would lead us to value ammonia gas and sulfuric acid as by-products.  It had become apparent that we needed to clarify what the Department's by-product methodology normally is, and then again reiterate to parties why we were diverting from this practice for this redetermination.  *Magnesium Metal from Russia* was not referenced to support our adjustments, but merely to establish the baseline normal by-product methodology.  It appears Jiheng agrees that this is our normal practice, *i.e.*,

---

[77] *See* Jiheng Comments at 5-8.
[78] *See, e.g.*, *Magnesium Metal from the Russian Federation: Final Results of Antidumping Duty Administrative Review*, 76 FR 56396 (September 13, 2011), and accompanying Issues and Decision Memorandum at Comment 1a.
[79] *See Chloro Isos 6th Final Results*, and accompanying Issues and Decision Memorandum at Comment 14.

32

Case: 17-1520    Document: 47    Page: 511    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

treating ammonia gas and sulfuric acid as the by-products, and therefore agrees with the method

explained in *Magnesium Metal from Russia*.  From this, the Department then explained again

why it was deviating from this normal practice of valuing the by-products as close to the split-off

point as possible.

> Kangtai's commented that regarding this methodology, the Court noted it was unclear:
>
> > whether Commerce in this matter is granting an offset to each respondent for the full amount of the ammonia gas and sulfuric acid claimed as produced during the POR, in accordance with Commerce's general by-products practice, as opposed to limiting the offset to the value of the amount of those by-products as embodied in the amount of ammonium sulfate actually sold during the POR… if Commerce is only granting an offset based on the amount of ammonium sulfate that was actually sold during the POR…then the new methodology is actually a "net realized value" standard (based upon the values of the ammonium gas and sulfuric acid by-products in actual sales of the downstream product that occur during a period of review), not a "net realizable value" standard, which would therefore be at odds both with the generally accepted accounting principles' cost accounting concerns for income and inventory valuations as well as at odds with Commerce's allegedly still-existing policy of determining whether or not the by-product has commercial value by proof of sales or reintroduction into production.[80]

To be clear, even in the by-product adjustment we made in this proceeding, we used the

amount of ammonium sulfate that was produced during the POR as the by-product offset, as

evident from the calculations.[81]  Therefore, we are not at odds with the generally accepted

accounting principles or with our by-product methodology.

In response to respondents' criticisms that the Department did not satisfactorily explain

why the new method is more reasonable and accurate than the previous methodology, the

Department disagrees.  We again note that no party has taken substantive issue with the

---

[80] *See Clearon 2015 Remand* at 55-56.
[81] *See* Memoranda, "Final Analysis for the Second Remand of the Final Results of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China:  Hebei Jiheng Chemical Company Ltd.," and "Final Analysis for the Second Remand of the Final Results of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China:  Juancheng Kangtai Chemical Co., Ltd.," dated concurrently with this remand (collectively, Final Remand Analysis Memoranda).

Case: 17-1520    Document: 47    Page: 512    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

methodology itself, but merely questioned why the Department made adjustments to its methodology.  In the Draft Remand Results, we stated we had two concerns with the methodology and that the latter of these two concerns especially led us to an adjustment that is more reasonable and one that more accurately captures the by-product offset.

Our first concern was that "neither respondent during the period of review could measure and keep records of the actual amount of waste ammonia gas and sulfuric acid which was being produced.  As a result, we were forced to go to the downstream product production records to obtain the data to derive the amounts of ammonia gas and sulfuric acid.  Therefore the first point at which the Department could determine the amount of by-product produced was from the companies' books and records on the downstream product production."[82]  Jiheng argues that the Department's concern about Jiheng's books and records, namely that because the ammonia gas is too hot and too caustic to measure, Jiheng does not maintain direct records of the amount of ammonia gas produced, is a *post hoc* rationalization.  Jiheng argues that this explanation must fail because while these underlying facts have not changed since the investigation, the Draft Remand Results were the first time the Department raised these concerns.  However, the Department's consideration of this matter on remand is just that, a consideration of the matter anew, and thus it cannot constitute a *post hoc* rationalization.

The second concern raised by parties, and supported by the record, is:

{I}f we valued the by-products as close to the split off point as possible in this proceeding, as we had done in all prior reviews and the investigation of this case, then the amount of the by-product offset would result in an illogical outcome because the value of the ammonia gas and sulfuric acid (the immediate by-products) would be higher than the value of the ammonium sulfate (the by-product that is actually sold).  In reality, as pointed out by the Court, in general no company would combine two inputs, and incur additional processing costs, in

---

[82] *See infra*, at 9.

Case: 17-1520    Document: 47    Page: 513    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  - Consol. Court No. 13-00073

order to make a lower-valued ammonium sulfate by-product.  This was a clear
indication that applying our methodology in the normal manner was not
appropriate.[83]

We noted in the First Remand Results that we re-evaluated the methodology we used in

the underlying review due to concerns raised in Petitioner's case brief.  The issue of the

appropriate by-product valuation was not mentioned until the briefing stage of the review (after

the preliminary results).  Petitioner noted in its case brief that:

> The record includes surrogate value data for ammonia gas, sulfuric acid, and ammonium
> sulfate in the Philippines.  From Philippine import data, the value of ammonia gas is
> 17.36 PhP/kg, the value of sulfuric acid is 13.71 PhP/kg, and the value of ammonium
> sulfate is 11.59 PhP/kg.  Applying the surrogate values from the Preliminary Results
> leads to the counterintuitive conclusion that respondents are combining two high-value
> byproducts (anhydrous ammonia and…sulfuric acid) in order to produce a significantly
> lower value byproduct in ammonium sulfate.  In reality, of course, no company would
> combine pure anhydrous ammonia and…sulfuric acid to make a lower-value ammonium
> sulfate product.[84]

Petitioner further suggested that "the Department should value these by-products using a

surrogate value derived from ammonium sulfate, the product that is actually sold by respondents.

Indeed, Kangtai itself, in its initial questionnaire response, reported ammonium sulfate as its by-

product.[85]  Based on these record facts, we reviewed the methodology we used in the preliminary

results, and agreed with Petitioner that that methodology led to results that did not reflect the

actual value that Kangtai or Jiheng would have received in a market economy.

Kangtai argues that it was not given any notice or chance to comment on this adjusted by-

product methodology.  However, as noted above, Petitioner raised this by-product concern in its

---

[83] *See infra* at 9.
[84] *See* Letter from Petitioner, "Chlorinated Isocyanurates from China – Sixth Administrative Review:  Case Brief of
Petitioners Clearon Corp. and Occidental Chemical Corporation," December 3, 2014, at 41-42.
[85] *See* Letter from Kangtai, "Certain Chlorinated Isocyanurates from the People's Republic of China *Section C and
D Questionnaire Response*," November 30, 2011, Appendix IV at 17.

35

Case: 17-1520    Document: 47    Page: 514    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

case brief.  Kangtai at that point was made aware that there was a concern facing the Department

on how to value by-products in the instant proceeding.  Kangtai was given an opportunity to

address the concerns raised by Petitioner, and suggest alternative options for the Department to

consider in its rebuttal case brief.  That Kangtai did not avail itself of this opportunity was

Kangtai's choice.  In the First Remand Results, Kangtai was again provided with an opportunity

to comment on the Department's by-product methodology, but again Kangtai provided no

substantive comments on the methodology for the Department to consider.

We continue to believe an adjustment to our methodology, *i.e.*, to value the downstream

products and subtract the costs of the respondents to turn the two by-products into ammonia

sulfate to arrive at the actual value that the respondents receive for the by-products, is a more

accurate and reasonable calculation.  Using our current practice – unadjusted – would lead to

illogical conclusions that do not match the real world experience of Jiheng and Kangtai, *i.e.*, in

general no company would combine inputs, and incur additional processing costs, in order to

make a lower-valued by-product.

Jiheng further points out that the Department did not address the Court's question of

"why any concerns over the value to be applied to ammonia gas and sulfuric acid could not have

been addressed through 'capping' the surrogate value used."[86]  Essentially however, the

adjustment we are doing is a capping-methodology.  Namely, we are capping the value of

ammonia gas and sulfuric acid at the value of ammonium sulfate, less the inputs needed to

further produce ammonium sulfate from ammonia gas and sulfuric acid.  The Court did not

request that the Department apply any specific cap.

---

[86] *See* Jiheng Comments at 11.

36

Jiheng's claim that in this remand, the Department changed its by-product methodology and neglected to inform any party, and that the numbers applied were unknown to Jiheng, misrepresents the facts of the underlying proceeding. Indeed, one simply must review the First Remand Results to ascertain the origin of these calculations. We relied on information requested from and provided by Jiheng regarding the inputs needed to produce ammonium sulfate from ammonia gas and sulfuric acid. We also relied on information provided by Jiheng to allocate the ammonium sulfate. As we specifically noted in the First Remand Results:

> In the underlying review, we allocated the ammonium sulfate by-product first to the production of cyanuric acid, and then to the total amount of subject merchandise produced. As noted by Petitioner, we did not use this same process for the Draft Remand Results. Due to this oversight in the Draft Remand Results, we have used the allocation calculations employed in the underlying review, with the company-specific data provided by Jiheng earlier in this remand proceeding, for these Final Remand Results.[87]

We continued to apply the calculations used in the First Remand Results in this instant proceeding to be consistent with our stated methodology. Jiheng argues that it did not provide CONNUM-specific adjustments in its August 25, 2014 remand questionnaire. While this is correct, the Department used the values reported by Jiheng in that questionnaire, as well as the CONNUM-specific calculations submitted by Jiheng in the underlying review to calculate CONNUM-specific by-product adjustments, as discussed in the First Remand Results. For ease, we are including the proprietary calculation details from Jiheng's Analysis Memorandum released by the Department with the First Remand Results on December 11, 2014, in Jiheng's Analysis Memorandum for these Final Remand Results.

---

[87] *See* First Remand Results at 49 (citations omitted).

Case: 17-1520    Document: 47    Page: 516    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

**Comment 3:   Urea Surrogate Value**

*Jiheng Comments*
- There is no production of urea in the Philippines during the POR, as supported by articles placed on the record of the underlying review.[88]
- The Department must use Philippine import data to value urea since there is no domestic production of urea, and therefore no domestic prices.[89]

*Kangtai Comments*
- The Department stated there was evidence of domestic production of urea and referenced the *Business Monitor Report*, but the article gives no support to this finding.[90]
- The Department cannot rely on a so-called "domestic" price when there is no market. The only reliable value for urea in the Philippines is the import value.[91]

**Department's Position:**  The Department is continuing to use the BAS data to value urea.  The Department, however, is now revising its position on this issue.  Initially, relying on three articles placed on the record of the administrative review, we concluded there was no domestic production of urea in the Philippines.  During litigation, as the Court notes, we conceded such a position was incorrect.  The information at issue does not indicate that urea *is not* produced in the Philippines.  However, it also does not indicate that urea *is* produced in the Philippines.  Rather, the information in the articles is inconclusive regarding this question.  The three articles state:

- "92% of PHL fertilizer requirements are imported," and goes on to discuss how the price of urea would be effected due to farmers reliance on imported fertilizer (*Business Mirror*);[92]

- "In 2004, the Philippines bought an aggregate volume of 8.8M tons of various fertilizer grades, with urea accounting for 30% and ammonium sulfate for 24%" (*The Philippine Fertilize Industry*);[93] and

---

[88] *See* Jiheng Comments at 1-5.
[89] *Id.*
[90] *See* Kangtai Comments at 19-20.
[91] *Id.*
[92] *See* Jiheng Comments at 2.

38

Case: 17-1520    Document: 47    Page: 517    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

- "Urea, potash, and half of the ammonium sulfate are imported while all the phosphatic grades (NP/NPK) and the rest of the ammonium sulfate are produced locally" (SPIK's - the Philippine chemicals industry association - website discussing the "Agrichemicals and Fertilizers Industry").[94]

While these articles support the contention that urea is imported (a fact the Department is not contesting), they offer a somewhat vague picture of the market and industry specific to urea and do not state that 100 percent of urea is imported, or that there is no domestic production. Without any such statements, we cannot conclude the price represents 100 percent imports. The Department does not as a matter of course conduct a query into whether an apparently domestic price (*e.g.*, a price published by a government agency involved in domestic policy, such as an agricultural agency) is, in fact, based on domestic market sales. Clearly, if presented with evidence that the price was solely an import price (*e.g.*, a price published by a customs authority or a footnote indicating the price was based solely on imports), we would consider that evidence. In this case, however, there is no such evidence.

The evidence implies that a large portion of urea is imported, but it does not preclude the possibility that urea is also domestically produced, albeit in small quantities, just as similar fertilizers are. Therefore we continue to rely on the BAS data as the SV for urea for this final remand redetermination.

**Comment 4:  Surrogate Country Selection**

*Kangtai Comments*
- The Department in this case has created an insurmountable threshold of the economic comparability aspect of its surrogate country selection. The Department considers three criteria in its surrogate country selection:  (1) economic comparability, (2) significant

---

[93] *See* Jiheng Comments at 3.
[94] *Id.*

39

Case: 17-1520    Document: 47    Page: 518    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

production, and (3) quality and availability of data.  While it is logical for the Department to decide to approach this comparison sequentially, an absolute threshold is not supported by the statute or the case law interpreting the statute.

● When forced by the Court to consider the data quality of India, the Department resorted to only considering how economic comparability impacted the quality of data.  The Department bypassed a true consideration of the quality of data in relation to its surrogate country selection.  As such, the Department's approach to country selection was contrary to law.

**Department's Position:**  The Department is continuing to use the Philippines as the primary surrogate country for these Final Remand Results.  We agree with Kangtai that we must consider three factors when selecting a surrogate country.  However, we disagree that the three factors must be "weighed" together in the evaluation of competing surrogate countries.  Data quality, for example, would not outweigh or compensate for a potential surrogate country's lack of economic comparability, unless no "quality data" was available from an economically comparable country.  Because the Philippines is economically comparable, we relied on data from the Philippines for the vast majority of factors, because there is quality data for valuing those factors.  Thus, we do not even consider relying on Indian data to value those factors, regardless of some subjective inference that data from India might be "better" than data from the Philippines.  (As explained in detail in the remand above, and as further discussed below, we do not believe the conclusions of Kangtai and the Court that Indian data is better than Philippine data are applicable within the context of selecting SVs.)  However, despite the fact that the Philippines is economically comparable, we did not rely on data from the Philippines for chlorine and hydrogen, because there was no quality data for valuing those two factors.[95]  This discussion makes clear that the

---

[95] "Quality data" refers to data that represents commercial value:  values determined through competitive market exchanges for the type of input used by the respondent; not values for samples, not values that might likely be the result of the misclassification of customs data or some type of transcription error, not values for inputs that cannot reasonably be considered comparable to the type of input used by the respondent, not values that likely reflect

40

Case: 17-1520    Document: 47    Page: 519    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

Department considers all three factors in deciding on the primary surrogate country. With all else being equal, the Department will consider data quality to be a tie breaker in choosing between multiple countries that are on the Surrogate Country List and that are significant producers of subject merchandise; such tie breakers come down to whether one country has data readily available for more inputs than the others (*i.e.*, the tie breaker is more a matter of data "quantity" than an attempt to compare data "quality" for specific inputs). For example, in the underlying review, we chose the Philippines over Thailand because useable financial statements were available for the former country, but not the latter. We thus concluded the Philippines had better data quality than Thailand.

As explained above, the Department is not required by statute to judge the quality of data in terms of the "commercial reality" of the underlying quantities (*i.e.*, whether they match the quantities consumed by the respondents), or in terms of whether the data reflects industries on the same scale as industries in the PRC. Kangtai states that "the Department has found the Indian chlorine and hydrogen values are superior to the Philippine data, but has decided all other Indian data is less quality for the sole reason it is from a country that is less economically comparable."[96] As we carefully explained above, we are *not* finding that the Indian chlorine and hydrogen values are "superior" to the Philippine data. Rather, we find that import data, from the Philippines or other countries, including India, cannot be used to value these two inputs due to their volatile, hazardous nature and high international transportation costs. Therefore, we turned to the record to find another source to value these two inputs. The only other source on the record to value chlorine and hydrogen was from India. We did not "weigh" various variables to

---

special packaging or transportation costs that would not be incurred by the respondent (*e.g.*, the import data for chlorine and hydrogen).
[96] *See* Kangtai Comments at 12.

41

Case: 17-1520    Document: 47    Page: 520    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

compare the Philippines import data with the Indian domestic data to determine which source was "superior;" we chose the only useable values.

Second, Kangtai argues that the "Department must follow the Court's instruction, as guided by policy, practice, and statute, and actually examine the extent of the quality of the Indian data irrespective of its per capita GNI."[97]  We disagree that this analysis is necessary.  As explained above, the Court stated clearly that such analysis was only necessary if the Department concluded "that no country on the surrogate country list provides the scope of 'quality' data that it requires in order to make a primary surrogate country selection."  As we have explained at length, "quality data," as that term is properly defined, exists from the Philippines for all factors of production, except chlorine and hydrogen, and there are more than 40 factors of production, depending on the producer's level of integration.

Regarding the quality of the Philippines data, Kangtai questions the financial statements from MVC, for the first time arguing that they contain countervailable subsidies, despite the fact that it could have raised these arguments in the administrative review.  The record clearly shows that MVC's financial statements are suitable to be used to calculate financial ratios.  Kangtai noted six possible countervailable subsidies, stating that "these programs very closely match programs the Department found are countervailable in the Philippines…MVC's statements do not provide the precise BOI program numbers; nonetheless, the same types of programs have been found countervailable and the Department is instructed not to conduct a 'formal investigation' into such matters and does not engage in such investigations-reason to suspect is enough."[98]

---

[97] *See* Kangtai Comments.
[98] *Id.* at 14.

Filed By: Kaitlin Wojnar, Filed Date: 3/22/16 3:22 PM, Submission Status: Approved

Case: 17-1520    Document: 47    Page: 521    Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

As discussed above, the Department's practice is only to exclude financial statements that contain a subsidy that the Department has found countervailable in the past.[99]  The six programs cited by Kangtai are all tax programs to which MVC is entitled, but Kangtai did not provide any indication from MVC's financial statements that the company actually received any of these tax incentives.[100]  Furthermore, the tax incentive references are either too vague to tie to a previously countervailed subsidy,[101] or are for disbursements the Department has not previously countervailed as a subsidy.  We continue to find that MVC's financial statements are usable to determine financial ratios, and that the Philippines has the "scope" of quality data to continue relying on it as the primary surrogate country.

Kangtai lastly takes issue with the third criteria, significant production, and argues that the Philippines is not a significant producer:

> Because this tariff classification is a basket category, the Department also looks to exports under 2828.90.  The Philippines had no exports under this tariff in 2010 or 2011. While the record did not contain export statistics for India, the Department has found India is a significant exporter and producer of comparable products in past reviews. Record information, including the continued production seen in the financial statements and information on the robust Indian chemical export industry, support a finding that

---

[99] *See infra* at 23.

[100] *See DuPont Teijin Films et al v. United States*, 896 F. Supp. 2d at 1312-13 (upholding the Department's determination that the "reason to believe or suspect" standard was not satisfied when the surrogate company's financial statements included line items to account for specific subsidies, but showed no actual dollar amount of the subsidies received); *see also Catfish Farmers of America v. United States*, 641 F. Supp. 2d at 1380 (affirming the Department's determination that the "reason to believe or suspect" standard was not satisfied when petitioners identified a subsidy without additional substantiating evidence of countervailability).

[101] *See* Kangtai Comments at 13 ("As a registered enterprise, the Company is entitled to certain tax incentives which include, among others:  (a) income tax holiday (ITH) for six (6) years from June 2008 or actual start of commercial operations, whichever is earlier; (b) extension of the ITH for a maximum of two years (bonus years), subject to certain conditions; (c) for the first five (5) years from the date of registration, additional deduction from taxable income of 50% of the wages arising from additional workers hired, provided that it is not simultaneously availed with the ITH; (d) tax credit for taxes and duties on raw materials for its export product; (e) exemption from wharfage dues, any export tax, duty, imposts and fees for ten (10) years from the date of registration; and, (f) may qualify for zero-duty import of capital equipment, spare parts and accessories from the date of registration up to June 16, 2011, pursuant to E.O. 528 and its Implementing Rules and Regulations").

43

Case: 17-1520     Document: 47     Page: 522     Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

India continues to be a significant producer and exporter of comparable products-much more so than the Philippines.[102]

Kangtai also notes two chemical industry reports that do not reference the Philippines in their analysis, supporting the contention that the Philippines is not a significant producer or that, at the very least, India is a "more significant producer." However, in the underlying administrative review, the Department found, based on record evidence, that the Philippines is a significant producer of comparable merchandise. Our finding did not rely on export data. Instead we relied on information from a Philippines Securities and Exchange Commission Management Report that states MVC (the company whose financial statements we used for our financial ratios) has a sodium hypochlorite production capacity of 30,000 metric tons per year.[103] We also determined sodium hypochlorite is a comparable product. This is direct evidence from a reliable source (a Philippine government authority) that a comparable product is produced in the Philippines. By contrast, the reports cited by Kangtai provide only an indirect suggestion that the Philippines is not a significant producer of comparable merchandise (*i.e.*, one could infer from the fact that the Philippines is not discussed in the reports that it is not a significant producer of any chemical, including chemicals comparable to subject merchandise). The fact that these two publications do not mention the Philippines, however, does not overcome the affirmative evidence that the Philippines is, in fact, a significant producer of comparable merchandise. The absence of evidence is not evidence of absence.

Moreover, as stated previously, there are not degrees of significant production. Either a potential surrogate country is a significant producer or not. While the reports cited by Kangtai might suggest that both India and China have much larger chemical industries than the

---

[102] *See* Kangtai Comments at 15.
[103] *See Chloro Isos 6th Final Results,* and accompanying Issues and Decision Memorandum at Comment 2.

44

Case: 17-1520     Document: 47     Page: 523     Filed: 07/13/2017

Barcode:3451387-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

Philippines, that fact is irrelevant.  As already explained above and in the first remand, the

Department does not seek to weigh degrees of production in order to choose the most significant

producer.  Nor do we attempt to choose a surrogate with an industry comparable in size to that of

the country under investigation.  As explained, attempting to do so is not required by the statute

and would, in the Department's view, undermine the statute's requirement that we pick an

economically comparable surrogate.  As discussed in the *Chloro Isos 6th Final Results*, "Policy

Bulletin 04.1 states that 'a country producing comparable merchandise is sufficient in selecting a

surrogate country.'  Thus, the Department now has production data on the record demonstrating

that the Philippines is a significant producer of comparable merchandise."[104]  Therefore, for the

reasons explained in *Chloro Isos 6th Final Results*, we continue to find that the Philippines

satisfies the significant producer criteria.

Kangtai appears to be claiming that India is a "more" significant producer.  Without

conceding this point, even if India was a "more" significant producer, that fact does not call into

question that the Philippines meets the Department's requirements of being a significant

producer.  Additionally, Kangtai makes the assertions, without any support or citation, that any

"development of the Chinese chemical industry attributable to non-market forces could not

reasonably be significant enough to bring the Chinese industry down to such a level that it would

be comparable to the Philippine market."[105]  Kangtai is missing the crux of the argument on this

point, namely that we do not know the impact of non-market forces on these countries industries,

and therefore, we cannot make any assumptions or comparisons to other markets.

---

[104] *See Chloro Isos 6th Final Results*, and accompanying Issues and Decision Memorandum at 7 (citations omitted).
[105] *See* Kangtai Comments at 16.

45

Barcode:3451451-01 A-570-898 REM - Remand - Consolidated Trade Administration

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-898
SECOND REMAND
POR:   06/01/2010-05/31/2011
E&C/Office VII:   EH
~~Proprietary Document~~
PUBLIC VERSION

March 22, 2016

MEMORANDUM TO:        The File

THROUGH:              Mark Hoadley
                      Program Manager, Office VII
                      Antidumping and Countervailing Duty Operations

FROM:                 Emily Halle
                      International Trade Analyst, Office VII
                      Antidumping and Countervailing Duty Operations

SUBJECT:              Final Analysis for the Second Remand of the Final Results of the
                      2010-2011 Administrative Review of the Antidumping Duty Order
                      on Chlorinated Isocyanurates from the People's Republic of China:
                      Hebei Jiheng Chemical Company Ltd.

_____

This memorandum describes the calculations in the final of the second remand of the final antidumping duty margin for Hebei Jiheng Chemical Company Ltd. (Jiheng), in connection with the 2010-2011 administrative review of the antidumping duty order on chlorinated isocyanurates from the People's Republic of China (PRC).

## I.   Final Remand Margin Statistics

| | |
|---|---|
| Total U.S. Quantity Sold | [       ] Metric Ton(s) |
| Total Value U.S. Sales | $[        ] |
| Total Amount of Dumping | $[        ] |
| Weight-Averaged Margin | 50.44% |

## II.    Changes Since the Draft Second Remand

We have not made any changes to the SAS programming since the draft second remand.[1]   As noted in the Final Second Remand, we are placing on the record the calculations used to determine Jiheng's by-product offset.[2]

_____

[1] *See* Memorandum, "Analysis for the Second Remand of the Final Results of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China:   Hebei Jiheng Chemical Company Ltd.," January 12, 2016.

[2] *See* Attachment 1.

Case: 17-1520    Document: 47    Page: 525    Filed: 07/13/2017

Barcode:3451451-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

## III.    LIST OF ATTACHMENTS

Attachment 1:          Excerpt from the Memorandum, "Analysis for the Remand of the Final
                       Results of the 2010-2011 Administrative Review of the Antidumping Duty
                       Order on Chlorinated Isocyanurates from the People's Republic of China:
                       Hebei Jiheng Chemical Company Ltd.," December 11, 2014.

Attachment 2:          SAS Log

Attachment 3:          SAS Output

Filed By: Kaitlin Wojnar, Filed Date: 3/23/16 9:00 AM, Submission Status: Approved

Barcode:3451451-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

# Attachment 1:
# Excerpt

# Public Version

Barcode:3451451-01 A-570-898 REM - Remand - Consit...ment Trade Administration

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-898
REMAND
POR:   06/01/2010-05/31/2011
E&C/Office VII:   EH
~~Proprietary Document~~
PUBLIC VERSION

DATE:                    December 11, 2014

MEMORANDUM TO:           The File

THROUGH:                 Mark Hoadley
                         Program Manager, Office VII
                         Antidumping and Countervailing Duty Operations

FROM:                    Emily Halle
                         International Trade Analyst, Office VII
                         Antidumping and Countervailing Duty Operations

SUBJECT:                 Analysis for the Remand of the Final Results of the 2010-2011
                         Administrative Review of the Antidumping Duty Order on
                         Chlorinated Isocyanurates from the People's Republic of China:
                         Hebei Jiheng Chemical Company Ltd.

---

This memorandum describes the changes to the calculations since the draft remand of the final antidumping duty margin for Hebei Jiheng Chemical Company Ltd. (Jiheng), in connection with the 2010-2011 administrative review of the antidumping duty order on chlorinated isocyanurates from the People's Republic of China (PRC).

## I.   Remand Margin Statistics

| | |
|---|---|
| Total U.S. Quantity Sold | [          ] Metric Ton(s) |
| Total Value U.S. Sales | $[          ] |
| Total Amount of Dumping | $[          ] |
| Weight-Averaged Margin | 31.22% |

## II.    Changes Since the Draft Remand

We have made the following changes to the SAS programming since the issuance of the draft remand.[1]

---

[1] *See* Memorandum, "Draft Remand Redetermination: Chlorinated Isocyanurates from the People's Republic of China," September 16, 2014.

INTERNATIONAL
T R A D E
ADMINISTRATION

Barcode:3451451-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

<u>By-Product Calculation</u>

Using the same methodology from the underlying review,[2] we calculated the amount of by-product produced and by-product inputs on a per-CONNUM basis.

[2] *See* Memorandum, "Analysis for the Final Results of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from the People's Republic of China: Hebei Jiheng Chemical Company Ltd.," January 14, 2013, at "By-Product Calculation." The "total generated quantity" for the by-product inputs was reported by Jiheng, *see* Letter from Jiheng, "Remand of the 2010-2011 Administrative Review of the Antidumping Duty Order on Chlorinated Isocyanurates from China-Hebei Jiheng Chemical Co., Ltd. Questionnaire Response," August 25, 2014, at exhibit 3.

Filed By: Kaitlin Wojnar, Filed Date: 3/23/16 9:00 AM, Submission Status: Approved

2

Barcode:3451451-01 A-570-898 REM - Remand  -  Consol. Court No. 13-00073

To calculate the by-product offset for ammonium sulfate using the above calculated FOPs, we did the following.

[

]

Filed By: Kaitlin Wojnar, Filed Date: 3/23/16 9:00 AM, Submission Status: Approved

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE KENTON R. MUSGRAVE, SENIOR JUDGE

| | |
|---|---|
| CLEARON  CORPORATION and OCCIDENTAL CHEMICAL CORP., ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | |
| UNITED STATES, ) | Consol. Court No. 13–00073 |
| Defendant, ) ) | |
| and ) ) | |
| ARCH CHEMICALS, INC., et al., ) ) | |
| Defendant-Intervenors. ) ) | |

**PLAINTIFFS', ARCH CHEMICALS, INC. AND HEBEI JIHENG CHEMICAL CO., LTD., COMMENTS ON FINAL RESULTS OF SECOND REDETERMINATION PURSUANT TO REMAND**

Peggy A. Clarke
LAW OFFICES OF PEGGY A. CLARKE
1325 G Street, NW
Suite 500
Washington, DC 20005
(202) 552-7407
*Attorney for Plaintiffs*
*Arch Chemicals, Inc. and*
*Hebei Jiheng Chemical Company, Ltd.*

Dated: April 22, 2016

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION...................................................................................1

II. SUMMARY OF THE ARGUMENTS ...............................................2

III. ARGUMENT ........................................................................................3

    A. COMMERCE'S TREATMENT OF THE BY-PRODUCT OFFSET
       REMAINS UNSUPPORTED BY RECORD EVIDENCE AND
       IS OTHERWISE CONTRARY TO LAW...........................................3

       1. Commerce did not Address Reliance Interest and is Incorrect
          with Respect to the Existence of Notice and Opportunity to
          Comment.....................................................................................4

       2. Commerce's Calculation is Fundamentally Flawed and
          Does Not Result in Greater Accuracy.........................................5

       3. Commerce Still has not Provided a Valid Reason to Support
          Changing its Methodology. .........................................................10

    B. COMMERCE'S DECISION TO USE THE BAS RESALE PRICES FOR
       UREA IS UNSUPPORTED BY RECORD EVIDENCE.........................14

       1. Where There is No Domestic Production There can be No
          Domestic Price............................................................................14

       2. The Record Evidence Does Not Support an Assumption that there
          May be Some Domestic Production of Urea.................................16

    C. COMMERCE'S DECISION TO USE INDIAN DOMESTIC PRICING
       FOR HYDROGEN IS UNSUPPORTED BY RECORD EVIDENCE AND
       IS OTHERWISE CONTRARY TO LAW...........................................21

       1. Commerce's Preference for Domestic Prices is Limited to a
          Preference for Domestic Prices in the Primary Surrogate Country.......................22

       2. The Evidence on the Record in this Review does Not Support a
          Concern about Transportation Costs for Hydrogen.......................23

IV. CONCLUSION......................................................................................31

i

Remand Comments at p. 12 (**Remand P.R. 82**), Commerce failed to correct this error in the 2nd Remand Results submitted to the Court.

To be clear, Commerce's reliance on still more surrogate values in the methodology makes this complex approach less accurate and less reflective of Jiheng's actual experience than the prior methodology Commerce had employed in the investigation and five previous reviews. Relying on ammonium sulfate – a product that was not produced as part of the production of the subject merchandise – further distances this offset from the realities of Jiheng's production of subject merchandise. Commerce compounded its inaccuracy by deducting more FOPs from the ammonium sulfate value than existed (*i.e.*, making three deductions for labor – direct labor, indirect labor, and something else), contrary to the record evidence. Finally, Commerce inexplicably "adjusted" the average FOPs per unit of ammonium sulfate by multiplying them by the amount of cyanuric acid consumed in the subject merchandise, even though those FOPs have nothing to do with cyanuric acid production – thus overstating the quantity of FOP included in the cost of producing ammonium sulfate for every single FOP deducted from the ammonium sulfate value. In sum, not only did Commerce not explain how its methodology was more accurate, that methodology is fundamentally flawed and unsupported by substantial evidence. Moreover, Commerce's flawed adjustments and refusal to correct the obvious clerical error are arbitrary and capricious and are otherwise not in accordance with law.

### 3. Commerce Still has not Provided a Valid Reason to Support Changing its Methodology.

After spending three years insisting that it had changed methodologies in order to "conform" to Commerce's practice (whether "agency wide" or "then recent"), in its 2nd Remand Results Commerce concedes that the former methodology is consistent with Commerce's practice and the new methodology is not. 2nd Remand Results at 32 ("It had become apparent

that we needed to clarify what the Department's by-product methodology normally is {the former methodology employed in previous reviews of this order}, and then again to reiterate to parties why we were ***diverting*** from this practice for this redetermination.") (emphasis added). At this point, any explanation, other than the remanded instruction of explaining why Commerce's "capping methodology" was insufficient to address Petitioners' stated concerns with the old methodology is *post hoc* rationalization.[3] Commerce makes no effort to explain why its capping methodology is insufficient and, instead, claims that this total methodological change (which it calls a mere "adjustment") is "capping." 2nd Remand Results at 36 ("Essentially, however, the adjustment we are doing is a capping-methodology.").

Commerce's new reason for its change (first mentioned in Defendant's Response to Comments on the First Remand) is that "neither respondent during the period of review could measure and keep records of the actual amount of waste ammonia gas and sulfuric acid which was being produced." 2nd Remand Results at 9 and 34. As Jiheng noted in its Reply to Defendant's Remand Response and again in its comments on the Draft 2nd Remand Results, this statement is factually incorrect as regards Jiheng. *See* Consolidated Plaintiffs', Arch Chemicals, Inc. and Hebei Jiheng Chemical Co., Ltd., Reply to Defendant's Response to Plaintiff's Comments Upon the Department of Commerce's Remand Results (March 13, 2015) at 5; Pltf. Draft 2nd Remand Comments at 9-10 (**Remand P.R. 82**). Jiheng tracks the actual quantity of sulfuric acid generated in its production of cyanuric acid, and the record evidence confirms that. Jiheng's original Section D Response, Exhibit D-12 provides information on the by-product

---

[3]    In the 2nd Remand Results, Commerce dismissed Plaintiffs' concerns about impermissible *post hoc* rationalizations, stating that it was not *post hoc* because they were considering the issue "anew." 2nd Remand Results at 34. The Court did not remand the matter to be considered anew and three years after the Final Results were issued is much too late to do so. Enough is enough. It would appear that Commerce has become more focused on defending a final result than in "engaging in genuine reconsideration of the issues." *Food Marketing Institute v. I.C.C.*, 587 F.2d 1285, 1290 (D.C.Cir. 1978) ("The agency's action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result.").

11

offsets claimed. Exhibit D-12.1 includes a by-product disposition chart that shows actual

production and sales or other disposition for chlorine gas, hydrogen gas, and recovered sulfuric

acid, as well as the calculated production of ammonia gas and its actual disposition. Exhibit D-

12.2 contains sample production records for each by-product, and conversion rates used in the

formulae to calculate each by-product. Exhibit D-12.7 provides the calculations of the

quantities of by-product produced based on the formulae (note Jiheng reports both by

production and by sales) (**C.R. 56, P.R. 49, 50**).[4] If one were to examine these exhibits, one

would see both that the by-products tie directly into Jiheng's production books and records and

that, in all instances, the quantity of by-product claimed when calculated by the formulae (the

so-called 'hypothetical' amounts) is never greater than the actual quantity of by-product

produced (indeed, as a matter of basic chemistry, it never can be). In fact, Commerce verified

the accuracy of the information provided. Memorandum, Verification of the Sales and Factors

of Response of Hebei Jiheng Chemical Company Ltd. in the Antidumping Review of

Chlorinated Isocyanurates from the People's Republic of China (November 20, 2012) (**P.R.

148**) at 12, 32-33. Thus, Commerce's stated reason that Jiheng does not maintain books and

records is contradicted by the record evidence, and, thus, is not supported by substantial

evidence (or indeed any evidence). Plaintiffs also note that Commerce continued to use the so-

called "hypothetical" quantities calculated according to the formulae for Jiheng's other by-

product offsets – hydrogen and discharged chlorine – therefore it could not have been concerned

about the accuracy of the reported quantities.

Commerce's other stated reason is that the surrogate values for ammonia gas and

sulfuric acid are greater than the surrogate value for ammonium sulfate in this review. As has

---

[4]     Submitted to this Court as the Confidential and Public Appendices to Consolidated Plaintiffs, Arch
Chemicals, Inc. and Hebei Jiheng Chemical Co., Ltd., Reply to Defendant's Response to Plaintiffs Comment Upon
the Department of Commerce's Remand Results (March 12, 2015), Ct. Docket Nos. 86 and 87.

The court's decision reinforces the concept that domestic prices in the antidumping context, and the preference for domestic prices, refers to the price of domestically-produced goods.

As Petitioners explained in their 56.2 Brief:

… stated differently the issue is whether the prices for urea, reported by the Philippine BAS, were in fact "duty-exclusive." Import prices reported by GTA are "duty-exclusive." The question is whether the BAS prices were *resale* prices for imported urea, which would include any import duty, or whether the BAS prices were prices for the sale of domestically produced urea, which would not include any import duty.

Pet. 56.2 Brief at 14 (emphasis in original). Thus, if the BAS prices are not duty exclusive, then the duty-exclusive import prices are the best information available.

Here, where there is no evidence to support a conclusion that any domestic production exists, the BAS prices cannot be found to represent prices for domestically-produced urea. In the absence of domestic prices, Commerce must use the import values for imported urea as the only surrogate value on the record meeting Commerce's criteria.

### 2. The Record Evidence Does Not Support an Assumption that there May be Some Domestic Production of Urea.

As explained in Plaintiffs' comments on the draft remand results, the record provides no evidence at all that there is any domestic production of urea and, in fact, demonstrates the contrary. Pltf. Draft 2nd Remand Comments at 1-4 (**Remand P.R. 82**). In the final results of remand Commerce stated:

The information at issue does not indicate that urea *is not* produced in the Philippines. However, it also does not indicate that urea *is* produced in the Philippines. Rather the information in the articles is inconclusive regarding this question.

2nd Remand Results at 38 (emphasis in original). Plaintiffs disagree, as demonstrated below, that the record is inconclusive. Nevertheless, assuming *arguendo* that it is inconclusive, Commerce has no evidence from which it can infer domestic production justifying the use of

16

domestic resale prices. Commerce's decisions must be based on facts, not on assumptions unsupported by evidence. Because, as discussed below, Commerce used the BAS pricing when there was no evidence of domestic production instead of using import prices when there was uncontroverted evidence that urea had been imported, Commerce's decision to use the BAS pricing is not supported by substantial evidence.

According to Commerce, "{t}he evidence implies that a large portion of urea is imported, but it does not preclude the possibility that urea is domestically produced, albeit in small quantities, just as similar fertilizers are." 2nd Remand Results at 39. Thus, Commerce stated in its final results on remand that it is using the BAS data because "all else being equal (public availability, contemporaneity, etc.), the BAS data, which presents dealer prices in the Philippines, is the preferred source over the GTA data used in the underlying review." *Id.* at 13. Of course, all else is not equal. Even assuming the record supported Commerce's assumption that some portion of urea sold by the retailers was produced in the Philippines, even Commerce agrees that the vast majority of the urea sold by retailers was imported. The majority of the urea included in the BAS retail price data includes the import duties imposed on imports; therefore, unlike the GTA import values Commerce had used in the original results of the review, the BAS data are not "tax and duty free," one of the criteria included in Commerce's "etc."

More importantly, in order to use the BAS data, some portion of the urea must have been produced domestically, and there is zero evidence that any was. Under the substantial evidence standard, Commerce cannot base its determinations on "mere conjecture or supposition." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). *See also, Jinan Yipin Corp. v. United States*, 526 F.Supp.2d 1347, 1375 (Ct. Int'l Trade 2007) (remanding where Commerce's decision was based on "mere assumptions which

17

find no apparent support in record evidence"); *China Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States*, 711 F.Supp. 407, 411 (Ct. Int'l Trade 1991) (finding Commerce's assumption that shop towel production in Hong Kong had resumed to be unsupported by evidence); *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 C.I.T. 1185, 1203 (2004) ("the court remains mindful that Commerce's general mandate is to calculate normal value as accurately as possible on the basis of the best information available. This mandate allows Commerce to draw reasonable inferences from the record, but it is not a mandate to guess.") (internal citations omitted). Neither can Commerce base its decision on a mere possibility, unsupported by any facts, that there might be production of urea in the Philippines. As this court stated in *China Nat'l Arts & Crafts*: "There is a logical difference between a belief, which usually must have some basis in fact, and a possibility, which does not necessarily need any facts to back it up. Possibilities are not equivalent to beliefs and it is not enough for a thing to be possible for it to be believed." *China Nat'l Arts & Crafts*, 711 F.Supp. at 424 (finding that two unjustified and unrelated prior statements do not demonstrate a general practice). A claim that the evidence does not prove conclusively that all urea is imported,[7] is insufficient to meet the substantial evidence standard required for Commerce to conclude that there is domestic production.

When Commerce made its erroneous statement in its responsive brief to the Court that evidence showed production of urea in the Philippines, it cited to evidence placed on the record by Jiheng. Defendant's Response to Plaintiff's Rule 56.2 Motions for Judgment on the Agency Record (February 24, 2014) at 47 ("Def. Resp. Brf."), citing a *Business Mirror* article in Jiheng, Resubmission of Surrogate Values (September 5, 2012) at Attachment 2 ("Jiheng Surrogate Value Submission") (**P.R. 118**). Neither that *Business Mirror* article nor any other evidence in

---

[7] As discussed *infra*., this claim is incorrect. The evidence on the record provides substantial evidence that all urea consumed in the Philippines is imported.

Jiheng Surrogate Value Submission, Attachment 2, (or elsewhere on the record) supports a conclusion that there might have been domestic production of urea, no matter how minimal. To the contrary, the articles in that attachment confirm that there was *no* domestic production.

The referenced *Business Mirror* article is headlined "92% of PHL fertilizer requirements are imported." It is apparently that headline that Commerce read to conclude that, therefore, 8% of urea requirements are produced domestically.[8] But the article does not say that. There are many types of fertilizer besides urea. The article mentions urea twice. The first mention states that the average retail price of urea had declined 2.81 percent in 2010 compared to 2009, and, thus says nothing about the source of the urea. The second reference to urea is:

> The increasing reliance of local farmers on imported fertilizer could make them vulnerable to price spikes in oil prices since the Department of Agriculture (DA) earlier said that some fertilizer grades are petroleum-based.
>
> High oil prices in the international market would cause fertilizer prices to spike. Urea, a fertilizer grade used in palay production, is a by-product of oil.

Jiheng Surrogate Value Submission, Attachment 2 ("92% of PHL fertilizer requirements are imported," *Business Mirror*) (**P.R. 118**). Thus, this second mention of urea is in the context of imports, not domestic production. The article discusses other types of fertilizer as well but provides no information on what is produced domestically. Therefore, this article can provide no support for concluding that there was domestic production of urea.

Other information contained in the same Jiheng Surrogate Value Submission, Attachment 2, does discuss domestic production of fertilizers and confirms that there is no domestic production of urea in the Philippines. A January 11, 2009 article, "The Philippines Fertilizer Industry," provides information on domestic production and imports. In discussing

---

[8]     Even assuming *arguendo* that Commerce was correct that 8% of urea consumed in the Philippines was produced domestically, that would mean that 92% of the urea included in the BAS data was imported and that its resale pricing reflected in the BAS data included import duties.

19

imports on page 2, that article states, "In 2004, the Philippines brought in an aggregate volume of 8.8M tons of various fertilizer grades, with urea accounting for 30% and ammonium sulfate for 24%. Ammonium sulfate is imported when the international price is lower than that of domestic production." There is no such explanation provided for imports of urea. This statement is followed by information on domestic production of fertilizer, but, again there is no discussion of domestic production of urea. In the paragraph that continues from page 2 to page 3, the article states:

> The Philippines currently has three fertilizer manufacturing plants that produce
> various fertilizer grades for local use and for export; one is located in Luzon and
> the other two are in Visayas… The fertilizers manufactured locally include 21-0-
> 0, 16-20-0, 0-18-0 (single phosphate), 15-15-15, 14-14-14, 12-12-12, 16-16-18,
> and 0-0-52 (sulfate of potash).

Finally, page 3 of that article states, "{t}he most widely used fertilizer grades are urea, 21-0-1 and 16-20-0. Urea is used mainly as a nitrogen source while 16-20 is applied as a source of both nitrogen and phosphorus." In other words, in discussing the Philippine fertilizer industry, urea is never mentioned as being produced domestically and is mentioned in discussing imports. Thus, this article provides no support for a finding of domestic production of urea in the Philippines.

The final document in Attachment 2 of Jiheng's Surrogate Value Submission states definitively that urea is imported, not produced domestically. Specifically, the excerpt from SPIK's – the Philippine chemicals industry association – website discussing the "Agrichemicals and Fertilizers Industry" states: "Urea, potash and half of the ammonium sulfate are imported while all the phosphatic grades (NP/NPK) and the rest of the ammonium sulfate are produced locally." Jiheng Surrogate Value Submission, Attachment 2 (**P.R. 118**). The first clause of the quoted sentence discusses what fertilizers are imported while the second clause discusses what is produced in the Philippines. Urea is only discussed in the first clause, in comparison to

20

ammonium sulfate, which is both imported and produced domestically. Taken altogether, these three articles provide substantial evidence that there was no domestic production of urea in the Philippines during the period of review and provide no support for Commerce's assumption that domestic production existed. Even were the Court to find that this evidence is inconclusive as to whether all urea consumed in the Philippines was imported, there is still no evidence to support an assumption (or possibility) that domestic production occurred. Without domestic production, Commerce has no basis for concluding that the BAS prices are representative of the domestic price of urea.

C.    COMMERCE'S DECISION TO USE INDIAN DOMESTIC PRICING FOR HYDROGEN IS UNSUPPORTED BY RECORD EVIDENCE AND IS OTHERWISE CONTRARY TO LAW.

The Court remanded the question of what surrogate value to use for hydrogen to allow Commerce to address "the higher transportation and packaging costs associated with movement of {chlorine and hydrogen} and why Commerce's expressed preference for valuing all FOPs from a single country should trump its other (presumably co-equal) preference for using domestic prices over import prices especially where these chemicals are concerned." *Slip Op.* at 15. Commerce chose to use the Indian individual company pricing that was on the record. However, the preference for domestic prices applies only to pricing in the primary surrogate country – in this case the Philippines – and, thus, does not apply to the Indian prices at all. Moreover, there is no evidence on the record before this Court to support a finding that hydrogen transportation costs are so high as to preclude the use of import prices into the Philippines as the preferred pricing source.

21

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE R. KENTON MUSGRAVE, JUDGE

| | |
|---|---|
| CLEARON CORP., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | )          Consol. Ct. No. 13-00073 |
| and | ) |
| | ) |
| ARCH CHEMICALS, INC., *et al.,* | ) |
| | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| JUANCHENG KANGTAI CHEMICAL CO., LTD. | ) |
| | ) |
| Defendant-Intervenor. | ) |

## CONSOLIDATED PLAINTIFF JUANCHENG KANGTAI CHEMICAL CO., LTD'S COMMENTS OPPOSING THE SECOND REMAND RESULTS

Gregory S. Menegaz
Alexandra H. Salzman
J. Kevin Horgan
**deKieffer & Horgan**
Suite 900B
1445 Pennsylvania Ave, N.W.
Washington, D.C. 20004
*Counsel to Kangtai*

Dated: April 22, 2016

## TABLE OF CONTENTS

I.      Surrogate Country Selection................................................................................1

     A.    The Department's Articulated Explanation Not to Select India as the
          Primary Surrogate Country Reflects Brand New Justifications
          Contrary to Practice and Statutory Obligations...................................................1

     B.    India Has the Highest Quality Data and is the Most Significant
          Producer of Comparable Merchandise.................................................................13

II.     The Department Continues to Misapply and Misunderstand Its Labor Policy.........21

III.    There Is No Evidence Of Domestic Production Of Urea In The Philippines,
      Therefore The Department Must Rely on The Import Price .......................................24

IV.   The Department's By-Product Methodology Remains Unsupported by Record
      Evidence and Otherwise Not in Accordance with Law ................................................26

V.     Conclusions and Prayer for Relief..................................................................................28

i

As discussed below, Kangtai continues to challenge the U.S. Department of Commerce's ("Department") explanation of its refusal to rely on India as the surrogate country, its calculation of the financial ratio with respect to labor, and the change in the by-product methodology in this review. Additionally, Kangtai also challenges the Department's change to the urea surrogate value source.

## I.      Surrogate Country Selection

### A.      The Department's Articulated Explanation Not to Select India as the Primary Surrogate Country Reflects Brand New Justifications Contrary to Practice and Statutory Obligations.

The Department continues to conflate its understanding of the quality of data and economic comparability. The Court found that "while it is reasonable for Commerce to prefer to use data from a surrogate country that is at a comparable level of economic development over one that is at a less comparable level of development, when presented with a "less economically comparable" country off the list it must still provide an analysis of how the data from the less comparable country presented does not outweigh its economic disparity." *Clearon Corp. v. United States*, Slip Op 15-91(Ct. Int'l Trade Aug. 20, 2015) ("*Clearon II*") at 9. Data quality and economic comparability are different aspects of the analysis, otherwise data quality could never outweigh economic comparability. The Court even clarified this further:

> On the one hand, it is unreasonable for Commerce to acknowledge that the level of economic comparability and the quality of a country's data are two separate considerations, and then refuse to undertake a comparative analysis, of the type Commerce here implies it must undertake, in order to determine whether data quality outweighs the fact that a country is not on the surrogate country list. *See* RR at 6, 14-15, 35. **The fact that India's data originates from a country not inside the GNI band <u>does not</u> implicate those data's availability or quality**.

*Clearon II* at 10 (emphasis added).

1

Not wanting to unnecessarily burden the Department, the Court also acknowledged that such a full comparative evaluation of data quality would be pointless if the non-listed country's data quality is in fact insufficient to overcome the fact that it is not on the list. *Id*. Thus, the Court found it was not unreasonable for the Department to burden the party proposing a non-listed country with demonstrating the listed countries does not provide the proper scope of quality data required. Once a party has met this threshold, the Department must consider the quality of data for the non-listed country. *Id*. The Court then criticized the Department for refusing to address Kangtai's arguments not only about the unsuitability of chlorine and hydrogen values in the Philippines, but the low quality of the entirety of the Philippines chemicals industry data. *Id*. The Court concludes that because of the quality of data issues, the choice of the Philippines as the primary surrogate country remains an open question. *Id*. at 12. It is clear from the Court's directions that the Department needed to "provide an analysis of how the data from the less comparable country presented does not outweigh its economic disparity", specifically addressing the chlorine and hydrogen values that were so pivotal in the Department's selection of the Philippines in the first place. *Id*. at 10.

Upon remand, the Department found that "the Philippines is a source of quality data for all FOPs besides chlorine and hydrogen" and thus it found no reason to change its primary surrogate country. Remand Results at 14-15. Dismissing the importance of chlorine and hydrogen for reasons Kangtai will address later, the Department found it could not switch to India "at the expense for all other factors chosen from a country at the same level of economic development." *Id*. at 15. According to the Department, "by definition, all else is not equal when choosing between a country at the same level of economic development and one that is less comparable. Data from a less comparable country is automatically at a disadvantage to data from

a country at the same level of economic development." *Id.* The Department has done precisely what the Court—and pure reason—cannot allow, it has conflated quality of data with economic comparability. Under this explanation, no country that is less economically comparable could possibly have higher quality data because its data is already less quality by the very nature of it being sourced from a less economically comparable country. This stands in direct contradiction to the Department's stance in other proceedings, in its policy memo, in the plain meaning of the statute, and the Department's own statements before the Court in this very proceeding and the Court's remand instructions.

Coincidently, the Department attempts to justify its decision by arguing the statute considers it preferable to value factors in an economically comparable country because "the data from a less economically comparable country is just that—less comparable". Remand Results at 19. While 19 U.S.C. § 1677b(c)(4) does instruct the Department to value FOPS from a country at the same level of economic development to the extent practicable, it certainly does not equate data quality with economic comparability. The Department in this case has created an insurmountable threshold of the economic comparability aspect of its surrogate country selection. Kangtai reminds the Department that it considers three criteria in its surrogate country selection—(1) economic comparability, (2) significant production, and (3) quality and availability of data. *See* Policy Bulletin 04.1 While it is logical for the Department to decide to approach this comparison sequentially (for indeed, the Department must examine the criteria in some order), an absolute threshold is not supported by the statute or the caselaw interpreting the statute or the policy bulletin.

19 U.S.C. § 1677b(c)(4) does not contemplate that economic comparability is more critical than significant production or that either criteria is more critical than the mandate to use

3

the "best available information" pursuant to Section 1677b(c)(1)(B). In fact, the statute can only be reasonably read in such a way that the language in paragraph 1 to use the "best available information" is mandated while the later criteria to utilize, *to the extent possible* factors from countries that are economic comparable and significant producers, is secondary and optional depending upon record data. To the extent that the Policy Bulletin's third surrogate country criterion, quality and availability of data, speaks to the mandate to use the "best available information," this criterion is, at a minimum, equally as critical as the economic comparability and the comparable production criteria.

With this correct understanding, the Court of International Trade ("CIT") has found that even "Commerce's own policy suggests that none of the three surrogate country eligibility criteria—economic comparability, significant production of comparable merchandise, and quality data—is preeminent." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1366, 1374 (Ct. Int'l Trade 2012) ("*Ad Hoc Shrimp*") *citing* Policy Bulletin 04.1.

The CIT in *Ad Hoc Shrimp* held:

> Because none of Commerce's three surrogate country eligibility criteria is preeminent, it follows that relative strengths and weaknesses among potential surrogates must be weighed by evaluating the extent to which the potential surrogates satisfy each of the three criteria…Rather, in such situations, Commerce must explain why its chosen surrogate's superiority in one of the three eligibility criteria outweighs another potential surrogate's superiority in one or more of the remaining criteria.

*Ad Hoc Shrimp* at 1374-1375. *Ad Hoc Shrimp* and *Amanda Foods*[1] both held that all three criteria must be weighed together in the evaluation of competing surrogate countries. Both cases' interpretation of the statute is sound, finding there is <u>no</u> statutory preference assigning

---

[1] *Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368 (Ct. Int'l Trade 2009).

4

threshold importance to GNI ranking when evaluating surrogate alternatives. *Amanda Foods* required the Department to focus upon and justify <u>each</u> element of the statutory criteria:

> Nor has Commerce explained why the difference between Bangladesh and Vietnam, in per capita GDP, is not relevant in this case or why the difference in economic similarity to Vietnam is outweighed by the differences in quality of data between Bangladesh and India…

> Significantly, the Department's Policy Bulletin states that each Surrogate Country Memorandum must explain how the chosen country satisfies each element of the statutory criteria. In accordance with the Department's own policy, therefore, the Surrogate Country Memorandum must explain why…

*Amanda Foods* at 1376-1378.

The *Ad Hoc Shrimp* and *Amanda Foods* courts found that logic and the Department's policy mandated weighing all three criteria rather than creating a threshold out of one measure of economic comparability. In the present case, when forced by the Court to consider the data quality of India, the Department resorted to only considering how economic comparability impacted the quality of data. The Department has again bypassed a true consideration of the quality of data in relation to its surrogate country selection. As such, the Department's approach to country selection was contrary to law, established CIT jurisprudence, and this Court's remand instructions.

### *The Department's Treatment of Significant Production Criterion Was Unlawful*

Additionally, the Department conflated any meaningful consideration of significant production in its analysis of the primary surrogate country. In the first remand, the Department found that Kangtai's discussion of the size and comparability of a country's chemical industry was "irrelevant" to its analysis of economic development but rather only addressed whether the country is a "significant producer" of comparable merchandise. *See Clearon II* at 10 *discussing*

5

issues discussed below reasonably demonstrate that India is the only suitable primary surrogate country in this review.

### *India Has More Quality and Quantity of Quality Financial Statements*

The record also contains five Indian financial statements. Often, the Department's surrogate country determination turns on which country has the highest quantity of suitable financial statements. *See*, *e.g.*, *Certain Steel Threaded Rod From the People's Republic of China; Final Results of Third Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 66,330 (Dep't Comm. Nov. 5, 2013) and accompanying *Issues & Decision Memo* at Cmt. 1, page 16 (while finding Ukraine and Thailand in many other ways to be equal or comparable, selected Thailand as the primary surrogate country because Thailand "offers superior quality of data for surrogate financial ratios."). The Department consistently finds that multiple statements are superior to a sole statement because they are more likely to be representative of the industry than the statement of a single company. *See*, *e.g.*, *Steel Wire Garment Hangers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2010-2011*, 78 Fed. Reg. 28,803 (May 16, 2013) and accompanying *Issues & Decision Memo* at Cmt. 1D ("Using multiple financial statements in this review is consistent with the Department's preference of using multiple financial statements to determine surrogate financial ratios… allow[ing] the Department to average the factory overhead, SG&A, and profit ratios and, thus, to *normalize any potential distortions that may arise from using those of a single producer*.") (emphasis added).

The Department preliminarily found that two of these Indian statements had evidence of countervailable subsidies, but Kangtai submits that the Philippine statement MVC also has as much evidence of countervailable subsidies. The record evidence concerning MVC meets, if not

exceeds, the threshold of "reason to believe or suspect" it is subsidized. Note 1 to the Annual

Report contains information on the company's registration with the Board of Investments

("BOI") and provides a nonexhaustive list of six tax incentives the company is entitled to:

> On July 2, 2007, the BOI approved the registration of the Company as "New Producer of Caustic Soda, Hydrochloric Acid, and Liquid Chlorine" on a pioneer status under Executive Order (E.O.) 226. Under the terms of its registration, the Company is required to achieve certain production and sales volume from the new Ion Exchange Membrane (IEM) Bi-polar Chlor-Alkali plant. As a registered enterprise, the Company is **entitled to certain tax incentives which include, among others**: (a) income tax holiday (ITH) for six (6) years from June 2008 or actual start of commercial operations, whichever is earlier; (b) extension of the ITH for a maximum of two years (bonus years), subject to certain conditions; (c) for the first five (5) years from the date of registration, additional deduction from taxable income of 50% of the wages arising from additional workers hired, provided that it is not simultaneously availed with the ITH; (d) tax credit for taxes and duties on raw materials for its export product; (e) exemption from wharfage dues, any export tax, duty, imposts and fees for ten (10) years from the date of registration; and, (f) may qualify for zero-duty import of capital equipment, spare parts and accessories from the date of registration up to June 16, 2011, pursuant to E.O. 528 and its Implementing Rules and Regulations.

*See* Jiheng Prelim. SV (January 9, 2012) at Exh. 4, page 23 (MVC Annual Report).

The Department claims that Kangtai has not shown that the company actually received

these tax incentives, but in fact Kangtai did precisely demonstrate this in the financial statement.

Remand Results at 43. The statement specifically delineates that these income tax holiday

benefits amounted to 6.95 million Philippine Pesos (PhP) in 2010 and 2.65 million PhP in 2009.

*Id*. These programs very closely match programs the Department found are countervailable in the

Philippines. *See, e.g., Canned Tuna From the Philippines; Final Results of Countervailing Duty

Administrative Review*, 51 Fed. Reg. 43,758 (Dep't Comm. Dec. 4, 1986) (Among the

countervailable programs are programs providing "Tax Deduction of Direct Labor Costs and

Local Raw Materials," "Tax Credit on Net Local Content," "Tax Exemption on Imported Capital

Equipment," and "Tax Deduction to Export Trading Companies."), *see also*

*http://ia.ita.doc.gov/esel/eselframes.html* (Dep't Commerce's list of Philippines Countervailable

Subsidy Programs).   MVC's statements do not provide the precise BOI program numbers;

nonetheless, the same types of programs have been found countervailable and the Department is

instructed not to conduct a "formal investigation" into such matters and does not engage in such

investigations—reason to suspect is enough. Omnibus Trade & Competitiveness Act, H.R. Rep.

No. 100-576 at 590-91 (1988).

     If the Department continues to find that it has reason to believe or suspect that two of the

Indian financial statements has receipt of countervailable subsidies, then it must reasonably draw

the same conclusion for the sole Philippine statement.  The Philippine record lacks reliable

chlorine prices, hydrogen prices, and potentially financial ratios due to countervailable subsidies

and no party has suggested that the Philippines data otherwise was superior to India in any way.

On the other hand, no party has suggested that any Indian data is unreliable and India has

superior data to value chlorine, hydrogen, and the financial ratios.  Even if India's subsidized

financial statement are disregarded, the remaining statements outweigh the Philippines three to

one.  The use of merely one statement represents exactly the risk of distortion the Department's

policy articulated in previous rulings seeks to avoid.

### *India's Raw Material Data is Superior*

     Indeed, the Department used Indian values in the Preliminary Results for financial ratios

and a host of chemical inputs.  *See* Prelim. SV Memo at 4(In addition to using Indian sources to

value the financial ratios, chlorine, and hydrogen, the Indian source "Chemical Weekly was used

to value calcium chloride, barium chloride, zinc sulfate, and sulfuric acid because we did not

have South African import statistics by the concentration level referenced in the GTA for these factors."). The Philippines import statistics likewise lack the specificity of the concentration levels. We have already addressed the chlorine and hydrogen factors that the Department conceded above.

In the Final Results, the Department found the Philippines is a significant producer based on the sodium hypochlorite production capacity statistics found in one Philippine producer's financial statement, MVC. *See* IDM at 7. The statement also stated that MVC's production alone represents 55% of the Philippines sodium hypochlorite market. *Id.* On remand, the Department reiterated that this is significant—but gives absolutely no measure of how or why that meets any reasonable definition of significance. Remand Results at 44. Meanwhile, the record contained the statements of five Indian producers of comparable products each with a production capacity similar to MVC—and these producers represent only a fraction of the Indian industry. Petitioners SV Submission (January 9, 2012) at Exhibits 41-43; *see also* Petitioners Final SVs (September 5, 2012) at Exhibits 1-3. As the Department frequently notes, the legislative history of the term significant producer includes a country that is a significant net exporter. *See* Policy Memo 04.1. The primary HTS classification for chlorinated isocyanurates is 2933.69. Under this tariff classification, the Philippines has no exports in the first half of 2011 and only 2,000 kilograms of exports in 2010—the least of any listed surrogate country. *See* Petitioners SC Comments (December 19, 2011) at 4. Because this tariff classification is a basket category, the Department also looks to exports under 2828.90. The Philippines had no exports under this tariff in 2010 or 2011. *Id.* While the record did not contain export statistics for India, the Department has found India is a significant exporter and producer of comparable products in past reviews. Record information, including the continued production seen in the financial

statements and information on the robust Indian chemical export industry, support a finding that India continues to be a significant producer and exporter of comparable products—much more so than the Philippines.

India also has a significant chemical industry comparable to China's. The European Chemical Industry Council (CEFIC), the main European trade association for the chemical industry, reported its world chemicals industry profile for 2011. Kangtai Remand Rebuttal Information (August 20, 2014) at Exh. 4. While India and China are listed by name in the analysis of world chemical sales—the Philippines does not even appear. Likewise, the American Chemistry Council reported global chemical shipments, listing India's and China's significant shipments, but making no mention of the Philippines. *Id.* The Philippines simply does not have a significant chemical industry. The UN Industrial Organization lists India and China among the leading manufacturing economies in the world—yet the Philippines and all other countries on the Department surrogate list do not appear on that list[4]. *Id.* at Exh. 3. India and China are major diverse economies with major comparable chemical production to support domestic production of chlorinated isocyanurates. *Id.* at Exh. 2. Generally and specifically to the industry of this case, the Philippines is not significant or significantly comparable to China, but India is.

The Department attempts to argue that the comparability of the size of industry between India and China is meaningless. Remand Results at 16-17. The Department claims that the size of China's chemical industry may be affected by non-market distortions, so the comparison to India is flawed because there is no proof the industries would be similar if China was not

---

[4] This lends credence to Kangtai's claim that the Department's construction of the surrogate country list is arbitrary and unreasonable. As an example, South Africa remains on the surrogate country list from AR6 through AR10, even though the Department found South Africa unsuitable in AR6. The Department has never to counsel's knowledge explained the selection of the individual countries on the list or the basis for the Policy Office's suggestion that these countries "are likely to have usable data.".

dumping and state-controlled.  *Id.*  First, given the vast size of the Chinese chemical industry and the small size of the Philippines chemical industry, even if the Chinese chemical industry was significantly reduced it would still be far more comparable in size to India than the Philippines. Any development of the Chinese chemical industry attributable to non-market forces could not reasonably be significant enough to bring the Chinese industry down to such a level that it would be comparable to the Philippine market.  This is an illogical stretch that cannot be used to completely dismiss the size and comparability of the Indian and Chinese industries.  Second, the Department's logic could equally be applied to GNI rankings.  If an industry size and exports are distorted by non-market forces in China, then surely a country's GNI is equally affected, distorted, and unusable to determine economic comparability.  By this reasoning, the Department cannot rely on GNI as a measure of economic comparability at all, but it does, taking China's internal economic parameters as a given.  Thus, the Court should not allow the Department to abritraryily cite China's NME status for one prong of the analysis without explanation why it does not affect other prongs of the analysis.

In conclusion, India has the highest quality and availability of data on the record based on a reasoned, consistent, and objective review of record facts.  India is also the most significant producer of comparable merchandise—a finding supported by the comparable size of the chemical industry in India and China.  The Department must explain why a difference of 610[5] dollars in GNI is more important than the quality of data and much greater significance of production in India in pursuing the best available information to calculate normal value.

---

[5] India's 2009 GNI was $610 lower than the GNI band relied upon by the Department in this review.  As argued in the first remand, the import of this difference is at minimum greatly decreased by the arbitrary nature in which the Department determines the GNI band.  It fluctuates from year to year without a logical connection to changes in China's GNI.  *See* Kangtai Comments on Remand I; ECF 76.

Meanwhile, there is nothing else on the record to support a finding that there is domestic production of urea. Thus, as the Department properly determined in its Final Results, the Department cannot rely on a so-called "domestic" price when there is no market. Moreover, the Department's finding that there is perhaps some possibility that urea is domestically produced "in small quantities" is equally unavailing. Remand Results at 39. The Department is required to use the best available information to value an input—commercial quantity and availability is an aspect of that consideration. The only reliable value for urea in the Philippines is the import value relied upon in the Final Results.

## IV.     The Department's By-Product Methodology Remains Unsupported by Record Evidence and Otherwise Not in Accordance with Law.

The Court acknowledged that the Department has the discretion to adopt a new by-product valuation methodology so long as it provides the respondents time to adapt and comply. *Clearon II* at 61. Given this and the Court's other findings with respect to the by-product, the Court made four specific requests of the Department on Remand:

(1) Offer a valid explanation of why the respondents had no reliance interest in the then-existing methodology
(2) Address the parties' arguments concerning lack of notice and comment
(3) Offer valid reasons why the new methodology results in greater accuracy which amounts to a sufficient, reasoned, analysis supported by substantial evidence, or, otherwise revert to its former methodology
(4) If basing Kangtai's by-product offsets on net realizable value methodology, then consider using facts available, notwithstanding Kangtai's apparent concession.

*Id*. at 61-62. The Department only complied with the last of these instructions. The Department did not attempt to explain why respondents did not have a right to rely on the old methodology. The Department did not attempt to address any of the parties' concerns about notice and comment regarding the methodology.

The Department half-heartedly attempts to address this by saying the Petitioner raised this by-product concern in its case brief, so Kangtai had an opportunity to address it and suggest alternative options in a rebuttal brief. Remand Results at 36. This is critically not the same as addressing the reliance interest of the parties or the lack of notice by the Department that it would change it methodology and provision of a comment period. Moreover, while petitioners raised a concern that the surrogate values for ammonia gas and sulfuric acid were too high and suggested capping, they did not actually suggest the methodology employed by the Department in the Final Results. So any rebuttal to the petitioners' raised argument would not have addressed the methodology the Department actually used.

Additionally, the Department's half-hearted defense that while parties object to a change in methodology, no one has objected substantively to the methodology it employed, is also ultimately incorrect. Remand Results at 34. Kangtai and Jiheng appealed the Department's by-product methodology in this case. The course of three years of litigation attacking the methodology employed in this review is certainly substantive. Kangtai and Jiheng do not take substantive issue with the methodology employed in the prior reviews, so perhaps the Department's incorrect labeling of its methodology in this case as merely an "adjustment" rather than a new methodology led the Department to believe parties do not have a substantive issue.

Kangtai maintains that the new policy is misguided and while the Department has explained it better on remand, the Department has not adequately explained that it is more accurate. The most accurate way to measure the cost of the actual subject merchandise is to measure the cost of its production minus the value of immediate by-products. The Department over-complicates the process by attempting to measure and value downstream production costs and the value of downstream products. Subject merchandise valued by the offset of immediate

by-products will always have the same value.  In contrast, as the Department moves downstream to value the offsets, companies can have different efficiencies in manufacturing the downstream products and manufacture different downstream products.  This could result in different NVs not based on the cost of manufacture of the subject merchandise itself but based on costs for non-subject downstream merchandise.  This methodology is further subject to question because due to the vagaries in the surrogate value methodology, it is not possible to know whether the ammonia and sodium hydroxide surrogate values are distortedly high or the ammonium sulfate by product surrogate value is distortedly low, so the capping argument is weak in this case.  This policy is flawed and less accurate and must be abandoned because respondents were not provided advance notice in time to adjust POR prices and costs.

## V.      Conclusion and Prayer for Relief

While the Department engaged in a discussion of the issues on remand, it failed to analyze the information and give a reasoned explanation for its decisions with respect to country selection, by-product methodology, labor allocation, and the urea source.  The Court should remand the decision and order the Department to:

1.  Engage in a complete analysis of India as the primary surrogate country and support its decision with substantial evidence;

2.  Apply its published *Labor Methodologie*s and account for all delineated labor items in MVC's financial statement;

3.  Apply its former by-product offset methodology to Kangtai's by-products; and

4.  Use Philippines import values to value urea inputs.

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HONORABLE R. KENTON MUSGRAVE, SENIOR JUDGE

| | |
|---|---|
| _____ ) | |
| CLEARON CORPORATION and OCCIDENTAL ) | |
| CHEMICAL CORPORATION, ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | Consol. Ct. No. 13-00073 |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| ARCH CHEMICALS, INC., ) | |
| Defendant-Intervenor, ) | |
| ) | |
| and ) | |
| ) | |
| JUANCHENG KANGTAI CHEMICAL CO., LTD., ) | |
| Defendant-Intervenor. ) | |
| _____ ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS
## UPON THE DEPARTMENT OF COMMERCE'S SECOND REMAND RESULTS

BENJAMIN C. MIZER
Principal Deputy
Assistant Attorney General

JEANNE E. DAVIDSON
Director

PATRICIA M. MCCARTHY
Assistant Director

OF COUNSEL
DAVID RICHARDSON
Senior Counsel
U.S. Department of Commerce
Office of the Chief Counsel
for Trade Enforcement & Compliance

EMMA E. BOND
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 353-0521
Email: Emma.E.Bond@usdoj.gov

June 20, 2016                    Attorneys for Defendant

to explain why Kangtai was not entitled to a reliance interest in the prior methodology.  *Id*. at *25-27.  Although the Government's brief had provided several responses to these issues, the Court determined that these responses were not found in Commerce's determination and could not support Commerce's new methodology.  *Id*. at *25.  The Court, thus, remanded to Commerce to either supply valid reasons for changing its methodology or to revert to the old methodology with appropriate capping.  *Id*. at 27.

On remand, Commerce continued to value the by-product offset using prices for the downstream by-product, ammonium sulfate, adjusted for the costs of production.  Second Remand Results at 8-10.  Responding to the Court's concern regarding production versus sales, Commerce explained that its by-product calculation was based on production, consistent with its practice.  *Id.* at 7-10, 33.  Commerce also explained its preference, on this record, for using the downstream by-product; explained why that preference was consistent with prior practice; and explained why its decision did not disrupt any reliance interest by the respondents.  *Id.* at 7-10.

## B.  Commerce Properly Explained Why The Downstream Calculation Is Preferable Here

On this record, Commerce properly found that respondents were entitled to a by-product offset, valued using the downstream by-product.  *See* Second Remand Results at 7-11.  Parties seeking an adjustment to normal value, such as a by-product offset, bear the burden to demonstrate the amount and nature of the adjustment.  19 C.F.R. § 351.401(b); *see also Mid Continent Nail Corp. v. United States*, 34 CIT 498, 510-511 (2010).  Where appropriate, Commerce will adjust the normal value with the by-product offset when the respondent shows "that the byproduct has commercial value."  *See, e.g.*, *Frontseating Service Valves From China*, 76 Fed. Reg. 70,706 (Dep't of Commerce Nov. 15, 2011) (final results), and accompanying IDM at cmt. 18; *see also* 19 C.F.R. § 351.401(b).  Respondents may demonstrate commercial

34

value by showing the byproduct "was sold" or "re-introduced . . . into production." *Id.* Here, Jiheng and Kangtai sell ammonium sulfate, a downstream by-product of producing chlorinated isocyanurates. In its questionnaire response to Commerce, Kangtai reported its by-product as ammonium sulfate. *See* Second Remand Results at 35 (citing P.R. 51, Part D at 17). Commerce properly determined to value the by-product offset using the value for ammonium sulfate.

This determination did not reflect a departure from Commerce's "long standing practice" to value "the products as close to the split-off point as possible," *i.e.*, the immediate by-products. Second Remand Results at 8-9. The immediate by-products here were ammonia gas and sulfuric acid. On this record, however, Commerce found it would be more accurate to use the prices for ammonium sulfate—the downstream by-product that is actually sold. *Id.* at 9-10. It provided two reasons. First, the respondents could not measure and did not keep records of the actual amount of waste ammonia and sulfuric acid they produced. *Id.* at 9. As a result, Commerce had to determine the by-product quantity by relying on "the companies' books and records on the downstream product production," ammonium sulfate. *Id.* Second, the values for ammonia gas and sulfuric acid were higher than the value for ammonium sulfate, and it would be "illogical" for the inputs for the downstream product to be worth more than the downstream product itself. *Id.* at 9-10, 35. Accordingly, Commerce determined the offset by calculating the production quantity and price for ammonium sulfate, reduced by the processing costs to convert ammonia gas and sulfuric acid to ammonium sulfate. *Id.* at 10.

Kangtai and Jiheng challenge Commerce's calculation for several reasons. First, Jiheng disputes Commerce's finding that neither respondent kept records of how much ammonia gas and sulfuric acid they actually produced. Jiheng Br. at 11-12. Citing to hypothetical records derived from formulas, Jiheng argues that it does keep records of ammonia gas and sulfuric acid.

35

*Id.* (citing, *e.g.*, C.R. 56, P.R. 49, 50, provided in Jiheng Pub. App'x, ECF No. 114, Jiheng Confidential Appx, ECF No. 115). But unlike the records for the downstream product, ammonium sulfate, those are not records of *actual* production. *See* Second Remand Results at 9. Neither Jiheng nor Kangtai has metering devices to measure the amount of ammonia gas and sulfuric acid that is generated by producing the subject merchandise. Second Remand Results at 34. They can only estimate the quantities of ammonia gas and sulfuric acid by using formulas based on the amount of merchandise produced. By contrast, they do maintain records of actual production for the downstream product, ammonium sulfate. *Id.* Jiheng nevertheless argues that Commerce relied on derived quantities for other by-product offsets, such as hydrogen and discharged chlorine. Jiheng Br. at 12. But it fails to show that these materials had a downstream by-product with actual records of production, and, thus, fails to demonstrate any inconsistency in Commerce's reasoning. *Id.* Commerce properly found that valuing the downstream product is more accurate because it is tied directly to records of actual production. And to the extent Jiheng argues that Commerce's calculation is too complex, calculations using records of actual production (as Commerce used) are not more complex than calculations using derivations based on chemical formulas.[4] *See, e.g.*, Jiheng Br. 7-8.

That reasoning, moreover, is consistent with Commerce's "typical practice regarding by-product offsets." *Mid Continent Nail*, 34 C.I.T. at 511. As this Court has explained, Commerce's practice is "'to require respondents to provide sufficient documentation of the *actual amount of by-product produced*.'" *Id.* (emphasis added) (citing *Wooden Bedroom Furniture from China*, 73 Fed. Reg. 49,162 (Dep't of Commerce Aug. 20, 2008) (final results),

---

[4] Jiheng also argues that Commerce's explanation was impermissibly *post hoc*, Jiheng Brief, at 11, but Commerce's decisions during a remand determination do not represent "merely a 'convenient litigation position' or a 'post hoc rationalization{.}'" *See Price v. Panetta*, 674 F.3d 1335, 1342 (Fed. Cir. 2012).

and accompanying IDM at cmt. 20)) (stating the reason for this practice is to determine the amount of by product "actually generated"). On this record, there is evidence of the actual amount of ammonium sulfate produced, but no records showing "actual amount" of ammonia gas and sulfuric acid. Second Remand Results at 9. Commerce properly selected the former.

Jiheng also challenges Commerce's second reason for valuing ammonium sulfate. Jiheng Br. at 12-13. It contends that the high prices of ammonia gas and sulfuric acid do not support Commerce's decision, and that Commerce should instead have reconciled those high prices by capping them with "the average of the inputs that produced the by-products"—urea and sulfuric acid. *Id.* at 12-13. As Commerce explained, however, it did cap the prices by relying on the downstream product. Second Remand Results at 36. Although Jiheng argues that Commerce must calculate the cap using an average of inputs, it provides no citation for that proposition aside from its own questionnaire response. Jiheng Br. at13. The cases it cites do not support a rigid capping method, but instead confirm that Commerce calculates the offset based on the record at hand. Jiheng Br. at 13 (citing, e.g., *Multilayered Wood Flooring From the People's Republic of China:* 76 Fed. Reg. 64,318 (Dep't of Commerce Oct. 18, 2011) (final det.), and accompanying IDM at cmt. 23; *Tapered Roller Bearings & Parts Thereof, Finished and Unfinished, From China*, 74 Fed. Reg. 3,978 (Dep't of Commerce Jan. 22, 2009) (final results), and accompanying IDM at cmt. 5; and *Certain Steel Nails from China*, 73 Fed. Reg. 33,977 (Dep't of Commerce June 16, 2008) (final det.), and accompanying IDM at cmt. 12)). In any event, by advocating for Commerce to apply a capping methodology, Jiheng concedes that the values for ammonia gas and sulfuric acid were too high. Commerce's calculation properly addressed those high prices by capping them at the value of the downstream by-product.

37

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE KENTON R. MUSGRAVE, SENIOR JUDGE

| | |
|---|---|
| **CLEARON  CORPORATION and**<br>**OCCIDENTAL CHEMICAL CORP.,**<br><br>            **Plaintiffs,**<br><br>   v.<br><br>**UNITED STATES,**<br><br>            **Defendant,**<br><br>   **and**<br><br>**ARCH CHEMICALS, INC., et al.,**<br><br>            **Defendant-Intervenors.** | **Consol. Court No. 13–00073** |

## PLAINTIFFS', ARCH CHEMICALS, INC. AND HEBEI JIHENG CHEMICAL CO., LTD., REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS UPON THE DEPARTMENT OF COMMERCE'S SECOND REMAND RESUTS

Peggy A. Clarke
LAW OFFICES OF PEGGY A. CLARKE
1325 G Street, NW
Suite 500
Washington, DC 20005
(202) 552-7407
*Attorney for Plaintiffs*
*Arch Chemicals, Inc. and*
*Hebei Jiheng Chemical Company, Ltd.*

Dated:  July 5, 2016

# TABLE OF CONTENTS

Page

I. INTRODUCTION..................................................................................1

II. SUMMARY OF THE ARGUMENTS ...........................................................2

III. ARGUMENT ...........................................................................................3

   A. COMMERCE'S TREATMENT OF THE BY-PRODUCT OFFSET REMAINS
       UNSUPPORTED BY RECORD EVIDENCE AND IS
       OTHERWISE CONTRARY TO LAW...........................................................3

      1. Commerce Still has Not Provided a Reasonable Explanation for the
         Change in Methodology Supported by Substantial
         Evidence on the Record.........................................................................3

      2. Because the Accuracy of Commerce's New Methodology is at
         Issue in this Review, Critiques of the So-Called Accuracy of that
         Methodology are Within the Scope of this Remand...............................10

   B. COMMERCE'S DECISION TO USE THE BAS RESALE PRICES FOR
       UREA REMAINS UNSUPPORTED BY RECORD EVIDENCE......................12

      1. Commerce's Decisions Must be Supported by Substantial
         Evidence, and Assumption (Inference) Unsupported by the
         Record is Not Permitted........................................................................13

      2. Commerce's Limited Preference for Domestic Prices
         Requires that the Prices be for Domestically-Produced Product.................15

   C. COMMERCE'S CLAIM WITH RESPECT TO PLAINTIFFS'
       COMMENTS ON THE CHOICE OF HYDROGEN'S SURROGATE
       VALUE IS UNFOUNDED.......................................................................17

IV. CONCLUSION......................................................................................19

changes a past practice the agency must show that there are good reasons for its new policy. Sometimes an agency must provide a more detailed justification than what would suffice for a new policy created on a blank slate, such as when *its new policy rests upon factual findings that contradict those which underlay its prior policy*, or when the prior policy has engendered serious reliance issues that must be taken into account.

*Huvis Corporation v. United States*, 570 F.3d 1347, 1354-55 (Fed. Cir. 2009) (citations and internal quotations omitted) (emphasis added). In *Dupont Teijin*, the Court of International Trade rejected an argument that changing methodology would lead to greater accuracy because there was no change in relevant facts from the previous reviews to the one at issue – similar to the situation here. *DuPont Teijin Films China Limited v. United States*, 7 F.Supp.3d 1338, 1347-48 (Ct. Int'l Trade 2014). In the present case, Commerce has not indicated what change in facts concerning the use of the formulae supported a finding that its change in methodology would lead to greater accuracy nor why that change would apply only to ammonia gas and sulfuric acid and not to hydrogen and discharged chlorine gas.

With respect to Commerce's second rationale – that the surrogate values for ammonia gas and sulfuric acid were too high – that too does not explain a complete change in methodology. As has been stated, and this Court has recognized, Commerce has a specific practice for addressing situations where it considers the surrogate value for a by-product to be too high. Commerce chose not to employ that methodology in this case but has not explained why. In its decision this Court noted "Kangtai correctly points out … that Commerce's concern is really a 'capping' argument." *Clearon Corp. v. United States* ("2nd Remand Order"), No. 13-00073, 2015 WL 4978995 (Ct. Int'l Trade 2015) at *26. The Court went on to note "if the concern is simply over the proper per-unit valuation, one is left wondering: what, exactly, is the improvement of the new methodology over the old one?" *Id.* In its response, Commerce states with respect to the cited cases concerning Commerce's practice of "capping" that they "do not

8

support a rigid capping method, but instead confirm that Commerce calculates the offset based on the record at hand." Def. 2nd Remand Response at 37. In none of the cases cited did Commerce deduct the factors of production from a downstream product to "cap" the value of the by-product offset. *See, e.g., Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 64,318 (Oct. 18, 2011) and accompanying Issues and Decision Memorandum at Cmt 24 ("we valued Layo Wood's byproducts using the simple average of the surrogate values for Layo Wood's wood veneer and wood core inputs"); *Tapered Roller Bearings and Parts Thereof , Finished and Unfinished, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 3,987 (Jan. 22, 2009) and accompanying Issues and Decision Memorandum at Cmt 5 (did not use a surrogate value for the by-product that was higher than the cost of the finished good); *Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 75 Fed. Reg. 33,977 (June 16, 2008) and accompanying Issues and Decision Memorandum at Cmt 12 (did not use a surrogate value for the by-product that was higher than the cost of the finished good). In cases where the surrogate value for the by-product is higher than the surrogate value of the finished product the Department has capped at the average of the inputs, as it did in *Multilayered Wood Flooring*, and has stated that such behavior is its "practice." *See, e.g., Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 1,167 (Jan. 11, 2016) and accompanying Issues and Decision Memorandum at Cmt. 3 (capping the value of hydrogen by-product by the average of its input values, citing Commerce's "practice" to this effect); *Glycine*, 80 Fed. Reg. at Cmt 3 (did not cap

9

hydrochloric acid because surrogate value was lower than the surrogate values for the inputs but capped the ammonium chloride surrogate value at the average of the inputs); *Certain Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 Fed. Reg. 20,917 (Apr. 15, 2015) and accompanying Issues and Decision Memorandum at Cmt 21 (capping the value of coal by-products to the value of the coal input surrogate values). At no time has Commerce explained why it did not use its normal capping practice if it felt a cap was required for the ammonia gas surrogate value (the sulfuric acid surrogate value does not exceed the average value of the relevant inputs – sulfuric acid and urea). In other words, on the choice of "capping methodology" as Commerce now calls its complete change in methodology, Commerce also has failed to provide a rational connection between the facts found and the choices made.

### 2. Because the Accuracy of Commerce's New Methodology is at Issue in this Review, Critiques of the So-Called Accuracy of that Methodology are Within the Scope of this Remand.

Commerce incorrectly claims that the inaccuracies in Commerce's actual by-product offset calculation are outside the scope of this remand. Def. 2nd Remand Results at 38. In the first remand, the key issue was Commerce's reason for changing its methodology. In this second remand the alleged increased accuracy of that changed methodology is squarely before this Court.

In its initial response brief, Commerce requested a remand on the issue of by-product offset "{b}ecause Commerce did not provide an explanation for the new by-product valuation methodology." Defendant's Response to Plaintiffs' Rule 56.2 Motions for Judgment on the Agency Record, (Feb. 24, 2014) at 54 ("Def. Rule 56.2 Response Brf."). The Court granted that request. In Commerce's draft results of that first remand, in recalculating the by-product offset,

10

FORM 3.  Notice of Appeal to the United States Court of Appeals for the Federal Circuit from a          Form 3
Judgment or Order of the UNITED STATES COURT OF INTERNATIONAL TRADE  Rev. 03/16

## United States Court of International Trade

## Case Number 13-00073

| | |
|---|---|
| CLEARON CORP., and OCCIDENTAL CHEMICAL CORP., <br><br>          Plaintiffs, <br><br>   v. <br><br> UNITED STATES, <br><br>         Defendant, <br><br>   and <br><br> ARCH CHEMICALS, INC., and HEBEI JIHENG CHEMICAL CO., LTD., <br><br>         Defendant-Intervenors, <br><br>   and <br><br> JUANCHENG KANGTAI CHEMICAL CO., LTD., <br><br>         Defendant-Intervenors. | **NOTICE OF APPEAL** |

Notice is hereby given that Arch Chemicals, Inc., Consolidated Plaintiff and Defendant-

Intervenor in the above-named case hereby appeals to the United States Court of Appeals for the

Federal Circuit from the final judgment entered in this action on November 23, 2016 (Slip Op. 16-110).

/s/ Peggy A. Clarke
Peggy A. Clarke
Law Offices of Peggy A. Clarke
1325 G Street, NW
Suite 500
Washington, DC  20005
Telephone:  (202) 552-7407
Facsimile:  (202) 449-7701
e-mail:  peggy@peggyclarkelaw.com

Dated:  January 23, 2017                              *Counsel for Arch Chemicals, Inc.*

LAW OFFICES OF

# DeKieffer & Horgan

SUITE 800
729 FIFTEENTH STREET, N.W.
WASHINGTON, D.C. 20005
Affiliated Office
Saarbrücken, Germany

TELEPHONE
(202) 783-6900
Gregory S. Menegaz

FACSIMILE
(202) 783-6909
gmenegaz@dhlaw.com

November 30, 2011

ELECTRONIC FILING

Honorable John Bryson
Secretary
Room 1870
U.S. Dept. of Commerce
Washington, D.C. 20230

A-570-898
Pages:
AR: 6/1/2010-05/31/2011
AD/CVD Operations
Office 9

**Public Version**

Business Proprietary Information
has been deleted/ranged
contained within brackets on
pages C: 2, 8, 10, 12, 13, 18, 19;
D: 3, 5, 6, 12, 15, 19 and in
Exhibits C: 1, 2; D: 1-12.

**May be Released under APO**

RE: Certain Chlorinated Isocyanurates from the People's Republic of China
*Section C and D Questionnaire Response*

Dear Secretary Bryson:

On behalf of Juancheng Kangtai Chemical Co., Ltd. ("Kangtai"), an exporter of certain chlorinated isocyanurates from the People's Republic of China, we hereby submit their Section C and D questionnaire response.

\*     \*     \*

Certain information contained herein is business confidential data that is proprietary. This information is enclosed with brackets ("[ ]"). Disclosure of this information would cause

Appx4205

## SECTION D

## Factors of Production

## Juancheng Kangtai Chemical Co., Ltd
### &
## Juancheng Ouya Chemical Co., Ltd

## November 28, 2011

I. <u>General Explanation of Section D</u>

This section of the antidumping questionnaire instructs you on how to report the **factors of production** of the merchandise under consideration. Please refer to the cover letter to determine your reporting requirements.

A. Factors of Production

Factors of production (FOP) are used to construct the value of the product sold by your company in the United States. The Department will use the input amounts you report, along with the appropriate price from the chosen **surrogate country**, to construct the **normal value** of the merchandise under consideration sold by your company to the U.S. market. Surrogate values for overhead, selling, general and administrative (SG&A) expenses and profit will also be added. Unless otherwise instructed by the Department, you should report FOP information for <u>all</u> models or product types in the U.S. market sales listing submitted by you (or the exporter) in response to Section C of the questionnaire, including that portion of the production that was not destined for the United States. The reported amounts should reflect the FOPs used to produce one unit of the merchandise under consideration.

If you believe that your company uses any raw materials that should be classified as factory overhead expenses rather than valued as a FOP and directly included in normal value, please: 1) notify the Department official in charge, and 2) identify these materials in your first Section D questionnaire response. Your first Section D questionnaire response should contain a comprehensive list of all such materials you consider to be part of factory overhead. Please provide this information to the Department immediately, as this will afford your company and the Department sufficient time to evaluate your company's specific use of the raw material and to determine the most appropriate manner in which the raw material should be valued.

If you have any questions regarding how to compute the FOPs of the merchandise under consideration, please contact the official in charge <u>before</u> preparing your response to this section of the questionnaire.

1

Filed By: kerryhorgan@dhlaw.com, Filed Date: 11/30/11 11:52 AM, Submission Status: Approved

The data in these documents are recorded on an actual cost basis. **Kangtai normally keeps all accounting records no less than 10 years.**

4. Please provide a detailed explanation of any difference that may exist between the production records (both standard and actual) maintained by the company in the normal course of business by the production department, and the company's accounting records, with specific reference to the cost of production records used to tie the company's records to its financial statements.

**<u>Answer</u>: There is no difference between the production records and the accounting records.**

5. Please state whether the company maintains material consumption worksheets, cost-center codes, etcetera, that track the monthly consumption of inputs and outputs on a product-specific basis.

**<u>Answer</u>: Kangtai maintains material consumption worksheets in its normal course of operation, which are kept on a product-specific basis.**

B. Products

1. Report the total quantity of the merchandise under consideration produced in each facility during the POR.

**<u>Answer</u>: During the POR, Kangtai produced [        ] MT of the subject merchandise, including both TCCA and SDIC. Ouya produced [     ] MT of the merchandise under consideration during the POR.**

2. List the products your company produces. Identify all products manufactured using the same production facilities as the merchandise under consideration.

**<u>Answer</u>: Kangtai produces four products, TCCA, SDIC, CYA and ammonium sulfate. TCCA and SDIC are subject merchandise; CYA is the major material of TCCA and SDIC; and ammonium sulfate is the by-product of CYA. Each product is produced in**

5

PUBLIC VERSION

**different workshops using different production facilities.**

**Ouya produced SDIC, CYA and ammonium sulfate during the POR. Ammonium sulfate is the by-product of CYA production.**

III.    Inputs Purchased by the U.S. Customer from a Supplier in the NME Country

If your unaffiliated customer in the United States supplied you with inputs that it obtained from a supplier in the NME country where you produced the merchandise under consideration, please supply the following:

   A.  name of the input;

**Answer: One of Kangtai's U.S. customers provided [            ] to Kangtai for the packing.**

   B.  name and address of the NME supplier; and

**Answer: To the best of Kangtai's knowledge, the [            ] producer was [**

**   ]. Kangtai received the [                                   ] according to the U.S. customer's instructions.**

   C.  whether you obtained the input from any other source during the POR.

**Answer: Not applicable.**

IV.    Market Economy Inputs

List the inputs that your company purchased from a market economy supplier and paid for in a market economy currency during the POR. For raw material inputs and packing materials, please report the price you actually paid for a specified quantity of inputs. If you used a service (e.g., trucking) from a market economy supplier, and paid market economy currency, please report the price you actually paid for the service. For these prices, please provide the following information:

PUBLIC VERSION

Filed By: kerryhorgan@dhlaw.com, Filed Date: 11/30/11 11:52 AM, Submission Status: Approved

However, since Kangtai and Ouya used its well water free of charge, they submit that surrogate values should be zero for water consumption in the normal value calculation, irrespective of the quantity consumed.

**FIELD NUMBERS 6.1 - 6.n:     By-products or Co-Products**

FIELD NAME:    Various

DESCRIPTION:    Please note: By-product/co-product offsets are only granted for merchandise that is either sold or reintroduced into production during the POR, up to the amount of that by-product/co-product actually produced during the POR.  If you are claiming a by-product or co-product offset in your FOP database, please report each by-product or co-product in a separate field.  Further, in your narrative response, please:

    i. Provide a description of the by-product/co-product;

    ii. Provide an explanation why you have defined the products as by-products or co-products, as applicable;

    iii. Complete the Excel chart at Appendix VIII, identifying, by month, the quantity produced, sold, reintroduced into production, or otherwise disposed of (e.g., sold, returned to production of the merchandise under consideration, discarded).  You should complete a separate chart for each by-product or co-product;

    iv. Provide production records demonstrating production of each by-product/co-product during one month of the POR.  (Where possible, provide records for the same month for each by-product/co-product for which an offset is claimed);

    v. Provide evidence of the disposition of the by-products/co-products:

        1. If **sold,** provide evidence of the sales (e.g., invoices or internal records demonstrating the sale), as well as evidence of receipt of payment for the sale of the item for the **largest month of sales** for each by-product/co-product;

        2. If **reintroduced into production**, provide production records demonstrating this for the **largest month of consumption** for each by-product/co-product;

    vi. Provide a detailed explanation of how you derived the claimed offset amount for each claim; and

Appx4258

vii.   Provide the calculations used to derive each claimed amount.

If the by-product for which you are claiming an offset is a downstream by-product, in addition to responding to the items above, please also:

i.   Provide the per-unit usage rate of each input used to produce the downstream by-product; and

ii.   Provide a detailed narrative description of the production process used to generate the downstream by-product.

**Answer**: During the production of CYA, ammonia gas is generated.  Kangtai and Ouya use sulfuric acid to react with ammonia gas to generate ammonium sulfate.  Since the sulfuric acid and labor hours consumed to produce ammonium sulfate have already been captured in the consumption of the CYA workshop and reflected in the reported FOPs, and Kangtai and Ouya sold ammonium sulfate during the POR, Kangtai claims that this by-product, i.e. ammonium sulfate, should be treated as an offset.

Since all ammonium sulfate generated is sellable, Kangtai reported the amount of ammonium sulfate generated in Kangtai and Ouya's CYA workshops, and derived the average unit offset amount by dividing the total amount of ammonium sulfate generated in the POR by the total amount of CYA produced in the POR.

Kangtai and Ouya recorded the production and sales amount and value in their auxiliary journals.  Please refer to **Exhibit D-9** for the spreadsheet of the amount produced and sold during the POR in accordance with Appendix VIII. A sample by-product sale document is included in **Exhibit D-10**.

**FIELD NUMBER 7.1 - 7.n:**      **Packing Materials**

FIELD NAME:    Various

17

Appx4259

Appx4313

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

J. Christopher Wood
Direct: +1 202.955.8595
Fax: +1 202.530.9698
CWood@gibsondunn.com

January 17, 2012

**VIA IA ACCE**

The Honorable John Bryson                    Case No. A-570-898
Secretary of Commerce                    Total Pages: 28
U.S. Department of Commerce         6th AD Admin. Review: 6/01/10 – 5/31/11
Central Records Unit, Room 1870               IA/China/NME/Office 8
14th Street and Constitution Avenue, N.W.        **Public Docu en**
Washington, D.C. 20230

Re:    *Chlorinated Isocyanurates from the People's Republic of China (6th Antidumping
       Administrative Review):  Petitioners' Submission of Rebuttal Information Regarding
       Surrogate Values for Factors of Production*

Dear Secretary Bryson:

On behalf of Petitioners Clearon Corp. and Occidental Chemical Corporation, this

letter provides factual information to rebut or clarify surrogate value information submitted

on January 9, 2012 by Hebei Jiheng Chemical Company, Ltd. ("Hebei Jiheng") and

Juancheng Kangtai Chemical Co., Ltd. ("Kangtai").

### urro a e Value Da a  ub  i ed by  an ai

At Exhibit SV-9, Kangtai submitted the 2010 annual report of Vinythai Public

Company Ltd. ("Vinythai"), a Thai producer of plastics, as a source for financial ratios.  For

several reasons, the Vinythai annual report is not a usable source from which to calculate

financial ratios in this review.  First, the Vinythai annual report shows that the company has

benefited from programs that the Department has previously found to be countervailable.  In

particular, pages 17-18 of the annual report indicate that the Thai government has granted

exemptions to Vinythai and its subsidiary company from corporate income taxes and has

Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich · New York
Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

Appx4313

# E    IBIT

Filed By: cwood@gibsondunn.com, Filed Date: 1/17/12 3:21 PM, Submission Status: Approved

## A era e P ili ines Dealers Prices or Urea Durin e Period o Re ie

| | May-11 | Apr-11 | Mar-11 | Feb-11 | Jan-11 | Dec-10 | Nov-10 | Oct-10 | Sep-10 | Aug-10 | Jul-10 | Jun-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Price | 1,098.88 | 1,100.84 | 1,096.99 | 1,085.59 | 1,085.52 | 1,014.93 | 973.08 | 952.45 | 919.79 | 927.85 | 953.47 | 984.52 |

[1] Pesos per sack of 50 kilograms.

Source: Philippines Bureau of Agricultural Statistics, "Updates on Fertilizer Prices", May 2011, March 2011, January 2011, November 2010, September 2010, July 2010.

1012191S7.1

Filed By: cwood@gibsondunn.com, Filed Date: 1/17/12 3:21 PM, Submission Status: Approved



ISSN-2012-4899

**BUREAU OF AGRICULTURAL STATISTICS**

**UPDATES** *on* **FERTILIZER PRICES**

| Volume 3 | No. 5 | | May 2011 |
|---|---|---|---|

❖ **The May 2011 national average dealers' prices of fertilizer, except Urea were, higher than the April 2011 quotations.**

❖ **Relative to last year's records, the dealers' prices of all fertilizer grades in May 2011 increased.   Price gains ranged from 0.55% to 10.38%.**

❖ **Across regions, the average dealers' prices in May registered varied movements from last month's and last year's records.**

**A. UREA**

o The average dealers' price of Urea in May 2011 was P1,098.88/sack.  This was **down** by 0.18% from last month's price but was **up** by 9.83% from last year's price.

o In most regions, prices were **lower** this month compared to previous month's levels.  Price reductions ranged from 0.07% in Ilocos Region to 2.01% in MIMAROPA. Prices were **higher** in Western Visayas by 1.78%, in Central Visayas by 0.06%, in Davao Region by 0.53% and in ARMM by 0.21%.



Monthly Dealers' Prices of UREA
Philippines, 2009-2011

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on    7/13/2017
by:

☐ U.S. Mail

☐ Fax

☐ Hand

☒ Electronic Means (by E-mail or CM/ECF)

Gregory S. Menegaz                                    /s/ Gregory S. Menegaz

Name of Counsel                                    Signature of Counsel

Law Firm                    deKieffer & Horgan, PLLC

Address                    1090 Vermont Ave., NW, Suite 410

City, State, Zip              Washington, DC 20005

Telephone Number          202-783-6900

Fax Number                n/a

E-Mail Address            gmenegaz@dhlaw.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields